```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,      )  Case No. 5:21-cr-259
 4                                  )
                   Plaintiff,       )
 5                                  )  Cleveland, Ohio
            vs.                     )  Tuesday, January 16, 2024
 6                                  )  1:27 p.m., Courtroom 15A
     RONALD DiPIETRO,               )
 7   CHRISTOS KARASARIDES, JR.,     )
     and CHRISTOPHER KARASARIDES,   )  TRIAL BY JURY
 8                                  )
                   Defendants.      )
 9   _____)  Volume 1, Pages 1 - 118

10

11
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
12
                 BEFORE THE HONORABLE DONALD C. NUGENT,
13                SENIOR UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Plaintiff:

17        OFFICE OF THE U.S. ATTORNEY - AKRON
          BY:  AARON P. HOWELL, AUSA
18        2 South Main Street, 208 Federal Building
          Akron, OH 44308
19        (330) 352-0993

20   (Appearances continued on Page 2)

21   COURT REPORTER:

22        Heather K. Newman, RMR, CRR
          U.S. District Court, Northern District of Ohio
23        801 West Superior Avenue, Court Reporters 7-189
          Cleveland, OH 44113
24        (216) 357-7035 or heather_newman@ohnd.uscourts.gov

25   Proceedings reported by machine shorthand; transcript
     produced by computer-aided transcription.
```

1    APPEARANCES CONTINUED:

2   For the Plaintiff:

3       U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
          BY:  SAMUEL B. BEAN, AUSA
4            HAYTER L. WHITMAN, AUSA
          150 M Street NE
5        Washington, DC 20002
          (202) 514-3774

6

7   For the Defendant Ronald DiPietro:

8       LAW OFFICE OF ROBERT J. FEDOR
          BY:  ROBERT J. FEDOR, ESQ.
9            BENJAMIN C. HEIDINGER, ESQ.
          23550 Center Ridge Road, Suite 107
10      Westlake, OH 44145
          (440) 250-9709

11  For the Defendant Christos Karasarides, Jr.:

12      LAW OFFICE OF MICHAEL J. GOLDBERG
         BY:  MICHAEL J. GOLDBERG, ESQ.
13          ADAM J. PARKER, ESQ.
         323 Lakeside Place, Suite 450
14      Cleveland, OH 44113
         (216) 696-5414

15

16  For the Defendant Christopher Karasarides:

17      JAMES M. KERSEY, ESQ.
         1360 East Ninth Street
         600 IMG Building
18      Cleveland, OH 44114
         (216) 241-3470

19

20            *   *   *   *   *

21

22

23

24

25

1                          Table of Contents

2
      Witnesses/Events                                    Page
3
      OPENING STATEMENT BY THE PLAINTIFF                     4
4
      OPENING STATEMENT BY DEFENDANT DIPIETRO               17
5
      OPENING STATEMENT BY DEFENDANT CHRISTOS KARASARIDES   24
6
      OPENING STATEMENT BY DEFENDANT CHRISTOPHER            32
7     KARASARIDES

8     GARRET JORDAN                                         39

9         Mr. Bean - Direct                                 39
          Mr. Fedor - Cross                                 94
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
|        | 1  | CLEVELAND, OHIO; TUESDAY, JANUARY 16, 2024; 1:27 P.M.         |
|        | 2  | --oOo--                                                      |
|        | 3  | P R O C E E D I N G S                                        |
| 01:27:48 | 4  | (Jury returned to courtroom at 1:27 p.m.)                  |
| 01:27:48 | 5  | COURTROOM DEPUTY:  All rise for the jury.                   |
| 01:28:21 | 6  | Court is in session.  Please be seated.                    |
| 01:28:23 | 7  | THE COURT:  Good afternoon, ladies and                     |
| 01:28:25 | 8  | gentlemen.                                                  |
| 01:28:25 | 9  | THE JURY:  Good afternoon.                                  |
| 01:28:27 | 10 | THE COURT:  I woke you up.                                  |
| 01:28:28 | 11 | Next order of business, as I mentioned, will be            |
| 01:28:31 | 12 | opening statements of the lawyers.  That means each side has |
| 01:28:34 | 13 | a chance to stand before you and give you like a summary or |
| 01:28:38 | 14 | an outline of what they expect the evidence to show.        |
| 01:28:43 | 15 | Don't substitute what a lawyer says for the actual          |
| 01:28:46 | 16 | evidence.  What lawyers say isn't evidence at all.  It just |
| 01:28:49 | 17 | is an effort to assist you in understanding and kind of get |
| 01:28:52 | 18 | an idea of what you might expect during the course of the   |
| 01:28:54 | 19 | trial.                                                      |
| 01:28:55 | 20 | And again, because the government has the burden of         |
| 01:28:56 | 21 | proof, they go first.  So, Aaron.                          |
|        | 22 | - - - - -                                                  |
| 01:29:00 | 23 | OPENING STATEMENT BY THE PLAINTIFF                         |
| 01:29:00 | 24 | MR. HOWELL:  Thank you, Judge.                             |
| 01:29:01 | 25 | May it please the Court, counsel, members of the jury:     |

**Opening by Plaintiff (Howell)**                    5

01:29:19    1        Christos Karasarides and Ron DiPietro owned and

01:29:27    2    operated an illegal gambling business down in Canton, Ohio,

01:29:31    3    named the Skilled Shamrock.

01:29:32    4        From 2012 through 2017, that illegal gambling business

01:29:36    5    involving slot machines brought in over $34 million in cash.

01:29:44    6        You will hear evidence, see exhibits, and you will see

01:29:48    7    that Christos Karasarides and Ron DiPietro took a series of

01:29:54    8    steps to conceal their ownership of that illegal business

01:29:58    9    and to hide the lucrative profits that they made from that

01:30:03   10    business.

01:30:04   11        You will also learn that during the time that

01:30:08   12    Mr. Karasarides is operating this illegal gambling business,

01:30:11   13    among other illegal gambling businesses that he was running,

01:30:15   14    at that time he owned the IRS a couple million dollars in

01:30:20   15    tax debt, unrelated tax debt.

01:30:25   16        And you will see and you will hear from witnesses,

01:30:29   17    series of witnesses, and you will learn that Christos's son

01:30:36   18    Christopher, co-defendant Ron DiPietro, and several other

01:30:41   19    individuals, some of them professionals, conspired with

01:30:45   20    Christos Karasarides to engage in a pattern of acts to

01:30:51   21    conceal the income and the assets that Christos Karasarides

01:30:56   22    had in an effort to help him evade paying that debt.

01:31:02   23        Those acts include Ron DiPietro, who is also, in

01:31:08   24    addition to running illegal gambling businesses, is a

01:31:11   25    certified public accountant, CPA.  And you will learn that

01:31:17   1   Ron DiPietro made several false statements to the IRS on

01:31:19   2   behalf of Christos Karasarides, his business partner, about

01:31:24   3   him not having any income, no money to be able to pay this

01:31:28   4   debt.

01:31:28   5        You will learn that Christopher Karasarides engaged in

01:31:33   6   several business transactions, presented false promissory

01:31:37   7   notes, put businesses in his name, did transactions with his

01:31:41   8   father's money in his name to conceal the money that his

01:31:44   9   father had so he wouldn't have to pay that debt.

01:31:48  10        You're going to learn that in July of 2018, a couple

01:31:53  11   of hundred federal agents from around the United States all

01:31:58  12   came to this area, met down in Independence, a little bit

01:32:03  13   south of here.  And the following day, on July 11st of 2018,

01:32:08  14   they executed a series of over 30 search warrants at

01:32:12  15   different locations, simultaneously.

01:32:15  16        You're going to get to see and hear evidence that they

01:32:17  17   recovered from those search warrants, search warrants at

01:32:22  18   Christopher and Christos Karasarides' home down in Canton,

01:32:29  19   Ohio.  You'll see photographs from that house, you'll see

01:32:32  20   documents.

01:32:33  21        Ron DiPietro's residence, his accounting business,

01:32:41  22   several of the illegal gambling businesses were searched,

01:32:43  23   items were seized.

01:32:44  24        You're going to hear from a number of individuals who

01:32:46  25   were involved and were co-owners of these illegal businesses

01:32:49   1   with Christos and Ron DiPietro.

01:32:51   2        You'll hear from some individuals who were

01:32:54   3   co-defendants, co-conspirators, who pled guilty and agreed

01:32:59   4   to come in here and tell you about what they did and what

01:33:02   5   they know about what these others did.

01:33:04   6        And at the end of this case, after you do hear all

01:33:06   7   that evidence, we're going to ask you to hold the defendants

01:33:10   8   responsible and find them guilty of every count in the

01:33:12   9   indictment.

01:33:15  10        But to truly understand how we got here, we have to go

01:33:18  11   back to 2009.  In 2009 is when Christos Karasarides and Ron

01:33:27  12   DiPietro conspired, agreed, got together and started to run

01:33:30  13   the illegal gambling business named Skilled Shamrock.

01:33:35  14        Now, I mentioned illegal gambling business a few

01:33:38  15   times.  I mentioned slot machines.  And many of you probably

01:33:41  16   know what a slot machine is.  You've been to a casino.  You

01:33:43  17   pull the handle down, the wheels spin, and if the things

01:33:46  18   match up, you may win money.

01:33:50  19        Well, Skilled Shamrock had several machines like that,

01:33:55  20   computer screens, touch screens that you could select

01:33:57  21   different games on, games like Keno, poker, or the spin and

01:34:04  22   win.  The same type of thing where you pull the slot on a

01:34:07  23   slot machine, you press the button, it spins.  If you line

01:34:11  24   them up, you get a ticket and let the cashier know.  They

01:34:16  25   come over and they pay you cash for your winnings.

01:34:20   1        And much like a slot machine, these machines also had

01:34:23   2   a bill collector.  The customer put their cash in, and if

01:34:27   3   they won, they get a ticket and they get paid out in cash.

01:34:31   4        You will also learn that just like slot machines,

01:34:37   5   these machines were able to be set to determine the odds,

01:34:42   6   the winning percentages.  They could be set by the owners,

01:34:45   7   people that have access to the keys, to determine how much

01:34:48   8   people were going to be able to win, all in violation of

01:34:51   9   Ohio and federal law.

01:34:53  10        You will hear from one of the co-owners of that

01:34:57  11   business that Christos Karasarides and Ron DiPietro,

01:35:01  12   eventually they brought in an individual name Jason Kachner.

01:35:04  13   You will hear from him.  He was indicted in this case, pled

01:35:08  14   guilty to operating that and tax violations.  He agreed to

01:35:11  15   come in here and testify.

01:35:12  16        You're going to learn, he'll tell you about how this

01:35:17  17   business was run, tell you exactly how I just explained how

01:35:22  18   those machines worked.

01:35:24  19        He'll also tell you about that there were weekly

01:35:27  20   audits.  At the end of each week, Mr. DiPietro would often

01:35:31  21   send a representative, sometimes it was his son, Tristan

01:35:34  22   DiPietro, other times it was one of his employees, Michael

01:35:37  23   Moneypenny, a woman named Trina, to show up at these weekly

01:35:41  24   audits at the end of week.  Mr. Kachner would be there.

01:35:54  25        Mr. Kachner would show up.  They'd go through the

**Opening by Plaintiff (Howell)**                    9

01:35:59  1    weekly audits.  They'd go through and they'd see how much

01:36:01  2    cash came into every one of the machines in this building,

01:36:04  3    how much cash went out, how much expenses they had and what

01:36:07  4    the profits were.

01:36:10  5         And during that time frame, Mr. DiPietro and his

01:36:15  6    representative would keep track of all that on a

01:36:22  7    spreadsheet, would have the money coming in for every

01:36:23  8    machine that was in there, money going out.  And then there

01:36:27  9    was categories for the profits to be spread amongst Christos

01:36:33  10   Karasarides, Jason Kachner, and Ron DiPietro.

01:36:39  11        Jason Kachner will tell you that he provided those

01:36:42  12   proceeds and the share of that to Christos Karasarides.

01:36:49  13        I mentioned before that they took a series of steps to

01:36:53  14   conceal their ownership.  They used nominee owners.  What I

01:36:58  15   mean by that is as opposed to putting their name to this

01:37:02  16   business, they would get an individual, typically someone

01:37:04  17   that had worked at the store before, maybe only made $10 and

01:37:08  18   hour, and say, hey, want to make more money.  They'd -- they

01:37:13  19   would pay that individual a fee for them to agree to put

01:37:16  20   their name tied to that illegal business.

01:37:21  21        If there was a lease with the building, example of

01:37:23  22   Skilled Shamrock, you'll hear from Derek Phillips who will

01:37:26  23   come in here and testify that he was approached by them and

01:37:29  24   asked to do that, put the lease for the building in his

01:37:33  25   name.  Went and got a zoning permit from the township in his

01:37:40  1    name.

01:37:40  2          Why would they do that?

01:37:43  3          Because they want to distance themselves from the

01:37:46  4    illegal business.  That's what Derek Phillips will tell you,

01:37:49  5    that he was paid a weekly fee for doing that.

01:37:52  6          As I mentioned, Christos Karasarides also was running

01:37:56  7    other illegal gambling businesses.  One of those other

01:37:59  8    illegal gambling businesses was just down the road from the

01:38:04  9    Skilled Shamrock.  It was called Redemption.

01:38:08  10         Mr. Karasarides was a co-owner with Jason Kachner as

01:38:14  11   well.  And he will tell you how lucrative that business was.

01:38:18  12   It was even bigger that Skilled Shamrock.  More machines.

01:38:20  13         There was another co-owner, Larry Dayton.  Jason

01:38:23  14   Kachner will talk about how they did the weekly audits there

01:38:26  15   as well.

01:38:27  16         You'll hear from Ronnie Hull.  Ronnie Hull was Jason

01:38:32  17   Kachner's right-hand man.  He was his manager, so he would

01:38:36  18   do the weekly audits as well.  They would divvy up the cash.

01:38:40  19         You'll hear from Christos Karasarides' nephew, Thomas

01:38:47  20   Helmick.  Christos Karasarides convinced his nephew, Thomas

01:38:52  21   Helmick, to be the nominee owner of Redemption.  Put the

01:38:56  22   business in his name, the utilities.  Told him, it's the

01:39:02  23   easiest job you'll ever have, easy money.  That he was paid

01:39:08  24   a fee for doing that.

01:39:09  25         The only thing he really had to do, go buy supplies

01:39:11  1   every once in a while.  Not only buy supplies for

01:39:15  2   Redemption, but while you're at it, go get supplies for my

01:39:19  3   other business down the street, Skilled Shamrock, and go

01:39:22  4   provide those over there.

01:39:23  5       Thomas Helmick was indicted and pled guilty in this

01:39:25  6   case.  He will testify -- he will talk to you about his plea

01:39:29  7   agreement.  He'll come in here and tell you about his

01:39:31  8   involvement in Redemption and what Christos Karasarides

01:39:35  9   asked him to do to conceal Christos's ownership.

01:39:41  10      I mentioned July 11th of 2018 that there was a series

01:39:57  11  of search warrants executed.  Thomas Helmick will tell you

01:40:00  12  that he was a -- was woken up that day by federal agents

01:40:04  13  knocking on his door, executed a search warrant at his

01:40:07  14  residence, seized a large amount of cash from his house.  As

01:40:13  15  part of his plea agreement, he agreed to forfeit that.

01:40:15  16      You're going to hear recorded telephone calls in which

01:40:22  17  Thomas Helmick, Christopher Karasarides, and Christos

01:40:26  18  Karasarides talk about those search warrants and what was

01:40:29  19  happening.

01:40:36  20      You'll hear recorded calls between Christos

01:40:41  21  Karasarides and his nephew, Thomas Helmick, discussing that

01:40:45  22  he thought that we could get 20 or $30,000 for the machines

01:40:49  23  that were in Redemption after it was shut down by federal

01:40:52  24  agents on July 11th, 2018.

01:41:01  25      You'll hear recorded calls between Christos

**Opening by Plaintiff (Howell)**                                    12

| | |
|---|---|
| 01:41:05 | 1 |
| 01:41:10 | 2 |
| 01:41:14 | 3 |
| 01:41:19 | 4 |
| 01:41:24 | 5 |
| 01:41:27 | 6 |
| 01:41:32 | 7 |

1   Karasarides and Christopher Karasarides.  You'll hear

2   Christopher Karasarides talking to his father saying, hey,

3   federal agents seized some keys from my wallet and I'm

4   worried about it.  Immediately, Christos Karasarides knew

5   exactly what his son was talking about.  What he was talking

6   about is a safe deposit box that Christopher put in his name

7   to conceal $239,000 in cash of Christos's money.

8        You'll hear Christos tell his son, get busy.  Get down

9   there and try to get another key.  Not knowing that the

10  agents were already down there.  Christopher expressing

11  concern, that safe deposit box is in his name.

12       You'll hear from Thomas Helmick who is familiar with

13  his cousin Christopher.  No way he's making that type of

14  money.

15       You'll hear later phone calls between Christos

16  Karasarides and Christopher giving him instructions, telling

17  him, well, I gave you that money, that's my money, don't you

18  worry about it.

19       You'll hear that there was $152,000 in cash seized

20  from Christos and Christopher's residence in Canton, Ohio,

21  on July 11th, 2018.

22       You'll hear that Christopher, in addition to getting

23  that safe deposit box, concealing that cash, also engaged in

24  real estate transactions on behalf of his father but did

25  them in his name.  You'll hear that he went and bought a

01:42:54  1   commercial property, an old restaurant.

01:42:57  2       You'll hear from the individual that sold that

01:43:00  3   restaurant, Mike Kazes.  Mike Kazes will tell you that even

01:43:08  4   though Christopher's name is on the check, all of his

01:43:11  5   dealings were with Christos, and that Christos came to him

01:43:17  6   with the money but said, hey, let's make this deal for -- on

01:43:21  7   paper look like $280,000.  Here's $30,000 cash on top of

01:43:26  8   that so it will 310, but let's mark it down as 280.

01:43:31  9       You're going to hear from individuals that also helped

01:43:36  10  Christos Karasarides remain out of that transaction at least

01:43:41  11  on paper.  You're going to hear from individuals that

01:43:45  12  Christos Karasarides approached, one of which he was aware

01:43:50  13  had recently won the lottery.  Another individual, it was

01:43:56  14  like a relative that he knew had money.  Approached them and

01:44:00  15  said, hey, Roger Steed, give me $70,000, write me out a

01:44:08  16  check as an investment in this restaurant that I'm going to

01:44:11  17  buy over here.  Put it down as it's an investment, it's a

01:44:15  18  loan.  If anybody ever asks you about it, tell them you've

01:44:18  19  never been paid on it.  And turns around and pays him that

01:44:23  20  $70,000 in cash back, nothing showing that transaction, keep

01:44:28  21  himself out of it.

01:44:30  22      You'll hear from Michelle Kenst.  She issued a check,

01:44:38  23  Christos Karasarides.  Her significant other at that time

01:44:40  24  was Harold Young.  It's a friend of Christos Karasarides.

01:44:43  25  Mr. Young has since pass away.  They provided a check for

**Opening by Plaintiff (Howell)**                    14

01:44:47  1    $50,000.  And you'll learn that they got that back in cash.

01:44:53  2         You'll learn that they were given instructions.  Roger

01:44:57  3    Steed, when agents come talking to him about this

01:45:00  4    transaction, pleads ignorance:  No, I haven't got my money

01:45:07  5    back, I'm really upset about it too.  Lied to us.  Later

01:45:12  6    comes in and tells us:  Christos told me just to stay strong

01:45:18  7    and they'll have nothing.  The only people that know about

01:45:21  8    this transaction are you and I.  If you stay strong, they'll

01:45:22  9    never know.

01:45:22  10        As you hear the evidence in this case, as I mentioned,

01:45:25  11   there's going to be other people coming in and telling you

01:45:28  12   similar things that Christos asked them to do.  See a

01:45:31  13   similar pattern.

01:45:36  14        As I mentioned, Roger Steed lied to federal agents,

01:45:49  15   federal authorities, about what was going on in that

01:45:51  16   transaction.  They were all well aware that the feds were

01:45:55  17   looking at this.

01:45:59  18        As I mentioned, on paper, looks like Christopher

01:46:03  19   Karasarides is the owner of that business.  So once they

01:46:07  20   realized the feds are coming around, what does Christopher

01:46:09  21   do?  They come up with a promissory note.  Christopher goes

01:46:13  22   and delivers it, giving the terms of this deal when these

01:46:21  23   folks have already been paid back their cash.  Fake

01:46:24  24   promissory notes from Christopher.

01:46:27  25        You'll hear that Christos Karasarides was involved in

01:46:38   1    other business ventures.  He decided to put Christopher as

01:46:45   2    being the person involved in those.

01:46:48   3         And you'll learn that Christopher was well aware of

01:46:50   4    his father's tax debt because you're also going to hear that

01:46:56   5    as part of an attempt to settle that tax debt, Christopher

01:47:00   6    sent a check to the IRS.  So he's well aware what's going on

01:47:04   7    when he's taking all these actions.

01:47:07   8         You're also going to hear from an individual, friend

01:47:11   9    of Christopher's, who approached Christopher at one point

01:47:15  10    and said, I know what the business you're dad's in, can you

01:47:18  11    get me a job, and Christopher obliged.

01:47:28  12         You're going to hear that after all this

01:47:31  13    investigation's going on, Christopher, along with his

01:47:35  14    father, then go in and file amended tax returns claiming

01:47:40  15    interest in this business, knowing full well that it's his

01:47:44  16    father.  Another attempt to conceal the assets and income of

01:47:49  17    Christos Karasarides.

01:47:50  18         You will hear from Christopher's tax preparer, will

01:47:53  19    testify in this case.

01:47:56  20         You're going to hear from Tony Bragg.  Tony Bragg was

01:48:03  21    operating an illegal gambling business right around the same

01:48:09  22    area with Christos Karasarides called Plaza 777.  Same type

01:48:15  23    of business as Redemption and Skilled Shamrock.  Tony Bragg

01:48:17  24    is the cousin of Christos Karasarides' wife, Melissa Bragg.

01:48:22  25         Tony Bragg will tell you about the investment, the

01:48:24  1    cash that both of them put into this business.  Tell you

01:48:28  2    that they took one of their young relatives, put her as the

01:48:31  3    nominee owner of that one, much like they did with Thomas

01:48:34  4    Helmick of Redemption.

01:48:41  5         You'll also hear from Tony Bragg that he was

01:48:44  6    approached by Christos Karasarides and asked if he would

01:48:48  7    give him a $50,000 check, check as an investment into this

01:48:54  8    job that Christos claimed that he had, a legitimate job;

01:48:58  9    that Tony Bragg did that, was paid back in cash.

01:49:04  10        And you're going to learn that that transaction and

01:49:08  11   the motivation for Christos to do that is to make it look

01:49:11  12   like he had a legitimate job.  And it turns out, he's

01:49:13  13   actually funding the salary of his own job.

01:49:23  14        As I mentioned, Ron DiPietro is not just a co-owner

01:49:26  15   and an operator of an illegal gambling business.  He's a

          16   certified public accountant.

01:49:30  17        I mentioned Jason Kachner.  Jason Kachner and his

01:49:34  18   wife, Rebecca Kachner, who was also indicted in this case,

01:49:38  19   Ron DiPietro was their tax preparer.  Jason Kachner will

01:49:43  20   tell you that he's in business with Ron DiPietro in the

01:49:50  21   illegal gambling business, the Skilled Shamrock.  Ron

01:49:53  22   DiPietro's well aware of that, obviously, the weekly audits.

01:50:01  23        That Ron DiPietro and Jason Kachner come up with, you

01:50:05  24   got to put something down.  You got to claim some income

01:50:07  25   here.  Why don't you say you're a handyman?  Ron DiPietro

01:50:10  1   helped him prepare a tax return saying he's a handyman.

01:50:13  2   Nowhere will you hear a mention of Skilled Shamrock or

01:50:16  3   Redemption on his tax returns.

01:50:22  4        Ron DiPietro prepared Christos Karasarides's tax

01:50:27  5   returns on multiple occasions.  No mention, Skilled

01:50:30  6   Shamrock, Redemption.  False returns.

01:50:39  7        That's why I mentioned to you before, as you hear this

01:50:41  8   evidence, you may sit there and wonder why would a certified

01:50:44  9   public accountant do this?  The business that they were

01:50:48  10  in -- this is just a further step to conceal that illegal

01:50:51  11  gambling business.

01:50:57  12       Members of the jury, throughout this case, the

01:51:01  13  evidence that we bring to you, you're going to get a glimpse

01:51:06  14  behind the curtain of the organized criminal operation that

01:51:09  15  Christos Karasarides, Ron DiPietro, and with the help of

01:51:11  16  others, including Christopher Karasarides, were running down

01:51:14  17  in Canton, Ohio.  And at the end of this case, after you

01:51:18  18  hear all the evidence, I'm going to stand back up here and

01:51:21  19  I'm going to ask you to find them guilty.

01:51:24  20       Thank you.

01:51:26  21            THE COURT:  Thank you.

01:51:27  22       Mr. Fedor.

          23                 - - - - -

01:51:36  24       OPENING STATEMENT BY DEFENDANT DIPIETRO

01:51:36  25            MR. FEDOR:  Thank you very much, Judge.

01:51:38   1        And members of the jury, ladies and gentlemen, good

01:51:41   2    afternoon.

01:51:41   3        My name is Robert Fedor, and I represent Mr. Ronald

           4    DiPietro.

01:51:46   5        If you could stand for a moment so they can see,

01:51:49   6    Mr. DiPietro.  Thank you.

01:51:50   7        Mr. DiPietro has been a CPA since 1985.  Never been in

01:51:53   8    trouble in the past.  Prepared returns.  Has a full-time

01:51:58   9    accounting firm.  That's what he does.

01:52:01  10        And what you've just heard from the government is

01:52:04  11    essentially there's two issues here:  Gambling and

01:52:07  12    tax-related issues.

01:52:08  13        The government would have you believe that

01:52:10  14    Mr. DiPietro was an owner of the Skilled Shamrock gaming

01:52:13  15    room, which he was not.

01:52:16  16        The government would have you believe that

01:52:18  17    Mr. DiPietro assisted Mr. Karasarides and lied to the IRS,

01:52:23  18    made false statements, submitted false documents, and that's

01:52:27  19    not accurate.  And you will see evidence and you will hear

01:52:29  20    from witnesses that will explain that.

01:52:32  21        Really what happened, 2009 and 2010, Mr. DiPietro did

01:52:37  22    previously operate a gaming room, and he got out of the

01:52:41  23    business.  You'll hear from witnesses that will talk about

01:52:45  24    him getting out of the business, Billy Pool, his partner,

01:52:49  25    and meeting with Jay Porter, an attorney from Akron, Ohio,

01:52:54   1    with the law firm of Vorys, Sater, Seymour and Pease.

01:52:58   2         Mr. Porter met with Mr. Pool, met with the defendant,

01:53:01   3    Mr. DiPietro, and set up a leasing business.  He got out of

01:53:04   4    the business and thereafter leased gaming machines to

01:53:09   5    different gaming rooms for several years thereafter.

01:53:12   6         There are tax returns filed each and every year.  All

01:53:16   7    of the income is reported each and every year on the

01:53:20   8    leasing -- on the leasing business tax returns.

01:53:24   9         There was something called UCC filings which were made

01:53:27  10    with the Secretary of State of Ohio which securitizes the

01:53:31  11    gamings.  So if, in fact, something illegal was going on in

01:53:36  12    the gaming room, RNB Leasing, a company owned -- "R" is Ron

01:53:39  13    DiPietro, "B" is Billy Pool, they could take back these

01:53:42  14    machines if in fact there was wrongdoing going on.

01:53:44  15         So you're going to hear from witnesses that will

01:53:47  16    testify about that arrangement.  You will see the different

01:53:49  17    drafts of the lease agreements, the different amendments to

01:53:52  18    the lease agreements and the different -- the different

01:53:57  19    pieces of substance which were included as part of that.

01:53:59  20         You'll also see that Attorney Jay Porter advised RNB

01:54:07  21    Leasing, Billy Pool, and Mr. DiPietro to conduct weekly

01:54:10  22    audits, and that is what the government's referencing,

01:54:13  23    weekly audits.

01:54:14  24         Mr. DiPietro is a CPA.  He's good with numbers.  He

01:54:17  25    conducted weekly audits.  He filed accurate tax returns and

01:54:21  1   wanted to make sure that the business received the portion

01:54:24  2   of income it was entitled to from the machines.  They were

01:54:33  3   RNB Leasing machines which were installed in the stores,

01:54:36  4   Mr. DiPietro, Mr. Pool had paid for.  You will see how they

01:54:38  5   are depreciated on the tax returns and how the ownership was

01:54:41  6   taken.

01:54:41  7        And Mr. Porter will advise exactly what was required

01:54:44  8   to get -- put in place a lease agreement with the stores,

01:54:48  9   how to collect it, how to account for it.

01:54:51  10       And the one important thing that you didn't hear from

01:54:53  11  the government in its opening was, Mr. DiPietro has not

01:54:57  12  been -- it's not been alleged that he underreported his

01:55:00  13  income.  He's not charged with that.  Mr. DiPietro, RNB

01:55:04  14  Leasing, has reported all of its income on all of its tax

01:55:07  15  returns.  That is not part of this case, and those are not

01:55:10  16  part of the charges.

01:55:11  17       It is only the allegation that Mr. DiPietro assisted

01:55:17  18  Mr. Karasarides in not paying the IRS.  It's called evasion

01:55:21  19  of payment.  And so, there's allegations made by the

01:55:25  20  government in the indictment that Mr. DiPietro made a

01:55:28  21  statement on this certain date in 2013, Mr. DiPietro made

01:55:32  22  another statement, submitted a false document to the IRS.

01:55:35  23  That is assisting -- that is the allegation, that

01:55:39  24  Mr. DiPietro was assisting Mr. Karasarides avoiding his

01:55:43  25  taxes.

01:55:43  1    What happened was, actually, Mr. DiPietro, you will

01:55:46  2  see from the evidence, you will hear from IRS revenue

01:55:50  3  officer David Ross, and you will see his history of

01:55:54  4  communications with the IRS, with Mr. DiPietro, and with

01:55:58  5  Mr. Karasarides, about Mr. DiPietro did everything in his

01:56:02  6  power to cooperate with the IRS, told the IRS exactly where

01:56:04  7  the assets were that they could go retrieve and pay down the

01:56:09  8  IRS liabilities.  And when Mr. DiPietro was no longer able

01:56:13  9  to resolve the liabilities, he referred it out to an

01:56:16  10  attorney to resolve the liabilities.

01:56:17  11    You will hear from Attorney Matt Yackshaw, who is with

01:56:26  12  the law firm of Day Ketterer in Akron, Ohio, who submitted a

01:56:29  13  deal to the IRS.  It's called an offer in compromise.  And

01:56:33  14  Mr. Yackshaw submitted a deal for $72,000 to resolve all of

01:56:37  15  Mr. Karasarides' tax problems.  And the problem was it

01:56:40  16  wasn't complete.

01:56:40  17    But you don't see Mr. Yackshaw sitting at this table

01:56:46  18  today.  He's not charged.  You will see the documents that

01:56:49  19  Mr. Yackshaw provided.  You will see the testimony that

01:56:51  20  Mr. Yackshaw provided, and he will testify.  And he made

01:56:54  21  matters worse for Mr. Karasarides in all actuality.

01:56:56  22    And so Mr. Karasarides had liabilities.  Mr. DiPietro

01:56:59  23  tried to resolve those liabilities, worked proactively with

01:57:02  24  the IRS, provided all the documents that the IRS ever wanted

01:57:05  25  to see, everything in his file to the IRS, and he worked all

01:57:09  1    along with them the entire time.

01:57:10  2         So we have that issue, and then we have the

01:57:13  3    preparation issue.

01:57:14  4         So Mr. DiPietro, as a CPA, is accused of false

01:57:18  5    preparation of tax returns.  One of the things that's not

01:57:20  6    even mentioned was he didn't even prepare a return for

01:57:24  7    Kachner for one or more of those tax years.  It was someone

01:57:28  8    else in his office.

01:57:29  9         You will hear from Leah Stark who prepared that tax

01:57:32  10   return, who will testify she was the one that prepared the

01:57:34  11   return.  And you will see different evidence submitted.

01:57:38  12        And I don't know how many of the members of the jury

01:57:41  13   here have worked with CPA firms versus small tax preparation

01:57:46  14   firms.  This is the type of accounting firm where the client

01:57:48  15   comes in January, February, March.  They have their W-2s,

01:57:52  16   they have they're 1099s, they have their tax documentation.

01:57:56  17   Mr. DiPietro and/or others in the office would prepare the

01:57:58  18   returns, face to face, complete it in 20 minutes,

01:58:03  19   30 minutes, and then go about their way.

01:58:06  20        Mr. DiPietro and his accounting firm, Ron &

01:58:10  21   Associates, which is what the name of it is, were not

01:58:12  22   auditing these people, were not asking for detailed

01:58:15  23   documentation because you don't have to as a tax preparer in

01:58:18  24   this country.  You prepare the returns based upon what the

01:58:20  25   documents are and what the client gives you.

01:58:23    1      And that -- you will hear from government witnesses

01:58:26    2  that will talk about that.  There's an IRS policy called

01:58:30    3  Circular 230 which governs tax preparation requirements and

01:58:34    4  what you should look at and what your ethical duties are for

01:58:38    5  that.

01:58:38    6      And Mr. DiPietro has performed remarkably in that, and

01:58:42    7  he still does that today.  He has a successful accounting

01:58:45    8  practice.  And I'll say it again.  He's a full-time

01:58:49    9  accountant.

01:58:49   10      He spent approximately 4 hours a week on this side of

01:58:52   11  the business, which was the leasing of the machines.  And

01:58:55   12  every nickel received from the leasing of those machines has

01:58:58   13  been picked up and reported as income.  It's got to be kept

01:59:04   14  in mind.  He's not charged with that.  He's charged with

01:59:06   15  preparation of false returns.  He's charged with evasion of

01:59:10   16  payment.

01:59:10   17      So the government is accusing Mr. DiPietro of

01:59:12   18  assisting Mr. Karasarides in not paying the IRS, and nothing

01:59:17   19  could be further from the truth.

01:59:19   20      And you'll see evidence, you will hear from the

01:59:21   21  witnesses, and government witnesses as well as our own

01:59:24   22  witnesses, that will testify about that entire transaction,

01:59:27   23  that he was not involved with gambling, that he was involved

01:59:30   24  with the leasing of machines effective 2009, 2010, to date.

01:59:35   25      And for those reasons, the jury should acquit

01:59:38   1   Mr. DiPietro.  And I have nothing further.

01:59:41   2        Thank you.

01:59:42   3             THE COURT:  Thank you.

01:59:43   4        Mr. Goldberg.

01:59:44   5             MR. GOLDBERG:  Thank you, Your Honor.  May I

01:59:46   6   address the jury?

01:59:47   7             THE COURT:  Sure.  As long as. . .

           8                          - - - - -

01:59:53   9   OPENING STATEMENT BY DEFENDANT CHRISTOS KARASARIDES

01:59:53  10             MR. GOLDBERG:  Good afternoon, ladies and

01:59:55  11   gentlemen.  I'm Michael Goldberg.  I represent Christos

01:59:58  12   Karasarides in this matter, and I am very thankful that you

02:00:02  13   all are here and grateful that you have agreed to take at

02:00:06  14   least a week out of your lives to decide this case.

02:00:10  15        And as the judge already -- as Judge Nugent already

02:00:12  16   said, we can't do this work without you folks.  And I think

02:00:17  17   we're an example to the world on the fairest way to decide

02:00:20  18   something like this that could have life-long implications.

02:00:23  19        We bring people in based on your voting registration

02:00:26  20   or driver's license, and you're going to decide.  It just

02:00:31  21   couldn't be fairer than that.

02:00:32  22        So, I'm honored to be involved in this case and do my

02:00:37  23   part to bring to light some of the facts, a lot of the facts

02:00:42  24   that you should know in deciding the case.

02:00:44  25        Now, you heard from the government, and Mr. Howell

02:00:46   1    took us through what the government thinks they're going to

02:00:49   2    show in the course of this case.  But I am stating to you

02:00:53   3    here today, right now, that practically everything they

02:00:59   4    have, everything they're going to put forth as solid

02:01:02   5    evidence that Mr. Karasarides is involved in these crimes,

02:01:05   6    there's an explanation for.  There is an explanation for,

02:01:08   7    and there's also an explanation for the evidence and an

02:01:11   8    explanation for the government' point of view.

02:01:13   9        They've been working on this case for six years,

02:01:17   10   really more like 10, and they have decided that Christos

02:01:21   11   Karasarides is Public Enemy Number 1 in Stark County, for

02:01:27   12   various reasons.

02:01:29   13       The number one reason is that he is a habitual

02:01:34   14   gambler.  He gambles.  He is addicted to gambling.  He was

02:01:38   15   addicted to gambling in 2012, and he was addicted to

02:01:41   16   gambling in 2018 when these searches were conducted.

02:01:47   17       And I'm going to tell you folks that there will be

02:01:49   18   proof that Mr. Karasarides, Christos, earned vast amounts of

02:01:57   19   cash from legal gambling and casinos all over the country.

02:02:02   20       Now, you're going to find out during the course of

02:02:05   21   this case that Mr. Karasarides Sr. went to prison in 2014.

02:02:13   22   He literally, weeks before he went away, he hit at a casino

02:02:18   23   for $880,000.  That's cash.  Cash money.

02:02:23   24       So when the government says, well, we found 200,000

02:02:26   25   here and we found 100,000 or 300,000 or whatever it was they

02:02:33  1    say they found, there is an explanation.

02:02:34  2         He went to prison, got out, was told condition of

02:02:36  3    getting out of prison, being on post-release supervision, no

02:02:39  4    gambling for you.  What does he do?  Because he's an addict,

02:02:43  5    he goes and gambles.  Makes more money.

02:02:46  6         This is what aggravates the government, the fact that

02:02:49  7    he's out there month after month while he's on supervised

02:02:55  8    release gambling against the rules, and winning, for the

02:03:01  9    most part.

02:03:02  10        This is all funds that can be shown to you.  This is

02:03:04  11   not some -- he didn't have a lemonade stand where he

02:03:12  12   collected cash off the street.  We have got receipts, we've

02:03:17  13   got 1099s, winning and loss statements from a number of

02:03:21  14   casinos that will show there's a substantial source of

02:03:24  15   income.

02:03:24  16        So when the government stands up here and says, oh, he

02:03:27  17   couldn't have had all this money if it wasn't for running

02:03:29  18   these game rooms -- and I'm going to come back to the game

02:03:32  19   rooms -- that's just not true.  You're going to see sources

02:03:35  20   of all this money.

02:03:35  21        So, the logical path that the government wants you to

02:03:39  22   take is Christos had money, therefore, he's guilty of

02:03:45  23   engaging in these game rooms and these illegal gambling

02:03:48  24   businesses.  Not true.  You're going to see that that's not

02:03:51  25   the case.

02:03:53  1          Now, these illegal gambling businesses that have been

02:03:56  2     referred to as Shamrock and Redemption, these were

02:04:01  3     businesses that originally, at least one of them was a

02:04:05  4     business that originally was an internet cafe, which was

02:04:16  5     legal.  It was a roundabout way of allowing people to come

02:04:16  6     in, have a drink, you know, smoke their cigarettes, and play

02:04:21  7     games on the internet to win prizes.  That was legal.

02:04:26  8          At some point the laws change in Ohio, around 2012,

02:04:30  9     2013.  Now, what's the important date here?  Is it

02:04:35  10    July 11th, 2018, the date of all the searches?  That's one

02:04:39  11    of the important dates.  Here's another important date:

02:04:43  12    May 15, 2012, the date the Jack casino opened up in

02:04:48  13    Cleveland.  Because there was an onslaught of lobbyists and

02:04:54  14    other people trying to wield influence with the Legislature,

02:04:59  15    with local governments, with township governments to get --

02:05:03  16    shut down these places where people could go and play

02:05:06  17    legally, some illegally, before they opened.

02:05:11  18          So, what happens?  They start raiding operations, game

02:05:16  19    rooms that have been open for years in what's, you'll find

02:05:22  20    out, Plain Township.

02:05:24  21          There was 17 to 20 of these gaming rooms in Plain

02:05:28  22    Township.  You're going to hear testimony about what went

02:05:32  23    on, how they were set up, what -- you know, you're going to

02:05:35  24    hear people say all of them were paying cash.

02:05:39  25          But you're also going to hear testimony that the

02:05:41  1    township, knowing this, sold permits every year to these

02:05:47  2    businesses to keep running.  They made hundreds of thousands

02:05:51  3    of dollars on it.

02:05:52  4         You're going to hear testimony how the sheriff knew

02:05:57  5    it, the sheriff of Stark County, who is law enforcement for

02:06:00  6    the township.  You're going to know -- hell, he knew it too.

02:06:05  7    Oh, shucks, you know, I never saw any money change hands.

02:06:10  8    Well, everyone knew what was going on.

02:06:12  9         You're going to hear from some of the government's

02:06:14  10   witnesses how, when something would happen at any of these

02:06:17  11   game rooms, people would show up -- I'm sorry, the law

02:06:21  12   enforcement would show up.  They'd come in, somebody --

02:06:23  13   somebody passed out on the floor, they'd see what was going

02:06:26  14   on.  Somebody robbed somebody or stole something, the police

02:06:29  15   would come in, they'd look around.  They knew what was going

02:06:32  16   on.

02:06:34  17        And I'm not saying because they knew it was going on,

02:06:36  18   that what was going on in those game rooms was legal, but it

02:06:41  19   sure felt legal.

02:06:42  20        Now, my client was not a part owner of these game

02:06:45  21   rooms after he went to prison in 2014.  He divested.  He was

02:06:49  22   done.  He had 800 and something thousand dollars in his

02:06:55  23   hands, enough to pay whatever expenses he had for him and

02:06:59  24   his wife, who had her own business with substantial income,

02:07:03  25   for the period of time that he went to prison.  He divested.

02:07:07   1        So, who is running these businesses?

02:07:10   2        You're going to hear about Jason Kachner and his wife,

02:07:14   3   Rebecca, and you're going to hear about Tom Helmick and this

02:07:19   4   Larry Dayton and a bunch of other people.

02:07:22   5        You're not going to hear that Mr. Karasarides Sr. was

02:07:28   6   in these places and was actively engaged in anything.  If

02:07:31   7   anything, what he did was he said to his nephew, Tom

02:07:41   8   Helmick, 2011, 2010, there's a possible job for you to work

02:07:45   9   in these game rooms when they were internet cafes.  He

02:07:50  10   hooked Tom into this business.

02:07:52  11        Jason Kachner.  He helped start this business with

02:07:57  12   some other individuals, but by the time he went to prison,

02:08:00  13   he was out.  These people were in.

02:08:02  14        Now, what happens?

02:08:04  15        The government sets their sight on Mr. Karasarides.

02:08:13  16   They start interviewing people pretty much after the search

02:08:15  17   in 2018.  Now everyone's afraid.  Anyone that has anything

02:08:20  18   do with these skilled game rooms or had any business

02:08:23  19   dealings with Mr. Karasarides at all, they are all terrified

02:08:29  20   when the IRS, the FBI, Homeland Security, whoever it is,

02:08:32  21   shows up at their house and says -- wants to talk to them

02:08:35  22   about these game rooms.

02:08:36  23        So who do -- what is the government looking for?

02:08:41  24   They're looking for evidence on Mr. Karasarides.

02:08:44  25        What did these witnesses figure out?  Well, if I say

02:08:49   1    Mr. Karasarides did X, Y, and Z, doesn't that help me get

02:08:52   2    out of this and who cares about Mr. Karasarides?  Who cares

02:08:56   3    about Christos?  He's a degenerate gambler.  And that's what

02:09:01   4    happened.  That's what happened.  You'll see every one of

02:09:04   5    these witnesses was approached in this way.  They changed

02:09:06   6    their stories around, got closer to what the government

02:09:09   7    wanted.

02:09:10   8         You'll hear them on the stand and you'll hear them be

02:09:14   9    cross-examined, and eventually they come around to, oh, it

02:09:17  10    was all Christos Karasarides, he made me do it.  That's what

02:09:19  11    you're going to hear.

02:09:21  12         A person like Jason Kachner, what are you going to

02:09:26  13    find out about him?

02:09:27  14         Kachner actually divided up the money, kept the money

02:09:33  15    from these game rooms.  Now, he's going to say, oh, I

02:09:37  16    divided it up for me and Christos.  But you're going to

02:09:40  17    listen to his testimony, and you'll decide whether he's

02:09:43  18    credible.  You're going to find out this guy does drugs

02:09:46  19    every day, this entire time.  This guy makes a number of

02:09:49  20    different statements that are not true.  This guy is

02:09:54  21    indicted, along with these gentlemen (indicating), and is

02:09:58  22    looking at a substantial prison term.

02:10:00  23         But what does he do, for him and his wife?  So what

02:10:05  24    does he do?  He makes five, six, seven, ten statements, I

02:10:09  25    don't know how many, a lot, meets with the government over

02:10:11  1    and over again.  And as he does, he builds this story that

02:10:14  2    it's all Christos.

02:10:16  3        That's what this case is.  It's about human sources

02:10:20  4    putting Mr. Karasarides in the most blameworthy place.

02:10:25  5        Now, is my client perfect?  No.  Did his taxes get

02:10:28  6    paid the way they should?  No.  Did he rely on the advice of

02:10:33  7    attorneys, CPA's, and other professionals?  Yes.  And that's

02:10:37  8    going to come out.

02:10:40  9        I want you to know this.  Like I said,

02:10:45  10   Mr. Karasarides, Christos, is not perfect.  But he loves his

02:10:48  11   son, and there's no daylight between them.  He is not

02:10:52  12   blaming his son for anything.  He is not casting anything.

02:10:58  13       And I bet if Christos had do this over again, he would

02:11:02  14   have handled it differently.  If he had the advice that

02:11:05  15   maybe I would have given him, he would have handled it

02:11:07  16   differently.  But he handled it the way he did, and it's

02:11:10  17   unfortunate that his son is sitting here.  And the only

02:11:12  18   reason he's sitting at that end of the table and Christos is

02:11:14  19   sitting there is because I sat down first this morning in

02:11:17  20   the spot that I like.  It has nothing do with any daylight

02:11:21  21   between them.

02:11:21  22       So you're going to look at what the government has.

02:11:24  23   They've got all these notebooks full of paper, full of

02:11:28  24   numbers, full of stuff that they've gathered over the --

02:11:32  25   over the course of the years, and you're going to ask

02:11:35  1  yourself, is this case about paper or is it about people?

02:11:38  2  Because if it's about the people testifying, you're not

02:11:41  3  going to find Christos guilty.  You're going to find that

02:11:44  4  he's not guilty of all these charges.

02:11:46  5        Thank you.

02:11:48  6              THE COURT:  Thank you.

02:11:48  7        Mr. Kersey.

          8                    - - - - -

02:11:51  9     OPENING STATEMENT BY DEFENDANT CHRISTOPHER KARASARIDES

02:11:51  10             MR. KERSEY:  Thank you.

02:11:54  11       Ladies and gentlemen, Your Honor, co-counsel, I

02:11:58  12  appreciate you.  I've been watching you as best I can.  I'm

02:12:02  13  going to stand over here.  And you've paid rapt attention,

02:12:06  14  close attention to what we've all been saying.

02:12:09  15       I'm telling you now you're going to find out a number

02:12:11  16  of things about Christopher Karasarides.  Number one, he

02:12:15  17  might have known or suspected but didn't object to the fact

02:12:20  18  that his father's nefarious -- alleged nefarious activities.

02:12:26  19  He was never involved in any of the gambling, had no part of

02:12:28  20  that.

02:12:28  21       What he did was, he -- his father would ask him,

          22  hey --

          23              (Court reporter interjection.)

02:12:43  24             MR. KERSEY:  So, what happened is, is the fact

02:12:47  25  that Christopher was asked by his father to do a number of

02:12:53  1    things.  Now, that in and of itself does not mean that you

02:13:00  2    are part of a conspiracy.

02:13:01  3        There's a jury instruction on that.  I mentioned that

02:13:03  4    to you before, and I want you to look at it closely.

02:13:05  5    Because you know about, because you're there with somebody

02:13:09  6    that is alleged to have done it, because that individual --

02:13:13  7    you might suspect that that individual is doing something,

02:13:17  8    that is his father, and you disapprove of it but you still

02:13:20  9    hang around him, you're still with him, doesn't mean that

02:13:23  10   you're part of the conspiracy.  You have to knowingly join

02:13:25  11   it and agree to do whatever they're alleging.  And you're

02:13:28  12   going to find that didn't happen.

02:13:30  13       Example.  The money they're talking about with -- my

02:13:36  14   client was asked by his father, out of the blue, to put some

02:13:39  15   money in a safe deposit box, but no contact with it.  It was

02:13:44  16   told to my client, the evidence will show, he won it

02:13:49  17   gambling.  Mike Goldberg was just talking about it.  He won

02:13:52  18   a lot of money gambling, wanted to put some of it in a box.

02:13:53  19   He asked my client to do it, and he did it at his father's

02:13:56  20   behest.

02:13:57  21       There's no -- there was no reason to -- that he was

02:14:00  22   involved in anything with it.  He just did what his father

02:14:03  23   asked him to do like any good son.

02:14:04  24       You'll also find out that my client has absolutely no

02:14:09  25   criminal history.  You'll find out from a friend of his that

**Opening/Christopher Karasarides (Kersey)**                34

02:14:13   1   he doesn't lie, cheat, steal, or tolerate those that do

02:14:18   2   that.

02:14:18   3        You'll also going to find out that all these things

02:14:23   4   with this real estate business he did, he -- those were

02:14:27   5   deals -- I believe were legitimate deals and that indicate

02:14:31   6   that my client was aware of what was going on.  There was a

02:14:35   7   legitimate basis for that.

02:14:36   8        And you'll find out that he was a part owner in some

02:14:39   9   of these businesses and he derived income therefrom.

02:14:46  10        So I want you to consider that and also consider the

02:14:48  11   fact whether or not there was any joining of a conspiracy or

02:14:51  12   joining with his father to defeat the tax laws of the United

02:14:55  13   States.

02:14:55  14        You're going to find out that that didn't happen.

02:14:58  15   You're going to find out that he might have been there, he

02:15:00  16   might have known about it, but he didn't participate in it.

02:15:03  17        He was living at home with his father.  He was around

02:15:06  18   him.  But as far as being there, not objecting to it, and

02:15:11  19   merely present around does not make him a conspirator.

02:15:15  20        Find him not guilty.

02:15:16  21        Thank you.

02:15:17  22             THE COURT:  Thank you.

02:15:17  23        You may call your first witness.

02:15:20  24             MR. BEAN:  Your Honor, we have a couple issues

02:15:21  25   we'd like to address with the Court before we call our first

| | | |
|---|---|---|
| 02:15:25 | 1 | witness, including stipulations. |
| 02:15:26 | 2 | THE COURT:  Okay.  Did you give me |
| 02:15:28 | 3 | stipulations? |
| 02:15:34 | 4 | (Counsel conferring.) |
| 02:15:44 | 5 | MR. HOWELL:  Your Honor, and also, I failed to |
| 02:15:47 | 6 | introduce, Carissa Welch is a paralegal from our office. |
| 02:15:50 | 7 | That's who's seated here with us. |
| 02:15:52 | 8 | THE COURT:  The brains of the operation, I |
| 02:15:53 | 9 | know.  You always are.  Usually you're running the computers |
| 02:15:58 | 10 | though.  Are you -- are you doing that?  Okay.  Yeah.  Has |
| 02:16:05 | 11 | to be one intelligent one here. |
| 02:16:13 | 12 | MR. BEAN:  Your Honor, while we're just doing |
| 02:16:14 | 13 | some signatures, we'd also like to address the summary |
| 02:16:18 | 14 | witness approval that we briefed in our trial brief as we |
| 02:16:21 | 15 | have our summary witness here, and we'd just like approval |
| 02:16:24 | 16 | that he may stay in the courtroom for the duration. |
| 02:16:27 | 17 | THE COURT:  Sure.  Sure. |
| 02:16:31 | 18 | MR. HOWELL:  Judge, we also have a whole host |
| 02:16:33 | 19 | of binders for you, copies of the exhibits.  Would you like |
| 02:16:35 | 20 | those up there or would you like them down here for now? |
| 02:16:38 | 21 | THE COURT:  You can keep them down there. |
| 02:16:40 | 22 | MR. HOWELL:  All right.  I thought that would |
| 02:16:41 | 23 | be the answer. |
| 02:16:41 | 24 | THE COURT:  I'll look at them on the screen. |
| 02:16:47 | 25 | But you'll have to take them back with you. |

**Opening/Christopher Karasarides (Kersey)**     36

02:17:04   1            MR. BEAN:  Your Honor, just on the record,

02:17:06   2   could you ask defense counsel that they've conferred with

02:17:10   3   their clients and both defense counsel and their clients

02:17:12   4   agree to these stipulations?

02:17:21   5            THE COURT:  Mr. Goldberg?

02:17:22   6            MR. GOLDBERG:  Your Honor, we have stipulated

02:17:23   7   to authenticity.  We're reserving any relevance objections

02:17:28   8   at the time, or hearsay.

02:17:29   9            THE COURT:  Okay.  Mr. Fedor?

02:17:31  10            MR. FEDOR:  Same thing, Your Honor.

02:17:32  11            THE COURT:  Same thing?

02:17:33  12            MR. FEDOR:  Thank you.

02:17:33  13            THE COURT:  And Mr. Kersey, same thing?

02:17:35  14            MR. KERSEY:  Judge, we filed objections to the

02:17:37  15   stipulations, and it was decided --

02:17:43  16            THE COURT:  Well, you -- you're not objecting

02:17:45  17   to the authenticity.  You're just --

02:17:46  18            MR. KERSEY:  No.

02:17:47  19            THE COURT:  You object to some relevance.

02:17:50  20            MR. KERSEY:  Right.  But I objected, Your

02:17:51  21   Honor, to 124 through 130, for the years 2011, '12, '13,

02:17:57  22   '14, '15, Judge, and I thought they were pulling those out.

02:18:01  23            THE COURT:  They did.

02:18:02  24            MR. KERSEY:  All right.

02:18:03  25            MR. BEAN:  Your Honor, we are going to attempt

**Opening/Christopher Karasarides (Kersey)**          37

02:18:05  1    to admit those momentarily, and I would ask for a ruling on

02:18:08  2    the 902(1)/803 issue briefed in the trial --

02:18:13  3              THE COURT:  Do you have a witness that you're

02:18:14  4    going to testify about that?

02:18:15  5              MR. BEAN:  Well, so the argument in our trial

02:18:17  6    brief is that we don't need a witness because they're

02:18:19  7    certified public government records.  And, you know, the

02:18:22  8    issue really is I would admit them now.  If the Court would

02:18:26  9    not rule in our favor, we'd need to call a witness

02:18:29  10   eventually to get here.

02:18:30  11             THE COURT:  Okay.  You could just -- give it

02:18:33  12   up here.

02:18:38  13       When do you intend to -- when do you want to use it?

02:18:41  14             MR. BEAN:  We'd admit them right now.

02:18:43  15             THE COURT:  You want to use them right now?

02:18:46  16             MR. BEAN:  I'm going to move to admit a whole

02:18:48  17   host of the tax records.

02:19:03  18             (Off-record discussion.)

02:19:23  19             THE COURT:  Folks, remember I told you one way

02:19:25  20   evidence can come to you is by way of stipulation?  And this

02:19:28  21   is a normal thing.  You have documents, and rather than call

02:19:32  22   individuals for every document and we would be here until

02:19:36  23   next Christmas, and so there's a stipulation as to the

02:19:39  24   authenticity, which means if there's an official document

02:19:42  25   and the -- it is what it says it is.

02:19:44 1    Now, whether it's relevant to the case, I have to make

02:19:47 2 that decision at the appropriate time.  So, but there are --

02:19:51 3 well, yeah, there are hundreds of these exhibits, so I'm not

02:19:56 4 going to read them all to you.  You'll eventually --

02:19:59 5 whenever ones are admitted, you'll have a copy of all of

02:20:01 6 those with you when you go back to look at if you see fit.

02:20:05 7 Okay?

02:20:06 8    MR. BEAN:  Thank you, Your Honor.

02:20:07 9    The government calls Garret Jordan.

02:20:50 10    THE COURT:  Just walk over to the witness

02:20:52 11 stand there, Garret, if you would.

02:20:59 12    Would you raise your right hand for me.

02:21:01 13    Do you swear the testimony you are about to give here

02:21:03 14 will be the truth as you answer to God?

02:21:05 15    THE WITNESS:  Yes.

02:21:05 16    THE COURT:  Please have a seat.

02:21:07 17    And if you wish, you can pull the microphone around to

02:21:10 18 the right.  The whole thing moves.

02:21:12 19    THE WITNESS:  Okay.

02:21:13 20    THE COURT:  You know what I mean?  Yeah.  That

02:21:14 21 way.

02:21:15 22    Could you tell us your full name, Garret, and spell

02:21:17 23 your last name.

02:21:19 24    THE WITNESS:  Garret Jordan, J-o-r-d-a-n.

02:21:21 25    THE COURT:  Thank you.

02:21:22   1              THE WITNESS:  Yes.

02:21:23   2              THE COURT:  Go ahead.

02:21:24   3                  - - - - -

           4          DIRECT EXAMINATION OF GARRET JORDAN

02:21:24   5    BY MR. BEAN:

02:21:24   6    Q     Good afternoon, sir.

02:21:25   7    A     Hello.

02:21:26   8    Q     How are you employed?

02:21:27   9    A     I'm a revenue agent with the IRS.

02:21:30  10    Q     How long have you been with the IRS?

02:21:32  11    A     Since 2009, so just coming up on 15 years.

02:21:36  12    Q     And throughout that period, have you always been a

02:21:39  13    revenue agent?

02:21:40  14    A     Yes.

02:21:40  15    Q     And have you -- as a revenue agent, can you just

02:21:44  16    describe for the jury kind of what are your job

02:21:47  17    responsibilities, what do you do?

02:21:47  18    A     So, my primary job is contacting taxpayers who are

02:21:53  19    being audited.  I request documents from the taxpayer,

02:22:01  20    review them, interview the taxpayer to determine correct tax

02:22:05  21    assessments.

02:22:05  22    Q     Now, before you joined the IRS, did you hold any other

02:22:10  23    employment?

02:22:11  24    A     I've had various jobs, yes.  But I -- my first job out

02:22:16  25    of college with an accounting degree was with the IRS.

02:22:21  1   **Q**    And since you've been with the IRS, have you undergone

02:22:25  2   trainings?

02:22:25  3   **A**    Yeah, I would say extensive compared to, you know, the

02:22:28  4   accounting world.

02:22:30  5   **Q**    Are you familiar with individuals named Christos

02:22:34  6   Karasarides Jr. and Ron DiPietro?

02:22:36  7   **A**    Yes.

02:22:36  8   **Q**    How are you familiar with them?

02:22:38  9   **A**    I performed an income tax examination on

02:22:43  10  Mr. Karasarides' income tax returns for 2009, 2010.  And

02:22:48  11  Mr. DiPietro was the representative for Mr. Karasarides for

02:22:54  12  those examinations, and he prepared one of those two tax

02:22:57  13  returns.

02:23:00  14                  MR. HOWELL:  Judge, can we check, can they

02:23:02  15  hear him?

02:23:04  16                  THE COURT:  You got to move up.

02:23:06  17        Yeah, if you could keep your -- see me?  If I'm this

02:23:09  18  far away, you can hear me.  Whatever is comfortable for you,

02:23:16  19  Garret.

02:23:16  20  BY MR. BEAN:

02:23:17  21  **Q**    I believe you described Mr. DiPietro as

02:23:19  22  Mr. Karasarides' representative.

02:23:20  23  **A**    Correct.

02:23:20  24  **Q**    What does that mean?

02:23:21  25  **A**    So when there's an income tax examination, often the

02:23:24  1    individual who's being audited, they will have somebody

02:23:30  2    typically with tax knowledge be their representative in

02:23:33  3    front of the IRS to facilitate communications with the IRS

02:23:38  4    for -- on behalf of the taxpayer.

02:23:44  5    **Q**    After you completed your examination, did you make a

02:23:47  6    tax assessment on Mr. Karasarides?

02:23:49  7    **A**    Yes.

02:23:51  8    **Q**    And I believe you might have mentioned this, but for

02:23:54  9    what years?

02:23:55  10   **A**    2009 and 2010.

02:23:57  11   **Q**    Can you just approximate how much that assessment was?

02:24:01  12   **A**    It was around half a million dollars for those two

02:24:04  13   years combined.

02:24:05  14   **Q**    And did Mr. Karasarides ever pay all of those tax

02:24:09  15   obligations?

02:24:09  16   **A**    No, not -- not during the audit, no.  And then I've

02:24:16  17   reviewed subsequent transcripts where I've seen very little

02:24:20  18   payment but some occasional small amounts.

02:24:27  19            THE COURT:  Are you objecting to that answer?

02:24:31  20            MR. GOLDBERG:  He wasn't asked about other tax

02:24:34  21   transcripts.  He was asked about whether he paid his taxes

02:24:36  22   for 2009 and 2010, Your Honor.

02:24:39  23            THE WITNESS:  During my examination he did

02:24:40  24   not -- I think there's one $5,000 payment out of the

02:24:45  25   500,000-ish tax deficiency.

02:24:47  1   BY MR. BEAN:

02:24:49  2   **Q**     Did Mr. Karasarides self-assess taxes for 2011, 2012,

02:24:53  3   2013, and 2014?

02:24:55  4   **A**     Yes.

02:24:55  5   **Q**     And can you just approximate for the jury how much?

02:24:59  6   **A**     All the years combined it was around 2.7 million.

02:25:04  7   **Q**     That he assessed?

02:25:05  8   **A**     Oh, the self-assessed amounts.

02:25:10  9   **Q**     An approximation is fine.

02:25:15  10        Well, let me ask you this:  Was it more than you

02:25:17  11  assessed for 2009 and 2010?

02:25:21  12  **A**     Yes.

02:25:21  13  **Q**     Did Mr. Karasarides ever pay the tax obligations that

02:25:24  14  were -- he self-assessed for 2011 through 2014?

02:25:28  15  **A**     No.  There was -- for the tax that he self-assessed,

02:25:34  16  there were very minimal amount of payments on those

02:25:40  17  assessments.  Very small.  But yes, he had made payments,

02:25:45  18  but insignificant is how I saw them.

02:25:49  19  **Q**     Before we get into more details exactly about your

02:25:53  20  examination and any communications you had with the

02:25:57  21  defendants, can you just explain to the jury, what exactly

02:25:59  22  does -- when you start an examination, like, what are the

02:26:02  23  steps you take?  What do you do?

02:26:04  24  **A**     So, you send out a letter to the taxpayer notifying of

02:26:09  25  the audit.  You give them publications and notice explaining

**G. Jordan  (Direct by Bean)**                              43

02:26:15  1    the audit procedures, processes, taxpayer rights,

02:26:21  2    responsibilities.  You schedule with them, explain those

02:26:25  3    publications, notices.  Request documentations to support

02:26:30  4    the tax that they reported or, when there is not a return

02:26:36  5    filed, you ask for the documents to arrive at correct tax

02:26:42  6    amounts.

02:26:42  7         So, in this particular case, summonsing bank records,

02:26:47  8    reaching out to third parties to get that information if the

02:26:52  9    taxpayer can't proceed the information.

02:26:54  10        We interview the taxpayer and typically representative

02:26:58  11   present as well, what their filing was, where their records

02:27:04  12   are at.

02:27:05  13        So, after we collect that information, we determine a

02:27:10  14   correct or proposed correct tax amount, and then we solicit

02:27:16  15   agreement or protest to those amounts.

02:27:18  16   **Q**    And is it accurate to say to do that that you need to

02:27:22  17   determine their income?

02:27:23  18   **A**    Yes.

02:27:24  19   **Q**    Are there certain types of income that it's hard for

02:27:28  20   you to identify when doing an examination?

02:27:31  21   **A**    Cash transactions are easily the most difficult, in my

02:27:36  22   experience, so cash transactions are more difficult to trace

02:27:40  23   than other transactions.

02:27:42  24   **Q**    Why are they more difficult?

02:27:46  25   **A**    Because it's hard to detect.  It's not always

02:27:49  1   deposited.  Where there's a check written or an electronic

02:27:53  2   transfer, there's a record and a bank statement, or you're

02:28:01  3   an employee and you receive a W-2, the money you receive is

02:28:04  4   summarized by the employer.  So those records are easier to

02:28:08  5   identify in an examination than a cash transaction that may

02:28:11  6   or may not have gone through a bank account.

02:28:16  7   **Q**    Now, when you're doing examination, if a taxpayer is

02:28:21  8   represented, can you talk about what are your steps that you

02:28:24  9   take regarding communications with the taxpayer and/or their

02:28:27  10  representative?

02:28:30  11  **A**    After the initial letter is sent out, once they secure

02:28:34  12  representation, all of our communication goes through the

02:28:38  13  representation -- the representative, primarily.  We had --

02:28:42  14  in this circumstance, we had numerous phone calls and at

02:28:47  15  least, you know, one -- the interview, and then I had picked

02:28:53  16  up some paperwork from his office.  But I don't think we had

02:28:55  17  a large communication on that occasion.  But I was on the

02:28:58  18  phone with Mr. DiPietro.

02:29:08  19  **Q**    During the course of the examination, what kind of

02:29:11  20  records do you keep?

02:29:15  21  **A**    I think the short answer is everything we get.

02:29:17  22      So, bank statements, in this circumstance bank

02:29:22  23  statements, Forms 1099, statements from casinos summarizing

02:29:30  24  gambling transactions, 1099s, which are forms issued for

02:29:38  25  commissioned income.  When someone earns commissioned

02:29:41  1  income, they're often issued a 1099 for the person paying

02:29:45  2  them for commissions.  And there's probably more, so. . . I

02:29:52  3  mean, I think those are the primary things in this case:

02:29:55  4  Bank statements, Forms 1099, Forms W-2G in this

02:30:01  5  circumstance, which is a W-2 for gambling earnings and

02:30:05  6  transactions, and then Forms 1099 that were issued to

02:30:11  7  Mr. Karasarides for commissioned income.

02:30:14  8          MR. BEAN:  Can we please pull up Exhibit 183

02:30:19  9  for the witness.

10  BY MR. BEAN:

02:30:25  11  **Q**    Mr. Jordan, do you recognize this document?

02:30:26  12  **A**    At the moment, nothing on the screen.

02:30:31  13          THE COURT:  There's a button somewhere on

02:30:34  14  there.

02:30:35  15          THE WITNESS:  There's a -- there's a U.S.

02:30:37  16  District Court emblem but no other shared screen.  So the

02:30:40  17  power is on.  I'll turn the power back off, back on.

02:30:45  18          COURTROOM DEPUTY:  It's going on with our

02:30:46  19  system.  Do you guys have anything?

02:30:50  20          (Off-record discussion.)

02:33:02  21  BY MR. BEAN:

02:33:03  22  **Q**    Mr. Jordan, what is this document?

02:33:05  23  **A**    This is my activity record for the -- my exam steps,

02:33:12  24  procedures, correspondence record which we do in real time

02:33:17  25  for every audit that we do, we maintain one of these

02:33:20   1   activity records.  This is the one for the -- my activity

02:33:22   2   record for the 20 -- the 2009-2010 examination of

02:33:27   3   Mr. Karasarides.

02:33:28   4   Q     And are you largely responsible for creating this

02:33:31   5   document?

02:33:31   6   A     Yeah.  Solely.

02:33:32   7   Q     All right.

02:33:32   8               MR. BEAN:  The government will move this

02:33:34   9   document into evidence.  And I believe it's also part of --

02:33:36  10               THE COURT:  We'll wait until the appropriate

02:33:38  11   time, when you rest.

02:33:42  12   BY MR. BEAN:

02:33:42  13   Q     When did the examination start?

02:33:44  14   A     June of 2011.

02:33:47  15   Q     And at that time, what tax periods were covered?

02:33:51  16   A     We opened the examination with only the 2009 tax year.

02:33:56  17   There was not a return filed.

02:33:59  18   Q     For whom?

02:33:59  19   A     For Mr. Karasarides.

02:34:02  20   Q     How did this examination get assigned to you?

02:34:05  21   A     I had been performing an audit for a different

02:34:10  22   business entity who was paying commissions to

02:34:13  23   Mr. Karasarides.  So that's our common and typical practice

02:34:20  24   when we audit a taxpayer, sometimes individual or business,

02:34:25  25   but if they are making payments to someone for commissions,

| | | |
|---|---|---|
| 02:34:28 | 1 | we will do a check to see if those individuals reported that |
| 02:34:31 | 2 | income. |
| 02:34:31 | 3 | And in this circumstance, there was no income reported |
| 02:34:34 | 4 | for 2009 by Mr. Karasarides for his income earned from |
| 02:34:45 | 5 | Elite Entertainment. |
| 02:34:47 | 6 | **Q**    Was that the business you were doing the audit of? |
| 02:34:49 | 7 | **A**    Yes. |
| 02:34:49 | 8 | **Q**    And were you auditing anyone else associated with |
| 02:34:59 | 9 | Elite Entertainment? |
| | 10 | **A**    Yes. |
| | 11 | **Q**    Who? |
| 02:35:01 | 12 | **A**    Mr. George Kopoulos. |
| 02:35:01 | 13 | **Q**    And is that the individual's last name?  Is that the |
| | 14 | last name of the individual? |
| | 15 | **A**    Yes. |
| 02:35:03 | 16 | **Q**    Do you recall the individual's first name? |
| 02:35:05 | 17 | **A**    George. |
| 02:35:10 | 18 | **Q**    So the assessment -- the examination gets assigned to |
| 02:35:14 | 19 | you.  What -- can you walk us through, what are your first |
| 02:35:16 | 20 | steps? |
| 02:35:17 | 21 | **A**    So, we reach -- we get we call it picking up the |
| 02:35:24 | 22 | audit, so it was auditing a different return.  We noticed |
| 02:35:26 | 23 | this, you know, non-reported income, so we get -- explain |
| 02:35:31 | 24 | that to our -- my supervisor.  He authorizes picking up a |
| 02:35:35 | 25 | related return is what we would call it. |

**G. Jordan  (Direct by Bean)**                48

02:35:37  1      So we do some pre-audit steps to verify, hey, did this

02:35:44  2  questionable transaction, does it warrant being audited.

02:35:48  3  So, hey, is there -- does the IRS have support or can the

02:35:52  4  IRS gain support to support an adjustment if that's

02:35:57  5  necessary.

02:35:58  6      The supervisor approves.  Then we initiate the

02:36:00  7  examination, you know, with a letter after a supervisor

02:36:04  8  approves, of course, by sending out the letter that I

02:36:07  9  referenced earlier notifying them that the audit is going

02:36:11  10  to -- is being undergone.

02:36:12  11  **Q**    And did you have contact with Mr. Karasarides

02:36:15  12  directly?

02:36:16  13  **A**    Through correspondence.

02:36:20  14      I don't recall a phone conversation, but we had

02:36:26  15  conversation through -- I had issued correspondence via a

02:36:28  16  letter, and then I was contacted by Mr. Karasarides's future

02:36:32  17  representative, Mr. DiPietro, which is common.  That's

02:36:35  18  pretty common, that a representative would contact us when a

02:36:40  19  taxpayer receives an audit notice.

02:36:41  20  **Q**    And approximately when were you first contacted by

02:36:44  21  Mr. DiPietro?

02:36:47  22  **A**    It was maybe 7 to 10 days.  I guess I could look at

02:36:54  23  this, but -- it's on here, but I think about a week after I

02:36:56  24  mailed the notice, which is typical, so taxpayer would have

02:36:59  25  received that, you know, a couple days after I issued it.

02:37:01  1  He probably talks to a representative.  Representative

02:37:04  2  reaches out to the examiner, me in that case.  So a week

02:37:07  3  later.

02:37:07  4  **Q**     And when you had contact with Mr. DiPietro, did you

02:37:09  5  explain why you were picking up Mr. Karasarides' examination

02:37:13  6  for 2009?

02:37:15  7  **A**     I did, but I didn't -- just for clarification, I

02:37:18  8  didn't do it right on that first contact because we have to

02:37:22  9  have verification that that representative is authorized to

02:37:27  10  represent the taxpayer.  So when a taxpayer wants to use

02:37:31  11  representation, they need to provide the IRS examiner -- a

02:37:38  12  Form 2848 typically is a form where the taxpayer officially

02:37:44  13  authorizes someone to represent them.

02:37:46  14       So I think it took a month or two before we got that

02:37:48  15  secured before I could discuss that with Mr. DiPietro, until

02:37:51  16  I had that verification for authorization.

02:37:54  17  **Q**     And after you had that verification, did you discuss

02:37:57  18  with Mr. DiPietro exam procedures?

02:38:02  19  **A**     Yes.

02:38:02  20  **Q**     How about what would happen if there was a proposed

02:38:05  21  tax adjustment?

02:38:06  22  **A**     Yeah.  We -- multiple conversations on the -- well,

02:38:14  23  one at the initial examination.  And then when we got into

02:38:20  24  the proposing adjustments, discussing adjustments, and for a

02:38:22  25  closing conversation, we discussed, you know, hey, if there

02:38:27  1   is an assessment, that it's agreed on then, I -- we did -- I

02:38:33  2   did solicit payment at the end of the examination.  But if

02:38:38  3   there's an amount due, we solicit payment, which is --

02:38:41  4   that's standard.

02:38:42  5        Any, you know, IRS audit procedure we would solicit

02:38:46  6   payment, ask if they had the ability to pay, and then offer

02:38:49  7   options on how they can make payments through collections if

02:38:53  8   they can't pay during the examination time frame.

02:38:56  9        So, yes, we had those discussions about payment being

02:38:59  10  due for these adjustments.

          11            MR. BEAN:  Carissa, can you go to page 3 for

          12  us?

02:39:05  13  BY MR. BEAN:

02:39:05  14  Q    And did you inform Mr. DiPietro that if an assessment

02:39:11  15  is made, that collections -- that could get sent to

02:39:15  16  collections?

02:39:15  17  A    Yes.  Yes.

02:39:15  18  Q    Is that -- is it unusual for after an assessment to

02:39:19  19  get sent to collections?

02:39:20  20  A    It's very common.  If the taxpayer doesn't -- if

02:39:23  21  there's an amount due to the IRS, we solicit payment.  And

02:39:29  22  if they don't make payment, we explain their options during

02:39:34  23  the exam and what the options are after the exam with the

02:39:40  24  IRS collection department, who after an exam is closed and

02:39:44  25  there's an amount due, collections -- the collections

02:39:46  1   department of the IRS reaches out to the taxpayer to set up

02:39:52  2   payment plans.  And that's discussed at the beginning of the

02:39:55  3   audit and at the end before we close.  And in this case and

02:40:00  4   others, we discuss that usually a time or two in between.

02:40:02  5   **Q**    Now, I believe you testified that you picked up this

02:40:06  6   examination because Mr. Karasarides had not filed a 2009

02:40:09  7   return.  At some point, were there discussions with

02:40:12  8   Mr. DiPietro about Mr. Karasarides filing a 2009 tax return?

02:40:16  9   **A**    Yes.

02:40:18  10       I -- when -- so when we had the contact and we were

02:40:23  11   explaining what the purpose of the audit was and the

02:40:26  12   procedures, we solicit them to file a return.  We in short

02:40:34  13   say, hey, we have information showing you have income but no

02:40:36  14   return is filed, would you file a return with us at exam.

02:40:42  15   So, Mr. DiPietro and I had that discussion, and at -- I'd

02:40:51  16   have to look at the date, but at some point during the audit

02:40:55  17   they filed a tax return with the service center, not with

02:40:59  18   me, the auditor.  So, I did eventually receive what we call

02:41:04  19   a delinquent return, which is a tax return filed after the

02:41:08  20   due date, so a late return filed.

02:41:11  21   **Q**    We'll return to that shortly.

02:41:13  22       Ultimately, at the end of the -- kind of the

02:41:17  23   examination that you did, did you prepare any types of

02:41:20  24   records, you know, kind of summing up all the work and what

02:41:23  25   determinations you had made?

**G. Jordan  (Direct by Bean)**                    52

02:41:24  1   **A**     Yeah.  Generically, I'd say that's an audit report.

02:41:28  2   It's a Form 4549, but it's an examination report.

02:41:34  3        So at the end of the audit, if there's adjustments

02:41:36  4   proposed such as in this case, we prepare a report that

02:41:39  5   shows the adjustments, tax penalties, interest amounts due

02:41:45  6   based on those adjustments.  And along with that, it looks

02:41:50  7   kind of like a spreadsheet, but with that we also send them

02:41:53  8   copies of work papers explaining why those adjustment were

02:41:56  9   made and what those adjustment numbers were.

02:41:59  10  **Q**     And in the course of doing that, did you have

02:42:00  11  discussions with Mr. DiPietro about determinations you had

02:42:04  12  made and why you had made them?

02:42:06  13  **A**     Yeah.  Several.  Several.  We had lots of

02:42:10  14  communication throughout this audit.

02:42:11  15  **Q**     Did you ever express any objections?

02:42:13  16  **A**     Yeah.  There were -- there were a couple objections.

02:42:17  17       So I issued a report that was orally objected to, and

02:42:24  18  Mr. DiPietro and I and my supervisor had had conversations

02:42:27  19  about gambling income, so money earned from gambling.

02:42:33  20  Mr. Karasarides was claiming to be a professional gambler,

02:42:39  21  so the income and deductions get reported on a different

02:42:44  22  place on your tax return and potential different tax

02:42:48  23  treatment based on if it's a professional gambler, which

02:42:54  24  would be claimed as a business versus personal income and

02:42:57  25  personal expenses for the winnings and losses from gambling.

02:43:00  1        So, Mr. DiPietro, he disagreed and said that

02:43:06  2   Mr. Karasarides was a professional gambler, so that those

02:43:11  3   transactions should be reported on the business section of

02:43:13  4   his income tax return, a Schedule C.

02:43:22  5   **Q**     Did you take his objection?

02:43:23  6   **A**     Yeah.  We discussed it, and the IRS conceded, you

02:43:27  7   know, disagreeing with that issue, and we left the gambling

02:43:30  8   transactions as a business on his income tax return.

02:43:39  9   **Q**     Did you make any determinations about specific checks

02:43:41  10  that were written to Mr. Karasarides?

02:43:42  11  **A**     Yes.

02:43:42  12       Along the lines of things that were objected to, a

02:43:45  13  good portion of the income amount that the IRS determined

02:43:48  14  was pretty simple, you add up all the deposits into

02:43:53  15  Mr. Karasarides' bank statements.  So, we add up all the

02:43:57  16  deposits and say, hey, you know, this is potential income.

02:44:05  17  And then we go through -- we summonsed bank statements.  So

02:44:09  18  they bring the bank statements, and they show the, we call

02:44:10  19  them deposit detail.  So if you deposit a check, a copy of

02:44:13  20  the check would come, or a bank transfer would show all

02:44:16  21  those transactions.

02:44:17  22       So some of the money that were within the bank records

02:44:25  23  that were given to us, we had copies of canceled checks,

02:44:29  24  commissions checks.  They would say commissions on the

02:44:31  25  bottom.  They were not deposited into the bank accounts.

02:44:35  1    They were deposited into a bank account that didn't --

02:44:40  2    someone -- it seemed like someone else's or another business

02:44:43  3    bank account.  I'm trying to recall the name of the account,

02:44:47  4    but it was a. . .

02:44:51  5         So, he had checks issued to him that he deposited in

02:44:54  6    somebody else's account.  I included those as income in the

02:44:58  7    exam assessment because I said, hey, those checks written to

02:45:01  8    him were income.  Just because they weren't deposited in his

02:45:05  9    personal bank account, they were still income to him, so

02:45:09  10   they're the deposit amounts plus those checks that were

02:45:11  11   issued to him that were not deposited.  So it's kind of a

02:45:14  12   pretty basic calculation to include those in his income.

02:45:18  13   And I think it was Elite --

02:45:23  14   **Q**    Was it the same business?

02:45:24  15   **A**    It had a similar name, but it was I think a music -- a

02:45:28  16   music name.

02:45:30  17   **Q**    That's all right.

02:45:31  18   **A**    But it was not his personal bank account.

02:45:37  19   **Q**    Turning back to 2009 return, I think you testified, I

02:45:40  20   believe, that it was filed with the service center.

02:45:43  21   **A**    Yes.

02:45:43  22   **Q**    What's the service center, just briefly?

02:45:45  23   **A**    So, and I'm not involved at the service center, but

02:45:49  24   they -- if any individual would file a tax return with --

02:45:54  25   via paper, it would get mailed to the service center, and

02:45:56  1    they would process that tax return.

02:45:58  2    **Q**    And were you surprised that it was filed with the

02:46:00  3    service center, the 2009 one?

02:46:02  4    **A**    Yeah, because I -- we had had communication and I had

02:46:06  5    expressed, hey, when you're under audit, your account is

02:46:09  6    frozen.  So if you file a tax return, it has to go to the

02:46:14  7    auditor who is auditing the exam because the account's

02:46:19  8    frozen.  So the service center eventually sent that to me,

02:46:23  9    you know, but months later.

02:46:25  10            MR. BEAN:  Can we please pull up Exhibit 100,

02:46:28  11   which is. . . and go to Page 2, please.

02:46:33  12   BY MR. BEAN:

02:46:34  13   **Q**    Just briefly, what is -- what is this that we're

02:46:37  14   looking at?

02:46:37  15   **A**    It's an account transcript for Mr. Karasarides' 2009

02:46:42  16   Form 1040.

02:46:43  17   **Q**    And does the IRS keep records of a tax return being

02:46:47  18   filed?

02:46:47  19   **A**    Yes.  And this would show that.

02:46:49  20   **Q**    Does the IRS keep records when it receives payment?

02:46:53  21   **A**    Yes.  It would be shown on the same transcript if

02:46:56  22   they -- if there were payments made.

02:46:58  23   **Q**    So this specific record?

02:46:59  24   **A**    Yes.

02:47:00  25   **Q**    For 2009?

02:47:01  1    **A**     Yes.  So it shows the filed tax return.  For payments

02:47:09  2    made, I would look down to verify, but I think there was one

02:47:12  3    $5,000 payment made on this one, but I'd have to see it on

02:47:16  4    there specifically to see it.

02:47:16  5    **Q**     And is this the account transcript for

02:47:19  6    Mr. Karasarides?

02:47:19  7    **A**     Yes.

02:47:21  8                    MR. BEAN:  Can we please --

02:47:22  9                    THE WITNESS:  2009.

02:47:24  10                    MR. BEAN:  -- pull up Exhibit 184.

02:47:27  11   BY MR. BEAN:

02:47:28  12   **Q**     What is this?

02:47:29  13   **A**     Mr. Karasarides filed 2009 income tax return,

02:47:35  14   previously referenced as filed with the service center, then

02:47:39  15   forwarded to exam a couple months later, a few months later.

02:47:43  16   **Q**     And how do you know that this is the 2009 return?

02:47:45  17   **A**     I can see the label that was put on there by the

02:47:48  18   taxpayer, but it also has the date stamp.  So when the IRS

02:47:51  19   service center receives a tax return, they put that date

02:47:54  20   stamp on there.  So the IRS -- that's the IRS's official

02:47:59  21   stamp to notify when that return was filed received.

02:48:03  22   **Q**     And who is the taxpayer for this return?

02:48:05  23   **A**     Mr. Karasarides.

02:48:07  24                    MR. BEAN:  And can we go to the next page?

02:48:09  25   BY MR. BEAN:

02:48:11   1   **Q**     Is there a signature down at the bottom?

02:48:13   2   **A**     Yes.

02:48:14   3   **Q**     And does it appear that this document was signed?

02:48:17   4   **A**     By --

02:48:18   5   **Q**     By an individual, presumably the taxpayer?

02:48:22   6   **A**     Correct.

02:48:22   7   **Q**     Is there a paid preparer listed here?

02:48:24   8   **A**     Yes.  Mr. DiPietro.

02:48:33   9   **Q**     Is this a true and accurate representation of the 2009

02:48:35  10   tax return Mr. Karasarides filed with the IRS?

02:48:40  11   **A**     Yes.

02:48:43  12                MR. BEAN:  Can we go -- no.  This is fine.

02:48:46  13   BY MR. BEAN:

02:48:47  14   **Q**     How much adjusted gross income did Mr. Karasarides

02:48:49  15   report on this return?

02:48:52  16          If you need us to change pages, just let us know.

02:48:55  17   **A**     That's fine.

02:48:57  18          It's right around 450,000.

02:49:00  19   **Q**     And how much tax did he self-assess?

02:49:04  20   **A**     Right around $157,000.

02:49:06  21   **Q**     And where do we see that on this form?

02:49:11  22   **A**     Line 75.

02:49:14  23          Sorry, the better line is Line 60.  They're the same

02:49:17  24   number, but --

02:49:18  25   **Q**     Can you just describe, you know, since the jury -- you

**G. Jordan  (Direct by Bean)**                    58

02:49:22  1    can't really point.  You can draw on the screen.

02:49:25  2          Can you just point next to that line?

02:49:28  3    **A**    (Witness complies).

02:49:29  4    **Q**    Perfect.  Thank you.

02:49:30  5          Have you reviewed it -- did you review this tax return

02:49:32  6    during your audit?

02:49:33  7    **A**    Yes.

02:49:33  8    **Q**    And did you use it as the basis for an assessment in

02:49:37  9    2009?

02:49:39  10   **A**    Yeah.  So I -- so, we processed this return as it was,

02:49:45  11   so we assessed the tax that self-reported, and then the

02:49:48  12   audit continued to -- because there was additional tax due

02:49:53  13   for unreported income, a couple other adjustments, but this

02:49:57  14   was the basis.  We started with this, assessed this tax, and

02:50:00  15   then through the examination, the IRS examination, we

02:50:05  16   proposed additional adjustments from this return amount.

02:50:08  17   **Q**    Did you discuss this tax return with Mr. DiPietro

02:50:11  18   during your examination?

02:50:13  19   **A**    Yeah, yeah, yeah.  Often.

02:50:15  20   **Q**    So did you receive additional information from him

02:50:17  21   about what was reported on this tax return?

02:50:20  22   **A**    They -- they had some bank statements, and the gross

02:50:28  23   receipts reported on this return were based on bank

02:50:32  24   statements.  Plus there was -- Mr. DiPietro informed that he

02:50:38  25   had added around a hundred thousand dollars of additional

02:50:43  1   income just to make sure everything was covered.

02:50:46  2   **Q**    Have you ever, in your career, ever run into a

02:50:49  3   situation where a tax preparer told you they added a hundred

02:50:54  4   thousand dollars of income just to make sure they're

02:50:57  5   covered?

02:50:57  6   **A**    No.  That's very odd.  I've never heard of that.  Just

02:51:00  7   like the IRS, we do an audit, if there's income not

02:51:04  8   reported, it's also required to not report income because

02:51:09  9   [sic] -- that's very odd for somebody to add income to pay

02:51:12  10  tax on.

02:51:13  11  **Q**    Does this return report that Mr. Karasarides owned a

02:51:17  12  business -- businesses?

02:51:19  13  **A**    Yes.

02:51:20  14  **Q**    Where on a tax return would we find information

02:51:23  15  related to any businesses?

02:51:25  16  **A**    So there's a Schedule C is the schedule that gets

02:51:30  17  attached to file with your income tax return.  So the

02:51:33  18  Schedule C is the business, in this case a sole

02:51:41  19  proprietorship, where an additional business or businesses

02:51:43  20  would be reported.  Two of those schedules on this one, I

02:51:45  21  believe.

02:51:45  22  **Q**    And what are we looking at right now?

02:51:47  23  **A**    This is Mr. Karasarides' 2009 Schedule C for reported

02:51:52  24  vending income.

02:51:54  25  **Q**    Is there a name reported for that business?

| | | |
|---|---|---|
| 02:51:57 | 1 | **A**    CK- -- C Care Corp. |
| 02:52:01 | 2 | **Q**    Did you have discussions with Mr. DiPietro about the |
| 02:52:04 | 3 | nature of this business and exactly what Mr. Karasarides was |
| 02:52:07 | 4 | doing with this business? |
| 02:52:08 | 5 | **A**    Yes. |
| 02:52:08 | 6 | **Q**    And can you tell us about those conversations? |
| 02:52:12 | 7 | **A**    He was selling what they called sweepstakes software, |
| 02:52:17 | 8 | so he would get commissions for selling sweepstakes software |
| 02:52:24 | 9 | where he would -- I think mostly in Ohio, a little bit in |
| 02:52:27 | 10 | Florida, he would sell a software, get commissions.  And he |
| 02:52:31 | 11 | would also solicit businesses that used the software to open |
| 02:52:36 | 12 | new businesses, and then he would look for individuals to |
| 02:52:38 | 13 | open new businesses where this software could be used. |
| 02:52:44 | 14 | **Q**    Did Mr. DiPietro tell you how sweepstakes software was |
| 02:52:49 | 15 | used? |
| 02:52:49 | 16 | **A**    Yes. |
| 02:52:49 | 17 | **Q**    How did he describe it? |
| 02:52:51 | 18 | **A**    So, I think the easiest way to picture it is usually |
| 02:52:55 | 19 | in a strip mall type situation they would have machines set |
| 02:52:58 | 20 | up, computers, where a customer would come in, pay -- they |
| 02:53:05 | 21 | would give money to earn playing points or playing time. |
| 02:53:11 | 22 | Then they would play games which they described as |
| 02:53:16 | 23 | sweepstakes where -- they described them as games of chance, |
| 02:53:18 | 24 | where if they would win these games of chance, then they |
| 02:53:22 | 25 | would earn payouts. |

**G. Jordan  (Direct by Bean)**                                    61

02:53:29  1   **Q**      Were any other businesses reported on the tax return?

02:53:31  2   **A**      Yes.  This is the second business reported on this tax

02:53:35  3   return for 2009 for gambling.  Previously mentioned

02:53:41  4   professional gambling.

02:53:41  5   **Q**      So this is the same professional gambling you were

02:53:44  6   talking about where you had made a determination and

02:53:46  7   Mr. DiPietro had an objection and the IRS backed down from

02:53:49  8   its position that you described earlier?

02:53:51  9   **A**      Correct.

02:53:54  10  **Q**      Are there any -- can you just tell the jury about what

02:53:58  11  is a Schedule E, just briefly?

02:54:00  12  **A**      A Schedule E is where a person would report their

02:54:03  13  income from rental properties, or we call it flow-through

02:54:11  14  income.  So if you have a sub-corporation or partnerships,

02:54:15  15  and in Mr. Karasarides' case he had partnerships and an S

02:54:19  16  corp., so your interest from those partnerships would be

02:54:21  17  reported on that Schedule E.

02:54:22  18  **Q**      And before we look to see if there's a Schedule E on

02:54:25  19  this return, what kind of schedule is this here?

02:54:28  20  **A**      This is a Schedule E.  So this is the profit or loss

02:54:31  21  from business, from business activity.

02:54:32  22  **Q**      And I didn't catch what letter, I think some of the

02:54:36  23  letters sound similar, but can you say that again, a

02:54:38  24  schedule what?

02:54:39  25  **A**      Oh, Schedule C.

02:54:40  1   **Q**     Got it.

02:54:41  2   **A**     As in cat.

02:54:42  3   **Q**     Yeah.  And under where it says profit or loss from

02:54:45  4   businesses, is there some text in parentheses?

02:54:48  5   **A**     Sole proprietorship.

02:54:51  6   **Q**     And what is a sole proprietorship?

02:54:53  7   **A**     That's when an individual runs a business, so that

02:54:58  8   would be Mr. Karasarides' personal business reported on

02:55:04  9   Schedule C.

02:55:05  10  **Q**     And if -- if an individual had a business and they had

02:55:08  11  partners, would they report it on a Schedule C?

02:55:10  12  **A**     It's possible, but that's not the typical, no.

02:55:17  13           MR. BEAN:  Carissa, can we flip a little bit?

02:55:24  14  I'll tell you when.  Keep going.  You can stop.

02:55:24  15  BY MR. BEAN:

02:55:25  16  **Q**     Is this Schedule E that you referenced earlier?

02:55:26  17  **A**     Yes, from the same tax return, yes.

02:55:30  18  **Q**     And what -- briefly, just what's on it?

02:55:32  19  **A**     Rental activity.  No income, but the expenses for

02:55:36  20  rental properties.

02:55:37  21  **Q**     Okay.

02:55:38  22           MR. BEAN:  And Carissa, can you go to the next

02:55:40  23  page?  And the next one?  And the next one?

02:55:45  24  BY MR. BEAN:

02:55:47  25  **Q**     So does Mr. Karasarides report any other business

02:55:49  1   interest on this tax return?

02:55:51  2   **A**    I think you're wanting to move down another page or

02:55:54  3   two, maybe.

02:55:55  4   **Q**    One more page?

02:56:01  5        You can tell us when to stop or -- keep going?

02:56:04  6   **A**    Yeah.  Keep going.  We're looking for the Schedule E.

02:56:07  7   I think the pages just got out of order.

02:56:12  8                    MR. BEAN:  It's frozen?

02:56:15  9                    MS. WELCH:  This is the last page.

         10   BY MR. BEAN:

02:56:19 11   **Q**    This is the last page.  So are there any other

02:56:20 12   businesses?

02:56:21 13   **A**    Oh.  Oh, yeah, no other businesses then on this

02:56:24 14   return, because this. . .

02:56:30 15   **Q**    At some point did you come to do an examination on

02:56:34 16   Mr. Karasarides for 2010?

02:56:36 17   **A**    Yes.

02:56:37 18   **Q**    How did that happen?

02:56:39 19   **A**    There was no 2010 return filed.  And based on the 2009

02:56:50 20   examination and records available, there was income required

02:56:52 21   to be reported, but there was no return filed for that

02:56:54 22   income.

02:56:54 23   **Q**    And in the course of that did you interact with

02:56:57 24   Mr. DiPietro?

02:56:58 25   **A**    Yeah.  Similar -- same way, continually throughout the

02:57:03   1   audit once we picked it up.

02:57:04   2   **Q**    And was it prepared in parallel with the 2009

02:57:07   3   examination?

02:57:08   4   **A**    The exam was done in parallel.  2009 and 2010 were

02:57:12   5   done parallel, yes.

02:57:13   6   **Q**    Was any return ever filed by Mr. Karasarides for 2010?

02:57:18   7   **A**    No.

02:57:19   8   **Q**    Did you complete an examination for 2010?

02:57:22   9   **A**    Yes.

02:57:28  10            MR. BEAN:  Can you please pull up Exhibit 201.

02:57:31  11   BY MR. BEAN:

02:57:31  12   **Q**    What are we looking at here?

02:57:32  13   **A**    This is the front page of an examination report

02:57:34  14   referenced earlier.  4549 is the form number.

02:57:38  15   **Q**    Who is the taxpayer?

02:57:40  16   **A**    Mr. Karasarides.

02:57:41  17   **Q**    Did you prepare this document initially?

02:57:44  18   **A**    Yes.

02:57:46  19            MR. BEAN:  And Carissa, could we go to the

02:57:47  20   next page?

02:57:49  21   BY MR. BEAN:

02:57:50  22   **Q**    Is there a signature down on the bottom of this?

02:57:53  23   **A**    Yes.  Mr. Karasarides signed that for the audit.

02:57:57  24   **Q**    How did you -- did you ever come to receive this

02:58:00  25   document in this form, signed?

02:58:03  1   **A**      Yeah.  I physically picked up this physical paper

02:58:07  2   document from Mr. DiPietro's office on August 12th, 2012,

02:58:13  3   the date stamp there.  That's my date stamp.

02:58:15  4   **Q**      On this document, do you assess additional tax against

02:58:20  5   Mr. Karasarides?

02:58:21  6   **A**      Yeah.  So once the IRS, the exam, we propose

02:58:25  7   adjustment as shown on this report.  We've gone through lots

02:58:28  8   of transactions of explaining, discussing, reviewing

02:58:31  9   records.  At the end, this was my proposed adjustments.  We

02:58:33  10  discussed it with Mr. DiPietro, and they agreed to this --

02:58:38  11  to this adjustment.

02:58:40  12  **Q**      And how much did you assess for each year?  And if we

02:58:44  13  need to change pages of this document, just let us know.

02:58:47  14  **A**      Yeah.  So, for 2009, it was right about $70,000 and

02:58:51  15  for 2010, about 430,000.  But the 70,000 for 2009, that's in

02:58:57  16  addition, above and beyond what was reported on the 2009

02:59:01  17  return.  I think that's a distinction there.

02:59:03  18  **Q**      So, are you saying that what Mr. Karasarides owed for

02:59:06  19  2009 would include what he reported on that 2009 return,

02:59:11  20  plus this figure here that you assessed?

02:59:14  21  **A**      Correct.  There's a -- I think a hundred -- we went

02:59:16  22  over that before.  156,000 was on the late-filed return, and

02:59:20  23  then this amount was in addition to that amount.

02:59:24  24  **Q**      And do these amounts, do they include penalties?

02:59:27  25  **A**      This does, yes.

**G. Jordan  (Direct by Bean)**                    66

02:59:29   1   **Q**     Is it common course for the IRS to assess penalties in

02:59:33   2   certain situations?

02:59:34   3   **A**     Yeah, very, very.

02:59:35   4   **Q**     Just -- can you give us -- what penalties were

02:59:38   5   assessed here?

02:59:39   6   **A**     Failure to file and failure to pay.  I think they're

02:59:42   7   somewhat self-explanatory.  If there's a return not filed

02:59:46   8   when one is required, if it's not filed on time, and then if

02:59:49   9   there is tax due, there's a failure to pay penalty for not

02:59:55   10  paying tax that's owed.  And this also has much smaller

03:00:01   11  amount but estimated tax.

03:00:05   12      So an employee might have taxes withheld from their

03:00:09   13  paycheck.  If you're self-employed, you'd be required to

03:00:13   14  make estimated payments quarterly on that tax.  So that

03:00:15   15  penalty is for not paying those estimated tax penalties.

03:00:19   16  **Q**     Does the IRS assess interest on unpaid tax debts?

03:00:23   17  **A**     Yes.

03:00:23   18  **Q**     Are you responsible for calculating any interest

03:00:26   19  assessments?

03:00:27   20  **A**     We're not responsible.  We would say this is a

03:00:30   21  courtesy calculation.  The service center actually keeps the

03:00:34   22  official calculation, but the software that we use to

03:00:37   23  prepare this report, it does that calculation of the

03:00:42   24  interest at the date shown here on the report.

03:00:45   25  **Q**     Is it accurate to say that for every day

03:00:48   1    Mr. Karasarides did not pay these assessments, the IRS

03:00:51   2    charged interest and the amount he owed went up?

03:00:56   3    **A**    Yes.  It compounds daily.

03:00:58   4    **Q**    Now, we looked earlier at the signature at the bottom?

03:01:00   5    **A**    Yes.

03:01:01   6    **Q**    By signing this document, what does that mean?

03:01:03   7    **A**    That they agreed to the tax amounts and to be held

03:01:07   8    liable for the tax shown on the report.

03:01:10   9    **Q**    And do you see there's some printed text right below

03:01:15  10    where it says your name and right above the signature?

03:01:17  11    **A**    Yes.

03:01:18  12    **Q**    Can you read the first two sentences there?

03:01:20  13    **A**    Yeah.

03:01:20  14         Consent to assessment and collection.  I do not -- I

03:01:27  15    do not wish to exercise my appeal rights with the Internal

03:01:30  16    Revenue Service or to contest in the United States Tax Court

03:01:33  17    the findings of this report.  Therefore, I give my consent

03:01:38  18    to the immediate assessment and collection of any increase

03:01:42  19    in tax penalties and accept any decrease in tax and

03:01:48  20    penalties shown above, plus additional interest as provided

03:01:51  21    by the law.

03:01:53  22              MR. BEAN:  Can we please go back to

03:01:55  23    Exhibit 100?

03:02:04  24    BY MR. BEAN:

03:02:05  25    **Q**    Does this account transcript show when

03:02:08    1    Mr. Karasarides' 2009 tax return was filed with the IRS?

03:02:12    2    **A**     Yes, it does.

03:02:14    3    **Q**     Where does it show that?

03:02:15    4    **A**     And I'm going to make sure I'm saying the right thing

03:02:19    5    here.  I'm going to circle this amount.  The 5-30, I believe

03:02:22    6    that's when we picked up the audit.

03:02:34    7    **Q**     Did anything happen on December 28th, 2011?

03:02:37    8    **A**     Ah, yes.  Thank you.  That's where the return was

03:02:39    9    filed.

03:02:39   10        I can see okay but it's a little bit difficult.

03:02:44   11    **Q**     And do you see some entries below that where it looks

03:02:47   12    like they're amount figures?

03:02:48   13    **A**     You said amount figures?

03:02:50   14    **Q**     Yeah.  Just some entries right below that 12-28-2011

03:02:54   15    date.

03:02:54   16    **A**     Yeah.  That would be penalty for failure to file,

03:02:57   17    failure to pay.  And the 156,000, that's the tax amount

03:03:00   18    shown on that late return.  The 3,700 odd dollars is failure

03:03:07   19    for making estimated payments.  That was assessed by the

03:03:11   20    service center because the service center will apply those

03:03:14   21    penalties, not in duplicate to the audit, but they will --

03:03:19   22    they will add those penalties on there for not paying.

03:03:22   23    **Q**     Did you eventually close your examination?

03:03:25   24    **A**     Yeah.  Shortly after.

03:03:28   25    **Q**     Is the date of that, is that shown on this document?

03:03:33  1        Down --

03:03:34  2   **A**   Repeat the question.

03:03:35  3   **Q**   Is the date that you closed your examination, is that

03:03:37  4   reported on this transcript?

03:03:38  5   **A**   Yes.

03:03:39  6   **Q**   And what date was that?

03:03:41  7   **A**   November 19th of 2012.

03:03:44  8   **Q**   By looking at this transcript, are you able to tell

03:03:47  9   whether a collections case was opened by the IRS to collect

03:03:51  10  on the tax that had been assessed against Mr. Karasarides

03:03:54  11  for 2009?

03:03:58  12  **A**   You're asking if they were --

03:04:00  13  **Q**   Are you able to tell by looking at the entries?

03:04:02  14  **A**   Yes.

03:04:03  15  **Q**   And was a collections case opened?

03:04:04  16  **A**   Yes.

03:04:09  17       Down there on 6-20-2014, that's collection giving a

03:04:15  18  notice that they intend to levy in their attempt to collect

03:04:22  19  unpaid tax debt.

03:04:23  20            MR. BEAN:  And Carissa, can you go to the next

03:04:26  21  page?

03:04:29  22  BY MR. BEAN:

03:04:30  23  **Q**   Does -- are you familiar with what an offer in

03:04:34  24  compromise is?

03:04:34  25  **A**   Yes.

**G. Jordan  (Direct by Bean)**                    70

| | | |
|---|---|---|
| 03:04:35 | 1 | **Q**     Can you just kind of sum it up for the jury? |
| 03:04:37 | 2 | **A**     So, if a taxpayer owes debt, they -- of course like |
| 03:04:42 | 3 | most things with the IRS, there's an official form.  You |
| 03:04:44 | 4 | file a form and you make an offer of some amount of money |
| 03:04:48 | 5 | lower than what you actually do in order to, you know, |
| 03:04:53 | 6 | compromise on how much you would pay them.  And, you know, |
| 03:04:56 | 7 | the IRS is trying to collect money, so they might take a |
| 03:05:00 | 8 | reduced amount. |
| 03:05:01 | 9 | So the taxpayer offered in this case -- this is |
| 03:05:04 | 10 | showing he had offered to make a reduced amount of payment |
| 03:05:07 | 11 | to -- an attempt to settle the tax debt. |
| 03:05:09 | 12 | **Q**     And so this document shows he did make an offer in |
| 03:05:13 | 13 | compromise? |
| 03:05:13 | 14 | **A**     Yes. |
| 03:05:13 | 15 | **Q**     Is that -- |
| 03:05:14 | 16 | **A**     Yes. |
| 03:05:15 | 17 | **Q**     Was that offer in compromise accepted? |
| 03:05:17 | 18 | **A**     It was rejected. |
| 03:05:19 | 19 |                 MR. BEAN:  Can we please pull up Exhibit 101. |
| 03:05:22 | 20 |                 THE COURT:  Mr. Bean, I think I'll interrupt |
| 03:05:24 | 21 | you at this point.  Take our afternoon recess if it's |
| 03:05:27 | 22 | convenient. |
| 03:05:28 | 23 | Okay, folks, we'll take about 15 minutes. |
| 03:05:31 | 24 | Now, you've heard some testimony.  You got a lot more |
| 03:05:33 | 25 | to go, so keep an open mind. |

03:05:35  1      Refresh yourself, and if we have a smoker or smokers,

03:05:38  2  you have to be accompanied down to the 7th floor where we

03:05:42  3  have a spot.  I think it's the 7th floor.

03:05:44  4      All right?  And so we'll see you in about 15 or

03:05:47  5  20 minutes.

03:05:47  6                  COURTROOM DEPUTY:  All rise.

03:41:08  7   (Jury excused from courtroom at 3:05 p.m. till 3:41 p.m.)

03:41:08  8                  COURTROOM DEPUTY:  All rise for the jury.

03:41:10  9              (Jury returned to courtroom.)

03:41:37  10                 COURTROOM DEPUTY:  Court is in session.

03:41:38  11  Please be seated.

03:41:42  12                 THE COURT:  Go ahead, Mr. Bean.

03:41:45  13                 MR. BEAN:  Could we please pull up Exhibit 100

03:41:49  14  again?  And go to the next page.

03:41:53  15      Excuse me, 10- -- 184, please.  Sorry.

03:42:04  16  BY MR. BEAN:

03:42:05  17  Q    Now, Mr. Jordan, I believe before the break you

03:42:07  18  testified about this document; right?

03:42:08  19  A    Yes.

03:42:09  20  Q    And you testified about what businesses reported on

03:42:11  21  this document; correct?

03:42:12  22  A    Yes.

03:42:12  23  Q    And you testified about what Mr. DiPietro told you

03:42:15  24  about what was on this document?

03:42:17  25  A    Yes.

03:42:17  1    **Q**    All right.  Is anywhere on this document, is there any

03:42:21  2    reference to Mr. Karasarides having ownership of a business

03:42:24  3    called Skilled Shamrock?

03:42:25  4    **A**    No, there's not.

03:42:26  5    **Q**    Is there -- anywhere in this tax return is there a

03:42:29  6    reference to Mr. Karasarides having ownership of a business

03:42:31  7    called Redemption?

03:42:33  8    **A**    None.

03:42:34  9    **Q**    Anywhere on this tax return does it report that

03:42:37  10   Mr. Karasarides earned income from either of those

03:42:39  11   businesses, Skilled Shamrock or Redemption?

03:42:41  12   **A**    No.

03:42:42  13          MR. BEAN:  Can we please go to Exhibit 101?

03:42:47  14       And go to the next page.

03:42:50  15   BY MR. BEAN:

03:42:51  16   **Q**    Can you please tell the jury what this is?

03:42:53  17   **A**    Another account transcript.  This is for

03:42:57  18   Mr. Karasarides' 2010 tax year.

03:43:00  19   **Q**    And is this for one of the years you assessed?

03:43:02  20   **A**    Yes, it is.

03:43:06  21          MR. BEAN:  And if we could just scroll through

03:43:08  22   it quickly.

03:43:10  23       Go back up, please.

03:43:12  24   BY MR. BEAN:

03:43:14  25   **Q**    Could we please -- or, Mr. Jordan, does this tax

03:43:17  1   return show whether Mr. Karasarides made any payments for

03:43:22  2   this tax debt?

03:43:23  3   **A**     It would show, but it does not show any payments.

03:43:26  4   **Q**     So if he had made any payments, it would show it?

03:43:29  5   **A**     Correct.

03:43:33  6                      MR. BEAN:  Can we please go to Exhibit 103?

03:43:41  7           And go to the next page, please.

03:43:42  8   BY MR. BEAN:

03:43:43  9   **Q**     What is this?

03:43:44  10  **A**     Mr. Karasarides' 2011 tax return.

03:43:47  11  **Q**     Now, in the course of your work with the IRS, are you

03:43:51  12  familiar with tax returns?

03:43:53  13  **A**     Yes, that's --

03:43:54  14  **Q**     And how to read one?

03:43:55  15  **A**     Yes, very much so.

03:43:58  16  **Q**     I mean, it's part of your job, recreating --

03:44:02  17  **A**     Our job is looking at these, reviewing -- looking to

03:44:06  18  verify their accuracy.

03:44:07  19  **Q**     And who is the taxpayer on this tax return?

03:44:09  20  **A**     Mr. Karasarides, Christos.

03:44:12  21                      MR. BEAN:  And could you go to the next page,

03:44:13  22  please?  And the page after that.

03:44:15  23  BY MR. BEAN:

03:44:16  24  **Q**     Is there -- does this tax return appear to be signed?

03:44:22  25  **A**     It does -- it appears to be electronically signed.  So

**G. Jordan  (Direct by Bean)**                    74

03:44:27  1   it does not show a physical signature like a paper-filed

03:44:30  2   return would show, like the prior return we looked at, 2009,

03:44:35  3   but it's typical that we see these asterisk marks at the

03:44:40  4   signature line down here with a date when a return is

03:44:44  5   electronically filed, which is much more common, you know,

03:44:48  6   rather than 15 years ago or so.

03:44:54  7                   MR. BEAN:  And can you go to the next page?

03:44:56  8   BY MR. BEAN:

03:44:56  9   **Q**     Is there a paid preparer listed on this return?

03:44:59 10   **A**     Yes.  Mr. DiPietro.

03:45:00 11                   MR. BEAN:  All right.  Could we please go back

03:45:04 12   up?

03:45:04 13   BY MR. BEAN:

03:45:05 14   **Q**     How much adjusted gross income does Mr. Karasarides

03:45:07 15   report on this tax return?

03:45:08 16   **A**     Roughly 1.4 million.

03:45:10 17   **Q**     And does he self-assess taxes on this return?

03:45:14 18   **A**     Yes.  Roughly half a million.

03:45:16 19   **Q**     Okay.

03:45:17 20   **A**     In tax.

03:45:23 21                   MR. BEAN:  Could we please go to I believe

03:45:25 22   it's Page 13 or Page 14.

03:45:33 23           That's perfect.

03:45:34 24   BY MR. BEAN:

03:45:35 25   **Q**     What is this?

03:45:37  1    **A**     A Schedule C profit and loss business statement for

03:45:42  2    Mr. Karasarides for 2011, so business schedule for this

03:45:45  3    year's tax return.

03:45:46  4    **Q**     And what type of business?

03:45:48  5    **A**     Vending.  Similar to the -- based on the description

03:45:51  6    of the audit years and what was going on in those years,

03:45:54  7    this would be the selling of sweepstakes, what it appears to

03:46:00  8    be.

03:46:00  9              MR. BEAN:  And can we go to the next couple

03:46:02  10   pages?

          11   BY MR. BEAN:

03:46:10  12   **Q**     And what this?

03:46:11  13   **A**     A second Schedule C business reporting a gambling

03:46:13  14   business.

03:46:14  15   **Q**     And, again, based on your conversations with

03:46:17  16   Mr. DiPietro, you know, on behalf of Mr. Karasarides, can

03:46:20  17   you draw any conclusions about what type of gambling?

03:46:24  18   **A**     I would -- it appears to be his -- the professional

03:46:29  19   gambling based on, you know, his prior years' audits that I

03:46:32  20   worked with him on.

03:46:40  21   **Q**     And what is this?

03:46:41  22   **A**     This is the Schedule E where an individual would

03:46:44  23   report their rental property activity income, deductions for

03:46:49  24   rental properties.

03:46:50  25             MR. BEAN:  And can you keep going slowly?

**G. Jordan  (Direct by Bean)**                                      76

03:46:53  1          Can you stop there?

2   BY MR. BEAN:

03:46:55  3   **Q**     What's reported here?

03:46:56  4   **A**     So this is information for the Schedule E, which we

03:47:02  5   talked about a little earlier was where an individual would

03:47:04  6   report flow-through activities from partnerships or a

03:47:11  7   sub-corporation.  This one shows -- you can see A, B, C, D,

03:47:18  8   E, there are four -- four partnerships and one S corp.

03:47:22  9   listed.  Five different businesses where Mr. Karasarides

03:47:27  10  reports being a partner or shareholder in the corresponding

03:47:35  11  business there.

03:47:35  12  **Q**     And can you just -- what are the names of those

03:47:37  13  businesses?

03:47:37  14  **A**     CM Care Corp; Cyber City Cafe Elyria, LLC; VS2 Cafe,

03:47:45  15  LLC; Broad Street Internet Cafe; Cyber City Port Street -- I

03:47:51  16  think that's Street Lucie, but ST Lucie.

03:47:53  17  **Q**     Now, during the course of the examination, did you

03:47:56  18  ever talk with Mr. DiPietro about a business or something

03:47:58  19  called VS2?

03:48:00  20  **A**     Yes.

03:48:01  21  **Q**     What was your understanding what VS2 was?

03:48:05  22  **A**     VS2 would be where Mr. Karasarides was selling

03:48:13  23  software for VS2.  He was paid from VS2 for his selling

03:48:20  24  software in Ohio, Florida, the places that we went over

03:48:23  25  earlier.

03:48:23  1   **Q**     So was it explained to you that VS2 was associated

03:48:26  2   with the sweepstakes business?

03:48:27  3   **A**     Yes.

03:48:29  4   **Q**     Is there anywhere else on this tax return where

03:48:31  5   Mr. Karasarides reports income or interest in businesses?

03:48:37  6   **A**     No.

03:48:39  7   **Q**     We can scroll through the pages if you like.

03:48:42  8   **A**     Yeah, if I scroll through, there are two Schedule C's

03:48:46  9   we went over and then just this.  No other business.

03:48:49  10  **Q**     Is there anywhere on this return where Mr. Karasarides

03:48:51  11  reports being an owner of a business called Skilled

03:48:53  12  Shamrock?

03:48:53  13  **A**     No, there's not.

03:48:53  14  **Q**     How about -- same question but for a business called

03:48:56  15  Redemption?

03:48:56  16  **A**     There's not.

03:48:57  17  **Q**     How about anywhere on this tax return where he reports

03:48:59  18  receiving income from businesses called Skilled Shamrock or

03:49:03  19  Redemption?

03:49:03  20  **A**     No.

03:49:11  21              MR. BEAN:  Can we pull -- please pull up

03:49:17  22  Exhibit 102?

03:49:19  23      Go to the next page.

03:49:22  24  BY MR. BEAN:

03:49:22  25  **Q**     And what is this?

**G. Jordan (Direct by Bean)**                    78

03:49:23  1  **A**     This is an account transcript for Mr. Karasarides'

03:49:26  2  2011 tax year from the --

03:49:29  3                    MR. BEAN:  If we go to the next page. . .

03:49:52  4  BY MR. BEAN:

03:49:52  5  **Q**     What date -- does this show the date that that 2011

03:49:55  6  tax return was filed?

03:49:56  7  **A**     Yeah.  November 19th, 2012, is when this tax return

03:50:00  8  was filed.

03:50:01  9  **Q**     All right.

03:50:02  10  **A**     Per this transcript.

03:50:04  11                    MR. BEAN:  Can we please go to Exhibit 105?

03:50:14  12  BY MR. BEAN:

03:50:15  13  **Q**     What is this?

03:50:16  14  **A**     A 2012 income tax return for Mr. Karasarides.

03:50:20  15                    MR. BEAN:  And if you could go to the next

03:50:22  16  page.  Page after.  And the next page.

03:50:30  17          Back one.  Sorry.

03:50:31  18  BY MR. BEAN:

03:50:32  19  **Q**     Who is listed as the paid preparer?

03:50:34  20  **A**     Mr. DiPietro.

03:50:35  21                    MR. BEAN:  And if you could go back one.

03:50:38  22  BY MR. BEAN:

03:50:39  23  **Q**     Do you see where it says third-party designee?

03:50:41  24  **A**     Yes.

03:50:42  25  **Q**     Who is listed there?

**G. Jordan  (Direct by Bean)**                    79

03:50:43    1    **A**     Mr. DiPietro.

03:50:45    2    **Q**     And what is a third-party designee?

03:50:47    3    **A**     That's the taxpayer telling the IRS when they file

03:50:50    4    this return if the IRS has questions, they authorize this

03:50:55    5    person to talk about the return for them.

03:50:59    6    **Q**     How much adjusted gross income does Mr. Karasarides

03:51:04    7    report on this return?

03:51:04    8    **A**     Just a touch over 1 million.

03:51:07    9    **Q**     And how much tax does he assess on this return?

03:51:10   10    **A**     Right about 380,000.

03:51:14   11    **Q**     Now, have you looked at this return before preparing

03:51:16   12    today?

03:51:16   13    **A**     Yes.

03:51:16   14    **Q**     And does it include Schedule Cs?

03:51:22   15    **A**     No, it does not.

03:51:23   16    **Q**     It doesn't include Schedule Cs?

03:51:29   17    **A**     Wait, hold on a second.  Let me. . .

03:51:29   18              MR. BEAN:  Can we go to Page 21?

03:51:27   19    **A**     Can I scroll up to the page above that?  On the first

03:51:37   20    page it would have showed it.

03:51:38   21          Yes, okay.  Yes, so this does show a Schedule C for

03:51:41   22    vending, similar to the other prior returns we've looked at.

03:51:44   23    **Q**     And it's your understanding that this would be the

03:51:46   24    same business?

03:51:46   25    **A**     Yes, this would be the vending business, selling.

03:51:50  1                      MR. BEAN:  If we could go three for pages.

03:51:54  2   BY MR. BEAN:

03:51:55  3   **Q**     And what's reported here?

03:51:57  4   **A**     The gambling business.

03:51:58  5   **Q**     And do you understand -- your understanding, what type

03:52:02  6   of gambling?

03:52:02  7   **A**     Professional gambling.

03:52:05  8   **Q**     And I think you've testified before what you

03:52:10  9   understood professional gambling was, but can you just go

03:52:12  10  over it again briefly?

03:52:13  11  **A**     Yeah.  Professional gambling is when somebody does

03:52:21  12  gambling --

03:52:21  13  **Q**     Your understanding here.  Your understanding here of

03:52:25  14  professional gambling.

03:52:25  15  **A**     Oh, of what is done.  Traveling to different places,

03:52:28  16  typically casinos is -- all the information I saw was from

03:52:31  17  casinos or similar resorts where someone gambles.

03:52:34  18  **Q**     Like legal casinos?

03:52:35  19  **A**     Yes.

03:52:36  20  **Q**     Like the Jack next door?

03:52:37  21  **A**     Yeah.  Like Mountaineer, Las Vegas, Atlantic City are

03:52:43  22  I think three or the more common ones for this circumstance.

03:52:45  23                      MR. BEAN:  And can you go down five pages?

03:52:53  24  BY MR. BEAN:

03:52:54  25  **Q**     What's this?

03:52:54   1    **A**      This is a Schedule E for reporting rental income and

03:52:59   2    expenses.

03:52:59   3                    MR. BEAN:  And can you keep going please.

03:53:01   4            Yep.  Stop there.

03:53:02   5            Oh, back one.

03:53:04   6    BY MR. BEAN:

03:53:05   7    **Q**      What's reported here?

03:53:05   8    **A**      So similar to one of the other returns we looked at,

03:53:08   9    this is where Mr. Karasarides reports flow-through income

03:53:14   10   from three partnerships, CM Care Corp., VS2 Cafe, LLC, and

03:53:20   11   Broad Street Internet Cafe.

03:53:23   12   **Q**      Are these some of the same businesses that was just on

03:53:27   13   the return we just looked at?

03:53:28   14   **A**      Yes.

03:53:30   15   **Q**      Are there any other -- does Mr. Karasarides report an

03:53:33   16   interest in or income from any other businesses on this

03:53:37   17   return?

03:53:37   18   **A**      No.

03:53:37   19   **Q**      How about a business called Skilled Shamrock?

03:53:39   20   **A**      There's not.

03:53:40   21   **Q**      How about a business called Redemption?

03:53:42   22   **A**      There is not.

03:53:42   23   **Q**      All right.

03:53:44   24                   MR. BEAN:  Can we please go to Exhibit 107?

03:53:51   25   BY MR. BEAN:

| | | |
|---|---|---|
| 03:53:52 | 1 | **Q**    What is this? |
| 03:53:53 | 2 | **A**    Mr. Karasarides' 2013 tax return. |
| 03:53:56 | 3 | MR. BEAN:  And can we go down a couple pages? |
| 03:54:03 | 4 | Yep. |
| 03:54:04 | 5 | Or, excuse me, one more.  Sorry. |
| 03:54:07 | 6 | BY MR. BEAN: |
| 03:54:08 | 7 | **Q**    Is there a paid preparer listed? |
| 03:54:10 | 8 | **A**    Yeah.  Mr. DiPietro. |
| 03:54:14 | 9 | MR. BEAN:  And can we go back up two pages? |
| 03:54:20 | 10 | Sorry.  Keep going. |
| 03:54:23 | 11 | Thank you. |
| 03:54:27 | 12 | Oh, wait.  Sorry.  Two more down. |
| 03:54:29 | 13 | BY MR. BEAN: |
| 03:54:30 | 14 | **Q**    Does Mr. Karasarides report adjusted gross income on |
| 03:54:32 | 15 | this report and, if so, how much? |
| 03:54:34 | 16 | **A**    Yes.  Right around 280,000. |
| 03:54:37 | 17 | **Q**    And does he self-assess tax? |
| 03:54:39 | 18 | **A**    Yes.  Right around 98,000. |
| 03:54:41 | 19 | MR. BEAN:  Can we go to Page 23? |
| 03:54:50 | 20 | Sorry.  One more. |
| 03:54:53 | 21 | BY MR. BEAN: |
| 03:54:53 | 22 | **Q**    What is this? |
| 03:54:54 | 23 | **A**    The Schedule C reporting self-employed business income |
| 03:55:00 | 24 | for vending, consistent with selling sweepstakes software |
| 03:55:11 | 25 | from the returns that were audited. |

03:55:12  1          MR. BEAN:  And can we please go down three

03:55:14  2    pages.

03:55:15  3    BY MR. BEAN:

03:55:15  4    **Q**    And what is this?

03:55:15  5    **A**    A Schedule C profit or loss from Mr. Karasarides

03:55:19  6    reporting a gambling business, appearing to be similar to

03:55:23  7    the professional gambling from the years that I audited.

03:55:25  8    **Q**    All right.

03:55:27  9          MR. BEAN:  Carissa, can you keep going pages

03:55:28  10   and I'll tell you when to stop?  Yep, right there.

03:55:35  11   BY MR. BEAN:

03:55:35  12   **Q**    So what's reported here?

03:55:36  13   **A**    So this is the schedule -- a page of the Schedule E

03:55:40  14   reporting partnership -- a partnership, Broad Street

03:55:45  15   Internet Cafe.

03:55:45  16   **Q**    Is there anywhere on this return where Mr. Karasarides

03:55:49  17   reports ownership of or income from a business called

03:55:51  18   Skilled Shamrock?

03:55:52  19   **A**    No.

03:55:52  20   **Q**    How about Redemption?

03:55:53  21   **A**    There's not.

03:55:56  22          MR. BEAN:  Can we go to Exhibit 109, please?

03:56:05  23   BY MR. BEAN:

03:56:05  24   **Q**    What is this?

03:56:06  25   **A**    Mr. Karasarides' 2014 income tax return.

03:56:08    1          MR. BEAN:  And if we could go down two pages,

03:56:12    2    I think.  Yep.

            3    BY MR. BEAN:

03:56:14    4    Q    Who is listed as the paid preparer?

03:56:15    5    A    Mr. DiPietro.

03:56:16    6    Q    And we haven't looked at this before.  I just want to

03:56:19    7    point it out now.

03:56:20    8         Do you see where it says "sign here" right up at the

03:56:22    9    top?

03:56:23   10    A    Yes.

03:56:23   11    Q    And is there some very, at least on my screen, pretty

03:56:27   12    small text to the right of the sign here?

03:56:29   13    A    Yes.

03:56:29   14    Q    Are you able to read that?

03:56:31   15    A    I think so.  I can start out.  But under the penalties

03:56:35   16    of perjury, I declare that I have examined this return --

03:56:40   17    oh, thank you -- and accompanying schedules and statements,

03:56:43   18    and to the best of my knowledge and belief they are true,

03:56:45   19    correct, and complete.

03:56:47   20         Declaration of preparer other than the taxpayer is

03:56:52   21    based on all information of which preparer has any

03:56:55   22    knowledge.

03:56:56   23    Q    Is this a standard language that's printed on tax

03:56:59   24    returns?

03:56:59   25    A    Yes.  It's -- yes.  Every tax return is -- they

03:57:03  1    require this.

03:57:04  2              MR. BEAN:  Can we go up a page?

03:57:07  3    BY MR. BEAN:

03:57:08  4    **Q**    Does Mr. Karasarides report adjusted gross income on

03:57:10  5    this return?

03:57:10  6    **A**    Yes, right around $380,000.

03:57:15  7    **Q**    And does he self-assess tax?

03:57:16  8    **A**    Yes, right around $136,000.

03:57:19  9              MR. BEAN:  Can we go to Page 20?

03:57:25  10         One more.

03:57:29  11        So then back two, I think.  Sorry.

03:57:31  12        Yep.  Sorry.  More.

03:57:33  13   BY MR. BEAN:

03:57:33  14   **Q**    All right.  What is this?

03:57:34  15   **A**    Schedule C for Mr. Karasarides for business of

03:57:39  16   professional gambling per my audit that's consistent with

03:57:44  17   those returns that I audited.

03:57:45  18   **Q**    Now, are there any other Schedule Cs included in this

03:57:50  19   tax return?

03:57:50  20   **A**    I can't see here, but I don't believe so.

03:57:52  21   **Q**    Could we --

03:57:52  22   **A**    Yeah.

03:57:53  23   **Q**    Do you want to scroll?

03:57:54  24   **A**    Yeah, just scroll through just to -- but there's not.

03:57:57  25             MR. BEAN:  Scroll up and then down.

03:57:59  1                    THE WITNESS:  Yep.

03:58:10  2   BY MR. BEAN:

03:58:11  3   **Q**    Do you see any Schedule Cs?

03:58:12  4   **A**    That was the last page, yeah, correct.  No other

03:58:16  5   Schedule C business reportings.

03:58:18  6             MR. BEAN:  If we could scroll back down, I

03:58:20  7   think it's Page 23.

03:58:28  8             We'll go one more.

03:58:30  9             One more.

03:58:32  10            Sorry, we'll go back a couple.  The numbers changed.

03:58:35  11   A few more.

03:58:36  12   BY MR. BEAN:

03:58:37  13   **Q**    What is this?

03:58:38  14   **A**    Mr. Karasarides' Schedule E where -- you know, rental

03:58:44  15   property reporting for 2014.

03:58:46  16             MR. BEAN:  And if you could go back to the

03:58:47  17   next page.

03:58:52  18   BY MR. BEAN:

03:58:53  19   **Q**    Does he report any partnerships here?

03:58:56  20   **A**    Yeah.  No partnership or S corporation.

03:59:00  21   **Q**    Is there anywhere on this return where Mr. Karasarides

03:59:03  22   reports income or ownership of a business called Skilled

03:59:06  23   Shamrock?

03:59:06  24   **A**    No, there's not.

03:59:07  25   **Q**    How about a business called Redemption?

03:59:09  1    **A**      There is not.

03:59:10  2    **Q**      All right.

03:59:10  3             MR. BEAN:  Can we please go to Exhibit 111.

03:59:19  4    BY MR. BEAN:

03:59:19  5    **Q**      What is this?

03:59:20  6    **A**      Mr. Karasarides' 2015 income tax return.

03:59:24  7             MR. BEAN:  And if we could go to the next

03:59:25  8    couple pages.

03:59:28  9         One more.  One more.

03:59:30  10   BY MR. BEAN:

03:59:31  11   **Q**      Who is listed as the paid preparer?

03:59:33  12   **A**      Mr. DiPietro.

03:59:35  13   **Q**      And just to give us a sense of when we are, is there a

03:59:38  14   date listed next to these names and the "sign here" and the

03:59:43  15   "paid preparer use only"?

03:59:44  16   **A**      Yes, the same date for both:  January 27th of 2016.

03:59:48  17             MR. BEAN:  All right.  If we could go back up.

03:59:50  18         Right there.

03:59:51  19   BY MR. BEAN:

03:59:52  20   **Q**      Does he report adjusted gross income on this return?

03:59:54  21   **A**      It's a negative adjusted gross income.

03:59:57  22   **Q**      Does he report owing any tax here?

03:59:59  23   **A**      He reports owing 0 tax.

04:00:02  24   **Q**      How -- does he request a refund?

04:00:04  25   **A**      Yes.

04:00:05  1    **Q**     How much of a refund?

04:00:06  2    **A**     Right around $6,000.

04:00:09  3    **Q**     All right.

04:00:11  4            MR. BEAN:  Carissa, if you could indulge me,

04:00:14  5    can we just scroll down, just by page.

04:00:19  6        Yeah.  Yeah.  Each page.  I just want to show them

04:00:22  7    all.

04:00:25  8    BY MR. BEAN:

04:00:26  9    **Q**     Can you stop us when you see there's a Schedule C or a

04:00:29  10   Schedule E, please.

04:00:30  11   **A**     Yes.

04:00:40  12       There's a Schedule E.

04:00:42  13   **Q**     And what's reported there?

04:00:43  14   **A**     That's rental property transactions.

04:00:45  15            MR. BEAN:  If we can go to the next page.

04:00:48  16       The page after.

04:00:50  17       The page after.

04:00:51  18            THE WITNESS:  And that page you just passed

04:00:53  19   was the second page of the Schedule E where you would report

04:00:57  20   flow-through income, partnerships, S corporations.

04:01:00  21            MR. BEAN:  Can we go back to it?

04:01:02  22   BY MR. BEAN:

04:01:02  23   **Q**     And are there any there?

04:01:03  24   **A**     There are none.

04:01:04  25   **Q**     All right.  So is there anywhere on this return where

**G. Jordan (Direct by Bean)**                    89

04:01:08  1   Mr. Karasarides reports ownership of income from a business

04:01:09  2   called Skilled Shamrock?

04:01:10  3   **A**      There is not.

04:01:10  4   **Q**      How about Redemption?

04:01:12  5   **A**      There is not.

04:01:12  6   **Q**      All right.

04:01:13  7              MR. BEAN:  Can we please go to Exhibit 113,

04:01:16  8   please.

04:01:19  9   BY MR. BEAN:

04:01:20  10  **Q**      What is this?

04:01:20  11  **A**      Mr. Karasarides' 2016 income tax return.

04:01:25  12             MR. BEAN:  And if we could go down a couple

04:01:27  13  pages.

04:01:29  14        More.

04:01:30  15  BY MR. BEAN:

04:01:30  16  **Q**      Who is listed as the paid preparer?

04:01:32  17  **A**      Mr. DiPietro.

04:01:33  18  **Q**      And again, can you just tell -- what's the dates

04:01:36  19  that's listed there next to those names?

04:01:37  20  **A**      March 28th, 2017, is the date by both names.

04:01:42  21             MR. BEAN:  And if we go back up.

04:01:44  22  BY MR. BEAN:

04:01:45  23  **Q**      Does he report adjusted gross income on this return?

04:01:48  24  **A**      Yes.  Right around $70,000.

04:01:50  25  **Q**      And does he report owing tax?

**G. Jordan  (Direct by Bean)**                    90

04:01:54  1    **A**      Yes.  Right around $7,000.

04:01:57  2    **Q**      Does he claim a refund?

04:01:59  3    **A**      Yes.  Right around $900.

04:02:01  4    **Q**      If he owed tax, how could he get a refund?

04:02:08  5    **A**      So, on this tax return he -- there's a W-2 reported

04:02:12  6    for an employee as -- so he's being -- the W-2 is issued to

04:02:17  7    a worker who is an employee, and the employer would withhold

04:02:23  8    tax from the worker.  So he has credit for that withholding.

04:02:32  9              MR. BEAN:  Can we go to Page 27?

04:02:35  10        One more.

04:02:37  11        Keep going.

04:02:39  12        All right.  Then can we go up.

04:02:42  13              THE WITNESS:  Yeah.  These prints are often

04:02:43  14    out of order.

04:02:44  15    BY MR. BEAN:

04:02:45  16    **Q**      What is this?

04:02:45  17    **A**      This is the W-2 information to Mr. Karasarides for

04:02:50  18    2016 issued from Enterprise Internet Solutions.

04:02:55  19    **Q**      Is there anywhere on this return -- are there any

04:02:59  20    Schedule Cs?

04:03:00  21    **A**      There are not.

04:03:00  22    **Q**      How about any partnerships or other businesses

04:03:07  23    reported anywhere?

04:03:07  24    **A**      There are not.

04:03:08  25    **Q**      Does a business called Skilled Shamrock show up

04:03:11  1   anywhere on here?

04:03:11  2   **A**    No.

04:03:12  3   **Q**    How about a business called Redemption?

04:03:14  4   **A**    No.

04:03:14  5   **Q**    And income from either of those?

04:03:15  6   **A**    No, there's not.

04:03:20  7              MR. BEAN:  Can we please pull up Exhibit 114.

04:03:29  8   BY MR. BEAN:

04:03:30  9   **Q**    Can you please tell the jury what is this?

04:03:31  10  **A**    Mr. Karasarides' tax account transcript for 2017.

04:03:36  11             MR. BEAN:  And if we could go to the next

04:03:38  12  page.

04:03:39  13  BY MR. BEAN:

04:03:40  14  **Q**    Was a tax return filed by Mr. Karasarides for this tax

04:03:42  15  year?

04:03:43  16  **A**    There was not a return filed.

04:03:44  17  **Q**    Was anything filed?

04:03:46  18  **A**    A request for extending the time to file a return.

04:03:52  19  **Q**    How much time does an extension give?

04:03:54  20  **A**    An additional 6 months.

04:03:57  21  **Q**    So it -- is it fair to say that the extension -- he's

04:04:01  22  no longer under an extension?

04:04:03  23  **A**    Yes, correct.  Yeah.  He's -- the extension has

04:04:06  24  expired.  And it's extension to file, not extension to pay.

04:04:10  25             MR. BEAN:  Can we go to Exhibit 115, please?

**G. Jordan  (Direct by Bean)**                              92

04:04:16   1   BY MR. BEAN:

04:04:16   2   **Q**     What is this?

04:04:18   3   **A**     That's the form, it's 4868 you can see there, but

04:04:22   4   that's what Mr. Karasarides filed to request an extension of

04:04:26   5   time to file.

04:04:29   6   **Q**     On an extension request, is a taxpayer required to

04:04:33   7   report an estimated tax liability?

04:04:35   8   **A**     Yes.

04:04:37   9   **Q**     And what did Mr. Karasarides state was his estimated

04:04:42  10   tax liability?

04:04:42  11   **A**     0.

04:04:44  12               MR. BEAN:  Can we go to Exhibit 116, please?

04:04:50  13   BY MR. BEAN:

04:04:51  14   **Q**     Now, what is this?

04:04:51  15   **A**     Mr. Karasarides' tax account transcript for 2018.

04:04:57  16               MR. BEAN:  If we can go to the next page.

04:05:02  17   BY MR. BEAN:

04:05:02  18   **Q**     Does this transcript say whether Mr. Karasarides filed

04:05:05  19   a tax return for 2018?

04:05:07  20   **A**     It shows that there is no return filed.

04:05:10  21   **Q**     Did he file an extension?

04:05:12  22   **A**     Yes.  There was a -- similar to the prior year, he

04:05:16  23   filed for an extension to file -- of time to file, which

04:05:19  24   extension again, 6 months, which has passed.

04:05:22  25               MR. BEAN:  Can we go to Exhibit 117, please.

04:05:28    1          The blowing it up was great.

04:05:32    2          Thank you.

04:05:33    3     BY MR. BEAN:

04:05:33    4     Q     What are we looking at here?

04:05:34    5     A     Similar to the prior year, this is a request to extend

04:05:37    6     time for filing his 2018 income tax return.

04:05:42    7     Q     And again, does he estimate any total tax liability

04:05:45    8     for 2018?

04:05:46    9     A     0.

04:05:50   10     Q     Now, I think earlier you testified about -- that

04:05:53   11     Mr. Karasarides had a tax debt.  Can you estimate -- you

04:05:57   12     know, have you looked through these records?

04:05:59   13     A     Yes, I have.

04:06:00   14     Q     Can you estimate how much Karasarides' tax debt was on

04:06:04   15     all the years combined?

04:06:05   16     A     Right up to 2. -- it's a little less than 2.8 million.

04:06:11   17               MR. BEAN:  Thank you.

04:06:12   18               THE WITNESS:  Yes.  You're welcome.

04:06:20   19               THE COURT:  Mr. Fedor, do you have any

04:06:21   20     questions?

04:06:23   21               MR. FEDOR:  I got a couple.

04:06:25   22               THE COURT:  Fire away.

04:06:26   23               MR. FEDOR:  Thank you, Judge.

04:06:55   24          Ladies and gentlemen of the jury, Robert Fedor again

04:06:58   25     on behalf of Mr. DiPietro, the CPA, defendant herein.  Thank

04:07:03   1    you for sticking through the tax discussions here.

           2                        - - - - -

           3               CROSS-EXAMINATION OF GARRET JORDAN

04:07:07   4    BY MR. FEDOR:

04:07:07   5    **Q**      Mr. Jordan, pleasure to see you.

04:07:09   6    **A**      Likewise.

04:07:10   7    **Q**      I'm not going to go too far into the weeds of each and

04:07:13   8    every tax return as Mr. Bean did, but I did want to cover

04:07:16   9    some issues with you.

04:07:18  10               And what's your title again with the Internal Revenue

04:07:22  11    Service?

04:07:22  12    **A**      Currently I'm a revenue agent tax -- income tax

04:07:26  13    specialist -- sorry.  Employment tax specialist.

04:07:29  14    **Q**      And how long have you been a revenue agent?

04:07:32  15    **A**      Just short of 15 years.

04:07:34  16    **Q**      Okay.  Have you ever been a revenue officer?

04:07:37  17    **A**      I have not.

04:07:37  18    **Q**      And what is a revenue officer, tell the jury?

04:07:40  19    **A**      So, when a taxpayer owes a tax debt, the revenue

04:07:44  20    officer reaches out and communicates with the taxpayer in

04:07:48  21    attempt to collect a tax debt.

04:07:49  22    **Q**      Would that be akin to a collection agent?

04:07:52  23    **A**      Yes.

04:07:52  24    **Q**      Okay.  And so there's a difference between what you do

04:07:55  25    as a revenue agent, i.e., an auditor, versus a collection

04:08:01    1    agent revenue officer; correct?

04:08:02    2    **A**    Yes.  There are some things that cross, but yes,

04:08:05    3    definitely different functions for sure.

04:08:07    4    **Q**    And have you ever been a revenue officer or a

04:08:09    5    collection agent?

04:08:09    6    **A**    No.

04:08:25    7                    MR. FEDOR:  Carissa, if you could turn to

04:08:27    8    Exhibit 183.

04:08:27    9           Thanks very much.

04:08:32    10   BY MR. FEDOR:

04:08:32    11   **Q**    I just want to spend a few minutes going over the

04:08:34    12   activity record.

04:08:35    13          And tell the jury again, what is your role -- when

04:08:37    14   you're examining a tax return, what does this document

04:08:40    15   reveal?  What is the action that you're taking?

04:08:42    16   **A**    This is to summarize the actions that I took,

04:08:45    17   communications, what work papers I worked on.

04:08:50    18   **Q**    Is it fair to say you do that each time you spend time

04:08:53    19   reviewing this return?

04:08:55    20   **A**    Yes.

04:08:56    21   **Q**    Okay.  And to summarize, the 2009, 2010 tax years, was

04:09:00    22   that something called an SFR?

04:09:02    23   **A**    Yes.

04:09:03    24   **Q**    And what is an SFR, can you tell the jury?

04:09:05    25   **A**    Yeah.  Substitute for return.

**G. Jordan  (Cross by Fedor)**                    96

04:09:07  1        So an SFR is when there's not a return filed by the

04:09:10  2   taxpayer, the IRS will file one for them if they have the

04:09:15  3   information to support the information on a tax return.

04:09:18  4   **Q**    And that, in effect -- I'm sorry, I didn't mean to

04:09:21  5   interrupt.

04:09:22  6   **A**    Yeah.  Typically income.  Sometimes deductions, but

04:09:26  7   it's typically the IRS will report an income on the SFR.

04:09:31  8   **Q**    So at some point you were assigned this case because

04:09:34  9   Mr. Karasarides hadn't filed his 2009 tax return; correct?

04:09:37  10  **A**    Correct.

04:09:37  11  **Q**    Okay.  And what was the result of that SFR or

04:09:40  12  substitute for return, what were your findings?

04:09:42  13  **A**    For 2009?

04:09:44  14  **Q**    Correct.

04:09:45  15  **A**    Well, he -- so I make a distinction because he -- it

04:09:48  16  was an SFR until we got the delinquent return.  So his

04:09:52  17  delinquent return assessed 156,000 of tax.  And then the

04:10:00  18  examination -- so, then the examination assessed an

04:10:07  19  additional, I think was -- I'd have to look again, but I

04:10:10  20  think it was $46,000 in tax.

04:10:13  21        So the report for 2009 is -- yeah, so it's based off

04:10:24  22  of his tax return.  Hopefully I answered that right.

04:10:25  23  **Q**    Okay.  And then at some point 2010 rolled in for the

04:10:28  24  same reasoning; correct?

04:10:29  25  **A**    Yes.

**G. Jordan  (Cross by Fedor)**                    97

04:10:30   1   **Q**     And how did that go about -- or how did that come

04:10:34   2   about?

04:10:34   3   **A**     Because there was -- we had information showing that

04:10:37   4   he had income that triggers a requirement to file a tax

04:10:42   5   return, and there was not a tax return filed.

04:10:44   6   **Q**     Okay.  And Mr. DiPietro, sitting here, was a power of

04:10:48   7   attorney in that regard; correct?

04:10:50   8   **A**     Yes.

04:10:50   9   **Q**     For both the 2009 and 2010 tax years?

04:10:53  10   **A**     Yes.

04:10:53  11   **Q**     Okay.  And did you work with Mr. DiPietro to work

04:10:56  12   through those income and expense issues?

04:10:58  13   **A**     Yes.  Yes.

04:10:59  14   **Q**     Okay.  Did he work through that cooperatively with

04:11:02  15   Mr. DiPietro?

04:11:04  16   **A**     Did Mr. DiPietro work cooperatively with me?

04:11:07  17   **Q**     Correct.

04:11:08  18   **A**     Yes.

04:11:09  19   **Q**     Okay.  And, in fact, in your activity record, in

04:11:14  20   August of 2012, you closed both of those cases as agreed;

04:11:17  21   correct?

04:11:17  22   **A**     Yes.

04:11:18  23   **Q**     And what does that mean for purposes of the jurors and

04:11:21  24   so they understand what agreed closing means?

04:11:23  25   **A**     Yep.  So the IRS makes a tax assessment, puts it on a

04:11:28  1    report, explains it to the taxpayer.  And if they agree to

04:11:32  2    that tax assessment, they sign and return that report saying

04:11:34  3    they agree for those amounts to be assessed.

04:11:38  4    **Q**    And that, in fact, is what happened; correct?

04:11:41  5    **A**    Yes.

04:11:41  6    **Q**    Okay.  And were you done reviewing Mr. Karasarides'

04:11:44  7    tax returns after that was closed out?

04:11:46  8    **A**    Yeah.  I -- with -- I'd have to look through the exact

04:11:50  9    time, but it's usually a couple weeks after the signature is

04:11:53  10   received that it's closed from examination, from my

04:11:58  11   examination.

04:11:58  12   **Q**    Right.  And so the jurors understand, you were done

04:12:00  13   with Mr. Karasarides at that point; correct?

04:12:02  14   **A**    Correct.

04:12:03  15   **Q**    Thank you.

04:12:07  16            MR. FEDOR:  If we could turn to Exhibit 184.

04:12:15  17   BY MR. FEDOR:

04:12:15  18   **Q**    I'm showing you what's been marked as Government

04:12:18  19   Exhibit 184 again.

04:12:21  20            If you could turn to Page 4 of that exhibit.

04:12:23  21            Thank you, Carissa.

          22   BY MR. FEDOR:

04:12:26  23   **Q**    And what is this schedule again?

04:12:27  24   **A**    Schedule C profit or loss from business for vending

04:12:32  25   for Mr. Karasarides.

**G. Jordan (Cross by Fedor)** 99

| | | |
|---|---|---|
| 04:12:33 | 1 | **Q**    And so Schedule C is filed in what circumstance? |
| 04:12:38 | 2 | **A**    When an individual has a business.  So this is a way |
| 04:12:40 | 3 | of an individual to report their business activity on their |
| 04:12:44 | 4 | personal tax return. |
| 04:12:45 | 5 | **Q**    And you could have an informal partnership, you could |
| 04:12:49 | 6 | have an informal business.  It's any activity that results |
| 04:12:51 | 7 | in self-employment income; is that correct? |
| 04:12:53 | 8 | **A**    In self-employment income. |
| 04:12:54 | 9 | **Q**    Correct. |
| 04:12:55 | 10 | **A**    Yes. |
| 04:12:55 | 11 | **Q**    Okay.  And that's what this Schedule C shows; correct? |
| 04:12:58 | 12 | **A**    Yes. |
| 04:13:00 | 13 | **Q**    And so I know on Mr. Bean's examination of you, you |
| 04:13:04 | 14 | discussed vending. |
| 04:13:05 | 15 | **A**    Yes. |
| 04:13:06 | 16 | **Q**    Okay.  And for the 2009 year, did you investigate what |
| 04:13:10 | 17 | the vending activity was on this Schedule C? |
| 04:13:13 | 18 | **A**    Yes. |
| 04:13:13 | 19 | **Q**    Okay.  And what was your understanding of that |
| 04:13:15 | 20 | activity? |
| 04:13:17 | 21 | **A**    That Mr. Karasarides sold sweepstakes and received |
| 04:13:23 | 22 | commissions for selling sweep -- for selling the sweepstakes |
| 04:13:27 | 23 | software.  If I didn't say that correctly, not for selling |
| 04:13:30 | 24 | sweepstakes, for selling the sweepstakes software. |
| 04:13:33 | 25 | **Q**    Okay.  And how did you come about that understanding? |

04:13:35  1    **A**    Interview.

04:13:36  2    **Q**    Interview of him?

04:13:38  3    **A**    I believe it was the same day, Mr. DiPietro and

04:13:42  4    Mr. Karasarides.

04:13:43  5    **Q**    Okay.

04:13:43  6    **A**    So that would have been -- I'd have to look at the

04:13:47  7    date, but I think it might have been August.

04:13:49  8    **Q**    Did Mr. -- I'm sorry.

04:13:50  9    **A**    Yeah.  Go ahead.

04:13:51  10   **Q**    Did Mr. Karasarides receive any 1099s for that income?

04:13:54  11   **A**    Yes.

04:13:56  12   **Q**    He did?

04:13:58  13   **A**    Yes.

04:13:59  14   **Q**    And did it tie to the Schedule C gross receipts?

04:14:03  15   **A**    No.  Not exactly, no.

04:14:05  16   **Q**    Okay.

04:14:06  17   **A**    He had more income than was reported to him on the

04:14:09  18   1099 forms.

04:14:10  19   **Q**    Okay.  And do you know what -- just turning on the

04:14:15  20   right side next to vending, there's something called a code,

04:14:18  21   a SIC code as it's known, a standard industry code; correct?

04:14:22  22   **A**    Yes.

04:14:23  23   **Q**    And it's code 713100; correct?

04:14:27  24   **A**    Yes.

04:14:27  25   **Q**    Do you know what that is?

**G. Jordan  (Cross by Fedor)**                                    101

04:14:28    1    **A**    No, I don't.  I had known it at the time.

04:14:28    2    **Q**    Did you ever investigate what it is?

04:14:29    3    **A**    Yeah, we would have looked that up, and we put that on

04:14:33    4    our work papers, but I --

04:14:34    5    **Q**    If I told you it was for casinos, gambling, and

04:14:37    6    gambling businesses, would that surprise you?

04:14:38    7    **A**    No.

04:14:38    8    **Q**    Okay.  So could it have been, perhaps that was the

04:14:41    9    internet cafes that were being reported?

04:14:45   10    **A**    It could have been.

04:14:46   11    **Q**    Thank you.

04:14:47   12          And it's $431,000; correct?

04:14:51   13    **A**    Yes.

04:14:51   14    **Q**    Substantial amount of money.

04:14:59   15          Can we go to exhibit -- Government Exhibit 201,

04:15:02   16    please?

04:15:07   17          And just reviewing, again, for purposes of -- so the

04:15:13   18    jurors understand this fully, these are your findings for

04:15:15   19    the 2009, 2010 tax years; correct?

04:15:18   20    **A**    Yes.

04:15:19   21    **Q**    And these findings were agreed to, and you came

04:15:21   22    together with Mr. DiPietro to come to this conclusion;

04:15:23   23    correct?

04:15:24   24    **A**    Yes.

04:15:29   25    **Q**    And it includes additional gross receipts from

1    vending; is that correct?

2    **A**    Yes.

3    **Q**    It also includes other income from Schedule E and

4    other miscellaneous third-party reporting; correct?

5    **A**    Yes.

6    **Q**    And just backing up for a second so the jurors

7    understand, again, what kind of -- I think it's called IRP

8    documentation that you receive as part of the findings of

9    these third-party payors and how you determine what should

10   go into this 4549 report when the exam is being conducted,

11   what should be reviewed and what should be pulled from the

12   IRS.  Can you explain to the jurors how you pull that

13   information, what you actually review?

14   **A**    Yeah.  So, for several different types of documents

15   but reference to these, the -- when a -- typically a

16   business -- when they file maybe someone's W-2, they would

17   have that information available on a document retrieval

18   system for the IRS.  So if there's a 1099 or a W-2 or a

19   1098 — you might be more familiar with a 1098 — any of these

20   forms, so there's a summary that -- it's a program that

21   several persons in the IRS can retrieve document information

22   from.  So W-2G, 1099, yeah, those would be the primary ones

23   here.

24   **Q**    So when you're preparing a return or preparing a

25   substitute for return because one is not on file, you go and

04:16:54   1   you pull that third-party information; is that correct?

04:16:56   2   **A**    Yes.

04:16:57   3   **Q**    And that's a matter of course?  You're --

04:17:00   4   **A**    Right.

04:17:00   5   **Q**    It's your policy you do so?

04:17:01   6   **A**    Yeah.  Yeah.

04:17:02   7   **Q**    And that would include any W-2 income, including

04:17:06   8   withholding taxes, 1099s for dividend income, interest

04:17:10   9   income, any capital gains transactions, any gambling

04:17:11  10   transactions, W-2G's, are all reported to the IRS, as well

04:17:15  11   as Schedule E K-1s would be on that information, I believe.

04:17:19  12   **A**    Yes.  Yeah.  If they're filed.  If they're filed and

04:17:21  13   they show.

04:17:22  14   **Q**    If they're filed?

04:17:23  15   **A**    Yeah.

04:17:23  16   **Q**    All the things that are on file that you utilized and

04:17:26  17   you worked with Mr. DiPietro on to come to what you both

04:17:30  18   believed to an accurate tax return; correct?

04:17:32  19   **A**    Yeah, that was part of -- yes, that's part of the

04:17:34  20   information used for that.

04:17:36  21   **Q**    Thank you.

04:17:36  22        And I think you referenced in your direct examination

04:17:44  23   that there was a discussion you had either with Mr. DiPietro

04:17:49  24   and/or your manager about the professional gambling status

04:17:55  25   of Mr. Karasarides; is that correct?

**G. Jordan  (Cross by Fedor)**                    104

04:17:56    1    **A**     Yes.

04:17:56    2    **Q**     And what was that discussion if you recall?  I know it

04:17:59    3    was 11 or 12 years ago.

04:18:00    4    **A**     Yeah, so there will be some sort of paraphrasing

04:18:04    5    because of that, but, so a manager of an audit group has

04:18:07    6    discretion to -- we kind of would use the term, you know,

04:18:11    7    make a business decision, hey, does it -- does it benefit --

04:18:15    8    what's the benefit versus cost of taking this position.  So,

04:18:20    9    you know, I use the term when Mr. Bean was talking or

04:18:23   10    interviewing me here was -- now, my -- my thoughts just left

04:18:29   11    me for a moment.

04:18:31   12    **Q**     The professional -- if I can refresh your

04:18:37   13    recollection.

04:18:37   14    **A**     Thank you.

04:18:38   15    **Q**     The discussions that you may have had with your

04:18:40   16    general manager and/or with Mr. DiPietro about

04:18:43   17    Mr. Karasarides' professional gambling status.

04:18:44   18    **A**     Oh, yeah.

04:18:45   19          So -- yeah.  So he would inform of, like, hey, what's

04:18:48   20    the cost or benefit of the IRS fighting or debating if he's

04:18:54   21    a professional gambler or not.  And we just conceded, just

04:18:59   22    said, hey, you know, it's not worth the IRS's time or effort

04:19:04   23    to pursue verifying if he is or is not a professional

04:19:08   24    gambler.

04:19:09   25    **Q**     So was there any finding made that he actually was?

04:19:11　1　**A**　We didn't make -- we conceded even pursuing if it was

04:19:15　2　or was not.  Like -- so that's part of the concession is,

04:19:20　3　like, well, we didn't pursue because it was not -- my

04:19:24　4　manager and I -- well, primarily manager would give you

04:19:26　5　direction and say, hey, it's not -- we're not going to

04:19:29　6　pursue making a determination on this.

04:19:33　7　**Q**　Thank you.

04:19:34　8　**A**　You're welcome.

04:19:39　9　　　　　MR. FEDOR:  Can I have Exhibit 100, please?

04:19:46　10　BY MR. FEDOR:

04:19:46　11　**Q**　Just switching back to the transcripts for a second,

04:19:51　12　please.

04:19:52　13　　　　And you previously identified this as a 2010 account

04:19:55　14　transcript; correct?

04:19:56　15　**A**　2009, but yes.

04:20:00　16　**Q**　I'm sorry, I'm on 101.  2009.

04:20:07　17　　　　And I don't want to get too far into the weeds, but if

04:20:10　18　you could tell the jurors, you know, what is this document?

04:20:12　19　What does this tell you?

04:20:13　20　**A**　This tells you several transactions that happened on a

04:20:17　21　taxpayer's account for, this tax year is 2009.  Usually if a

04:20:21　22　return is filed, if there's tax due, payments made on tax,

04:20:28　23　certain letters that are sent to the taxpayer, request by

04:20:31　24　the taxpayer show up on this account.

04:20:34　25　**Q**　Okay.  And, in fact, down towards the bottom of that

04:20:37    1    first page, adjusted gross income of almost $550,000;

04:20:43    2    correct?

04:20:43    3    **A**    Yes.

04:20:44    4    **Q**    Okay.  And is there any balance due on this for this

04:20:47    5    tax year, '09?

04:20:48    6    **A**    This shows an account balance of 0.

            7                    MR. BEAN:  Objection.  Not clear, the

04:20:53    8    question.

04:20:53    9                    THE COURT:  Overruled.

04:20:56   10                    MR. BEAN:  What time frame?

04:20:57   11                    MR. FEDOR:  On Exhibit 100.  What does

04:21:00   12    Exhibit 100 show.

04:21:01   13                    MR. BEAN:  Are you talking about today?

04:21:02   14                    THE COURT:  No, the objection is overruled.

04:21:03   15        Go ahead.

04:21:04   16    BY MR. FEDOR:

04:21:05   17    **Q**    Mr. Jordan, again, what's the balance due to the IRS

04:21:07   18    on Exhibit 100?

04:21:09   19    **A**    This shows a 0 balance.

04:21:10   20    **Q**    Thank you?

04:21:12   21                    MR. BEAN:  Objection, Your Honor.  This is the

04:21:13   22    subject of a motion in limine the government filed.

04:21:17   23                    THE COURT:  Objection's overruled.

04:21:20   24                    MR. FEDOR:  And if we could turn to

04:21:23   25    Exhibit 101.

04:21:26   1   BY MR. FEDOR:

04:21:26   2   **Q**    Again, so the jury understands, what was the adjusted

04:21:28   3   gross income -- what was the income reported by

04:21:30   4   Mr. Karasarides on the 2010 tax return?

04:21:33   5   **A**    0.

04:21:35   6   **Q**    No, the income that was reported.

04:21:36   7   **A**    On 2010?

04:21:38   8   **Q**    Correct.

04:21:40   9   **A**    He didn't file a 2010 return.

04:21:43   10  **Q**    No, after the SFR was done, what was the -- okay.  Let

04:21:47   11  me take a couple steps back.

04:21:50   12           Exhibit 101, there's AGI stated.  What is the AGI,

04:21:54   13  adjusted gross income, stated on the account transcript?

04:21:56   14  **A**    Yeah, the transcript shows roughly 1.6 million.

04:21:59   15  **Q**    That was my question.  Thank you.

04:22:01   16           And what is the balance due per this transcript?

04:22:06   17  **A**    This shows 0 balance due.

04:22:07   18  **Q**    Thank you.

04:22:17   19              MR. FEDOR:  If we could turn to the next page

04:22:19   20  of the account transcript.

           21  BY MR. FEDOR:

04:22:22   22  **Q**    If we scroll down towards the bottom of this exhibit,

04:22:28   23  it says received offer in compromise on July 15th, 2016;

04:22:33   24  correct?

04:22:33   25  **A**    Okay.  I'm going to find where you're looking at here.

**G. Jordan  (Cross by Fedor)**                                   108

04:22:36    1    **Q**    It's the third last entry.

04:22:38    2    **A**    Yes.  Yes.  I see that, yes.

04:22:39    3    **Q**    And it also indicates denied offer in compromise what,

04:22:43    4    two, three weeks later; correct?

04:22:44    5    **A**    Yes.

04:22:45    6    **Q**    Okay.  Do you have any experience in offer in

04:22:48    7    compromise?

04:22:48    8    **A**    I would say very -- I would say very limited because

04:22:51    9    I'm -- yeah.  No.  I have not processed one, so I know of

04:22:55    10   them, but I don't have extended experience with them.  But

04:22:58    11   I'm aware of them and have some knowledge of them because --

04:23:03    12   but we don't -- I have never offered one or received one.

04:23:05    13   **Q**    And what's your limited knowledge of an OIC, can you

04:23:09    14   tell the jurors?

04:23:09    15   **A**    Yeah.  So similar to earlier was a taxpayer files a --

04:23:14    16   an official request on a form -- I'd have to look the form

04:23:16    17   number up -- but they file an IRS form, and they are

04:23:19    18   required to make a presentation of payment.  And the IRS has

04:23:24    19   the opportunity to say, hey, we -- you know, they can agree

04:23:30    20   or not agree to accepting what the taxpayer offers.

04:23:33    21   **Q**    Do you know what forms are utilized to submit an

04:23:35    22   offer?

04:23:36    23   **A**    I -- no, I don't know the forms off the top of my

04:23:39    24   head.  If they were on here, I might see the form number

04:23:43    25   but --

**G. Jordan (Cross by Fedor)**                    109

04:23:43  1    **Q**    Do you have any idea what is required to submit an

04:23:46  2    offer in compromise?

04:23:46  3    **A**    You have to fill the form out.  And there's a

04:23:48  4    percentage of the tax amount, the tax debt, that's required

04:23:51  5    to be submitted with the compromise.

04:23:54  6    **Q**    And what is the percentage of tax debt that's required

04:23:57  7    to be submitted?  Because that's the first time I've ever

04:24:00  8    heard that.

04:24:01  9    **A**    I don't know the percentage.

04:24:02  10   **Q**    Okay.  And do you know any of the terms of the offer

04:24:06  11   in compromise that were submitted by Mr. Karasarides?

04:24:07  12   **A**    I do not.

04:24:08  13   **Q**    Have you ever seen the offer in compromise submitted

04:24:11  14   by Mr. Karasarides?

04:24:11  15   **A**    I have not seen Mr. Karasarides' offer in compromise,

04:24:14  16   no.

04:24:15  17   **Q**    Do you know the difference between a rejection and a

04:24:18  18   return of an offer in compromise?

04:24:19  19   **A**    I do not.

04:24:21  20   **Q**    Okay.  And that's a legal term.

04:24:24  21        And this was -- you know, the account transcript

04:24:28  22   itself shows it was pending two, three weeks; correct?

04:24:30  23   **A**    Yes.

04:24:31  24   **Q**    Do you think this offer in compromise was ever

04:24:34  25   considered by the IRS pending for a short period of time?

G. Jordan (Cross by Fedor)                    110

04:24:37  1    **A**     Like, when I look at this, you're asking, hey, was

04:24:40  2    this accepted or not?

04:24:42  3    **Q**     No.  My question is, do you think the IRS ever looked

04:24:45  4    at it in the two or three-week period of time?

04:24:49  5    **A**     Oh, looked at it.

04:24:50  6          I can't say, but that would be fast.  I think that's

04:24:53  7    what you're saying.  That would be fast.

04:24:55  8    **Q**     That would surprise you, wouldn't it?

04:24:56  9    **A**     Well, do they make -- so, do they make that with a

04:25:00  10   collections officer?  If they make it with a collections

04:25:03  11   officer, if they have direct contact with a collections

          12   officer, I don't know if they can give you correspondence.

04:25:07  13   So if somebody's under audit, they have close -- you know, a

04:25:09  14   person who they're working with directly, then you can get

04:25:12  15   faster response.  So I don't know if this was --

04:25:14  16   **Q**     You really don't have any idea?

04:25:16  17   **A**     I don't know that.  Yeah, and that was my original

04:25:19  18   answer, is I don't know if this was looked at or not.  I

04:25:22  19   can't tell at all by looking at this.

04:25:23  20   **Q**     Fair enough.

04:25:24  21               MR. FEDOR:  Can we turn to Exhibit 103?

          22   BY MR. FEDOR:

04:25:32  23   **Q**     And this again is a 2011 Form 1040 filed by

04:25:36  24   Mr. Karasarides?

04:25:36  25   **A**     Yes.

04:25:40    1           MR. FEDOR:  And can we turn to the first

04:25:42    2    Schedule C?

04:25:51    3        Thank you, Carissa.

04:25:53    4    BY MR. FEDOR:

04:25:54    5    Q    Once again, I'm not going to get into the weeds with

04:25:56    6    all the tax returns as Mr. Bean did, but I do want to point

04:25:59    7    out again that we have the same gross receipts being --

04:26:03    8    large gross receipts being reported on Schedule C as vending

04:26:06    9    income under casino and/or related SIC code, which I don't

04:26:13   10    believe was ever investigated.  Correct?

04:26:15   11    A    Well, you don't investigate them.  But we looked that

04:26:18   12    up before, like in the pre-audit -- Mr. Bean asked about the

04:26:21   13    pre-audit.  That's one of the pre-audit steps, is you look

04:26:22   14    up the NAICS code.

04:26:23   15        So, we would look those up and say, hey, do these

04:26:27   16    business statistics look similar to other businesses with

04:26:30   17    that NAICS code to do a, you know, ballpark analysis.  So,

04:26:32   18    investigate, you know, but we would know this and look that

04:26:35   19    up.  At the time of the audit I would have looked that up to

04:26:37   20    see what the NAICS -- you know, NAICS description.

04:26:40   21    Q    And do you recall if there was ever a 1099 issued for

04:26:43   22    $1.3 million that ties to this Schedule C?

04:26:46   23    A    I -- I do not for 2011 since I did not do any audit

04:26:50   24    work with the 2011.

04:26:53   25    Q    Have you seen this 2011 return prior to preparing for

**G. Jordan (Cross by Fedor)** 112

04:26:56  1   today?

04:26:56  2   **A**     Yes.

04:26:57  3   **Q**     Okay.  In what capacity?

04:26:59  4   **A**     Review and preparation for testifying to this

04:27:04  5   evidence.

04:27:05  6   **Q**     Okay.  So you've not seen any 1099s that would tie to

04:27:10  7   that number on the Schedule C; correct?

04:27:12  8   **A**     Correct.

04:27:13  9   **Q**     And instead of going through each and every other

04:27:16  10  exhibit for 2012, '13, '14, '15, '16 tax years, I think were

04:27:24  11  all similarly prepared; is that correct?

04:27:26  12  **A**     Yeah.  Yeah.  I mean, they -- there's some

04:27:30  13  similarities, yeah, some are not, but the --

04:27:32  14  **Q**     Go ahead, finish.

04:27:33  15  **A**     Do you want to ask if there's -- hey, there's a

04:27:36  16  difference in, hey, that some reported, you know,

04:27:39  17  self-employment business and some did not, so I would say

04:27:41  18  that's very different.

04:27:42  19        So if you say, hey, are they reported similarly, I

04:27:45  20  would say no because some report business income and some

04:27:49  21  report 0 business income with employment income.  So I would

04:27:53  22  say those are quite different.

04:27:54  23  **Q**     And I would agree with you.  But in the years at issue

04:27:57  24  for '12, '13, and '14 at least, we have one professional

04:28:01  25  gambling schedule it looks like, and we have one vending

| 04:28:04 | 1 | schedule it looks like; correct? |

**A**    Yes.

**Q**    That's all I wanted to ask.

Are you aware when Mr. Karasarides went to prison?

**A**    No.

**Q**    Are you aware if Mr. Karasarides divested his gambling store businesses in 2014?

**A**    I -- he divested his -- so he shut his businesses down in 2014?  I did not know that.

**Q**    Okay.  Would that impact your decision-making in terms of what you just reviewed with Mr. Bean and what's on Schedule C in terms of the gross receipts?

**A**    Would it change what -- my assessment of what Mr. Bean -- that's -- I -- be more specific, please.

**Q**    Well, why don't we go through a tax return.

MR. FEDOR:  111, please, Carissa.

Thank you.

BY MR. FEDOR:

**Q**    This is a 2015 Form 1040; correct?

**A**    Yes.

**Q**    And it was prepared by Mr. DiPietro?

**A**    Yes.

**Q**    And it looks like it was e-filed on January 27th of 2016; correct?

**A**    Yes.

04:29:09  1    **Q**    So timely tax return; correct?

04:29:10  2    **A**    Yes.

04:29:14  3    **Q**    Are you aware that Mr. Karasarides was in prison

04:29:17  4    during this time period?

04:29:19  5    **A**    I had only -- no, not of the period.  I knew that he

04:29:24  6    was incarcerated, but I don't know the times or what the

04:29:26  7    reasons were.

04:29:28  8    **Q**    But if he wasn't operating any gaming rooms at that

04:29:32  9    time, he certainly wouldn't have income related to that;

04:29:35  10   correct?

04:29:35  11   **A**    Not commission income or gambling I wouldn't think,

04:29:40  12   correct.  But I -- yeah, so -- but I don't know what kind of

04:29:45  13   commission, how his commission was earned.  You know, if,

04:29:48  14   like, they're residuals or not because books and records --

04:29:51  15   the years that I audited, we had no books and records

04:29:54  16   summarizing how the commissions were calculated, you know,

04:29:56  17   those sorts of things.  So I can't say if the income was

04:29:59  18   residual or not, but I don't know if he could or -- it's

04:30:04  19   possible, but I can't say he would never have income.  But I

04:30:09  20   don't know that circumstance for him.

04:30:10  21   **Q**    Well, let me go back and ask again.

04:30:12  22         For the 2015 tax year, and I know you didn't audit it,

04:30:16  23   you audited 2009, 2010 --

04:30:18  24   **A**    Yeah.

04:30:18  25   **Q**    -- but for 2015, did you see any third-party payor

04:30:22  1    information related to this return?

04:30:23  2    **A**    Well, I didn't look at any payor information for 2015.

04:30:28  3    **Q**    No third-party payor information.  So no 1099s, K-1s,

04:30:33  4    W-2s, you didn't review any of that?

04:30:36  5    **A**    No.  I was not working -- at the time this was filed,

04:30:40  6    I was not working on this case at all.

04:30:45  7    **Q**    So you don't know anything about this 2015 return?

04:30:49  8    **A**    Well, I can look at a return and tell you what's on

04:30:51  9    the return and -- so I can tell you some things, yes.

04:30:55  10   **Q**    Right.  Just like Mr. DiPietro could look at the

04:30:58  11   return; correct?

04:30:59  12   **A**    Oh, yeah, correct.

04:31:00  13              MR. FEDOR:  Nothing further, Your Honor.

04:31:01  14   Thank you.

04:31:02  15              THE COURT:  Thank you.

04:31:03  16        Mike, do you have questions?

04:31:07  17              MR. PARKER:  Thank you, Your Honor.

04:31:09  18              THE COURT:  How long do you think you're going

04:31:10  19   to be?

04:31:11  20              MR. PARKER:  Maybe 20 minutes to half an hour.

04:31:15  21   Possibly 20 minutes, Your Honor.

04:31:17  22              THE COURT:  What do you want to do?  Do you

04:31:18  23   want to go home?  Because we won't finish the witness today

04:31:22  24   because Mr. Kersey has to ask questions, if he does, and

04:31:25  25   then we have redirect by the government.

**G. Jordan (Cross by Fedor)**                116

04:31:27  1      It's 4:30.  That's usually the time we break.

04:31:31  2      It's up to you guys because you've been here since

04:31:34  3  7:30.

04:31:35  4              A JUROR:  Let's roll.

04:31:37  5              THE COURT:  Your first vote, home or finished?

04:31:39  6  This witness.

04:31:40  7              THE JURY:  Home.  Go home.

04:31:42  8              THE COURT:  Home.  Okay.

04:31:45  9      Got that message loud and clear.  That was the only

04:31:48  10  time Morgan was quiet.

04:31:51  11      All right.  Now, you've heard some testimony.  You

04:31:55  12  know you haven't heard it all.  You don't know what the

04:31:58  13  exhibits are.  You haven't seen that.  And certainly you

04:32:00  14  don't know what the law is that applies in the case.  It's

04:32:02  15  very important you keep an open mind, you don't form or

04:32:06  16  express an opinion about anything about the case whatsoever.

04:32:08  17      Don't discuss the case with anyone nor permit anyone

04:32:11  18  to discuss it with you.  And I'm repeating again, when you

04:32:14  19  go home, believe me, those at home are going to be real

04:32:16  20  interested in what you did today.  Say, please, I can't talk

04:32:20  21  about it.  I've been selected to sit as a juror.  Don't tell

04:32:24  22  them whether it's a civil or criminal case.  Say, when it's

04:32:26  23  over and we return a verdict, at that time I'll be free to

04:32:29  24  talk to my heart's content, and have them honor that.

04:32:32  25      No independent investigation.  Right?  Don't be

04:32:35  1    looking on your phone for anything.  Everything that you

04:32:37  2    need in order to come up with a fair verdict will be

04:32:40  3    presented here in court.

04:32:41  4         So we'll see you at 8:15.

04:32:45  5         Where, Morgan?

04:32:47  6              A JUROR:  L1.

04:32:48  7              THE COURT:  L1.  Okay.

04:32:49  8         And tomorrow, Steve's got some treats for you, so if

04:32:53  9    you guys get here a little early maybe you can eat them

04:32:57  10   before we -- am I right?

04:32:59  11             COURTROOM DEPUTY:  Yeah.

04:32:59  12             THE COURT:  Yeah.  Okay.  It's a long story

04:33:00  13   about treats because we don't have any place we can get

04:33:02  14   stuff around here, so it's a big deal on Wednesday morning

04:33:06  15   for you.

04:33:07  16        So have a good night, and we'll see you tomorrow

04:33:10  17   morning.

04:33:11  18             COURTROOM DEPUTY:  All rise.

04:33:11  19             (Jury excused from courtroom at 4:33 p.m.)

04:33:49  20             THE COURT:  You can step down.

04:34:01  21             (Witness excused.)

04:34:01  22             MR. GOLDBERG:  So, both my client and his son

04:34:04  23   reside in the same neighborhood, not in the same home.

04:34:10  24   There's a no contact as a condition of bail.

04:34:12  25        Would the government object to them driving in and

04:34:17    1    driving home together?

04:34:18    2                    THE COURT:  No.  That's fine.

04:34:19    3                    MR. GOLDBERG:  They're in trial.  Okay?

04:34:21    4                    THE COURT:  As long as you're here on time.

04:34:27    5                    DEFENDANT CHRISTOS KARASARIDES:  What time

04:34:28    6    tomorrow?

04:34:29    7                    THE COURT:  8:15.

04:34:32    8                    DEFENDANT CHRISTOS KARASARIDES:  Okay.

04:34:54    9                    (Proceedings adjourned at 4:34 p.m.)

           10                          *  *  *  *  *

           11

           12                    **C E R T I F I C A T E**

           13         I certify that the foregoing is a correct transcript
                 of the record of proceedings in the above-entitled matter
           14    prepared from my stenotype notes.

           15         */s/ Heather K. Newman*         *1-16-2024*
                      HEATHER K. NEWMAN, RMR, CRR              DATE
           16

           17

           18

           19

           20

           21

           22

           23

           24

           25