1                        UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF OHIO
2                               EASTERN DIVISION

3
    UNITED STATES OF AMERICA,        )  Case No. 5:21-cr-259
4                                    )
                    Plaintiff,       )
5                                    )  Cleveland, Ohio
            vs.                      )  Wednesday, January 17, 2024
6                                    )  8:44 a.m., Courtroom 15A
    RONALD DiPIETRO,                 )
7   CHRISTOS KARASARIDES, JR.,       )
    and CHRISTOPHER KARASARIDES,     )  TRIAL DAY 2
8                                    )
                    Defendants.      )
9   _____)  Pages 119 - 400

10

11
                   REPORTER'S TRANSCRIPT OF PROCEEDINGS
12
                 BEFORE THE HONORABLE DONALD C. NUGENT,
13                 SENIOR UNITED STATES DISTRICT JUDGE

14

15    APPEARANCES:

16    For the Plaintiff:

17          OFFICE OF THE U.S. ATTORNEY - AKRON
            BY:  AARON P. HOWELL, AUSA
18          2 South Main Street, 208 Federal Building
            Akron, OH 44308
19          (330) 352-0993

20    (Appearances continued on Page 2)

21    COURT REPORTER:

22          Heather K. Newman, RMR, CRR
            U.S. District Court, Northern District of Ohio
23          801 West Superior Avenue, Court Reporters 7-189
            Cleveland, OH 44113
24          (216) 357-7035 or heather_newman@ohnd.uscourts.gov

25    Proceedings reported by machine shorthand; transcript
      produced by computer-aided transcription.

1    APPEARANCES CONTINUED:

2    For the Plaintiff:

3          U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
           BY:  SAMUEL B. BEAN, AUSA
4               HAYTER L. WHITMAN, AUSA
           150 M Street NE
5          Washington, DC 20002
           (202) 514-3774

6

7    For the Defendant Ronald DiPietro:

8          LAW OFFICE OF ROBERT J. FEDOR
           BY:  ROBERT J. FEDOR, ESQ.
               BENJAMIN C. HEIDINGER, ESQ.
9          23550 Center Ridge Road, Suite 107
           Westlake, OH 44145
10         (440) 250-9709

11   For the Defendant Christos Karasarides, Jr.:

12         LAW OFFICE OF MICHAEL J. GOLDBERG
           BY:  MICHAEL J. GOLDBERG, ESQ.
13              ADAM J. PARKER, ESQ.
           323 Lakeside Place, Suite 450
14         Cleveland, OH 44113
           (216) 696-5414

15

16   For the Defendant Christopher Karasarides:

17         JAMES M. KERSEY, ESQ.
           1360 East Ninth Street
           600 IMG Building
18         Cleveland, OH 44114
           (216) 241-3470

19

20                         *   *   *   *   *

21

22

23

24

25

1                            Table of Contents

2
Witnesses/Events                                          Page

3
GARRET JORDAN (CONT'D)                                    123

4
        Mr. Parker - Cross                                123
5       Mr. Bean - Redirect                               136
        Mr. Fedor - Recross                               154
6       Mr. Parker - Recross                              158
                                                          166
7  JASON KACHNER

8       Mr. Bean - Direct                                 166
        Mr. Goldberg - Cross                              310
9       Mr. Fedor - Cross                                 367

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
  08:44:52    1      CLEVELAND, OHIO; WEDNESDAY, JANUARY 17, 2024; 8:44 A.M.

              2                          --oOo--

  08:44:52    3                   P R O C E E D I N G S

  08:44:52    4           COURTROOM DEPUTY:  All rise for the jury.

  08:44:54    5           (Jury returned to courtroom at 8:44 a.m.)

  08:45:56    6           THE COURT:  Good morning, ladies and

  08:45:57    7   gentlemen.

  08:45:57    8           THE JURY:  Good morning.

  08:45:58    9           THE COURT:  Have a seat.

  08:45:59   10      You notice we are missing our poor Juror No. 2.  Did

  08:46:03   11   you guys see him down there this morning?

  08:46:05   12      Yeah.  Did he tell you that his daughter's in the

  08:46:09   13   hospital and whatnot?  Pretty good excuse.  Much more

  08:46:13   14   important that he be there with her.  So there we go, right?

  08:46:16   15      And took a little extra time for you because I told

  08:46:18   16   you that Steve, when left to his devices, he could bring

  08:46:22   17   some good stuff.  So, you had rolls and whatever else.  And

  08:46:26   18   let's hope he can keep it up for the whole time here.

  08:46:32   19      All right.  I think you're ready to question Garret.

  08:46:37   20           MR. PARKER:  Thank you, Your Honor.

  08:46:41   21           THE COURT:  So I wanted to give you a couple

  08:46:43   22   extra minutes so when you see it, you can have a cup of

  08:46:46   23   coffee and have something.

  08:46:52   24           MR. PARKER:  Good morning.

  08:46:53   25           THE WITNESS:  Good morning.
```

**G. Jordan (Cross by Parker)** 123

|  |  |  |
|---|---|---|
| | 1 | - - - - - |
| | 2 | CROSS-EXAMINATION OF GARRET JORDAN |
| 08:46:54 | 3 | BY MR. PARKER: |
| 08:46:54 | 4 | **Q**    I want to ask you first about the timing of your |
| 08:46:57 | 5 | involvement in this case. |
| 08:46:58 | 6 | Do you understand? |
| 08:46:59 | 7 | **A**    Yeah. |
| 08:46:59 | 8 | **Q**    All right.  So you began working on this audit in |
| 08:47:03 | 9 | 2011; correct? |
| 08:47:03 | 10 | **A**    Yes. |
| 08:47:04 | 11 | **Q**    And you were done in 2012? |
| 08:47:05 | 12 | **A**    Yes. |
| 08:47:06 | 13 | **Q**    So at that point you essentially stepped away from |
| 08:47:09 | 14 | this case for a while? |
| 08:47:10 | 15 | **A**    Correct. |
| 08:47:11 | 16 | **Q**    In fact, you even transferred to a different division |
| 08:47:13 | 17 | within your office? |
| 08:47:16 | 18 | **A**    In 2020 I changed. |
| 08:47:20 | 19 | **Q**    Okay.  And during that whole span of time you hadn't |
| 08:47:24 | 20 | heard anything else about Christos Karasarides or Ron |
| 08:47:30 | 21 | DiPietro? |
| 08:47:30 | 22 | **A**    Correct. |
| 08:47:30 | 23 | **Q**    All right.  And then you were contacted again around |
| 08:47:33 | 24 | November of 2023; is that right? |
| 08:47:34 | 25 | **A**    October. |

**G. Jordan (Cross by Parker)**                                   124

| | | |
|---|---|---|
| 08:47:35 | 1 | **Q**   October.  Okay. |
| 08:47:36 | 2 | And you met with agents for the government in |
| 08:47:40 | 3 | November; right? |
| 08:47:40 | 4 | **A**   Yes. |
| 08:47:41 | 5 | **Q**   Okay.  So that was when this case came back around to |
| 08:47:44 | 6 | you essentially? |
| 08:47:44 | 7 | **A**   Correct. |
| 08:47:45 | 8 | **Q**   Okay.  Next I want to talk about the efforts that |
| 08:47:50 | 9 | Mr. Karasarides did make to comply with the tax law. |
| 08:47:52 | 10 | You understand that? |
| 08:47:53 | 11 | **A**   I believe so. |
| 08:47:54 | 12 | **Q**   Okay.  So you send him this notice that he was being |
| 08:48:01 | 13 | auditing? |
| 08:48:01 | 14 | **A**   Yes, in 2011. |
| 08:48:04 | 15 | **Q**   And he promptly responded to you? |
| 08:48:07 | 16 | **A**   Yes. |
| 08:48:09 | 17 | **Q**   He had hired a CPA to help him address the matter? |
| 08:48:11 | 18 | **A**   Correct. |
| 08:48:12 | 19 | **Q**   Okay.  He didn't drag his feet there? |
| 08:48:17 | 20 | **A**   No.  There was -- there was some stalling in the audit |
| 08:48:21 | 21 | where Mr. DiPietro informed me that he was trying to buy his |
| 08:48:27 | 22 | client time, so I think that slowed the audit process down |
| 08:48:29 | 23 | some, but I think that's not too uncommon for an audit. |
| 08:48:34 | 24 | **Q**   It's not uncommon? |
| 08:48:36 | 25 | **A**   To answer that question, you know, hey, was he |

**G. Jordan (Cross by Parker)**                    125

08:48:38  1    stalling, I don't know.  So -- there was some intentional

08:48:42  2    stalling that they informed me of during the audit.

08:48:44  3    **Q**    He didn't hesitate to respond to the notice and to

08:48:47  4    hire a CPA to represent him?

08:48:49  5    **A**    Correct.

08:48:52  6    **Q**    For 2009 and 2010, he agreed to assessed tax amounts?

08:48:57  7    **A**    Correct.

08:48:57  8    **Q**    Okay.  In 2011 he made a payment of about $50,000

08:49:06  9    toward his tax balance?

08:49:07  10   **A**    I'd have to look to see the year, but there was a

08:49:10  11   $50,000 payment made.  You might have the date there, but

08:49:12  12   with the 2009 return, I think it was a $5,000 payment.  And

08:49:15  13   then a $50,000 payment was made, I think -- you might have

08:49:19  14   the date there, but I think that was later, possibly after

08:49:22  15   my audit was done.

08:49:25  16   **Q**    We --

08:49:26  17   **A**    You were asking about the $50,000 payment though.

08:49:28  18   **Q**    We agree that payment was made one of these years?

08:49:32  19   **A**    Yes.

08:49:33  20   **Q**    Okay.  No, I want to talk to you about the change in

08:49:36  21   Mr. Karasarides' financial circumstances.  So first let's

08:49:40  22   talk about the year prior to 2014.  Understand?

08:49:42  23   **A**    Yes.

08:49:42  24   **Q**    Now, prior to 2014, he's reporting incomes that are in

08:49:47  25   the hundreds of thousands or some years even over a million

08:49:51  1    dollars?

08:49:51  2    **A**    Yes.

08:49:51  3    **Q**    Okay.  And the types of income that he had for those

08:49:55  4    years was self-employment income?

08:49:59  5    **A**    Yes, self-employment.  And then W-2 -- I'd have to

08:50:03  6    look at the year, but then W-2 income.  But yes,

08:50:09  7    self-employed income in the hundreds of thousands of dollars

08:50:09  8    for some of those years.

08:50:10  9    **Q**    Primarily self-employment income for those years?

08:50:13  10   **A**    Yes.

08:50:14  11   **Q**    Okay.  So he had a business involved in this

08:50:16  12   sweepstakes software?

08:50:19  13   **A**    Yes.

08:50:20  14   **Q**    That was one of the things he filed the Schedule C

08:50:23  15   for?

08:50:23  16   **A**    Yes.

08:50:24  17   **Q**    Okay.  Now, what is a sweepstakes?  How does it work?

08:50:27  18   **A**    Similar to yesterday, a customer comes in, pays some

08:50:31  19   money to -- I don't know if points is the right word, but

08:50:33  20   they get some points or tokens to play what they described

08:50:38  21   as skill-based games.  And based on their winnings there,

08:50:43  22   they could enter into sweepstakes to get -- to gain rewards.

08:50:50  23   **Q**    McDonald's has sweepstakes, don't they?

08:50:55  24   **A**    Yes.

08:50:55  25   **Q**    You buy a hamburger, and then you get a chance to win

**G. Jordan (Cross by Parker)**                    127

08:50:58  1    a prize, essentially?

08:50:59  2    **A**    Yes.

08:51:00  3    **Q**    Okay.  Do you have any knowledge of what the legality

08:51:02  4    of that business model was at that time?

08:51:03  5    **A**    I don't think a great understanding.  I knew the State

08:51:08  6    of Ohio -- you know, during the pre-audit process we look

08:51:12  7    up, hey, what might the circumstances might be.  There were

08:51:14  8    questions about the legality of internet cafes.  So, you

08:51:18  9    know, we use the word "sweepstakes."  That's how it was

08:51:23  10   described to me by your client there.

08:51:26  11          But I think the common debate was, hey, is this

08:51:29  12   gambling or sweepstakes internet cafe, are those legal.  I

08:51:33  13   think that was going around during the time of the audit, so

08:51:36  14   I was aware of that during the time of the audit, pre-audit

08:51:38  15   and throughout the audit.

08:51:40  16   **Q**    Now, we discussed yesterday the tax code that he put

08:51:43  17   down for his Schedule C for that business.

08:51:47  18   **A**    Oh, the NAICS code, yes.

08:51:49  19   **Q**    I'm sorry, what is it called?

08:51:50  20   **A**    NAICS.

08:51:51  21   **Q**    Okay.

08:51:52  22   **A**    I think it was reference to something else yesterday,

08:51:54  23   but it's a NAICS, NAICS code.

08:51:55  24   **Q**    Got it.  And, you know, that's for -- the code for

08:51:59  25   casinos for gambling businesses?

G. Jordan (Cross by Parker)                128

08:52:00    1    **A**    Correct.

08:52:01    2    **Q**    So when the accountant for Jack casino is getting

08:52:05    3    their taxes prepared for the year, that's the same code that

08:52:08    4    person would use?

08:52:09    5    **A**    Possibly.

08:52:11    6    **Q**    Jack is a casino?

08:52:12    7    **A**    Yeah.  So casino and casino-related businesses, so I

08:52:17    8    can't -- I couldn't tell you what all of the businesses that

08:52:18    9    would fall under that would be.  But that would make sense

08:52:21   10    if they used that, so I think that's what you're asking.

08:52:24   11    **Q**    You don't know what all of them would be, but it seems

08:52:27   12    safe to assume that Jack would be one of the ones that fall

08:52:30   13    under that?

08:52:30   14    **A**    It could.  But there are usually several for related

08:52:33   15    business.  For construction, there are numerous codes that

08:52:36   16    all relate to construction.  Some or specialty, some are --

08:52:39   17    you know, woodwork, carpentry.  So I would assume that would

08:52:43   18    be similar for maybe casino and gambling.  And I don't know.

08:52:45   19    I don't know what those are.

08:52:47   20    **Q**    Okay.  Now, for Schedule C, you're supposed to say

08:52:49   21    what the primary business or profession is; correct?

08:52:52   22    **A**    Yes.

08:52:53   23    **Q**    Okay.  So for this business that we've been talking

08:52:55   24    about, Mr. Karasarides said that the primary business or

08:52:59   25    profession was vending?

08:53:01    1    **A**    Yeah.  That's what the Schedule C showed was vending.

08:53:04    2    **Q**    Now, that's -- there's no requirement that he be more

08:53:06    3    elaborate or specific with that, is there?

08:53:08    4    **A**    No.

08:53:08    5    **Q**    So vending, that's a perfectly adequate description of

08:53:12    6    his business?  Well, from the point of view of what's

08:53:16    7    required for Schedule C.

08:53:17    8    **A**    For what's required, that's adequate to put that on

08:53:20    9    there to describe it, yes.

08:53:21   10    **Q**    Okay.  So let's say that I as a lawyer have -- I'm a

08:53:26   11    sole practitioner, right, I run my own shop?

08:53:29   12    **A**    Yes.

08:53:29   13    **Q**    Let's say I have some people I represent in maybe

08:53:33   14    divorce matters.

08:53:33   15    **A**    Sure.

08:53:34   16    **Q**    Let's say I represent a couple of local businesses.

08:53:37   17    They pay me to write contracts for them, things like that.

08:53:40   18    **A**    Yes.

08:53:41   19    **Q**    Now, you're not going to expect to see the names of

08:53:43   20    each of those businesses on my tax returns?

08:53:50   21    **A**    Okay.  So on your Schedule C, if you had a Schedule C,

08:53:53   22    you would call it one title -- you could describe it --

08:54:08   23    probably your primary source of income is what you would put

08:54:10   24    on there.

08:54:12   25         Is that answering what you're asking?  Saying, hey,

08:54:15  1   you have multiple aspects of your business.  You wouldn't be

08:54:17  2   expected to put on there contracts, legal work, filing work.

08:54:21  3   That wouldn't be in your title in this -- you know, in the

08:54:24  4   vending type label arena.

08:54:26  5   **Q**    I might say that my primary business is legal

08:54:30  6   services?

08:54:30  7   **A**    Yes, exactly.

08:54:31  8   **Q**    And then any income I make as a lawyer I could put on

08:54:33  9   that Schedule C?

08:54:34  10  **A**    Correct.

08:54:35  11  **Q**    It doesn't matter if it's coming from multiple

08:54:38  12  sources?

08:54:38  13  **A**    Correct.

08:54:38  14  **Q**    Okay.  Similarly, let's say I drove for one of the

08:54:43  15  ride-share apps to make money.  So my primary business might

08:54:49  16  be driving?

08:54:50  17  **A**    Yes.

08:54:51  18  **Q**    And then if I drove separately for Uber and what is

08:54:57  19  it, Lyft is their competitor, I would still only need one

08:55:00  20  Schedule C?

08:55:00  21  **A**    Yeah.  Depending on how you have your business set up,

08:55:04  22  you can do that and that would make sense.

08:55:07  23  **Q**    And I would put my Lyft income on that Schedule C?

08:55:10  24  **A**    Yes.

08:55:11  25  **Q**    And I would put my Uber income on that Schedule C?

08:55:13  1    **A**    Yes.

08:55:15  2    **Q**    So similarly, any income that Mr. Karasarides makes

08:55:19  3    through his work vending would go on that Schedule C?

08:55:23  4    **A**    It could.

08:55:23  5    **Q**    Even though it might be coming from multiple sources?

08:55:27  6    **A**    It could.

08:55:30  7    **Q**    Now, the other self-employment business, or one of

08:55:33  8    them, that he was putting on his Schedule Cs for those years

08:55:37  9    was professional gambling?

08:55:38  10   **A**    Yes.

08:55:40  11   **Q**    Do you -- what -- how much do you know about how

08:55:43  12   gambling is taxed?

08:55:45  13   **A**    I think a fair amount.

08:55:46  14   **Q**    Okay.  So at least at the time he was filing these

08:55:52  15   returns, he's allowed to deduct his losses from his wins in

08:55:56  16   gambling?

08:55:56  17   **A**    Correct.

08:55:57  18   **Q**    And he's even allowed to declare a net loss for

08:56:00  19   gambling for the year?

08:56:02  20   **A**    I think that would be questionable, but you can take

08:56:05  21   your losses up to the amount of your earnings.

08:56:08  22   **Q**    Hasn't -- wasn't the law amended later in time than

08:56:13  23   the tax returns we're talking about to remove the ability to

08:56:16  24   declare a loss?

08:56:20  25   **A**    I don't know the time frame for that.

G. Jordan (Cross by Parker)                    132

08:56:23  1    **Q**     And you can also declare business expenses as a

08:56:28  2    professional gambler?

08:56:30  3    **A**     Yes.

08:56:30  4    **Q**     That could include things like travel?

08:56:32  5    **A**     Yes.

08:56:34  6    **Q**     Now, he was declaring large amounts both as wins and

08:56:38  7    losses as a professional gambler?

08:56:40  8    **A**     Yes.

08:56:40  9    **Q**     I mean, some years there were hundreds of thousands,

08:56:43  10   maybe even an amount over a million in wins?

08:56:45  11   **A**     Yes.

08:56:46  12   **Q**     And some years similar amounts in losses?

08:56:50  13   **A**     Yes.

08:56:51  14   **Q**     So the amount of cash that he's got on hand could

08:56:55  15   change significantly pretty quickly based on that kind of

08:56:59  16   gambling activity?

08:57:00  17   **A**     Yes.

08:57:02  18   **Q**     Now, let's talk about Mr. Karasarides' circumstances

08:57:06  19   after 2014; okay?

08:57:07  20   **A**     Okay.

08:57:08  21   **Q**     Do you know of any significant life event that would

08:57:12  22   have happened to him in 2014 that could have changed his

08:57:14  23   circumstances?

08:57:15  24   **A**     I knew he was in jail.  I didn't know the extent or

08:57:17  25   time frame until -- until I was informed yesterday.

G. Jordan (Cross by Parker)                 133

08:57:22  1   **Q**    Okay.  So do we think that happened sometime around

08:57:25  2   2014?

08:57:25  3   **A**    Yes.

08:57:27  4   **Q**    So, after 2014, first off, the amount of income is

08:57:32  5   significantly less?

08:57:33  6   **A**    Yes.

08:57:35  7   **Q**    In 2015, he declares $50,000 of income?

08:57:40  8   **A**    Yes.

08:57:40  9   **Q**    And the next year, 2016, it was 70,000; correct?

08:57:44  10  **A**    That sounds correct, yes.

08:57:46  11  **Q**    And he's not declaring self-employment income for

08:57:50  12  these years?

08:57:51  13  **A**    Correct.

08:57:51  14  **Q**    So no Schedule Cs?

08:57:53  15  **A**    Correct.

08:57:53  16  **Q**    And no Schedule Es?

08:57:55  17  **A**    Correct.

08:57:56  18  **Q**    So if he was no longer involved in these businesses

08:58:00  19  that he previously had been filing those forms for, it would

08:58:03  20  make sense to no longer file them in 2015 and 2016?

08:58:07  21  **A**    Correct.  If you're not -- if you don't have a

08:58:09  22  business, you don't file a business return.

08:58:11  23  **Q**    Okay.  And he's getting W-2s from those years?

08:58:15  24  **A**    Yes.

08:58:15  25  **Q**    So that would be employment where tax was withheld?

**G. Jordan (Cross by Parker)**                    134

08:58:19   1   **A**     Correct.

08:58:21   2   **Q**     Now, it was also mentioned yesterday that he did not

08:58:24   3   file tax returns for 2017 and for 2018?

08:58:29   4   **A**     Yes.

08:58:30   5   **Q**     Do we know anything about any kind of significant life

08:58:37   6   events within those years that might have affected why he

08:58:40   7   did or didn't file?

08:58:41   8   **A**     I don't know his life events for '17 or '18 that would

08:58:46   9   affect filing.

08:58:47  10   **Q**     Do we know anything that happened to him in 2018 that

08:58:50  11   might have affected his ability to access the information or

08:58:53  12   the documents that he would have needed to do that?

08:58:54  13   **A**     I do not know.

08:58:55  14   **Q**     Okay.  And, you know, just again, coming up back to

08:58:59  15   what your involvement is, your role is to audit taxes and

08:59:03  16   determine the amount of liability?

08:59:05  17   **A**     Correct.

08:59:06  18   **Q**     You're not involved in collecting on tax liability?

08:59:10  19   **A**     That's incorrect.

08:59:11  20          So, we talked yesterday a touch about I'm a revenue

08:59:17  21   agent, so my primary role is to assess a tax liability.  And

08:59:23  22   the revenue officers, that department is -- their primary

08:59:26  23   role is to collect on those -- on liabilities, typically --

08:59:31  24   sometimes determined by exam but other ways as well.  But

08:59:35  25   the revenue agents, we still do -- you know, we solicit for

G. Jordan (Cross by Parker)                               135

08:59:39   1   payment, and we do have the authority to set up payment

08:59:43   2   plans.

08:59:45   3        In my work here for 2009, 2010, we didn't work to set

08:59:49   4   up a payment plan, but we have that authority so we do cover

08:59:53   5   that.  We can set up payment plans with someone who has a

08:59:57   6   tax debt from our examination.  Now, we wouldn't collect on

09:00:00   7   other things, just our own -- you know, our own inventory,

09:00:03   8   our own cases.

09:00:04   9   Q    The primary responsibility for collecting on a tax

09:00:07  10   liability lies with the revenue officer and not the revenue

09:00:11  11   agent?

09:00:12  12   A    Correct.  Correct.

09:00:14  13   Q    And again, you wouldn't have been involved, just given

09:00:17  14   your time -- the timing of your involvement, with any

09:00:20  15   collection efforts that would have happened in between 2012

09:00:23  16   and the present date?

09:00:25  17   A    Oh, okay.  So from 2012 to present, I had no -- no

09:00:30  18   involvement in collecting -- determining tax or collecting

09:00:34  19   tax.

09:00:34  20   Q    Or any real involvement or knowledge of what further

09:00:38  21   investigation would have been done after those dates into

09:00:41  22   Mr. Karasarides' taxes?

09:00:41  23   A    Correct.  Nothing after 2009, 2010 tax years, which I

09:00:46  24   stopped involvement late 2012.

09:00:52  25             MR. PARKER:  Okay.  Thank you.

09:00:58  1          THE COURT:  Mr. Parker, is that it?

09:01:00  2          MR. PARKER:  Yes.  Nothing further.

09:01:02  3          THE COURT:  Mr. Kersey, any questions?

09:01:03  4          MR. KERSEY:  I have no questions.  Thank you,

09:01:05  5  Judge.

09:01:05  6          THE COURT:  Thank you.

09:01:05  7      You may redirect if you wish, Mr. Bean.

09:01:10  8          MR. BEAN:  Yes, please, Your Honor.

09:01:14  9                    - - - - -

10              REDIRECT EXAMINATION OF GARRET JORDAN

09:01:15  11  BY MR. BEAN:

09:01:15  12  **Q**    Mr. Jordan, yesterday you testified about what a

09:01:19  13  sweepstake is, and today Mr. Parker asked you about it again

09:01:22  14  and you provided some testimony.

09:01:24  15      How do you know what that business was and what it

09:01:28  16  involved?

09:01:29  17  **A**    Based on what Mr. Karasarides and Mr. DiPietro

09:01:32  18  informed me of.

09:01:34  19  **Q**    And in the course of when they were talking to you

09:01:36  20  about that business, did they ever mention that involved

09:01:41  21  skill games businesses?

09:01:42  22  **A**    Yeah.  That's -- so, they used the term "sweepstakes"

09:01:45  23  for what the games were, and they said that those games were

09:01:47  24  skill-based games.

09:01:49  25  **Q**    Did they ever use the phrase -- talk about it

**G. Jordan (Redirect by Bean)**          137

09:01:51   1   involving gambling?

09:01:55   2   **A**     I don't recall them saying that what they were doing

09:01:58   3   was gambling.  I think they made a strong point to call it

09:02:01   4   skill-based gaming.

09:02:03   5   **Q**     Did they describe it as -- or yesterday you testified

09:02:05   6   about a business called VS2?

09:02:08   7   **A**     Yes.

09:02:08   8   **Q**     Did they talk about how VS2 was involved?

09:02:12   9   **A**     So I think I informed somewhat of yesterday is they

09:02:16   10  would pay Mr. Karasarides for his selling of the gaming

09:02:22   11  software and trying to expand, you know, that software sales

09:02:28   12  and increase internet cafe locations.

09:02:37   13  **Q**     Did they describe the business involving internet

09:02:39   14  cafe?

09:02:39   15  **A**     Yeah.  I understood them to be internet cafes.  That's

09:02:44   16  the term they used, and I think that was -- publicly that's

09:02:45   17  the term that's used as well, that I know of.

09:02:51   18  **Q**     When you began the audit of Mr. Karasarides, how did

09:02:56   19  you -- I think you testified yesterday that there was no

09:02:59   20  2009 tax return filed.

09:03:00   21  **A**     Correct.

09:03:02   22  **Q**     Did you have some knowledge that Mr. Karasarides had

09:03:05   23  received income in 2009?

09:03:07   24  **A**     Yes.

09:03:07   25  **Q**     How did you have that information?

**G. Jordan (Redirect by Bean)** 138

09:03:10 1 **A**     For the audit of VS2 where I saw payments being made

09:03:15 2 from VS2, and they -- to Mr. Karasarides.  And they also

09:03:19 3 issued a 1099 form showing commissions income to

09:03:24 4 Mr. Karasarides.

09:03:25 5 **Q**     What is a Form 1099?

09:03:27 6 **A**     So that would be what a business or an individual

09:03:31 7 could pay a worker for their services.  They'd call it

09:03:35 8 commission income rather than -- as opposed to employment

09:03:38 9 income.  So, they paid and issued a 1099 for payments made

09:03:43 10 for services.  That's the -- probably the basic definition.

09:03:46 11 **Q**     And does the IRS receive that 1099?

09:03:49 12 **A**     Yes.

09:03:49 13 **Q**     So, going into the audit, you already knew that

09:03:54 14 Mr. Karasarides had income in relation to this VS2 business?

09:03:59 15 **A**     Yes.  So we -- yeah.  There's unreported income.  No

09:04:02 16 return filing -- no return filed and known income.

09:04:08 17 **Q**     Now, what about with gambling.  I think yesterday

09:04:12 18 Mr. Fedor asked you about a W-2G.

09:04:17 19 **A**     Yes.

09:04:18 20 **Q**     What's that?

09:04:18 21 **A**     So, typically would be a casino, but I'll just use the

09:04:23 22 term "casino" because that's the most common.

09:04:26 23      So if -- when someone would gamble at a casino, the

09:04:30 24 casino has requirements to report winnings and losses for

09:04:35 25 their customers, and they report that on a W-2G.  Sometimes

09:04:42   1   they will withhold federal income tax, not in this case, but

09:04:45   2   that W-2G would also show -- could show withholdings if

09:04:52   3   withholdings were done.  They sometimes show what type of

09:04:56   4   gambling was done, and they would -- might put that on the

09:04:59   5   return.  I find them to be sometimes missing some of that

09:05:02   6   information.

09:05:02   7   **Q**     Does the IRS receive W-2Gs?

09:05:05   8   **A**     Yes.

09:05:06   9   **Q**     So were you aware that W-2Gs had been filed during

09:05:10   10  your audit for Mr. Karasarides?

09:05:11   11  **A**     Yes.

09:05:12   12  **Q**     So, again, with the Schedule C regarding professional

09:05:15   13  gambling, you went in knowing that Mr. Karasarides had

09:05:18   14  income from professional gambling?

09:05:20   15  **A**     Yes.  At that time I didn't think of it as

09:05:23   16  professional when I picked it up, but, yes.  So I knew he

09:05:27   17  had gambling income from those W-2G forms that were filed

09:05:32   18  to -- issued to him, and the 1099s.

09:05:36   19            MR. BEAN:  Can we please pull up Exhibit 183

09:05:48   20  and. . . I don't have it.

09:05:50   21            COURTROOM DEPUTY:  I have to do the shutdown

09:05:51   22  consequence.

09:05:51   23       Anything up there on your screen?

09:05:53   24            THE JURY:  Nothing.

09:05:56   25            COURTROOM DEPUTY:  Let's try this again.

**G. Jordan (Redirect by Bean)**                    140

09:05:58   1                    (Brief pause in proceedings.)

09:07:31   2                    MR. BEAN:  Can we go. . . 184.

           3    BY MR. BEAN:

09:07:39   4    Q    We have Mr. Karasarides' 2009 tax return here.  We

09:07:42   5    looked at it yesterday.  And could we go to -- a couple

09:07:47   6    pages down to the Schedule C?

09:07:52   7                    MR. HOWELL:  What exhibit are we looking at?

09:07:55   8                    MR. BEAN:  184.

           9                    MR. HOWELL:  Which page?

09:07:57  10                    MR. BEAN:  Page 4 of the exhibit.

09:07:59  11    BY MR. BEAN:

09:07:59  12    Q    Now, you testified about what business this was; is

09:08:02  13    that right?

09:08:02  14    A    Yes.

09:08:02  15    Q    Can you remind us, what business is this and what was

09:08:06  16    involved in the business?

09:08:06  17    A    It was described to me as the selling of sweepstakes

09:08:10  18    software.

09:08:11  19    Q    And is this -- when you've talked about internet cafe,

09:08:15  20    is -- when you talk about internet cafes, is it this

09:08:18  21    business?

09:08:18  22    A    I understood this to be the selling of sweepstakes,

09:08:21  23    not income from an internet cafe is how I understood it.

09:08:25  24    Q    So something like internet cafes would be different?

09:08:28  25    A    That's how I understand it.

**G. Jordan (Redirect by Bean)**                    141

09:08:30   1   **Q**      Reported differently?

09:08:30   2   **A**      Yes.

09:08:31   3   **Q**      All right.  Did you have conversations with

09:08:35   4   Mr. DiPietro about what went into this Schedule C, how the

09:08:39   5   information was here, what business this was?

09:08:41   6   **A**      Yes.

09:08:41   7   **Q**      Okay.  Did he ever tell you that this business

09:08:45   8   involved gambling businesses?

09:08:47   9   **A**      No.

09:08:48  10   **Q**      Did he ever mention a business called Skilled Shamrock

09:08:51  11   was involved in this?

09:08:52  12   **A**      No.

09:08:52  13   **Q**      How about a business called Redemption?

09:08:55  14   **A**      No.

09:08:55  15   **Q**      All right.

09:08:56  16            MR. BEAN:  Could we go to the next page,

09:08:58  17   please?

09:09:00  18   BY MR. BEAN:

09:09:01  19   **Q**      All right.  On this Schedule C, does Mr. Karasarides

09:09:03  20   take a -- report miles he drove for the business?

09:09:07  21   **A**      No.

09:09:08  22            Oh, yes.  Sorry.  Yes.  Yeah.  Thank you for circling.

09:09:12  23   **Q**      And how many -- how many?

09:09:15  24   **A**      About 42,000.

09:09:16  25   **Q**      And was it explained to you why miles -- he had miles

**G. Jordan (Redirect by Bean)**     142

09:09:19   1   driven for the business?

09:09:20   2   **A**     Yeah.  Traveling to internet cafes to do sales and to

09:09:27   3   solicit other -- you know, people who sell it already, to do

09:09:31   4   more of the sweepstakes and for them to set up additional

09:09:35   5   cafes, not necessarily the same people to set up but

09:09:38   6   soliciting new customers.

09:09:40   7   **Q**     And are you -- have you come across other individuals

09:09:42   8   who are involved in sales who report a Schedule C?

09:09:44   9   **A**     Yes.

09:09:44   10  **Q**     Is people in that line of business, is it pretty

09:09:48   11  common for them to report miles driven?

09:09:49   12  **A**     Yes.

09:09:51   13  **Q**     And does he report cell phone expenses?

09:09:54   14  **A**     Yes.

09:09:55   15  **Q**     And again, is it -- in your experience, is it pretty

09:09:58   16  common for someone in sales to report something like cell

09:10:02   17  phone expenses?

09:10:02   18  **A**     Very.

09:10:03   19  **Q**     All right.  Now, 2010, there isn't a Schedule C;

09:10:07   20  right?

09:10:08   21  **A**     Correct.

09:10:09   22  **Q**     And is that because you prepared the tax paperwork

09:10:14   23  because no return was filed?

09:10:15   24  **A**     Yeah.  So the exam filed a return for Mr. Karasarides.

09:10:19   25  **Q**     Now, I think yesterday you testified that you had

09:10:23  1    conversations with Mr. DiPietro about what would go onto

09:10:26  2    that tax return and how the income would be reported; is

09:10:29  3    that correct?

09:10:29  4    A    Correct.

09:10:29  5    Q    And in the course of those conversations did you talk

09:10:32  6    about the sweepstakes business and his sales in that

09:10:36  7    sweepstakes business?

09:10:37  8    A    Yes.

09:10:37  9    Q    And was one of your goals to figure out how much

09:10:41  10   income he had for that business?

09:10:42  11   A    Exactly.

09:10:44  12   Q    And report it similarly, maybe not in the exact same

09:10:47  13   form, but similarly to how it was done on the 2009 tax

09:10:51  14   return?

09:10:51  15   A    Correct.

09:10:51  16   Q    In the course of those conversations did he ever tell

09:10:54  17   you about Mr. Karasarides having gambling businesses?

09:10:57  18   A    Not outside of the professional gambling.

09:10:59  19   Q    How about a business called Skilled Shamrock?

09:11:02  20   A    No.

09:11:02  21   Q    How about a business called Redemption?

09:11:05  22   A    No.

09:11:06  23   Q    Now, yesterday Mr. Fedor asked you if -- we looked at

09:11:12  24   the Schedule Cs -- you and I had looked at the Schedule Cs

09:11:15  25   for 2011, '12, '13, and '14.  And Mr. Fedor asked you, based

09:11:21  1  on your acknowledge, could the Schedule Cs for the vending

09:11:25  2  businesses, in theory, have been -- involved a gambling

09:11:29  3  business?

09:11:29  4  **A**    It's allowable to do that.

09:11:31  5  **Q**    Right.  But he was asking you if, in theory, on this,

09:11:35  6  on the Schedule C we're looking at, it could have been a

09:11:39  7  gambling business?

09:11:40  8  **A**    I had no evidence to show that.

09:11:41  9  **Q**    And I think you -- when we had looked at the Schedule

09:11:45  10  Cs, you had testified that you believed that they were

09:11:47  11  consistent with the business that's reported on this

09:11:50  12  Schedule C; is that right?

09:11:51  13  **A**    Correct.

09:11:51  14  **Q**    All right.

09:11:52  15          MR. BEAN:  Can we please go to the 2014 tax

09:11:55  16  return, which is Exhibit 109, please.

09:12:02  17  BY MR. BEAN:

09:12:02  18  **Q**    Mow, Mr. Parker just asked you about any events in

09:12:06  19  2014 that might have changed Mr. Karasarides' situation.

09:12:09  20  Isn't that right?

09:12:09  21  **A**    Yes.

09:12:10  22  **Q**    And I believe you testified you -- you believed he had

09:12:14  23  gone to jail at some point?

09:12:15  24  **A**    Correct.

09:12:16  25  **Q**    Do you know what part of time of the year he went to

09:12:18  1    jail?

09:12:19  2    **A**      Not a clue.

09:12:20  3    **Q**      Now, if an individual has a business during part of

09:12:23  4    the year but not through the whole year, are they still

09:12:27  5    required to report that business that they had for part of

09:12:29  6    the year?

09:12:29  7    **A**      Yeah.  Required to report all income from all sources,

09:12:31  8    yes.

09:12:32  9    **Q**      And, so, if Mr. Karasarides was reporting this income

09:12:38  10   on a Schedule C, do you agree with me there should probably

09:12:41  11   be a Schedule C in here for that?

09:12:43  12   **A**      If there's income from a business for that year, it

09:12:46  13   should be reported, and the Schedule C would be the way to

09:12:48  14   do that.

09:12:49  15                  MR. BEAN:  Carissa, can you please just flip

09:12:51  16   through this tax return so we can look at each place -- each

09:12:56  17   page?

09:12:56  18        Mr. Jordan, I'm going to ask you to stop me when we

09:13:00  19   get to a Schedule C for a vending business, or anything

09:13:03  20   similar.

09:13:03  21                  THE WITNESS:  Yeah.

09:13:07  22                  (Brief pause in proceedings.)

09:13:20  23                  THE WITNESS:  There we -- there's your

09:13:21  24   Schedule C.

09:13:22  25   BY MR. BEAN:

**G. Jordan (Redirect by Bean)** 146

09:13:22  1   **Q**    And for what type of business?

09:13:23  2   **A**    Gambling.

09:13:24  3   **Q**    Okay.  So, is this a vending business here?

09:13:26  4   **A**    No.

09:13:28  5   **Q**    Is this consistent with the professional gambling that

09:13:31  6   you had been told about?

09:13:32  7   **A**    Yes.

09:13:33  8   **Q**    All right.

09:13:34  9             MR. BEAN:  You can keep going.

09:13:51  10            (Brief pause in proceedings.)

09:13:51  11            THE WITNESS:  So there was not a -- there was

09:13:53  12   not a second Schedule C, which is the self-employed

09:13:57  13   business.  There was a Schedule E on there, but I didn't

09:14:00  14   see -- in the quick scan, there's not any business reported

09:14:03  15   there.

09:14:04  16   BY MR. BEAN:

09:14:04  17   **Q**    Okay.  So, from Mr. Fedor's question, could gambling

09:14:10  18   businesses have been reported on Mr. Karasarides' 2014 tax

09:14:13  19   return?

09:14:14  20   **A**    It doesn't look like that to me.

09:14:18  21            MR. BEAN:  Could we go back to Exhibit 184,

09:14:21  22   please, quickly?  And if we could go to Page 4 again.

09:14:27  23   BY MR. BEAN:

09:14:27  24   **Q**    Now, you testified that you were told by Mr. DiPietro

09:14:29  25   that this business related to VS2 -- the sweepstakes?

**G. Jordan (Redirect by Bean)**    147

| | | |
|---|---|---|
| 09:14:34 | 1 | **A**    Yes. |
| 09:14:34 | 2 | **Q**    Which you knew about the sweepstakes going into the |
| 09:14:38 | 3 | audit; right? |
| 09:14:38 | 4 | **A**    Yes. |
| 09:14:39 | 5 | MR. BEAN:  And if we could go to the next |
| 09:14:43 | 6 | Schedule C. |
| 09:14:43 | 7 | BY MR. BEAN: |
| 09:14:43 | 8 | **Q**    And you testified that this business relates to his |
| 09:14:45 | 9 | professional gambling.  This is Page 6. |
| 09:14:48 | 10 | **A**    Correct. |
| 09:14:49 | 11 | **Q**    And going into the audit, you had known that |
| 09:14:53 | 12 | Mr. Karasarides did some gambling; right? |
| 09:14:54 | 13 | **A**    Yes.  There are extensive documents, W-2Gs. |
| 09:14:59 | 14 | **Q**    All right.  Did Mr. DiPietro, during the course of the |
| 09:15:01 | 15 | audit, tell you about Mr. Karasarides' interest in any |
| 09:15:04 | 16 | businesses that you didn't already know about? |
| 09:15:06 | 17 | **A**    No. |
| 09:15:11 | 18 | MR. BEAN:  Can we please go to Exhibit 102, |
| 09:15:15 | 19 | please.  And if we could go down -- sorry.  I've gone -- |
| 09:15:24 | 20 | 103.  Sorry about that. |
| 09:15:26 | 21 | And if we could go down. |
| 09:15:31 | 22 | I'll tell you when to stop.  It's the Schedule C, and |
| 09:15:37 | 23 | I don't have the. . . |
| 09:15:41 | 24 | Right here.  Thank you. |
| 09:15:42 | 25 | BY MR. BEAN: |

**G. Jordan (Redirect by Bean)**          148

09:15:42  1    **Q**    Page 14.  I believe yesterday you testified that based

09:15:46  2    on looking at this return, you believed -- this was

09:15:49  3    consistent with the sweepstakes business --

09:15:51  4    **A**    Yes.

09:15:52  5    **Q**    -- that Mr. DiPietro told you about?

09:15:53  6    **A**    Yes.

09:15:54  7              MR. BEAN:  Can you go to the next page.

09:15:55  8         And the next one.

09:15:56  9    BY MR. BEAN:

09:15:57  10   **Q**    Are there driving miles reported on this return?

09:16:00  11   **A**    Yes.

09:16:00  12   **Q**    For this Schedule C?

09:16:02  13   **A**    Yes.

09:16:03  14   **Q**    And how about cell phone expenses?

09:16:05  15   **A**    Yes.

09:16:05  16   **Q**    All right.

09:16:07  17             MR. BEAN:  Can we please go to Exhibit 105?

09:16:14  18        And go -- we're looking for the same document.

09:16:30  19             (Brief pause in proceedings.)

09:16:33  20             MR. BEAN:  Right there.

09:16:34  21   BY MR. BEAN:

09:16:34  22   **Q**    Is -- again, I believe your testimony yesterday was

09:16:37  23   that this schedule was consistent with the sweepstakes

09:16:40  24   business as described to you?

09:16:41  25   **A**    Yes.

09:16:41   1          MR. BEAN:  Can we go to the next page?

09:16:44   2      And one more.   Page 24.

09:16:46   3   BY MR. BEAN:

09:16:47   4   **Q**    Are there driving miles reported here?

09:16:48   5   **A**    Yes.  Yes.

09:16:50   6   **Q**    And how about cell phone?

09:16:52   7   **A**    Yes.

09:16:52   8   **Q**    And without looking at the 2013 return, do you recall,

09:16:56   9   are there also driving miles and cell phone expenses on that

09:16:59  10   one?  And we can pull it up if that's helpful.

09:17:03  11   **A**    Yeah.  I believe there were.

09:17:06  12   **Q**    So, is there anything that you see on this return that

09:17:09  13   makes you think it's different from the 2009 one, on this

09:17:15  14   Schedule C?

09:17:15  15   **A**    No.  It's similar.  Some different amounts, but same

09:17:20  16   reporting form, styles, places.

09:17:23  17   **Q**    Now, I've asked you some questions about tax years

09:17:26  18   other than 2009, 2010, after the audit.

09:17:30  19   **A**    Correct.

09:17:30  20   **Q**    I know Mr. Fedor did.

09:17:32  21      And there have been some questions about what your

09:17:34  22   involvement was after -- for those later tax years.

09:17:37  23   **A**    Yes.

09:17:38  24   **Q**    Did you have any involvement after that period?

09:17:40  25   **A**    No.

**G. Jordan (Redirect by Bean)**                    150

09:17:41  1    **Q**    Is your testimony about those tax years basically

09:17:46  2    reading off the documents that are from the IRS?

09:17:48  3    **A**    Correct.

09:17:48  4    **Q**    And to the extent bringing the knowledge that you had

09:17:52  5    from things Mr. DiPietro told you?

09:17:53  6    **A**    Correct.

09:17:53  7    **Q**    Do you have any involvement in collections by the --

09:17:58  8    collections at IRS?

09:17:59  9    **A**    No.

09:18:01  10   **Q**    So, if you're asked questions about an offer in

09:18:05  11   compromise, do you really understand, like, the details of

09:18:07  12   that?

09:18:07  13   **A**    I do not.

09:18:08  14   **Q**    And when I asked you questions about an offer in

09:18:10  15   compromise, were you just reading off a record?

09:18:12  16   **A**    Yes.

09:18:16  17   **Q**    Is it fair to say -- would you have any reason to know

09:18:18  18   about 1099s, W-2s, K-1s, you know, direct knowledge other

09:18:27  19   than what you're reading off the records for any years after

09:18:30  20   2010 for Mr. Karasarides?

09:18:32  21   **A**    No.

09:18:34  22            MR. BEAN:  Can we please go to Exhibit 100?

09:18:40  23        And can you go to the last page, please?

09:18:44  24        Thank you.

09:18:48  25   BY MR. BEAN:

09:18:48  1   **Q**     Now, yesterday, Mr. Fedor asked you if today,

09:18:56  2   Mr. Karasarides -- if the IRS believed Mr. Karasarides owed

09:18:59  3   money for this tax year; correct?

09:19:01  4   **A**     Yes.

09:19:02  5   **Q**     Do you recall that?

09:19:02  6         And I believe your answer was no?

09:19:04  7   **A**     Correct.  It showed a 0 balance.

09:19:06  8   **Q**     Is there a civil statute of limitations for

09:19:10  9   collections on a tax owed?

09:19:12  10  **A**     Yes.

09:19:13  11  **Q**     Do you know how long that period is?

09:19:16  12  **A**     Typically, 10 years.  I think there are some very few

09:19:19  13  exceptions, but 10 years.

09:19:22  14  **Q**     So, is it correct that if a taxpayer evades the

09:19:29  15  payment of taxes long enough, that it could basically get

09:19:32  16  wiped clean?

09:19:35  17             MR. GOLDBERG:  Objection.

09:19:35  18             THE COURT:  Overruled.

09:19:36  19             THE WITNESS:  That's correct.

09:19:37  20  BY MR. BEAN:

09:19:38  21  **Q**     So did this get wiped clean for 2009?

09:19:41  22  **A**     Yes.

09:19:41  23  **Q**     How much got wiped clean?

09:19:42  24  **A**     About $270,000.

09:19:45  25  **Q**     Now, does the expiration of the civil statute of

**G. Jordan (Redirect by Bean)**      152

09:19:50   1   limitations, as far as you're aware, have any impact on any

09:19:52   2   criminal liability?

09:19:54   3              MR. GOLDBERG:  Objection.

09:19:55   4              THE COURT:  Overruled.

09:19:57   5              THE WITNESS:  Sorry.  Just a touch distracted

09:20:00   6   for a moment.

09:20:00   7      So, the 10-year civil statute can be extended

09:20:04   8   indefinitely for criminal fraud.

09:20:07   9   BY MR. BEAN:

09:20:07   10   **Q**     But, I mean, I'm not talking about the civil period.

09:20:10   11   I'm saying does the expiration, civilly, of the IRS's

09:20:14   12   ability to collect on the tax debt affect any criminal

09:20:19   13   liability the taxpayer might have?

09:20:21   14   **A**     No.

09:20:27   15              MR. FEDOR:  Objection.

09:20:28   16       Objection, Judge.

09:20:29   17              THE COURT:  Overruled.

09:20:29   18              THE WITNESS:  It does not.

09:20:30   19              MR. BEAN:  Can we please go to Exhibit 101,

09:20:33   20   and can we go to the last page.

09:20:38   21   BY MR. BEAN:

09:20:39   22   **Q**     Was the tax debt written off under the civil statute

09:20:42   23   of limitations for tax year 2010?

09:20:44   24   **A**     Yes.  Yes.

09:20:45   25   **Q**     How much was written off?

09:20:47  1    **A**     About 524,000.

09:20:49  2    **Q**     All right.  So if we add those two numbers together,

09:20:52  3    are we getting close to $800,000 now written off?

09:20:55  4    **A**     Yes.

09:20:56  5    **Q**     All right.

09:20:56  6                MR. BEAN:  Now can we go to Exhibit 104,

09:21:00  7    please, and go to the last page.  Or one page up.  Sorry.

09:21:05  8    BY MR. BEAN:

09:21:05  9    **Q**     And for tax year 2012, was tax debt written off under

09:21:10  10   the civil statute of limitations?

09:21:12  11   **A**     Yes.  About 445,000.

09:21:14  12   **Q**     And so if we add those to our previous figures,

09:21:18  13   estimate how much are we at now?

09:21:19  14   **A**     1.3 million.

09:21:29  15                MR. BEAN:  Nothing further.  Thank you.

09:21:30  16                THE COURT:  Thank you.

09:21:32  17        Mr. Fedor, any questions?

09:21:34  18                MR. FEDOR:  Limited, Judge.  Thank you very

09:21:35  19   much.

09:21:44  20        Good morning again, ladies and gentlemen of the jury.

09:21:47  21   Robert Fedor on behalf of Mr. DiPietro.  Good to see you

09:21:49  22   again this morning.

09:21:49  23        Everybody's ready to go?

09:21:50  24        Good morning, Judge and staff and counsel and parties.

09:21:54  25        And Mr. Jordan, thank you again for appearing today.

09:21:58  1    Just a few limited questions.

09:21:59  2                        - - - - -

09:21:59  3            RECROSS-EXAMINATION OF GARRET JORDAN

09:22:00  4    BY MR. FEDOR:

09:22:00  5    **Q**    Mr. Bean just referred, on redirect, to a theory of

09:22:04  6    NAICS codes.

09:22:04  7         Are there any theories involved with NAICS codes?

09:22:07  8    What is a NAICS code, can you tell the jurors?

09:22:09  9                 MR. BEAN:  Objection.  I didn't refer to any

09:22:11  10   NAICS codes.

09:22:14  11                 THE COURT:  I didn't hear a NAICS code, but if

09:22:16  12   you did, go ahead.

09:22:19  13   BY MR. FEDOR:

09:22:19  14   **Q**    Can you advise the jurors what a NAICS code is,

09:22:22  15   Mr. Jordan?

09:22:22  16   **A**    Yeah.  So that's a coding system that taxpayers would

09:22:28  17   use when they file a return to show what type of business

09:22:31  18   they are reporting.  This would be on sole proprietorship or

09:22:36  19   corporate returns would have this coding.  I think the

09:22:39  20   construction example is easy.  If you're a -- if you put up

09:22:42  21   walls, you would be a builder of a certain type.  If you do

09:22:47  22   drywall, a certain type, so. . . that's --

09:22:50  23   **Q**    And my only question then is, the NAICS codes that

09:22:53  24   were used for Mr. Karasarides' returns reflected casino-ish

09:22:58  25   related business; correct?

09:22:59  1    **A**    Yes.

09:23:00  2    **Q**    Thank you.

09:23:01  3    **A**    Yeah -- for sales.

09:23:02  4    **Q**    And at the end of the day, your examination of the

09:23:06  5    2019, 2010 tax returns, the SFR, the substitute for return,

09:23:11  6    your estimate, your findings, your tax penalties and

09:23:14  7    interest due, you closed that as an agreed case with

09:23:16  8    Mr. DiPietro and Mr. Karasarides; correct?

09:23:18  9    **A**    Correct.

09:23:19  10   **Q**    And that was in when, 2012?

09:23:21  11   **A**    Yes.

09:23:21  12   **Q**    And since 2012, you've had no other involvement in

09:23:24  13   this case other than preparing for testimony today; correct?

09:23:28  14   **A**    Correct.

09:23:31  15   **Q**    Thank you.

09:23:32  16         And in fact, as part of that examination, you conceded

09:23:37  17   that Mr. Karasarides was a professional gambler; correct?

09:23:40  18   **A**    Correct.

09:23:41  19         MR. FEDOR:  Carissa, morning, by the way.

09:23:43  20         Can you pull up Exhibit 109, please, just briefly?

09:23:48  21   Page 18.

09:23:53  22   BY MR. FEDOR:

09:23:53  23   **Q**    So Mr. Bean just walked you through the other 1040s,

09:23:58  24   the tax returns again, comparing the Schedules C and looking

09:24:03  25   at it year by year; correct?

09:24:04  1   **A**     Yes.

09:24:05  2   **Q**     And one of the things that was just pointed out that

09:24:07  3   you testified to was for 2014, there was only one Schedule

09:24:12  4   C; correct?

09:24:12  5   **A**     Correct.

09:24:12  6   **Q**     And it's for gambling; correct?

09:24:14  7   **A**     Yes.

09:24:15  8   **Q**     All the other tax returns, did they not show both

09:24:19  9   gross receipts from gambling as well as gambling losses; is

09:24:23  10  that correct?

09:24:23  11  **A**     Yes.

09:24:24  12  **Q**     Does this return show any gambling losses?

09:24:30  13  **A**     No.  Only legal and professional services.

09:24:33  14  **Q**     And why might that be?  Because you certainly don't

09:24:37  15  incur professional and legal expenses when you're a

09:24:39  16  professional gambler; correct?

09:24:43  17  **A**     It's odd.

09:24:45  18  **Q**     Thank you.

09:24:46  19  **A**     I don't know why he put that there.

09:24:47  20  **Q**     Thank you.

09:24:49  21         Lastly, let's talk about collection statutes.  Okay.

09:24:53  22  And your testimony was, with exceptions, there's a 10-year

09:24:58  23  statute of limitations; correct?

09:24:59  24  **A**     Yes.

09:24:59  25  **Q**     And you've also testified, you testified yesterday

| | | |
|---|---|---|
| 09:25:02 | 1 | before me and before the Court, that you have no experience |
| 09:25:05 | 2 | in collections; correct? |
| 09:25:06 | 3 | **A**    Correct. |
| 09:25:07 | 4 | **Q**    So what's your background on what's called CSEDs, |
| 09:25:12 | 5 | collection statute expiration dates, when this entire |
| 09:25:15 | 6 | liability goes away?  What's your background on that? |
| 09:25:18 | 7 | **A**    Well, when we look at transcripts, we pay attention to |
| 09:25:21 | 8 | when those dates are. |
| 09:25:22 | 9 | **Q**    Do you regularly look at transcripts? |
| 09:25:24 | 10 | **A**    Yes. |
| 09:25:25 | 11 | **Q**    As part of your examination functioning? |
| 09:25:28 | 12 | **A**    A hundred percent of the time. |
| 09:25:29 | 13 | **Q**    Okay.  And are you aware of when collection statutes |
| 09:25:32 | 14 | are expiring? |
| 09:25:34 | 15 | **A**    I don't pay attention to those.  I read them, but it's |
| 09:25:37 | 16 | not -- I don't do anything with them. |
| 09:25:40 | 17 | **Q**    Do you have any particular background or expertise in |
| 09:25:45 | 18 | the legal issue between criminal and civil collection |
| 09:25:50 | 19 | statutes? |
| 09:25:52 | 20 | **A**    No. |
| 09:25:53 | 21 | **Q**    Do you have any education whatsoever on the criminal |
| 09:25:56 | 22 | side of what happens with collection statutes and |
| 09:25:59 | 23 | examination and collection function? |
| 09:26:03 | 24 | **A**    Well, some, because I have, like, post-prosecution |
| 09:26:06 | 25 | cases, I've had several of those, so we do pay attention -- |

**G. Jordan (Recross by Parker)**                    158

09:26:10  1   so I can't say I'm not experienced.  I hope -- I'm trying to

09:26:13  2   answer your question.  Hopefully I am.

09:26:16  3   **Q**    You're doing a good job.

09:26:17  4   **A**    Okay.

09:26:20  5   **Q**    So in this case with Mr. Karasarides, did you look at

09:26:22  6   the collection statutes at all prior to preparation for the

09:26:24  7   trial?

09:26:25  8   **A**    No.  No.

09:26:27  9   **Q**    And, in fact, those exhibits all show that there are

09:26:31  10  no liabilities for those periods; correct?

09:26:32  11  **A**    Correct.

09:26:34  12            MR. FEDOR:  Thank you.

09:26:35  13        Nothing further, Judge.

09:26:36  14            THE COURT:  Thank you.

09:26:36  15        Mr. Parker, anything?

09:26:39  16            MR. PARKER:  Yes, Your Honor.  Thank you.

09:26:52  17                      - - - - -

          18            RECROSS-EXAMINATION OF GARRET JORDAN

09:26:53  19  BY MR. PARKER:

09:26:53  20  **Q**    Do you remember Mr. Bean asking you about the civil

09:26:56  21  statute of limitation for tax collection?

09:26:58  22  **A**    Yes.

09:27:00  23  **Q**    I'm going to try to get the question as close to the

09:27:03  24  words he used as possible.  If it's not the exact words,

09:27:07  25  forgive me.  But he essentially asked you if somebody evades

09:27:11  1  payment for long enough, can the tax liability get wiped

09:27:13  2  clean.

09:27:14  3       Was that in substance the question?

09:27:15  4  **A**    Yes.

09:27:16  5  **Q**    Now, the thing that wipes the debt clean is the

09:27:21  6  expiration of the civil statute of limitations?

09:27:23  7  **A**    In that scenario, yes.

09:27:24  8  **Q**    Which is 10 years?

09:27:26  9  **A**    Yes.

09:27:27  10  **Q**    The wiping clean doesn't depend on evasion happening?

09:27:33  11  **A**    Correct.

09:27:34  12  **Q**    For example, if somebody was trying in good faith to

09:27:37  13  settle their tax liability for that period of time, the debt

09:27:41  14  would still be wiped clean?

09:27:42  15  **A**    After 10 years, yes.

09:27:43  16  **Q**    So Mr. Bean's question had a built-in assumption that

09:27:48  17  someone is in fact evading taxes.

09:27:53  18  **A**    That's a question?

09:27:54  19  **Q**    I'm asking you that, yes.

09:27:58  20  **A**    I don't know if he knows.  You're asking me if -- I

09:28:03  21  don't know if he knows that there was evasion or not, so I

09:28:05  22  can't say if he said that.  When he -- that -- it doesn't

09:28:10  23  make sense to me.  So you made a statement and said that's a

09:28:12  24  question.

09:28:14  25  **Q**    Okay.

**G. Jordan (Recross by Parker)**                    160

09:28:15  1  **A**      There's where I'm getting hung up.

09:28:17  2  **Q**      Let me restate the question.

09:28:19  3        Would you agree that Mr. Bean's question had a

09:28:22  4  built-in assumption that someone is evading taxes?

09:28:24  5  **A**      I don't know if it's an assumption because I don't

09:28:26  6  know if there's evasion or not, so I can't say.  Because if

09:28:28  7  there was evasion and he knows that, and if that's the case,

09:28:31  8  then that would be correct, but I don't know if there was

09:28:33  9  evasion or not.  I'm not here to say if there was or was not

09:28:36  10  evasion, so I don't know that.

09:28:37  11  **Q**      No, no, I'm not asking for your knowledge, but

09:28:39  12  again -- so his question implies that the civil -- the

09:28:44  13  operation of the civil statute depends on evasion when, in

09:28:47  14  fact, it doesn't?

09:28:47  15  **A**      Yeah.  It does not depend on evasion.

09:28:50  16  **Q**      Right.  So there wasn't any need to include evasion in

09:28:53  17  that question?

09:28:55  18  **A**      That -- that's up for you guys to decide, if that's

09:28:59  19  needed as a question or not.  You ask whatever you want.

09:29:01  20  I'll answer as best I can.

09:29:02  21  **Q**      Fair enough.

09:29:04  22        Now, you talked about skill games in relation to

09:29:09  23  Mr. Karasarides' vending business.

09:29:11  24  **A**      Yes.

09:29:11  25  **Q**      You understand the sweepstakes and the skill games to

**G. Jordan  (Recross by Parker)**                161

09:29:14  1    essentially be the same thing?

09:29:16  2    **A**    Yes.

09:29:16  3    **Q**    Okay.  And did you say that that was because that was

09:29:19  4    how Mr. Karasarides or how Mr. DiPietro described them?

09:29:22  5    **A**    Correct.

09:29:23  6    **Q**    Okay.  So if that was not actually what they had said,

09:29:28  7    you would not have any independent reason for believing that

09:29:32  8    skill games and sweepstakes are the same thing?

09:29:40  9    **A**    My understanding was they were the same thing.

09:29:45  10   **Q**    That -- that -- I'm sorry.  That understanding came

09:29:47  11   from what you believe Mr. Karasarides or Mr. DiPietro said?

09:29:50  12   **A**    Yes.

09:29:50  13   **Q**    Okay.  So, hypothetically, imagine that that's not

09:29:58  14   what they said.  You would no longer have any reason for

09:30:01  15   believing that?

09:30:09  16   **A**    I would still believe that because they had internet.

09:30:11  17   I had known about internet cafes, so I knew it was involved

09:30:14  18   with that.  So that is independent of what they had informed

09:30:17  19   me.

09:30:18  20   **Q**    I'm sorry, you knew that what was involved with

09:30:21  21   internet cafes?

09:30:23  22   **A**    Mr. Karasarides.

09:30:26  23   **Q**    So, I'm sorry, I -- I apologize if I don't understand

09:30:29  24   your answer, but how -- I don't understand how your answer

09:30:36  25   shows that you had some independent knowledge of what skill

**G. Jordan  (Recross by Parker)** 162

09:30:39  1    games were or what sweepstakes were and how they might be

09:30:42  2    the same thing.

09:30:44  3    **A**    Oh, well --

09:30:45  4    **Q**    Can you tell me how you would have known that?

09:30:46  5    **A**    Yeah.  From Mr. DiPietro and Mr. Karasarides.

09:30:48  6    **Q**    Okay.  So, again --

09:30:50  7    **A**    That's the primary, yes.

09:30:52  8    **Q**    All right.  Your understanding of that came from them.

09:30:54  9          Now, are you aware of any significant change in the

09:30:59  10   law of Ohio about sweepstakes or internet cafes that

09:31:04  11   occurred in 2013?

09:31:07  12   **A**    I do not.

09:31:09  13   **Q**    We discussed that in 2014, Mr. Karasarides no longer

09:31:14  14   filed a Schedule C for his vending business.

09:31:17  15   **A**    Correct.

09:31:17  16   **Q**    So I imagine if Ohio had declared that business

09:31:26  17   illegal or passed a law making it illegal in 2013, that

09:31:29  18   would be a good explanation for why Mr. Karasarides would no

09:31:33  19   longer engage in that business in 2014 going forward?

09:31:35  20   **A**    It would make sense.

09:31:36  21   **Q**    And that would also make sense why he would not file a

09:31:40  22   Schedule C for that business from 2014 going forward?

09:31:42  23   **A**    If there's no business, no income, then you wouldn't

09:31:45  24   report a Schedule C for it.

09:31:47  25   **Q**    It would be unusual for somebody to deliberately

**G. Jordan  (Recross by Parker)**                      163

09:31:51  1   declare an illegal activity on their tax return?

09:31:54  2   **A**    It's difficult because illegal activities typically --

09:31:59  3   there's a lot of nonreporting of illegal activities.  But

09:32:04  4   that's kind of making presumptions because I don't know of

09:32:06  5   the ones that are not reported.

09:32:07  6   **Q**    Right.  Deliberately reporting illegal activity, that

09:32:12  7   would be unusual?

09:32:12  8   **A**    Yes.

09:32:13  9   **Q**    Not reporting it is the more common thing?

09:32:16  10  **A**    Yes.

09:32:17  11  **Q**    I mean, you don't get Schedules C where somebody says

09:32:20  12  their primary business is selling drugs?

09:32:23  13  **A**    That's what came to mind.  So, if somebody sells

09:32:26  14  drugs, I wouldn't see that on a return typically.

09:32:30  15  **Q**    And if -- I mean, if he was exiting that business, he

09:32:36  16  could still declare legal fees that he incurred doing that

09:32:38  17  on his taxes?

09:32:39  18  **A**    Yes.  If there's an on -- if there's an ongoing

09:32:41  19  business.

09:32:43  20       So you asked if he could still deduct legal expenses

09:32:46  21  for a business that's no longer in existence?

09:32:50  22  **Q**    Could he?

09:32:52  23  **A**    You wouldn't deduct expenses for a business that's no

09:32:55  24  longer in business.

09:32:56  25  **Q**    Okay.  But as long as he was engaged with that, he

**G. Jordan (Recross by Parker)**                    164

| | |
|---|---|
| 09:32:59 | 1 |
| 09:33:00 | 2 |
| 09:33:04 | 3 |
| 09:33:08 | 4 |
| 09:33:09 | 5 |

09:32:59  1   could be incurring legal fees?

09:33:00  2   **A**    Oh, he could be incurring legal fees, but you wouldn't

09:33:04  3   deduct them if the business is no longer in existence.  They

09:33:08  4   would be personal -- you know, personal expenses.

09:33:09  5   **Q**    They would be personal expenses?

09:33:12  6              MR. PARKER:  All right.  Nothing further.

09:33:13  7              THE COURT:  Thank you.

09:33:13  8         Mr. Kersey, anything?

09:33:15  9              MR. KERSEY:  I have no questions.  Thank you.

09:33:17  10             THE COURT:  Thank you.

09:33:17  11        Mr. Jordan, thank you, sir.  You're excused.

09:33:20  12        Watch your step going down.

09:33:21  13             THE WITNESS:  Thank you.

09:33:22  14             (Witness excused.)

09:33:23  15             THE COURT:  You may call your next witness.

09:33:25  16             MR. BEAN:  The government calls Jason Kachner.

09:34:02  17             (Brief pause in proceedings.)

09:36:50  18             THE COURT:  All right, Mr. Kachner.  Would you

09:36:52  19   raise your right hand, sir.

09:36:53  20        Do you swear the testimony you are about to give will

09:36:56  21   be the truth as you answer to God?

09:36:57  22             THE WITNESS:  Yes, sir.

09:36:58  23             THE COURT:  Please have a seat.

09:36:58  24        You can hand your gum to Mr. Bean, too, if you will.

09:37:03  25             THE WITNESS:  What?

**G. Jordan (Recross by Parker)**                    165

09:37:03   1                    THE COURT:  You got gum?

09:37:04   2                    THE WITNESS:  Yes, sir.

09:37:05   3                    THE COURT:  Hand it to Mr. Bean.

09:37:07   4                    THE WITNESS:  Can I just throw it in the trash

09:37:09   5     right there, sir?

09:37:10   6                    THE COURT:  Sure.

09:37:10   7          I was a prosecutor way back in the old days, and I had

09:37:13   8     this big real tough detective that was going to testify and

09:37:16   9     he was, you know, chewing gum.  And I said you know you got

09:37:20  10     to take that damn gum out of your mouth.  You can't go into

09:37:24  11     the courtroom like that.  He goes, it's not gum.  He got

09:37:27  12     shot in the face.  I went, oh, God.

09:37:30  13          So you never know, right?

09:37:32  14                    MR. BEAN:  Does anybody actually hand the gum

09:37:34  15     to the attorney?

09:37:34  16                    THE COURT:  Well, that's my little trick.

09:37:38  17     That way, I kind of cue the lawyer in, talk to your witness

09:37:46  18     before they come in, you know.

09:37:47  19          I know, so probably maybe nervous.  I get it.  No

09:37:50  20     problem.

09:37:50  21          All right, sir, tell us your full name and spell your

09:37:53  22     last name.

09:37:53  23                    THE WITNESS:  Jason Kachner, K-a-c-h-n-e-r.

09:37:56  24                    THE COURT:  You're going to have to speak up a

09:37:58  25     little bit more than that.  If you're about 3 or 4 inches

| | | |
|---|---|---|
| 09:38:00 | 1 | from the microphone, we can hear everything that you have to |
| 09:38:03 | 2 | say. |
| 09:38:03 | 3 | Want to try that again? |
| 09:38:06 | 4 | THE WITNESS:  Jason Kachner, K-a-c-h-n-e-r. |
| 09:38:11 | 5 | THE COURT:  Thank you, Jason. |
| | 6 | - - - - - |
| | 7 | DIRECT EXAMINATION OF JASON KACHNER |
| 09:38:12 | 8 | BY MR. BEAN: |
| 09:38:12 | 9 | Q    Good morning, sir. |
| | 10 | Do you also have a nickname? |
| | 11 | A    Kake. |
| 09:38:15 | 12 | Q    Where are you from? |
| 09:38:15 | 13 | MR. KERSEY:  What did he say?  I didn't hear |
| 09:38:17 | 14 | him. |
| 09:38:17 | 15 | What did you say? |
| 09:38:17 | 16 | THE WITNESS:  Kake. |
| 09:38:18 | 17 | THE COURT:  Is it like K, Special K? |
| 09:38:22 | 18 | THE WITNESS:  K-a-k-e. |
| 09:38:25 | 19 | MR. KERSEY:  Kake, is that what you said? |
| 09:38:27 | 20 | THE WITNESS:  Yes, sir. |
| 09:38:27 | 21 | MR. BEAN:  Like the cake that you get at a |
| 09:38:29 | 22 | birthday. |
| 09:38:30 | 23 | THE COURT:  Cake, like cake -- |
| 09:38:30 | 24 | THE WITNESS:  No, not cake like you get at a |
| 09:38:32 | 25 | birthday.  Kake like my last name, K-a-k-e. |

| | | |
|---|---|---|
| 09:38:35 | 1 | THE COURT:  Gotcha. |
| 09:38:36 | 2 | BY MR. BEAN: |
| 09:38:37 | 3 | **Q**   Where are you from? |
| 09:38:37 | 4 | **A**   Stark County, Louisville, Ohio. |
| 09:38:40 | 5 | **Q**   And what are you currently doing for work? |
| 09:38:42 | 6 | **A**   Landscaping and snow removal. |
| 09:38:45 | 7 | **Q**   What kind of things do you do in your free time? |
| 09:38:49 | 8 | **A**   Spend time with my grandkids and my kids. |
| 09:38:53 | 9 | **Q**   Do you know the defendants? |
| 09:38:55 | 10 | **A**   Yes, sir. |
| 09:38:57 | 11 | **Q**   Which ones? |
| 09:38:59 | 12 | **A**   Chris Karasarides, Ron DiPietro.  That's all I see. |
| 09:39:09 | 13 | **Q**   How do you know them? |
| 09:39:11 | 14 | **A**   Business acquaintances. |
| 09:39:12 | 15 | **Q**   What kind of business? |
| 09:39:13 | 16 | **A**   Skill rooms. |
| 09:39:14 | 17 | **Q**   Do they have names? |
| 09:39:15 | 18 | **A**   Redemption skill room and Shamrock. |
| 09:39:21 | 19 | **Q**   And were you in business with them? |
| 09:39:22 | 20 | **A**   Yes. |
| 09:39:23 | 21 | **Q**   Can you just describe, where was Shamrock located? |
| 09:39:28 | 22 | **A**   It was in Canton, Ohio. |
| 09:39:29 | 23 | **Q**   And what about Redemption? |
| 09:39:31 | 24 | **A**   Whipple Avenue in Canton, Ohio. |
| 09:39:34 | 25 | **Q**   And when were you in business with each of them, and I |

09:39:37   1    understand -- the time periods with each of them?

09:39:39   2    **A**    2009 to '18.

09:39:43   3    **Q**    How did those businesses make money?

09:39:50   4    **A**    Patrons coming into the establishment and playing the

09:39:55   5    games.

09:39:58   6                    MR. KERSEY:  Judge, I'm having trouble

09:40:01   7    hearing.  Judge, I can't hear him.  He's running his words

09:40:05   8    together, and I -- I wish he'd be a little bit more --

09:40:08   9                    THE WITNESS:  Sir, if I come up any closer, my

09:40:11   10   chest is going to be in this computer.

09:40:13   11                   MR. KERSEY:  Are you going to argue with me?

09:40:14   12   I'm asking --

09:40:14   13                   MR. BEAN:  Do you mind just speaking up a

09:40:16   14   little bit?  Thank you.

09:40:17   15                   MR. KERSEY:  Is he going to argue when I ask

09:40:19   16   him?

09:40:20   17                   THE COURT:  Yeah, it's -- you know, you'd

09:40:22   18   think we have this modern technology, we could hear

09:40:25   19   everything.  But I'm going to try to turn your mic up as

09:40:30   20   much as I can.

09:40:30   21                   THE WITNESS:  Is that better?

09:40:31   22                   THE COURT:  Oh, my gosh.  Yes.

09:40:33   23                   THE WITNESS:  I didn't know the mic moved up

09:40:36   24   into close.

           25                   THE COURT:  Yeah, night and day.

09:40:37   1              THE WITNESS:  Is that better, sir?

09:40:39   2              MR. KERSEY:  Yeah, that's better.  That's a

09:40:41   3   whole lot better.  Just make an effort.

09:40:44   4   BY MR. BEAN:

09:40:45   5   Q    Sir, I'd like to ask that question again because I

09:40:50   6   think we got a little distracted.

09:40:53   7        How did those businesses make money?

09:40:55   8   A    By patrons coming into the business so that they can

09:40:58   9   play the games.

09:40:59  10   Q    And what kind of games?

09:41:00  11   A    Pot-O-Gold.

09:41:01  12   Q    Can you just describe, what's a Pot-O-Gold?

09:41:06  13   A    A machine with games on it that you --

09:41:10  14   Q    What kind of games?  Did they have names?

09:41:13  15   A    I mean, there's -- there was like nine or 10 of the

09:41:16  16   games that are on there.  Keno's, 7s and 777, and Bingo, I

09:41:25  17   think.  Pretty much sums it up.

09:41:26  18   Q    What's 777?

09:41:28  19   A    Excuse me?

09:41:28  20   Q    What -- can you just describe, what's 777 exactly?

09:41:33  21   A    It's a triple 7s game, and there's a Respin 777 game.

09:41:36  22   Q    So did you have to match things up?

09:41:38  23   A    Yes, sir.

09:41:38  24   Q    And if one of the people came in and they were

09:41:43  25   successful at the game, what happened?  Did they get

09:41:45  1    anything?

09:41:46  2    **A**    I mean, they wagered an amount to win an amount for

09:41:50  3    whatever they wagered.

09:41:52  4    **Q**    And could they be paid out in cash?

09:41:54  5    **A**    Yes.

09:41:57  6    **Q**    Did Skilled Shamrock and Redemption, did they have

09:42:01  7    employees?

09:42:01  8    **A**    Yes, sir.

09:42:02  9    **Q**    Can you approximate for the jury how many employees

09:42:06  10   each one had at any one time?

09:42:10  11   **A**    Redemption probably had 10 to 13 employees, maybe, and

09:42:18  12   Shamrock might have had 8 to 10.

09:42:20  13   **Q**    All right.  Let's talk a little bit about Skilled

09:42:23  14   Shamrock first.

09:42:24  15        When did you get involved in Skilled Shamrock,

09:42:27  16   approximately?

09:42:29  17   **A**    Late 2010, 2011.

09:42:32  18   **Q**    And when you got involved, who were the owners of the

09:42:36  19   business?

09:42:36  20   **A**    Myself, Chris Kare, Larry Dayton, and Ron DiPietro.

09:42:44  21   **Q**    Is Chris Kare Mr. Karasarides?

09:42:46  22   **A**    Yes, sir.

09:42:47  23   **Q**    Is that generally how you know him and refer to him?

09:42:49  24   **A**    Correct.

09:42:52  25   **Q**    Was the business in any of those individuals' names,

09:42:55  1   your name, Mr. Karasarides, Mr. DiPietro?

09:42:55  2   **A**    No, sir.

09:42:57  3   **Q**    Whose name was it in?

09:42:58  4   **A**    Which one?

09:42:59  5   **Q**    Skilled Shamrock, whose name was that in?

09:43:02  6   **A**    Derek Phillips.

09:43:05  7   **Q**    Who is Derek Phillips?

09:43:06  8   **A**    A buddy of Larry Dayton and myself.

09:43:09  9   **Q**    Now, turning to Redemption, when did you come into

09:43:13  10  Redemption?

09:43:15  11  **A**    I started the business in 2009.

09:43:18  12  **Q**    And who were the owners of Redemption with you?

09:43:21  13  **A**    To start --

09:43:22  14       I feel like this mic keeps going out.

09:43:26  15           COURTROOM DEPUTY:  It's just -- it's like if

09:43:27  16  you're not right -- if you get a little too far, it goes

09:43:30  17  out.

09:43:31  18           THE WITNESS:  Gotcha.

09:43:33  19       2009 to roughly '11, myself -- myself, Larry, Chris,

09:43:44  20  and Ron DiPietro.

09:43:46  21  BY MR. BEAN:

09:43:47  22  **Q**    And how about after 2011?

09:43:48  23  **A**    Myself, Larry Dayton, and Chris Kare.

09:43:53  24  **Q**    What happened to Mr. DiPietro?

09:43:53  25  **A**    We bought our own machines and had him take his back.

09:43:58  1    **Q**    Now, when you first started the business, who -- whose

09:44:01  2    name was the business put in?

09:44:03  3    **A**    Larry Dayton's.

09:44:05  4    **Q**    At some point did that change?

09:44:06  5    **A**    Yes, sir.

09:44:07  6    **Q**    Approximately when did that change?

09:44:16  7    **A**    '14 -- 2013, '14-ish.

09:44:20  8    **Q**    At that point whose name was the business put in?

09:44:23  9    **A**    Thomas Helmick.

09:44:24  10   **Q**    Whose idea was it to do that?

09:44:26  11   **A**    The three business owners.

09:44:27  12   **Q**    Did you know Mr. Helmick before he got involved in

09:44:31  13   Redemption?

09:44:31  14   **A**    Yeah.  I had seen him here and there.  Not like

09:44:35  15   friendship or nothing.

09:44:35  16   **Q**    And how had you seen him?

09:44:37  17   **A**    Just met him.

09:44:39  18   **Q**    Did he ever any connection to any of the -- your

09:44:44  19   co-owners?

09:44:44  20   **A**    Chris Kare's nephew, I believe.

09:44:47  21   **Q**    At Redemption, who were employees told to say owned

09:44:50  22   the business if somebody asked?

09:44:53  23   **A**    Thomas Helmick.

09:44:57  24            MR. KERSEY:  Judge, I still can't hear.  He

09:44:59  25   runs the words together.

09:45:01  1        THE COURT:  Say that again.

09:45:01  2        MR. KERSEY:  He's running his words together,

09:45:03  3  Your Honor, and I'm just asking him to be a little bit more

09:45:05  4  specific and a little bit more concise in his answers.

09:45:08  5        THE COURT:  All right, Mr. Kersey has a little

09:45:10  6  hearing issue, so if you could do your best.

09:45:13  7        THE WITNESS:  Gotcha.

09:45:17  8  BY MR. BEAN:

09:45:18  9  **Q**    Why -- if Redemption was owned by -- you know, after

09:45:24  10 Mr. Helmick came in, if Redemption was owned by you,

09:45:28  11 Mr. Dayton, and Mr. Karasarides, why weren't any of you

09:45:31  12 listed on the business?

09:45:33  13 **A**    Because I'm a felon.

09:45:34  14 **Q**    Okay.  Why couldn't Mr. Karasarides be listed?

09:45:37  15 **A**    He's a felon.

09:45:39  16 **Q**    Why -- why couldn't Mr. Dayton continue to be listed?

09:45:44  17 **A**    Mr. Dayton was on the list and got into some personal

09:45:52  18 problems with drugs.

09:45:55  19 **Q**    What was the issue with having the business in the

09:45:57  20 name of someone who is a felon?

09:46:00  21 **A**    I mean, more likely to probably get in trouble.

09:46:04  22 **Q**    Why would -- why would you be concerned about getting

09:46:06  23 in trouble?

09:46:09  24 **A**    I don't know, I just did -- I didn't want to have my

09:46:12  25 name on the business being a felon.

09:46:14    1   **Q**      And how about Skilled Shamrock?

09:46:17    2   **A**      Derek Phillips.

09:46:19    3   **Q**      I understand, I think you testified he was the

09:46:22    4   nominee, but why not put it in the name of Mr. DiPietro or

09:46:25    5   Mr. Karasarides or yourself or Mr. Dayton?

09:46:28    6   **A**      I mean, there wasn't many game rooms that were in

09:46:31    7   anyone's name that was an owner, to be honest.  It was just

09:46:34    8   like a thing that all the -- they did with the game rooms.

09:46:37    9   **Q**      So that was pretty standard?

09:46:39   10   **A**      Correct.

09:46:39   11   **Q**      Do you have -- do you know -- do you have any reason

09:46:42   12   to believe why that was standard?

09:46:45   13   **A**      No idea.

09:46:51   14   **Q**      So did Skilled Shamrock pay out cash to patrons?

09:46:55   15   **A**      Yes, sir.

09:46:55   16   **Q**      Did Redemption?

09:46:56   17   **A**      Yes, sir.

09:46:57   18   **Q**      When that was happening did you, specifically, believe

09:47:01   19   that it was legal to pay out cash to patrons?

09:47:06   20                  MR. GOLDBERG:  Objection.

09:47:07   21                  THE COURT:  Overruled.

09:47:09   22                  MR. BEAN:  You can answer.

09:47:10   23                  THE WITNESS:  By the State of Ohio law, you're

09:47:12   24   allowed to pay up to $10.  Anything over $10 is supposed to

09:47:17   25   be paid out in a cash prize per the Chuck E. Cheese law.

09:47:22   1    BY MR. BEAN:

09:47:22   2    **Q**    And was Shamrock and Redemption, were they paying out

09:47:24   3    more than $10?

09:47:26   4    **A**    Yes, sir.

09:47:26   5    **Q**    During that your time, do you remember some of the

09:47:28   6    larger payouts?

09:47:30   7    **A**    Not off the top of my head, no.

09:47:31   8    **Q**    Can you give estimates?

09:47:33   9                  MR. GOLDBERG:  Objection.

09:47:33   10                 THE COURT:  Overruled.

09:47:34   11                 THE WITNESS:  I mean, it would vary.

09:47:36   12   Depending on what you -- what you bet for --

09:47:39   13   BY MR. BEAN:

09:47:39   14   **Q**    Hundreds, thousands, tens of thousands?

09:47:43   15   **A**    I mean, it could be anywhere from a quarter to a

09:47:46   16   thousand dollars depending on what you hit.

09:47:50   17   **Q**    Did you have any conversations with Mr. Karasarides to

09:47:55   18   indicate to you that he knew Skilled Shamrock and Redemption

09:47:57   19   were paying out cash?

09:47:58   20                 MR. GOLDBERG:  Objection.

09:47:59   21                 THE COURT:  Overruled.

09:48:02   22                 THE WITNESS:  One more time.

09:48:03   23   BY MR. BEAN:

09:48:04   24   **Q**    Did you have any conversations with Mr. Karasarides

09:48:07   25   that indicated to you that he knew it was paying out cash?

09:48:09   1   **A**     We all knew they were paying out cash.

09:48:12   2                    MR. BEAN:  Can you please play --

09:48:14   3                    MR. GOLDBERG:  Objection.

09:48:14   4                    THE COURT:  Overruled.

09:48:15   5        I guess the question was directed about

09:48:17   6   Mr. Karasarides.  Did you ever talk to him about it?

09:48:20   7                    THE WITNESS:  Yeah.  We all knew it.  Every

09:48:22   8   owner knew that they were paying out cash.  Every game room

09:48:26   9   in Stark County paid out cash.

09:48:30  10                    MR. BEAN:  Can we please go to Exhibit 346,

09:48:33  11   which the parties have stipulated is a phone call between

09:48:37  12   Mr. Karasarides and Melissa Bragg that took place on

09:48:40  13   July 20th, 2018.

09:48:46  14                    THE COURT:  Let me interrupt you here,

09:48:47  15   Mr. Bean.

09:48:48  16        You know, when we have recordings, the real evidence

09:48:52  17   is the recording itself, but we allow a professional

09:48:57  18   transcriber, you know, like Heather here, to listen to the

09:49:00  19   recordings and then to the best of their ability write it

09:49:03  20   down so -- to help you when you listen to the recording.

09:49:08  21   But the transcription is not the evidence, it's the

09:49:10  22   recording itself.  Just so you know.

09:49:12  23        And eventually when you go back to the jury room, you

09:49:15  24   may or may not have the transcription, but you'll definitely

09:49:17  25   have the recording.

09:49:19  1          MR. BEAN:  And this call, what the parties

09:49:21  2  have stipulated was July 20, 2018.

09:49:24  3      And can you play at the timestamp, please.

09:49:46  4              (Brief pause in proceedings.)

09:50:24  5          MR. HOWELL:  Apologize, Your Honor.  Carissa

09:50:25  6  is helping us with a technical issue again.

09:50:27  7          THE COURT:  Thank God for her.

09:50:30  8          MR. HOWELL:  Yes.

09:50:33  9              (Brief pause in proceedings.)

09:50:53  10             (Audio played.)

09:50:53  11         MR. BEAN:  Can everybody hear that okay?  That

09:50:56  12  little snippet that just played, did you hear that?  Because

09:51:01  13  we are having some issues and testing getting it loud

09:51:05  14  enough.

09:51:06  15      All right.

09:51:36  16  BY MR. BEAN:

09:51:37  17  Q      Did you make money from these businesses, Skilled

09:51:39  18  Shamrock and Redemption?

09:51:40  19  A      Yes.

09:51:41  20  Q      Did your co-owners make money?

09:51:44  21  A      Yes.

09:51:44  22  Q      Can you just give us a sense of how much?  Was it a

09:51:48  23  lot?

09:51:48  24  A      It was a good number.

09:51:51  25  Q      Was it all cash?

**J. Kachner (Direct by Bean)**                178

09:51:54  1   **A**    Was what all cash?

09:51:55  2   **Q**    All the money you made from these businesses, were

09:51:58  3   they all cash?

09:51:59  4   **A**    Yes.

09:51:59  5   **Q**    I mean, were these cash businesses?

09:52:01  6   **A**    Yes.

09:52:03  7   **Q**    Did Mr. Karasarides receive a cut of that cash?

09:52:05  8   **A**    Yes.

09:52:06  9   **Q**    Did you ever deliver it to him?

09:52:08  10  **A**    Occasionally.

09:52:10  11  **Q**    Did you -- do you recall a period where

09:52:13  12  Mr. Karasarides went to prison?

09:52:15  13  **A**    Yes.

09:52:16  14  **Q**    In approximately 2014, to the best of your

09:52:23  15  recollection?

09:52:24  16  **A**    Yeah.

09:52:24  17  **Q**    Did Mr. Karasarides stop receiving cash from Skilled

09:52:27  18  Shamrock or Redemption after he got out of prison?

09:52:29  19  **A**    No.

09:52:30  20  **Q**    Did you ever deliver cash to him after he got out of

09:52:32  21  prison?

09:52:34  22  **A**    I'm not sure.

09:52:37  23  **Q**    What company prepared your tax returns for 2013

09:52:41  24  through 2017?

09:52:44  25  **A**    Ron & Associates.

| | | |
|---|---|---|
| 09:52:45 | 1 | **Q**    Who owned that company? |
| 09:52:47 | 2 | **A**    Mr. DiPietro. |
| 09:52:48 | 3 | **Q**    Did Ron DiPietro prepare some of your tax returns? |
| 09:52:51 | 4 | **A**    Yes. |
| 09:52:52 | 5 | **Q**    How did he come to prepare your tax returns? |
| 09:52:58 | 6 | **A**    What do you mean how did he come? |
| 09:53:00 | 7 | **Q**    How did that happen?  How did you end up at |
| 09:53:02 | 8 | Mr. DiPietro's tax preparation business? |
| 09:53:06 | 9 | **A**    Mr. Karasarides told me that I could go to him to get |
| 09:53:08 | 10 | my taxes prepared. |
| 09:53:15 | 11 | **Q**    Did anybody else there prepare your tax returns, ever? |
| 09:53:23 | 12 | **A**    Tristan, Ron's son, did it one time, and I believe |
| 09:53:28 | 13 | there was a lady that did it.  I don't know who -- I don't |
| 09:53:30 | 14 | remember what her name was. |
| 09:53:32 | 15 | **Q**    Do you recall, how many times did the lady do it? |
| 09:53:36 | 16 | **A**    Once, I believe. |
| 09:53:38 | 17 | **Q**    Did you report all of the income you received from |
| 09:53:42 | 18 | gambling rooms that you owned, including Skilled Shamrock |
| 09:53:44 | 19 | and Redemption, on your 2013 through 2017 tax returns? |
| 09:53:49 | 20 | **A**    No. |
| 09:53:51 | 21 | **Q**    Did Mr. DiPietro know you had income from your |
| 09:53:54 | 22 | gambling businesses? |
| 09:53:55 | 23 | **A**    Yes.  Yes. |
| 09:53:57 | 24 | MR. BEAN:  Can we please pull up Exhibit 152. |
| 09:54:03 | 25 | Next page. |

09:54:04    1    BY MR. BEAN:

09:54:04    2    **Q**    Is this your 2017 tax return?

09:54:12    3    **A**    Yes.  It's me and my wife's.

09:54:16    4                    MR. BEAN:  Can we go to the next page, please,

09:54:19    5    Page 3 and Page 4, please, and one more page, please,

09:54:23    6    Page 5.

09:54:25    7         Back one.

09:54:28    8    BY MR. BEAN:

09:54:28    9    **Q**    Is there a return preparer listed here?

09:54:31    10        Do you see where it says "paid preparer"?

09:54:33    11   **A**    Okay.  Okay.

09:54:37    12   **Q**    Whose name is listed there?

09:54:39    13   **A**    You're talking -- you're talking -- you're talking

09:54:43    14   about the firm's name?

09:54:44    15   **Q**    Right above -- well, you can read off the firm, sure,

09:54:47    16   and also right above that.

09:54:49    17   **A**    Oh, okay.  The print type preparer's name was Ron

09:54:54    18   DiPietro.  The firm's name was Ron & Associates, and the

09:54:57    19   firm's address is below that.

09:54:59    20   **Q**    And did Mr. DiPietro, in fact, prepare this return?

09:55:02    21   **A**    Yes.

09:55:03    22   **Q**    All right.

09:55:05    23                   MR. BEAN:  Can we please go to what I believe

09:55:07    24   will be Page 6.  Or one more.  Okay.

09:55:12    25        Keep going.  Sorry about that.

| | | |
|---|---|---|
| 09:55:14 | 1 | This page.  Thank you.  Page 8. |
| 09:55:17 | 2 | BY MR. BEAN: |
| 09:55:17 | 3 | **Q**    What is this, as far as you understand it? |
| 09:55:22 | 4 | **A**    A tax -- tax paper. |
| 09:55:24 | 5 | **Q**    Um-hmm.  And do you see at the top where it says |
| 09:55:28 | 6 | profit or loss from business in bold letters?  Do you see |
| 09:55:35 | 7 | that? |
| 09:55:35 | 8 | **A**    No, sir. |
| 09:55:36 | 9 | **Q**    Right at the top in bold letters in the middle? |
| 09:55:40 | 10 | **A**    Or right in the middle, yeah.  Profit or loss from |
| 09:55:44 | 11 | business. |
| 09:55:44 | 12 | **Q**    And what type of business is listed here? |
| 09:55:46 | 13 | **A**    Handyman service. |
| 09:55:50 | 14 | **Q**    Did you have a handyman service? |
| 09:55:56 | 15 | **A**    No. |
| 09:56:01 | 16 | **Q**    Why -- how did handyman service end up on your tax |
| 09:56:04 | 17 | return then? |
| 09:56:06 | 18 | **A**    Well, there's no way to file for running an illegal |
| 09:56:09 | 19 | gambling business, so I put handyman as I was a technician |
| 09:56:15 | 20 | for the services -- or for the machines. |
| 09:56:18 | 21 | **Q**    Who told you there was no way to file for an illegal |
| 09:56:20 | 22 | gambling business? |
| 09:56:21 | 23 | **A**    Ron & Associates. |
| 09:56:23 | 24 | **Q**    Anyone specifically at Ron & Associates? |
| 09:56:26 | 25 | **A**    Not a hundred percent sure who told me that.  Could |

09:56:28   1    have been the woman that did it the first time, or Ron.

09:56:31   2    **Q**      Do you know that the woman prepared your first tax

09:56:33   3    return, or do you know who prepared your first tax return?

09:56:35   4    **A**      I -- it was a lady.  I don't remember her name.

09:56:37   5    **Q**      The first one?

09:56:38   6    **A**      I believe so, yes.

09:56:47   7                    MR. BEAN:  Can we go to -- can we zoom out,

09:56:52   8    please?  How much -- actually, let's go down a couple pages,

09:56:58   9    please.

09:57:01   10          Do you -- and can you zoom in at the top?

09:57:07   11          We're on Page 11.

           12    BY MR. BEAN:

09:57:12   13    **Q**      Did you have a car dealership business?

09:57:15   14    **A**      Yes, sir.  Yes, sir.

09:57:16   15    **Q**      And what was it called?

09:57:18   16    **A**      Premos Used Cars.

09:57:20   17                    MR. BEAN:  And if we can scroll out.

           18    BY MR. BEAN:

09:57:21   19    **Q**      Is it your understanding that this -- that's what's

09:57:24   20    reported here, financial information from your used car

09:57:27   21    business?

09:57:28   22    **A**      Correct.

09:57:31   23    **Q**      Now, when Mr. DiPietro and anyone else at Ron &

09:57:35   24    Associates prepared a tax return for you, did you bring

09:57:38   25    records from Premos to assist them in the preparation of the

09:57:44    1    return?

09:57:44    2    **A**    Yes, sir.

09:57:44    3    **Q**    And what kind of records did you bring?

09:57:46    4    **A**    I had my -- I had my secretary print all the paperwork

09:57:51    5    that came off of the Frazer documentation from -- it was a

09:57:59    6    thing that we used from Frazer, and at the end of it you

09:58:02    7    just calculated everything from car sales to bills paid.

09:58:07    8    **Q**    Was this pretty detailed information?

09:58:10    9    **A**    Yeah.

09:58:11   10    **Q**    Why did you bring this information?

09:58:14   11    **A**    So that I could properly fill out the taxes for

09:58:17   12    Premos.

09:58:22   13              MR. BEAN:  Now, could we go back to the other

09:58:24   14    Schedule C, please?

           15    BY MR. BEAN:

09:58:25   16    **Q**    When -- did you bring any records for a handyman

09:58:28   17    business when you went to go have your tax returns prepared?

09:58:32   18    **A**    No.

09:58:33   19    **Q**    Did you bring any records for Skilled Shamrock or

09:58:35   20    Redemption when you went to have your tax returns prepared?

09:58:38   21    **A**    No, sir.

09:58:38   22    **Q**    Why not?

09:58:38   23    **A**    Didn't have any.

09:58:43   24    **Q**    Did Mr. DiPietro ever ask you for any records relating

09:58:45   25    to a handyman business or for Skilled Shamrock or

**J. Kachner  (Direct by Bean)**                                184

09:58:48  1    Redemption?

09:58:49  2    **A**    The only thing that we ever put in there was for my

09:58:53  3    expenses for the machine equipment.

09:58:57  4    **Q**    Machine equipment for -- what kind of machine

09:59:00  5    equipment?

09:59:00  6    **A**    For the skilled -- for the games, like bill accepters

09:59:03  7    and whatnot.

09:59:05  8    **Q**    Did you have discussions with Mr. DiPietro about this

09:59:07  9    handyman business?

09:59:10  10   **A**    Pertaining to what?

09:59:11  11   **Q**    Like, how it ended up on your tax return?

09:59:14  12   **A**    I already stated that we didn't have anything to put

09:59:17  13   for me being a technician, so we put handyman service that I

09:59:20  14   was doing.

09:59:22  15   **Q**    Okay.

09:59:23  16   **A**    Working on the --

09:59:26  17   **Q**    Did you have that conversation with Mr. DiPietro?

09:59:28  18   **A**    Sure.

09:59:28  19   **Q**    And did you have an understanding with him about what

09:59:31  20   income is actually reported on here?

09:59:36  21         I mean, what income is actually reported on here?

09:59:39  22   **A**    Says 126,000.

09:59:40  23   **Q**    Right.  But where was the source of that income?

09:59:43  24   **A**    My head.

09:59:44  25   **Q**    Your what?

09:59:45   1   **A**      Top of my head.

09:59:46   2   **Q**      Right.  But what -- where -- what businesses was that

09:59:49   3   coming from?

09:59:49   4   **A**      Redemption and Shamrock.

09:59:53   5   **Q**      Okay.  Did you have conversations with Mr. DiPietro

09:59:56   6   about what businesses that income was coming from?

10:00:03   7   **A**      Did I have. . . one more time.

10:00:05   8   **Q**      Did you have conversations with Mr. DiPietro about

10:00:07   9   what businesses that was coming from?

10:00:11  10          Did he know that this was coming from Skilled Shamrock

10:00:12  11   and Redemption?

10:00:13  12   **A**      Yes.

10:00:14  13   **Q**      How --

10:00:15  14   **A**      He knew it was coming from game rooms, and Shamrock he

10:00:19  15   was involved with.

10:00:20  16   **Q**      So did he know that you didn't have a handyman

10:00:22  17   business?

10:00:22  18   **A**      Yes.

10:00:23  19   **Q**      And he knew that this was income from game rooms,

10:00:25  20   including Shamrock?

10:00:26  21   **A**      Yes, sir.  Yes, sir.  Yes.  Yes.

10:00:31  22   **Q**      When Mr. DiPietro prepared your tax returns,

10:00:35  23   particularly relating to the Premos part, did he have

10:00:45  24   questions for you?  In the course of going through it, did

10:00:47  25   he ask you questions about the business, about expenses,

10:00:49   1    finances?

10:00:50   2    **A**    Yeah.

10:00:50   3    **Q**    All right.  How about when preparing the handyman

10:00:54   4    business Schedule C, did he have questions for you?

10:00:57   5    **A**    No.  The only thing that I -- I ever put in there was

10:01:01   6    expenses.

10:01:06   7    **Q**    Are the businesses Skilled Shamrock or Redemption

10:01:10   8    mentioned anywhere on this tax return?

10:01:11   9    **A**    No.  No.  No.

10:01:18  10    **Q**    Why aren't Skilled Shamrock and Redemption reported on

10:01:22  11    this tax return?

10:01:22  12    **A**    Because like I stated before, there's nowhere to put

10:01:26  13    that you own a game room, so we put handyman service because

10:01:30  14    I worked on the machines.

10:01:31  15    **Q**    Now, earlier you testified that Mr. DiPietro was a

10:01:33  16    co-owner in Skilled Shamrock; right?

10:01:35  17    **A**    Correct.

10:01:36  18    **Q**    Sitting here today, do you wonder how Mr. DiPietro

10:01:39  19    reported Skilled Shamrock on his tax return?

10:01:43  20    **A**    It was none of my business.

10:01:45  21    **Q**    How about sitting here today?

10:01:48  22    **A**    Do I wonder why he didn't --

10:01:50  23    **Q**    How could he have if you were told that you couldn't

10:01:53  24    report these businesses?

10:01:54  25              MR. KERSEY:  Judge, I'd object.  That assumes

**J. Kachner  (Direct by Bean)**                                  187

10:01:57  1    a prior question on that.

10:01:58  2                    THE COURT:  Overruled.

10:01:58  3         Go ahead.

10:01:59  4                    THE WITNESS:  All right.  You're going to have

10:02:00  5    to repeat that -- repeat that one more time.

10:02:03  6    BY MR. BEAN:

10:02:03  7    **Q**    You testified that you were told that these businesses

10:02:05  8    couldn't be reported on your tax return; right?

10:02:07  9    **A**    Correct.

10:02:07  10   **Q**    So sitting here today, do you wonder how your

10:02:10  11   co-owner, Mr. DiPietro, the preparer who prepared this tax

10:02:14  12   return, reported his income from these businesses?

10:02:16  13   **A**    No.  I never even thought of it.

10:02:21  14   **Q**    How did you initially meet Mr. Karasarides?

10:02:25  15   **A**    Through poker games.

10:02:31  16   **Q**    And how did you get involved in these game rooms?

10:02:34  17   **A**    I always wanted to get into them and was at the right

10:02:38  18   place at the right time and was able to fall into one.

10:02:41  19   **Q**    And how did you end up in business specifically with

10:02:44  20   Mr. Karasarides?

10:02:48  21   **A**    He and Mr. DiPietro put the machines into Redemption

10:02:54  22   Skill Rooms.

10:02:54  23   **Q**    How did you get invited to be involved in Redemption?

10:02:58  24   **A**    I asked him to be a game room owner.

10:03:00  25   **Q**    And why did you ask Mr. Karasarides?

10:03:03  1   **A**    Because he was in the business.

10:03:07  2   **Q**    Let's talk some more about Skilled Shamrock.

10:03:10  3          How did you get involved in Skilled Shamrock?

10:03:18  4   **A**    Was asked -- was -- was asked to take over the

10:03:25  5   property from Big Store.

10:03:28  6   **Q**    And who is Big Store?

10:03:36  7          Is he a person?

10:03:37  8   **A**    Bill Strathakaros I believe was his name.

          9                MR. KERSEY:  I can't hear him, Judge.

          10               THE WITNESS:  Bill Strathakaros was his name.

10:03:46  11  BY MR. BEAN:

10:03:46  12  **Q**    Who asked you to get involved in Skilled Shamrock?

10:03:49  13  **A**    Mr. Karasarides.

10:03:54  14  **Q**    Was Skilled Shamrock already operating at that time?

10:03:56  15  **A**    Yes.

10:03:59  16  **Q**    As far as you're aware, did Mr. Strathakaros have any

10:04:03  17  relationship with Mr. Karasarides?

10:04:05  18  **A**    Friends.

10:04:06  19  **Q**    Why did they bring you in -- or why did

10:04:10  20  Mr. Karasarides bring you in?

10:04:13  21  **A**    Because I'm friends with him.

10:04:15  22  **Q**    At that time, was Mr. DiPietro already involved in

10:04:18  23  Skilled Shamrock?

10:04:20  24  **A**    To my knowledge, yes.

10:04:21  25  **Q**    And just -- I think you answered this already, but can

10:04:24  1    you just -- again, approximately what time period was this?

10:04:27  2    **A**    I believe it was 2010 or '11.

10:04:30  3    **Q**    Did you agree to get involved in Skilled Shamrock?

10:04:32  4    **A**    Yep.

10:04:33  5    **Q**    Did Mr. Dayton get involved in Skilled Shamrock?

10:04:35  6    **A**    Yes.

10:04:36  7    **Q**    And was that around the same time?

10:04:37  8    **A**    Yes.

10:04:43  9    **Q**    Now, I think earlier you testified that Mr. Derek

10:04:48  10   Phillips was listed as the owner of Skilled Shamrock.  Why

10:04:51  11   not -- if the business had multiple owners, why not list it

10:04:54  12   as a partnership?

10:04:57  13                    MR. GOLDBERG:  Objection.

10:04:57  14                    THE COURT:  Overruled.

10:04:58  15                    THE WITNESS:  List what as partnership?

10:05:00  16   BY MR. BEAN:

10:05:00  17   **Q**    I mean, why not list it as the business had multiple

10:05:04  18   owners?  Why not do it -- why not say who the actual owners

10:05:07  19   were?  Why not set it up that way?

10:05:11  20   **A**    Like I stated before, I don't know if there was a game

10:05:15  21   room in Stark County that had the right name on it.

10:05:17  22   **Q**    Now, earlier you said you didn't want it in your name

10:05:20  23   because you were a felon.  What -- are you referencing a

10:05:23  24   specific offense?

10:05:24  25   **A**    The city of Plain Township had to approve --

10:05:29    1              MR. GOLDBERG:  Objection.  Not responsive.

10:05:30    2              THE COURT:  He can answer.

10:05:32    3              THE WITNESS:  The city of Plain Township had

10:05:35    4    guidelines that you had to go through in order to open a

10:05:39    5    game room.  Being a felon was going to pretty much null and

10:05:44    6    void that.

10:05:45    7    BY MR. BEAN:

10:05:45    8    **Q**     Was there a specific offense that you were thinking

10:05:49    9    of, you know, when -- why you didn't want to be on the

10:05:53   10    owner -- be listed as an owner?

10:05:56   11    **A**     No.

10:05:56   12    **Q**     Had you previously gotten in trouble for operating a

10:05:58   13    game room?

10:06:01   14    **A**     Yes.  It was after -- but that was after Redemption

10:06:04   15    opened.

10:06:04   16    **Q**     Okay.  And where was that store?

10:06:06   17    **A**     Massillon, Ohio.

10:06:08   18    **Q**     And did you do that store with anybody else?

10:06:10   19    **A**     Myself, Larry, and Chris.

10:06:12   20    **Q**     Chris who?

10:06:14   21    **A**     Kare.

10:06:17   22    **Q**     Did Mr. Phillips get paid for being listed as the

10:06:22   23    owner on the business?

10:06:22   24    **A**     Yes.

10:06:23   25    **Q**     Did he do other work there in addition to --

10:06:26  1  **A**    He was like the manager of the store while he was

10:06:28  2  there.

10:06:29  3  **Q**    Do you recall who owned the building at Skilled

10:06:33  4  Shamrock?  Would -- that Skilled Shamrock was located in?

10:06:36  5  **A**    Mr. Steve.

10:06:37  6  **Q**    Do you know Steve's last name?

10:06:40  7  **A**    I think it's Karasarides too.

10:06:42  8  **Q**    Was he an owner of Skilled Shamrock?

10:06:44  9  **A**    No, sir.

10:06:46  10  **Q**    Was he frequently at the business?

10:06:48  11  **A**    No, sir.

10:06:50  12  **Q**    Are you aware of him telling anybody that he was an

10:06:52  13  owner of the business?

10:06:54  14  **A**    Not to my knowledge.

10:06:56  15  **Q**    All right.

10:06:57  16          MR. BEAN:  Can we please pull up Exhibit 402.

10:07:04  17  BY MR. BEAN:

10:07:04  18  **Q**    What is this?

10:07:05  19  **A**    Front -- front door of Skilled Shamrock.

10:07:08  20  **Q**    Is this how Skilled Shamrock looked at times when you

10:07:12  21  were involved in the business?

10:07:19  22  **A**    No.  I believe we repainted it.

10:07:21  23  **Q**    But when did you -- if you recall, approximately when

10:07:24  24  did you repaint it?

10:07:26  25  **A**    I'm not sure.  I mean, maybe 2012 or '13-ish.  I'm not

| | | |
|---|---|---|
| 10:07:30 | 1 | a hundred percent. |
| 10:07:32 | 2 | **Q**    Is this a true and accurate representation of Skilled |
| 10:07:35 | 3 | Shamrock when -- during a period during which you owned it? |
| 10:07:37 | 4 | **A**    Yes, sir. |
| 10:07:40 | 5 |         MR. BEAN:  Can we please pull up Exhibit 400? |
| 10:07:45 | 6 | BY MR. BEAN: |
| 10:07:46 | 7 | **Q**    What are we looking at here? |
| 10:07:49 | 8 | **A**    The inside front room of Shamrock. |
| 10:07:53 | 9 | **Q**    And can you just -- if there were patrons here, can |
| 10:07:58 | 10 | you just paint us a picture of where they might be? |
| 10:08:00 | 11 | **A**    Sitting in those chairs. |
| 10:08:01 | 12 | **Q**    And what would they be doing? |
| 10:08:06 | 13 | **A**    They could be doing a lot of things.  They could be |
| 10:08:08 | 14 | playing a game.  They could be just sitting there BS'g. |
| 10:08:12 | 15 | **Q**    Where -- how did -- are there machines in this photo? |
| 10:08:16 | 16 | Do you see machines? |
| 10:08:17 | 17 | **A**    Yes, sir. |
| 10:08:17 | 18 | **Q**    Is that where people play the games? |
| 10:08:19 | 19 | **A**    Yes, sir. |
| 10:08:22 | 20 | **Q**    Do you recall approximately how many machines were at |
| 10:08:24 | 21 | Skilled Shamrock in, say, 2018? |
| 10:08:31 | 22 |         An estimate's fine. |
| 10:08:35 | 23 | **A**    36 to 42 machines. |
| 10:08:40 | 24 |         MR. BEAN:  Can we please pull up Exhibit 403? |
| 10:08:46 | 25 | BY MR. BEAN: |

10:08:47   1   **Q**     What is this?

10:08:49   2   **A**     Those are signs that we had made that we put on

10:08:55   3   machines, and I believe one was taped to the wall, maybe.

10:09:01   4   **Q**     And were -- was a sign like this at Skilled Shamrock?

10:09:05   5   **A**     I believe it was at all the game rooms.  Not -- excuse

10:09:10   6   me, let me rephrase that.

10:09:11   7          It was at Redemption.  It was at the game rooms that I

10:09:15   8   was in ownership with.

10:09:16   9   **Q**     So, that includes Skilled Shamrock and Redemption?

10:09:19  10   **A**     Correct.

10:09:20  11   **Q**     At the very least?

10:09:21  12   **A**     Correct.

10:09:25  13   **Q**     Were there prizes on the wall at Skilled Shamrock?

10:09:29  14   **A**     Yes.

10:09:30  15   **Q**     What kind of prizes?  Give us a sense.

10:09:33  16   **A**     Dollar General prizes.

10:09:40  17   **Q**     Why were they prizes on the wall?

10:09:42  18   **A**     Because like I stated before, the State of Ohio, it's

10:09:45  19   like it was the way -- the way it was done said to me is

10:09:48  20   it's like an adult Chuck E. Cheese, that when the points on

10:09:53  21   the tickets are supposed to be paid out in prizes.  So we

10:09:55  22   had tickets -- I mean, we had prizes that amounts to points.

10:10:00  23   **Q**     Did people ever request these prizes instead of cash?

10:10:03  24   **A**     Yes.  Yes.

10:10:04  25   **Q**     Was that a common occurrence?

| | | |
|---|---|---|
| 10:10:07 | 1 | **A**     No. |
| 10:10:11 | 2 | **Q**     When you first became a part of Skilled Shamrock, what |
| 10:10:14 | 3 | was your role as far as the actual operations of the |
| 10:10:17 | 4 | business? |
| 10:10:18 | 5 | **A**     Day-to-day operations. |
| 10:10:20 | 6 | **Q**     And did that ever change during your time involved in |
| 10:10:25 | 7 | Skilled Shamrock? |
| 10:10:25 | 8 | **A**     No. |
| 10:10:28 | 9 | **Q**     How were the profits at Skilled Shamrock divided when |
| 10:10:35 | 10 | you first joined? |
| 10:10:36 | 11 | **A**     60-40. |
| 10:10:37 | 12 | **Q**     But who gets each percentage? |
| 10:10:39 | 13 | **A**     Myself, Larry, and Chris got 60, and Ron received 40. |
| 10:10:47 | 14 | **Q**     Now, of those 60/40, which -- which side did the |
| 10:10:52 | 15 | expenses come out of? |
| 10:10:54 | 16 | **A**     To start, myself, Larry, and Chris. |
| 10:10:58 | 17 | **Q**     So the 60 percent? |
| 10:10:59 | 18 | **A**     Correct. |
| 10:11:00 | 19 | **Q**     Now, at some point did that change? |
| 10:11:02 | 20 | **A**     Yes. |
| 10:11:03 | 21 | **Q**     All right.  What changed about that? |
| 10:11:06 | 22 | **A**     I got mad because expenses weren't being taken out |
| 10:11:11 | 23 | properly, so we went 50/50. |
| 10:11:15 | 24 | **Q**     Now, did you -- did the owners at Skilled Shamrock |
| 10:11:20 | 25 | have audits performed at the business, of the machines? |

**J. Kachner (Direct by Bean)** 195

10:11:26  1  **A**    Yes.

10:11:26  2  **Q**    All right.  And approximately how often did those

10:11:28  3  occur?

10:11:28  4  **A**    Once a week.

10:11:30  5  **Q**    And during the audits, can you just describe for us

10:11:36  6  kind of what would happen?

10:11:37  7  **A**    Myself and whoever was on call with -- for Ron went

10:11:41  8  around and did printouts, and each machine printed out a

10:11:47  9  ticket.

10:11:47  10  **Q**    And what did that ticket say?

10:11:49  11  **A**    Total -- what the total in, out, and profit was.

10:11:54  12  **Q**    And when you say in and out, is that money in and

10:11:57  13  money out?

10:11:57  14  **A**    Yes, sir.

10:11:58  15  **Q**    Did you remove money from the machines?

10:12:01  16  **A**    Yes.

10:12:01  17  **Q**    Was it counted?

10:12:02  18  **A**    Yes.

10:12:03  19  **Q**    Were expenses taken out?

10:12:05  20  **A**    Yes.

10:12:06  21  **Q**    And what happened with the leftover profits?

10:12:12  22  **A**    We divided it.

10:12:14  23         MR. BEAN:  Can you please pull up Exhibit 330

10:12:17  24  which the parties have stipulated is an authentic text

10:12:21  25  message between Mr. Kachner and Mr. DiPietro.

10:12:26   1      And can we please go down a few pages.  There's one on

10:12:29   2  12-10.  Keep going, please.

10:12:30   3      All right.  That's perfect.

10:12:31   4      And we're on Page 3 here.

10:12:35   5      Please -- can you please zoom in on the -- at the top

10:12:38   6  there, kind of the top third of the page.

10:12:42   7      Yeah.

10:12:47   8  BY MR. BEAN:

10:12:47   9  Q     What are you texting Mr. DiPietro about here in

10:12:51   10  December of 2017?

10:13:01   11              (Brief pause in proceedings.)

10:13:11   12              THE WITNESS:  Looks like the. . . from what

10:13:13   13  I'm reading, it's stating that the numbers were off by

10:13:16   14  $4,000.  They just totaled it and put it into expenses

10:13:21   15  instead of figuring out where it was at.  And it says -- I

10:13:24   16  said that Jay messed up.

10:13:28   17  BY MR. BEAN:

10:13:29   18  Q     Who is Jay?  Do you know a Jay?

10:13:31   19  A     Jay was the guy that came in with -- for Ron.

10:13:35   20  Q     Do you know Jay's last name?

10:13:44   21  A     Spitale, maybe.

10:13:46   22  Q     And -- well, first off, I'll ask you, the text

10:13:49   23  response, it lists Melodee.  Do you know anyone named

10:13:54   24  Melodee?

10:13:55   25  A     Melodee?

**J. Kachner  (Direct by Bean)**                    197

10:13:56  1    **Q**     Do you have any reason to think that a Melodee is

10:13:59  2    texting you?

10:14:00  3    **A**     Melodee.  I don't know a Melodee.

10:14:02  4    **Q**     Do you know Mr. DiPietro -- you were texting

10:14:05  5    Mr. DiPietro here?

10:14:05  6    **A**     Correct.

10:14:05  7    **Q**     Okay.  How does he respond?  Could you read that,

10:14:09  8    please.

10:14:12  9          Could you read that part out loud, please?

10:14:15  10   **A**     You're wanting me to read the one right below where it

10:14:19  11   says Melodee?

10:14:20  12   **Q**     The one where it says "sorry to hear."

10:14:22  13   **A**     "Sorry to hear.  I can't make Mondays.  I have office

10:14:24  14   ours.  However, Tristan is going to call to work out a

10:14:28  15   different time that works for both of you."

10:14:29  16   **Q**     Who -- did you know -- do you know anybody named

10:14:32  17   Tristan associated with Mr. DiPietro?

10:14:34  18   **A**     It's his son.

10:14:35  19   **Q**     Had Tristan DiPietro ever performed any audits at

10:14:42  20   Skilled Shamrock?

10:14:42  21   **A**     For a brief time when Trina passed away.

10:14:44  22   **Q**     And who is Trina?

10:14:46  23   **A**     Was a female that worked for Ron.

10:14:50  24               MR. BEAN:  And could we zoom back out and zoom

10:14:56  25   in on the next part.

10:14:59    1        Yeah.  Right there is perfect.

10:15:08    2   BY MR. BEAN:

10:15:08    3   **Q**    Can you please read your response to him out loud.

10:15:11    4   **A**    Top paragraph?

10:15:13    5   **Q**    The top text message, yes, please.

10:15:15    6   **A**    "That would work out great.  Monday mornings with him

10:15:23    7   again."

            8                (Court reporter interjection.)

10:15:24    9   **A**    "I'm not sure how much control you have over Jay, but

10:15:27   10   I'm sorry, he has no clue.  We have been short for the last

10:15:33   11   5 to 6 weeks since he took back over for Tristan.  He puts

10:15:37   12   stuff into expenses to make it right when short, then you

10:15:40   13   get your paperwork looking good.  Sorry, but if we was short

10:15:45   14   when Trina was working, she would be in there Monday

10:15:48   15   afternoon to figure it out, not just sweep it under the rug

10:15:51   16   and put it in expenses."

10:15:52   17        Actually, it says "out," but that should be "put."

10:15:56   18        "Again, not trying to be that guy, but I have 30 brand

10:16:01   19   new machines in my garage.  Want to be a man of my word by

10:16:04   20   keeping you guys there, but if we can't come up with a

10:16:06   21   solution that works for the owner, then the owners will take

10:16:10   22   different steps.  Sorry, but shit's got to change today."

10:16:13   23   **Q**    Now, when you reference the owner will take different

10:16:16   24   steps, who did you mean as the owner?

10:16:18   25   **A**    I'm talking to Ron DiPietro in this.

| | | |
|---|---|---|
| 10:16:20 | 1 | **Q**    Yeah, but who -- when you say it, who do you mean the |
| 10:16:24 | 2 | owner?  I didn't catch your answer. |
| 10:16:25 | 3 | **A**    I'm talking -- I'm speaking -- this text message is |
| 10:16:28 | 4 | speaking with Ron DiPietro. |
| 10:16:29 | 5 | **Q**    Right.  Okay.  You read, "that works for the owner, |
| 10:16:33 | 6 | then the owner will take different steps" in your text |
| | 7 | message. |
| 10:16:37 | 8 |      Who is the owner that you're referring to? |
| 10:16:38 | 9 | **A**    Myself. |
| 10:16:39 | 10 | **Q**    Okay.  How does Mr. DiPietro respond? |
| 10:16:45 | 11 | **A**    "I believe we are the owner too." |
| 10:16:47 | 12 | **Q**    Who is the "we," as you understand? |
| 10:16:51 | 13 |           MR. GOLDBERG:  Objection. |
| 10:16:52 | 14 |           THE COURT:  Overruled. |
| 10:16:53 | 15 |           THE WITNESS:  Who is the "we" as into what? |
| 10:16:55 | 16 | BY MR. BEAN: |
| 10:16:55 | 17 | **Q**    He -- that -- Mr. DiPietro says "I believe we are the |
| 10:16:58 | 18 | owner too." |
| 10:16:58 | 19 | **A**    Oh. |
| 10:16:58 | 20 | **Q**    Who is "we"? |
| 10:16:59 | 21 | **A**    Himself and Chris. |
| 10:17:01 | 22 | **Q**    All right.  And how did you reply? |
| 10:17:04 | 23 | **A**    "You are right of the machines.  We are the owners of |
| 10:17:10 | 24 | the business; correct?" |
| 10:17:11 | 25 | **Q**    And what does Mr. DiPietro reply to you? |

10:17:19  1  **A**     "I think we opened that business and needed Billy out,

10:17:22  2  so Chris talked to his cousin and had you guys take over

10:17:25  3  day-to-day."

10:17:34  4                    MR. BEAN:  Can we please go to Exhibit 411?

10:17:42  5       And can you scroll through this -- can you scroll

10:17:45  6  through this so the witness has a chance to just review the

10:17:48  7  documents in here, quickly.

10:17:51  8                    (Brief pause in proceedings.)

10:18:05  9                    MR. BEAN:  All right.  That's fine.  Can we go

10:18:07  10  back to the first one?

10:18:08  11  BY MR. BEAN:

10:18:09  12  **Q**     What are these records?  Do you recognize them?

10:18:13  13  **A**     These are on the back board of each -- of the score --

10:18:16  14  of the store.  This was, I don't know, maybe in Shamrock,

10:18:21  15  I'm not sure.

10:18:21  16  **Q**     Well, do you see at the top, what it does it say?

10:18:24  17  **A**     Shamrock, 4225 Hills and Dales Road.

10:18:28  18  **Q**     Was that the address of Skilled Shamrock?

10:18:31  19  **A**     I'm not -- yeah.  I don't know exactly.

10:18:32  20  **Q**     Any reason to think it wasn't the address?

10:18:36  21  **A**     Yeah, it probably is, yeah.

10:18:36  22  **Q**     And beneath that, it looks like there are a whole

10:18:41  23  bunch of phone numbers.  Who's listed -- whose phone numbers

10:18:44  24  are listed there?  Who are these people?

10:18:46  25  **A**     Employees.

| | | |
|---|---|---|
| 10:18:47 | 1 | **Q**    So who is Derek? |
| 10:18:49 | 2 | **A**    The guy we spoke about before that was the owner. |
| 10:18:53 | 3 | **Q**    And do you see down at the bottom on the list, there's |
| 10:18:57 | 4 | a Thomas.  Who's Thomas? |
| 10:19:00 | 5 | **A**    Thomas Helmick. |
| 10:19:03 | 6 | **Q**    And below that do you see where it says "machine"? |
| 10:19:04 | 7 | **A**    Yes, sir. |
| 10:19:05 | 8 | **Q**    All right.  What names are listed there? |
| 10:19:07 | 9 | **A**    Mike and Mike Sr., Jr. |
| 10:19:10 | 10 | **Q**    And do you know who that references? |
| 10:19:12 | 11 | **A**    Mr. Moneypenny. |
| 10:19:13 | 12 | **Q**    And who is he? |
| 10:19:14 | 13 | **A**    Was Ron's machine guy. |
| 10:19:19 | 14 | **Q**    How do you know that? |
| 10:19:20 | 15 | **A**    Because he came and did audits and fixed machines. |
| 10:19:24 | 16 | **Q**    At Skilled Shamrock? |
| 10:19:25 | 17 | **A**    At probably 80 percent of the game rooms in Canton |
| 10:19:29 | 18 | that trusted him. |
| 10:19:38 | 19 | **Q**    Did Mr. Moneypenny have any involvement in Redemption? |
| 10:19:42 | 20 | **A**    He would come and fix machines. |
| 10:19:45 | 21 | **Q**    Are you aware of Mr. DiPietro having leases for |
| 10:19:50 | 22 | machines for game rooms he was involved in? |
| 10:19:54 | 23 | **A**    I believe he has -- he had Derek fill out some type of |
| 10:20:00 | 24 | paperwork, yes. |
| 10:20:00 | 25 |             MR. BEAN:  Can you pull up Exhibit 410, |

10:20:03   1    please?

10:20:07   2         And if you could just -- I'll give you a moment to

10:20:09   3    kind of take a look at this page.

10:20:21   4    BY MR. BEAN:

10:20:21   5    **Q**    Who -- in that first paragraph, does it list who the

10:20:24   6    parties of this -- to this document are?

10:20:27   7    **A**    "Equipment lease agreement is entered in between RNB

10:20:32   8    Leasing, LLC, and herein lessor, Derek Phillips."

10:20:36   9    **Q**    Do you know what RNB Leasing is?

10:20:41  10    **A**    I don't know what it stands for, no.

10:20:42  11    **Q**    But do you -- who's -- do you know who's involved in

10:20:46  12    that business?

10:20:46  13    **A**    Yeah.  It was Ron.

10:20:48  14    **Q**    All right.

10:20:48  15              MR. BEAN:  Can you please go to Page 7?

10:20:53  16    BY MR. BEAN:

10:20:54  17    **Q**    And does it appear that this document is signed?

10:21:02  18    **A**    Yeah, it's signed.

10:21:03  19    **Q**    By whom?

10:21:07  20    **A**    Tristan DiPietro and Derek Phillips.

10:21:11  21    **Q**    Now, was Derek Phillips an owner -- a real owner of

10:21:15  22    Skilled Shamrock?

10:21:15  23    **A**    No.  His name was on the lease.

10:21:17  24    **Q**    Did Mr. DiPietro believe Derek Phillips was a real

10:21:20  25    owner of Skilled Shamrock?

| | | |
|---|---|---|
| 10:21:22 | 1 | MR. FEDOR:  Objection. |
| 10:21:23 | 2 | THE COURT:  Objection sustained. |
| 10:21:25 | 3 | BY MR. BEAN: |
| 10:21:25 | 4 | **Q**    Do you have any reason to believe whether Mr. DiPietro |
| 10:21:28 | 5 | believed Derek Phillips was an owner of Skilled Shamrock? |
| 10:21:31 | 6 | MR. FEDOR:  Objection. |
| 10:21:32 | 7 | THE COURT:  Sustained. |
| 10:21:33 | 8 | BY MR. BEAN: |
| 10:21:34 | 9 | **Q**    Did you ever have any conversations with Mr. DiPietro |
| 10:21:37 | 10 | where he indicated that he believed Derek Phillips was an |
| 10:21:40 | 11 | owner of Skilled Shamrock? |
| 10:21:41 | 12 | MR. FEDOR:  Objection. |
| 10:21:42 | 13 | THE COURT:  Overruled. |
| 10:21:44 | 14 | THE WITNESS:  He knew Derek Phillips wasn't |
| 10:21:46 | 15 | the owner. |
| 10:21:47 | 16 | MR. GOLDBERG:  Objection.  Non-responsive. |
| 10:21:50 | 17 | THE COURT:  Did you ever have a conversation |
| 10:21:51 | 18 | with him about that? |
| 10:21:53 | 19 | THE WITNESS:  Yeah, he knew -- he knew that -- |
| 10:21:55 | 20 | he knew who the owners were. |
| 10:21:57 | 21 | MR. GOLDBERG:  Objection.  Non-responsive. |
| 10:21:59 | 22 | THE COURT:  How do you know that? |
| 10:22:01 | 23 | THE WITNESS:  Because we talked about.  He |
| 10:22:02 | 24 | knew that myself, Chris, and Larry were the owners. |
| 10:22:05 | 25 | THE COURT:  Thank you. |

10:22:06   1    BY MR. BEAN:

10:22:07   2    **Q**    What's -- is there a date listed below these

10:22:10   3    signatures?

10:22:10   4    **A**    8-29-2010.

10:22:14   5            MR. BEAN:  Can you go to Page 9, please?

10:22:20   6        I'll give you a chance to take a look at what's

10:22:22   7    written here.

10:22:23   8            (Brief pause in proceedings.)

10:22:27   9    BY MR. BEAN:

10:22:27  10    **Q**    Mr. Kachner, what's written here?

10:22:30  11    **A**    How to list the machines that were in Shamrock.

10:22:37  12            MR. BEAN:  Can we please go up to Page 2?

10:22:47  13    BY MR. BEAN:

10:22:47  14    **Q**    I want to direct your attention to the bottom

10:22:49  15    paragraph that's in all caps.

10:22:51  16        Could you please read that section out loud?

10:22:54  17            MR. FEDOR:  Objection, Your Honor.  No

10:22:55  18    foundation for this document.

10:22:56  19            MR. BEAN:  This document's stipulated to by

10:23:00  20    the parties to authenticity.

10:23:01  21            THE COURT:  I thought too.

10:23:01  22        Yeah, go ahead.

10:23:03  23            THE WITNESS:  Read it?

10:23:03  24            MR. BEAN:  Yes, please.

10:23:04  25            THE WITNESS:  "Lessee further" -- I don't know

10:23:09  1  what -- "convenience that the equipment at all times will be

10:23:12  2  used and operated in accordance with all applicable local,

10:23:17  3  state, and federal government laws, statutes, regulations,

10:23:23  4  and ordinances, specifically including, without limitation,

10:23:28  5  Ohio Revised Code § 2915.01(AAA), all of which lessee

10:23:37  6  convinced [sic] that it has read and understands.  Lessee

10:23:41  7  shall at all times keep apprised of and shall in all

10:23:46  8  respects abide by all laws, regulations, and changes thereto

10:23:52  9  affecting the use and. . ."

10:23:56  10          MR. BEAN:  Can you go to the next page please

10:23:58  11  so we can read it?

10:24:03  12  BY MR. BEAN:

10:24:04  13  **Q**     Right at the top, sir.  In bold.

10:24:06  14  **A**     Oh, ". . .operations of the equipment and legally

10:24:10  15  permissible prizes and rewards."

10:24:14  16  **Q**     Thank you.

10:24:15  17          MR. BEAN:  Can you go back to Page 2.

        18  BY MR. BEAN:

10:24:18  19  **Q**     Was Skilled Shamrock operating -- did you believe

10:24:20  20  Skilled Shamrock was operating consistent with state laws?

10:24:26  21          MR. FEDOR:  Objection.

10:24:27  22          THE COURT:  Overruled.

10:24:31  23          THE WITNESS:  I didn't hear what he said.

10:24:32  24      Did he say --

10:24:33  25  BY MR. BEAN:

**J. Kachner (Direct by Bean)**                                    206

| | | |
|---|---|---|
| 10:24:34 | 1 | **Q**    You can answer the question. |
| 10:24:35 | 2 | **A**    Did I -- one more time? |
| 10:24:37 | 3 | **Q**    Did you believe that Skilled Shamrock was operating in |
| 10:24:39 | 4 | accordance with state laws? |
| 10:24:41 | 5 | **A**    No.  We knew they wasn't. |
| 10:24:43 | 6 | **Q**    All right.  When you say "we knew," who's "we"? |
| 10:24:46 | 7 | **A**    The owners that I stated before. |
| 10:24:49 | 8 | **Q**    Did Mr. DiPietro ever tell you he needed to pull his |
| 10:24:52 | 9 | machines out? |
| 10:24:53 | 10 | **A**    No. |
| 10:24:54 | 11 | **Q**    Did Mr. DiPietro ever express any concern to you that |
| 10:24:58 | 12 | the business was not operating in accordance with state law? |
| 10:25:01 | 13 | **A**    No. |
| 10:25:02 | 14 | **Q**    Was it ever a discussion anybody ever had? |
| 10:25:05 | 15 | **A**    No. |
| 10:25:06 | 16 | **Q**    Was it ever even a thought in your mind? |
| 10:25:08 | 17 | **A**    No. |
| 10:25:11 | 18 | **Q**    Did you ever have any discussions with Mr. DiPietro |
| 10:25:14 | 19 | about whether Skilled Shamrock should not pay out cash -- |
| 10:25:18 | 20 | **A**    No. |
| 10:25:18 | 21 | **Q**    -- to patrons? |
| 10:25:20 | 22 | What would have happened if Skilled Shamrock didn't |
| 10:25:22 | 23 | pay out cash? |
| 10:25:24 | 24 | **A**    There would have been no customers inside the doors. |
| 10:25:29 | 25 | MR. BEAN:  Can we please go to Exhibit 407? |

| | | |
|---|---|---|
| 10:25:43 | 1 | BY MR. BEAN: |
| 10:25:44 | 2 | **Q**    Sir, do you recognize this? |
| 10:25:47 | 3 | **A**    Yeah.  Yes. |
| 10:25:48 | 4 | **Q**    What are we looking at here? |
| 10:25:56 | 5 | **A**    It's a page inside the terminal audits that you can |
| 10:25:59 | 6 | look to see what your percentages are and set your |
| 10:26:02 | 7 | percentages and tells you, I don't know if it's the lifetime |
| 10:26:07 | 8 | of the board. |
| 10:26:08 | 9 | **Q**    Well, do you see at the bottom where it says "last |
| 10:26:15 | 10 | time game stats cleared"? |
| 10:26:16 | 11 | **A**    Yes. |
| 10:26:17 | 12 | **Q**    Is there a date there? |
| 10:26:18 | 13 | **A**    2-9-10. |
| 10:26:19 | 14 | **Q**    Okay.  So can we presume that these stats at least are |
| 10:26:22 | 15 | from 2-9-10 to the date this photo was taken?  I mean, does |
| 10:26:29 | 16 | it make sense? |
| 10:26:30 | 17 | **A**    Yes. |
| 10:26:30 | 18 | **Q**    Are the names of the games listed here? |
| 10:26:34 | 19 | **A**    Yes. |
| 10:26:35 | 20 | **Q**    Are the games that people could play the ones in |
| 10:26:38 | 21 | green? |
| 10:26:38 | 22 | **A**    Yeah. |
| 10:26:39 | 23 | **Q**    All right.  So, do you see where it says "Keno"? |
| 10:26:43 | 24 | Can you just describe Keno, briefly? |
| 10:26:46 | 25 | **A**    Which one? |

**J. Kachner  (Direct by Bean)**                    208

10:26:46  1   **Q**     I mean, is there a significant difference between

10:26:49  2   Touch Easy Keno and Superball Keno?

10:26:52  3   **A**     Yeah, I believe there is.

10:26:54  4   **Q**     All right.  So, can you just -- let's go Superball

10:26:57  5   Keno.

10:26:57  6   **A**     I'm not a hundred percent, but I believe there was

10:27:00  7   like a bonus ball.  If you hit it on your number, you got a

10:27:04  8   multiplier, I believe.

10:27:05  9   **Q**     Just what's Keno?

10:27:06  10  **A**     Just like your Ohio Lottery.  Pick your numbers and --

10:27:09  11  just like you play in a bar.

10:27:10  12  **Q**     So you just got to hit the numbers?

10:27:13  13  **A**     Pick your numbers, place cash -- I mean your bet.

10:27:16  14  **Q**     And earlier you talked about 777 and Respin 777.

10:27:19  15         Do you see those here?

10:27:20  16  **A**     Yeah.

10:27:21  17  **Q**     All right.  Now, on the far right do you see where it

10:27:23  18  says "payout percentage"?

10:27:24  19  **A**     Yeah.  Yes.  Yes.

10:27:25  20  **Q**     What's payout percentage?

10:27:28  21  **A**     For?  For what one?  For what game?

10:27:32  22  **Q**     Just not any -- I'm not asking about the number; I'm

10:27:35  23  asking what is a payout percentage.  What is that?

10:27:39  24  **A**     That was the percentage that the machine would pay

10:27:42  25  out, meaning that it was set at 94 percent payout, it would

J. Kachner (Direct by Bean)                209

| | | |
|---|---|---|
| 10:27:46 | 1 | hold 6.1 percent. |
| 10:27:49 | 2 | MR. GOLDBERG:  Your Honor, we're going to |
| 10:27:50 | 3 | object to this because I don't believe this document was |
| 10:27:52 | 4 | stipulated to. |
| 10:27:52 | 5 | THE COURT:  All right.  We'll take our morning |
| 10:27:54 | 6 | recess at this time and we can talk about it. |
| 10:27:55 | 7 | All right, folks, we'll take 15, 20 minutes to refresh |
| 10:27:59 | 8 | yourself. |
| 10:27:59 | 9 | Keep in mind the admonition.  We'll see you back here |
| 10:28:02 | 10 | in about 15 or 20 minutes. |
| 10:28:04 | 11 | COURTROOM DEPUTY:  All rise. |
| 10:28:04 | 12 | (Jury excused from courtroom at 10:28 a.m.) |
| 10:28:43 | 13 | THE COURT:  I didn't think any of this stuff |
| 10:28:44 | 14 | was in dispute. |
| 10:28:45 | 15 | MR. GOLDBERG:  So, Your Honor, you know, I |
| 10:28:46 | 16 | should have caught it quicker, but Mr. Kachner is testifying |
| 10:28:49 | 17 | from a document that -- and testifying -- identified it, but |
| 10:28:55 | 18 | I don't believe a full foundation's been laid for this. |
| 10:28:58 | 19 | This has not been stipulated to. |
| 10:28:59 | 20 | THE COURT:  No, but I mean I didn't think it |
| 10:29:02 | 21 | was in dispute about the percentages and things like that |
| 10:29:05 | 22 | with the machines. |
| 10:29:06 | 23 | MR. GOLDBERG:  Well, I mean -- |
| 10:29:07 | 24 | THE COURT:  People mentioned that in opening |
| 10:29:09 | 25 | statement and everything. |

| | | |
|---|---|---|
| 10:29:09 | 1 | MR. GOLDBERG:  Well, that's correct, but |
| 10:29:10 | 2 | there's more than just the percentages here.  I mean, |
| 10:29:13 | 3 | there's a date that's referenced.  There's the game names. |
| 10:29:20 | 4 | You know, there's some other, looks like coding information. |
| 10:29:23 | 5 | THE COURT:  You don't think Mr. Kachner has |
| 10:29:24 | 6 | the knowledge about that? |
| 10:29:26 | 7 | MR. GOLDBERG:  I'm not sure Mr. Kachner has |
| 10:29:27 | 8 | personal knowledge of -- well, at least I'd want to hear |
| 10:29:30 | 9 | testimony and a foundation that he's got personal knowledge |
| 10:29:33 | 10 | of how this was compiled because he's testifying from it and |
| 10:29:37 | 11 | he's going to -- |
| 10:29:38 | 12 | THE COURT:  But, he can -- if he understands |
| 10:29:40 | 13 | what it is and he has knowledge of the circumstances, he can |
| 10:29:42 | 14 | testify about it. |
| 10:29:43 | 15 | MR. FEDOR:  Judge, we don't even know what the |
| 10:29:45 | 16 | accuracy of this is.  This printout -- |
| 10:29:47 | 17 | THE COURT:  Again, you can cross-examine him |
| 10:29:51 | 18 | on that. |
| 10:29:52 | 19 | MR. FEDOR:  Exactly. |
| 10:29:54 | 20 | MR. GOLDBERG:  I do think that the government |
| 10:29:55 | 21 | has to lay a foundation as to how the document was created. |
| 10:29:56 | 22 | THE COURT:  Well, Mr. Bean, what do you think? |
| 10:29:58 | 23 | MR. BEAN:  I understand Mr. Kachner testified |
| 10:29:59 | 24 | that he was familiar with this, that this was on the |
| 10:30:01 | 25 | machines.  I can ask him the question specifically, was this |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:30:05 | 1  | screen available on the machines at Skilled Shamrock and     |
| 10:30:08 | 2  | Redemption, when we bring the jury back.                     |
| 10:30:09 | 3  |                 THE COURT:  Well, I think that's what they're |
| 10:30:11 | 4  | looking for.                                                 |
| 10:30:12 | 5  |                 MR. BEAN:  I will ask that specific question. |
| 10:30:13 | 6  |                 THE COURT:  I mean, yeah.                     |
| 10:30:14 | 7  |     One of the problems of always looking at documents is    |
| 10:30:17 | 8  | sometimes it's better just to ask the witness the questions. |
| 10:30:20 | 9  | Because they know.  He was there.  Right?                    |
| 10:30:23 | 10 |                 MR. KERSEY:  Judge, it's a hearsay document.  |
|          | 11 | We don't know --                                             |
|          | 12 |                 (Cour reporter interjection.)                |
| 10:30:30 | 13 |                 MR. KERSEY:  Judge, the argument is it's a    |
| 10:30:32 | 14 | classic hearsay document.  You don't know who put that in    |
| 10:30:34 | 15 | there.  Bring him in, how they -- how those were put in      |
| 10:30:37 | 16 | there, all the -- everybody that put all those figures in    |
| 10:30:40 | 17 | there.                                                       |
| 10:30:40 | 18 |                 THE COURT:  We got it.                        |
| 10:30:41 | 19 |                 MR. KERSEY:  It's a hearsay document.  It's   |
| 10:30:43 | 20 | inadmissible, I think.                                       |
| 10:30:44 | 21 |                 THE COURT:  Okay.                             |
| 10:30:46 | 22 |                 COURTROOM DEPUTY:  Court is in recess.        |
| 10:45:09 | 23 |     (Recess was taken at 10:30 a.m. till 11:04 a.m.)         |
| 11:04:03 | 24 |                 COURTROOM DEPUTY:  All rise for the jury.     |
| 11:04:09 | 25 |                 (Jury returned to courtroom at 11:04 a.m.)    |

11:04:32  1        COURTROOM DEPUTY:  Court is in session.

11:04:33  2   Please be seated.

11:04:34  3        THE COURT:  Mr. Bean, rather than go through

11:04:36  4   the different exhibits that maybe he didn't author, you can

11:04:39  5   just ask the witness what he knows.

11:04:42  6        MR. BEAN:  Sure.  I'd still like to show him

11:04:44  7   that exhibit.  I'm happy to lay the foundation for it.

11:04:48  8        THE COURT:  Okay.  But you're going to show

11:04:50  9   him an exhibit that he doesn't -- he didn't author?

11:04:54  10       MR. BEAN:  I'll explain -- I mean, if they

11:04:57  11  object and I think there's a basis for showing that exhibit

11:05:00  12  and I'll establish it on the record, and if they object and

11:05:05  13  you sustain the objection --

11:05:07  14       THE COURT:  All right.  But you're going to

11:05:08  15  ask him about what he knows about what the information is on

11:05:11  16  the exhibit?

11:05:12  17       MR. BEAN:  I'm going to ask him about the

11:05:14  18  columns and what's just -- just what's there.  I'm not going

11:05:16  19  to ask him about the specific, you know, did this machine

11:05:19  20  pay out at this percentage or did this machine have those --

11:05:22  21  it's really as much a demonstrative to just explain to the

11:05:27  22  jury in part how these machines operated.

11:05:29  23       THE COURT:  Well, then you can ask him that

11:05:30  24  without referring to the exhibit.

11:05:33  25    I mean, makes things a lot smoother.

| 11:05:37 | 1 | MR. BEAN:  I can proceed that way. |

11:05:37  1        MR. BEAN:  I can proceed that way.

11:05:39  2        THE COURT:  Okay.

11:05:40  3        MR. KERSEY:  Judge, our objection still

11:05:42  4   stands.  It's hearsay.

11:05:43  5        THE COURT:  Well, I rectified your objection.

11:05:45  6        MR. KERSEY:  No.  No, you did.  I appreciate

11:05:47  7   it.

11:05:47  8        THE COURT:  Yeah, so withdraw it.

11:05:48  9        MR. KERSEY:  You listened to me a little bit.

11:05:50  10       THE COURT:  All right.

11:05:50  11       MR. KERSEY:  All right.

11:05:51  12       THE COURT:  Sometimes you got to straighten

11:05:52  13  out these lawyers, you know?

11:05:59  14       MR. BEAN:  Mr. Kachner, before I ask you

11:06:00  15  another question, can I just -- the court reporter asked me,

11:06:05  16  sometimes I think when you answer my questions I'm just

11:06:08  17  finishing up my question.  Do you mind just waiting a moment

11:06:08  18  to make sure my question is finished before answering.

11:06:11  19       Thank you.

11:06:13  20  BY MR. BEAN:

11:06:14  21  **Q**    Now, Mr. Kachner, machines at Skilled Shamrock and

11:06:18  22  Redemption, could -- one of the owners or someone who

11:06:23  23  operated the business, could they set the payout percentage

11:06:30  24  of the machine?

11:06:31  25  **A**    The owners can?

11:06:31  1   **Q**    Could the owner, someone who has control of the

11:06:33  2   machine, could they set the payout percentage?

11:06:36  3   **A**    Yeah, if they knew what they were doing.

11:06:37  4   **Q**    And what exactly is the payout percentage?

11:06:41  5   **A**    What the machine pays out to hold.

11:06:45  6   **Q**    All right.  And could you change that to make it go up

11:06:48  7   or down?

11:06:48  8   **A**    Yes.

11:06:48  9   **Q**    All right.  And would changing it to go up or down

11:06:52  10  impact how much money patrons win?

11:06:59  11  **A**    It's a percent like -- I mean, I don't understand what

11:07:02  12  your question is.

11:07:02  13  **Q**    I mean, by changing the percentage, could you impact

11:07:05  14  the payouts that patrons would win playing these machines?

11:07:11  15  **A**    Yes.

11:07:12  16  **Q**    Okay.  Did you have any authority from the State of

11:07:18  17  Ohio or Ohio Casino Control to change the payout

11:07:23  18  percentages?

11:07:26  19  **A**    You set your percentages at what you wanted.

11:07:28  20  **Q**    So was the State of Ohio or Ohio Casino Control

11:07:32  21  involved in any way?

11:07:33  22  **A**    No.

11:07:33  23  **Q**    Did they do any monitoring of the payout percentages?

11:07:37  24  **A**    No, sir.

11:07:40  25  **Q**    Now, earlier you testified about audits, that there

**J. Kachner (Direct by Bean)**                          215

11:07:43   1    were audits done at Skilled Shamrock.  And I think you

11:07:47   2    testified that there were done approximately every week.

11:07:50   3         Were there records created during those audits?

11:07:55   4    **A**    Ron DiPietro had a computer that he used.  Myself, I

11:08:00   5    only used the printout sheets.

11:08:03   6    **Q**    Were the printout sheets, are those paper -- were

11:08:06   7    those paper records?

11:08:07   8    **A**    There was two different -- like, the employees had a

11:08:11   9    daily or a sheet that they used, as well as when I came in

11:08:15   10   to do my weeklies, you hit a button to print out all the

11:08:21   11   week's information.

11:08:22   12   **Q**    And at the end of an audit, what happened to those

11:08:26   13   paper records?

11:08:26   14   **A**    Got rid of them.

11:08:30   15   **Q**    Now, you mentioned about there being a computer

11:08:35   16   involved in the audits; right?

11:08:36   17   **A**    Yes, sir.

11:08:37   18   **Q**    Did you ever see the computer?

11:08:38   19   **A**    Yes, sir.

11:08:38   20   **Q**    And who had the computer during audits?

11:08:42   21   **A**    Whoever was in charge of doing it for Mr. DiPietro.

11:08:46   22              MR. BEAN:  Can we please pull up Exhibit 413,

11:08:50   23   which the parties have stipulated is called Big Store (1),

11:08:56   24   and that it is from -- recovered from Ron DiPietro's

11:09:00   25   computer at Ron & Associates.

11:09:12    1         413, please.

11:09:32    2         And can you please scroll up so we can see the top?

11:09:35    3    And maybe zoom out a little bit as well so we can try to see

11:09:40    4    all of -- everything at once.

11:09:46    5         Could you zoom out slightly?  It's in the bottom

11:09:48    6    right.

11:09:52    7         Thank you.

11:09:53    8    BY MR. BEAN:

11:09:53    9    Q    Sir, do you recognize this?  Just what you're looking

11:09:57   10    at, do you recognize it?

11:09:58   11    A    This is -- this is off of the laptops.

11:10:03   12    Q    Is this an audit sheet?

11:10:05   13    A    This was Mr. DiPietro's audit sheet.

11:10:07   14    Q    Okay.  So, when you were -- said that someone on

11:10:11   15    behalf of Mr. DiPietro was there on a computer, is this what

11:10:15   16    was on the computer during the audits?

11:10:17   17    A    Correct.

11:10:18   18                   MR. FEDOR:  Objection.

11:10:18   19                   THE COURT:  Overruled.

11:10:21   20                   THE WITNESS:  Correct.

11:10:22   21    BY MR. BEAN:

11:10:23   22    Q    And let's -- is there dates listed for this audit

11:10:27   23    sheet down at the bottom on the tabs?

11:10:34   24    A    6-8 -- 6-18-17.

11:10:39   25    Q    All right.  And was Skilled Shamrock operating in June

11:10:41   1    of 2017?

11:10:43   2    **A**    Yes.

11:10:43   3    **Q**    All right.

11:10:45   4            MR. BEAN:  And Carissa, can you show us the

11:10:47   5    very -- the second tab, please, on this?

11:10:52   6        Yeah.  So if you go over to the left with the arrow

11:10:56   7    and double clip -- or right click, excuse me.  If you right

11:11:00   8    click, you can. . . yeah.  And then you can scroll up.

11:11:06   9        And the second one, please.

11:11:12  10    BY MR. BEAN:

11:11:13  11    **Q**    And, sir, what's the date on this one?

11:11:16  12    **A**    11-28-09.

11:11:18  13    **Q**    All right.  And have you reviewed this exhibit before

11:11:21  14    testifying here today?

11:11:23  15    **A**    Yes, sir.

11:11:23  16    **Q**    And is there an audit spreadsheet for approximately

11:11:29  17    every week between November 2009 and June 2017, including

11:11:37  18    this spreadsheet, approximately ever week?

11:11:41  19    **A**    Yes, sir.

11:11:48  20            MR. BEAN:  All right.  Can we go back to the

11:11:49  21    last one, the June 2017, please?

11:11:58  22        Yeah.  Thank you.

11:12:01  23    BY MR. BEAN:

11:12:01  24    **Q**    Sir, do you see in the upper left corner of this

11:12:05  25    spreadsheet, what does it say?

11:12:07  1   **A**      "Big Store machine number."

11:12:10  2   **Q**      In that first -- who is Big Store?  I believe you

11:12:14  3   testified this about already, but just to remind the jury?

11:12:16  4   **A**      Bill Strathakaros.

11:12:18  5   **Q**      And I believe you testified already, but was -- at any

11:12:22  6   point was Bill Strathakaros involved with Skilled Shamrock?

11:12:25  7   **A**      He was prior to myself and the other owners.

11:12:29  8   **Q**      Now, can you -- can you describe what's in each

11:12:33  9   column, just for the jury, starting with column A, machine

11:12:37  10  number and working your way to the right, please?

11:12:39  11  **A**      Column A is -- for some reason's got Big Store with a

11:12:44  12  machine number.

11:12:44  13          And then B is the name of each game that's in the --

11:12:50  14  in the facility.

11:12:52  15          The in-meter is the money in.

11:12:55  16          Multiplier is what each denomination of the in meter

11:13:00  17  equals.

11:13:00  18          The out meter is the money taken out by dollar as

11:13:05  19  well.

11:13:06  20          And then the next, G, is same thing, money in, money

11:13:13  21  out meter, total profit.  Total out.  Net for the machine.

11:13:16  22  **Q**      And is net, is that the revenue from each machine

11:13:18  23  during -- from that week?

11:13:20  24  **A**      Yes.

11:13:21  25  **Q**      Now, sir, did you input any data into this

**J. Kachner  (Direct by Bean)**                    219

11:13:24  1    spreadsheet?

11:13:26  2    **A**    No.

11:13:27  3    **Q**    All right.  Were you shown this spreadsheet during

11:13:31  4    audits at Skilled Shamrock?

11:13:35  5    **A**    We cross-referenced numbers, correct.

11:13:38  6    **Q**    All right.  Now, if -- is there information down at

11:13:40  7    the bottom of this spreadsheet?

11:13:43  8    **A**    Yes.

11:13:43  9    **Q**    All right.  Can we walk through what type of

11:13:48  10   information's down there?

11:13:49  11        So, do you see where it says "POG in"?

11:13:52  12   **A**    Correct.

11:13:53  13   **Q**    All right.  What -- is that a summary of the

11:13:55  14   information from the Pot-O-Golds?

11:13:58  15   **A**    Correct.

11:14:00  16   **Q**    And are Fruit and Nudge, are those other types of

11:14:03  17   games?

11:14:04  18   **A**    Correct.

11:14:04  19   **Q**    Machines?

11:14:05  20        All right.  And if we see there, across the bottom, do

11:14:09  21   we see calculations for the nets -- the net amounts?

11:14:14  22   **A**    Yes.

11:14:16  23   **Q**    And are there also expenses reported here?

11:14:22  24   **A**    Yes.

11:14:24  25   **Q**    And do you see in -- where it says "net check," what

| | | |
|---|---|---|
| 11:14:31 | 1 | figure is there, in column -- |
| 11:14:38 | 2 | **A** 14. |
| 11:14:40 | 3 | **Q** Column H, Row 37. |
| 11:14:47 | 4 | **A** 21,901. |
| 11:14:49 | 5 | **Q** All right. And below that, do you see in Column F |
| 11:14:51 | 6 | where it says net expenses? |
| 11:14:53 | 7 | **A** 9,910. |
| 11:14:55 | 8 | **Q** All right. And then 50/50, do you see that? |
| 11:14:59 | 9 | **A** 4,955. |
| 11:15:01 | 10 | **Q** All right. Now, does this spreadsheet show that 4,955 |
| 11:15:06 | 11 | was split 33 percent/66 percent? |
| 11:15:12 | 12 | **A** It's just half of -- half of the expenses. |
| 11:15:15 | 13 | **Q** Right. But it does it show that that amount was |
| 11:15:18 | 14 | split? |
| 11:15:21 | 15 | **A** Yes. |
| 11:15:22 | 16 | **Q** And who was it split between? |
| 11:15:25 | 17 | MR. GOLDBERG: Objection. |
| 11:15:25 | 18 | THE COURT: Overruled. |
| 11:15:27 | 19 | THE WITNESS: CK and R. |
| | 20 | BY MR. BEAN: |
| 11:15:31 | 21 | **Q** And do you know who R is? |
| 11:15:32 | 22 | **A** Ron DiPietro. |
| 11:15:33 | 23 | **Q** And do you know who CK is? |
| 11:15:36 | 24 | **A** Chris Kare. |
| 11:15:37 | 25 | **Q** All right. Now, does it appear that they're splitting |

11:15:41  1    50 percent of the profits here?

11:15:44  2                    MR. GOLDBERG:  Objection.  Form.

11:15:45  3                    THE COURT:  Overruled.

11:15:48  4                    THE WITNESS:  That's. . . that's the expenses,

11:15:53  5    correct?

11:15:54  6    BY MR. BEAN:

11:15:55  7    **Q**    Sir, does it appear they're splitting 50 percent of

11:15:58  8    the profits?

11:15:58  9    **A**    33 percent and 66 percent.

11:16:00  10   **Q**    Right.  Is -- when you had your splits at Skilled

11:16:05  11   Shamrock, how was it split?  Not even looking at the

11:16:08  12   spreadsheet.

11:16:09  13   **A**    Took the money in, money out, subtracted it, then

11:16:12  14   got --

11:16:13  15   **Q**    What were the percentages for the owners?  How was it

11:16:15  16   split?

11:16:15  17   **A**    We split it 50/50.

11:16:17  18   **Q**    And can you tell -- 50/50, who's one 50 percent share?

11:16:21  19   **A**    50 percent myself, Chris, and Larry.  The other

11:16:26  20   50 percent was Chris Kare, Ron DiPietro.

11:16:29  21   **Q**    All right.  And what happened with Mr. Karasarides'

11:16:33  22   share from the 50 percent involving Mr. DiPietro?

11:16:37  23                    MR. FEDOR:  Objection.

11:16:38  24                    THE COURT:  Overruled.

11:16:40  25                    THE WITNESS:  Went back into the kitty for

**J. Kachner (Direct by Bean)** 222

11:16:42   1   myself, Larry, and Chris.

11:16:44   2   BY MR. BEAN:

11:16:45   3   **Q**   So, during the audits, did you or the person

11:16:48   4   performing the audit take Mr. Karasarides' share from the

11:16:51   5   share with Mr. DiPietro and combine it with the share for

11:16:54   6   you and Mr. Dayton?

11:16:56   7   **A**   Normally I would split it, and then the person

11:17:01   8   representing Ron DiPietro would give me back 33 percent.

11:17:03   9   **Q**   All right.  And the remainder of it, how would you

11:17:06   10   split it amongst yourself, Mr. Karasarides, and Mr. Dayton?

11:17:09   11   **A**   33 1/3 apiece.

11:17:11   12   **Q**   So, equally; is that right?

11:17:13   13   **A**   Correct.

11:17:15   14   **Q**   Now, does this spreadsheet show that expenses are

11:17:19   15   coming out of Mr. DiPietro's share?

11:17:22   16   **A**   Yes.

11:17:25   17   **Q**   All right.

11:17:27   18   MR. BEAN:  Carissa, could we please go to the

11:17:29   19   11-9-14 tab?

11:17:53   20   And if you could just give us the whole. . .

11:18:05   21   Can you make it bigger but scroll up, because right

11:18:07   22   now it's not scrolled up to the top.

11:18:09   23   Can you make it bigger?

11:18:19   24   MS. WELCH:  Do you want to show all of it?

11:18:22   25   MR. BEAN:  Yes, please.

**J. Kachner (Direct by Bean)**                                  223

11:18:23  1           Thank you.

11:18:23  2     BY MR. BEAN:

11:18:24  3     **Q**     Sir, does this spreadsheet appear to operate roughly

11:18:26  4     the same way as the one we just looked at?

11:18:34  5     **A**     Yeah.

11:18:35  6     **Q**     All right.  If we look down in the bottom right, is

11:18:39  7     there -- is there a difference in this one and the other

11:18:42  8     one?

11:18:43  9     **A**     No representation of CK or R.

11:18:46  10    **Q**     So the initials aren't there?

11:18:48  11    **A**     Correct.

11:18:50  12              MR. BEAN:  Can we go to the next tab,

11:18:52  13    November 16, 2014?

11:18:56  14          All right.  Are there -- we're fine, Carissa.  Thank

        15    you.

        16    BY MR. BEAN:

11:18:59  17    **Q**     Are there initials here?

11:19:00  18    **A**     Yes, sir.

11:19:02  19    **Q**     Now, you testified earlier that you've reviewed this

11:19:06  20    exhibit before.  For all of the spreadsheets after

11:19:12  21    November 16, 2014 -- I mean that chronologically -- do the

11:19:18  22    initials CK and R appear on the spreadsheet?

11:19:20  23    **A**     Yes, sir.

11:19:25  24    **Q**     Do you know Christopher Karasarides?

11:19:31  25    **A**     Christopher?

11:19:32    1              MR. KERSEY:  Objection.

11:19:34    2              THE WITNESS:  Yes.

11:19:36    3         Oh --

11:19:37    4              THE COURT:  You don't want him to say whether

11:19:39    5    he knows him or not?

11:19:45    6              MR. KERSEY:  Judge, he indicated in the

11:19:46    7    beginning when he named people, he didn't name my client,

11:19:49    8    definitely.  Now they've shifted asking that question after

11:19:54    9    he's answered it.  He first said he had everybody but my

11:19:58   10    client.  We don't have any business in this at all.  I don't

11:20:01   11    know where that's coming from.

11:20:02   12              THE COURT:  Well, we'll find out.

           13    BY MR. BEAN:

11:20:05   14    Q     Do you know Christopher Karasarides?

11:20:07   15    A     Only because of my kids.

11:20:10   16    Q     Did Christopher Karasarides have any involvement in

11:20:12   17    Skilled Shamrock?

11:20:14   18    A     No.

11:20:16   19    Q     Do you have any reason to believe that CK refers to

11:20:21   20    Christopher Karasarides?

11:20:21   21    A     No.

11:20:22   22              THE COURT:  Now, do you withdraw your

11:20:24   23    objection now?

11:20:25   24              MR. KERSEY:  Yes.

11:20:26   25    BY MR. BEAN:

11:20:26  1  **Q**      Do you have any reason to believe that Christopher

11:20:29  2  Karasarides received any of the share of the profits from

11:20:31  3  Skilled Shamrock or Redemption?

11:20:33  4  **A**      Do I believe that he did?

11:20:35  5  **Q**      Do you have any reason to believe that he did?

11:20:39  6  **A**      That Christopher did?  I'm sorry.

11:20:42  7  **Q**      Christos's son.

11:20:44  8  **A**      No.  He had nothing to do with it.

11:20:46  9  **Q**      All right.  As far as you're aware, who received

11:20:48  10  Christos's share?

11:20:51  11  **A**      Chris Kare received his share.

11:20:56  12              MR. BEAN:  Carissa, can we please pull up

11:21:01  13  Exhibit 416 which is titled "Big Store" which the parties

11:21:04  14  have stipulated was recovered from a USB drive at Michael

11:21:09  15  Moneypenny's residence.

11:21:22  16  BY MR. BEAN:

11:21:23  17  **Q**      What is this?

11:21:25  18  **A**      Another spreadsheet.

11:21:27  19  **Q**      Does this exhibit appear largely identical to the last

11:21:32  20  in form and type of information?

11:21:34  21  **A**      Yes, sir.

11:21:34  22  **Q**      And is this a spreadsheet for -- that was used for the

11:21:38  23  audits at Skilled Shamrock?

11:21:40  24  **A**      From Ron DiPietro's half or party.

11:21:43  25  **Q**      Now, what's the date on this tab?

| | | |
|---|---|---|
| 11:21:47 | 1 | **A**    12-10-17. |
| 11:21:49 | 2 | **Q**    So, is this a later date than we saw on the last |
| 11:21:53 | 3 | spreadsheet? |
| 11:21:53 | 4 | **A**    Yes, sir. |
| 11:21:53 | 5 | **Q**    And are there tabs here on this spreadsheet for, you |
| 11:21:58 | 6 | know, the period between June 2017 through December 2017? |
| 11:22:05 | 7 | **A**    I only see 9-24-17 to 12-10-17. |
| 11:22:10 | 8 | MR. BEAN:  Carissa, could you just click to |
| 11:22:12 | 9 | the left on the tabs just so we can take a look at them all? |
| 11:22:18 | 10 | Thank you. |
| 11:22:20 | 11 | THE WITNESS:  Yes. |
| 11:22:27 | 12 | BY MR. BEAN: |
| 11:22:28 | 13 | **Q**    Was Skilled Shamrock -- did Skilled Shamrock operate |
| 11:22:30 | 14 | after December 2017? |
| 11:22:34 | 15 | **A**    Yes. |
| 11:22:35 | 16 | **Q**    When did it close down? |
| 11:22:39 | 17 | **A**    When you raided them. |
| 11:22:40 | 18 | **Q**    Do you recall approximately when that was? |
| 11:22:43 | 19 | **A**    June, July or August -- June or July, I think. |
| 11:22:47 | 20 | **Q**    Of what year? |
| 11:22:48 | 21 | **A**    2018. |
| 11:22:49 | 22 | **Q**    All right. |
| 11:22:50 | 23 | MR. BEAN:  Can we please pull up Exhibit 422, |
| 11:22:53 | 24 | which the parties have stipulated is titled "Big Store MRM" |
| 11:22:57 | 25 | and which the parties have stipulated was recovered from a |

| | | |
|--|--|--|
| 11:23:00 | 1 | computer at Michael Moneypenny's residence. |
| 11:23:05 | 2 | BY MR. BEAN: |
| 11:23:05 | 3 | **Q**    Sir, I'm going to ask you largely the same questions I |
| 11:23:09 | 4 | asked on the last one. |
| 11:23:10 | 5 |      What is this? |
| 11:23:11 | 6 | **A**    Ron DiPietro's, whoever came in do the audits. |
| 11:23:15 | 7 | **Q**    And does this appear to be largely consistent in form |
| 11:23:24 | 8 | and use as the prior audit sheets we've looked at here? |
| 11:23:27 | 9 | **A**    Yes. |
| 11:23:27 | 10 | **Q**    And can you look down at the date on this one? |
| 11:23:29 | 11 | **A**    1-22-18. |
| 11:23:31 | 12 | **Q**    All right.  So now is this showing into January of |
| 11:23:33 | 13 | 2018? |
| 11:23:33 | 14 | **A**    Yes, sir. |
| 11:23:34 | 15 | **Q**    All right.  Did Christos Karasarides know about the |
| 11:23:42 | 16 | spreadsheets prepared during the audits at Skilled Shamrock? |
| 11:23:45 | 17 |           MR. GOLDBERG:  Objection. |
| 11:23:46 | 18 |           THE COURT:  If you know. |
| 11:23:49 | 19 |           THE WITNESS:  Answer? |
| 11:23:52 | 20 |      I mean, to my knowledge he did. |
| 11:23:54 | 21 |           MR. GOLDBERG:  Objection. |
| 11:23:54 | 22 |           THE COURT:  Overruled. |
| 11:23:56 | 23 |           MR. BEAN:  Can we please pull up Exhibit 334, |
| 11:23:59 | 24 | which the parties have stipulated is an e-mail dated |
| 11:24:04 | 25 | March 4th, 2012, that was sent from an e-mail address |

11:24:08  1   subscribed to by Tristan DiPietro to an e-mail address

11:24:12  2   subscribed to by Christos Karasarides, Jr.

11:24:16  3        And sir, I'll give you a moment to take a look at

11:24:19  4   that.

11:24:19  5                  (Brief pause in proceedings.)

11:24:22  6   BY MR. BEAN:

11:24:22  7   Q    Sir, what's the subject line of this e-mail say?

11:24:25  8                  MR. GOLDBERG:  Objection.  Not his -- it's not

11:24:28  9   his e-mail, Judge.

11:24:29  10                 THE COURT:  Yeah, what are we talking about

11:24:30  11  here?

11:24:31  12                 MR. BEAN:  The e-mail.

11:24:31  13                 THE COURT:  What e-mail?

11:24:33  14                 MR. BEAN:  Isn't there -- there's an exhibit

11:24:34  15  up that's an e-mail.

11:24:36  16                 THE COURT:  I'm asking you the question

11:24:37  17  though.

11:24:37  18                 MR. BEAN:  Right.  And e-mail from Tristan

11:24:39  19  DiPietro -- an e-mail from an e-mail address subscribed to

11:24:43  20  by Tristan DiPietro to Christos Karasarides.

11:24:50  21       It's co-conspirator hearsay.

11:24:52  22                 THE COURT:  Overruled.

11:24:53  23                 THE WITNESS:  Sham.

11:24:54  24  BY MR. BEAN:

11:24:55  25  Q    And was -- do you know Sham to stand for anything?

| | | |
|---|---|---|
| 11:24:58 | 1 | **A**    Shamrock. |
| 11:24:59 | 2 | **Q**    Is that Skilled Shamrock? |
| 11:25:01 | 3 | **A**    Yes, sir. |
| 11:25:02 | 4 | **Q**    All right.  And is there an -- does there appear to be |
| 11:25:05 | 5 | an attachment to this e-mail? |
| 11:25:09 | 6 | **A**    It says "Big Store X- -- XLSX" maybe. |
| 11:25:17 | 7 | **Q**    And what does Tristan DiPietro write to |
| 11:25:20 | 8 | Mr. Karasarides? |
| 11:25:22 | 9 | **A**    I have no idea. |
| 11:25:23 | 10 | **Q**    Yeah, well, sir, can you just read this? |
| 11:25:26 | 11 |              MR. GOLDBERG:  Objection. |
| 11:25:26 | 12 |              THE COURT:  Overruled. |
| 11:25:27 | 13 |              THE WITNESS:  Oh.  "Here is the whole file |
| 11:25:30 | 14 | from open to current date." |
| 11:25:37 | 15 |              MR. BEAN:  All right.  Thank you. |
| 11:25:37 | 16 |        Carissa, can we please play Exhibit 348A, which is a |
| 11:25:41 | 17 | phone call between Mr. Christos Karasarides and Michael |
| 11:25:49 | 18 | Moneypenny that occurred on August 14th, 2018. |
| 11:25:53 | 19 |              MR. GOLDBERG:  Can I have the date again? |
| 11:25:55 | 20 |              MR. BEAN:  August 14th, 2018. |
| 11:25:59 | 21 |              MR. GOLDBERG:  Thank you. |
| 11:26:14 | 22 |              (Brief pause in proceedings.) |
| 11:26:21 | 23 |              (Audio played.) |
| 11:28:07 | 24 | BY MR. BEAN: |
| 11:28:08 | 25 | **Q**    Mr. Kachner, do you recognize the voices there? |

| | | |
|---|---|---|
| 11:28:10 | 1 | **A**    Yes, sir. |
| 11:28:12 | 2 | Yes, sir. |
| 11:28:13 | 3 | **Q**    I'm not sure the microphone picked up. |
| 11:28:15 | 4 | **A**    Yes, sir. |
| 11:28:17 | 5 | **Q**    Who is speaking there? |
| 11:28:21 | 6 | **A**    Moneypenny and Chris Kare. |
| 11:28:22 | 7 | **Q**    All right.  And those spreadsheets we looked at that |
| 11:28:26 | 8 | said "Big Store" that you testified were used at the audits |
| 11:28:31 | 9 | of Skilled Shamrock, approximately how many years of records |
| 11:28:33 | 10 | were there? |
| 11:28:35 | 11 | **A**    Nine. |
| 11:28:38 | 12 | MR. BEAN:  Carissa, can we please play |
| 11:28:40 | 13 | Exhibit 347A? |
| 11:28:58 | 14 | (Audio played.) |
| 11:29:13 | 15 | MR. BEAN:  And the parties have stipulated |
| 11:29:15 | 16 | this is a call between Christos Karasarides and Melissa |
| 11:29:18 | 17 | Bragg that occurred on August 9th, 2018. |
| 11:29:22 | 18 | BY MR. BEAN: |
| 11:29:22 | 19 | **Q**    Do you know an individual named Saris? |
| 11:29:27 | 20 | **A**    Yes. |
| 11:29:27 | 21 | **Q**    Who is he? |
| 11:29:28 | 22 | **A**    Another party that owned the game rooms. |
| 11:29:30 | 23 | **Q**    Did you own a game room with him? |
| 11:29:33 | 24 | **A**    Yes, sir. |
| 11:29:33 | 25 | **Q**    And what was that place called? |

| | | |
|---|---|---|
| 11:29:34 | 1 | **A**    Cafe 62. |
| 11:29:36 | 2 | MR. BEAN:  All right.  You can keep playing. |
| 11:29:38 | 3 | Thank you. |
| 11:29:38 | 4 | (Audio played.) |
| 11:30:31 | 5 | MR. BEAN:  And can we please play 347B, which |
| 11:30:36 | 6 | is from the same call.  It's just later in the call. |
| 11:30:41 | 7 | The date is 8-9-2018. |
| 11:30:52 | 8 | (Audio played.) |
| 11:33:38 | 9 | BY MR. BEAN: |
| 11:33:39 | 10 | **Q**    Mr. Kachner, do you know any accountants who are |
| 11:33:41 | 11 | associated with Mr. Karasarides? |
| 11:33:45 | 12 | **A**    I only know of the one. |
| 11:33:46 | 13 | **Q**    And who is that? |
| 11:33:47 | 14 | **A**    Ron DiPietro. |
| 11:33:48 | 15 | **Q**    All right.  Now, who is Melissa Bragg, do you know? |
| 11:33:52 | 16 | **A**    Chris Kare's wife. |
| 11:33:54 | 17 | **Q**    Now, did you hear a reference to an individual named |
| 11:33:59 | 18 | Pete on that call? |
| 11:34:02 | 19 | **A**    I believe I might have, yeah. |
| 11:34:03 | 20 | **Q**    Do you know an individual named Pete who is |
| 11:34:05 | 21 | associated -- who you believe is associated with |
| 11:34:08 | 22 | Mr. Karasarides? |
| 11:34:11 | 23 | **A**    A friend of Chris Kare's. |
| 11:34:12 | 24 | **Q**    And do you know his last name? |
| 11:34:13 | 25 | **A**    I -- I don't, sir. |

11:34:16   1   **Q**   Would you recognize him if you saw him?

11:34:18   2   **A**   Yeah.

11:34:19   3   **Q**   Is he here in the courtroom?

11:34:21   4   **A**   Yes.

11:34:22   5   **Q**   Where is he sitting?

11:34:24   6   **A**   Back behind that TV.

11:34:28   7            MR. BEAN:  You can take down the transcript.

11:34:30   8   Thank you.

11:34:31   9   BY MR. BEAN:

11:34:31  10   **Q**   Was Skilled Shamrock a cash business?

11:34:37  11   **A**   Yes.

11:34:38  12   **Q**   Were you and the other owners concerned about theft?

11:34:43  13   **A**   You're always concerned about theft when you deal with

11:34:45  14   money.

11:34:46  15   **Q**   What kind of things did you do to combat theft?

11:34:51  16   **A**   To combat theft?

11:34:53  17   **Q**   Um-hmm.

11:34:55  18   **A**   Put a doorman in place.

11:34:59  19            MR. KERSEY:  I didn't understand.  What did

11:35:00  20   you say?

11:35:01  21            THE WITNESS:  Put a doorman in place.

11:35:03  22   BY MR. BEAN:

11:35:04  23   **Q**   Were there still thefts?

11:35:06  24   **A**   Yes.  Yes and no.

11:35:10  25   **Q**   And did people try to manipulate the machines?

11:35:13    1    **A**      Always.

11:35:14    2    **Q**      Were there any notable instances where individuals

11:35:18    3    manipulated the machines?

11:35:20    4    **A**      Yeah.  There was a machine or two that were far off

11:35:25    5    with numbers, I would -- with the ins and out meters.

11:35:30    6    **Q**      And did you ultimately discover that someone was

11:35:33    7    manipulating them?

11:35:33    8    **A**      Correct.

11:35:34    9    **Q**      Did that ever happen at Redemption?

11:35:38   10    **A**      Happened all over the place.

11:35:41   11    **Q**      Do you recall any instance where that happened at

11:35:44   12    Redemption involving an individual you believe was

11:35:46   13    associated with Melissa Bragg?

11:35:49   14    **A**      Correct.

11:35:50   15    **Q**      Can you just describe generally what kind of happened

11:35:53   16    there?

11:35:55   17    **A**      Some employee from her store as well as an employee

11:35:58   18    from Redemption were manipulating the game in order for it

11:36:07   19    to go directly into a prize -- not a prize but a jackpot

11:36:15   20    screen.

11:36:17   21              MR. BEAN:  Carissa, can you please pull up

11:36:21   22    Exhibit 331?  And can we please go down to a text message on

11:36:27   23    May 31st, 2018?

11:36:29   24          And the parties have stipulated that these are

11:36:35   25    authentic text messages between Mr. Kachner and

| 11:36:38 | 1 | Mr. Karasarides. |

11:36:39  2        Keep going, please.

11:36:40  3        Stop right there, please.

11:36:45  4  BY MR. BEAN:  Sir --

11:36:46  5        And can you blow up from -- starting from there, down.

11:36:50  6              MS. WELCH:  Here?

11:36:51  7              MR. BEAN:  Where I made the yellow line.

11:37:00  8        And this is Page 6 of the exhibit.

11:37:04  9  BY MR. BEAN:

11:37:04  10  **Q**    Sir, do you see where Mr. Karasarides texts you, "Get

11:37:08  11  your guy to show you how it does it.  I will talk to Missy

11:37:12  12  tonight"?

11:37:14  13  **A**    Yes.

11:37:14  14  **Q**    All right.  Is this text exchange regarding the theft

11:37:17  15  you just talked about?

11:37:19  16  **A**    Yes.

11:37:20  17  **Q**    And do you see the bottom text on May 31st, 2018, from

11:37:26  18  Mr. Karasarides?

11:37:28  19  **A**    From what date?

11:37:29  20  **Q**    The bottom text on the -- on this blow-up screen from

11:37:34  21  May 31st, 2018.

11:37:35  22  **A**    "Meet me at Redemption."

11:37:37  23  **Q**    Can you read the rest of it, please?

11:37:39  24  **A**    "Meet me at Redemption.  Missy is with me."

11:37:43  25  **Q**    And why was Mr. Karasarides and his wife, Ms. Bragg,

11:37:49  1    going to Redemption?

11:37:50  2    **A**      Because I had called them because their employee was

11:37:53  3    robbing -- was stealing from us.

11:37:54  4    **Q**      All right.

11:37:56  5             MR. BEAN:  Carissa, can you please play

11:37:58  6    Exhibit 349A, which is a phone call between Mr. Karasarides

11:38:02  7    and Ms. Bragg that the parties have stipulated occurred on

11:38:06  8    August 14th, 2018.

11:38:08  9             (Audio played.)

11:38:51  10             MR. BEAN:  Can you pause it quickly?

11:38:54  11    BY MR. BEAN:

11:38:55  12    **Q**      Sir, do you know who Thomas is referring to, or do you

11:38:57  13    have any belief who Thomas is referring to there?

11:38:59  14    **A**      I have no idea.

11:39:00  15    **Q**      Okay.

11:39:00  16             MR. BEAN:  Can you keep playing?

11:39:03  17             (Audio played.)

11:39:34  18             MR. BEAN:  You can pause it again.

11:39:35  19    BY MR. BEAN:

11:39:35  20    **Q**      Sir, does that help you understand who Thomas was?

11:39:38  21    Are they reference --

11:39:39  22         Let me ask you this:  Are they referencing you when

11:39:42  23    they say Kake?

11:39:43  24    **A**      Correct.

11:39:44  25    **Q**      All right.

**J. Kachner  (Direct by Bean)** 236

11:39:45  1  **A**     I mean, yeah.

11:39:46  2  **Q**     After the --

11:39:47  3  **A**     Not spelled right, but yeah.

11:39:48  4  **Q**     After the search warrants, did you go and get machines

11:39:51  5  from anybody?

11:39:53  6  **A**     Did I get machines from anybody?

11:39:56  7  **Q**     Yeah.  Did you go collect some machines from anywhere?

11:39:59  8  **A**     Yeah.  We had to move them out because the feds only

11:40:01  9  took the boards.

11:40:02  10  **Q**     Did you have to move them out from Redemption?

11:40:04  11  **A**     Correct.

11:40:05  12  **Q**     All right.  So, do you understand Thomas to be Thomas

11:40:08  13  Helmick --

11:40:10  14               MR. GOLDBERG:  Objection.

11:40:10  15  BY MR. BEAN:

11:40:11  16  **Q**     -- in that context?

11:40:12  17               THE COURT:  Overruled.

11:40:15  18               THE WITNESS:  I can't clarify if that's Thomas

11:40:17  19  or not.

11:40:17  20  BY MR. BEAN:

11:40:20  21  **Q**     Okay.

11:40:21  22               MR. BEAN:  Can we keep playing, please?

11:40:23  23               (Audio played.)

11:41:27  24  BY MR. BEAN:

11:41:28  25  **Q**     Mr. Kachner, did Redemption have security cameras?

11:41:31  1   **A**    Yes.

11:41:33  2   **Q**    Did Ms. Bragg ever come to the store in association

11:41:39  3   with the theft involving the individual she was associated

11:41:42  4   with?

11:41:44  5   **A**    Yes.  But to clarify, I don't know who Timmy is.

11:41:46  6   That's not who did it.

11:41:47  7   **Q**    Who did it?

11:41:48  8   **A**    It was -- and I'm not even a hundred percent what her

11:41:52  9   name is, but it could be Carla or whatever, but it was

11:41:56  10  another gentleman that was working at Redemption.

11:42:02  11  **Q**    Mr. Kachner, did Mr. DiPietro ever identify a theft by

11:42:07  12  reviewing the audit sheets?

11:42:12  13  **A**    At one time through his audits he noticed that one

11:42:15  14  machine was astronomically out of whack, yes.

11:42:20  15              MR. BEAN:  Can we please pull up Exhibit 330?

11:42:27  16  And can we please go down to the second to last text?  I

11:42:34  17  mean, sorry, on the entire chain.  I apologize.

11:42:49  18       And the parties have stipulated these are text

11:42:52  19  messages that are authentic between Mr. Kachner and

11:42:55  20  Mr. Dayton -- not Mr. -- Mr. DiPietro, excuse me, and we are

11:42:58  21  on Page 3 of the exhibit.

11:43:00  22  BY MR. BEAN:

11:43:00  23  **Q**    Sir, can you please read this text message from

11:43:03  24  Mr. DiPietro?

11:43:07  25  **A**    "I tried calling you yesterday when Mike when Mike was

| | | |
|---|---|---|
| 11:43:11 | 1 | here.  I really don't need anyone there if you are going to |
| 11:43:14 | 2 | be the one doing the breakdowns." |
| 11:43:17 | 3 | **Q**    Can you pause there. |
| 11:43:18 | 4 |      By "breakdowns," is he referring to the audits? |
| 11:43:21 | 5 | **A**    Yes. |
| 11:43:21 | 6 | **Q**    Okay. |
| 11:43:22 | 7 | **A**    Yes. |
| 11:43:23 | 8 | **Q**    You can keep going.  Thank you. |
| 11:43:25 | 9 | **A**    "I have someone there to help us both, and in the past |
| 11:43:29 | 10 | it helped us catch a thief." |
| 11:43:30 | 11 | **Q**    And you can pause there. |
| 11:43:32 | 12 |      Is he referencing the time where the audit sheets |
| 11:43:35 | 13 | helped him identify that there was theft going on at Skilled |
| 11:43:41 | 14 | Shamrock? |
| 11:43:41 | 15 | **A**    I just -- from what it reads, it says "in the past it |
| 11:43:44 | 16 | helped us catch a thief," so. . . |
| 11:43:46 | 17 | **Q**    Okay.  You can keep reading. |
| 11:43:48 | 18 | **A**    "I perceive you as one of the few honest people in the |
| 11:43:53 | 19 | industry, so if you are doing a breakdown and splitting |
| 11:43:57 | 20 | things, I done need -- I done need anyone there." |
| 11:44:01 | 21 | **Q**    You can pause there. |
| 11:44:02 | 22 |      Sir, is he referring to you? |
| 11:44:05 | 23 | **A**    Yes, sir. |
| 11:44:05 | 24 | **Q**    Is he calling you one of the few honest people in the |
| 11:44:08 | 25 | industry? |

| | | |
|---|---|---|
| 11:44:08 | 1 | **A**   Correct. |
| 11:44:11 | 2 | **Q**   Thank you. |
| 11:44:13 | 3 | I don't need you to read the rest of the text message. |
| 11:44:16 | 4 | Now, sir, are you here testifying pursuant to a plea |
| 11:44:22 | 5 | and cooperation agreement? |
| 11:44:23 | 6 | **A**   Yes, sir. |
| 11:44:24 | 7 | **Q**   And were you indicted in this matter? |
| 11:44:28 | 8 | **A**   Yes, sir.  Yes, sir. |
| 11:44:30 | 9 | **Q**   And did you have an attorney? |
| 11:44:34 | 10 | **A**   Yes, sir. |
| 11:44:35 | 11 | **Q**   Have you -- have you read the indictment that charged |
| 11:44:38 | 12 | you in this case? |
| 11:44:40 | 13 | **A**   Yes, sir.  Yes. |
| 11:44:42 | 14 | **Q**   And does it generally charge you with conduct that is |
| 11:44:45 | 15 | the subject of your testimony here today? |
| 11:44:48 | 16 | **A**   Yes, sir. |
| 11:44:52 | 17 | **Q**   Did you ultimately plead guilty? |
| 11:44:55 | 18 | **A**   Yes. |
| 11:44:56 | 19 | **Q**   And did you agree to cooperate? |
| 11:44:58 | 20 | **A**   Yes. |
| 11:45:00 | 21 | **Q**   Why did you agree to cooperate with the government? |
| 11:45:04 | 22 | **A**   Because your evidence is unbelievable. |
| 11:45:09 | 23 | MR. BEAN:  Can we please pull up Exhibit 624? |
| 11:45:16 | 24 | And if you could just scroll through the pages for the |
| 11:45:19 | 25 | witness so he can just. . . |

**J. Kachner  (Direct by Bean)**                    240

11:45:24   1                  (Brief pause in proceedings.)

11:45:36   2                  MR. BEAN:  Thank you.

11:45:37   3   BY MR. BEAN:

11:45:37   4   **Q**    Sir, is this your plea agreement in this matter?

11:45:40   5   **A**    Yes.  Yes.

11:45:43   6   **Q**    And is that your signature?

11:45:45   7   **A**    Yes.

11:45:46   8   **Q**    On -- and is that the signature of your attorney below

11:45:51   9   yours?

11:45:51  10   **A**    Yes.

11:45:54  11   **Q**    And on what date did you appear to sign this document?

11:45:58  12   **A**    6-27-22.

11:46:02  13                  MR. BEAN:  And can we please pull up

11:46:05  14   Exhibit 625?

11:46:08  15        And can we scroll through it, please?

11:46:11  16                  (Brief pause in proceedings.)

11:46:14  17   BY MR. BEAN:

11:46:15  18   **Q**    And we're on Page 5 here.

11:46:16  19        What is this document?  Is this your cooperation

11:46:19  20   agreement?

11:46:20  21   **A**    Plea Agreement -- Plea Agreement Addendum.

11:46:23  22   **Q**    And does this set out some of the terms of your

11:46:25  23   cooperation?

11:46:28  24   **A**    I went over it with my lawyer and whatever we

11:46:31  25   discussed that day.  I was -- I signed it.

**J. Kachner  (Direct by Bean)**                    241

| | | |
|---|---|---|
| 11:46:34 | 1 | **Q**    And does this bear your signature? |
| 11:46:36 | 2 | **A**    Correct. |
| 11:46:37 | 3 | **Q**    Your attorney's signature? |
| 11:46:38 | 4 | **A**    Correct. |
| 11:46:38 | 5 | **Q**    Same date as the last one? |
| 11:46:40 | 6 | **A**    Yes, sir. |
| 11:46:41 | 7 | **Q**    All right.  Did you appear before the judge sitting in |
| 11:46:46 | 8 | this case, Judge Nugent, and plead guilty pursuant to the |
| 11:46:49 | 9 | terms of this plea and cooperation agreement? |
| 11:46:51 | 10 | **A**    I did. |
| 11:46:53 | 11 | **Q**    Did you review these two documents, these two |
| 11:46:57 | 12 | exhibits, with your attorney before signing them? |
| 11:47:00 | 13 | **A**    Yes, sir. |
| 11:47:02 | 14 | **Q**    I think the mic might have not picked it up. |
| 11:47:05 | 15 | **A**    Yes, sir. |
| 11:47:06 | 16 | **Q**    Did you discuss these documents with your attorney |
| 11:47:09 | 17 | before signing them? |
| 11:47:11 | 18 | **A**    He did all the proper steps to advise me for the |
| 11:47:13 | 19 | proper thing I needed to do. |
| 11:47:15 | 20 |          MR. BEAN:  Can we please go to the plea |
| 11:47:17 | 21 | agreement, Exhibit 624.  And can we go to Page 2, please. |
| 11:47:26 | 22 | BY MR. BEAN: |
| 11:47:27 | 23 | **Q**    I'd like to direct your attention to Paragraph 2 of |
| 11:47:29 | 24 | this agreement. |
| 11:47:30 | 25 |          What did you plead guilty to? |

11:47:37  1   **A**      Two counts of conspiracy to defraud the United States

11:47:40  2   government and five counts of conspiracy to defraud the

11:47:46  3   United States.

11:47:47  4   **Q**      Sir, do you understand that that's the number of the

11:47:49  5   counts or the count number of the -- in the indictment?

11:47:52  6   **A**      Correct.

11:47:53  7   **Q**      Which one is it?  Because you just said "correct," and

11:47:57  8   it was an either/or.

11:47:59  9   **A**      What is your question?

11:48:00  10  **Q**      Did you plead guilty to more than two counts, or are

11:48:04  11  those counts -- are those just the count number in the

11:48:06  12  indictment?

11:48:06  13  **A**      The count number -- I believe those are the count

11:48:08  14  numbers for the indictment that I was charged with.

11:48:10  15  **Q**      And how many counts did you actually plead guilty to?

11:48:14  16  **A**      Two.

11:48:18  17  **Q**      Do you understand that per the terms of this plea

11:48:20  18  agreement, that you can be sentenced to a maximum of

11:48:23  19  10 years' imprisonment, 5 years for each count?

11:48:26  20  **A**      Yes.

11:48:28  21  **Q**      And --

11:48:28  22  **A**      Yes.

11:48:29  23  **Q**      And do you understand that you can be fined up to

11:48:32  24  $250,000 for each count?

11:48:33  25  **A**      Yes.  Yes.

| | | |
|---|---|---|
| 11:48:36 | 1 | **Q**     And be sentenced to a period of supervised release? |
| 11:48:39 | 2 | **A**     Yes.  Yes. |
| 11:48:42 | 3 | **Q**     I'd like to direct your attention to Paragraph 4, |
| 11:48:49 | 4 | which begins on the same page, Page 2. |
| 11:48:54 | 5 | Sir, did you agree to withdraw a claim you had filed |
| 11:48:58 | 6 | civilly against approximately $241,000 that had been seized |
| 11:49:02 | 7 | by the government? |
| 11:49:05 | 8 | **A**     Did I -- are you saying did I fill out paperwork to |
| 11:49:09 | 9 | get it back? |
| 11:49:09 | 10 | **Q**     Well, did you agree to waive any claim you had to that |
| 11:49:13 | 11 | money as part of the plea agreement? |
| 11:49:17 | 12 | **A**     I believe I did down the road, yes. |
| 11:49:19 | 13 | **Q**     And the $241,000, or there so abouts, what happened |
| 11:49:25 | 14 | with that money?  How did the government come to get it? |
| 11:49:29 | 15 | **A**     They seized it from a YMCA. |
| 11:49:32 | 16 | **Q**     And in that claim -- were you represented by an |
| 11:49:36 | 17 | attorney? |
| 11:49:39 | 18 | **A**     Yes. |
| 11:49:41 | 19 | **Q**     Did you -- did that attorney file the claim on your |
| 11:49:44 | 20 | behalf? |
| 11:49:45 | 21 | **A**     Correct. |
| 11:49:46 | 22 | **Q**     Did you have knowledge of what he filed in that claim? |
| 11:49:50 | 23 | **A**     No.  I told him I'll give him 20 percent of anything |
| 11:49:53 | 24 | he gets back. |
| 11:49:54 | 25 | **Q**     So he had an interest in getting part -- any money |

11:49:57  1    back that he recovered?

11:49:57  2    **A**    Correct.

11:49:59  3    **Q**    So, is that a different attorney than you've been

11:50:04  4    represented throughout this plea agreement and cooperation

11:50:06  5    agreement?

11:50:07  6    **A**    Yes, sir.

11:50:10  7    **Q**    As far as you're aware, were false statements made in

11:50:13  8    that claim for the money that was submitted?

11:50:15  9    **A**    I have no idea.  All I did was sign the paperwork.  I

11:50:19  10   didn't really read the stuff.

11:50:19  11   **Q**    So, is it fair to say you don't know the contents of

11:50:22  12   what was put in that claim?

11:50:23  13   **A**    No, sir.  Again, I just -- I believe that I thought my

11:50:25  14   lawyer was representing me the proper way.

11:50:29  15   **Q**    I'd like to direct your attention to Paragraph 9,

11:50:33  16   which is on Page 3.

11:50:36  17        If we could blow that up.

11:50:41  18        In exchange for your plea of guilty, did the

11:50:44  19   government agree to dismiss charges against you?

11:50:49  20   **A**    Yes.

11:50:50  21   **Q**    And are -- were those additional charges brought in

11:50:54  22   relation to the conduct you're testifying about here today?

11:51:00  23   **A**    Again, please?

11:51:01  24   **Q**    And were those charges related to the conduct about

11:51:04  25   which is the subject of your testimony today, involving tax

11:51:08  1    returns for yourself?  You were charged with false tax

11:51:10  2    returns, operating illegal gambling businesses, operating --

11:51:14  3    and a conspiracy to operate illegal gambling businesses?

11:51:17  4    **A**    Correct.

11:51:18  5    **Q**    I'd like to direct your attention to Paragraph 15,

11:51:22  6    please, which is on Page 5.

11:51:33  7         Is there a manual that provides how sentencing

11:51:38  8    guidelines are calculated?

11:51:42  9    **A**    Yes.

11:51:43  10   **Q**    And is it your understanding that at sentencing, one

11:51:46  11   of the factors the judge considers is the sentencing

11:51:50  12   guidelines?

11:51:50  13   **A**    Correct.

11:51:52  14   **Q**    As part of your plea agreement, did you, through your

11:51:58  15   attorney, come to an agreement with the government on the

11:52:00  16   calculation of your guidelines at sentencing?

11:52:03  17   **A**    Yes.

11:52:04  18   **Q**    So, you agree with the government that the tax loss

11:52:07  19   for the conspiracies you were involved in fell between half

11:52:11  20   a million dollars and $1.5 million?

11:52:14  21   **A**    Correct.

11:52:15  22   **Q**    And did you agree with the government that those --

11:52:17  23   the proceeds there were from an illegal source?

11:52:20  24   **A**    Correct.

11:52:21  25   **Q**    And in this case, specifically, was that from the

11:52:24  1    gambling businesses?

11:52:24  2    **A**    Yes.

11:52:25  3    **Q**    And did you agree with the government that you were a

11:52:27  4    manager or a supervisor of that activity?

11:52:31  5    **A**    Yes.

11:52:32  6    **Q**    And then did you agree with the government that by

11:52:35  7    coming in and pleading guilty, that you would get an

11:52:38  8    adjustment downward of 3 points for acceptance of

11:52:41  9    responsibility?

11:52:41  10   **A**    Correct, um-hmm.  Correct.

11:52:44  11   **Q**    Is it your understanding that the government may have

11:52:48  12   argued for a higher guidelines calculation if you had

11:52:51  13   proceeded to trial?

11:52:54  14   **A**    Yes.

11:52:56  15              MR. BEAN:  Can we please go to Paragraph 20?

11:53:03  16         And this is on Page 7, begins on Page 7.

11:53:06  17   BY MR. BEAN:

11:53:06  18   **Q**    Did you and the government agree to a statement of

11:53:09  19   facts and relevant conduct in this plea agreement?

11:53:13  20   **A**    What do you mean?

11:53:14  21   **Q**    Is there a statement of facts in this plea agreement,

11:53:17  22   generally laying out the -- your conduct and the conduct

11:53:20  23   you're testifying about here today?

11:53:21  24   **A**    It says at the top "Factual Basis and Relevant

11:53:24  25   Conduct."

11:53:26  1  **Q**    Do those statement of facts reference your wife?

11:53:32  2               THE WITNESS:  Can you move the document to the

11:53:33  3  left, please?

11:53:39  4       Thank you.

11:53:42  5  BY MR. BEAN:

11:53:42  6  **Q**    And there are more pages of this if you need to take a

11:53:45  7  look.

11:53:45  8  **A**    I'm just trying to find my wife's name real quick.

11:53:49  9               MR. BEAN:  Carissa, it's --

11:53:51  10               THE WITNESS:  I don't believe I see my wife's

11:53:52  11  name on this paperwork, sir.

11:53:53  12               MR. BEAN:  Can we keep going?

11:53:57  13       Can we keep going?

11:54:01  14       Can we keep going?

11:54:02  15       All right.  There.  Can you blow up the middle?

11:54:07  16  Thanks.

11:54:07  17               THE WITNESS:  Yes.  Column X.

11:54:09  18  BY MR. BEAN:

11:54:09  19  **Q**    Is Rebecca Kachner your wife?

11:54:12  20  **A**    Yes.

11:54:12  21  **Q**    Did she plead guilty to a conspiracy to defraud the

11:54:15  22  United States in relation to the conduct you're describing

11:54:17  23  today?

11:54:19  24  **A**    Yes.

11:54:20  25  **Q**    All right.

| | | |
|---|---|---|
| 11:54:22 | 1 | MR. BEAN:  Can we zoom -- can we go to |
| 11:54:24 | 2 | paragraph Y, please, and blow that up? |
| | 3 | BY MR. BEAN: |
| 11:54:31 | 4 | **Q**    Can you please read this paragraph? |
| 11:54:34 | 5 | **A**    In or around January 19, Jason Kachner and others |
| 11:54:39 | 6 | opened, owned, and operated other IGB known as Skillz 777 |
| 11:54:45 | 7 | located at 2128 Columbus Road, Northeast, Canton, Ohio, and |
| 11:54:51 | 8 | Got Skillz located at 1400 Whipple Avenue, Northwest, |
| 11:54:55 | 9 | Canton, Ohio.  These two IGBs closed around April 17th, |
| 11:55:02 | 10 | '19." |
| 11:55:04 | 11 | **Q**    So are Skilled Shamrock and Redemption the only |
| 11:55:10 | 12 | gambling businesses you were involved in? |
| 11:55:12 | 13 | **A**    No. |
| 11:55:12 | 14 | **Q**    Can you tell us about the other businesses you were |
| 11:55:14 | 15 | involved in, gambling businesses? |
| 11:55:15 | 16 | **A**    I had the one in Massillon that I got raided for and |
| 11:55:19 | 17 | charged with. |
| 11:55:20 | 18 | **Q**    That was with whom?  Who were the other co-owners? |
| 11:55:23 | 19 | **A**    Larry Dayton and Chris and myself. |
| 11:55:26 | 20 | **Q**    And it sounded like there were more. |
| 11:55:28 | 21 | **A**    Cafe 62 with Steve Saris. |
| 11:55:31 | 22 | **Q**    And where was Cafe 62 located?  Just the town is fine. |
| 11:55:38 | 23 | **A**    Right off -- oh, Stark County. |
| 11:55:40 | 24 | **Q**    And are there -- and what about Got Skillz and Skillz |
| 11:55:45 | 25 | 777 referenced here? |

11:55:46  1   **A**    Those were opened after the raids took place in '18.

11:55:51  2   **Q**    And did you have any others?

11:55:54  3   **A**    I had one for a couple months with a buddy in

11:55:57  4   Austintown.

11:55:59  5   **Q**    How about any in Perry Township?

11:56:03  6   **A**    Yes, sir.

11:56:03  7   **Q**    And what was in Perry Township?

11:56:05  8   **A**    I don't remember the name of it.  I don't even know if

11:56:08  9   we really had a name for it to be honest.  But it was a game

11:56:11  10  room.

11:56:12  11  **Q**    Were you ever approached by anybody to open any

11:56:15  12  additional game rooms other than the ones you did open?

11:56:26  13  **A**    After I opened my first one, I went about opening them

11:56:38  14  myself.  Well, not myself but with other owners, with other

11:56:38  15  people.

11:56:39  16            MR. BEAN:  Can we please go to Paragraph 22?

          17  BY MR. BEAN:

11:56:43  18  **Q**    Did you agree to pay restitution to the IRS?

11:56:45  19  **A**    Yeah.

11:56:46  20  **Q**    In what amount?

11:56:50  21  **A**    1.393024.

11:56:57  22  **Q**    Now, is it your understanding that you will be solely

11:56:59  23  responsible for this almost $1.4 million in restitution?

11:57:03  24  **A**    No, sir.

11:57:04  25  **Q**    Can you explain, who else might be responsible?

| | | |
|---|---|---|
| 11:57:06 | 1 | MR. GOLDBERG:  Objection. |
| 11:57:06 | 2 | THE COURT:  Overruled. |
| 11:57:08 | 3 | THE WITNESS:  The parties that are involved in |
| 11:57:10 | 4 | the case. |
| 11:57:15 | 5 | BY MR. BEAN: |
| 11:57:16 | 6 | **Q**    And is it your understanding that regardless of the |
| 11:57:18 | 7 | outcome in this trial, that the IRS could still attempt to |
| 11:57:21 | 8 | hold them responsible for that money civilly? |
| 11:57:24 | 9 | **A**    Yes, sir. |
| 11:57:27 | 10 | MR. BEAN:  All right.  Can we please go to |
| 11:57:30 | 11 | Paragraph 37? |
| 11:57:38 | 12 | Can you please blow that up. |
| 11:57:41 | 13 | BY MR. BEAN: |
| 11:57:41 | 14 | **Q**    Can you please read that? |
| 11:57:44 | 15 | **A**    "Consequences of Breaching of Plea Agreement. |
| 11:57:49 | 16 | "Defendant understands that if defendant breaches any |
| 11:57:52 | 17 | promise in this agreement, commits additional crimes, |
| 11:57:56 | 18 | obstructs justice, attempts to withdraw defendant's guilty |
| 11:58:00 | 19 | plea, or if defendant's guilty plea is rejected by the Court |
| 11:58:13 | 20 | or is vacated or set aside, the government will be released |
| 11:58:17 | 21 | from all of its obligations under this agreement and may |
| 11:58:21 | 22 | institute or maintain any charges and make any |
| 11:58:24 | 23 | recommendations with respect to the sentencing that |
| 11:58:28 | 24 | otherwise would be prohibited under the terms of this |
| 11:58:30 | 25 | agreement. |

11:58:32  1        "Defendant understands, however, that a breach of the

11:58:35  2    agreement by defendant will not entitle defendant to

11:58:40  3    withdraw, vacate, set aside defendant's guilty plea or

11:58:43  4    conviction."

11:58:44  5            MR. BEAN:  Can we please pull up Exhibit 625,

11:58:47  6    and Page 1 will be perfect.

11:58:50  7        Thank you.

11:58:52  8    BY MR. BEAN:

11:58:53  9    **Q**    Can you please read the first two sentences of this

11:58:54  10   document?

11:58:59  11   **A**    "Defendant agrees to cooperate fully with the United

11:59:05  12   States of America on any state or local -- or -- with the

11:59:11  13   United States of America and any state or local authorities

11:59:15  14   in investigations and prosecutions as requested by the USAO

11:59:19  15   or the Department of Justice Tax Division (together - the

11:59:25  16   government).  Such cooperation shall include providing

11:59:28  17   complete and truthful information, attending all interviews

11:59:31  18   and debriefings, testifying truthfully before the Grand

11:59:37  19   Jury, and all court proceedings and requested -- and all

11:59:42  20   court proceedings as requested, providing all documents and

11:59:46  21   records which may be requested, and providing other forms of

11:59:49  22   cooperation as requested by government agents and

11:59:53  23   prosecutors."

11:59:54  24   **Q**    Thank you, sir.

11:59:55  25        Do you understand that the agreement you struck with

| | | |
|---|---|---|
| 11:59:58 | 1 | the government requires you to be truthful? |
| 12:00:00 | 2 | **A**    Yes.  Yes. |
| 12:00:03 | 3 | **Q**    Do you understand that if you are not truthful, the |
| 12:00:05 | 4 | government is not bound by the terms of the plea agreement? |
| 12:00:09 | 5 | **A**    Yes. |
| 12:00:10 | 6 | **Q**    Do you understand that if you are not truthful, the |
| 12:00:12 | 7 | government will not be required to dismiss the charges |
| 12:00:14 | 8 | against you? |
| 12:00:18 | 9 | **A**    One more time, sir. |
| 12:00:19 | 10 | **Q**    Do you understand that if you are not truthful with |
| 12:00:22 | 11 | the government in your testimony and when you've met with |
| 12:00:25 | 12 | the government, that the government will not be then |
| 12:00:28 | 13 | required to dismiss the charges against you? |
| 12:00:30 | 14 | **A**    Correct. |
| 12:00:32 | 15 | **Q**    Do you understand that the government will not be |
| 12:00:34 | 16 | bound by the sentencing guidelines calculation agreed to in |
| 12:00:37 | 17 | the plea agreement either? |
| 12:00:38 | 18 | **A**    Correct. |
| 12:00:41 | 19 | **Q**    But that in that instance, you would still be bound to |
| 12:00:43 | 20 | your plea -- to your guilty plea, but you would not be able |
| 12:00:46 | 21 | to withdraw that plea? |
| 12:00:47 | 22 | **A**    Correct. |
| 12:00:49 | 23 | **Q**    Do you understand that you could face additional |
| 12:00:51 | 24 | charges if you are not truthful? |
| 12:00:53 | 25 | **A**    Yes. |

12:00:55  1   **Q**    Have you met with me prior to today?

12:00:57  2   **A**    Yes.  Yes.  Yes.

12:01:01  3   **Q**    Have you met with federal agents a number of times,

12:01:05  4   let's say at least six, prior to today?

12:01:07  5   **A**    Correct.

12:01:14  6                    MR. BEAN:  Can we please go to Paragraph 3?

         7   BY MR. BEAN:

12:01:21  8   **Q**    Can you please read the first two sentences?

12:01:23  9   **A**    "If the government determines that the defendant has

12:01:28  10  fully cooperated and has rendered substantial assistance in

12:01:33  11  the investigation or prosecution of other persons, the

12:01:36  12  government, in consideration for such substantial

12:01:41  13  assistance, may move the Court for a substantial assistance

12:01:44  14  reduction pursuant to USSG § 5K1.1.  More specifically, the

12:01:53  15  government may move for a downward departure of up to four

12:01:58  16  levels."

12:02:00  17  **Q**    Thank you.

12:02:01  18        By testifying today, is it your hope that the

12:02:03  19  government will file a motion recommending to the Court that

12:02:07  20  your guidelines calculation be lowered by up to 4 points?

12:02:10  21  **A**    Yes.

12:02:12  22  **Q**    Has the government made any promises to you about

12:02:15  23  filing such a motion?

12:02:18  24  **A**    I believe that's up to Judge Nugent.

12:02:20  25  **Q**    Has the government promised that we will file a motion

12:02:25  1   recommending a downward departure?

12:02:26  2   **A**    Yes.

12:02:27  3   **Q**    We've promised or --

12:02:28  4   **A**    Oh, promised, no.

12:02:29  5   **Q**    Okay.  Is it your understanding that the Court is not

12:02:32  6   bound to follow such a recommendation?

12:02:37  7   **A**    From my understanding, it's up to Mr. -- Mr. Judge

12:02:41  8   Nugent's discretion of what I get.

12:02:43  9   **Q**    Is the outcome of this trial relevant to your

12:02:46  10  sentencing?

12:02:47  11  **A**    No, sir.

12:02:49  12  **Q**    Is it your job to get a conviction?

12:02:51  13  **A**    No, sir.

12:02:54  14  **Q**    Did you --

12:02:55  15           MR. BEAN:  We can take down the exhibit.

12:02:56  16  Thank you.

          17  BY MR. BEAN:

12:02:59  18  **Q**    Did you, in preparation for this trial, review quite a

12:03:02  19  number of documents?

12:03:04  20  **A**    Yes.

12:03:05  21  **Q**    And as part of your cooperation agreement and as part

12:03:08  22  of your plea agreement, spend a lot of hours reviewing those

12:03:12  23  records, both with the government and not with the

12:03:15  24  government, on your own?

12:03:16  25  **A**    Lots.

12:03:17   1   **Q**      Hours?  Multiple days?

12:03:20   2   **A**      Hours.

12:03:24   3   **Q**      Did you review summaries that were prepared of the

12:03:28   4   audit sheets for Skilled Shamrock and adopt them?

12:03:31   5   **A**      Yes.

12:03:32   6                    MR. BEAN:  Can we please pull up Exhibit 436?

12:03:35   7                    THE COURT:  Mr. Bean, how much longer do you

12:03:36   8   have with this witness?

12:03:39   9                    MR. BEAN:  It's the -- a number of time.

12:03:41  10                    THE COURT:  Okay.

12:03:42  11        We'll recess for lunch then, folks.  It's about 5

12:03:45  12   after 12:00.  1:20 on L1 you can call -- or be there.  We'll

12:03:50  13   call for you.

12:03:50  14        Keep in mind the admonition.  Refresh yourself, and

12:03:55  15   we'll see you 1:20 on where, Morgan?

12:03:59  16                    A JUROR:  L1.

12:04:00  17                    THE COURT:  L1.

12:04:00  18                    COURTROOM DEPUTY:  All rise.

12:04:02  19                    (Jury excused from courtroom at 12:04 p.m.)

12:04:33  20                    COURTROOM DEPUTY:  Court is in recess.

12:04:36  21                    (Recess was taken at 12:04 p.m.)

01:27:35  22                    COURTROOM DEPUTY:  All rise for the jury.

01:28:00  23                    (Jury returned to courtroom at 1:27 p.m.)

01:28:00  24                    COURTROOM DEPUTY:  Court is in session.

01:28:01  25   Please be seated.

01:28:01  1        THE COURT:  Good afternoon, ladies and

01:28:05  2   gentlemen of the Jury.

01:28:05  3        THE JURY:  Good afternoon, Judge.

01:28:07  4        THE COURT:  Mr. Fedor, I --

01:28:08  5     You're not finished yet, right?

01:28:10  6        MR. BEAN:  Not finished.

01:28:11  7        THE COURT:  Okay.  Go ahead, Mr. Bean.

01:28:12  8        MR. BEAN:  Thank you.

01:28:17  9   BY MR. BEAN:

01:28:18  10  **Q**    Mr. Kachner, I'm going to pick up with a couple

01:28:20  11  questions I asked right before we took our break just so we

01:28:24  12  can transition into it.

01:28:25  13       Did you spend some time, prior to trial, and at the

01:28:29  14  government's request, reviewing the Big Store spreadsheets

01:28:34  15  and comparing them with a summary of those?

01:28:39  16  **A**    Yes, sir.

01:28:40  17  **Q**    And did you review that so that you could adopt the

01:28:43  18  summary?

01:28:44  19  **A**    Yes, sir.

01:28:46  20       MR. BEAN:  Can we please pull up Exhibit 436?

01:29:07  21       There are more tabs, so if you could go to the. . . so

01:29:10  22  all the tabs can show.

01:29:13  23       And could you go to one of the tabs, please?

01:29:19  24       Thank you.

01:29:20  25  BY MR. BEAN:

01:29:21    1    **Q**     Sir, is this the summary exhibit that you reviewed

01:29:23    2    with the Big Store spreadsheets and are adopting?

01:29:27    3                    MR. GOLDBERG:  Objection.

01:29:27    4                    THE COURT:  Overruled.

01:29:32    5                    THE WITNESS:  Yes, sir.

01:29:35    6    BY MR. BEAN:

01:29:36    7    **Q**     And what Big Store spreadsheets were used?  Was it

01:29:42    8    exhibits we looked at today with you during your testimony?

01:29:45    9    **A**     Yes.

01:29:45   10    **Q**     And are those listed in column K where it says "source

01:29:50   11    spreadsheet"?

01:29:52   12    **A**     Correct.

01:29:55   13    **Q**     Have you cross-referenced those exhibits with the

01:29:58   14    information in this summary?

01:30:00   15    **A**     Yes.

01:30:03   16    **Q**     Can you just explain to the jury, what data is

01:30:06   17    summarized here?

01:30:13   18          And can you lean in a little bit to the mic?  Thank

01:30:16   19    you.

01:30:18   20    **A**     This thing stinks.

01:30:19   21          It's the total -- it says right at the top, it's the

01:30:22   22    total out, the net, the percentage of it, the expenses, the

01:30:26   23    amount to split, the split 1, split 2, for the store.

01:30:30   24                    MR. BEAN:  Carissa, can you -- there's a

01:30:31   25    column -- a couple columns that aren't shown.  Could you go

01:30:34  1   to the. . .

01:30:36  2   BY MR. BEAN:

01:30:37  3   **Q**      And does it show that for each week?

01:30:40  4   **A**      From what I can see it's 1-2-12, and at the bottom it

01:30:48  5   says 2018 is the last one.

01:30:51  6   **Q**      And, so, did you review each of the tabs down there,

01:30:55  7   2012, 2013, 2014 through 2018, the information thereon?

01:31:04  8   **A**      Yes, sir.

01:31:04  9   **Q**      And does this exhibit fairly and accurately summarize

01:31:07  10  the audit spreadsheet from Skilled Shamrock as well as your

01:31:10  11  testimony regarding the personal split of the profits?

01:31:14  12  **A**      Yes.

01:31:17  13  **Q**      How many -- those spreadsheets, the Big Store

01:31:20  14  spreadsheets we looked at earlier, now, approximately how

01:31:22  15  many tabs are in those spreadsheets?  I mean, is there

01:31:30  16  approximately one for every week?

01:31:31  17  **A**      Yes.

01:31:31  18  **Q**      All right.  And I think earlier you testified that it

01:31:34  19  was approximately 9 years worth of spreadsheets; right?

01:31:39  20  **A**      I've been showed 9 years, but again, I didn't take

01:31:43  21  over ownership until 2000, I think it was '10 or '11.

01:31:47  22  **Q**      But I'm just talking about in the document, in the

01:31:49  23  exhibit we looked at, it was approximately --

01:31:51  24  **A**      Yes, in the exhibit there was.

01:31:52  25  **Q**      So, if you multiply 9 by, let's say, 52 --

| | | |
|---|---|---|
| 01:31:57 | 1 | approximately 52 weeks, is that about 450 tabs of entries, |
| 01:32:03 | 2 | 450-something spreadsheets? |
| 01:32:08 | 3 | **A**     Yes. |
| 01:32:13 | 4 |              MR. BEAN:  Can we click on the tab for 2015, |
| 01:32:15 | 5 | please? |
| 01:32:22 | 6 | BY MR. BEAN: |
| 01:32:22 | 7 | **Q**     Now, can you -- can you please -- I think you talked |
| 01:32:32 | 8 | about this.  Can you please tell the jury a little bit, what |
| 01:32:36 | 9 | column is the expenses?  What's -- I mean, or excuse me. |
| 01:32:40 | 10 | Let me start with the net. |
| 01:32:41 | 11 | What's reported in the net? |
| 01:32:43 | 12 | **A**     D. |
| 01:32:44 | 13 | **Q**     And is that the information from the spreadsheet taken |
| 01:32:46 | 14 | directly, the net amount on that spreadsheet?  On each -- |
| 01:32:51 | 15 | you know, for each week. |
| 01:32:52 | 16 | **A**     This was Ron DiPietro's computers for his employee. |
| 01:32:56 | 17 | **Q**     All right.  And was the amount on each spreadsheet |
| 01:32:59 | 18 | copied on so the net on each of those spreadsheets for each |
| 01:33:03 | 19 | week copied onto this summary? |
| 01:33:05 | 20 | **A**     To my knowledge, yes. |
| 01:33:07 | 21 | **Q**     And the expenses as well? |
| 01:33:09 | 22 | **A**     Yes. |
| 01:33:10 | 23 | **Q**     And, so -- and the CK 33.33 percent split number, was |
| 01:33:16 | 24 | that as well? |
| 01:33:18 | 25 | **A**     Yes.  Yes. |

01:33:19  1   **Q**     The R 66.66 percent split number?

01:33:25  2   **A**     Yes.

01:33:26  3   **Q**     All right.

01:33:27  4                MR. BEAN:  And could we scroll down just to

01:33:30  5   the bottom?

01:33:31  6   BY MR. BEAN:

01:33:32  7   **Q**     Are there totals?

01:33:34  8   **A**     Correct.

01:33:35  9   **Q**     And do those totals, do they sum up the numbers above

01:33:39  10  it?

01:33:40  11  **A**     To my knowledge.

01:33:41  12               MR. GOLDBERG:  Objection.

01:33:43  13               THE COURT:  Did you finish the question?

01:33:46  14        Would you say it again.

01:33:48  15  BY MR. BEAN:

01:33:48  16  **Q**    Do those totals sum the numbers above it?

01:33:55  17               THE COURT:  I still didn't understand you.

01:33:57  18               MR. BEAN:  I'm asking if the totals listed on

01:33:59  19  the spreadsheets sum the numbers in that column in the

01:34:01  20  spreadsheet.

01:34:02  21               THE COURT:  Sums the numbers?

01:34:03  22               MR. BEAN:  Sum, s-u-m.

01:34:04  23               THE COURT:  S-u-m-s?

01:34:06  24               MR. BEAN:  Yes.

01:34:06  25               THE COURT:  Overruled.

**J. Kachner  (Direct by Bean)**                                    261

01:34:09   1    BY MR. BEAN:

01:34:09   2    **Q**    You can answer, sir.

01:34:10   3    **A**    I mean, without having a calculator and adding them

01:34:14   4    up, then yeah.

01:34:14   5                    MR. GOLDBERG:  Objection.

01:34:15   6                    MR. BEAN:  Carissa, can you please --

01:34:17   7                    THE COURT:  Overruled.

01:34:18   8          Again, anybody can do the math if they look at it.

01:34:21   9                    MR. BEAN:  Can you please click on cell I54?

01:34:29   10         I -- specifically on I54.

01:34:35   11   BY MR. BEAN:

01:34:36   12   **Q**    Sir, do you see up at the top where it says

01:34:42   13   =SUM(I2:I53)?  Up at the top of the spreadsheet?

01:34:47   14   **A**    Yes.

01:34:48   15   **Q**    Okay.  Thank you.

01:34:52   16         Do you agree that according to the spreadsheets, that

01:34:56   17   at least the spreadsheets report that in 2015,

01:34:59   18   Mr. Karasarides' cut from Skilled Shamrock was a little over

01:35:02   19   $158,000?

01:35:03   20                    MR. GOLDBERG:  Objection.

01:35:03   21                    THE COURT:  Overruled.

01:35:05   22                    THE WITNESS:  Correct.

01:35:06   23   BY MR. BEAN:

01:35:07   24   **Q**    And that according to the spreadsheet, Mr. DiPietro's

01:35:09   25   cut from Skilled Shamrock in 2015 was $316,000?

01:35:14    1              MR. FEDOR:  Objection.

01:35:14    2              THE COURT:  Overruled.

01:35:15    3              THE WITNESS:  Correct.

01:35:16    4    BY MR. BEAN:

01:35:16    5    Q     All right.  And if we were to click on each tab for

01:35:19    6    each of the year -- years, would we see similar additions

01:35:24    7    and figures for those years?

01:35:27    8    A     Yes.

01:35:28    9    Q     All right.

01:35:29   10              MR. BEAN:  Carissa, can we click on the tab

01:35:32   11    that says "summary by year"?

01:35:36   12    BY MR. BEAN:

01:35:37   13    Q     Does this tab summarize -- reprint the totals from

01:35:41   14    each of the tabs for 2012, 2013, '14, '15, 16', '17, and

01:35:46   15    '18?

01:35:47   16    A     Correct.

01:35:48   17    Q     And so, according to the spreadsheets, from 2012 to

01:35:54   18    2018, did Mr. Karasarides receive a little more than

01:35:59   19    $725,000 from Skilled Shamrock?

01:36:02   20              MR. GOLDBERG:  Objection.

01:36:02   21              THE COURT:  Overruled.

01:36:09   22              THE WITNESS:  I mean, no, I can't answer

01:36:11   23    that --

01:36:12   24    BY MR. BEAN:

01:36:12   25    Q     According to the spreadsheet.  I'm just asking --

| | | |
|---|---|---|
| 01:36:13 | 1 | **A** According to the spreadsheet, yes. |
| 01:36:15 | 2 | MR. GOLDBERG: Objection. |
| 01:36:15 | 3 | THE COURT: Overruled. |
| 01:36:16 | 4 | BY MR. BEAN: |
| 01:36:16 | 5 | **Q** And according to the spreadsheet, did Mr. DiPietro |
| 01:36:19 | 6 | receive more than $1.4 million from Skilled Shamrock from |
| 01:36:25 | 7 | 2012 through 2018? |
| 01:36:27 | 8 | MR. FEDOR: Objection. |
| 01:36:27 | 9 | THE COURT: Overruled. |
| 01:36:28 | 10 | THE WITNESS: Yes. |
| 01:36:31 | 11 | BY MR. BEAN: |
| 01:36:32 | 12 | **Q** How did Mr. Karasarides get his money? |
| 01:36:37 | 13 | MR. GOLDBERG: Objection. |
| 01:36:38 | 14 | THE COURT: Overruled. |
| 01:36:41 | 15 | THE WITNESS: Explain better. |
| 01:36:42 | 16 | BY MR. BEAN: |
| 01:36:42 | 17 | **Q** Well, it's a cash business; right? That was your |
| 01:36:45 | 18 | testimony? |
| 01:36:45 | 19 | **A** Correct. |
| 01:36:46 | 20 | **Q** And he received a cut of the profits; right? |
| 01:36:48 | 21 | **A** Correct. |
| 01:36:49 | 22 | **Q** How did he get the money? |
| 01:36:51 | 23 | **A** In cash. |
| 01:36:53 | 24 | **Q** Physically, was it handed to him? Did he come pick it |
| 01:36:59 | 25 | up? Like. . . |

01:37:00  1   **A**     Depended on the time or the day.

01:37:02  2   **Q**     Can you give us some examples of how he received his

01:37:05  3   money?

01:37:05  4   **A**     He would either pick it up or have someone drop it off

01:37:08  5   or meet someone or however it went down for that week.

01:37:11  6   **Q**     Did he ever come to Redemption or Skilled Shamrock to

01:37:14  7   come get it?

01:37:15  8   **A**     Sure.

01:37:20  9   **Q**     Did Mr. Karasarides also get profits from Redemption?

01:37:24  10  **A**     Did Mr. Karasarides?

01:37:26  11  **Q**     Yes.

01:37:26  12  **A**     Yes.  Yes.

01:37:29  13  **Q**     Where -- what town was Redemption located in?

01:37:34  14  **A**     Whipple -- or town.  Canton, Ohio.

01:37:37  15  **Q**     And it sounded like you were about to say what street

01:37:39  16  it was on specifically; is that right?

01:37:41  17  **A**     Whipple.

01:37:47  18  **Q**     When you became involved with Redemption, who were the

01:37:50  19  owners at that time?

01:37:53  20  **A**     Myself -- the owners were --

01:37:56  21  **Q**     When you first became involved.

01:37:57  22  **A**     Myself and Larry Dayton.

01:37:59  23  **Q**     And who else?

01:38:01  24  **A**     Chris Kare and Ron DiPietro were the machine people.

01:38:08  25  **Q**     Did they provide the machines?

**J. Kachner  (Direct by Bean)**                                    265

01:38:09  1    **A**    Correct.

01:38:11  2    **Q**    At that time, did they get a cut of the profits?

01:38:13  3    **A**    Correct.

01:38:17  4    **Q**    And I think that you testified at some point

01:38:19  5    Mr. DiPietro was removed from the business; is that right?

01:38:21  6    **A**    Yes.

01:38:22  7    **Q**    And what happened to machines -- any machines that he

01:38:25  8    had there?

01:38:27  9    **A**    He had someone come pick them up.

01:38:30  10   **Q**    And did Redemption get new machines?

01:38:33  11   **A**    Correct.  Yes.

01:38:34  12   **Q**    Where did they come from?

01:38:35  13   **A**    Somewhere down south.

01:38:37  14   **Q**    Were you involved in getting them or paying for them?

01:38:41  15   **A**    The purchase of them, yes.  Picking them up, no.

01:38:48  16              MR. BEAN:  Can we please pull up Exhibit 438?

01:38:54  17   BY MR. BEAN:

01:38:54  18   **Q**    Sir, what are we looking at here?

01:38:57  19   **A**    Front door of Redemption.

01:39:02  20              MR. BEAN:  And can we please pull up

01:39:04  21   Exhibit 437?

01:39:08  22   BY MR. BEAN:

01:39:09  23   **Q**    And how about, what are we looking at here?

01:39:12  24   **A**    It's the back room of Redemption.

01:39:13  25   **Q**    All right.  And it looks like there's a machine, you

01:39:17  1   can show a screen up -- are you able to identify what game

01:39:20  2   looks like it's up right now on that?

01:39:23  3   **A**     Keno.

01:39:29  4   **Q**     And so, if there were patrons at Redemption when this

01:39:32  5   photo was taken, can you just describe where might we see

01:39:35  6   them?

01:39:35  7   **A**     In the chairs in front of games.

01:39:42  8              MR. BEAN:  Can we please pull up Exhibit 468?

          9   BY MR. BEAN:

01:39:48  10  **Q**     What are we looking at in this photo?

01:39:50  11  **A**     Gaggle System.

01:39:51  12  **Q**     And where was the Gaggle System?

01:39:53  13  **A**     In the employee's room.

01:39:55  14  **Q**     At -- located at a business?  In a building?  Where

01:39:59  15  at?

01:39:59  16  **A**     At Redemption.

01:40:03  17  **Q**     What is the Gaggle System?

01:40:06  18  **A**     Prints off the tickets to the back so the patrons

01:40:11  19  don't have to do nothing but hit the button.

01:40:14  20  **Q**     Hit what button?

01:40:15  21  **A**     The cashout button.

01:40:17  22  **Q**     On a machine?

01:40:18  23  **A**     Correct.

01:40:19  24  **Q**     Were all the machines connected to this Gaggle System

01:40:22  25  at Redemption?

01:40:23  1    **A**    Most of them.  I don't think all of them were.  Most

01:40:26  2    of them were.

01:40:26  3    **Q**    And I apologize to bring it up, but can you lean in to

01:40:30  4    the microphone again?

01:40:31  5    **A**    This mic stinks.

01:40:33  6    **Q**    I'm aware.  I apologize.

01:40:35  7    **A**    Like, I am up in the computer talking in this thing,

01:40:37  8    man.  I don't know, it, like, catches it one time and then

01:40:40  9    it doesn't.

01:40:41  10   **Q**    I appreciate you humoring us.

01:40:50  11          MR. BEAN:  Can we please pull up Exhibit 474.

        12   BY MR. BEAN:

01:40:53  13   **Q**    What is this here?

01:40:57  14   **A**    That's a picture of the back room of Redemption.

01:41:00  15   **Q**    So if we are kind of -- is this a different

01:41:03  16   perspective than the other photo we saw of Redemption?

01:41:06  17   **A**    Different perspective?

01:41:09  18   **Q**    Of the other photo we saw of the interior.

01:41:12  19   **A**    Correct.  This is the back half.  This is the back

01:41:14  20   door to where the other picture was the front door.

01:41:16  21          MR. BEAN:  Can we please pull up Exhibit 447?

        22   BY MR. BEAN:

01:41:26  23   **Q**    Do you recognize what you're looking at here?

01:41:28  24   **A**    Yes.

01:41:28  25   **Q**    What is that?

01:41:29  1   **A**     Daily sheets.

01:41:30  2   **Q**     Can you describe for the jury, what is a daily sheet?

01:41:34  3   **A**     Each shift had to pertain -- or had to do their

01:41:39  4   numbers to fill out the paperwork to check out for the

01:41:43  5   second or the third shift, whatever shift was coming in the

01:41:47  6   next shift.

01:41:48  7   **Q**     And do you see up at the top where it says "date"?

01:41:51  8   **A**     Yeah.

01:41:52  9   **Q**     What's the date listed?

01:41:56  10  **A**     I mean, it's either a 1 or a 7, I don't know, maybe a

01:42:00  11  9 or a 4, 18.

01:42:03  12  **Q**     Were these -- were sheets like this used at Skilled

01:42:07  13  Shamrock and Redemption?

01:42:08  14  **A**     You want me to answer this or no?

01:42:11  15          It's 7-9-18 now.  I can see it.

01:42:14  16  **Q**     Thank you.

01:42:15  17          Were daily sheets like this used at Skilled Shamrock

01:42:18  18  and Redemption?

01:42:19  19  **A**     They were used at every store I owned.

01:42:22  20  **Q**     I'm sorry?

01:42:22  21  **A**     They were used at all the stores that I was affiliated

01:42:25  22  with.

01:42:28  23          MR. BEAN:  Can you please flip through this to

01:42:30  24  Page 10?

01:42:38  25          Can we do -- actually, can you go back one page,

01:42:42   1   please?

01:42:42   2        One more.

01:42:44   3        One more.

01:42:46   4   BY MR. BEAN:

01:42:46   5   **Q**    Sir, what are these?

01:42:50   6   **A**    Printout for the dailies.

01:42:54   7   **Q**    From what store?

01:42:57   8   **A**    Redemption.

01:42:57   9   **Q**    And we're on Page 7 here.

01:42:59   10       And how were these used?

01:43:00   11  **A**    That's the Gaggle System.

01:43:03   12  **Q**    And so what -- the Gaggle System prints this out.

01:43:07   13  What are you -- how is this record used at the business?

01:43:11   14  Like, what's the point of it?

01:43:12   15  **A**    I'm pretty sure each shift printed it off, and it gave

01:43:16   16  you the rundown of what your shift did.

01:43:18   17  **Q**    And I note up at the top it says -- it references

01:43:21   18  points.  What are points?

01:43:24   19  **A**    The amount of money that was probably paid out on that

01:43:27   20  shift.

01:43:28   21  **Q**    So, does that number correspond to a dollar figure?

01:43:37   22  **A**    $1 for each increment.

01:43:37   23  **Q**    So 8,361 points, does that correspond to $8,361?

01:43:41   24  **A**    I can't be a hundred percent, but more than likely,

01:43:44   25  yes.

01:43:45  1            MR. BEAN:  All right.  You can stop with that.

2      BY MR. BEAN:

01:43:48  3      **Q**    Now, when Mr. DiPietro's were -- machines were at

01:43:52  4      Redemption, what was your role in the business?

01:43:55  5      **A**    Myself and Larry were the owners of it.

01:44:00  6      **Q**    In terms of operations.  In terms of the operation at

01:44:08  7      Redemption.

01:44:08  8      **A**    We ran the business, the day-to-day operations.

01:44:11  9      **Q**    What did that entail?

01:44:15  10     **A**    Just daily business, opening the store and running

01:44:23  11     the -- depending on what week it was, myself or Larry ran

01:44:27  12     week to week.

01:44:27  13     **Q**    Now, at this time and time period where Mr. DiPietro

01:44:30  14     is still involved, were audits carried out at Redemption?

01:44:34  15     **A**    Yes.

01:44:35  16     **Q**    And how were the audits carried out?

01:44:40  17     **A**    Back then, Trina came in and did the audits.

01:44:44  18     **Q**    Did she bring a computer with her?

01:44:46  19     **A**    Yes.

01:44:48  20     **Q**    Was it similar to how the audits were conducted at

01:44:51  21     Skilled Shamrock?

01:44:52  22     **A**    The same.

01:44:57  23     **Q**    When Mr. DiPietro was still involved in Redemption,

01:45:00  24     how were the profits split?

01:45:04  25     **A**    60/40.

| | | |
|---|---|---|
| 01:45:05 | 1 | **Q**   And how about the expenses? |
| 01:45:08 | 2 | **A**   60/40. |
| 01:45:09 | 3 | **Q**   And -- so the expenses were split equally to the |
| 01:45:16 | 4 | profits? |
| 01:45:19 | 5 | **A**   For some reason I feel like that's why I told him he |
| 01:45:22 | 6 | had to go, because he was only paying a percent of the |
| 01:45:25 | 7 | expenses, which was the match plays or something like that. |
| 01:45:27 | 8 | **Q**   And when you say he was only paying a percentage of |
| 01:45:30 | 9 | expenses, are you referencing, you felt like you weren't |
| 01:45:33 | 10 | getting as much money as you should have been? |
| 01:45:34 | 11 | **A**   Correct. |
| 01:45:35 | 12 | **Q**   Okay.  And approximately when was Mr. DiPietro removed |
| 01:45:39 | 13 | from the business? |
| 01:45:43 | 14 | **A**   2010, early '11. |
| 01:45:46 | 15 | **Q**   Was it around when you got involved in Skilled |
| 01:45:49 | 16 | Shamrock? |
| 01:45:49 | 17 | **A**   Correct. |
| 01:45:49 | 18 | **Q**   Were you at all nervous about getting involved with |
| 01:45:52 | 19 | Skilled Shamrock with Mr. DiPietro after just kind of take |
| 01:45:54 | 20 | him out of another business you were involved in? |
| 01:45:56 | 21 | **A**   No. |
| 01:45:56 | 22 | **Q**   Why not? |
| 01:45:58 | 23 | **A**   For what?  For what reason? |
| 01:46:04 | 24 | **Q**   When Mr. DiPietro was out of the business, did the |
| 01:46:08 | 25 | split of the profits change at Redemption? |

01:46:19  1   **A**     You have to repeat that again.

01:46:21  2   **Q**     After -- when -- when it was just you, Mr. Dayton, and

01:46:25  3   Mr. Karasarides at Redemption, Mr. DiPietro's been removed,

01:46:27  4   how were the profits split?

01:46:29  5   **A**     33 1/3.

01:46:31  6   **Q**     For each of you?

01:46:32  7   **A**     Correct.

01:46:32  8   **Q**     All right.  And did you continue performing audits?

01:46:36  9   **A**     Yes.

01:46:37  10  **Q**     And did you continue having a computer that was used

01:46:40  11  in the audits?

01:46:41  12  **A**     Did I?

01:46:42  13  **Q**     Were -- was a computer at all used in the audits?

01:46:45  14  **A**     After Mr. DiPietro left?  Negative.  No, sir.

01:46:50  15  **Q**     How were -- what kind of records did you generate

01:46:52  16  during the audits?

01:46:55  17  **A**     You just showed me the sheets that the Gaggle System,

01:47:00  18  there was a -- before the Gaggle System you just went in and

01:47:03  19  printed out the daily in the period, and it would print out

01:47:07  20  a small sheet for you.

01:47:08  21  **Q**     And what happened to the records at the end of the

01:47:11  22  audits?

01:47:11  23  **A**     Destroyed them.

01:47:17  24  **Q**     Was the cash profits at Redemption, were they

01:47:19  25  physically divided amongst the owners?

01:47:21  1   **A**     Yes.

01:47:22  2   **Q**     And can you describe physically exactly how that

01:47:27  3   happened, you know, tell us where the cash was taken from,

01:47:31  4   how -- you know, put it together, how it's divided?

01:47:35  5   **A**     Do the ins and outs and calculate all your numbers.

01:47:39  6   **Q**     Are you taking cash out of the machines?

01:47:42  7   **A**     Yeah, you do that daily.

01:47:44  8   **Q**     And where do you store the cash?

01:47:50  9   **A**     Wherever.  I mean. . .

01:47:51  10  **Q**     Was there a particular place where it was kept safe?

01:47:55  11  **A**     I mean, I told them to keep it in the water, but who

01:47:59  12  knows where they kept it.

01:48:00  13  **Q**     What do you mean by the water?

01:48:03  14  **A**     Well, when you guys raid the stores, you don't take

01:48:07  15  the product.  So the best way to hide the money was to cut

01:48:10  16  off the top of the waters and put it down in the water to

01:48:13  17  hide it.

01:48:13  18  **Q**     Now, during the audits, was all of the cash at the

01:48:17  19  business pulled out and put into one place?

01:48:21  20  **A**     Yeah.

01:48:21  21  **Q**     And did you divide it?

01:48:22  22  **A**     Correct.  Yes.

01:48:24  23  **Q**     So what -- and then what happens with your cut?  You

01:48:28  24  divided it, you've got your cut.  What happens?

01:48:35  25  **A**     I leave.

01:48:35   1   **Q**     With the money?

01:48:36   2   **A**     Yeah.

01:48:36   3   **Q**     Do you put it in a container of some sort?

01:48:39   4   **A**     I like to use the bubble gum machine or the bubble gum

01:48:42   5   whatever, buckets.

01:48:43   6   **Q**     How about Mr. Dayton's share, even when he -- even

01:48:48   7   after he was no longer involved in Redemption?

01:48:51   8   **A**     I had no dealings with that.  Scrub did -- or Ronnie

01:49:00   9   Hull is the one who would take care of his end, of Larry

01:49:03   10  Dayton's.

01:49:04   11  **Q**     And how about Mr. Karasarides' cut?

01:49:07   12  **A**     I believe Thomas took it to him.

01:49:09   13  **Q**     Thomas who?

01:49:09   14  **A**     Helmick.

01:49:10   15  **Q**     Now, even after Mr. DiPietro was out of Redemption,

01:49:15   16  did you have any conversations with him during which you

01:49:18   17  discussed your continued involvement in Redemption?

01:49:22   18              MR. FEDOR:  Objection.

01:49:22   19              THE COURT:  Overruled.

01:49:26   20              THE WITNESS:  I mean, all I did was tell him

01:49:27   21  to take his machines, and I put my own in there.

01:49:30   22  BY MR. BEAN:

01:49:30   23  **Q**     Right.  But after that, did you ever talk about the

01:49:32   24  numbers at Redemption or how Redemption was doing,

01:49:34   25  particularly in comparison to Skilled Shamrock?

J. Kachner (Direct by Bean)                          275

01:49:36  1    **A**     Not that I remember.

01:49:38  2    **Q**     Did you ever have any discussions with him regarding

01:49:41  3    being in gaming businesses or gambling businesses or skilled

01:49:46  4    games businesses?

01:49:46  5    **A**     I mean, he knew I owned them.  People who are in the

01:49:49  6    game room know who owns what.

01:49:58  7               MR. BEAN:  Can we please pull up up exhibit --

01:50:00  8               MR. GOLDBERG:  Excuse me.  I didn't get the

01:50:01  9    answer to the last question.  If the court reporter --

01:50:04  10              MR. FEDOR:  I didn't understand the answer.

          11              THE COURT:  I hope you're not asking me, Mike,

01:50:22  12   because I couldn't understand it either.

01:50:22  13              (Court Reporter read back as requested.)

01:50:25  14              MR. BEAN:  Can we please pull up Exhibit 455?

01:50:33  15        And could you scroll through the few pages here?

01:50:37  16        Thank you.

01:50:38  17        Now, if we could go back and -- to the second page,

01:50:43  18   please?

01:50:44  19        And I'll just note that the parties have stipulated on

01:50:46  20   this exhibit.

01:50:48  21   BY MR. BEAN:

01:50:48  22   **Q**     Mr. Kachner, what is this?

01:50:54  23   **A**     Plain Township Zoning Department's permit.

01:50:58  24   **Q**     All right.  So, help me understand, I think you

01:51:02  25   testified earlier that you knew that Redemption and Skilled

01:51:06  1    Shamrock were not in compliance with state law.  How -- how

01:51:10  2    is there a permit here from Plain Township?

01:51:15  3    **A**     You want my honest answer?

01:51:17  4    **Q**     Always.

01:51:17  5    **A**     They're thiefs.

01:51:22  6    **Q**     Okay.  Can you elaborate on that?

01:51:24  7    **A**     Well, they figured they could get their hand in on the

01:51:26  8    prize, so they made the fire marshal come out and count how

01:51:29  9    many machines it was and tell you -- charge you an annual

01:51:31  10   fee and a hundred dollars a machine for some unruly [sic]

01:51:34  11   reason.

01:51:34  12   **Q**     So, was it -- did you understand that Redemption

01:51:37  13   needed to pay this fee and if it didn't, it would get shut

01:51:40  14   down by the township?

01:51:42  15   **A**     Correct.

01:51:42  16   **Q**     All right.  And who is listed on this permit as the

01:51:47  17   owner of the business?

01:51:50  18   **A**     It says the name of applicant is Thomas Helmick.

01:51:57  19          Oh, name of the -- I'm sorry.

01:51:59  20   **Q**     Was he actually the owner of the business?

01:52:00  21   **A**     Underneath it said that.  I'm sorry.

01:52:02  22   **Q**     Was he actually the owner of the business?

01:52:04  23   **A**     No, sir.

01:52:04  24   **Q**     Did you believe that having this permit authorized

01:52:09  25   Redemption to pay out cash to patrons?

01:52:12  1   **A**      To pay out cash to the patrons?  No.

01:52:14  2   **Q**      Why not?

01:52:16  3   **A**      This is -- this was something that I stated just a

01:52:19  4   minute ago.  Like, they robbed everybody for it.

01:52:23  5               MR. KERSEY:  Judge, I still can't understand

01:52:24  6   him.  He's got to speak up.

01:52:26  7               THE COURT:  I don't understand half of what

01:52:27  8   he's saying.

01:52:28  9               MR. BEAN:  Can you lean into the microphone,

01:52:29  10  please.

01:52:32  11              THE WITNESS:  As I stated before, this was

01:52:35  12  their way to get their hand into the money that was being

01:52:38  13  made at the stores, and they robbed them basically, in my

01:52:40  14  opinion.

01:52:42  15  BY MR. BEAN:

01:52:42  16  **Q**      Are you the only person who was involved in the

01:52:45  17  skilled games or gaming -- gambling businesses who thought

01:52:48  18  this way about the zoning permits?

01:52:51  19  **A**      I can't answer that.

01:52:52  20  **Q**      Well --

01:52:53  21  **A**      I don't know if the other -- how the others felt.

01:52:56  22  **Q**      Did you ever talk to other people about it?

01:52:57  23  **A**      No.  That's my opinion.

01:53:01  24  **Q**      On this permit, does it say how many machines were

01:53:05  25  paying for the permit here?

01:53:06    1    **A**    75.

01:53:08    2    **Q**    Is that approximately how many machines were at

01:53:11    3    Redemption in 2018?

01:53:12    4    **A**    Normally I overed that by five to seven machines.

01:53:17    5    **Q**    So, as you say, it was probably more like 70 then at

01:53:21    6    Redemption?

01:53:21    7    **A**    Roughly, yeah, 68 to 70 machines.

01:53:24    8                    MR. BEAN:  Can we pull up Exhibit 434?

01:53:28    9         And I'll note the parties have also stipulated on this

01:53:30   10    exhibit.

01:53:31   11         And could you go to the second page, please?

01:53:37   12    BY MR. BEAN:

01:53:38   13    **Q**    What is this?

01:53:39   14    **A**    Same paperwork, just is for Skilled Shamrock.

01:53:41   15    **Q**    All right.  And who is listed as the owner of the

01:53:44   16    business on this?

01:53:48   17    **A**    Derek Phillips.

01:53:49   18    **Q**    And how many machines are listed here?

01:53:55   19    **A**    32.

01:53:57   20    **Q**    So, is it about -- was it exactly 32, you think, or

01:54:02   21    again, is that kind of an estimate?

01:54:04   22    **A**    That one's probably pretty close.  Maybe over by about

01:54:07   23    two because the place was still so small.

01:54:09   24    **Q**    So is it fair to say that there are about twice as

01:54:12   25    many machines at Redemption as at Skilled Shamrock?

01:54:15  1   **A**      At one point, yes.

01:54:16  2   **Q**      Now, earlier we looked at the audit sheets from

01:54:19  3   Skilled Shamrock and we saw some numbers.  Are there similar

01:54:25  4   records for Redemption?

01:54:27  5   **A**      No.

01:54:30  6   **Q**      But you testified that there are about twice as many

01:54:33  7   machines at Redemption as at Skilled Shamrock.

01:54:35  8           Would it be a conservative estimate to stay Redemption

01:54:41  9   made at least as much profit as Skilled Shamrock?

01:54:44  10                  MR. GOLDBERG:  Objection.

01:54:44  11                  THE COURT:  Overruled.

01:54:44  12                  THE WITNESS:  Yes.

          13   BY MR. BEAN:

01:54:48  14  **Q**      Did Skilled Shamrock and Redemption have a busy

01:54:50  15   season?

01:54:54  16  **A**      Tax time.

01:54:57  17  **Q**      All right.  I'd like to go back to your tax returns if

01:55:02  18   we could.

01:55:03  19           I believe you testified that Mr. DiPietro prepared

01:55:05  20   some of your returns, including your 2017 return, and that

01:55:11  21   return was false because it did not report income from

01:55:16  22   Skilled Shamrock or Redemption or all the income you had

01:55:18  23   from your gambling businesses.

01:55:19  24           Was that your testimony earlier?

01:55:21  25                  MR. FEDOR:  Objection.

01:55:21  1                    THE COURT:  Overruled.

01:55:23  2                    THE WITNESS:  Yes.

01:55:24  3                    MR. BEAN:  Can we please pull back up

01:55:28  4   Exhibit 152?  And can we keep going to that Schedule C.

01:55:39  5   BY MR. BEAN:

01:55:40  6   **Q**    Now, when we first looked at the Schedule C, we hadn't

01:55:43  7   looked at any of the audit sheets but now we have.  And I

01:55:46  8   think you testified earlier -- let me ask you again.

01:55:47  9        How did you come up with the $126,000 number?

01:55:50  10  **A**    I just told him a number when I went into the

01:55:52  11  establishment.

01:55:53  12  **Q**    All right.  Were there records that would -- from

01:55:57  13  which an individual could calculate what a much closer

01:56:00  14  number was or maybe what the actual number was?

01:56:03  15  **A**    From his Excel sheets.

01:56:05  16  **Q**    So, did -- when you were meeting with Mr. DiPietro on

01:56:07  17  your tax returns -- well, let me ask you this:  Did you ever

01:56:11  18  meet specifically in person with Mr. DiPietro on your tax

01:56:14  19  returns?

01:56:16  20  **A**    Did I meet -- did I meet him before I went --

01:56:19  21  **Q**    No.  Meet with him in person.

01:56:21  22  **A**    To do my taxes?

01:56:27  23  **Q**    Yes.

01:56:27  24  **A**    Yes, sir.

01:56:28  25  **Q**    All right.  During those meetings, did Mr. DiPietro

01:56:30  1    say, hey, let me pull out the audit sheets.  Let's look at

01:56:33  2    that and use that?

01:56:34  3    **A**     No.

01:56:34  4    **Q**     Did you ever say to Mr. DiPietro, hey, I know you have

01:56:37  5    these audit sheets.  Why didn't you pull that out and use

01:56:40  6    it?

01:56:40  7    **A**     No, sir.

01:56:40  8    **Q**     Was there ever any expectation that the audit sheets

01:56:43  9    would be used to prepare your tax return to determine how

01:56:47  10   much income you had from Skilled Shamrock?

01:56:50  11   **A**     No.

01:56:52  12   **Q**     Is this $126,000, is that less than the amount of

01:56:55  13   income you had from Skilled Shamrock?

01:56:59  14   **A**     Yes.

01:57:00  15   **Q**     Can you --

01:57:01  16   **A**     Yes.

01:57:01  17   **Q**     And if you add in Redemption, it's probably even less

01:57:05  18   by even more?

01:57:08  19   **A**     Could be depending on --

01:57:11  20   **Q**     Well, if Redemption had at least as much profits as

01:57:14  21   Skilled Shamrock, and this is less than Skilled Shamrock, do

01:57:18  22   you agree that it follows that if you add both together,

01:57:22  23   it's probably even -- it's underreported by even more?

01:57:25  24   **A**     Okay.

01:57:27  25   **Q**     All right.

**J. Kachner  (Direct by Bean)**                                       282

01:57:29   1                    MR. FEDOR:  Objection.  Non-responsive.

01:57:30   2                    THE WITNESS:  Witness yes.

01:57:31   3                    THE COURT:  I understood it.

01:57:32   4                    THE WITNESS:  Yes.

01:57:33   5                    MR. BEAN:  Can you please pull up Exhibit 328?

01:57:40   6    BY MR. BEAN:

01:57:40   7    **Q**     Sir, when you -- when Mr. DiPietro prepared your tax

01:57:44   8    returns, did he ask you to sign some forms?

01:57:47   9    **A**     Yes.

01:57:49   10   **Q**     Is your signature on this form?

01:57:52   11   **A**     Yes.

01:57:55   12   **Q**     Is this -- do you recognize this as one of the forms

01:57:57   13   he asked you to sign?

01:58:00   14   **A**     I mean. . .

01:58:02   15   **Q**     I mean, if you don't recall specifically, you can say.

01:58:06   16   **A**     I'm not going to say that I remember signing this.  I

01:58:09   17   just signed paperwork that -- when the paperwork was filled

01:58:11   18   out.

01:58:12   19   **Q**     But do you agree it has your signature?

01:58:13   20   **A**     It is my signature.

01:58:15   21   **Q**     And do you agree it looks like this relates to taxes?

01:58:18   22   **A**     Correct.

01:58:19   23   **Q**     Can you -- up at the top, can you just tell us what

01:58:24   24   it's -- well, that was a terrible drawing.

01:58:26   25   **A**     I got you.

**J. Kachner  (Direct by Bean)**                    283

01:58:28  1    **Q**     Can you just read that out for the jury, please?

01:58:31  2    **A**     "IRS E-File Signature Authorization."

01:58:35  3    **Q**     And do you see your name and your wife's name on this

01:58:37  4    document?

01:58:39  5    **A**     Yes, sir.

01:58:39  6    **Q**     And for what year does this relate?

01:58:43  7    **A**     2017.

01:58:45  8    **Q**     All right.

01:58:46  9              MR. BEAN:  Carissa, can we pull up the part

01:58:48  10   under part 2?

01:58:53  11   BY MR. BEAN:

01:58:53  12   **Q**     Sir, I'm going to ask you to read the first sentence,

01:58:56  13   please.

01:59:00  14   **A**     You're not talking about the taxpayer declaration,

01:59:03  15   right?

01:59:04  16   **Q**     The smaller text that begins "under," please.

01:59:06  17   **A**     "Under penalties of perjury, I declare that I have

01:59:12  18   examined a copy of my electronic individual income tax

01:59:15  19   return and accompanying schedules and statements for the tax

01:59:20  20   year ending December 31, 2017, and, to the best of my

01:59:25  21   knowledge and belief, it is true, correct, and accurately

01:59:30  22   lists all amounts of sources of income I received during the

01:59:34  23   tax year."

01:59:35  24   **Q**     Thank you, sir.

01:59:37  25             Now, do you agree that your 2017 tax return, to the

01:59:42    1    best of your knowledge, was correct or accurately listed

01:59:45    2    your number, or your sources of income?

01:59:47    3    **A**      No, sir.

01:59:48    4    **Q**      Then why did you sign this document?

01:59:55    5    **A**      As I did it -- that's what I did with all my taxes.  I

01:59:59    6    was supposed to sign them.

02:00:00    7    **Q**      When Mr. -- you can finish.  I apologize.

02:00:03    8    **A**      I had to sign is what I was going to say.

02:00:05    9    **Q**      When Mr. DiPietro asked you to sign documents in

02:00:07   10    relation to your tax returns, did he explain what the

02:00:10   11    documents were?

02:00:12   12    **A**      He might have.  I'm not a hundred percent sure.

02:00:15   13    **Q**      Do you recall any such conversation?

02:00:19   14    **A**      To be honest, when it came to filing taxes, I didn't

02:00:22   15    give two craps about it.  I just signed and went along with

02:00:25   16    it.

02:00:25   17    **Q**      Do you recall him ever going over this document with

02:00:29   18    you?

02:00:29   19    **A**      Again, my wife was more in charge of doing that.  I

02:00:33   20    was --

02:00:34   21    **Q**      What do you mean, more in charge of doing what?

02:00:36   22    **A**      She paid -- she paid attention to what we were signing

02:00:39   23    and whatnot.

02:00:41   24    **Q**      Did you ever talk about this document with her?

02:00:46   25    **A**      The only one I remember about is that we had to fill

02:00:48  1    out and we had to send in, like, little monthly or

02:00:54  2    something, bi-monthly payments is the only thing that I can

02:01:00  3    remember really.  As for just signing paperwork, it was just

02:01:04  4    another piece of paper that I signed.

02:01:08  5    **Q**    When your 2017 tax return was filed, did Mr. DiPietro

02:01:14  6    know that the tax return was false?

02:01:18  7    **A**    Per his numbers on the computer, yes.

02:01:24  8    **Q**    Did Mr. DiPietro know you were involved in Cafe 62?

02:01:30  9    **A**    Again, Stark County is only so big.  Everyone that

02:01:35  10   owned a game room knew who owned what.

02:01:37  11   **Q**    Did you ever talk specifically about that business

02:01:39  12   with him?

02:01:41  13   **A**    I mean, I might have said something, that it was doing

02:01:43  14   good or doing bad or in the hood or something like that, but

02:01:46  15   to break down numbers, no.

02:01:47  16   **Q**    Is what you just described, would that be the extent

02:01:50  17   of it?

02:01:51  18   **A**    Correct.

02:01:51  19   **Q**    Did Mr. DiPietro ever ask you any questions about your

02:01:55  20   involvement in Cafe 62?

02:01:57  21   **A**    No.

02:01:59  22   **Q**    Now, this form we're looking at, do you believe you

02:02:03  23   signed this form in prior years as well?

02:02:06  24   **A**    The e-file?

02:02:09  25   **Q**    Yes.

**J. Kachner (Direct by Bean)**                    286

| | | |
|---|---|---|
| 02:02:10 | 1 | **A**    I can't be sure. |
| 02:02:13 | 2 | **Q**    If someone -- would you be surprised if you learned |
| 02:02:15 | 3 | that you had signed it in prior years? |
| 02:02:17 | 4 | **A**    That I had? |
| 02:02:17 | 5 | **Q**    Yeah.  Had signed it. |
| 02:02:19 | 6 | **A**    I mean, if it's a document that was supposed to be |
| 02:02:22 | 7 | signed by the government -- for the government, then yeah, I |
| 02:02:24 | 8 | signed it. |
| 02:02:25 | 9 | **Q**    Okay. |
| 02:02:25 | 10 |          MR. BEAN:  Can we please pull up Exhibit 329? |
| 02:02:34 | 11 | And could we go to the second page, please? |
| 02:02:36 | 12 | BY MR. BEAN: |
| 02:02:36 | 13 | **Q**    Sir, is that your signature? |
| 02:02:38 | 14 | **A**    Yes, sir. |
| 02:02:40 | 15 | **Q**    And do you see above where you've signed it, do you |
| 02:02:44 | 16 | see a name? |
| 02:02:47 | 17 | **A**    Ron DiPietro, Ron & Associates. |
| 02:02:49 | 18 | **Q**    Thank you. |
| 02:02:50 | 19 |          MR. BEAN:  Can we go back to the first page, |
| 02:02:53 | 20 | please? |
| 02:02:54 | 21 | BY MR. BEAN: |
| 02:02:55 | 22 | **Q**    Let me ask you, do you recall signing this document? |
| 02:03:00 | 23 | **A**    Again, I signed a lot of documents when I went in |
| 02:03:04 | 24 | there.  To say that I specifically remember this document, |
| 02:03:06 | 25 | no. |

02:03:08  1   **Q**    Can you please read the first two sentences of the

02:03:12  2   second paragraph?

02:03:15  3   **A**    "We will prepare your 2017 federal and state income

02:03:21  4   tax returns.  We will depend on you to provide the

02:03:24  5   information we need to prepare complete and accurate

02:03:27  6   returns."

02:03:28  7   **Q**    Thank you.  That's fine.

02:03:30  8        Did you have records of how much income you received

02:03:33  9   from Skilled Shamrock and Redemption?

02:03:36  10  **A**    Personally, no.

02:03:37  11  **Q**    Why not?

02:03:39  12  **A**    Because I didn't keep any of that paperwork.

02:03:40  13  **Q**    Who had records of your income from Skilled Shamrock?

02:03:44  14  **A**    Ron DiPietro's computer.

02:03:47  15  **Q**    Do you recall going over the text of this document

02:03:50  16  with Mr. DiPietro at the time you signed it, or really at

02:03:54  17  any time he was preparing your tax returns?

02:03:55  18  **A**    No.

02:04:01  19  **Q**    Do you recall reading this document at any time before

02:04:05  20  the government showed it to you in preparation for trial?

02:04:12  21  **A**    Can you repeat that again?

02:04:13  22  **Q**    So I'm asking, did the government show you this

02:04:16  23  document in preparation for trial?

02:04:18  24  **A**    I believe so, yes.

02:04:20  25  **Q**    Before that happened, do you recall ever seeing this

02:04:23  1   document before?

02:04:25  2   **A**    I believe I remember signing it.

02:04:28  3   **Q**    Do you recall reading it?

02:04:31  4   **A**    No.

02:04:32  5   **Q**    Why did you sign it if you didn't read it?

02:04:38  6   **A**    Again, I just sign the paperwork.  I don't -- I never

02:04:42  7   read nothing.

02:04:44  8            MR. BEAN:  Can we please pull up Exhibit 150?

02:04:50  9       And the next page, Page 2, please.

02:04:52  10  BY MR. BEAN:

02:04:52  11  **Q**    Is this your 2016 tax return?

02:04:58  12  **A**    Okay.  Yep.

02:05:00  13           MR. BEAN:  And can we go -- I think it's

02:05:02  14  probably Page 3.

02:05:05  15      Page 4, please.

02:05:06  16  BY MR. BEAN:

02:05:07  17  **Q**    Who is listed as the paid preparer?

02:05:14  18  **A**    Ron DiPietro, Ron & Associates, 34-something West Tusc

02:05:22  19  Street, Canton, Ohio.

02:05:24  20  **Q**    Thank you.

02:05:25  21           MR. BEAN:  Can you please go to Page 9?

02:05:30  22      Sorry.  Numbers keep changing.  Keep going, please.

02:05:47  23           (Off-record discussion).

02:05:52  24           MR. BEAN:  Can you go backwards, please?

02:06:00  25      All right.

02:06:01  1          We'll go to Exhibit 148, please.

02:06:07  2   BY MR. BEAN:

02:06:08  3   **Q**     Is this your 2015 tax return?

02:06:13  4   **A**     Yes, that's what it says at the top.

02:06:15  5              MR. BEAN:  Can we please go to Page 3?

02:06:23  6   BY MR. BEAN:

02:06:24  7   **Q**     Who is listed as the paid preparer?

02:06:30  8              THE WITNESS:  Can you blow that up?  Can you

02:06:32  9   blow that up, please?

02:06:35  10  **A**     Ron DiPietro, Ron & Associates, 3414 West Tusc

02:06:39  11  Street -- Tuscarawas Street, Canton, Ohio.

02:06:42  12  **Q**     Thank you.

02:06:43  13             MR. BEAN:  Can we scroll through some pages

02:06:45  14  and I'll tell you when to stop, please.

02:06:50  15         Thank you.

02:06:52  16  BY MR. BEAN:

02:06:53  17  **Q**     Sir, does this appear to be a Schedule C for a

02:06:56  18  handyman service?

02:06:57  19  **A**     Yes.

02:06:58  20  **Q**     Did you have a handyman service in 2015?

02:07:01  21  **A**     No.

02:07:02  22  **Q**     Is this the income that you did report from your

02:07:06  23  gambling businesses?

02:07:07  24  **A**     Yes.  Yes.

02:07:09  25  **Q**     Is that the true amount of income --

| 02:07:12 | 1 | MR. BEAN:  Can we shrink that down, please. |

02:07:12  1          MR. BEAN:  Can we shrink that down, please.

02:07:15  2          THE WITNESS:  No.

02:07:16  3  BY MR. BEAN:

02:07:16  4  **Q**    Is that the true amount of income you earned from your

02:07:19  5  gambling businesses?

02:07:20  6  **A**    No.

02:07:20  7  **Q**    All right.  Is the income you received from Skilled

02:07:23  8  Shamrock, Redemption, or Cafe 62 reported anywhere on this

02:07:27  9  return?

02:07:32  10 **A**    I mean, as in name-wise?

02:07:37  11 **Q**    Yeah.  Are they reported -- do they show up anywhere

02:07:40  12 on this return?

02:07:41  13 **A**    No.

02:07:46  14 **Q**    How about your ownership of those businesses?

02:07:48  15 **A**    No.

02:07:48  16 **Q**    Is this tax return false?

02:07:54  17 **A**    I mean, without looking at all the numbers, yeah, it's

02:07:57  18 false.

02:07:57  19 **Q**    I mean, if Skilled Shamrock and Redemption aren't on

02:08:01  20 here --

02:08:01  21 **A**    If you're asking for Redemption too, then yes, it's

02:08:04  22 false.

02:08:04  23 **Q**    And what about -- I mean, is your ownership in those

02:08:07  24 businesses reported on here?

02:08:08  25 **A**    No.

**J. Kachner  (Direct by Bean)**                     291

02:08:08  1   **Q**     All right.  And were you -- did you have a handyman

02:08:10  2   business?

02:08:11  3   **A**     Again, no.

02:08:17  4              MR. BEAN:  Does this work?  Because the Trial

02:08:19  5   Director for 150 does not have all the pages, but the

02:08:21  6   binders have all the pages for the exhibits.

02:08:23  7        So does the overhead work?

          8              MR. HOWELL:  Yeah, Steve, can he please use

          9   the overhead?

02:08:28  10             COURTROOM DEPUTY:  Overhead?  Sure.

02:08:31  11             MR. HOWELL:  Thank you.

02:08:31  12             COURTROOM DEPUTY:  Okay.  Give it a second.

02:08:50  13             MR. BEAN:  We've got Exhibit 150 here.

          14  BY MR. BEAN:

02:08:52  15  **Q**     Sir, is this your 2015 tax return?

02:08:55  16  **A**     Yes, sir.

02:08:55  17  **Q**     And is this the same one we looked at a few moments

02:08:58  18  ago and we tried to scroll some pages and we were stopped?

02:09:00  19  **A**     Yes.  Yes, sir.

02:09:01  20  **Q**     All right.  I'm going to go to Page 11.

02:09:12  21        Sir, this a Schedule C that reports a handyman

02:09:15  22  business?

02:09:15  23  **A**     Yes.

02:09:17  24  **Q**     Did you have a handyman business in 2016?

02:09:20  25  **A**     No.

J. Kachner (Direct by Bean)                                292

02:09:22  1   **Q**     Did you earn $90,000 from a handyman business in 2016?

02:09:28  2   **A**     No.

02:09:28  3   **Q**     Is this -- is that $90,000, is that actual reporting

02:09:34  4   income from a gambling business or multiple gambling

02:09:37  5   businesses?

02:09:37  6   **A**     Yes.

02:09:39  7   **Q**     Are businesses Skilled Shamrock or Redemption

02:09:42  8   mentioned anywhere on this return?

02:09:43  9   **A**     No.

02:09:45  10  **Q**     Is the income -- is all of the income you earned from

02:09:48  11  those businesses reported on this return?

02:09:50  12  **A**     No.  No.

02:09:57  13  **Q**     Is it your understanding that Mr. DiPietro, when he

02:10:02  14  prepared this return, knew the return was not true?

02:10:06  15  **A**     Per his computers, yes.

02:10:10  16           MR. BEAN:  Can we please pull up Exhibit 146?

02:10:22  17           MS. WELCH:  Steve, can we have the computer

02:10:23  18  again?

02:10:24  19           COURTROOM DEPUTY:  Yes.

02:10:29  20  BY MR. BEAN:

02:10:29  21  **Q**     Sir, is this your 2014 tax return?

02:10:33  22  **A**     Yes.

02:10:35  23           MR. BEAN:  And can we go to Page 3, please?

02:10:41  24       And can we blow up the bottom?

02:10:47  25  BY MR. BEAN:

02:10:48  1    **Q**    Who is listed as the paid preparer?

02:10:53  2    **A**    Leah Stark.

02:10:54  3    **Q**    Do you remember meeting with her?

02:11:00  4    **A**    I mean, meeting with a lady.  To pick her out of a

02:11:04  5    line-up, I couldn't do that.

02:11:05  6    **Q**    Where did she work though?

02:11:07  7    **A**    Ron & Associates.

02:11:07  8    **Q**    And how did she come to prepare your tax return?

02:11:13  9    **A**    I believe it was a late -- late appointment and

02:11:17  10   Mr. DiPietro was running behind, so he had her prepare the

02:11:22  11   taxes.

02:11:24  12              MR. BEAN:  Can we please go to Page --

02:11:27  13   actually, can we just scroll out a little bit.

02:11:32  14   BY MR. BEAN:

02:11:32  15   **Q**    Sir, do you see above where it says "paid preparer use

02:11:36  16   only" and "sign here" it says "third-party designee"?

02:11:39  17   **A**    No.  Can you blow anything up that you --

02:11:42  18   **Q**    Yes, we can.

02:11:43  19              How about now.  Is that better?

02:11:45  20   **A**    What was your question again, please?

02:11:47  21   **Q**    Who is listed as the third-party designee on this

02:11:50  22   return?

02:11:50  23   **A**    Designee's name, Ron DiPietro.

02:11:52  24   **Q**    All right.

02:11:54  25              MR. BEAN:  Can we please go to Page -- it's

02:11:56  1   likely Page 9.

02:12:01  2          Keep going.

02:12:02  3          Keep going.

02:12:05  4          Thank you.

02:12:07  5   BY MR. BEAN:

02:12:07  6   **Q**     Is this a Schedule C for your handyman business?

02:12:12  7   **A**     It's what the paper -- that's what it says, yes.

02:12:14  8   **Q**     Did you have a handyman business in 2014?

02:12:16  9   **A**     No.  No.

02:12:18  10  **Q**     And is the income that's reported here, is that

02:12:21  11  actually from your gambling businesses?

02:12:25  12  **A**     No.  No.

02:12:26  13  **Q**     It's not from your gambling businesses?

02:12:28  14  **A**     Oh.  Yes.

02:12:32  15  **Q**     How did the person who prepared this return get this

02:12:35  16  figure?

02:12:37  17  **A**     Because I went in and told them what to put down.

02:12:41  18  **Q**     And did anybody have records that would say how much

02:12:45  19  at least you had from Skilled Shamrock?

02:12:47  20  **A**     Mr. DiPietro -- Mr. DiPietro.

02:12:50  21  **Q**     And who owned the business that prepared this return?

02:12:52  22  **A**     Ron & Associates.

02:12:54  23  **Q**     And who owned that business?

02:12:55  24  **A**     Mr. DiPietro.

02:12:57  25  **Q**     Thank you.

| | | |
|---|---|---|
| 02:13:00 | 1 | MR. BEAN:  Can we please go to Exhibit 143? |
| 02:13:07 | 2 | BY MR. BEAN: |
| 02:13:07 | 3 | **Q**    Is this your 2013 tax return? |
| 02:13:12 | 4 | **A**    Yes. |
| 02:13:14 | 5 | MR. BEAN:  Can you go to Page 3, please? |
| 02:13:18 | 6 | Actually, one page back. |
| 02:13:21 | 7 | And can you blow up the bottom? |
| 02:13:25 | 8 | BY MR. BEAN: |
| 02:13:25 | 9 | **Q**    Who is listed as the preparer of this tax return? |
| 02:13:32 | 10 | **A**    Ron DiPietro. |
| 02:13:33 | 11 | **Q**    All right.  Thank you. |
| 02:13:35 | 12 | MR. BEAN:  Can we go to Page -- can we scroll |
| 02:13:41 | 13 | a couple pages, please, and I'll tell you when to stop, |
| 02:13:44 | 14 | please?  Thank you. |
| 02:13:46 | 15 | Right here.  Thank you. |
| 02:13:47 | 16 | BY MR. BEAN: |
| 02:13:47 | 17 | **Q**    Does this report a handyman business? |
| 02:13:51 | 18 | **A**    Yeah. |
| 02:13:51 | 19 | **Q**    And is -- I'll note this is Page 9. |
| 02:13:54 | 20 | Again, I think I've asked -- beat this question to |
| 02:13:57 | 21 | death, but I'll ask you:  In 2013, did you have a handyman |
| 02:13:59 | 22 | business? |
| 02:14:00 | 23 | **A**    No, sir. |
| 02:14:00 | 24 | **Q**    All right.  And what income is actually shown here? |
| 02:14:06 | 25 | **A**    What income? |

**J. Kachner  (Direct by Bean)**                                    296

02:14:07   1   **Q**     What was the source of the income that's reported

02:14:09   2   here?

02:14:09   3   **A**     From the skill rooms.

02:14:10   4   **Q**     And is this all of the income you had from those

02:14:14   5   businesses?

02:14:16   6   **A**     No, sir.

02:14:17   7   **Q**     Are Skilled Shamrock or Redemption mentioned anywhere

02:14:21   8   on this tax return?

02:14:22   9   **A**     No, sir.

02:14:22  10   **Q**     How about Cafe 62?

02:14:26  11   **A**     No, sir.

02:14:30  12                 MR. BEAN:  Can we please pull up Exhibit 144?

02:14:33  13   BY MR. BEAN:

02:14:34  14   **Q**     Mr. Kachner, do you remember at some point having to

02:14:36  15   file an amended tax return?

02:14:40  16   **A**     Yes.

02:14:43  17   **Q**     All right.  Is this the amended tax return that you

02:14:45  18   filed for tax year 2013?

02:14:50  19   **A**     Sir, looking at this stuff is like Chinese to me,

02:14:54  20   okay?

02:14:54  21   **Q**     Let's just -- how about -- can you read the part

02:14:57  22   that's circled in yellow?

02:14:59  23   **A**     "Amended U.S. Individual Income Tax Return."

02:15:03  24   **Q**     So, does it look -- seem based on that that it looks

02:15:07  25   like this is an amended return?

02:15:08   1    **A**      Yes, sir.

02:15:09   2    **Q**      Okay.  And that's your name on this return; right?

02:15:14   3    **A**      Myself and my wife.

02:15:17   4              MR. BEAN:  Can you scroll through this,

02:15:19   5    please?

02:15:21   6         Stop right there.

02:15:22   7    BY MR. BEAN:

02:15:23   8    **Q**      All right.  Is this a Schedule C for your car

02:15:29   9    business?  Does this report your car business?

02:15:31  10    **A**      It does.

02:15:32  11    **Q**      Do you recall that at some point there was an issue

02:15:35  12    with the car business and you had to file an updated tax

02:15:41  13    return?

02:15:42  14    **A**      Yes, because the cars on the lot get to be. . . I

02:15:47  15    mean, I don't know what the proper tax word is, but

02:15:49  16    basically, like, reduced because it's still profit on the

02:15:53  17    business.

02:15:56  18              MR. BEAN:  Carissa, can you scroll through the

02:15:57  19    rest of this tax return?

02:16:01  20    BY MR. BEAN:

02:16:01  21    **Q**      Having looked through the whole tax return, were there

02:16:03  22    any amendments made to that Schedule C for the handyman?

02:16:07  23    **A**      No.

02:16:08  24    **Q**      So, from this tax return, does it appear that it's

02:16:13  25    adopting that earlier filing, the 2013 return?

02:16:18   1                      MR. FEDOR:  Objection.

02:16:19   2                      THE COURT:  Overruled.

02:16:20   3                      THE WITNESS:  Meaning that it -- we did an

02:16:22   4    adjustment to the '13?

02:16:25   5    BY MR. BEAN:

02:16:26   6    **Q**    It didn't do any adjustment.  It's basically saying

02:16:28   7    stand by it.

02:16:29   8    **A**    For the game rooms you're saying?

02:16:32   9    **Q**    Um-hmm.

02:16:32   10   **A**    Correct.

02:16:34   11                     MR. BEAN:  And can we go up to Page 2, I

02:16:37   12   believe.

02:16:37   13          One more, down.  Sorry.

02:16:38   14          And can you blow up the bottom.

02:16:43   15   BY MR. BEAN:

02:16:43   16   **Q**    Who is listed as the preparer?

02:16:46   17   **A**    Ron DiPietro.

02:16:47   18   **Q**    All right.  Thank you.

02:16:49   19                     MR. BEAN:  We can take that down.

        20   BY MR. BEAN:

02:16:52   21   **Q**    Now, earlier you testified that Skilled Shamrock had

02:16:54   22   employees; is that right?

02:16:56   23   **A**    Yes.

02:16:57   24   **Q**    Were those employees paid in cash?

02:17:01   25   **A**    Yes.

**J. Kachner  (Direct by Bean)**                                    299

02:17:02  1   **Q**   And -- all right.  How many hours did an employee

02:17:07  2   work, approximately?

02:17:09  3   **A**   Eight.

02:17:11  4   **Q**   So were there shifts?

02:17:12  5   **A**   Yeah.  Yes.

02:17:13  6   **Q**   How many hours a day was Skilled Shamrock open?

02:17:16  7   **A**   One more time, I'm sorry.

02:17:18  8   **Q**   How many hours a day was Skilled Shamrock open?

02:17:24  9   **A**   To start, I think it was only open until, like,

02:17:28  10  midnight, and then we started opening them 24 hours.

02:17:31  11  **Q**   And was it -- how about number of days a week?

02:17:34  12  **A**   Seven.

02:17:37  13  **Q**   And how much were employees paid an hour?

02:17:42  14  **A**   10 bucks to 12 bucks an hour.

02:17:45  15  **Q**   And for most of the time you were involved in Skilled

02:17:49  16  Shamrock, were there any employment taxes withheld and paid

02:17:51  17  over?

02:17:52  18  **A**   There was supposed to be, but Derek never went and did

02:17:55  19  it.

02:17:55  20  **Q**   When you say there was supposed to be, who told Derek

02:17:58  21  that maybe you should do it?

02:18:00  22  **A**   Myself.

02:18:01  23  **Q**   Did you ever have any discussion with your co-owners

02:18:04  24  about employment taxes?

02:18:06  25  **A**   Not that I recall -- not that I remember.

**J. Kachner  (Direct by Bean)**                    300

02:18:08  1   **Q**     Did any of them ever tell you, hey, Kake, make sure

02:18:13  2   we're doing this?

02:18:14  3                      MR. GOLDBERG:  Objection.

02:18:14  4                      THE COURT:  Overruled.

02:18:15  5                      THE WITNESS:  No, sir.  No, sir.

02:18:21  6   BY MR. BEAN:

02:18:21  7   **Q**     At some point did you learn that Mr. Karasarides had

02:18:23  8   issues with the IRS?

02:18:25  9   **A**     Yes.

02:18:26  10  **Q**     How did that happen?

02:18:29  11  **A**     I purchased a home and couldn't get the deed for it

02:18:32  12  because it was under a government lien.

02:18:34  13  **Q**     And approximately when was this?

02:18:38  14  **A**     I don't know.

02:18:38  15  **Q**     An estimate's fine.

02:18:40  16  **A**     '13, '15, somewhere in there.

02:18:46  17  **Q**     Did you -- did Mr. Karasarides tell you what his

02:18:49  18  troubles with the IRS were?

02:18:50  19  **A**     Just said he owed money to them.

02:18:52  20  **Q**     Did he say how much money?

02:18:55  21  **A**     No, not exactly.  No.

02:18:56  22  **Q**     Did Mr. Karasarides say anything to you about whether

02:18:59  23  or not he could pay?

02:19:00  24  **A**     No.  It was in the millions from what I understood.

02:19:03  25                      MR. GOLDBERG:  I didn't understand.

02:19:05   1                    THE WITNESS:  It was in the millions from what

02:19:06   2   I understood.

02:19:11   3   BY MR. BEAN:

02:19:11   4   **Q**     Did title of this house ever transfer to you?

02:19:14   5   **A**     No.

02:19:16   6   **Q**     What did you do to try to solve this problem?

02:19:22   7   **A**     Nothing.

02:19:23   8   **Q**     Why not?

02:19:25   9   **A**     What am I supposed to do?

02:19:27  10   **Q**     I mean, you were trying to purchase a property; right?

02:19:30  11   **A**     Yes, sir.

02:19:33  12   **Q**     I mean, weren't there steps you could take or talk to

02:19:36  13   Mr. Karasarides and try to get him to resolve the issue?

02:19:39  14   **A**     I mean, it was an ongoing thing.  We were trying to

02:19:42  15   get it accomplished, yes.

02:19:43  16                    MR. BEAN:  Can we please pull up Exhibit 331?

02:19:49  17        And I'll note I think this exhibit's been stipulated

02:19:51  18   to and we've already looked at it.

02:19:56  19        Can we go to -- can we look -- blow up the text at the

02:20:03  20   bottom, please?  The last three.

02:20:11  21   BY MR. BEAN:

02:20:12  22   **Q**     Can you please read the text from you on May 5th,

02:20:16  23   2017, to Mr. Karasarides?

02:20:20  24   **A**     You want me to read this word for word?

02:20:22  25   **Q**     Yes, please.

02:20:26   1   **A**     "Hey, bud.  Can you call me about getting this parking

02:20:29   2   lot redone at Sham?  Had a lady last night basically F up

02:20:33   3   her front end cause of water in a hole filling it up, and I

02:20:38   4   didn't know if that was -- if it was that big -- if it was

02:20:42   5   that big, now she is bitching, wanting it fixed.  Can you

02:20:46   6   help?"

02:20:47   7   **Q**     What is Sham?

02:20:49   8   **A**     Skilled Shamrock.

02:20:50   9   **Q**     And why are you texting Mr. Karasarides about this?

02:20:54  10   **A**     Because I didn't have anybody that I knew offhand to

02:20:57  11   do parking lots.

02:20:57  12   **Q**     All right.

02:20:59  13              MR. BEAN:  We can make this one smaller.

02:21:02  14        Thank you.

02:21:03  15        And can we go to the next page, please?

02:21:06  16        And can we please blow up this one next to the yellow

02:21:10  17   mark?

02:21:20  18   BY MR. BEAN:

02:21:20  19   **Q**     Can you please read this text message from you on

02:21:23  20   May 14th, 2017, to Mr. Karasarides?

02:21:26  21   **A**     "You want me to stop by or you want me to leave and

02:21:29  22   pick up?"

02:21:30  23   **Q**     What are you talking about here?

02:21:37  24   **A**     What is 5-14-2017's day?

02:21:41  25   **Q**     I mean, why -- why -- I don't know offhand.

**J. Kachner  (Direct by Bean)**                         303

02:21:45  1    Why would you -- why would you be talking about

02:21:48  2  stopping by or picking up with Mr. Karasarides?

02:21:51  3  **A**    I mean, if it was a Sunday or Monday, I'm probably

02:21:54  4  asking what he wants me to do with the money.

02:21:55  5  **Q**    What money?

02:21:56  6  **A**    The split.  The split.

02:22:06  7            MR. BEAN:  Is it?

02:22:07  8            MR. HOWELL:  Yeah.

02:22:08  9            MR. BEAN:  What day?

02:22:10  10   I'd ask the Court to take notice that May 14, 2017,

02:22:14  11 was a Sunday.

02:22:24  12   Can we make that one smaller?  And go to the next

02:22:30  13 page, please.

02:22:31  14   And can you please blow up from here to there

02:22:44  15 (indicating)?

        16 BY MR. BEAN:

02:22:58  17 **Q**    What are you talking -- what are you talking about

02:23:00  18 here when Mr. Karasarides says, "Okay.  Don't forget Tom's

02:23:05  19 and for bills"?

02:23:10  20 **A**    To make sure I take care of Tom and make sure the

02:23:13  21 bills are in for him to take care of it.

02:23:16  22 **Q**    Tom who?

02:23:17  23 **A**    Helmick.  Helmick.

02:23:19  24 **Q**    And bills for what?

02:23:20  25 **A**    For the stores.

**J. Kachner (Direct by Bean)** 304

02:23:21  1   **Q**    All right.  And what's -- what's Tom's?  What would

02:23:25  2   Tom get?

02:23:27  3   **A**    His paycheck for the week.

02:23:28  4   **Q**    So is this talking about money related to Redemption?

02:23:31  5   **A**    Yes.

02:23:33  6             MR. BEAN:  And we can make that one smaller?

02:23:39  7         And can we go to the next page, please?

02:23:43  8         And can we blow up this one (indicating)?

02:23:52  9   BY MR. BEAN:

02:23:53  10  **Q**    Why are you texting Mr. Karasarides "Need two door

02:23:58  11  guys.  Any help"?

02:23:59  12  **A**    Because employees were hard to find.

02:24:01  13  **Q**    And what did you need door guys for?

02:24:05  14  **A**    To answer the door.

02:24:06  15  **Q**    To where, your house?

02:24:09  16  **A**    To the game rooms.

02:24:12  17  **Q**    I mean, it sounded like that was a question.  You tell

02:24:16  18  me.

02:24:17  19  **A**    I followed up with, "to the game rooms."

02:24:21  20            MR. BEAN:  Can we please go to Exhibit 333?

02:24:27  21        And can we blow up the phone numbers, please?

02:24:33  22        And I'll note the parties have stipulated on this

02:24:35  23  exhibit.

02:24:36  24  BY MR. BEAN:

02:24:37  25  **Q**    I think earlier you testified you're aware of an

02:24:41  1    individual named Jay Spitale.  Can you just remind us, who

02:24:44  2    is Jay Spitale?

02:24:45  3    **A**     Young kid that came in and was doing the daily or the

02:24:49  4    weekly audits.

02:24:50  5    **Q**     And did you exchange text messages with him?

02:24:55  6    **A**     Did I personally?  Probably, yeah.

02:24:59  7                    MR. BEAN:  Actually -- can you make this

02:25:00  8    smaller and can we look at the first text?

02:25:08  9    BY MR. BEAN:

02:25:08  10   **Q**     Do you see where it says, "Jay, this is Kake"?

02:25:11  11   **A**     Yeah.  Yes.

02:25:12  12   **Q**     Do you recognize that phone number as yours?

02:25:17  13   **A**     No.  No.  No.

02:25:20  14   **Q**     So if it's not your -- your number, how is it you?

02:25:26  15   **A**     How is it me?

02:25:27  16   **Q**     Yeah.  How are you texting from a different number

02:25:30  17   that's not your number?

02:25:31  18   **A**     Because I had a burner phone.

02:25:34  19   **Q**     Why use a burner phone?

02:25:42  20   **A**     Why use a burner phone?  Because it was very cheap,

02:25:46  21   very easy to throw out the window if need be.

02:25:50  22   **Q**     Why would you throw it out the window?

02:25:53  23   **A**     Because if the feds ever came in, you'd have

02:25:56  24   incriminating witness that said "Jay, this is Kake" on it.

02:26:01  25   **Q**     Did you know of anyone -- any of your business

02:26:03  1   partners to use a burner phone?

02:26:06  2   **A**     From the business owners that I knew in the game room

02:26:09  3   business, every one of us had one.

02:26:11  4   **Q**     How about Mr. Karasarides?

02:26:15  5   **A**     I can't say that he had one or if it was on a plan, I

02:26:18  6   don't know.  But like I just said, 90 percent of us had a

02:26:22  7   burner phone.

02:26:24  8            MR. BEAN:  Can we please pull up Exhibit 330?

02:26:30  9   And we can keep it here.  And we're going to look at the

02:26:39  10  top -- the 11-9 text until we get the -- to that -- let me

02:26:47  11  make it easier and just draw the line.

02:26:59  12  BY MR. BEAN:

02:26:59  13  **Q**     What are you talking with here about -- what are you

02:27:02  14  talking about with Mr. DiPietro here?

02:27:23  15  **A**     This was a machine that was in question for being

02:27:26  16  cheated.

02:27:28  17  **Q**     And you see where it says here, "It showed on the tape

02:27:33  18  like 1100 in and out but only 100 was in the game"?

02:27:36  19  **A**     Correct.

02:27:37  20  **Q**     How would Mr. DiPietro know that?

02:27:41  21  **A**     From the numbers from the computer.

02:27:48  22           MR. BEAN:  All right.  We can make that

02:27:51  23  smaller.

02:27:54  24       Can we go to the next page.

02:28:00  25       Thank you.

02:28:02  1      And can you blow up this one (indicating)?

02:28:10  2   BY MR. BEAN:

02:28:12  3   **Q**    Can you please read the text from Mr. DiPietro?

02:28:16  4   **A**    "Mike is going to call you.  Whatever games you want

02:28:19  5   switched to slim, he will change.  Sometimes it takes two or

02:28:22  6   three calls to figure a repair out.  He says he worked with

02:28:27  7   you on that too.  If he doesn't call or get you what you

02:28:31  8   want, let me know and I will address the issue further."

02:28:34  9   **Q**    Who is Mike?

02:28:36  10  **A**    Mr. Moneypenny.

02:28:37  11  **Q**    And just -- what's going on here?

02:28:42  12  **A**    I believe I tried to get smaller machines into the

02:28:45  13  store because the big ones were taking up too much room, and

02:28:49  14  I could get more small slim lines than the fat ones.

02:28:52  15  **Q**    All right.

02:28:52  16           MR. BEAN:  And can we go to the last page of

02:28:55  17  this exhibit?

02:28:57  18      And can we blow up the second to last text?

02:29:01  19  BY MR. BEAN:

02:29:01  20  **Q**    Earlier we looked at this text, but we didn't read the

02:29:04  21  whole thing.  Can you read the whole thing for the jury,

02:29:06  22  please?

02:29:08  23  **A**    "I tried calling you yesterday, but Mike was here -- I

02:29:13  24  tried calling you yesterday when Mike was here.  I really

02:29:15  25  don't need anyone here -- I don't need anyone there if you

02:29:19   1    are going to be the one doing the breakdowns.  I have

02:29:21   2    someone there to help us both.  And in the past it helped us

02:29:25   3    catch a thief.  I perceive you as one of the fewest

02:29:29   4    honest -- few honest people in the industry, so if you are

02:29:31   5    doing a breakdown and splitting things, I done need anyone

02:29:36   6    there.  If you still want someone to help read this store,

02:29:42   7    Tristan can come Monday evening or possibly Mike Monday

02:29:44   8    morning.  There is also other opportunities out there if you

02:29:49   9    want to partner up with some more.  I will be out of town

02:29:54   10   the rest of the week, so please contact Tristan or Mike and

02:29:57   11   let us know how you want to go forward.  I am taking an

02:30:03   12   accounting and legal class in Columbus this -- on how best

02:30:07   13   to do accounting work for the marijuana industry.  Have a

02:30:10   14   great day, and may we all have a great week."

02:30:13   15   **Q**    Did you ever partner up with Mr. DiPietro again?

02:30:19   16   **A**    Partner up with DiPietro when?

02:30:22   17   **Q**    In a business.  The text referenced, you know, there's

02:30:25   18   also other opportunities out there if you want to partner up

02:30:27   19   some more.  Did you?

02:30:28   20   **A**    No.

02:30:30   21              MR. BEAN:  We can take this exhibit down.

02:30:32   22   BY MR. BEAN:

02:30:32   23   **Q**    After the search warrants in 2018, did you have any

02:30:37   24   discussions with Mr. Karasarides about the investigation?

02:30:44   25   **A**    Yes.

**J. Kachner  (Direct by Bean)**                                    309

02:30:44  1    **Q**     And what were those discussions?

02:30:46  2    **A**     Just talking about what's going on and what's not

02:30:48  3    going on.

02:30:49  4    **Q**     And what -- you know, can you share what those

02:30:52  5    discussions were, please?

02:30:53  6    **A**     I mean, I don't remember word for word.  We

02:30:55  7    bullshitted.

02:30:57  8    **Q**     Was there any -- did the employees at Skilled Shamrock

02:31:00  9    or Redemption have any understanding about if they needed

02:31:03  10   attorneys, whether those would be paid for?

02:31:07  11   **A**     I mean, when you go first into the business, yeah,

02:31:09  12   it's always said everyone will be taken care of, but. . .

02:31:13  13   **Q**     So who would take care of the attorneys for the

02:31:16  14   employees at Skilled Shamrock and Redemption?

02:31:17  15   **A**     The owners.

02:31:19  16   **Q**     And so, that would be yourself?

02:31:22  17   **A**     Correct.

02:31:22  18   **Q**     Mr. Karasarides, Mr. Dayton?

02:31:25  19   **A**     Correct.

02:31:25  20   **Q**     Mr. DiPietro at Skilled Shamrock?

02:31:33  21   **A**     (No verbal response.)

02:31:33  22             MR. BEAN:  All right.  Nothing further.

02:31:36  23             THE COURT:  Okay.  Thank you.

02:31:37  24        Okay.  Mr. Fedor?

02:31:39  25             MR. GOLDBERG:  I think I'm going to go first

02:31:40  1    if that's okay, Your Honor.

02:31:41  2                    THE COURT:  Okay.

02:31:42  3                    MR. GOLDBERG:  Thank you.

02:31:47  4                         - - - - -

02:31:47  5              CROSS-EXAMINATION OF JASON KACHNER

02:31:47  6    BY MR. GOLDBERG:

02:31:47  7    **Q**     Good afternoon, sir.  I have a few questions to ask

02:31:51  8    you.

02:31:52  9         You said -- well, you've been asked questions about

02:31:56  10   your plea agreement with the United States; correct?

02:31:59  11   **A**     Yes, sir.

02:32:00  12   **Q**     And part of your plea agreement is that you're going

02:32:02  13   to tell the truth to the government; right?

02:32:05  14   **A**     Correct.

02:32:06  15   **Q**     Does that mean you're going to tell the truth to me?

02:32:08  16   **A**     Well, yeah.

02:32:09  17   **Q**     Okay.  So let's start with a lie you told in the first

02:32:16  18   5 minutes of your testimony.

02:32:16  19   **A**     Okay.

02:32:17  20   **Q**     Now, with regard to any of these establishments, the

02:32:33  21   owners split the income; correct?

02:32:34  22   **A**     Correct.

02:32:36  23   **Q**     Okay.  And do you remember meeting with the government

02:32:39  24   where you specifically discussed Cafe 62?

02:32:44  25   **A**     Okay.

**J. Kachner (Cross by Goldberg)**                    311

02:32:45  1  **Q**    Do you remember that?

02:32:46  2  **A**    Sure.

02:32:47  3  **Q**    Do you remember them asking you who -- where did the

02:32:50  4  money go from Cafe 62?

02:32:52  5  **A**    Okay.

02:32:53  6  **Q**    You do remember that?

02:32:55  7  **A**    Them asking me where it went?

02:32:58  8  **Q**    Yeah.  Like who got the money.

02:32:58  9  **A**    They asked me a lot of questions about a lot of game

02:33:02  10  rooms.

02:33:02  11  **Q**    Who got the money?

02:33:03  12  **A**    Who got the money from Cafe 62?  Myself and Steve

02:33:07  13  Saris.

02:33:07  14  **Q**    Right.  Okay.

02:33:08  15        So you test -- so yourself and Steve Saris are the

02:33:11  16  owners of Cafe 62; correct?

02:33:16  17  **A**    Correct.

02:33:16  18  **Q**    Chris Karasarides had nothing to do with Cafe 62?

02:33:21  19  **A**    Correct.

02:33:21  20  **Q**    Okay.  Don't you remember 5 or 6 hours ago telling the

02:33:24  21  jury that that was a business you had with Mr. Karasarides?

02:33:26  22  **A**    Or he asked me if it was with anyone else, and I said

02:33:29  23  Steve Saris.

02:33:30  24  **Q**    Well, but you -- you mentioned -- you said -- tell me

02:33:34  25  if you remember this.

**J. Kachner (Cross by Goldberg)**          312

02:33:34  1    **A**      Okay.

02:33:35  2    **Q**      Do you remember saying, I was in another business with

02:33:41  3    Mr. Karasarides, Cafe 62?

02:33:43  4    **A**      Not true.

02:33:45  5                MR. BEAN:  Object.  And if Mr. Goldberg would

02:33:47  6    like to know what he said, we can go over the transcript.

02:33:49  7                THE COURT:  Overruled.  He can ask the

02:33:56  8    question.

02:33:56  9        I don't need a speech.

          10   BY MR. GOLDBERG:

          11   **Q**      You don't remember saying that?

          12                THE COURT:  Excuse me.  I don't need a speech.

          13                (Court reporter interjection.)

02:33:58  14                THE COURT:  Go ahead, Mike.

02:34:00  15                MR. GOLDBERG:  I'm sorry.

          16   BY MR. GOLDBERG:

02:34:00  17   **Q**      You don't remember saying that in this room?

02:34:02  18   **A**      I believe the question was asked, did you own any

02:34:04  19   other game rooms, and he stated maybe Virus or Steve Saris

02:34:09  20   for Cafe 62.

02:34:12  21   **Q**      Okay.  You didn't -- you're saying you don't remember

02:34:13  22   saying that Mr. Karasarides was a partner in Cafe 62?

02:34:17  23   **A**      Chris Kare had absolutely nothing do with Cafe 62.

02:34:20  24   **Q**      So if you would have said that, it would have been a

02:34:22  25   lie; correct?

02:34:24  1    **A**    If I would have said what?

02:34:25  2    **Q**    That Chris Karasarides was a partner in Cafe 62?

02:34:29  3    **A**    Why would I say that when I know he wasn't?

02:34:31  4    **Q**    That's my question.  You don't have any answer to

02:34:35  5    that?

02:34:35  6    **A**    Okay.  Maybe you misunderstood it.

02:34:37  7    **Q**    Maybe you misspoke.  Would you --

02:34:40  8    **A**    Or maybe --

02:34:41  9    **Q**    Could you have misspoken, do you think?

02:34:43  10   **A**    Maybe you misspoken.

02:34:44  11   **Q**    Do you think you could have misspoken?

02:34:45  12         Let me back up.

02:34:46  13         Now, when you went -- you first made contact with the

02:34:50  14   government, was that in 2018, 2019, 2020?  Do you remember

02:34:59  15   when you called them?

02:35:01  16   **A**    First off, I never called them.

02:35:03  17   **Q**    You never called them to get your property back?

02:35:06  18   **A**    To get my property back or Mr. --

02:35:09  19   **Q**    Did you call Homeland Security at some point to get

02:35:14  20   your property back that was seized in the search of Cafe 62

02:35:18  21   in 2019?

02:35:20  22   **A**    What property, sir?

02:35:22  23   **Q**    Computer, phones.

02:35:24  24   **A**    Did I call them to get my property back?

02:35:27  25   **Q**    Yes.

1    **A**    Yes.

02:35:29   2    **Q**    I'll give you a hint.

02:35:31   3    **A**    When you stated the computers and stuff, yes.  And I

02:35:33   4    actually met Mr. Agent Paul, I think it is, and he gave me

02:35:37   5    my equipment back.

02:35:38   6    **Q**    Right.  Very good.  Okay.

02:35:40   7           And that was in 1099; right?

02:35:41   8    **A**    Not a hundred percent sure.

02:35:43   9    **Q**    Well, would it refresh your memory if I showed you

02:35:45   10   notes from that --

02:35:46   11   **A**    Well, that's what Mr. Bean did on the computer here,

02:35:48   12   so if you have something, yeah, that would be fine.

02:35:50   13   **Q**    Yeah.

02:35:51   14              MR. GOLDBERG:  May I approach the witness,

02:35:52   15   Your Honor?

02:35:53   16              THE COURT:  You may.

02:35:53   17              MR. GOLDBERG:  Okay.

02:35:54   18        You don't have to read this out loud, but you could

02:35:57   19   just look at the top of it and look at the substance of it.

02:36:04   20              THE WITNESS:  Okay.

02:36:05   21   BY MR. GOLDBERG:

02:36:06   22   **Q**    Okay.  Does that refresh your memory as to the date?

02:36:09   23   **A**    9-29 -- September 30th, 2019.

02:36:13   24   **Q**    Okay.  I'll take that back.

02:36:15   25           Does that seem about right?

**J. Kachner  (Cross by Goldberg)**                    315

02:36:16   1    **A**     That's -- yeah.  That's what it says.

02:36:18   2           Did I meet him on that day?  I don't -- I don't

02:36:22   3    remember --

02:36:22   4    **Q**     Well, let me ask you this.

02:36:24   5    **A**     If that's the paperwork that the agent had to fill out

02:36:26   6    for the day that he met me, then that's the day that I met

02:36:28   7    him there.

02:36:28   8    **Q**     Okay.  So was that the first time you spoke to anybody

02:36:32   9    regarding this investigation?

02:36:37   10   **A**     To my knowledge, yes.

02:36:37   11   **Q**     Okay.  Now, you were represented by counsel at that

02:36:40   12   time?

02:36:40   13   **A**     I believe I was represented by Mr. Petitti.

02:36:48   14   **Q**     You don't remember his name?

02:36:51   15   **A**     Mr. Rick Petitti?

02:36:52   16   **Q**     Petitti.  Okay.

02:36:55   17          All right.  So, do you remember when you called and

02:36:59   18   spoke to Mr. Paul, him telling you, hey, come on down and

02:37:04   19   talk to us and we can help you out?

02:37:06   20          Do you remember that?

02:37:09   21   **A**     Do I remember him saying come and talk to us and we

02:37:12   22   can help you out?

02:37:12   23   **Q**     Yeah, yep.

02:37:15   24          You asked him when the investigation --

02:37:17   25   **A**     Can I answer your question, sir?

J. Kachner (Cross by Goldberg)          316

| | | |
|---|---|---|
| 02:37:19 | 1 | **Q**    Sure. |
| 02:37:19 | 2 | **A**    I didn't speak to the federal agents after I got with |
| 02:37:22 | 3 | Mr. Scott Lucas and Sam Lauricia. |
| 02:37:25 | 4 | MR. GOLDBERG:  Okay.  I need to reapproach, |
| 02:37:27 | 5 | Your Honor, if you don't mind. |
| 02:37:28 | 6 | THE COURT:  Go ahead. |
| 02:37:29 | 7 | BY MR. GOLDBERG: |
| 02:37:29 | 8 | **Q**    Okay.  Look at Paragraph 3 of the same memo. |
| 02:37:43 | 9 | **A**    Okay. |
| 02:37:43 | 10 | **Q**    Okay. |
| 02:37:44 | 11 | **A**    Says he's going to take -- |
| 02:37:46 | 12 | **Q**    Well, let me ask you a question. |
| 02:37:48 | 13 | Does it note that you asked a question of him about |
| 02:37:50 | 14 | when the investigation was going to be resolved? |
| 02:37:55 | 15 | **A**    So you want me to read this before I answer that? |
| 02:37:57 | 16 | **Q**    I just want a -- |
| 02:37:58 | 17 | **A**    Well, I got to read this before I'm going to answer |
| | 18 | that, sir. |
| | 19 | **Q**    Doesn't -- doesn't it -- |
| | 20 | **A**    Give me a second here, and I'm going to read this |
| | 21 | whole thing. |
| | 22 | (Court reporter interruption.) |
| | 23 | THE COURT:  That's for sure. |
| | 24 | And Mike, you're interrupting him.  Let him read it. |
| 02:39:19 | 25 | (Brief pause in proceedings.) |

02:39:19   1                    THE WITNESS:  Okay.  Now, what was your

02:39:21   2    question, sir?

02:39:23   3    BY MR. GOLDBERG:

02:39:24   4    **Q**    Did you ask the agent when the investigation was going

02:39:27   5    to be resolved?

02:39:29   6    **A**    I did.

02:39:35   7    **Q**    Did he inform you that the items would be returned at

02:39:39   8    the conclusion of the investigation?

02:39:42   9    **A**    Correct.

02:39:43  10    **Q**    Did he inform you that if you wanted to expedite the

02:39:50  11    investigation, that you need to speak with your lawyer and

02:39:53  12    come speak to the case agents?

02:39:55  13    **A**    Yeah, with Rick Petitti.  But like I stated before,

02:39:59  14    Rick Petitti led me down a path of destruction, and I never

02:40:04  15    even went with him.  And the computers that are in that --

02:40:04  16    **Q**    Okay.  That was a yes or no question.

02:40:06  17    **A**    But the --

02:40:07  18    **Q**    Your answer is yes.

02:40:07  19                    THE COURT:  Mike, Mike, you keep interrupting

02:40:09  20    him.

02:40:10  21                    MR. GOLDBERG:  I asked a yes or no question.

02:40:12  22                    THE COURT:  Well, but he can answer the way he

02:40:14  23    thinks is appropriate.

          24                    MR. GOLDBERG:  Okay.

02:40:15  25                    THE WITNESS:  The items that are in pertained

02:40:17   1   in there are the items that were for a car lot, for titles

02:40:20   2   to cars that I was trying to get out of the Premos Used Cars

02:40:24   3   lot because they canceled my license.

02:40:26   4                    MR. GOLDBERG:  Okay.

02:40:26   5   BY MR. GOLDBERG:

02:40:27   6   **Q**    Okay.  And that's what your lawyer, Mr. Petitti, was

02:40:30   7   helping you with?

02:40:31   8   **A**    Sir, Mr. Petitti didn't help me with anything.  I did

02:40:34   9   it myself.

02:40:35  10   **Q**    Well, okay.  You just said he led you down a path of

02:40:37  11   destruction.

02:40:38  12   **A**    Correct.

02:40:39  13   **Q**    So, this whole thing is your lawyer's fault?

02:40:43  14   **A**    What whole thing?

02:40:44  15   **Q**    Well, that we're in court here today, that you're

02:40:47  16   indicted, that --

02:40:48  17   **A**    Is that your theory?

02:40:50  18   **Q**    This is your lawyer's fault; right?

02:40:52  19   **A**    That's your theory?

02:40:53  20   **Q**    I'm asking you, is it your lawyer's fault?

02:40:55  21   **A**    No.  I'm represented by Mr. Lucas and Mr. Lauricia

02:40:59  22   now.

02:40:59  23   **Q**    Okay.  So what do you mean path of destruction?

02:41:02  24   **A**    Well, one, he had me sign a paperwork to get my money

02:41:05  25   back that he was going to receive 20 percent of.  You don't

02:41:07  1    find that to be kind of messed up, sir?

02:41:10  2    **Q**    Sign -- get your -- get the money back?

02:41:12  3    **A**    It was 240,000 that was at the locker.

02:41:14  4    **Q**    Okay.  So did you get the 240,000 back from the

02:41:18  5    locker?

02:41:19  6    **A**    No.  My lawyers that are representing me now told me

02:41:22  7    that that was the dumbest thing ever and that we need to --

02:41:25  8    I believe we might have filed -- I'm not a hundred percent,

02:41:28  9    but we might have filed paperwork stating that I didn't want

02:41:30  10   any of that back.

02:41:31  11   **Q**    Okay.  All right.  So, you brought it up, $240,000

02:41:36  12   taken out of the YMCA locker; right?

02:41:40  13   **A**    Correct.

02:41:40  14   **Q**    Didn't you tell the U.S. Attorney, the Homeland

02:41:45  15   Security that that was money that your wife earned as a

02:41:47  16   stripper?

02:41:49  17   **A**    I told them that?

02:41:50  18   **Q**    Yeah.

02:41:51  19   **A**    Negative.

02:41:51  20   **Q**    Did your wife tell them that?

02:41:53  21   **A**    Did my wife have a talk with them?

02:41:55  22   **Q**    Did your wife tell them that it was her stripper

02:41:57  23   money?

02:41:57  24   **A**    Is she allowed to talk to me about things pertaining

02:42:00  25   to the case?

02:42:01  1   **Q**      Did she tell the U.S. Attorney or the Homeland

02:42:04  2   Security agents that that was stripper money?

02:42:05  3   **A**      Sir, you're asking me questions that she was in talks

02:42:10  4   with the federal government, not myself.  I'm not allowed to

02:42:13  5   be there.  I'm not allowed to have a lawyer represent her.

02:42:16  6   **Q**      Did she tell the government that that was her money?

02:42:22  7   **A**      How do you want me to answer a question?

02:42:24  8   **Q**      I want you to answer truthfully.

02:42:26  9   **A**      Okay.  Well, then bring my wife back from prison.  She

02:42:29 10   can answer it.

02:42:29 11   **Q**      I want you to answer truthfully.

02:42:30 12   **A**      Okay.  I'm going to answer truthfully, just like I

02:42:33 13   just told you.  I don't know.  And you keep asking it.

02:42:34 14   **Q**      Okay.  So then what did you say to the government

02:42:36 15   about that money when you filed a petition to get it back?

02:42:40 16   **A**      I didn't say anything to the government about it.

02:42:44 17          Again, I just told you a minute ago, Rick Petitti had

02:42:47 18   me sign that because he was getting 20 percent of it.

02:42:49 19   **Q**      Do you just sign anything that's put in front of you?

02:42:51 20   **A**      Boy, I tell you what, we just did like two and a half

02:42:54 21   hours of taxes, and I just told you guys that all I did was

02:42:58 22   sign.

02:42:58 23   **Q**      Okay.  But now we're talking about something else.

02:43:00 24   We're talking about a petition to get money back --

02:43:02 25   **A**      Correct.

| | | |
|---|---|---|
| 02:43:03 | 1 | **Q**   -- that was seized; right? |
| 02:43:04 | 2 | **A**   Correct. |
| 02:43:04 | 3 | **Q**   You just signed it; you didn't look at it? |
| 02:43:06 | 4 | **A**   Correct. |
| 02:43:07 | 5 | **Q**   Okay.  What about your plea agreement?  Did you read |
| 02:43:09 | 6 | that? |
| 02:43:10 | 7 | **A**   My lawyers went over it with me, sir. |
| 02:43:13 | 8 | **Q**   Okay.  Okay.  We're going to come back to that.  I |
| 02:43:17 | 9 | want to stay on this. |
| 02:43:17 | 10 | Your wife's in prison? |
| 02:43:18 | 11 | **A**   Correct. |
| 02:43:19 | 12 | **Q**   For this -- for these game rooms? |
| 02:43:24 | 13 | **A**   Correct. |
| 02:43:24 | 14 | **Q**   Okay.  And how much time is she serving? |
| 02:43:28 | 15 | **A**   2 years. |
| 02:43:29 | 16 | **Q**   And how much time does she have left? |
| 02:43:31 | 17 | **A**   Approximately 4 months. |
| 02:43:33 | 18 | **Q**   Okay.  So, at this point, she's going to be out in |
| 02:43:38 | 19 | May, June? |
| 02:43:38 | 20 | **A**   April. |
| 02:43:39 | 21 | **Q**   Something like that. |
| 02:43:40 | 22 | Okay.  And is your cooperation and your testimony here |
| 02:43:45 | 23 | today and your assistance in this investigation aimed at |
| 02:43:50 | 24 | helping your wife get out earlier? |
| 02:43:52 | 25 | **A**   Are you serious right now? |

| | | |
|---|---|---|
| 02:43:53 | 1 | **Q**   Of course I'm serious. |
| 02:43:54 | 2 | **A**   Okay.  Well, your question is retarded. |
| 02:43:56 | 3 | **Q**   All right.  Well -- |
| 02:43:57 | 4 | **A**   What does -- let me ask you a question, sir. |
| 02:43:59 | 5 | **Q**   It's my job to ask the questions, and it's your job to |
| 02:44:02 | 6 | answers? |
| 02:44:02 | 7 | **A**   Okay.  Well, what does she have to do with me sitting |
| 02:44:04 | 8 | on the stand? |
| 02:44:05 | 9 | **Q**   Well, you're getting consideration -- |
| 02:44:07 | 10 | **A**   If she got sentenced to 2 years, what would me sitting |
| 02:44:11 | 11 | here doing affect her ability to get out early? |
| 02:44:13 | 12 | **Q**   You tell me. |
| 02:44:13 | 13 | **A**   Well, I just answered it for you. |
| 02:44:15 | 14 | **Q**   Okay.  Okay.  And your answer is -- |
| 02:44:18 | 15 | **A**   She already went through court and did her trial, so I |
| 02:44:21 | 16 | don't understand what she's being brought up for. |
| 02:44:23 | 17 | **Q**   Well, you're still married to her; correct? |
| 02:44:25 | 18 | **A**   I am.  I am. |
| 02:44:26 | 19 | **Q**   Okay.  And you'd like to help her in any way you can; |
| 02:44:30 | 20 | correct? |
| 02:44:30 | 21 | **A**   Absolutely. |
| 02:44:33 | 22 | **Q**   All right.  Now, let's talk about some other money. |
| 02:44:36 | 23 | **A**   Okay. |
| 02:44:36 | 24 | **Q**   You had money in a storage locker; right? |
| 02:44:38 | 25 | **A**   Okay. |

**J. Kachner  (Cross by Goldberg)**                         323

02:44:39  1    **Q**    Is that a "yes"?

02:44:40  2    **A**    Yes.

02:44:41  3    **Q**    All right.  And you discussed that with the U.S.

02:44:45  4    Attorney and the various agents you talked to during the

02:44:48  5    course of this investigation; correct?

02:44:50  6    **A**    Correct.

02:44:51  7    **Q**    Okay.  And that was about a million dollars; isn't

02:44:54  8    that correct?

02:44:55  9    **A**    Undisclosed amount.  Not a hundred percent sure what

02:44:58  10   it was.

02:44:58  11   **Q**    Well, it wasn't much less than a million if it was

02:45:02  12   less than a million; correct?

02:45:03  13   **A**    How would you know if I don't know?

02:45:05  14   **Q**    Well, it's your money.  Is it a million dollars or

02:45:08  15   not?

02:45:08  16   **A**    I don't know.

02:45:09  17   **Q**    Well, when you were asked this question by the agents,

02:45:11  18   you said, well, you got to talk to your lawyers.

02:45:14  19         Did you talk to your lawyers about that?

02:45:15  20   **A**    Well, that's correct.  I talked to my lawyers.  Did

02:45:17  21   I -- did we come up with a number?

02:45:20  22   **Q**    I'm asking you.  What was the number?

02:45:24  23   **A**    I don't know what the amount was that was stolen from

02:45:28  24   the locker.

02:45:29  25   **Q**    So it could have been more than -- it could have been

| | | |
|---|---|---|
| 02:45:31 | 1 | more than a million dollars really; right? |
| 02:45:36 | 2 | **A**    It's whatever you think it was, sir. |
| 02:45:37 | 3 | **Q**    No.  I'm asking you. |
| 02:45:38 | 4 |      It could be more than a million; right? |
| 02:45:40 | 5 | **A**    How many times are you going to ask me when I tell you |
| 02:45:43 | 6 | I don't know the amount that was taken from there? |
| 02:45:45 | 7 | **Q**    So the amount of cash that you lost from theft and |
| 02:45:53 | 8 | from what the government seized from the YMCA is at least |
| 02:45:57 | 9 | one million or could be $1,248,000; correct? |
| 02:46:01 | 10 | **A**    Correct. |
| 02:46:03 | 11 | **Q**    Okay.  And all of that would have come from your work |
| 02:46:07 | 12 | in this game room -- work in these game rooms? |
| 02:46:12 | 13 | **A**    It would have been proceeds from the game rooms, |
| 02:46:14 | 14 | correct. |
| 02:46:14 | 15 | **Q**    Proceeds from the game rooms.  Okay. |
| 02:46:16 | 16 |      Now, you've met with the government six, seven times. |
| 02:46:25 | 17 | Do you have a number? |
| 02:46:26 | 18 | **A**    I believe it was six times. |
| 02:46:27 | 19 | **Q**    Six times? |
| 02:46:28 | 20 |      And your last time was in December, right after |
| 02:46:30 | 21 | Christmas? |
| 02:46:36 | 22 | **A**    No. |
| 02:46:37 | 23 | **Q**    Oh, okay.  So when was the last time you met with |
| 02:46:41 | 24 | them? |
| 02:46:41 | 25 | **A**    January I believe it was. |

**J. Kachner (Cross by Goldberg)**                    325

02:46:41  1    **Q**    Okay.  All right.  So in December, were you shown

02:46:47  2    these spreadsheets that you testified here to today?

02:46:51  3    **A**    Correct.

02:46:52  4    **Q**    And was this the only time you were shown the

02:46:54  5    spreadsheets?

02:46:57  6    **A**    You mean throughout the whole time of meeting with

02:46:59  7    them?

02:47:00  8    **Q**    Well, all of them together and matched up individual

02:47:04  9    months to --

02:47:06  10   **A**    We've reviewed those three or four -- three times, I

02:47:10  11   believe.

02:47:10  12   **Q**    Okay.  But I'm talking about -- now, you were shown a

02:47:13  13   summary of all the spreadsheets; right?  Remember testifying

02:47:17  14   to that?

02:47:18  15   **A**    I was shown a lot of documents, sir.

02:47:20  16   **Q**    Okay.  You were shown -- well. . .

02:47:31  17            MR. GOLDBERG:  Can you bring up -- I'm

02:47:33  18   sorry -- Government's 436, please?  It will be the summary,

02:47:59  19   I believe.

          20   BY MR. GOLDBERG:

02:48:00  21   **Q**    Now, you were shown this spreadsheet during your

02:48:04  22   direct testimony, Government's 436, correct?

02:48:09  23   **A**    Yes, sir.

02:48:09  24   **Q**    Okay.  And you testified as to this matching the

02:48:12  25   individual spreadsheets for the individual months; correct?

02:48:19  1   **A**     The totals -- the totals for the individuals per year,

02:48:23  2   correct.  Is that what you're saying?

02:48:25  3   **Q**     Yeah.

02:48:26  4   **A**     Yes.

02:48:26  5   **Q**     Now, did you go through all 450 months and total them

02:48:31  6   up and get these numbers?

02:48:33  7   **A**     No.

02:48:34  8   **Q**     You went by what the government told you; right?

02:48:42  9   **A**     No.  They didn't tell me.

02:48:44  10  **Q**     All right.  You went by the numbers the government

02:48:47  11  presented you?

02:48:47  12  **A**     Correct.

02:48:48  13  **Q**     All right.  So it's not telling you, but they showed

02:48:53  14  you these, they're like, this is the totals, right?  And you

02:48:55  15  said correct?

02:48:56  16  **A**     From the thumb drives from Ron DiPietro's computers

02:48:59  17  that matched these numbers.

02:49:00  18  **Q**     But did you particular -- personally add these up and

02:49:04  19  get these numbers?

02:49:05  20  **A**     No.

02:49:06  21  **Q**     You took the government's word for it; right?  They

02:49:11  22  showed you the numbers and you said, yeah, that looks right?

02:49:15  23  **A**     Have you looked at a computer?

02:49:16  24  **Q**     I'm asking you a question.  Did you add the numbers up

02:49:19  25  yourself?

02:49:21   1   **A**    No.

02:49:23   2   **Q**    So you basically just ratified what the government

02:49:28   3   did; right?

02:49:29   4   **A**    No.

02:49:30   5   **Q**    Well, you just said you didn't add it up.  So what did

02:49:33   6   you do to make sure these numbers were correct?  Tell me

02:49:38   7   everything you did --

02:49:39   8   **A**    I looked at the spreadsheets.

02:49:40   9   **Q**    I'm in the middle of a question.

02:49:43  10        Tell me everything you did to make sure these numbers

02:49:45  11   were correct that you testified to here today in court.

02:49:48  12   **A**    Looked at all the spreadsheets that were presented.

02:49:52  13   Did I add them up?  No.  But they're right there in bold

02:49:55  14   letters.  I mean, you go back and look through the thumb

02:49:59  15   drives, the numbers are right there in your face.

02:50:01  16   **Q**    Did you add them up?  You don't know that this is

02:50:03  17   correct math.

02:50:04  18   **A**    You keep asking the same repetitive question.

02:50:08  19   **Q**    And you keep giving the same non-answer.

02:50:11  20        Did you add these up?

02:50:12  21   **A**    Pretty sure I've answered that three times.  No.

02:50:15  22   **Q**    Okay.  Did you just go with what the government

02:50:18  23   presented to you?

02:50:20  24   **A**    I reviewed the numbers that they asked me to review on

02:50:23  25   a thumb drive that came from Mr. DiPietro's computers.

**J. Kachner (Cross by Goldberg)**                    328

02:50:30  1    That's what I did.  That's what I was asked to do.  I wasn't

02:50:33  2    asked to take every column, add them up, subtract them and

02:50:37  3    do everything else.  If I had been asked that, I would have

02:50:40  4    went through and did it with a calculator and brought you

02:50:42  5    notes.

02:50:43  6    **Q**    Right.  Yet, you were asked in court today if these

02:50:46  7    numbers are an accurate summary of all those spreadsheets;

02:50:50  8    right?

02:50:51  9    **A**    Correct.

02:50:51  10   **Q**    And you answered yes; right?

02:50:55  11   **A**    Yes.

02:50:56  12   **Q**    But you never added them up, so you don't really know;

02:50:59  13   correct?

02:51:00  14   **A**    Yes.

02:51:02  15   **Q**    Okay.  So, you got a plea agreement in this case, and

02:51:06  16   you had a lot of time to work with your lawyers in

02:51:13  17   concluding that deal; correct?

02:51:15  18   **A**    Correct.

02:51:16  19   **Q**    All right.  So, I assume that in the course of

02:51:21  20   preparing and coming up with that deal, you knew what you

02:51:25  21   were facing in this case.  Isn't that right?

02:51:28  22   **A**    As in how much time I was facing?

02:51:31  23   **Q**    Yeah.

02:51:32  24   **A**    Yeah.

02:51:32  25   **Q**    Yeah.  Prison time.

| | | |
|---|---|---|
| 02:51:33 | 1 | **A**    Correct. |
| 02:51:34 | 2 | **Q**    All right.  So, had the government -- well, let me ask |
| 02:51:40 | 3 | you this:  Do you know what the statutory maximum is? |
| 02:51:42 | 4 | You've testified to the two counts that you did plead to |
| 02:51:47 | 5 | were 5 each; right? |
| 02:51:48 | 6 | **A**    5 years each? |
| 02:51:50 | 7 | **Q**    5 years each. |
| 02:51:51 | 8 | **A**    Correct. |
| 02:51:52 | 9 | **Q**    Right? |
| 02:51:52 | 10 | **A**    Yes. |
| 02:51:53 | 11 | **Q**    And you pled to -- and there was, I believe, five |
| 02:51:59 | 12 | counts dropped that all carried another 5 years each; |
| 02:52:02 | 13 | correct? |
| 02:52:03 | 14 | **A**    Okay. |
| 02:52:04 | 15 | **Q**    So that's 35 years; right? |
| 02:52:06 | 16 | **A**    Okay. |
| 02:52:07 | 17 | **Q**    All right.  Now, you were charged with subscribing a |
| 02:52:14 | 18 | false tax return; right? |
| 02:52:15 | 19 | **A**    Correct. |
| 02:52:15 | 20 | **Q**    You could have been charged with tax evasion.  Isn't |
| 02:52:22 | 21 | that right? |
| 02:52:22 | 22 | **A**    I'm sure I could have been charged with a lot of other |
| 02:52:24 | 23 | things. |
| 02:52:25 | 24 | **Q**    Right.  But you weren't because you're cooperating; |
| 02:52:29 | 25 | correct? |

02:52:29   1   **A**      No.

02:52:31   2   **Q**      Well, I mean, you're getting something for your

02:52:35   3   testimony and for your assistance in this case.  Isn't that

02:52:37   4   correct?

02:52:38   5   **A**      That's if Mr. -- if Judge Nugent agrees to that.

02:52:42   6   **Q**      Well, I mean, you even said, your expectation in one

02:52:46   7   of your interviews with the agents is that you're going to

02:52:48   8   get 2 years; right?

02:52:51   9   **A**      I don't remember ever saying that.

02:52:53   10  **Q**      Okay.

02:52:53   11  **A**      Because to my knowledge, I'm looking at 3 to 5, sir.

02:52:56   12  **Q**      Okay.  In your last interview with the agents -- do

02:53:01   13  you remember meeting with them last December?

02:53:03   14  **A**      I met with the agents a lot of times, sir.

02:53:06   15  **Q**      I'm sorry?

02:53:06   16  **A**      I met with the agents a lot of times.

02:53:09   17  **Q**      Okay.  Well, give me a moment and I will find the

02:53:13   18  paperwork.

02:53:26   19                (Brief pause in proceedings.)

02:53:32   20  BY MR. GOLDBERG:

02:53:33   21  **Q**      Well, while I'm looking for this, when you first met

02:53:35   22  with the agents, were they interested in talking about

02:53:42   23  Christos Karasarides?

02:53:45   24  **A**      Were the agents?

02:53:47   25  **Q**      The agents, yes.

02:53:51   1   **A**     When I met with the agents the first, we did a talk

02:53:55   2   about everything.

02:53:57   3   **Q**     Okay.  Were they focused on Mr. Karasarides?

02:54:02   4   **A**     They were focused on the whole case.

02:54:04   5   **Q**     Okay.

02:54:07   6               MR. GOLDBERG:  May I approach the witness,

02:54:08   7   Your Honor?

02:54:08   8               THE COURT:  You may.

02:54:10   9               MR. GOLDBERG:  I'm going to show you a memo

02:54:18  10   from November 1st of 2021, and if you can just refresh your

02:54:24  11   memory.  Paragraph 25.

02:54:37  12               (Brief pause in proceedings.)

02:54:38  13               THE WITNESS:  You want me to read this?

02:54:39  14               MR. GOLDBERG:  No.  Just want to refresh your

02:54:41  15   memory.

02:54:42  16               THE WITNESS:  Where is this from?  What is

02:54:45  17   this from?

02:54:46  18               MR. GOLDBERG:  That is a memo of your meeting

02:54:48  19   with the agents in November of 2021.

          20   BY MR. GOLDBERG:

02:54:52  21   **Q**     Does it refresh your memory as to what you were

02:54:55  22   talking to them about in terms of time to be served in this

02:54:59  23   case?

02:55:01  24   **A**     I'm pretty sure that's what I said that I would like

02:55:03  25   to serve.

02:55:04  1   **Q**    Okay.  2 to 3 years; right?

02:55:06  2   **A**    Correct.

02:55:06  3   **Q**    Okay.  Yet, you were facing -- did you discuss with

02:55:10  4   your lawyers what you were facing?

02:55:12  5   **A**    To start?

02:55:13  6   **Q**    You knew what you were facing; correct?

02:55:16  7   **A**    Sir, I'm pretty sure you've been doing this quite a

02:55:20  8   long time.  That when you get charged, they charge you with

02:55:23  9   the max.

02:55:23  10  **Q**    I'm asking you, do you know what you were facing

02:55:26  11  before you made a deal?

02:55:31  12  **A**    Who did I make a deal with?

02:55:33  13  **Q**    You made a deal with the government.

02:55:35  14  **A**    That I possibly could get a 5-point reduction;

02:55:38  15  correct?

02:55:38  16  **Q**    I'm asking you, before you made the deal, do you know

02:55:41  17  how much time you were facing?

02:55:43  18  **A**    I believe when I spoke with the prosecution or the

02:55:49  19  government, excuse me, as you put it, I was looking at 8 to

02:55:53  20  11 years.

02:55:54  21  **Q**    Okay.  Fair enough.  I appreciate it.

02:55:58  22          8 to 11, and now you're looking at 2 or 3, depending

02:56:01  23  if the judge gives you your 5K?

02:56:04  24  **A**    Where do you keep coming up with this 2 to 3, sir?

02:56:07  25  **Q**    It's in your words.

**J. Kachner (Cross by Goldberg)** 333

02:56:08   1   **A**     My words that I stated that that's what I would like

02:56:11   2   to serve?

02:56:11   3   **Q**     Let's just --

02:56:12   4   **A**     But my indictment here or my case is for 3 to 5.  36

02:56:17   5   to 60 months, sir.

02:56:19   6   **Q**     Okay.  Well, we can agree that's half of what you were

02:56:22   7   looking at originally; right?

02:56:26   8   **A**     Yes.

02:56:27   9   **Q**     Okay.  Now, we can also agree that for Redemption and

02:56:33   10  Shamrock, you were running the shows; right?

02:56:35   11  **A**     Correct.  Correct.

02:56:36   12  **Q**     And you had these employees, more than five.  You've

02:56:40   13  already been asked this; correct?

02:56:42   14  **A**     Yes.

02:56:43   15  **Q**     And you could hire or fire them, you could raise --

02:56:46   16  give them raises if you wanted to; right?

02:56:48   17  **A**     Who did that?

02:56:50   18  **Q**     You.  You could do that.

02:56:51   19  **A**     No.

02:56:52   20  **Q**     Did you tell them what to do?

02:56:54   21  **A**     Did I tell them what to do?  Yes.

02:56:57   22  **Q**     Yeah.

02:56:57   23  **A**     But did I -- did I reach to other -- the other owners

02:57:01   24  to establish --

02:57:03   25  **Q**     I'm asking whether on the ground at the shops, at the

02:57:06   1    two stores, did you have authority over the workers there?

02:57:12   2    **A**     Well, yeah, I'm -- well, yeah -- yes, sir, I'm an

02:57:15   3    owner.

02:57:16   4    **Q**     Okay.  And all of those people that were working at

02:57:21   5    the stores knew that there was cash being paid?

02:57:28   6    **A**     Correct.

02:57:29   7    **Q**     Okay.  So you discussed with your lawyers, or the

02:57:31   8    people you trust, the fact that supervising more than five

02:57:37   9    people gets you a 4-point bump on your guidelines.

02:57:42   10         Are you aware of that?

02:57:43   11   **A**     No, sir.

02:57:45   12   **Q**     So, in your plea agreement that we've seen, the

02:57:50   13   government has brought up in evidence --

02:58:15   14                  MR. GOLDBERG:  Plea agreement is 625?

02:58:16   15        Can you bring up 625, please?

02:58:19   16                  MR. BEAN:  That's the cooperation.

02:58:19   17                  MS. WELCH:  The cooperation or the plea?

02:58:20   18                  MR. GOLDBERG:  Oh, let's do the plea first.

02:58:29   19        Okay.  And let's advance this a page or two.

02:58:41   20        Okay.  Go -- keep going.

02:58:44   21        Keep going.

02:58:49   22        Keep going.

02:58:51   23   BY MR. GOLDBERG:

02:58:51   24   **Q**     Okay.  Now, would you agree with me that we're looking

02:58:54   25   at Page -- 624, Page 5.  That is the guideline calculation

| | | |
|---|---|---|
| 02:58:59 | 1 | for your plea agreement? |
| 02:59:02 | 2 | **A**     Yes. |
| 02:59:03 | 3 | **Q**     Okay.  So first of all, the government puts you at a |
| 02:59:11 | 4 | tax loss of 500,000 to 1.5 million; correct? |
| 02:59:15 | 5 | **A**     Correct. |
| 02:59:15 | 6 | **Q**     Okay. |
| 02:59:20 | 7 |          MR. GOLDBERG:  If we can go ahead to Page -- |
| 02:59:30 | 8 | Page 13, please. |
| 02:59:36 | 9 | BY MR. GOLDBERG: |
| 02:59:37 | 10 | **Q**     Now, you look at Paragraph (ff), the government -- at |
| 02:59:52 | 11 | the last line of (ff), total foreseeable loss in this |
| 02:59:55 | 12 | conspiracy -- in your conspiracies would have been |
| 02:59:58 | 13 | 2.2 million. |
| 02:59:59 | 14 |      Do you remember that being said in court and in this |
| 03:00:02 | 15 | agreement? |
| 03:00:03 | 16 | **A**     I see it in front of the -- written in the agreement. |
| 03:00:06 | 17 | **Q**     Okay.  Well, this was read in court when you plead |
| 03:00:08 | 18 | guilty; right? |
| 03:00:09 | 19 | **A**     Okay. |
| 03:00:10 | 20 | **Q**     Well, was it? |
| 03:00:12 | 21 | **A**     Yeah. |
| 03:00:13 | 22 | **Q**     Every word of it. |
| 03:00:14 | 23 |      Are these your initials down in the corner? |
| 03:00:17 | 24 | **A**     Yes. |
| 03:00:18 | 25 | **Q**     Okay.  So, you'll agree with me that 1.5 million is |

**J. Kachner (Cross by Goldberg)**                    336

03:00:24  1    less than 2.2 million; right?

03:00:26  2    **A**    When this started it was 4.5 million, wasn't it?

03:00:29  3    **Q**    Right.  Okay.  So they came down from 4.5 million in

03:00:32  4    tax loss to half a million to a million and a half; right?

03:00:37  5    **A**    Correct.  Divide that by three and you come up with

03:00:40  6    what?

03:00:40  7    **Q**    And that was part of your plea agreement; right?

03:00:42  8    **A**    You divide that number by three, you come up with

03:00:45  9    what?

03:00:45  10   **Q**    I'm asking you if that was part of your plea

03:00:47  11   agreement.

03:00:47  12   **A**    I'm back to the last question you --

03:00:49  13   **Q**    You can answer the question or you can say you don't

03:00:51  14   want to answer it.

03:00:51  15   **A**    Sir, you asked me about the 4.5, and then you said it

03:00:54  16   got dropped down to 1.3.  And you said a question after

          17   that.

03:00:57  18        Can I answer the question about the 1.3, sir?

03:00:58  19   **Q**    I'm asking you, you originally were charged with 4.5;

03:01:02  20   correct?

03:01:02  21   **A**    Correct.  But you got to divide that by --

03:01:04  22   **Q**    And then your plea agreement lets you plead guilty to

03:01:07  23   half a million to a million and a half in tax loss; correct?

03:01:13  24   **A**    You want me to answer that, or are you going to

03:01:15  25   continue to ask me questions?

03:01:17    1    **Q**    I want a yes or no.

03:01:17    2    **A**    Yes, per the paperwork, it says 1.3 million.

03:01:21    3    **Q**    And that is a substantial reduction in your

03:01:22    4    guidelines; correct?

03:01:23    5    **A**    If you take the 4 --

03:01:25    6    **Q**    It's a substantial reduction in your guidelines;

03:01:28    7    correct?

03:01:28    8    **A**    Sir --

03:01:30    9    **Q**    You can't --

03:01:31    10    **A**    What part of 4.3 million divided by three owners do

03:01:35    11    you not understand?

03:01:36    12    **Q**    Well, I'm wondering what part of my questions you

03:01:38    13    don't understand.

03:01:40    14    MR. GOLDBERG:  Your Honor, can I have the

03:01:41    15    witness admonished to answer my questions and not question

03:01:43    16    me back?

03:01:43    17    THE COURT:  Well, I hate to say it, I think

03:01:45    18    he's trying to.

03:01:46    19    MR. GOLDBERG:  Well. . .

03:01:49    20    BY MR. GOLDBERG:

03:01:49    21    **Q**    Did you get a reduction in the amount of loss as part

03:01:51    22    of your --

03:01:52    23    THE COURT:  Mr. Goldberg, try to ask one

03:01:53    24    question at a time.

03:01:54    25    THE WITNESS:  Thank you.

03:01:55  1        Sir, to answer that question, that 4.5 million or 4.3,

03:01:59  2  whatever it was, is to be divided by three owners.  The

03:02:03  3  reduction to 1.3 million -- 500,000 to 1.3 million I'm

03:02:07  4  pretty sure is including the employment tax as well.

03:02:11  5  Correct?  That gets it to the 1.3?  But if you take that big

03:02:14  6  number and divide it by three, you're pretty dang close to

03:02:17  7  where it should be; correct?

03:02:18  8  BY MR. GOLDBERG:

03:02:18  9  **Q**     Well, I'm not answering the questions.  You're

03:02:21  10  supposed to be answering them.

03:02:22  11        So your answer is, that's what it should have been,

03:02:24  12  should have been reduced from 4.5 down to what you pled to?

03:02:28  13  **A**     The number that the government came up with needed to

03:02:31  14  be divided by three.  I'm sorry that some people don't want

03:02:34  15  to take ownership of what they did.

03:02:36  16  **Q**     Okay.  So the answer is yes, they reduced it down --

03:02:41  17  they gave you a reduction of the loss amount.  It's that

03:02:44  18  simple.

03:02:45  19  **A**     Does it state -- does it state in here that it's a

03:02:48  20  reduction?

03:02:50  21  **Q**     Okay.  Paragraph (ff) that's up on the screen says

03:02:55  22  that the foreseeable tax loss in the -- in his -- in his,

03:03:00  23  you, conspiracies is in excess of 2.2 million.

03:03:04  24        That's not about anybody else.  That's about you.

03:03:08  25  Right?

| | | |
|---|---|---|
| 03:03:08 | 1 | **A**    Correct.  But your question is -- |
| 03:03:12 | 2 | **Q**    My question is -- |
| 03:03:13 | 3 | **A**    -- am supposed to be on the hook for that.  When I |
| 03:03:15 | 4 | said yeah, I'll be on the hook for the 1.3, but that was -- |
| 03:03:18 | 5 | the big number was divided by three people. |
| 03:03:20 | 6 | **Q**    Does your plea agreement not say you're responsible |
| 03:03:24 | 7 | for a foreseeable amount of 4.2 million? |
| 03:03:28 | 8 | **A**    Yes. |
| 03:03:28 | 9 | **Q**    Does it allow you to plead to under 1.5 million? |
| 03:03:32 | 10 | **A**    Does it allow me to plead to under 1. -- |
| 03:03:34 | 11 | **Q**    Did you plead to under 1.5 million in tax loss? |
| 03:03:37 | 12 | **A**    I believe it was 1.3, wasn't it? |
| 03:03:39 | 13 | **Q**    It was under 1.5; correct? |
| 03:03:41 | 14 | **A**    Yes. |
| 03:03:42 | 15 | **Q**    Okay.  And your understanding is that reduces your |
| 03:03:47 | 16 | guideline exposure as well; right? |
| 03:03:49 | 17 | **A**    It brings it down, yes. |
| 03:03:51 | 18 | **Q**    Okay.  Thank you. |
| 03:03:54 | 19 | All right. |
| 03:03:54 | 20 | THE COURT:  All right, Mr. Goldberg.  Let me |
| 03:03:55 | 21 | interrupt you. |
| 03:03:56 | 22 | Recess for the afternoon, like 15 minutes.  Give you |
| 03:04:00 | 23 | time to refresh yourselves, a little bit after 3:00.  So |
| 03:04:04 | 24 | maybe 3:20 or thereabouts we'll call for you. |
| 03:04:07 | 25 | Keep in mind the admonition.  We'll see you soon. |

| | | |
|---|---|---|
| 03:04:10 | 1 | COURTROOM DEPUTY:  All rise. |
| 03:04:11 | 2 | (Jury excused from courtroom at 3:04 p.m.) |
| 03:25:32 | 3 | COURTROOM DEPUTY:  All rise for the jury. |
| 03:25:34 | 4 | (Jury returned to courtroom at 3:25 p.m.) |
| 03:25:58 | 5 | COURTROOM DEPUTY:  Court is in session. |
| 03:26:00 | 6 | Please be seated. |
| 03:26:18 | 7 | THE COURT:  Okay.  Mike, go ahead. |
| 03:26:20 | 8 | MR. GOLDBERG:  Thank you. |
| | 9 | BY MR. GOLDBERG: |
| 03:26:22 | 10 | Q    Mr. Kachner, you understand what a yes or no question |
| 03:26:24 | 11 | is, right? |
| 03:26:24 | 12 | A    Yes, sir. |
| 03:26:25 | 13 | Q    Okay.  So if I ask a yes or no, you know that the |
| 03:26:28 | 14 | answer is either yes or no; right? |
| 03:26:30 | 15 | A    Yes, sir. |
| 03:26:31 | 16 | Q    And you know that if you want to add something to it, |
| 03:26:34 | 17 | that these gentlemen (indicating) over here will give you a |
| 03:26:37 | 18 | chance when it's their turn to get back up; right? |
| 03:26:40 | 19 | A    I did not know that. |
| 03:26:41 | 20 | Q    Okay.  Well, you've prepared with them for your |
| 03:26:44 | 21 | testimony; right? |
| 03:26:45 | 22 | A    Correct. |
| 03:26:45 | 23 | Q    They told you you'd be cross-examined; right? |
| 03:26:49 | 24 | A    Correct. |
| 03:26:49 | 25 | Q    And I'm assuming they didn't tell you to not answer a |

03:26:53    1    yes or no question yes or no?

03:26:53    2    **A**    They told me to answer the questions truthfully.

03:26:56    3    **Q**    Right.  Okay.  So I'm going to ask some yes and no

03:26:59    4    questions, and we're going to try to get through this.

03:27:01    5    Okay?

03:27:01    6    **A**    Okay.

03:27:02    7    **Q**    First question, I want to go back, you said that there

03:27:05    8    was a store -- a skill games store in Massillon; correct?

03:27:10    9    **A**    Correct.

03:27:11   10    **Q**    What was the name of that store?

03:27:14   11    **A**    I don't even believe it had a name.

03:27:16   12    **Q**    Okay.  And that was -- do you remember the address?

03:27:21   13    **A**    It was right down by the -- right when you go into

03:27:24   14    Massillon, right on the right-hand side in a plaza.

03:27:30   15    **Q**    How long was it open for?

03:27:33   16    **A**    2 to 4 months.

03:27:34   17    **Q**    Okay.  And that's not Cafe 62?

03:27:37   18    **A**    No.

03:27:38   19    **Q**    Okay.  All right.

03:27:40   20           So I'm going to go back to your plea agreement, if we

03:27:43   21    could bring that back up.  And I will share this.

03:27:48   22           And I'm looking at Page 9.

03:27:54   23           Okay.  Page 9, Paragraph 1 indicates that you received

03:27:59   24    approximately 1,424,464 income from Redemption, 2012 through

03:28:10   25    2017.

03:28:11  1     Now, you agreed with that number and you initialed the

03:28:14  2   bottom; correct?

03:28:16  3   **A**    Yes.

03:28:23  4   **Q**    Did you agree to a similar number regarding

03:28:27  5   Redemption -- I'm sorry, regarding Skilled Shamrock?

03:28:34  6   **A**    I -- I can't answer that yes or no, sir, so I don't

03:28:37  7   know.

03:28:37  8   **Q**    Okay.  Directing your attention to Paragraph -- I'm

03:28:42  9   sorry, that was Paragraph L.  I said 1.

03:28:45  10  **A**    Yes.  Understood.  Yeah.

03:28:47  11  **Q**    Now Paragraph P.

03:28:55  12  **A**    Okay.

03:28:55  13  **Q**    So if you could read Paragraph P, the first sentence

03:28:58  14  please?

03:28:58  15  **A**    "The machines at Skilled Shamrock were supplied by

03:29:02  16  DiPietro through his company, RNB Leasing, Incorporated."

03:29:06  17  **Q**    Okay.  So you testified here today you didn't know

03:29:08  18  what RNB Leasing, Incorporated, was; correct?

03:29:11  19  **A**    I didn't -- yes.

03:29:12  20  **Q**    Okay.  But when you signed this agreement in July of

03:29:18  21  '22, you did.  Right?

03:29:21  22  **A**    Okay.  RNB is the things that they put -- well --

03:29:26  23  **Q**    Well, you understood what that was in July of 2022;

03:29:32  24  correct?

03:29:35  25  **A**    I understood what?

| | | |
|---|---|---|
| 03:29:38 | 1 | **Q**    What RNB Leasing was.  Because you say it right here. |
| 03:29:45 | 2 | You are admitting the machines at Skilled Shamrock were |
| 03:29:48 | 3 | supplied by Ron DiPietro through his company, RNB Leasing? |
| 03:29:54 | 4 | **A**    Yes. |
| 03:29:54 | 5 | **Q**    So you do know what RNB Leasing is, as opposed to your |
| 03:29:59 | 6 | testimony today; correct? |
| 03:30:00 | 7 | **A**    I can't answer that with a yes or no, so. . . |
| 03:30:02 | 8 | **Q**    Well, did you read this agreement before you signed |
| 03:30:06 | 9 | it? |
| 03:30:07 | 10 | **A**    Yes. |
| 03:30:08 | 11 | **Q**    Are those your initials at the bottom? |
| 03:30:10 | 12 | **A**    Yes. |
| 03:30:10 | 13 | **Q**    Was it read in open court when you pled guilty? |
| 03:30:13 | 14 | **A**    Yes. |
| 03:30:13 | 15 | **Q**    Okay.  All right.  You've testified as to how money |
| 03:30:23 | 16 | was accounted for at Skilled Shamrock and Redemption.  And |
| 03:30:30 | 17 | you've indicated that there were daily accounting sheets |
| 03:30:35 | 18 | that were generated by the machines; is that correct? |
| 03:30:40 | 19 | **A**    Yes. |
| 03:30:41 | 20 | **Q**    Okay.  So, were those receipts printed out every day, |
| 03:30:48 | 21 | or only on Sundays or once a week? |
| 03:30:52 | 22 | **A**    How am I going to answer that with a yes or no, sir? |
| 03:30:55 | 23 | **Q**    Well, that's not a yes or no question. |
| 03:30:57 | 24 | **A**    Well, you told me that you wanted yes or no answers, |
| 03:31:00 | 25 | so that's what I was -- |

03:31:01  1   **Q**      If I ask a yes or no, I'd like a yes or no.  That is,

03:31:04  2   did you print out receipts once a week?  Was it multiple

03:31:07  3   times a week?

03:31:08  4        How did you account for the money coming in to these

03:31:12  5   two skill game rooms?

03:31:14  6   **A**      Normally it was once a week.

03:31:15  7   **Q**      Once a week.

03:31:16  8        Okay.  So, was it a little different at the two

03:31:20  9   different stores, Skilled Shamrock versus Redemption, or

03:31:26  10  were they just once a week you printed out the numbers?

03:31:30  11  **A**      I did it myself once a week.

03:31:31  12  **Q**      Once a week.  Both places?

03:31:33  13  **A**      Correct.

03:31:34  14  **Q**      Okay.

03:31:35  15  **A**      Sometime --

03:31:36  16  **Q**      So, when you printed those out, that generated actual

03:31:44  17  paper documents; right?

03:31:46  18  **A**      Yeah, it was a slip.

03:31:47  19  **Q**      I'm sorry?

03:31:48  20  **A**      It was a slip.

03:31:49  21  **Q**      A slip.  Okay.

03:31:52  22        And every -- that would be used in calculating the

03:31:56  23  money in and the money out for each machine and therefore

03:31:59  24  the whole room; correct?

03:32:00  25  **A**      Total ins and outs.

| | | |
|---|---|---|
| 03:32:02 | 1 | **Q**     Okay.  All right.  So, those pieces of paper were |
| 03:32:08 | 2 | destroyed every time you calculated the in and out; correct? |
| 03:32:17 | 3 | **A**     Correct, from -- yes. |
| 03:32:19 | 4 | **Q**     And you were the one that destroyed them by burning |
| 03:32:22 | 5 | them; right? |
| 03:32:22 | 6 | **A**     Not true. |
| 03:32:23 | 7 | **Q**     Okay.  Who destroyed them? |
| 03:32:25 | 8 | **A**     Whoever took the paperwork that day. |
| 03:32:26 | 9 | **Q**     Okay.  Well, was that you? |
| 03:32:28 | 10 | **A**     Occasionally. |
| 03:32:30 | 11 | **Q**     Was it Tom Helmick? |
| 03:32:32 | 12 | **A**     Occasionally. |
| 03:32:35 | 13 | **Q**     It wasn't Mr. Karasarides, ever? |
| 03:32:37 | 14 | **A**     Can't say that. |
| 03:32:38 | 15 | **Q**     Well, okay.  It was a regular part of the way you ran |
| 03:32:45 | 16 | these stores, to destroy the records every time they were |
| 03:32:47 | 17 | generated, whether you did it personally or not; correct? |
| 03:32:53 | 18 | **A**     "Destroy" is a bad word, but yeah, we got rid of the |
| 03:32:56 | 19 | paperwork. |
| 03:32:56 | 20 | **Q**     Well, you got rid of it. |
| 03:32:58 | 21 |        Well, how did -- did you throw it in a dumpster?  Burn |
| 03:33:01 | 22 | it?  Did you put it down the garbage disposal?  Flush it |
| 03:33:06 | 23 | down the toilet?  What did you do to it? |
| 03:33:08 | 24 | **A**     All depended. |
| 03:33:09 | 25 | **Q**     Did you just throw them out on the side of the |

03:33:11  1   highway?

03:33:11  2   **A**    Again, like I stated, I don't know what the other

03:33:13  3   people did with theirs, but --

03:33:15  4   **Q**    What did you do?  When you destroyed records, what did

03:33:17  5   you do?

03:33:17  6   **A**    When I destroyed the paperwork?

03:33:19  7   **Q**    Correct.  The records.

03:33:21  8   **A**    Okay.  Threw them in the trash.  Use them as a fire

03:33:25  9   starter at my camper that I had.

03:33:27  10  **Q**    Okay.  And most of the time when these records were

03:33:32  11  destroyed, you destroyed them?

03:33:34  12  **A**    Not true.

03:33:34  13  **Q**    All right.  All right.  So when you look at these

03:33:39  14  spreadsheets that you've seen throughout this case, those

03:33:41  15  are numbers that someone on behalf of Mr. DiPietro kept in

03:33:47  16  their computer; right?

03:33:49  17  **A**    Yes, that I seen.

03:33:50  18  **Q**    And the records that would back up those numbers were

03:33:53  19  burned up at your camper or thrown off the side of the road

03:33:57  20  by someone else; right?

03:33:59  21  **A**    To back up those numbers?  You couldn't leave the

03:34:01  22  store unless it was correct.  If it was wrong, you'd see the

03:34:05  23  text messages I was bitching about them being wrong.

03:34:08  24  **Q**    Okay.  So when I go to get my car out of the parking

03:34:10  25  lot, I got to show a receipt that I paid; right?

03:34:15  1  **A**   A receipt that you paid?

03:34:16  2  **Q**   That I paid for my parking space; right?

03:34:18  3  **A**   Okay.  Okay.

03:34:19  4  **Q**   Yeah.  And if anyone -- and if I want to keep a record

03:34:23  5  of what I paid, I keep that receipt; right?

03:34:27  6  **A**   Okay.

03:34:28  7  **Q**   Now, you are -- have testified that the records, the

03:34:33  8  receipts — I'm going to call them receipts because that's

03:34:35  9  pretty much what they were — after they were copied onto

03:34:40  10  whatever spreadsheet there was, were destroyed; right?

03:34:43  11  **A**   They were never copied on.

03:34:44  12  **Q**   After they -- numbers were put onto a spreadsheet,

03:34:47  13  they were destroyed; correct?

03:34:48  14  **A**   They were plugged in from the person that was

03:34:51  15  affiliated with Ron DiPietro.

03:34:51  16  **Q**   By "plugged in" you mean typed in?

03:34:53  17  **A**   Correct.

03:34:54  18  **Q**   They looked at the receipt, they typed it into the

03:34:57  19  spreadsheet --

03:34:59  20  **A**   No.

03:34:59  21  **Q**   Okay.  Tell us how it happened.

03:35:02  22  **A**   They would either look at the clicker on it or they

03:35:04  23  would look at -- when they looked at Ron DiPietro's, they

03:35:07  24  looked at the clickers that were on the inside of the

03:35:09  25  machine, I believe it was, and I printed off the paperwork

**J. Kachner (Cross by Goldberg)**                              348

03:35:11   1    for myself to do it so we could match the paperwork up.

03:35:14   2    **Q**    Right.  And the paperwork you printed off for

03:35:17   3    yourself, which would be another way to prove the numbers in

03:35:22   4    this case, was destroyed?

03:35:24   5    **A**    Correct.

03:35:25   6    **Q**    Okay.  So I'm going to hold up Government's Exhibit

03:35:31   7    447, and it's 144 pages.

03:35:38   8          Have you seen this?

03:35:38   9    **A**    I don't believe so.  I could have.  I know I -- from

03:35:42   10   where I'm looking right now I can see the front page.  I

03:35:44   11   know what it is.

03:35:45   12              MR. GOLDBERG:  Okay.  I'm going to approach

03:35:46   13   the witness if that's okay with the Court.

03:35:48   14              THE COURT:  Sure.

           15   BY MR. GOLDBERG:

03:35:49   16   **Q**    All right, Mr. Kachner, handing you Government's

03:35:55   17   Exhibit 447.  I think you've already identified that.

03:35:58   18   Correct?

03:35:59   19   **A**    Correct.

03:36:00   20   **Q**    Now, am I correct that those are the documents that

03:36:05   21   were generated just before the search in July 2018?

03:36:16   22   **A**    Correct.

03:36:16   23   **Q**    Okay.  Thank you.

03:36:19   24          And when I'm talking about documents showing the

03:36:22   25   different amounts going in and out of the machines, I'm

| | | |
|---|---|---|
| 03:36:25 | 1 | talking about Government's Exhibit 447; right? |
| 03:36:29 | 2 | **A**    False.  False. |
| 03:36:30 | 3 | **Q**    Okay.  What am I talking about then? |
| 03:36:32 | 4 | **A**    That is the daily sheet, like I explained before, that |
| 03:36:37 | 5 | is performed by each employee, each shift, each day. |
| 03:36:39 | 6 | **Q**    Well, let me ask you this:  Is -- you know, are there |
| 03:36:44 | 7 | any other documents that you know of that are like |
| 03:36:48 | 8 | Government's 447 that haven't been destroyed, burned, thrown |
| 03:36:52 | 9 | away, shredded? |
| 03:37:01 | 10 | **A**    I don't understand your question, sir. |
| 03:37:02 | 11 | **Q**    These documents were seized in a search. |
| | 12 | **A**    Okay. |
| 03:37:04 | 13 | **Q**    Right? |
| 03:37:04 | 14 | **A**    Yes. |
| 03:37:05 | 15 | **Q**    Were any other similar documents from the 450 weeks |
| 03:37:09 | 16 | that we've been discussing seized in the search? |
| 03:37:11 | 17 | **A**    Yes.  Yes. |
| 03:37:12 | 18 | **Q**    They were? |
| 03:37:13 | 19 | **A**    Absolutely.  There was a computer full of documents. |
| 03:37:16 | 20 | **Q**    Okay.  I'm talking about paper documents generated at |
| 03:37:19 | 21 | the store.  Let's make sure -- |
| 03:37:21 | 22 | **A**    You're going in circles with these questions, sir. |
| 03:37:23 | 23 | You started out asking me a question about the paperwork for |
| 03:37:25 | 24 | the dailies.  You said I destroyed them.  The paperwork that |
| 03:37:29 | 25 | you're talking about now was done daily.  Has absolutely, |

03:37:32  1   positively nothing to do with the total numbers at the end

03:37:36  2   of the week.

03:37:37  3   **Q**    Okay.  Fine.  That's fine.

03:37:45  4        Those -- other that's what's in the spreadsheets in

03:37:46  5   the computer that the government seized, there's no

03:37:48  6   surviving paper documents except for 447; right?

03:37:52  7   **A**    To my knowledge, yes.

03:37:54  8   **Q**    Okay.  That means there's 439 weeks worth of documents

03:38:00  9   that were shredded, burned, destroyed by somebody, sometimes

03:38:03  10  you?

03:38:04  11  **A**    Correct.

03:38:04  12  **Q**    Okay.  Now, you testified early on that you couldn't

03:38:15  13  have any of these skill game stores in your name because

03:38:19  14  you've got a prior felony conviction; right?

03:38:22  15  **A**    Correct.

03:38:23  16  **Q**    Okay.  What was that felony conviction for?

03:38:27  17  **A**    Trafficking in marijuana.

03:38:29  18  **Q**    Okay.  And you've had other convictions since then;

03:38:35  19  isn't that correct?

03:38:36  20  **A**    I have a pretty big rap sheet from when I was younger,

03:38:39  21  yes.

03:38:39  22  **Q**    Okay.  So, you having this prior felony record was the

03:38:51  23  only reason you put these skilled games stores into other

03:38:57  24  people's names?

03:39:01  25       You couldn't have it in your name; right?

**J. Kachner  (Cross by Goldberg)**                    351

03:39:03  1   **A**     I could have had it in my name.  I had the Massillon

03:39:06  2   store in my name, and that's probably why I got raided in

03:39:10  3   2 months.

03:39:10  4   **Q**     Okay.  So in order to not get raided, you wouldn't

03:39:13  5   want it in your name?

03:39:14  6   **A**     Look, like, no one put them in their own names that

03:39:19  7   ran these stores.  There was very few that I could know of

03:39:21  8   that put them in their name.

03:39:23  9   **Q**     Okay.  So you're saying, you know, the stores in Stark

03:39:28  10  County?

03:39:28  11  **A**     The ones that I know of, yes.

03:39:31  12  **Q**     All right.  How many stores were operating skill games

03:39:35  13  let's say in 2017 in Stark County?

03:39:37  14  **A**     No clue.

03:39:39  15  **Q**     But you know that none of them were in the name of the

03:39:42  16  actual owner?

03:39:43  17  **A**     That's not what I said.  The ones that I know of were

03:39:46  18  not in the people that I rep -- that I've been associated

03:39:50  19  with were not in their names.

03:39:51  20  **Q**     Okay.  Fair enough.

03:39:53  21         So, you met Mr. Karasarides, you were dealing poker;

03:40:01  22  correct?

03:40:01  23  **A**     I've known him for a while.

03:40:03  24  **Q**     Okay.  When you first came into these shops, were they

03:40:07  25  operating as internet cafes or skill games?

03:40:11    1    **A**    He had both.

03:40:12    2    **Q**    There was a time when internet cafes were legal and

03:40:16    3    then they weren't legal; right?

03:40:17    4    **A**    I believe so, yes.

03:40:18    5    **Q**    And both Shamrock and Redemption were established when

03:40:26    6    the law changed and made internet cafes illegal; correct?

03:40:31    7    **A**    Were they established when the -- you talking about

03:40:34    8    the VS2 is what you're talking about?

03:40:36    9    **Q**    Yes.  When the law changed and no longer allowed

03:40:39    10   internet cafes, the skill games came in?

03:40:42    11   **A**    No.  Skill games were running way before VS2 was even

03:40:47    12   thought of.

03:40:47    13   **Q**    Okay.  So, at the point when the VS2 and the internet

03:40:55    14   cafes were running, did you consider those to be legal?

03:40:58    15   **A**    The VS2s?

03:41:00    16   **Q**    Yes.

03:41:02    17   **A**    To my knowledge they were.

03:41:03    18   **Q**    Okay.  All right.  So, you talked about the township

03:41:17    19   taking its share; right?

03:41:20    20   **A**    Yes.

03:41:22    21   **Q**    Through the permit process?

03:41:23    22   **A**    Yes.

03:41:24    23   **Q**    Okay.  And that was the cost of doing business;

03:41:29    24   correct?

03:41:30    25   **A**    That was their fee to do the -- open the business.

| | | |
|---|---|---|
| 03:41:33 | 1 | **Q**    Now, based on what you know -- let me back up. |
| 03:41:37 | 2 | You were at both of these stores every day pretty |
| 03:41:40 | 3 | much? |
| 03:41:41 | 4 | **A**    You could -- I mean, yeah, pretty much. |
| 03:41:43 | 5 | **Q**    All right.  So -- |
| 03:41:44 | 6 | **A**    Not every day though, no. |
| 03:41:46 | 7 | **Q**    Okay.  But based on what you know as operating these |
| 03:41:50 | 8 | two stores, the Plainfield Township trustees knew what was |
| 03:41:55 | 9 | going on.  Isn't that correct? |
| 03:42:01 | 10 | They knew there was cash being paid out by you? |
| 03:42:05 | 11 | **A**    I can't answer that. |
| 03:42:06 | 12 | **Q**    Okay.  Well, what about the police, were they -- or, |
| 03:42:10 | 13 | I'm sorry, the sheriffs, were deputies every in the stores? |
| 03:42:13 | 14 | **A**    I'm pretty sure there was customers that were |
| 03:42:16 | 15 | sheriffs. |
| 03:42:16 | 16 | **Q**    Right.  So obviously law enforcement were in both |
| 03:42:19 | 17 | establishments numerous times, either as customers or on |
| 03:42:24 | 18 | duty; right? |
| 03:42:25 | 19 | **A**    Sure. |
| 03:42:26 | 20 | **Q**    Okay.  In your estimation, you know, there's no way |
| 03:42:30 | 21 | they couldn't have known; right? |
| 03:42:32 | 22 | **A**    I don't know what another man knows.  All I can tell |
| 03:42:34 | 23 | you is what I know, sir. |
| 03:42:36 | 24 | **Q**    Okay.  Well, you know -- did you ever discuss the cash |
| 03:42:40 | 25 | being paid with any law enforcement official before you were |

03:42:44  1   arrested, before this case came up?

03:42:52  2   **A**    Ask that again, please.

03:42:53  3   **Q**    Meaning, during the time you were operating, did you

03:42:56  4   talk to law enforcement, sheriff's deputies, the sheriff,

03:43:01  5   police officers, anybody in law enforcement about paying

03:43:04  6   cash winnings?

03:43:06  7   **A**    I got raided in Massillon, so I guess it would be yes.

03:43:10  8   **Q**    Okay.  So, it wasn't any secret?

03:43:15  9   **A**    That what, that they were paying cash?

03:43:18  10  **Q**    Yes.

03:43:20  11  **A**    Correct.

03:43:20  12  **Q**    And that's for all the game rooms that were open --

03:43:23  13  **A**    If you weren't paying cash, you had no business.

03:43:25  14  **Q**    Right.  Because people don't want a stuffed animal,

03:43:28  15  they want cash?

03:43:29  16  **A**    Correct.

03:43:29  17  **Q**    And that's why -- and that's why cash was paid out at

03:43:34  18  these two stores that we're discussing; correct?

03:43:37  19  **A**    All the cash -- all the game rooms paid out cash.

03:43:41  20  **Q**    Okay.  Now, you testified, or at least I believe you

03:43:53  21  testified, I know I saw it maybe in your statements, that

03:43:56  22  you set up the machines, that you set them to the various

03:44:02  23  games and the various payouts; is that correct?

03:44:04  24  **A**    Correct.

03:44:08  25  **Q**    No one assisted you in doing that as a -- to start off

03:44:13   1   with?

03:44:14   2   **A**   Not true.

03:44:15   3   **Q**   Okay.  Well, you said that you set them up though;

03:44:21   4   right?

03:44:23   5   **A**   Sure I did.

03:44:24   6   **Q**   All right.  Okay.

03:44:28   7          All right.  So, let's talk about --

03:44:31   8   **A**   Can I -- can we back up on that?  Because I never

03:44:35   9   touched Ron DiPietro's machines, so only Redemption's.

03:44:38   10  **Q**   Okay.  You set those up though; right?

03:44:41   11  **A**   Correct.

03:44:41   12  **Q**   Set the ratios or whatever you would call the payoff?

03:44:46   13  **A**   Correct.  After speaking with other people about what

03:44:48   14  I should set them to.

03:44:49   15  **Q**   Okay.  And another person, Mike Moneypenny, set up

03:44:54   16  Mr. DiPietro's machines?

03:44:55   17  **A**   I believe Trina did.  Trina did it.

03:44:58   18  **Q**   I'm sorry?

03:44:59   19  **A**   I believe Trina did.

03:45:00   20  **Q**   Trina did.  Okay.

03:45:02   21         All right.  So let's go back.  You know, it's accurate

03:45:07   22  to say that you smoke marijuana; correct?

03:45:11   23  **A**   What does that have do with anything?

03:45:13   24  **Q**   I'm asking the question.  Do you smoke marijuana?

03:45:15   25  **A**   What does that have to do with skill rooms?  I'm

**J. Kachner (Cross by Goldberg)** 356

03:45:18  1   asking a question, sir.  I'm not trying to be a dick.  I

03:45:20  2   just want to know, what does that have to do with anything?

03:45:22  3   **Q**   Do you smoke marijuana?

03:45:24  4   **A**   Yeah.

03:45:24  5   **Q**   Okay.  Now, am I correct -- and you went to the

03:45:29  6   probation department; right?

03:45:31  7   **A**   To what probation department?

03:45:32  8   **Q**   Here.

03:45:33  9   **A**   Correct.

03:45:33  10  **Q**   To -- yeah.  Okay.  And you disclosed your drug use;

03:45:37  11  right?

03:45:37  12  **A**   Correct.

03:45:38  13  **Q**   Okay.  Now, your use of marijuana was daily?

03:45:42  14  **A**   Correct.

03:45:42  15  **Q**   Correct?

03:45:43  16      Your entire adult life?

03:45:46  17  **A**   I smoke marijuana like you smoke Marlboros.

03:45:50  18  **Q**   Okay.  So that means what, a pack a day?

03:45:52  19  **A**   No.  That means that you could smoke a cigarette and

03:45:54  20  not affect you just like I smoke weed and it don't affect

03:45:57  21  me.

03:45:57  22      I see where you're going with this, and you're not

03:45:59  23  going to get it around me, dawg.  No chance.

03:46:01  24  **Q**   Okay.  Okay.  So we can assume that you were under the

03:46:06  25  influence of marijuana, or at least you had smoked

03:46:08  1    marijuana, on every day anything relevant in this case

03:46:13  2    happened?

03:46:13  3    **A**     Do you smoke weed?

03:46:14  4    **Q**     I'm asking you.  Can we assume --

03:46:17  5    **A**     I'm asking you.  Do you smoke weed?  Then you can't

03:46:20  6    tell me what marijuana does for me.  I use it for medical

03:46:23  7    purposes because I've had three back surgeries and multiple

03:46:26  8    injuries.

03:46:27  9    **Q**     Okay.  Well, my question is, you smoked marijuana

03:46:31  10   every day --

03:46:32  11   **A**     I just answered your question, sir.

03:46:34  12   **Q**     Every day anything relevant happened in this case;

03:46:36  13   correct?

03:46:37  14   **A**     I smoke weed daily, and it does not affect me the way

03:46:40  15   you think it does.

03:46:43  16   **Q**     Well, my question is just, do you smoke it every day,

03:46:46  17   and you said yes.

03:46:48  18          So, I can assume you smoked it today?

03:46:50  19   **A**     No, sir.

03:46:51  20   **Q**     Today you took off?

03:46:53  21   **A**     I did not smoke no marijuana today, sir.

03:46:56  22   **Q**     And what about yesterday?

03:46:57  23   **A**     Absolutely.

03:46:58  24   **Q**     Okay.  And every day, from 2010 to 2024, the 17th of

03:47:11  25   January, except for the 17th of January; right?

03:47:15   1    **A**      I have not smoked no marijuana today, sir.

03:47:17   2    **Q**      But you smoked every other day going back to January

03:47:22   3    1, 2010?

03:47:23   4    **A**      No, sir.

03:47:23   5    **Q**      Okay.  Well --

03:47:25   6    **A**      You're asking me to answer question from multiple

03:47:28   7    years.  There was days that I didn't smoke it.  So for me to

03:47:30   8    answer that as yes, it would be lying.  So I'm going to be

03:47:32   9    truthful and say, no, sir, I haven't smoked it every day.

03:47:35   10   **Q**      Okay.  Well, that's fine.  But generally you are a

03:47:39   11   daily marijuana --

03:47:40   12   **A**      Where are you going with this, with the marijuana?

03:47:42   13   **Q**      You just said --

03:47:43   14   **A**      Where are you going with this?

03:47:43   15   **Q**      Well, I'll let you know.  Listen to the question.

03:47:45   16          You just said you smoke marijuana like you smoke

03:47:48   17   Marlboros, so --

03:47:48   18   **A**      No, like you smoke Marlboros.

03:47:51   19   **Q**      That's -- like I smoke Marlboros.

03:47:53   20   **A**      Correct.

03:47:53   21   **Q**      Well, that's safe to assume it's an everyday thing;

03:47:55   22   right?

03:47:56   23   **A**      If you want to assume that, but I just told you

03:47:57   24   sitting in the box that I put my hand to God that I don't

03:48:00   25   smoke every day and I haven't smoked today.  So your theory

03:48:03   1   what you're saying is false.

03:48:05   2   **Q**    Okay.  Okay.  Well, my -- we'll move on to something

03:48:10   3   else.

03:48:10   4   **A**    Thank you, sir.

03:48:12   5   **Q**    What other drugs do you use?

03:48:14   6   **A**    None.  None.  None.

03:48:17   7   **Q**    Nothing?

03:48:18   8   **A**    No.

03:48:33   9   **Q**    I have a question about the motherboards for these

03:48:36   10  machines.

03:48:37   11  **A**    Okay.

03:48:39   12  **Q**    What's a motherboard?

03:48:40   13  **A**    The board that the government seized that's in -- I

03:48:45   14  don't know if they have evidence of it or not.  It's about

03:48:48   15  that big (indicating) with plug-ins for it.

03:48:50   16  **Q**    And what does it do?

03:48:52   17  **A**    Runs the computer.

03:48:53   18  **Q**    Okay.  Now, do the motherboards -- the computer in the

03:48:56   19  machine -- in the game machines?

03:48:59   20  **A**    Is it in the machine?

03:49:00   21  **Q**    Yeah.

03:49:01   22  **A**    Yeah, it's in the bottom of the machine, or in the

03:49:03   23  back of the machine, or on the side mounted sometimes.

03:49:05   24  **Q**    Would you say it was the brain of the machine?

03:49:08   25  **A**    I mean -- it was a part -- excuse me, a part of the

03:49:12   1    machine, yes.

03:49:12   2    **Q**    But it's the electronics that runs the games and --

03:49:16   3    **A**    It's the major part of it.

03:49:18   4    **Q**    Do those motherboards get switched out between

03:49:23   5    machines to get new ones and put them in?  Do you ever have

03:49:29   6    to replace them?

03:49:30   7    **A**    Ron DiPietro did all that with his boards.  If you're

03:49:34   8    speaking on Redemption, there was times that a board would

03:49:37   9    go bad and you'd have to put a new one in, correct.

03:49:40  10    **Q**    Okay.  And would they ever be switched out between

03:49:43  11    different game rooms?  You know, for instance, between

03:49:48  12    Redemption or Skilled Shamrock or between --

03:49:50  13    **A**    Never did I take a game board from Redemption to

03:49:55  14    Shamrock.

03:49:55  15    **Q**    What about other game rooms that you operated, brought

03:49:57  16    them into Shamrock or Redemption?

03:49:59  17    **A**    I can't answer that.  I don't know.

03:50:02  18    **Q**    Then that answer is maybe.

03:50:05  19    **A**    I just said I can't answer it.

03:50:07  20    **Q**    It's not a hard -- it's not a no, it's maybe?

03:50:09  21    **A**    I'm going to stick with the answer I just gave you.

03:50:11  22    **Q**    Which is you can't answer it?

03:50:12  23    **A**    Correct.

03:50:13  24    **Q**    You can't answer it for -- because you don't want to

03:50:15  25    answer it or you can't answer it because you don't know?

03:50:17  1  **A**      I'm answering it truthfully because I don't remember

03:50:19  2  whether I took a board from another store and took it into

03:50:22  3  another store.

03:50:23  4  **Q**      Well, that would be something that could have

03:50:25  5  happened; right?  I mean, if you don't remember whether you

03:50:29  6  did it or not --

03:50:30  7  **A**      Hypothetically, no, because the store that I was in

03:50:32  8  business with Steve Saris, he didn't want nothing to do with

03:50:35  9  Redemption, and I didn't do shit at Shamrock.

03:50:41  10  **Q**      So your answer now is no, you never switched out

03:50:44  11  motherboards?

03:50:47  12          THE WITNESS:  Judge, is he going to keep

03:50:50  13  trying to circle around this?

03:50:50  14      Like, I mean, what answer you want out of me?  You

03:50:53  15  tell me what --

03:50:54  16          MR. GOLDBERG:  I just want you to stick with

03:50:55  17  one.  I said --

03:50:56  18          THE WITNESS:  I just explained to you and to

03:50:57  19  the jury what I just told you.  It's not a yes or no answer,

03:51:01  20  sir.

03:51:02  21  BY MR. GOLDBERG:

03:51:02  22  **Q**      Did you switch out motherboards?  That's all I'm

03:51:04  23  asking.

03:51:05  24  **A**      Did I switch out motherboards?  I took boards and put

03:51:06  25  them in different games, absolutely.  But I also ordered

03:51:07  1   them.  Myself, Chris Kare, and Larry Dayton took them and

03:51:12  2   put them to the expense, and we normally ordered them from a

03:51:12  3   place out of Cleveland.

03:51:14  4   **Q**   Okay.  So it was I can't answer that, then it was no,

03:51:17  5   and now it's yes.

          6   **A**   I'll wait till your next question, sir.

03:51:19  7   **Q**   You switched out motherboards between machines;

03:51:23  8   correct?

03:51:25  9   **A**   I've already answered that question, sir, multiple

03:51:27  10  times.

03:51:28  11  **Q**   You gave three different answers, so I want one answer

03:51:30  12  now, final answer.

03:51:31  13      You switch out motherboards between machines?

03:51:34  14  **A**   I have done a lot of technical things within the

03:51:37  15  machines, sir.

03:51:37  16  **Q**   Is that a yes or no?  Is that a yes -- I take that as

03:51:42  17  a yes, you switched out motherboards.  You just said it.

03:51:44  18  **A**   In the store alone, if I was in Redemption, there

03:51:48  19  might have been a game that might have been down, that

03:51:51  20  another game might have been broke, that I might have taken

03:51:53  21  a board out of a machine, put it into another machine to get

03:51:55  22  that one working until parts came in for the other machine.

03:52:00  23      Does that help you, sir?

03:52:01  24  **Q**   Yeah, that's a yes.

03:52:02  25      Okay.  So, there's something that's been discussed

03:52:08  1   called match play.

03:52:10  2   **A**   Yes, sir.

03:52:10  3   **Q**   Are you familiar with what that is?

03:52:11  4   **A**   Yes, sir.

03:52:12  5   **Q**   Okay.  What is it?

03:52:13  6   **A**   A patron would come in, and I believe anywhere between

03:52:18  7   5 and -- 5 for 5, 10 for 10, or 20 for 20.

03:52:22  8   **Q**   So you, like, would add money to their initial bet?

03:52:27  9   **A**   Not to their bet, no.

03:52:29  10  **Q**   So tell -- explain, like what -- like what would you

03:52:32  11  do?

03:52:32  12  **A**   If they put -- there was days that we would do a 20

03:52:35  13  for 20, that if they brought a 20 in, you put another 20 in,

03:52:39  14  after they played the machine for a successful 30 minutes.

03:52:43  15  Whether or not the patron was doing what they was supposed

03:52:45  16  to, I can't answer that question.

03:52:47  17  **Q**   Well, answer this.  Is that accounted for in the daily

03:52:49  18  and weekly audits?

03:52:51  19  **A**   Correct, yes.

03:52:52  20  **Q**   Where is it accounted for?

03:52:54  21  **A**   You just said where it was accounted for:  In the

03:52:57  22  daily and weekly audits.

03:52:58  23  **Q**   Okay.  But at the -- in the bottom line that went into

03:53:02  24  the spreadsheets, where is it accounted for?

03:53:04  25  **A**   That would be in expenses.

03:53:06    1    **Q**    It would be part of expenses?

03:53:08    2    **A**    Correct.

03:53:12    3    **Q**    But it's not specified in any spreadsheet as a match

03:53:18    4    play; it's just one item for expenses?

03:53:21    5    **A**    If you pull up that paperwork that you tried to show

03:53:23    6    me a minute ago with the dailies on it, if you look on that,

03:53:26    7    it might say match play on there.

03:53:28    8    **Q**    Okay.  That would be Exhibit 447?

03:53:30    9    **A**    I believe -- I don't know.

03:53:31    10   **Q**    With all the -- the 144 pages that I just showed you?

03:53:35    11   **A**    The one that's got the three things on the front of

03:53:37    12   it, the daily.

03:54:13    13   **Q**    At one point the government accused you of having a

03:54:17    14   couple million dollars stashed somewhere.

03:54:20    15          Do you recall that?

03:54:21    16   **A**    Correct.

03:54:22    17   **Q**    You do?

03:54:23    18   **A**    Yes.

03:54:25    19   **Q**    Okay.  And that was because the numbers that you gave

03:54:32    20   them didn't add up.  Isn't that correct?

03:54:37    21   **A**    What numbers that I gave them?

03:54:39    22   **Q**    The numbers that you gave them in the amount of money

03:54:43    23   that you took home from this enterprise.

03:54:46    24   **A**    I don't understand your question.

03:54:47    25   **Q**    Okay.  They accused you of hiding money; right?

03:54:51  1  **A**      Okay.

03:54:51  2  **Q**      Above and beyond the million that was stolen,

03:54:54  3  thereabouts, and the 248,000, thereabouts, that was taken

03:54:59  4  out of the YMCA; right?

03:55:01  5  **A**      No, I don't recollect that.

03:55:02  6  **Q**      Okay.  Did you tell them you were living like Gotti,

03:55:05  7  and they wanted to know where all the money was?

03:55:07  8  **A**      No, sir.

03:55:11  9        To be honest, that's what my wife's name is in my

03:55:15  10  wife.  It's Miss Gotti.

03:55:17  11  **Q**      That was your wife's name?

03:55:18  12  **A**      Yeah.  Because of the way she used to act towards me.

03:55:33  13  **Q**      Now, you were shown some text messages between you and

03:55:38  14  Mr. Karasarides.

03:55:40  15        Do you remember that?

03:55:41  16  **A**      I've been shown a lot of text messages today, sir.

03:55:44  17  **Q**      Your answer about whether or not they were relating to

03:55:48  18  proceeds being dropped off were -- one of the things you

03:55:53  19  said was if they were on Sunday or Monday, that's what they

03:55:56  20  were about; right?

03:55:58  21  **A**      I did the number -- I did the numbers on Sundays or

03:56:02  22  Mondays.  He could have asked -- might have been out of

03:56:05  23  town.  He might have been somewhere else and might have got

03:56:07  24  it on a Thursday or Friday.

03:56:08  25  **Q**      Okay.  And with regard to at least one of these skill

03:56:16  1    game stores, Mr. Karasarides owned the machines, is that

03:56:21  2    your understanding, or was a part owner of the machines?

03:56:24  3    **A**      To my knowledge, I don't believe Chris owned any

03:56:26  4    machines except for in Redemption with me and Larry.

03:56:29  5    **Q**      In Redemption?

03:56:31  6    **A**      Yes.  Yes.

03:56:32  7    **Q**      Okay.  So you were shown a series of tax returns --

03:56:47  8    and I'm not going to go too far into this -- but you were

03:56:50  9    shown all your tax returns between 2013 and 2017; correct?

03:57:05  10   **A**      Correct.  Correct.

03:57:07  11   **Q**      During the course of your testimony you were shown

03:57:08  12   those; right?

03:57:09  13   **A**      Correct.

03:57:09  14   **Q**      And you lied on every single one of them.  Isn't that

03:57:12  15   correct?

03:57:15  16   **A**      All except for the Premos Used Cars.

03:57:17  17   **Q**      I'm sorry?

03:57:18  18   **A**      All except for Premos Used Cars.

03:57:20  19   **Q**      Okay.  But with regard to your income, your expenses,

03:57:25  20   everything, those were all lies, under penalty of perjury;

03:57:28  21   right?

03:57:29  22   **A**      Pretty sure that's why I'm on trial right now for

03:57:32  23   defrauding the United States Government in taxes.  Good

03:57:34  24   question.

03:57:35  25   **Q**      And you're not on trial.

| | | |
|---|---|---|
| 03:57:36 | 1 | Did you know that? |
| 03:57:37 | 2 | **A**   Okay. |
| 03:57:37 | 3 | **Q**   You know you're not on trial; right? |
| 03:57:39 | 4 | **A**   I'm in -- I'm in the trial. |
| 03:57:41 | 5 | **Q**   Right.  You're not in trial because you made a deal to |
| 03:57:44 | 6 | get far less time than you would have got otherwise; right? |
| 03:57:49 | 7 | **A**   That's your theory. |
| 03:57:51 | 8 | **Q**   Well, did you make the deal just for fun? |
| 03:57:53 | 9 | **A**   Because I just said something, you're going to go this |
| 03:57:57 | 10 | route again?  Come on, man.  You keep circling around.  Get |
| 03:57:58 | 11 | to your question.  I'm tired, and I'm trying to get out of |
| 03:58:00 | 12 | here by 4:30. |
| 03:58:00 | 13 | **Q**   That's my question.  Did you make a deal with the |
| 03:58:02 | 14 | government for fun, because you love them, or did you make a |
| 03:58:05 | 15 | deal to get less prison time? |
| 03:58:07 | 16 | THE COURT:  Let's go to another subject. |
| 03:58:08 | 17 | We've beat this to death. |
| 03:58:10 | 18 | THE WITNESS:  Thank you, sir. |
| 03:58:11 | 19 | MR. GOLDBERG:  Okay.  I'm done.  Thank you. |
| 03:58:12 | 20 | THE WITNESS:  Thank you. |
| 03:58:13 | 21 | THE COURT:  Mr. Fedor. |
| 03:58:16 | 22 | MR. FEDOR:  Thank you, Judge. |
| 03:58:48 | 23 | - - - - - |
| 03:58:48 | 24 | CROSS-EXAMINATION OF JASON KACHNER |
| 03:58:49 | 25 | BY MR. FEDOR: |

03:58:49   1    **Q**     Mr. Kachner, my name is Robert Fedor.  I represent

03:58:57   2    Mr. DiPietro.

03:58:58   3    **A**     Nice to meet you, sir.

03:59:00   4    **Q**     Pleasure is mine.

03:59:01   5          I'd like to start just to clarify for the jury, how

           6    many game rooms did you actually own over the course of '9

03:59:03   7    to '18?  I don't know if we've heard that fully.

03:59:11   8    **A**     Partnership, roughly seven.

03:59:25   9    **Q**     Can you identify those?

03:59:27  10    **A**     The one in Massillon didn't have a name, Redemption,

03:59:33  11    Shamrock, Cafe 62, Skillz 7, Got Skillz, and one in

03:59:38  12    Austintown that I don't believe had a name either.

03:59:41  13    **Q**     And were those in existence for the entire period '9

03:59:46  14    through '18?

03:59:46  15    **A**     No, sir.

03:59:46  16    **Q**     And what was the name of the one that was closed down

03:59:48  17    that was only one for 3 or 4 months?

03:59:50  18    **A**     I don't think it had a name, sir.

03:59:52  19    **Q**     Okay.

03:59:53  20    **A**     Honestly, you had to buy one of those big light-up

03:59:58  21    signs or whatever, and it was raided before we could even

04:00:00  22    buy the thing.

04:00:02  23    **Q**     And why was it raided, to your understanding?

04:00:08  24    **A**     I don't even know what the real -- I don't even know

04:00:10  25    what the document said.

**J. Kachner (Cross by Fedor)** 369

| | | |
|---|---|---|
| 04:00:13 | 1 | **Q**    Okay.  You testified previously that Mr. DiPietro had |
| 04:00:18 | 2 | machines in Redemption at one point; correct? |
| 04:00:21 | 3 | **A**    That's true. |
| 04:00:22 | 4 | **Q**    Okay.  And do you know if Mr. DiPietro actually owned |
| 04:00:25 | 5 | and supplied the machines? |
| 04:00:27 | 6 | **A**    Yes. |
| 04:00:28 | 7 | **Q**    Okay.  And at some point, I believe your testimony was |
| 04:00:32 | 8 | 2010, 2011, that those machines were removed; correct? |
| 04:00:35 | 9 | **A**    Yes, sir. |
| 04:00:36 | 10 | **Q**    And why were they removed? |
| 04:00:38 | 11 | **A**    Because myself and Chris and Larry bought machines |
| 04:00:40 | 12 | from somewhere in the south. |
| 04:00:42 | 13 | **Q**    Was there animosity with Mr. DiPietro? |
| 04:00:45 | 14 | **A**    No.  I just didn't want to keep giving that percentage |
| 04:00:48 | 15 | up for no reason. |
| 04:00:49 | 16 | **Q**    Okay.  So, you wanted the money? |
| 04:00:52 | 17 | **A**    Correct.  Well, not -- you're saying myself.  We |
| 04:00:56 | 18 | wanted the money. |
| 04:00:56 | 19 | **Q**    You, meaning yourself, Mr. Dayton? |
| 04:01:01 | 20 | **A**    Correct. |
| 04:01:01 | 21 | **Q**    And who else? |
| 04:01:02 | 22 | **A**    Chris Kare. |
| 04:01:03 | 23 | **Q**    Okay.  Thank you. |
| 04:01:07 | 24 |      And I believe you indicated that after that date, |
| 04:01:10 | 25 | there were no longer any records kept for Redemption; |

04:01:14  1    correct?

04:01:14  2    **A**    Correct.

04:01:22  3    **Q**    How did you actually keep those records for

04:01:25  4    Redemption?  Other than the daily sheets that we heard from

04:01:29  5    Mr. Goldberg and the slips that you printed out, how did you

04:01:32  6    keep records for Redemption?

04:01:35  7    **A**    As in for the week?

04:01:36  8    **Q**    As in how to prepare your tax returns, how to split

04:01:40  9    your proceeds, how to do whatever to run the business.  How

04:01:44  10   did you keep records?

04:01:44  11   **A**    I didn't keep records.

04:01:45  12   **Q**    How did you determine what the split of the percentage

04:01:48  13   was?

04:01:49  14   **A**    How did I -- what did you say?  What did you say, sir?

04:01:52  15   **Q**    How did you determine the split amongst the owners?

04:01:56  16   **A**    By the daily sheets after we did the numbers on

04:01:58  17   Sunday.

04:01:59  18   **Q**    Okay.  And that was it?

04:02:00  19   **A**    Correct.

04:02:01  20   **Q**    And then you'd destroy those sheets; correct?

04:02:05  21   **A**    We would get rid of them, yes.

04:02:07  22   **Q**    And so at the end of the year did you have any

04:02:08  23   documents left for your taxes?

04:02:10  24   **A**    No.

04:02:11  25   **Q**    Okay.  Thank you.

**J. Kachner  (Cross by Fedor)**                    371

04:02:12  1     I believe you previously testified that you used Mike

04:02:28  2  Moneypenny to repair the machines; correct?

04:02:29  3  **A**     Where?

04:02:30  4  **Q**     Good question.

04:02:33  5     Where did he repair machines?

04:02:35  6  **A**     Multiple stores, but he wasn't the only one that was

04:02:37  7  used.

04:02:39  8  **Q**     Did he repair machines at Skilled Shamrock?

04:02:41  9  **A**     Yes.

04:02:42  10  **Q**     Did he work for RND [sic] Leasing?

04:02:46  11  **A**     He worked for Ron DiPietro.

04:02:48  12  **Q**     Okay.  Do you know the difference -- let me back up

04:02:52  13  and restate the question.

04:02:53  14     Do you know what RNB Leasing was?

04:02:55  15  **A**     Yeah, a bullshit thing that he had people sign that

04:02:58  16  tried to keep him out of trouble for like what we're doing

04:03:00  17  right now.

04:03:01  18  **Q**     Okay.  Do you know who Billy Pool is?

04:03:03  19  **A**     I have no clue who Billy Pool is.

04:03:04  20  **Q**     Would it surprise you if I told you the B stood for

04:03:09  21  Billy Pool who is a partner in RNB Leasing?

04:03:11  22  **A**     I don't know who it is.

04:03:12  23  **Q**     Okay.  Would it surprise you that Mr. DiPietro met

04:03:15  24  with an attorney and had lease agreements drafted for every

04:03:18  25  one of the game rooms that he had machines in?

04:03:20    1    **A**      I don't know if he did or not.

04:03:20    2    **Q**      Exactly.  You don't.

04:03:44    3                   MR. FEDOR:  Carissa, could we pull up

04:03:46    4    Exhibit 410, Government's Exhibit 410.

04:03:49    5          Thank you.  Thanks again for all your help.

04:03:53    6                   MS. WELCH:  You're welcome.

04:03:54    7    BY MR. FEDOR:

04:03:55    8    **Q**      Do you see Government's Exhibit 410 in front of you,

04:03:57    9    Mr. Kachner?

04:03:57   10    **A**      I do, sir.

04:03:58   11    **Q**      And what kind of familiarity do you have with this

04:04:02   12    document?

04:04:03   13    **A**      My name is not on this document, sir.  It says Derek

04:04:06   14    Phillips.

04:04:06   15    **Q**      Exactly.  But how many times have you seen this lease

04:04:08   16    agreement?

04:04:09   17    **A**      Maybe three or four times.

04:04:11   18    **Q**      And what was that situation where you saw it the three

04:04:13   19    or four times?

04:04:19   20    **A**      I believe once in the store when Derek had to sign it,

04:04:22   21    and then the other times would have been with the federal

04:04:24   22    government.

04:04:25   23    **Q**      Okay.  So, once with Derek Phillips; correct?

04:04:29   24    **A**      Correct.

04:04:30   25    **Q**      The other times with the federal government; correct?

**J. Kachner  (Cross by Fedor)**                    373

| | | |
|---|---|---|
| 04:04:32 | 1 | **A**    Correct. |

**A**    Correct.

04:04:33  2  **Q**    And that was for preparation of today's testimony?

04:04:38  3  **A**    In preparation?

04:04:40  4  **Q**    In preparation for your testimony today; correct?

04:04:42  5  **A**    Correct.

04:04:43  6  **Q**    So you've seen the document once?

04:04:48  7  **A**    No.  We just said we've seen it three or four times.

04:04:50  8  **Q**    While you were operating -- while you were operating

04:04:54  9  the game rooms, while you were using the RNB Leasing

04:04:57  10  machines in the game rooms, you've seen the document once.

04:04:59  11  That's your testimony?

04:05:00  12  **A**    Correct.

04:05:10  13            MR. FEDOR:  Carissa, can you turn to I think

04:05:12  14  Page 3, the last page?

04:05:14  15  BY MR. FEDOR:

04:05:14  16  **Q**    And what's the date on the lease agreement?

04:05:16  17  **A**    8-29-2010.

04:05:19  18  **Q**    And you agree these were all RNB Leasing machines in

04:05:24  19  the Skilled Shamrock room, correct?

04:05:27  20  **A**    To be honest, from seeing all your guys' paperwork,

04:05:30  21  this RNB Leasing, now it says BNR Leasing.

04:05:31  22    Which one are you using?  Are you using RNB or are you

04:05:33  23  using BNR or which one are you using?

04:05:35  24  **Q**    Just answer my question, please.

04:05:37  25  **A**    I'm asking you a question.  I can't answer that

04:05:38  1    question if -- you just said from RNB.  So, no, the lessor

04:05:41  2    is BNR Leasing, LLC, sir.  So your question is actually no,

04:05:45  3    this isn't from RNB.

04:05:47  4         Now, if you go to the first page, it does state RNB.

04:05:50  5    So if you want to redirect your question to the right

04:05:53  6    answer, then I'll give it to you.

04:05:54  7    Q    You know, it's not up to you whether it's right or

04:05:57  8    wrong.  It's up to me to ask the questions, you answer them,

04:05:59  9    please.

          10    A    That's fine.

04:05:59  11   Q    Would you just cooperate today?

04:06:02  12   A    That's fine.  But ask --

          13   Q    It would be really helpful if you cooperated.

04:06:02  14   A    Sir, you asked me a question that regarded to RNB;

04:06:05  15   correct?

04:06:06  16   Q    I asked you a question about a lease agreement.

04:06:08  17   Answer my questions.

04:06:09  18   A    Okay.  This doesn't have -- where it's signed right

04:06:11  19   here says BNR, not RNB, sir.

04:06:14  20   Q    That's correct, it does.

04:06:15  21        And what's the date on it?

04:06:16  22   A    8-29-2010.

04:06:18  23   Q    And who signed off on that?

04:06:20  24   A    Tristan DiPietro, technician, Derek Phillips -- just

04:06:28  25   says Derek Phillips again, three times.

| | | |
|---|---|---|
| 04:06:30 | 1 | **Q**    Thank you. |
| 04:06:45 | 2 | Do you understand the percentages that were to be paid |
| 04:06:50 | 3 | for Mr. DiPietro's RNB/BNR Leasing's machines in Skilled |
| 04:06:57 | 4 | Shamrock?  Do you understand the percentage that was set up? |
| 04:06:58 | 5 | **A**    No. |
| 04:07:04 | 6 | MR. FEDOR:  I'm sorry, Carissa, can you take |
| 04:07:05 | 7 | it back up?  I'm not done. |
| 04:07:07 | 8 | MS. WELCH:  Yep.  What was the document? |
| 04:07:09 | 9 | MR. FEDOR:  410. |
| 04:07:10 | 10 | Thank you. |
| 04:07:14 | 11 | I think there's a Schedule A attached, the addendum? |
| 04:07:18 | 12 | Last page. |
| 04:07:20 | 13 | Correct.  Thank you. |
| 04:07:22 | 14 | BY MR. FEDOR: |
| 04:07:22 | 15 | **Q**    Can you take a look at Exhibit A for a minute? |
| 04:07:25 | 16 | Are you familiar with Exhibit A, the one time you saw |
| 04:07:28 | 17 | this prior to preparation for this today? |
| 04:07:30 | 18 | **A**    I can't say that I went through it fully like this, |
| 04:07:32 | 19 | no. |
| 04:07:32 | 20 | **Q**    Okay.  Will you spend a minute and go through a little |
| 04:07:35 | 21 | bit more fully today so you see it? |
| 04:07:38 | 22 | **A**    I see it, sir. |
| 04:07:39 | 23 | **Q**    Okay.  And the last line, what does that say? |
| 04:07:46 | 24 | **A**    The last line? |
| 04:07:48 | 25 | **Q**    Correct. |

04:07:48  1    **A**    Says "40 percent."

04:07:50  2    **Q**    And what is that for?

04:07:51  3    **A**    That's a lie.

04:07:53  4    **Q**    What does the document state, sir?  I'm not asking you

04:07:56  5    what your opinion is.

04:07:58  6    **A**    But it -- you're asking me what it is, and I'm telling

04:08:00  7    you that that's not a true statement.  It was 50 percent.

04:08:03  8    **Q**    Does the document itself say "rental percentage,

04:08:06  9    40 percent"?

04:08:06  10   **A**    It does, sir.

          11   **Q**    Thank you.

04:08:07  12   **A**    It also says an initial term of a lease for 5 years,

04:08:10  13   which would be outdated.

04:08:13  14   **Q**    There may be more than one lease perhaps; correct?

04:08:15  15   **A**    There wasn't.

04:08:16  16   **Q**    How do you know if you've only seen it once?

04:08:18  17   **A**    Because I would have known if he signed the paperwork,

04:08:20  18   sir.

04:08:20  19   **Q**    How?  Your name's not on here.

04:08:29  20          So these are Mr. DiPietro's machines in Skilled

04:08:35  21   Shamrock; correct?

04:08:35  22   **A**    Yes, sir.  Yes, sir.

04:08:35  23   **Q**    Okay.  And Mr. DiPietro owned those machines; correct?

04:08:39  24   **A**    I don't know if he personally owned them, but he put

04:08:41  25   them in the store.

04:08:42  1    **Q**    Or RNB or BNR Leasing may have, correct, as well?

04:08:46  2    **A**    Correct.

04:08:46  3    **Q**    Okay.  How was BNR Leasing, RNB Leasing, Mr. DiPietro

04:08:52  4    compensated for the ownership of those machines?

04:08:57  5    **A**    He was given 50 percent of the proceeds.

04:08:59  6    **Q**    Right.  For the machines; correct?

04:09:00  7    **A**    From the machines after expenses and everything.

04:09:03  8    **Q**    Exactly.

04:09:04  9          And, so, they purchase the machines, they put them in

04:09:09  10   Skilled Shamrock, and at least per this document said a

04:09:13  11   40 percent rental percentage, correct, for the usage of the

04:09:15  12   machines in each of the game rooms -- I take that back --

04:09:18  13   Skilled Shamrock game room?

04:09:19  14   **A**    Correct.

04:09:19  15   **Q**    Thank you.

04:09:24  16          I think you -- I believe you told the government, and

04:09:30  17   I can refresh your recollection, that Mr. DiPietro was

04:09:32  18   actually only in Skilled Shamrock once or twice to your

04:09:35  19   recollection.

04:09:36  20          Do you remember that?

04:09:36  21   **A**    Into the game room itself?

04:09:38  22   **Q**    Yes.

04:09:39  23   **A**    I don't know if he's been there at all to be honest.

04:09:41  24   I don't know.

04:09:41  25   **Q**    Okay.  And you understand that he's a certified public

04:09:48  1  accountant; correct?

04:09:48  2  **A**    Correct.

04:09:49  3  **Q**    And that is his full-time profession; correct?

04:09:52  4  **A**    Correct.

04:09:53  5  **Q**    And you don't recall if he was ever seen in Skilled

04:10:02  6  Shamrock?

04:10:02  7  **A**    He was a silent partner.

04:10:05  8  **Q**    Well, he was being compensated for the machines that

04:10:07  9  he put in the game room; correct?

04:10:09  10  **A**    He was a silent partner, sir.

04:10:10  11  **Q**    Well, I think your prior testimony is that he put

04:10:14  12  machines in, and he was compensated with the percentage.

04:10:17  13  **A**    No.  My previous statement was that him and Chris

04:10:21  14  Karasarides put games in.

04:10:37  15           MR. FEDOR:  Carissa, could you pull up

04:10:40  16  Exhibit 436, please?

04:10:47  17       Thank you.

04:10:54  18  BY MR. FEDOR:

04:10:55  19  **Q**    This is Government's Exhibit 436 which you've seen

04:10:59  20  previously.  I think, obviously, Mr. Bean discussed it with

04:11:02  21  you.  Mr. Goldberg discussed it with you to some degree.

04:11:04  22       I'm not going to get into the weeds again with the

04:11:08  23  jurors.  They've heard plenty about spreadsheets, they've

04:11:11  24  heard plenty about the summaries and all that.  But I don't

04:11:13  25  see your name on here.

**J. Kachner  (Cross by Fedor)**                                    379

04:11:14  1        Is your name on here anywhere?

04:11:17  2    **A**    No, sir.

04:11:19  3    **Q**    I didn't think so.

04:11:20  4        Where is your split coming out of this document?

04:11:23  5    **A**    The other 50 side.

04:11:25  6    **Q**    Okay.  And how was anyone to know that sitting here

04:11:28  7    today?

04:11:29  8    **A**    Because I'm telling you on the stand in front of God.

04:11:31  9    **Q**    Right.  Today.  Right?  Today?

04:11:34  10   **A**    Or when I did my proffer and everything else.

04:11:36  11   **Q**    Right.  Well, we weren't at your proffer session.

04:11:39  12   **A**    That's why I just told you that.

04:11:40  13   **Q**    Right.  Thank you.

04:11:41  14       So your name's nowhere on this document?

04:11:45  15   **A**    No, sir.

04:11:46  16   **Q**    Okay.  Was it on any of these spreadsheets that rolled

04:11:49  17   up into this document?

04:11:52  18   **A**    My name's not on any of it.

04:11:54  19   **Q**    Correct.  I didn't think so.

04:11:58  20   **A**    Isn't that worse?

04:12:09  21   **Q**    Have you filed your 2018 tax return?

04:12:11  22   **A**    I've been advised not to until the court allows me to.

04:12:14  23   **Q**    And who told you that?

04:12:17  24   **A**    What do you want me to file?

04:12:19  25   **Q**    I'm asking you a question.  Who told you not to file a

| | | |
|---|---|---|
| 04:12:22 | 1 | tax return for 2018? |
| 04:12:24 | 2 | **A**    I've been advised not to file taxes until the judge |
| 04:12:27 | 3 | rules and what that I need to file so that I don't go into |
| 04:12:32 | 4 | the defrauding the United States government again, like I'm |
| 04:12:37 | 5 | on the case now. |
| 04:12:39 | 6 | **Q**    Do you have a draft of your 2018 tax return? |
| 04:12:42 | 7 | **A**    Why would I have a draft of 2018? |
| 04:12:45 | 8 | **Q**    Well, because we're in 2024. |
| 04:12:50 | 9 | **A**    Sir, I answered your question. |
| 04:12:52 | 10 | **Q**    Have you filed for 2019? |
| 04:12:54 | 11 | **A**    Nope.  No, sir, I have not. |
| 04:12:56 | 12 | **Q**    And in 2018, you were still running your game rooms; |
| 04:13:00 | 13 | correct? |
| 04:13:00 | 14 | **A**    Until June or July I believe it was. |
| 04:13:03 | 15 | **Q**    Correct. |
| 04:13:04 | 16 |         But you have yet to file -- are you aware that you |
| 04:13:07 | 17 | have a legal duty to file a tax return each and every year? |
| 04:13:10 | 18 | **A**    Are you aware that I owe 1.3 million already?  What's |
| 04:13:14 | 19 | another 1.3 million? |
| 04:13:15 | 20 | **Q**    The question is to you, sir.  Will you answer my |
| 04:13:17 | 21 | question? |
| 04:13:17 | 22 | **A**    I just did with the comment. |
| 04:13:19 | 23 | **Q**    I'll repeat it. |
| 04:13:20 | 24 | **A**    Okay. |
| 04:13:20 | 25 | **Q**    Are you aware you have a legal duty to file a tax |

04:13:22    1    return each and every year?

04:13:24    2    **A**    I'm on trial right now for illegally filing my taxes.

04:13:28    3    **Q**    You're not on trial right now.  You already cut your

04:13:31    4    deal with the government.

04:13:31    5    **A**    Right.  Cut my deal.  You're right.

04:13:35    6                MR. FEDOR:  Judge, could you instruct the

04:13:37    7    witness to answer the question?

04:13:38    8                THE COURT:  Ask him a question.

04:13:40    9    BY MR. FEDOR:

04:13:40   10    **Q**    Are you aware you have a legal duty to file your --

04:13:43   11    are you aware you have a legal duty to file a tax return

04:13:45   12    each and every year?

04:13:46   13    **A**    Correct.

04:13:47   14    **Q**    Thank you.

04:13:49   15         And you have not done so; correct?

04:13:51   16    **A**    Correct.

04:13:52   17    **Q**    And why haven't you?

04:13:54   18                THE WITNESS:  I already answered that, Judge.

04:13:57   19    BY MR. FEDOR:

04:13:57   20    **Q**    Well, I'm a little slow.  Can you help me out?

04:14:00   21    **A**    No, you're not.  You're very smart and intelligent.

04:14:04   22    Quit being stupid.

04:14:04   23                THE COURT:  He's answered it, like, three

04:14:05   24    times.

04:14:06   25                THE WITNESS:  Thank you, sir.

**J. Kachner  (Cross by Fedor)**                              382

04:14:07   1      You guys keep -- it's circling, questions.  Like, come

           2   on, man.

           3                MR. FEDOR:  It's because we get different

           4   answers.

04:14:09   5                THE WITNESS:  No, you don't.  You try to

04:14:10   6   manipulate it.  You try to get me to say something that you

04:14:13   7   want to hear.  You ain't going to get it out of me, bud.

           8   BY MR. FEDOR:

04:14:25   9   **Q**    Going back to your destruction of records real quick.

04:14:28  10   **A**    Okay.

04:14:28  11   **Q**    How do you file a tax return if you destroyed all the

04:14:31  12   records?

04:14:32  13   **A**    Like I -- like I stated before, I went in and told

04:14:36  14   Mr. DiPietro a number and he filed it.

04:14:40  15   **Q**    And that was the end of it?

04:14:41  16   **A**    Correct.  Besides the expenses he asked me to put on

04:14:45  17   there.

04:14:45  18   **Q**    Okay.  So you told him a number, he prepped it and

04:14:48  19   that was it?

04:14:48  20   **A**    Correct.

04:14:49  21   **Q**    How long -- give the jurors an idea how your tax

04:14:53  22   preparation worked.  What happened?  You schedule a meeting?

04:14:56  23   **A**    My wife would schedule a meeting, yes.

04:14:57  24   **Q**    And you go into his office; correct?

04:14:59  25   **A**    Correct.

**J. Kachner  (Cross by Fedor)**                               383

04:15:00  1   **Q**     And how long was the period of time where the tax

04:15:02  2   return was prepared?  Did you drop off your things and then

04:15:07  3   pick it up?

04:15:08  4   **A**     No.  We sat there and did it.

04:15:09  5   **Q**     Right.

04:15:09  6          And how long did that take?

04:15:12  7   **A**     An hour, hour and a half, maybe.

04:15:14  8   **Q**     Okay.  And you sat at a table.  You gave him your

04:15:17  9   information, he inputted it; correct?

04:15:19  10  **A**     He put it in, yes.

04:15:20  11  **Q**     Correct.  Some of the years.

04:15:22  12         You've also testified I think it was the first year,

04:15:24  13  2013, that Leah Stark prepared your return; right?

04:15:28  14  **A**     Well, let me back up here.

04:15:29  15         I didn't have any paperwork for anything to do with

04:15:32  16  the game rooms.  Any paperwork I had was for my car lot.

04:15:34  17  **Q**     That's kind of my point.

04:15:36  18  **A**     Okay.

04:15:36  19  **Q**     How do you prepare an accurate tax return if you're

04:15:39  20  not giving your accountant good paperwork?

04:15:42  21  **A**     Because he never asked for it.  But he asked me for

04:15:45  22  the paperwork for Premos so that we could do it properly.

04:15:48  23  **Q**     It's not up to your accountant to do an audit of your

04:15:52  24  personal life.  He prepares a return based on information

04:15:54  25  you give him.

**J. Kachner  (Cross by Fedor)**                                     384

04:15:56  1    **A**     Yeah, you're right.

04:15:57  2    **Q**     Exactly.  And you didn't have anything to give him.

04:16:00  3    **A**     He was a partner in a game room.  He knew I didn't

04:16:03  4    make the amount of money that we made.

04:16:05  5          Where you going with this again?

04:16:07  6    **Q**     Please don't challenge me.  I'm just trying to get

04:16:09  7    some answers that are accurate.

04:16:10  8    **A**     Right, but your questions are misleading.

04:16:21  9              MR. FEDOR:  Carissa, could we go to

04:16:22  10   Government's Exhibit 322?

04:16:27  11         Thank you very much.

04:16:29  12   BY MR. FEDOR:

04:16:30  13   **Q**     Can you read Paragraph 2 out loud, please, for the

04:16:33  14   jurors?

04:16:34  15   **A**     We will -- "we will prepare"?

04:16:36  16   **Q**     Yes.

04:16:37  17   **A**     "We will prepare your 2012 federal and state income

04:16:40  18   tax returns.  We will depend on you to provide the

04:16:44  19   information we need to prepare complete and accurate

04:16:47  20   returns."  Excuse me.  "We may ask you to clarify some items

04:16:51  21   but will not audit or otherwise verify the data you submit."

04:16:56  22   **Q**     That's exactly what I just asked you a moment ago;

04:16:59  23   correct?  He doesn't audit you.  That's what it says right

04:17:03  24   in the engagement letter.

04:17:05  25   **A**     Correct.

**J. Kachner (Cross by Fedor)**                                    385

04:17:06   1    **Q**    Can you read the next paragraph, please, out loud?

04:17:13   2    **A**    "We will perform accounting services only as needed to

04:17:23   3    prepare your tax returns.  Our work will not include

04:17:27   4    procedures to find" -- whatever that word --

04:17:34   5    "defalcations or other irregularities.  Accordingly, our

04:17:38   6    engagement should not be relied upon to disclose errors,

04:17:44   7    fraud, or other illegal acts, though it may be necessary for

04:17:48   8    you to clarify some of the information you submit.  We will

04:17:52   9    of course inform you of any material errors, fraud, or other

04:17:57   10   illegal acts we discover."

04:17:59   11   **Q**    Thank you.

04:18:00   12                 MR. FEDOR:  And Carissa, could you go to

04:18:02   13   Page 2 of that?

           14   BY MR. FEDOR:

04:18:05   15   **Q**    Is that you and your wife's signature on that

04:18:07   16   document?

04:18:08   17   **A**    Yes.

04:18:10   18   **Q**    Thank you.

04:18:12   19                 MR. FEDOR:  Could we go to Government's

04:18:14   20   Exhibit 326?

           21   BY MR. FEDOR:

04:18:18   22   **Q**    I'm not going to get into the weeds again about this,

04:18:21   23   but this is a -- an engagement letter, again, dated

04:18:25   24   August 8th of 2016, you and your wife's name is on it, and

04:18:29   25   it's for preparation of your 2015 tax returns.  Correct?

**J. Kachner (Cross by Fedor)**                                        386

04:18:32  1    **A**    Correct.

04:18:33  2    **Q**    And, like I said, I'm not going to reiterate it.  I

04:18:37  3    think it's -- actually, it's a little bit different

04:18:40  4    language.

04:18:40  5         Would you read in Paragraph 2?  Read it out loud,

04:18:43  6    please.

04:18:43  7    **A**    "We will prepare your 2015 federal and state income

04:18:47  8    tax returns.  We will depend on you to provide the

04:18:50  9    information we need to prepare complete and accurate

04:18:52  10   returns.  We may ask you to clarify some items but will not

04:18:57  11   audit or otherwise verify your data to submit.  An organizer

04:19:01  12   is enclosed to help you collect the data required for your

04:19:05  13   return.  The organizer will help you avoid overlooking

04:19:09  14   important information.  By using it, you will contribute to

04:19:14  15   efficient preparation of your returns and help minimize the

04:19:17  16   cost of our service."

04:19:19  17   **Q**    Thank you.

04:19:20  18              MR. FEDOR:  And Carissa, could you go to

04:19:22  19   Page 2, please?

04:19:23  20         Thank you.

04:19:23  21   BY MR. FEDOR:

04:19:24  22   **Q**    Is that you and your wife's signature on that as well?

04:19:25  23   **A**    Correct.

04:19:26  24   **Q**    And it's Mr. DiPietro's as well; correct?

04:19:30  25   **A**    It's signed above his name, yes.

04:19:32  1  **Q**    Correct.  Correct.

04:19:34  2              MR. FEDOR:  Could we go to Government's

04:19:36  3  Exhibit 329?

          4  BY MR. FEDOR:

04:19:40  5  **Q**    And once again, I'm not going to go too far in the

04:19:43  6  weeds.  It's an engagement letter from Mr. DiPietro's office

04:19:46  7  dated April 9th, 2018, in reference to your 2017 tax

04:19:50  8  returns.  And it's the same language, the same limiting

04:19:53  9  language.  It says, Hey, Jason Kachner, Rebecca Kachner, you

04:19:56  10  got to give us the documents so we can prepare an accurate

04:19:59  11  tax return, and we're not responsible because we don't know

04:20:02  12  what else is going on in your life to prepare an accurate

04:20:05  13  tax return.

04:20:06  14       So you're sitting down for an hour with Mr. DiPietro,

04:20:10  15  or Leah Stark, or Tristan DiPietro, whomever was preparing

04:20:15  16  returns, and you have to give them the documentation;

04:20:18  17  correct?

04:20:18  18  **A**    That's false information.  He knew what we were making

04:20:21  19  at the Shamrock.

04:20:22  20  **Q**    How?

04:20:22  21  **A**    Because he's got the spread -- what do you mean?  He's

04:20:25  22  got the spreadsheets.  He knows what was getting taken out

04:20:29  23  of there.

04:20:29  24  **Q**    Okay.  Carissa --

04:20:30  25  **A**    It says that -- you just said that it would depend on

04:20:32  1  you to provide the proper information; correct?  Accurate

04:20:35  2  things.

04:20:35  3  **Q**    Yeah.

04:20:36  4  **A**    He knew specifically that I made more money than what

04:20:39  5  I did just from Shamrock.

04:20:41  6  **Q**    Who is this letter directed to?

04:20:44  7  **A**    Myself and my wife.

04:20:46  8  **Q**    Right.

04:20:46  9       It's not directed to Mr. DiPietro.  It's directed to

04:20:50  10  you?

04:20:50  11  **A**    Correct, but your comment was that he had -- he

04:20:54  12  doesn't have to audit or say anything.  He knew damn well

04:20:57  13  what we were making.

04:20:58  14  **Q**    We'll get to that in a moment.

04:21:00  15  **A**    Okay.

04:21:00  16  **Q**    So you signed an engagement letter.

04:21:03  17       Did you also receive the tax organizer that was sent

04:21:06  18  with this?

04:21:06  19  **A**    I have no -- I have no -- I don't know.

04:21:10  20  **Q**    It says, the paragraph you read out loud to the

04:21:12  21  jurors, "An organizer is enclosed to help you collect the

04:21:15  22  data required for your returns"; right?

04:21:18  23  **A**    Okay.

04:21:20  24  **Q**    So, did you receive that?  Do you recall?

04:21:23  25  **A**    I don't recall.

04:21:24  1   **Q**    Do you recall filling out a tax organizer?

04:21:26  2   **A**    I don't -- can you show me a picture of one, please?

04:21:29  3   **Q**    I don't need to.

04:21:31  4   **A**    Well, you do when you got someone up here that doesn't

04:21:34  5   know nothing about taxes and you're asking about a tax

04:21:37  6   organizer.

04:21:37  7   **Q**    Okay.

04:21:37  8   **A**    So a document to submit to the gov- -- to the court so

04:21:40  9   that I could see it would be pretty dope.

04:21:42  10  **Q**    I don't understand what dope means.

04:21:45  11         What do you mean by that?

04:21:46  12  **A**    It means --

04:21:46  13  **Q**    I'm too old for that.  I don't get it.

04:21:47  14         What do you mean by that?

04:21:47  15  **A**    Where are you going with this, dude?

04:21:49  16         You're like my wife, take one word out of the sentence

04:21:52  17  and try to go with it.  Come on, man.

04:21:53  18  **Q**    I didn't understand.

04:21:54  19         What do you mean by that?

04:21:55  20  **A**    What does dope mean?

04:21:57  21  **Q**    Yeah.

04:21:57  22  **A**    Cool.

04:21:58  23  **Q**    Oh, okay.  Thank you.

04:22:00  24  **A**    I'm sure you do.  You've got kids, don't you?

04:22:02  25  **Q**    It also indicates in this engagement letter -- this is

04:22:05  1  a contract between you and Mr. DiPietro, by the way.  It

04:22:08  2  says, we'll prepare your return if you do X.

04:22:11  3  **A**    And he'll do my returns as long as he knows that I'm

04:22:15  4  putting the right proper numbers down; correct?

04:22:18  5  **Q**    No.

04:22:18  6  **A**    Why not -- no.  Why no?

04:22:22  7  **Q**    Because it's not incumbent on --

04:22:23  8  **A**    He was a partner of mine, sir.  He knows exactly what

04:22:25  9  I was making at a store.

04:22:27  10  **Q**    Okay.

04:22:29  11          MR. FEDOR:  Carissa, can we go back to

04:22:31  12  Exhibit 436?

04:22:37  13  BY MR. FEDOR:

04:22:38  14  **Q**    Let's revisit 436, the summaries.

04:22:40  15          Where is your name on this sheet?

04:22:41  16  **A**    Where is my name on the sheet?

04:22:42  17  **Q**    Yeah.

04:22:43  18  **A**    50 percent of net.

04:22:45  19  **Q**    Where does it say Jason Kachner on here?

04:22:48  20  **A**    Because he knew.

04:22:49  21  **Q**    How?

04:22:51  22  **A**    Hmm.  Let's see, from 2011 until 2018 we were in

04:22:56  23  business with text messages back and forth.

04:22:59  24  **Q**    I haven't seen those text messages.  Have you produced

04:23:01  25  them to the government?

| | | | |
|---|---|---|---|
| 04:23:02 | 1 | **A** | Have you been in court today, sir? |
| 04:23:08 | 2 | **Q** | Please don't insult me. |
| 04:23:09 | 3 | **A** | Okay.  Please don't insult me. |
| 04:23:10 | 4 | **Q** | I'm not. |
| 04:23:11 | 5 | **A** | Yes, you are. |
| 04:23:12 | 6 | **Q** | I don't see your name on this document. |
| 04:23:12 | 7 | **A** | Yes, you are.  You're belittling me, and I'm tired of |
| 04:23:14 | 8 | | it. |
| | 9 | **Q** | You testified -- |
| 04:23:14 | 10 | **A** | Ask me questions that mean something to the case, sir. |
| 04:23:16 | 11 | **Q** | You testified your name wasn't on this document or any |
| 04:23:18 | 12 | | of the other summary spreadsheets. |
| 04:23:19 | 13 | **A** | We've already went over the fact that CK and Ron get |
| 04:23:22 | 14 | | the 50 percent and myself and Larry were getting the other |
| 04:23:25 | 15 | | 50, and Chris Kare's third came back over. |
| 04:23:27 | 16 | **Q** | And we also went through that he was supplying the |
| 04:23:30 | 17 | | machines, and there was a percentage and a lease agreement |
| 04:23:32 | 18 | | in place to allow for 40 percent payment for those machines. |
| 04:23:35 | 19 | **A** | Which I told you before was BS. |
| 04:23:38 | 20 | **Q** | That's not what the lease agreement says. |
| 04:23:40 | 21 | **A** | I don't care what lease agreement says.  That lease |
| 04:23:43 | 22 | | agreement said it was for 5 years from 2010.  We're in 2024 |
| 04:23:43 | 23 | | now.  We were raided in 2018.  On top of the fact that |
| 04:23:48 | 24 | | 40 percent went out the window in, like, '13.  So that |
| 04:23:51 | 25 | | document is now null and void, sir. |

04:23:54    1    And again, Derek Phillips wasn't the owner of the

04:23:56    2    facility.  We've already established that; correct?

04:23:59    3    **Q**    Did you file accurate tax returns in 2013, '14, '15,

04:24:03    4    '16, or '17?

04:24:04    5    **A**    I haven't filed an accurate tax return for the

04:24:07    6    handyman service not one time, sir.

04:24:09    7    **Q**    Have you filed an accurate 1040 -- I don't care about

04:24:13    8    handyman.  I didn't ask that question.

04:24:14    9    Did you file an accurate tax return?

04:24:16   10    **A**    I'm telling you that the handyman business that I

04:24:18   11    filed was not filed properly.  The Premos Used Cars was

04:24:22   12    filed properly, to the T.

04:24:25   13                MR. FEDOR:  Carissa, could you pick up -- pull

04:24:27   14    up Government's Exhibit 319?

04:24:39   15    BY MR. FEDOR:

04:24:40   16    **Q**    I think this was introduced by Mr. Bean on direct.

04:24:43   17    It's Form 8879.  I don't know if you're aware what that is.

04:24:47   18    Do you know what this document is, Mr. Kachner?

04:24:48   19    **A**    Says the IRS e-file signature authorization.

04:24:51   20    **Q**    Yeah.  Do you know what that means?

04:24:53   21    **A**    I stated before I didn't.

04:24:55   22    **Q**    Okay.  Do you see the Part 3, certification,

04:25:00   23    authentication, practitioner PIN method only?

04:25:05   24    **A**    I see that down there, yes.

04:25:06   25    **Q**    Yeah.  And this is yours and your wife's signature on

**J. Kachner (Cross by Fedor)** 393

04:25:09  1    this; correct?

04:25:12  2    **A**    Yes.

04:25:13  3    **Q**    And it looks like a timely filed 2010 tax return

04:25:16  4    because this document's dated April 6th of 2011; correct?

04:25:23  5    **A**    Yes, it is.

04:25:24  6    **Q**    And who's the signature that's typed in underneath the

04:25:28  7    certification?

04:25:32  8    **A**    Under --

04:25:33  9    **Q**    It's printed.

04:25:35  10   **A**    The Ron Anderson & Associates, is that what you're

04:25:39  11   talking about?

04:25:39  12   **Q**    No.  Keep going down to the bottom, the very bottom.

04:25:40  13   It says, "ERO's signature"?

04:25:42  14   **A**    Tristan DiPietro?

04:25:43  15   **Q**    Yeah.  That's not Ronald DiPietro, is it?

04:25:46  16   **A**    No.  That's his son.

04:25:47  17   **Q**    Correct.

04:25:50  18        So, you don't know what this document is, but do you

04:25:52  19   know if your return was electronically filed or mailed by

04:25:57  20   snail mail?

04:25:58  21   **A**    What's snail mail, sir?

04:25:59  22   **Q**    U.S. Postal Service.

04:26:03  23   **A**    What's the question?

04:26:05  24   **Q**    Do you know if your tax returns were filed

04:26:07  25   electronically or by the U.S. Postal Service?

**J. Kachner  (Cross by Fedor)**                      394

04:26:11  1   **A**    I don't know what -- how they were filed, sir.

04:26:13  2   **Q**    Okay.  Do you know if they were filed?

04:26:15  3   **A**    Well, yeah, they were filed because I had to pay on

04:26:17  4   them.

04:26:18  5   **Q**    Pardon me?  I didn't hear that.

04:26:19  6   **A**    Yes, they were filed because I had to pay every year.

04:26:23  7   **Q**    And so for this year, 2010, there's a balance due of

04:26:27  8   $2,479; correct?

04:26:29  9   **A**    Okay.

04:26:30  10  **Q**    Does it say that on here?

04:26:31  11  **A**    I don't -- like I stated before at about 5 hours ago,

04:26:37  12  taxes ain't my thing.

04:26:39  13  **Q**    I'm sorry.  I didn't hear that again.

04:26:40  14  **A**    Taxes aren't my thing.

04:26:42  15  **Q**    Okay.  What is your thing?

04:26:48  16  **A**    Being respectful and truthful and standing up for what

04:26:50  17  I did was wrong and taking my -- taking it on the chin,

04:26:54  18  unlike others that are in this case.

04:26:56  19            MR. KERSEY:  Objection, Your Honor.

04:26:57  20            THE WITNESS:  What do you -- I mean --

04:26:59  21            THE COURT:  Too late.

04:27:01  22            MR. KERSEY:  Objection to wise answer.

04:27:03  23            THE COURT:  Too late.

04:27:05  24            MR. FEDOR:  Carissa, could you pull up

04:27:07  25  Government's Exhibit 320, please?

**J. Kachner  (Cross by Fedor)**                                    395

04:27:18    1    BY MR. FEDOR:

04:27:19    2    **Q**      Have you seen Government's Exhibit 320 before,

04:27:20    3    Mr. Kachner?

04:27:23    4    **A**      I don't -- I have seen a lot of exhibits, sir.

04:27:25    5    **Q**      Okay.  Can you take a moment and take a look at that

04:27:28    6    and see if you recall?

04:27:29    7    **A**      Yes, sir, I see it.

04:27:30    8    **Q**      Do you know what it is?

04:27:32    9    **A**      Looks like a paid fee for the Ron Anderson &

04:27:37   10    Associates.

04:27:37   11    **Q**      All right.  Would this be for tax return preparation?

04:27:41   12    **A**      I would say yes.

04:27:42   13    **Q**      Okay.  And how much did you pay Ron Anderson &

04:27:46   14    Associates?

04:27:46   15    **A**      It says a hundred dollars.

04:27:48   16    **Q**      And what was the date of it?

04:27:49   17    **A**      4-4-12.

04:27:52   18    **Q**      And who prepared that return?

04:27:53   19    **A**      Tristan.

04:27:55   20    **Q**      Correct.

04:27:55   21           It wasn't Ronald DiPietro on this receipt, is it?

04:28:01   22    **A**      What about 2015, '16, '17?

04:28:04   23    **Q**      That wasn't my question.  Would you just answer my

04:28:05   24    question?

04:28:06   25    **A**      No, because you're bringing his son into it.  You guys

04:28:09    1    need to quit bringing their sons into it.  They didn't have

04:28:09    2    nothing to do with this case.

04:28:11    3    **Q**    What -- whose name is on this receipt?

04:28:13    4    **A**    Tristan.

04:28:14    5    **Q**    Thank you.

04:28:14    6    **A**    Yes.

            7         I don't know where you're going with that.  It was

04:28:19    8    one -- one filing.

04:28:19    9              MR. FEDOR:  Carissa, could you pull up

04:28:22   10    Exhibit 321?

04:28:26   11    BY MR. FEDOR:

04:28:27   12    **Q**    Are you familiar with this document, Mr. Kachner?

04:28:29   13    **A**    Yes.  It's the same one that you just showed me for

04:28:32   14    2012, sir.

04:28:33   15    **Q**    Well, but what's the date on this one?

04:28:34   16    **A**    2013, sir.

04:28:36   17    **Q**    Correct.  And what's the -- March 30th of 2013,

04:28:40   18    correct?

04:28:40   19    **A**    Yes.  3-30, sir.

04:28:42   20    **Q**    And would it be a fair assumption that this was for

04:28:44   21    your 2012 tax return?

04:28:46   22    **A**    I believe that's right.

04:28:48   23    **Q**    Okay.  What did you pay for tax preparation for all

04:28:52   24    your 1040 work?  What did you pay as your fee?

04:28:54   25    **A**    $100.

| 04:28:56 | 1 | **Q** | Correct. |

04:28:56  2        And who prepared it?

04:28:58  3  **A**    Tristan.

04:29:01  4  **Q**    Thank you.

04:29:01  5  **A**    But can I also state for the record I believe --

04:29:03  6  **Q**    No.  No, you answered the question.

04:29:05  7  **A**    Why not?

04:29:06  8            THE WITNESS:  Judge, it pertains to the

04:29:08  9  Tristan --

04:29:08  10            THE COURT:  That's all right.  Don't worry.

04:29:09  11  If the government wants to question you on these issues,

04:29:11  12  they can.  They have a chance to do it.

04:29:39  13            (Brief pause in proceedings.)

04:29:39  14            THE WITNESS:  You should be ashamed of

04:29:40  15  yourself.

04:29:53  16            (Brief pause in proceedings.)

04:29:53  17            THE COURT:  Do you have a lot more, Mr. Fedor?

04:29:55  18            MR. FEDOR:  No, I don't.  I'm wrapping up

04:29:57  19  quickly, Judge.  Thank you.

04:30:01  20            (Brief pause in proceedings.)

04:30:02  21  BY MR. FEDOR:

04:30:02  22  **Q**    You've testified that you believe, at least, that

04:30:05  23  Mr. DiPietro is aware of your earnings from Skilled

04:30:09  24  Shamrock; correct?

04:30:09  25  **A**    Correct.

| | | |
|--|--|--|
| 04:30:10 | 1 | **Q**    Did he know about your earnings from Cafe 62? |
| 04:30:14 | 2 | **A**    No. |
| 04:30:15 | 3 | **Q**    Did he know about your earnings from any of the other |
| 04:30:17 | 4 | game stores? |
| 04:30:17 | 5 | **A**    No. |
| 04:30:19 | 6 | **Q**    Yet you believe he should have prepared an accurate |
| 04:30:21 | 7 | tax return for you; correct? |
| 04:30:23 | 8 | **A**    If you look at what I filed, I made more than that on |
| 04:30:26 | 9 | each one of them, pretty sure. |
| 04:30:28 | 10 | **Q**    Can you just answer my question? |
| 04:30:29 | 11 | **A**    I did answer your question.  You don't like my |
| 04:30:32 | 12 | answers, don't ask the question, sir. |
| 04:30:36 | 13 | **Q**    Do you know Leah Stark? |
| 04:30:38 | 14 | **A**    I told you before I couldn't pick her out of a |
| 04:30:42 | 15 | line-up, no, sir. |
| 04:30:48 | 16 |              MR. FEDOR:  Nothing further, Judge. |
| 04:30:50 | 17 |              THE COURT:  Thank you. |
| 04:30:51 | 18 |              MR. FEDOR:  Thank you. |
| 04:30:52 | 19 |              MR. BEAN:  Your Honor, we do not have a |
| 04:30:53 | 20 | redirect. |
| 04:30:54 | 21 |              THE COURT:  Well, how about poor Mr. Kersey |
| 04:30:56 | 22 | back there? |
| 04:30:56 | 23 |              MR. FEDOR:  Yeah, Mr. Kersey is here. |
| 04:30:59 | 24 |              MR. KERSEY:  I have no further questions, |
| 04:31:00 | 25 | Judge. |

| | | |
|---|---|---|
| 04:31:00 | 1 | THE COURT:  Okay.  All right. |
| 04:31:02 | 2 | Thank you.  You're excused, Mr. Kachner. |
| 04:31:05 | 3 | THE WITNESS:  Does that mean I can get down? |
| 04:31:06 | 4 | THE COURT:  That concludes that testimony |
| 04:31:07 | 5 | today, folks.  And thank you again for your patience with |
| 04:31:12 | 6 | us. |
| 04:31:13 | 7 | I hope we satisfied you with a little bit of the |
| 04:31:16 | 8 | Panera today, and hopefully we'll have a little bit more |
| 04:31:19 | 9 | tomorrow for you.  So, don't eat too much tonight. |
| | 10 | Get here 8:15.  And should we ask Morgan where you |
| | 11 | should meet again? |
| 04:31:24 | 12 | A JUROR:  L1. |
| 04:31:24 | 13 | THE COURT:  L1.  All right. |
| 04:31:25 | 14 | You guys have been good because every once in a while |
| 04:31:29 | 15 | we have jurors wandering the halls and going, where are we |
| 04:31:33 | 16 | supposed to be?  That's why I do that.  So I'm not picking |
| | 17 | on you, I'm just -- I have to take somebody in every case, |
| 04:31:37 | 18 | and so you happened to be the one this time. |
| 04:31:38 | 19 | All right.  You've heard some testimony.  You |
| 04:31:41 | 20 | certainly haven't heard it all and nor do you know what the |
| 04:31:44 | 21 | law is that applies in the case.  So keep an open mind about |
| 04:31:46 | 22 | what we're doing and remember the admonition.  Have a good |
| 04:31:49 | 23 | night, and we'll see you first thing. |
| 04:31:51 | 24 | THE JURY:  Thank you. |
| 04:31:52 | 25 | COURTROOM DEPUTY:  All rise. |

04:31:53   1          (Jury excused from courtroom at 4:32 p.m.)

2          (Proceedings adjourned at 4:32 p.m.)

3                          * * * * *

4                   **C E R T I F I C A T E**

5

6       I certify that the foregoing is a correct transcript

7   of the record of proceedings in the above-entitled matter

8   prepared from my stenotype notes.

9

10          */s/ Heather K. Newman*            *01-17-2024*
            HEATHER K. NEWMAN, RMR, CRR          DATE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25