<pre>
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,      )  Case No. 5:21-cr-259
 4                                  )
                    Plaintiff,      )
 5                                  )  Cleveland, Ohio
            vs.                     )  Thursday, January 18, 2024
 6                                  )  8:39 a.m., Courtroom 15A
     RONALD DiPIETRO,               )
 7   CHRISTOS KARASARIDES, JR.,     )
     and CHRISTOPHER KARASARIDES,   )  TRIAL DAY 3
 8                                  )
                    Defendants.     )
 9   _____)  Pages 401 - 655

10

11

                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
12
                 BEFORE THE HONORABLE DONALD C. NUGENT,
13                SENIOR UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Plaintiff:

17        OFFICE OF THE U.S. ATTORNEY - AKRON
          BY:  AARON P. HOWELL, AUSA
18        2 South Main Street, 208 Federal Building
          Akron, OH 44308
19        (330) 352-0993

20   (Appearances continued on Page 2)

21   COURT REPORTER:

22        Heather K. Newman, RMR, CRR
          U.S. District Court, Northern District of Ohio
23        801 West Superior Avenue, Court Reporters 7-189
          Cleveland, OH 44113
24        (216) 357-7035 or heather_newman@ohnd.uscourts.gov

25   Proceedings reported by machine shorthand; transcript
     produced by computer-aided transcription.
</pre>

1    APPEARANCES CONTINUED:

2    For the Plaintiff:

3         U.S. DEPARTMENT OF JUSTICE - TAX DIVISION
          BY:  SAMUEL B. BEAN, AUSA
4              HAYTER L. WHITMAN, AUSA
          150 M Street NE
5         Washington, DC 20002
          (202) 514-3774

6

     For the Defendant Ronald DiPietro:

7
          LAW OFFICE OF ROBERT J. FEDOR
8         BY:  ROBERT J. FEDOR, ESQ.
               BENJAMIN C. HEIDINGER, ESQ.
9         23550 Center Ridge Road, Suite 107
          Westlake, OH 44145
10        (440) 250-9709

11   For the Defendant Christos Karasarides, Jr.:

12        LAW OFFICE OF MICHAEL J. GOLDBERG
          BY:  MICHAEL J. GOLDBERG, ESQ.
13             ADAM J. PARKER, ESQ.
          323 Lakeside Place, Suite 450
14        Cleveland, OH 44113
          (216) 696-5414

15

     For the Defendant Christopher Karasarides:

16
          JAMES M. KERSEY, ESQ.
17        1360 East Ninth Street
          600 IMG Building
18        Cleveland, OH 44114
          (216) 241-3470

19

20                          *   *   *   *   *

21

22

23

24

25

1                          Table of Contents

2

Witnesses/Events                                        Page

3

RONNIE HULL                                             405

4

          Mr. Howell - Direct                          405
5         Mr. Goldberg - Cross                         477
          Mr. Heidinger - Cross                        490
6         Mr. Howell - Redirect                        491

7   DAVID ROSS                                         493

8         Mr. Bean - Direct                            493
          Mr. Fedor - Cross                            581

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| | 1 |
| 08:25:52 | 3 |
| 08:39:06 | 4 |
| 08:40:03 | 5 |
| 08:40:03 | 6 |
| 08:40:05 | 7 |
| 08:40:05 | 8 |
| 08:40:08 | 9 |
| 08:40:10 | 10 |

1    CLEVELAND, OHIO; THURSDAY, JANUARY 18, 2024; 8:39 A.M.

2                            --oOo--

3                    P R O C E E D I N G S

4              COURTROOM DEPUTY:  All rise for the jury.

5              (Jury returned to courtroom at 8:39 a.m.)

6              THE COURT:  Well, good morning, ladies and

7    gentlemen.

8              THE JURY:  Good morning, Judge.

9              THE COURT:  Got your coats and your boots for

10   tomorrow in case it snows?  I'm getting all kinds of

11   different reports.  I don't know.  We'll have to play it by

12   ear; right?

13       A little snow never hurt anybody, did it?

14       Okay.  You may call your next witness.

15              MR. HOWELL:  Thank you, Judge.

16       The United States would call Ronnie Hull to the stand.

17              (Brief pause in proceedings).

18              THE COURT:  Just walk up there, Ronnie.

19       If you would raise your right hand for me.

20       Do you swear the testimony you are about to give will

21   be the truth as you answer to God?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Please have a seat.

24       And could you tell us your full name and spell your

25   last name.

| | | |
|---|---|---|
| 08:41:11 | 1 | THE WITNESS:  Ronnie George Hull, H-u-l-l. |
| 08:41:14 | 2 | THE COURT:  Thank you. |
| 08:41:15 | 3 | MR. HOWELL:  Your Honor, may I approach and |
| 08:41:18 | 4 | help with the mic? |
| | 5 | DIRECT EXAMINATION OF RONNIE HULL |
| 08:41:38 | 6 | BY MR. HOWELL: |
| 08:41:38 | 7 | **Q**    Good morning. |
| 08:41:39 | 8 | **A**    Good morning. |
| 08:41:39 | 9 | **Q**    You already stated your full name.  Can you tell the |
| 08:41:42 | 10 | jury what you do for a living? |
| 08:41:43 | 11 | **A**    I work at the United States Postal Service. |
| 08:41:46 | 12 | **Q**    Can you say that again, please? |
| 08:41:47 | 13 | **A**    I work at the United States Postal Service. |
| 08:41:49 | 14 | **Q**    And what are your duties there? |
| 08:41:51 | 15 | **A**    Currently, I am a Form 50 Level 17 supervisor, but I'm |
| 08:41:56 | 16 | acting manager of a Level 20 office right now. |
| 08:41:58 | 17 | **Q**    All right.  And what does that mean? |
| 08:42:00 | 18 | **A**    I manage operations of a local post office. |
| 08:42:17 | 19 | **Q**    All right.  Did you start as a supervisor? |
| 08:42:19 | 20 | **A**    I did not, no. |
| 08:42:21 | 21 | **Q**    What did you start as? |
| 08:42:23 | 22 | **A**    I started as a city carrier assistant. |
| 08:42:26 | 23 | **Q**    All right.  And when did you start that job? |
| 08:42:29 | 24 | **A**    August of 2018. |
| 08:42:35 | 25 | **Q**    Prior to August of 2018, what was your job? |

08:42:38  1  **A**    I worked at the Skilled Shamrock and Redemption Skill

08:42:44  2  Games.

08:42:44  3  **Q**    When did you start working there?

08:42:46  4  **A**    August of 2010.

08:42:49  5  **Q**    You said August of 2010.  What was going on in your

08:42:52  6  life at that time?

08:42:54  7  **A**    I was young.  I was in school, and I was unemployed.

08:43:00  8  **Q**    Okay.  And when you say that you were in school, what

08:43:02  9  type of school were you in?

08:43:04  10  **A**    I was at Stark State College going through electrical

08:43:10  11  engineering.

08:43:10  12  **Q**    And how old were you in 2010?

08:43:14  13  **A**    21.

08:43:15  14  **Q**    And you said that you were unemployed and going to

08:43:17  15  school at Stark State.  Is that down in Canton, Ohio?

08:43:20  16  **A**    Yes.

08:43:24  17  **Q**    So you're unemployed.  So what did you do?

08:43:27  18  **A**    Went to school.

08:43:30  19       Are you asking in regards to how I got the job?

08:43:32  20  **Q**    Yes, sir.

08:43:33  21  **A**    Jason Kachner called me one day and asked me if I was

08:43:36  22  looking for a job.  He was friends with my brother, and my

08:43:39  23  brother was telling him I was looking for a job.  And I

08:43:42  24  said, of course.  And he said, well, I got a job at my game

08:43:48  25  room.  If you're interested, be there whatever day it was at

08:43:54  1   this time.  And I just -- I showed up.

08:43:57  2   **Q**    And this is in 2010?

08:43:59  3   **A**    Yes.

08:44:00  4   **Q**    You mentioned that Mr. Kachner was a friend of your

08:44:03  5   brother's.  How long had you known Mr. Kachner prior to

08:44:06  6   that?

08:44:09  7   **A**    Known him well, not very well, but I've known -- he's

08:44:12  8   been around my life probably my whole life, that I know of.

08:44:16  9   **Q**    And you mentioned game room.  At that point in time,

08:44:20  10  were you familiar with the game rooms that were operating

08:44:22  11  down in the Stark County area?

08:44:23  12  **A**    No.  I thought I was going to like an arcade type game

08:44:27  13  room is what I thought I was going to.

08:44:29  14  **Q**    Were you excited?

08:44:31  15  **A**    Money.  That's what I was excited for.

08:44:33  16  **Q**    Okay.  So, he gave you a report date it sounded like.

08:44:37  17  What was your understanding you were going to do when you

08:44:40  18  showed up at the place?

08:44:41  19  **A**    He said that I would be there to learn how to operate

08:44:45  20  the room.  I'd have a trainer that would show me how to,

08:44:49  21  like, clean the area, cash people out, which I was -- wasn't

08:44:53  22  for sure what he was talking about at that point.  But they

08:44:56  23  would just show me everything in detail of what I had to do

08:44:59  24  at the game room.

08:45:00  25  **Q**    And was there a specific game room that you were to

**R. Hull  (Direct by Howell)**                         408

08:45:03    1    report to?

08:45:03    2    **A**    I was to report to Shamrock, but the training happened

08:45:06    3    at Redemption.

08:45:08    4    **Q**    And when you say you were to report to Shamrock, what

08:45:10    5    do you mean by that?

08:45:11    6    **A**    That was where my job was going to be.  Like, I was

08:45:13    7    going to be at Shamrock.

08:45:16    8    **Q**    Did you have any understanding at that point of what

08:45:18    9    your pay would be?

08:45:20   10    **A**    $10 an hour.

08:45:25   11    **Q**    All right.  So it was your understanding you were

08:45:26   12    going to start work at Shamrock but you went to Redemption

08:45:31   13    for training?

08:45:32   14    **A**    Yes.

08:45:32   15    **Q**    All right.  Walk the jury through when you show up at

08:45:35   16    Redemption.  What do you see and what happens?

08:45:36   17    **A**    So, first I walked up and it said ring the bell, which

08:45:40   18    kind of confused me at first, so I rang the bell.  A woman

08:45:44   19    in her late fifties, her name was Robin, came up to the door

08:45:48   20    and said, are you hear to train?  Because I looked young so

08:45:51   21    I probably wasn't there to play the machines.  And I said

08:45:55   22    yes.

08:45:55   23         So she walked me in the back.  And she was like, okay,

08:46:00   24    this is the basic stuff.  I'm going to show you how to clean

08:46:05   25    because no one in here cleans.  So we focused on -- 7 of my

08:46:10  1   8 hours of the day was focused on cleaning.  And I was more

08:46:13  2   concerned on doing the money because I didn't want to get

08:46:16  3   the money wrong.

08:46:17  4   **Q**    I want to kind of take the jury to the moment you say

08:46:19  5   you go up to the door and you have to ring a bell.

08:46:22  6   **A**    Yeah.

08:46:22  7   **Q**    Okay.  So you couldn't just walk into the place?

08:46:25  8   **A**    No.  The door was locked.  I tried pulling on it, but

08:46:29  9   there was a little note that said "ring doorbell."

08:46:30  10  **Q**    As you're walking up to this place, describe where

08:46:33  11  this is located.

08:46:34  12  **A**    It's in a plaza.  There's like a Subway to the left if

08:46:38  13  you're looking at the building, and then there was a

08:46:41  14  printing place to the right of it.  But it's in a bigger

08:46:44  15  plaza.

08:46:46  16  **Q**    Are there other stores and grocery stores and things

08:46:49  17  right around there?

08:46:49  18  **A**    Yeah.  There's an Acme across the street, restaurants,

08:46:53  19  apartment buildings.  It's in a busier area of Canton.

08:46:56  20  **Q**    As you approach to go to the door, can you see inside

08:47:01  21  Redemption?

08:47:02  22  **A**    No.  The windows are dark.

08:47:04  23  **Q**    And so when she let's you in, what do you see?

08:47:08  24  **A**    Immediately to your left there's -- like, there was a

08:47:12  25  little room of machines, probably 8 to 10 machines, and then

08:47:16    1    there was a back room that had more machines.  And then like

08:47:18    2    the area of where the cashier would be would be kind of

08:47:25    3    like, as soon as you walked in, 10 to 15 feet to the left.

08:47:29    4    **Q**    Did you notice anything specific that was in there?

08:47:30    5    **A**    Just the machines.

08:47:32    6    **Q**    All right.  And did you know what those were?

08:47:34    7    **A**    Not at the time, no.

08:47:35    8    **Q**    What did they look like to you?

08:47:39    9    **A**    Cabinets with monitors in them.

08:47:41   10    **Q**    All right.  And did you see -- you thought it was

08:47:45   11    going to be a game room.  Did you see any of those things

08:47:47   12    you expected to see?

08:47:48   13    **A**    No.

08:47:50   14    **Q**    Did you smell anything when you went in there?

08:47:52   15    **A**    Smelled smoke.

08:47:54   16    **Q**    All right.  Were there people smoking?

08:47:55   17    **A**    Yeah.  There was always people smoking.

08:47:58   18    **Q**    What time of day did you arrive for your training, do

08:48:02   19    you -- approximately?

08:48:03   20    **A**    3 -- I think her shift was 3 to 11.

08:48:06   21    **Q**    So the afternoon?

08:48:07   22    **A**    Yeah.

08:48:07   23    **Q**    Were there customers in the business?

08:48:10   24    **A**    Probably 10 to 15 or so.

08:48:12   25    **Q**    All right.

08:48:12  1    **A**    It wasn't very busy.

08:48:13  2    **Q**    Okay.  So you say you spent 8 hours training?

08:48:18  3    **A**    Yes.

08:48:19  4    **Q**    And primarily cleaning?

08:48:21  5    **A**    Yes.

08:48:21  6    **Q**    All right.  What was the cleaning you had to do?

08:48:24  7    **A**    Cleaned up after lunch.  They have like a lunch crowd

08:48:27  8    that come in.  And then we cleaned up after dinner.  Cleaned

08:48:30  9    all the utensils, cleaned the bathrooms, mopped the floors,

08:48:35  10   swept the floors, dusted the machines.  Anytime somebody got

08:48:38  11   up off the machine, they wanted you to spray it with like a

08:48:41  12   little bit of alcohol and clean it off.

08:48:44  13   **Q**    Did you receive -- you said 7 of the 8 hours were

08:48:47  14   cleaning.  Did you receive any other training about how the

08:48:49  15   place operated?

08:48:50  16   **A**    Yeah.  When she closed out, like the last hour we

08:48:53  17   focused on taking the money that she cashed out for the day.

08:48:57  18   And you'd take all the tickets, put it on a piece of paper,

08:49:01  19   and then calculate what your expenses were, like -- so they

08:49:04  20   had a match play, so if you came in, they gave you -- if you

08:49:08  21   put $10 in, they would give you $10.  So if a hundred people

08:49:12  22   came in, you had 10 times a hundred for the match play.  And

08:49:15  23   then that would be part of your expenses.  And then your

08:49:19  24   cash-outs and you subtract all that from what you started

08:49:23  25   with.  That should be what you end it with.

08:49:25   1   **Q**     Okay.  What was your, I guess, job title?  Were you

08:49:31   2   told what you were -- you know, what you were called?

08:49:33   3   **A**     When I started, I was a cashier.

08:49:37   4   **Q**     So as far as interacting with the customers, what type

08:49:40   5   of training did you receive as far as how you were supposed

08:49:43   6   to interact with them?

08:49:44   7   **A**     You're supposed to just be there and talk to them, and

08:49:47   8   if they want like a drink or something, you grab it for

08:49:50   9   them.  If they wanted to cash out a ticket, you grab the

08:49:53   10  ticket and cash it out.

08:50:01   11  **Q**     When you say that Jason Kachner reached out to you in

08:50:04   12  regards to, and you said that his game room, what did that

08:50:07   13  mean to you?

08:50:08   14  **A**     That he owned it.

08:50:09   15  **Q**     All right.  At some point did you learn if there were

08:50:13   16  any other owners, I'm talking early on when you start

08:50:16   17  working there, as far as the business goes?

08:50:17   18  **A**     Yeah.  It wasn't long that I learned that Larry Dayton

08:50:20   19  was an owner of Redemption and Shamrock.

08:50:23   20  **Q**     Did you know Larry Dayton prior to that?

08:50:25   21  **A**     No.

08:50:26   22  **Q**     So it was your understanding, it sounds like, at that

08:50:29   23  time Jason Kachner and Larry Dayton were who you understood

08:50:31   24  to be the owners?

08:50:32   25  **A**     Correct.

**R. Hull  (Direct by Howell)**                413

08:50:33  1  **Q**     All right.  So how many days did you start working

08:50:38  2  there at the beginning?

08:50:39  3  **A**     Two.

08:50:39  4  **Q**     And was that at Redemption?

08:50:41  5  **A**     Shamrock.

08:50:42  6  **Q**     So you started working over at Shamrock?

08:50:44  7  **A**     Correct.

08:50:44  8  **Q**     All right.  Now, I want you to paint a picture for the

08:50:47  9  jury as far as when you go over to Shamrock, kind of tell

08:50:50  10  them what you see as you're approaching and kind of how it

08:50:53  11  went when you went to that place.

08:50:54  12  **A**     Shamrock is a stand-alone building.  It's real small.

08:50:58  13  Looks like it might have been a drive-through at one time or

08:51:02  14  maybe a garage, which is what I think they use it for now,

08:51:05  15  is like an auto garage now.

08:51:07  16       When you walk in, it's very small.  It's one -- it's

08:51:10  17  got like a little office, one stand-alone room, and

08:51:17  18  bathrooms.  When you walk in, immediately in front of you is

08:51:20  19  the office, and it kind of goes to the left a little bit.

08:51:23  20  It's like a little nook, and then to the right is the area

08:51:26  21  where the game rooms were -- or the game systems.

08:51:29  22  **Q**     How did you enter the Skilled Shamrock?

08:51:31  23  **A**     Through the door -- through the front door.

08:51:33  24  **Q**     All right.  Were you able to just walk in?

08:51:34  25  **A**     No.  Same thing.  You had to -- that one I think at

**R. Hull  (Direct by Howell)**                    414

| | | |
|---|---|---|
| 08:51:37 | 1 | the time you just had to knock.  I don't even think they had |
| 08:51:39 | 2 | a buzzer at the time. |
| 08:51:40 | 3 | **Q**     You knocked? |
| 08:51:40 | 4 | **A**     I just knocked, yeah. |
| 08:51:42 | 5 | **Q**     So it's fair to say the door was locked? |
| 08:51:43 | 6 | **A**     The door was locked, yes. |
| 08:51:45 | 7 | **Q**     Were you able to see inside the windows of Skilled |
| 08:51:48 | 8 | Shamrock? |
| 08:51:48 | 9 | **A**     They were tinted, but you could see if you -- like if |
| 08:51:51 | 10 | you put your -- like if you got close enough, you could see. |
| 08:51:55 | 11 | They weren't as blacked out as Redemption was. |
| 08:51:57 | 12 | **Q**     All right.  You mentioned that your training happened |
| 08:51:59 | 13 | at Redemption and then you start working at Skilled |
| 08:52:03 | 14 | Shamrock.  Give the jury an understanding of how far away is |
| 08:52:06 | 15 | Skilled Shamrock from Redemption? |
| 08:52:07 | 16 | **A**     A mile, maybe, not even.  Depending on how you take -- |
| 08:52:11 | 17 | how you drive to it. |
| 08:52:13 | 18 | **Q**     Can you say that again? |
| 08:52:15 | 19 | **A**     A mile, depending on how you drive to it.  Like you |
| 08:52:19 | 20 | could exit the back of Redemption, and it's just one street |
| 08:52:22 | 21 | that's probably less than a half a mile to Shamrock. |
| 08:52:26 | 22 | **Q**     Do you have any background in athletics? |
| 08:52:31 | 23 | **A**     I do. |
| 08:52:31 | 24 | **Q**     Play baseball? |
| 08:52:32 | 25 | **A**     I did. |

**R. Hull  (Direct by Howell)**                    415

08:52:33  1   **Q**     Do you think you could hit Skilled Shamrock with a

08:52:35  2   baseball from Redemption?

08:52:37  3   **A**     Maybe a golf ball.

08:52:38  4   **Q**     All right.  So pretty close?

08:52:39  5   **A**     Pretty close, yeah.

08:52:40  6   **Q**     All right.  What was your job at Skilled Shamrock?

08:52:45  7   **A**     I was a cashier at Skilled Shamrock.

08:52:48  8   **Q**     And just explain briefly what that means.

08:52:50  9   **A**     Same thing as how I trained at Redemption.  I would

08:52:53  10  cash out the customers.  Now, over there, especially when I

08:52:56  11  was a cashier over there, there was no business.  So

08:53:00  12  basically I just took in my books and my laptop and I did a

08:53:03  13  lot of studying, and I also took in DVDs and watched a lot

08:53:09  14  of DVDs.  Because we'd probably get 10 to 15 people for a

08:53:14  15  day, whereas Redemption had 10 to 15 people in it all day.

08:53:19  16  **Q**     So we're talking late summer of 2010.  Is that still

08:53:22  17  the same time frame?

08:53:24  18  **A**     Correct, yeah.

08:53:27  19  **Q**     How many machines were in Skilled Shamrock,

08:53:29  20  approximately, at that time?

08:53:31  21  **A**     25, maybe.

08:53:33  22  **Q**     All right.  So you were working 2 days a week at

08:53:44  23  Skilled Shamrock.  Were you working at Redemption as well?

08:53:46  24  **A**     Not at first.  They -- it was probably a couple --

08:53:50  25  maybe a month or so into Skilled Shamrock, I was supposed to

**R. Hull  (Direct by Howell)**                    416

08:53:54  1   be full-time Skilled Shamrock, but they either caught

08:53:56  2   someone stealing at Redemption or thought someone was

08:53:58  3   stealing, and they let two people go.  One was the person

08:54:01  4   that trained me.  So they moved me over to Redemption and

08:54:04  5   then bumped me up to a third day.

08:54:05  6   **Q**   So they lost the person that really wanted the place

08:54:07  7   very clean?

08:54:08  8   **A**   Correct.

08:54:09  9   **Q**   All right.  So, you went over to Redemption?

08:54:12  10  **A**   Yes.

08:54:12  11  **Q**   How many days were you working there?

08:54:14  12  **A**   Three days.

08:54:16  13  **Q**   And were you still working at Shamrock?

08:54:19  14  **A**   If they needed -- it was like on -- on a call type

08:54:22  15  thing.  Like if they had someone that needed replaced, I

08:54:26  16  would always pick up a day or something like that.

08:54:28  17  **Q**   What place did you prefer to work at at that time?

08:54:30  18  **A**   Redemption.

08:54:30  19  **Q**   Why is that?

08:54:31  20  **A**   Way more customer coming through and then if -- we got

08:54:34  21  tips, better tips.

08:54:45  22  **Q**   What was your understanding of Jason Kachner's role at

08:54:48  23  Skilled Shamrock?

08:54:48  24  **A**   Same thing as Redemption.

08:54:50  25  **Q**   And what's that?

08:54:52  1  **A**     Part owner.  Part owner.  It's going out.  Sorry.

08:54:55  2  **Q**     Yeah, the microphone keeps going out.  Just go ahead

08:54:59  3  and --

08:54:59  4  **A**     Part owner.

08:55:00  5  **Q**     With who?

08:55:01  6  **A**     Over there, it was known to be like a --

08:55:06  7                MR. GOLDBERG:  Objection.

08:55:06  8                THE COURT:  Overruled.

08:55:08  9       Go ahead.

08:55:09  10               THE WITNESS:  Over there it was -- I was

08:55:11  11  unaware who it was at the time, like, when I first started.

08:55:14  12  They always had someone come do the audits, and that person

08:55:18  13  at the time was -- like, they would switch between a guy

08:55:22  14  named Jay and a guy named Mike Moneypenny.  Sometimes -- I

08:55:27  15  don't think Jay lasted very long, but Mike Moneypenny was

08:55:29  16  their -- like the main person that came through.

08:55:32  17  BY MR. HOWELL:

08:55:33  18  **Q**     Okay.  And what was the significance of that to you?

08:55:34  19  **A**     The audit or --

08:55:35  20  **Q**     The people that were there, Jay Spitale and Mike

08:55:39  21  Moneypenny?

08:55:39  22  **A**     That was just whoever his partners were.  I don't --

08:55:44  23  **Q**     Whose partners?

08:55:46  24  **A**     Kake's, Jason Kachner.

08:55:49  25  **Q**     Okay.  So what was your understanding when you started

**R. Hull (Direct by Howell)** 418

08:55:52  1  at the Skilled Shamrock as to who the owners were?  What was

08:55:55  2  your understanding --

08:55:55  3  **A**    My understanding at the time of starting was Jason

08:55:58  4  Kachner and Larry Dayton.

08:55:58  5  **Q**    All right.  And did that change at some point?

08:56:01  6  **A**    2013, when Tom took over for Larry Dayton, that's when

08:56:08  7  I realized that it was more than just Tom and Jason.  It was

08:56:13  8  whoever Moneypenny was working for.

08:56:14  9  **Q**    All right.  Whoever Moneypenny was working for was

08:56:21  10  what?

08:56:21  11  **A**    I -- from what I heard, it was DiPietro.

08:56:25  12              MR. GOLDBERG:  Objection.

08:56:26  13              THE COURT:  Sustained.

08:56:27  14  BY MR. HOWELL:

08:56:28  15  **Q**    Yeah, I'm not asking you what you heard.

08:56:30  16  **A**    Okay.

08:56:31  17  **Q**    I'm just asking you at some point did you learn who

08:56:33  18  other owners were, to your understanding?

08:56:34  19  **A**    To my understanding, without firsthand knowledge, I do

08:56:37  20  not know who the other owner was.

08:56:39  21  **Q**    Okay.  So to your knowledge, the people you dealt with

08:56:41  22  and who you knew was Jason Kachner and Larry Dayton?

08:56:46  23  **A**    Correct.

08:56:46  24  **Q**    But you understood that there were other people there

08:56:49  25  that were working on behalf of someone, but you didn't know

08:56:51  1  who that was?

08:56:51  2  **A**    Yes, sir.

08:56:51  3  **Q**    All right.  You mentioned Thomas Helmick.

08:56:55  4  **A**    Yes.

08:56:55  5  **Q**    And you mentioned that that kind of showed you that

08:56:58  6  there were other people involved.  What do you mean by that?

08:57:00  7  **A**    When Larry left in 2013, Tom took over.

08:57:04  8  **Q**    Took over as what?

08:57:05  9  **A**    As Larry's part.  So, I don't know if it was 50/50,

08:57:10  10  whatever they did.  It was Larry's -- he took over for

08:57:13  11  Larry.

08:57:13  12  **Q**    And how did you become aware that Thomas Helmick was

08:57:16  13  coming in and Larry Dayton was leaving?

08:57:18  14  **A**    Well, when Tom came in, he kind of just, hey, I'm

08:57:22  15  taking over the --

08:57:24  16              MR. GOLDBERG:  Objection to what he said,

08:57:26  17  Judge.

08:57:26  18              THE COURT:  Overruled.

08:57:27  19              THE WITNESS:  The -- Tom came in and he said

08:57:29  20  that he was going to take over, like, the bills and the

08:57:35  21  responsibilities of the unit as far as, like, supplies and

08:57:37  22  stuff like that goes, and he was taking over the payroll.

08:57:40  23  BY MR. HOWELL:

08:57:41  24  **Q**    All right.  And was that significant to you in your

08:57:43  25  role as a cashier there?

**R. Hull  (Direct by Howell)**                                    420

08:57:43   1   **A**     Yeah, because he put me on a check.

08:57:47   2   **Q**     All right.  And we'll talk about that in just a little

08:57:50   3   bit as far as how you received a paycheck.

08:57:51   4   **A**     Okay.

08:57:52   5   **Q**     But basically, there's a new person you're answering

08:57:55   6   to that comes in at Redemption?

08:57:57   7   **A**     Correct.

08:57:57   8   **Q**     Did Mr. Helmick, at that time, have any role over at

08:58:01   9   Skilled Shamrock?

08:58:01  10   **A**     Same thing.  He got supplies and -- but he did less of

08:58:06  11   the bills over there.  So, it wasn't in his name over there

08:58:11  12   like it was at Redemption.

08:58:12  13   **Q**     And do you know whose name -- when you say it wasn't

08:58:15  14   in his name, what do you mean by that?

08:58:17  15   **A**     Who the business name was under.

08:58:19  16   **Q**     All right.  And I guess what I'm asking you is, where

08:58:23  17   would the business owner's name be listed that informs you

08:58:26  18   of that?

08:58:27  19   **A**     We had to get like a license from Stark County to

08:58:34  20   operate, and on that license it showed you who the owner of

08:58:37  21   the business was.

08:58:38  22   **Q**     And how did you become aware of that?

08:58:42  23   **A**     We would have to get money orders to pay for the

08:58:46  24   yearly fee.

08:58:47  25   **Q**     And give us a rough estimate of what the fee cost.

**R. Hull  (Direct by Howell)**                                                                 421

08:58:53  1   **A**      They charged you per machine in the building, I think

08:58:55  2   it was like a hundred dollars per machine, and then they

08:58:57  3   charged you an operational fee.  I think the Redemption was

08:59:01  4   12,000 or so a year, and Shamrock might have been like 7,500

08:59:05  5   a year or something like that.

08:59:06  6   **Q**      All right.  And you mentioned -- would you receive

08:59:09  7   something from, is this Plain Township?

08:59:11  8   **A**      Yes, Stark County Sheriff.

08:59:13  9   **Q**      Is this a zoning permit?

08:59:15  10  **A**      It was a zoning permit, but it also, I believe, said

08:59:18  11  that it was a license to operate.

08:59:20  12  **Q**      Okay.  And that was your understanding?

08:59:22  13  **A**      Yes.

08:59:22  14  **Q**      And how did you come to that understanding?

08:59:25  15  **A**      Because they sent in a certified mailing that -- like

08:59:29  16  they -- it was signed by the sheriff, that it was an

08:59:32  17  operations to run the unit.

08:59:33  18  **Q**      All right.  And had you ever seen that before?

08:59:37  19  **A**      I don't know when they started it.  So whenever the

08:59:40  20  first year was they started it, maybe 2012 or '13, that's

08:59:44  21  when we were aware of it.  I'm not exactly sure when they

08:59:47  22  started doing that though.

08:59:48  23  **Q**      Okay.  And you think that this is from the sheriff

08:59:50  24  versus the township?

08:59:51  25  **A**      Yeah, because it was signed -- I'm pretty sure it was

**R. Hull  (Direct by Howell)**                                    422

| | | |
|---|---|---|
| 08:59:54 | 1 | signed by the sheriff. |
| 08:59:54 | 2 | **Q**    And was this put on the wall at Redemption and |
| 08:59:58 | 3 | Shamrock? |
| 08:59:58 | 4 | **A**    Yeah.  We had to have it up.  We -- I think we framed |
| 09:00:01 | 5 | it and put it on a wall. |
| 09:00:02 | 6 | **Q**    And do you have any idea who -- did you do that |
| 09:00:05 | 7 | yourself? |
| 09:00:05 | 8 | **A**    No, it would have been the owner -- or who the name of |
| 09:00:08 | 9 | the building was in, Tom for Redemption, Derek Phillips for |
| 09:00:12 | 10 | Shamrock. |
| 09:00:12 | 11 | **Q**    All right.  And so it would be listed and it would be |
| 09:00:14 | 12 | permanently displayed at the business? |
| 09:00:16 | 13 | **A**    Correct. |
| 09:00:17 | 14 | **Q**    And what was the significance of that to you as far as |
| 09:00:20 | 15 | the legality of what you were doing? |
| 09:00:22 | 16 | **A**    That it proved that we were legal to operate. |
| 09:00:25 | 17 | **Q**    That's what your understanding was? |
| 09:00:26 | 18 | **A**    Yes. |
| 09:00:26 | 19 | **Q**    Okay.  You mentioned that you got money orders to pay |
| 09:00:33 | 20 | for the zoning permits. |
| 09:00:34 | 21 | **A**    Correct. |
| 09:00:34 | 22 | **Q**    Who gave you that instruction? |
| 09:00:37 | 23 | **A**    It would have came from Kachner. |
| 09:00:38 | 24 | **Q**    And how would you purchase the money orders? |
| 09:00:40 | 25 | **A**    Cash. |

09:00:41  1    **Q**      Where would you go to get them?

09:00:43  2    **A**      Across the street at Acme.  Normally did thousand

09:00:49  3    dollar money orders, so you just go over there and grab

09:00:52  4    however many you needed.  I never personally paid for it,

09:00:54  5    but I think Tom would do it for Redemption and Derek or his

09:00:57  6    brother would do it for Shamrock.

09:00:58  7    **Q**      Where would the money come from to purchase those

09:01:01  8    money orders to pay the zoning permits?

09:01:02  9    **A**      The expenses of the store.

09:01:05  10   **Q**      So it would come out of the cash that's at the stores?

09:01:07  11   **A**      Yeah.  It might not -- it might be over a weekly

09:01:10  12   period.  It might not have been like one week, take $11,000

09:01:15  13   out, but over a period of time, hey, the fees are coming,

09:01:18  14   start taking like a thousand dollars out and getting money

09:01:20  15   orders.

09:01:20  16   **Q**      Why wouldn't you just take cash over to Plain

09:01:24  17   Township?

09:01:24  18   **A**      Can't answer that.

09:01:26  19   **Q**      You're just following instructions.  Is that fair?

09:01:28  20   **A**      Correct.

09:01:35  21   **Q**      Did you become familiar with the games, the cabinets,

09:01:38  22   the touch screens at Redemption and Skilled Shamrock?

09:01:42  23   **A**      Yes.

09:01:42  24   **Q**      Could you just give the jury a little bit of an

09:01:44  25   overview.  Describe what types of games were in there.

**R. Hull  (Direct by Howell)**                    424

09:01:48   1   **A**     Like on that machine right there is probably a

09:01:50   2   Pot-O-Gold.  It holds 12 to 14 games, I believe, but usually

09:01:55   3   we only activated eight games or so on it, mostly like a

09:02:00   4   Keno, a Blackjack or 777s.  There were other games in the

09:02:06   5   stores, mostly like penny games that didn't really get

09:02:10   6   played.

09:02:10   7         Towards the end, I would say like 2016, '17, we got

09:02:14   8   what were called platinum machines.  They were a little

09:02:18   9   different.  They had a lot more games on it where you could

09:02:20   10  go a little deeper and change, like, what kind of Keno games

09:02:24   11  you play and stuff like that.

09:02:24   12  **Q**     How popular were the platinum games?

09:02:27   13  **A**     Not very popular.

09:02:29   14  **Q**     It went over like a lead balloon?

09:02:32   15  **A**     Yeah.  The most popular game, 95 percent of play, was

09:02:36   16  on Pot-O-Golds.

09:02:37   17  **Q**     Okay.  And you referenced a machine.  Do you see a

09:02:40   18  machine in the courtroom?

09:02:40   19  **A**     Yes.

09:02:41   20  **Q**     All right.  Are you familiar with that type of

09:02:43   21  machine?

09:02:43   22  **A**     Yes.

09:02:43   23  **Q**     The particular one that's in the courtroom here, have

09:02:46   24  you had the opportunity to see that previously?

09:02:48   25  **A**     Yes.

| | | |
|---|---|---|
| 09:02:49 | 1 | **Q**   And was that yesterday? |
| 09:02:50 | 2 | **A**   Yes. |
| 09:02:52 | 3 | **Q**   Did you plug it in? |
| 09:02:53 | 4 | **A**   I didn't personally plug it in. |
| 09:02:55 | 5 | **Q**   Did you see us plug it in? |
| 09:02:57 | 6 | **A**   Yes. |
| 09:02:57 | 7 | **Q**   Were you able to operate it? |
| 09:02:58 | 8 | **A**   Yes. |
| 09:02:59 | 9 | **Q**   And, specifically, I think you referenced Pot-O-Gold? |
| 09:03:04 | 10 | **A**   Yes. |
| 09:03:04 | 11 | **Q**   What is -- what is Pot-O-Gold?  What does that mean? |
| 09:03:08 | 12 | **A**   To me, it is just a software that's on it. |
| 09:03:11 | 13 | **Q**   On the -- |
| 09:03:12 | 14 | **A**   On the hard drive.  Yeah, on the hard drive. |
| 09:03:16 | 15 | **Q**   Okay.  And the Pot-O-Gold, the software, that's in the |
| 09:03:20 | 16 | computer.  Is that fair? |
| 09:03:22 | 17 | **A**   Yes. |
| 09:03:22 | 18 | **Q**   Is that what you were describing has the different |
| 09:03:25 | 19 | types of games that you can play? |
| 09:03:26 | 20 | **A**   Yeah.  The Pot-O-Gold itself is probably the software. |
| 09:03:31 | 21 | Each game inside the software, there's multiple games inside |
| 09:03:35 | 22 | the software. |
| 09:03:36 | 23 | **Q**   And specifically with the Pot-O-Golds, was that the |
| 09:03:39 | 24 | most prevalent type of software and the types of machines |
| 09:03:42 | 25 | that were in both Skilled Shamrock and Redemption? |

09:03:45  1  **A**     Correct.

09:03:46  2  **Q**     And what were the most popular games for the

09:03:50  3  customers, if you're aware?

09:03:51  4  **A**     Superball Keno and 777s.

09:03:54  5  **Q**     And describe the Keno game for the jury, please.

09:03:58  6  **A**     Keno, you pick up to 10 numbers.  Your payout changes

09:04:04  7  based on how many numbers you pick.

09:04:06  8       And then the Superball part of the Keno is if your

09:04:09  9  last number bounces, I believe it doubles your pay.  I could

09:04:13  10  be wrong on that, it could be four times your pay, but I

09:04:16  11  think it doubles your pay.

09:04:17  12  **Q**     Prior to working in the game rooms, were you familiar

09:04:20  13  with Keno?

09:04:20  14  **A**     No.  Oh, sorry.  My dad loved to play Keno in Vegas

09:04:25  15  when we lived in Vegas, so that aspect of it, yes.

09:04:28  16  **Q**     All right.  And in the state of Ohio have you come

09:04:32  17  across Keno in any other type of establishment?

09:04:35  18  **A**     Yeah.  They're in every bar now.

09:04:36  19  **Q**     All right.  And is that sanctioned through the Ohio

09:04:40  20  Lottery Commission?

09:04:40  21  **A**     As far as I know, yes.

09:04:41  22  **Q**     All right.  And, specifically, as far as your role at

09:04:45  23  Skilled Shamrock and Redemption, were the Keno games that

09:04:48  24  were on there, were those sanctioned by the Ohio Lottery

09:04:52  25  Commission?

09:04:52   1    **A**     I'm unaware.

09:04:54   2    **Q**     All right.  Did you ever meet anyone from the Ohio

09:04:57   3    Lottery Commission that came in and told you that that was

09:04:58   4    okay to use those?

09:04:59   5    **A**     No.

09:05:00   6    **Q**     And how long did you work there, 2010 until when?

09:05:03   7    **A**     2018.

09:05:04   8    **Q**     And were you working with Pot-O-Golds that entire

09:05:06   9    time?

09:05:07   10   **A**     Yes.

09:05:07   11   **Q**     And was Keno one of the most popular games through

09:05:10   12   that entire period?

09:05:11   13   **A**     Yes.

09:05:13   14   **Q**     And you mentioned -- was it 777?  What did you call

09:05:18   15   it?

09:05:18   16   **A**     777s, yeah.

09:05:19   17   **Q**     And describe for the jury, what's that game?

09:05:21   18   **A**     777, you spin.  The object is to get three 7s.  So

09:05:27   19   there's different colored 7s.  If you match the same color,

09:05:31   20   it's a different payout.  And then if you get the 777, then

09:05:35   21   it's like a jackpot.

09:05:36   22   **Q**     All right.  Have you ever seen a game like that

09:05:39   23   before?

09:05:39   24   **A**     No.

09:05:40   25   **Q**     All right.  You mentioned you lived in Vegas before?

**R. Hull  (Direct by Howell)**                    428

09:05:42   1   **A**      Yes.

09:05:42   2   **Q**      Had you ever been in -- been to a casino prior to your

09:05:45   3   time working there?

09:05:45   4   **A**      Yes.

09:05:46   5   **Q**      I think you said, what were you, 21 in 2010 --

09:05:49   6   **A**      Yes.

09:05:50   7   **Q**      -- when you started working?

09:05:51   8          So you had been at a casino prior to that?

09:05:53   9   **A**      Correct.

09:05:54   10  **Q**      And when you say a casino, I'm talking about Las Vegas

09:05:56   11  or like the Jack casino.

09:05:58   12  **A**      Correct.

09:05:58   13  **Q**      Okay.  Have you ever played a slot machine?

09:06:00   14  **A**      Yes.

09:06:01   15  **Q**      And did you see a similar game on those?

09:06:04   16  **A**      Not on the Pot-O-Golds.  They're a little different.

09:06:07   17  **Q**      Describe that for us.

09:06:09   18  **A**      I guess -- at the time, we didn't ever have Blackjack

09:06:12   19  on there.  That kind of came later down the road.  So

09:06:15   20  Blackjack would be something like that you would see on a

09:06:18   21  game in Cleveland.  But for the most part, those are

09:06:21   22  different.  Those are more like bar-style games than they

09:06:25   23  are casino games.

09:06:26   24  **Q**      I guess what I'm referring to is, is you ever pull a

09:06:29   25  reel for a slot machine and have the wheels turn and try to

**R. Hull  (Direct by Howell)**                    429

09:06:33  1    match up the three --

09:06:34  2    **A**    Yeah.  Yeah, on the 777s.  If you're going to say one

09:06:37  3    is the most like a casino, it would be 777s.

09:06:39  4    **Q**    Okay.  And that's what I'm kind of trying to get it.

09:06:43  5    **A**    Okay.

09:06:43  6    **Q**    So the 777 game, walk us through how do you play that

09:06:46  7    on the Pot-O-Gold?

09:06:47  8    **A**    You put how many credits to you want to bet per line

09:06:51  9    and then you hit "spin."

09:06:52  10   **Q**    So you hit a button?

09:06:54  11   **A**    Yeah.

09:06:54  12   **Q**    That's all you do?

09:06:55  13   **A**    That's all you do.

09:06:56  14   **Q**    And it spins and stops where it stops.  Is that fair?

09:06:59  15   **A**    Correct.

09:07:00  16   **Q**    You said you put credits on it.  How do you put

09:07:02  17   credits on a Pot-O-Gold?

09:07:03  18   **A**    You put money in the bill accepter, and then it's a

09:07:07  19   raise or lower your bet.  So every time you go up a nickel

09:07:10  20   it plays one line up to eight lines.

09:07:12  21   **Q**    All right.  So you -- the customer would actually put

09:07:14  22   cash into the machine?

09:07:15  23   **A**    Correct.

09:07:15  24   **Q**    And then select how many things they wanted to bet?

09:07:19  25   **A**    Yes.

**R. Hull  (Direct by Howell)**                    430

**Q**     All right.  What happens if they match it up, if they win?

**A**     Then it would credit them the amount of money.  So, I think if you played one line and hit 7s it was $25.  If you hit same colored 7s it was $50.  Triple 7s on one line was $500.

**Q**     So if they win and they decide, hey, I'm done playing, what happens?

**A**     Then they would request a cashout.

**Q**     How would they do that?

**A**     When I first started as a cashier, they just pushed a button.  Towards the end we had to actually physically cash them out.

**Q**     And when you say push a button, what do you mean by that?

**A**     I don't know if that machine has it, but on the machine there's a -- I think it will say ticket or cash out on it.  If you push that button, it prints out the printer.  Depending on where that printer is on the machine, it could be on the bottom right or top right.

**Q**     And that would print out what, showing what they'd won?

**A**     Yeah, it's just a ticket with the machine number, what machine, probably what game they were playing, and then how much the value was of the ticket.

**R. Hull  (Direct by Howell)** 431

09:08:19  1  **Q**   And they hit the button, they ask for you to cash them

09:08:22  2  out.  What do you do?

09:08:23  3  **A**   Cash them out.

09:08:24  4  **Q**   And where do you get the cash from?

09:08:25  5  **A**   Cash register.

09:08:27  6  **Q**   Go ahead and say that again.

09:08:28  7  **A**   Cash register.

09:08:29  8  **Q**   So if they win, you hand them over cash?

09:08:31  9  **A**   Yes.

09:08:39  10  **Q**   Are you familiar with the win percentages?

09:08:44  11  **A**   Pretty close, yeah.

09:08:46  12  **Q**   I'm not asking you what the rates were --

09:08:49  13  **A**   Okay.

09:08:49  14  **Q**   -- that you're familiar with.  I'm just asking you

09:08:51  15  what is a win percentage on a Pot-O-Gold machine, for

16  example?

09:08:55  17  **A**   So on those machines, if you go into the actual hard

09:08:59  18  drive, you can change the actual win percentage on them.

09:09:02  19  Like, I believe Superball Keno is 94.35 percent.  But if you

09:09:07  20  change the percentage, it changes the cashout value.  So if

09:09:09  21  you went up a percentage, it might drop your -- if you hit

09:09:12  22  four out of four, it might go -- instead of $100, you might

09:09:17  23  only get $75 because the percentage went up.  So the

09:09:21  24  percentage affected the cashout value.

09:09:23  25  **Q**   Does that essentially change the odds as well?

**R. Hull  (Direct by Howell)**                                           432

09:09:26   1          Are you able to change the odds as far as like how

09:09:29   2    likely someone is to win on your machines?

09:09:30   3    **A**      I would assume that the percentage itself is the odd.

09:09:33   4    **Q**      Okay.

09:09:34   5    **A**      So, if it's 94 percent, it's keeping 6 out of every

09:09:40   6    hundred dollars would be the theory.  So if you change it to

09:09:43   7    92 percent, it would keep 8 out of every hundred dollars.

09:09:47   8    **Q**      In your personal experience in the 8 years that you

09:09:49   9    worked at these places, Skilled Shamrock and Redemption, did

09:09:52   10   you ever have to deal with a machine and set a win

09:09:55   11   percentage?

09:09:55   12   **A**      Yes.

09:09:56   13   **Q**      And explain to the jury, what's a situation when you'd

09:09:59   14   have to do that?

09:10:00   15   **A**      So if they put in new hardware or the system

09:10:04   16   completely rebooted, sometimes it would factory reset to

09:10:08   17   something, we would have to go in.  You'd have to click a

09:10:12   18   tab in there to let you go into the system itself.  When you

09:10:17   19   go in there, you have to change it to a percentage.  But we

09:10:20   20   always set our percentages at the exact same percentage.

09:10:23   21   **Q**      And who instructed you to do that?

09:10:24   22   **A**      Jason Kachner.

09:10:25   23   **Q**      Now, you walked us through a bit of a scenario with

09:10:28   24   Keno as far as the win percentage and what the payout would

09:10:33   25   be.  And you mentioned that was a very popular game as well;

09:10:36  1    correct?

09:10:36  2    **A**    Correct.

09:10:37  3    **Q**    If you changed that percent in there, would your

09:10:39  4    customers know?

09:10:40  5    **A**    Immediately, yes.

09:10:41  6    **Q**    And why is that?

09:10:42  7    **A**    Because their payouts would be different.

09:10:44  8    **Q**    Can you say that again, please?

09:10:46  9    **A**    Because their payouts would be different.

09:10:48  10   **Q**    And can you just describe that a little bit for the

09:10:50  11   jury, how would that happen?

09:10:51  12   **A**    So, when you go on the Keno, if you put 5 numbers on

09:10:57  13   there, it will tell you on the right how many -- how much

09:10:59  14   you would win if you got 3 out of 5, 4 out of 5, 5 out of 5.

09:11:04  15   It tells you before you spin.  Like, you don't have to spin

09:11:07  16   to see what the payout is.

09:11:08  17        So if you change the percentage, the number beside

09:11:11  18   that, 3, 4, 5, would change depending on if you went up or

09:11:14  19   down.

09:11:15  20   **Q**    All right.  So let's change that.

09:11:16  21        Can you do anything with the win percentage for, like,

09:11:19  22   the spin and win, the 777s?

09:11:21  23   **A**    Yes.  I've never seen anybody actually change that

09:11:24  24   because I think I just did factory, whatever the factory

09:11:28  25   built-in was on the system.

**R. Hull  (Direct by Howell)**                                434

09:11:30  1   **Q**     All right.  But do you have an understanding of what

09:11:32  2   the effect would be if you changed the percentage on the

09:11:34  3   777s?

09:11:35  4   **A**     You would probably, best guess, would -- instead of

09:11:38  5   winning $25, you might win $20, or you might win 30, if the

09:11:44  6   percentage is lower or higher.

09:11:45  7   **Q**     So is it fair to say based your experience there with

09:11:47  8   the customers knowing these games and being popular, they

09:11:49  9   would certainly realize that if it changed?

09:11:52  10  **A**     Oh, yeah.  We had several instances where we would get

09:11:55  11  a new machine and the customer would be like, your

09:11:58  12  percentages are off.

09:11:58  13  **Q**     Because they're playing somewhere else and they're

09:12:00  14  getting more money.  Is that fair?

09:12:02  15  **A**     Correct.

09:12:02  16  **Q**     So those win percentages, were those important to the

09:12:05  17  functioning of the businesses?

09:12:07  18  **A**     Yeah.  I mean, if you change your percentages, people

09:12:10  19  think you're trying to get them, so they would just go

09:12:14  20  somewhere else.

09:12:15  21  **Q**     All right.  And what if your percentages were higher

09:12:18  22  win percentages than other business?

09:12:20  23  **A**     As odd as this might sound, customers didn't like it

09:12:23  24  because if your higher percentage, your payout was lower, so

09:12:27  25  they thought you were trying to get them.

09:12:28  1   **Q**    So they thought you were trying to get them either

09:12:31  2   way?

09:12:31  3   **A**    Either way, yes.

09:12:32  4   **Q**    But were they aware that you guys could change that at

09:12:35  5   any point in time?

09:12:36  6                    MR. GOLDBERG:  Objection.

09:12:37  7                    THE COURT:  Objection's sustained.

09:12:39  8   BY MR. HOWELL:

09:12:39  9   **Q**    If you guys changed those, would you get feedback from

09:12:42  10  the customers?

09:12:42  11  **A**    Yes.

09:12:48  12  **Q**    And if you received complaints, who would you pass

09:12:51  13  those on to?

09:12:54  14  **A**    Kachner.

09:13:02  15  **Q**    At some point did your role change from a cashier to

09:13:07  16  something else at Redemption?

09:13:08  17  **A**    Yeah.  When Tom took over in 2013, they asked me to

09:13:12  18  take over as the guy that emptied the machines.

09:13:18  19  **Q**    And when you say "they," who are you referring to?

09:13:21  20  **A**    Tom and Jason.

09:13:22  21  **Q**    Jason Kachner?

09:13:23  22  **A**    Yeah.

09:13:23  23  **Q**    So Thomas take over.  He comes in, replaces Larry

09:13:27  24  Dayton, to your knowledge?

09:13:27  25  **A**    Yes.

09:13:28  1    **Q**    Now, was Larry Dayton out of the business at that

09:13:31  2    time?

09:13:31  3    **A**    He was come and go.  It depended on his situation, but

09:13:38  4    he was always -- he would always come around to grab quick

09:13:42  5    cash if he needed it.  He would come in and grab money if he

09:13:44  6    needed it.

09:13:45  7    **Q**    All right.  Explain for the jury what you mean by your

09:13:48  8    role changed as far as taking cash out of the machines.

09:13:50  9    **A**    So, when the cashier gets low, they would call me.

09:13:57  10   And I would come in and grab cash from all the machines.  I

09:14:00  11   would take the cash in the back room.  I would sort it based

09:14:03  12   on twenties, tens, fives, hundreds, whatever.  And then I

09:14:08  13   would count all that up.  They would come back there and

09:14:11  14   check my count.  If we agreed upon it, we put it on the

09:14:14  15   worksheet, and they would add it to their bank.

09:14:22  16   **Q**    Did your role change in any other way, your duties?

09:14:26  17   **A**    It was more of a -- I was the manager of the

09:14:30  18   operation.  I still reported to Kake and Becky.

09:14:32  19   **Q**    Who is Becky?

09:14:34  20   **A**    Becky is Jason's wife.

09:14:36  21   **Q**    Okay.

09:14:38  22   **A**    Anything -- they did all the scheduling.  They did all

09:14:41  23   the hiring and firing.  But I would do the day-to-day

09:14:45  24   operations and report to them if there was any issues.

09:14:47  25   **Q**    And was that just solely at Redemption?

**R. Hull  (Direct by Howell)** 437

09:14:49  1    **A**    No.  Shamrock as well.

09:14:51  2    **Q**    And what would you do at Shamrock?

09:14:53  3    **A**    Same thing.  Do the counts throughout the week and

09:14:58  4    give money to the cashiers.

09:14:59  5    **Q**    All right.  Now, we've heard cash throughout the week,

09:15:04  6    and we've also -- in this trial we've heard of audits.

09:15:07  7    Can you describe for the jury what, if any, difference

09:15:09  8    is from cashing out each day versus the audits?

09:15:11  9    **A**    So, cash each day would be, like if I started with

09:15:16  10   $10,000 and I paid out 9,000, I'm getting low, hey, I got to

09:15:20  11   call somebody to get more money.  Or a lot of times we ran

09:15:24  12   through fives a lot because we did match plays with fives

09:15:27  13   and tens.  We'd run out of fives, so I'd have to come in and

09:15:32  14   resupply their fives and tens.

09:15:34  15   So throughout the week, two or three times I day I

09:15:36  16   would go in and I would pull all the money from the

09:15:38  17   machines, count it out, write it down, like I said, match it

09:15:41  18   with what they got.  If our numbers matched, we wrote it on

09:15:46  19   the piece of paper.  And we would do that 15, 20 times a

09:15:49  20   week or whatever.  But the audit was once a week.  It was

09:15:52  21   normally every Sunday morning.

09:15:54  22   What they'd do is they would take the numbers from the

09:15:56  23   machine, what it took in for the week, what it paid out for

09:15:59  24   the week.  And then they would take that net value, add them

09:16:03  25   all together, minus the expenses, and then you would have

09:16:07   1   the total net profit.

09:16:09   2   **Q**   All right.  And we're going to talk more extensively

09:16:11   3   about the audits, but I want to focus more on the day-to-day

09:16:16   4   taking the cash out of the machines.

09:16:17   5   What would you do with the cash after you take them

09:16:20   6   out of the machines?

09:16:20   7   **A**   I would count it, separate it between the

09:16:25   8   denominations of the bills.  And then the cashier -- or the

09:16:29   9   cashier would check my money, and then they would add it to

09:16:32   10   their bank.

09:16:33   11   **Q**   And you would reflect that on daily sheets?

09:16:34   12   **A**   The daily sheet, yes.

09:16:36   13   **Q**   Where would the money go after that?

09:16:38   14   **A**   They would normally --

09:16:40   15   **Q**   Who is "they"?

09:16:41   16   **A**   The cashiers.  Sorry.

09:16:42   17   The cashiers would take that money and they would put

09:16:45   18   it -- most of them put it under a white trash bag in a trash

09:16:49   19   can in the back office of each facility.

09:16:52   20   **Q**   And why would you do that?

09:16:55   21   **A**   They didn't have a safe, I guess.

09:16:57   22   **Q**   Okay.  So just so I'm clear, they would take the cash

09:17:00   23   and put it under a trash bag in a trash can?

09:17:03   24   **A**   Um-hmm.

09:17:04   25   **Q**   Okay.  So that cash, would that remain there

**R. Hull  (Direct by Howell)**                                    439

09:17:09   1   throughout the week until the audit?

09:17:10   2   **A**    Yes.

09:17:17   3   **Q**    What would happen with the daily sheets?

09:17:20   4   **A**    They would get -- they would take first shift, second

09:17:25   5   shift, third shift, midnight guy would put them all into

09:17:29   6   one, wrap it up and staple it.  And then it would go up on

09:17:32   7   the top or, if we had like a filing cabinet or something,

09:17:34   8   sometimes we did, sometimes we didn't — it went back and

09:17:36   9   forth if we didn't or didn't — they'd put it up in the

09:17:40  10   filing cabinet, and then we would save it till the audit.

09:17:43  11   **Q**    So the daily sheets would remain in the business the

09:17:46  12   way that you indicated until the day of the audits?

09:17:48  13   **A**    Correct.

09:17:52  14   **Q**    Did you have any role in the weekly audits?

09:17:55  15   **A**    After 2013, yes.

09:17:58  16   **Q**    So after you took over kind of managerial duties?

09:18:02  17   **A**    Yes.

09:18:02  18   **Q**    Walk the jury through, it's a Sunday, you're going to

09:18:07  19   do the audit, what do you do?

09:18:08  20   **A**    So I would go and I would take the money out of the

09:18:12  21   machines and do the exact same thing I'd normally do

09:18:15  22   throughout the week.  I'd count the money up, and then Jason

09:18:18  23   would follow me and print the audit or he would just write

09:18:23  24   them down and clear them out on the machine.  You could do

09:18:26  25   it either way.  He preferred to physically write it down

09:18:31  1    rather than print.

09:18:32  2    **Q**    And just so we're clear, when you say Jason, you mean

09:18:35  3    Jason Kachner?

09:18:35  4    **A**    Yes.

09:18:37  5    **Q**    On a Sunday, what time of day would you typically do

09:18:40  6    this?

09:18:40  7    **A**    We would normally try to be there 7:00 a.m.

09:18:43  8    **Q**    Was Redemption open 24 hours a day at that time?

09:18:46  9    **A**    Yes.

09:18:46  10   **Q**    So would customers be there?

09:18:49  11   **A**    Yes.

09:18:49  12   **Q**    Jason Kachner is there with you.  Was there anyone

09:18:51  13   else there for the audits?

09:18:53  14   **A**    Most of the times Becky was there, his wife.

09:18:57  15   **Q**    Anyone else?

09:18:59  16   **A**    Time to time Tom, but not very often.

09:19:02  17   **Q**    Thomas Helmick?

09:19:03  18   **A**    Yes.

09:19:04  19   **Q**    All right.  Now, I want to take a step back in time

09:19:07  20   just a little bit.

09:19:08  21       So you said in 2013 you started to take part in the

09:19:12  22   audits at Redemption; right?

09:19:13  23   **A**    Correct.

09:19:14  24   **Q**    Prior to that, in the time that you were working as a

09:19:18  25   cashier, were you ever present when audits were conducted?

**R. Hull  (Direct by Howell)** 441

09:19:22    1    **A**    Yeah.  Sometimes they would do emergency audits.  If

09:19:25    2    they thought something was wrong or there was a big hit or

09:19:27    3    something like that, they might do an emergency audit on my

09:19:31    4    shift.

09:19:31    5    I always worked afternoon shifts, so it was very rare

09:19:33    6    that they would do one on my shift because they tried to do

09:19:36    7    it when there was the least amount of people there.

09:19:38    8    **Q**    And who is "they" in that situation?

09:19:39    9    **A**    "They" would be Jason Kachner and Larry Dayton and

09:19:43    10    normally their two wives.

09:19:47    11    **Q**    All right.  So back to your role in doing them at

09:19:50    12    Redemption.

09:19:52    13    You're there with typically you said Jason Kachner and

09:19:55    14    his wife.

09:19:56    15    Are you familiar with a Gaggle System?

09:19:58    16    **A**    Yes.  Well, that came very late, probably 2017.

09:20:03    17    **Q**    And what was the Gaggle System?

09:20:05    18    **A**    So the Gaggle System was a system that connected all

09:20:09    19    the machines together.  And what they would do -- so instead

09:20:13    20    of you saying, hey, I got a cashout, come grab my ticket for

09:20:18    21    me, they would just hit the cashout button.  It would print

09:20:21    22    in the back office, so everything came to the back office.

09:20:24    23    There was no need at that time to go out and grab a physical

09:20:27    24    ticket.

09:20:27    25    It also kept all numbers of the audit on, like, wins

**R. Hull  (Direct by Howell)**                    442

09:20:32  1   and losses for the entire office, net profit, on there.

09:20:35  2   **Q**     So I think you estimated that that came into play

09:20:38  3   around 2017?

09:20:39  4   **A**     I believe so, yes.

09:20:40  5   **Q**     What was done, if you know, with the records from the

09:20:44  6   Gaggle System?

09:20:45  7   **A**     I don't know.

09:20:46  8   **Q**     Okay.  So you're there.  You guys are performing the

09:20:53  9   audits on a Sunday.

09:20:55  10       Do the numbers always correspond with the daily sheets

09:20:58  11  in your experience?

09:20:59  12  **A**     No.

09:20:59  13  **Q**     And walk the jury through a situation where that had

09:21:02  14  happened and how you handled it.

09:21:04  15  **A**     I mean, some situations were better than others.

09:21:07  16  There were times where we were a hundred, $200 off, which

09:21:10  17  they didn't really care that much.  They -- that was just a

09:21:16  18  blip.  And there was times where we were 4, 5, $6,000 off.

09:21:21  19  Normally it was a machine malfunction throughout the week.

09:21:24  20  But if they couldn't locate it, obviously they were very

09:21:26  21  upset, and we would always do like a deeper dive.  And

09:21:30  22  sometimes they made me do daily audits where I would have to

09:21:33  23  go through -- now, I didn't clear the machine, but I would

09:21:36  24  have to go through and take the numbers and just make sure

09:21:38  25  every day was checking out.

**R. Hull  (Direct by Howell)**                                    443

09:21:40   1    **Q**     What would Mr. Kachner's demeanor be if the count was

09:21:44   2    off?

09:21:45   3    **A**     He would be upset.

09:21:46   4    **Q**     At who?

09:21:48   5    **A**     Whoever was in the room.

09:22:01   6    **Q**     In your role as the manager there at Redemption and

09:22:05   7    doing the daily sheets and the audits, did you try to be

09:22:08   8    meticulous in your numbers?

09:22:10   9    **A**     Yeah, I always want my numbers to be on.

09:22:13  10    **Q**     Why?

09:22:13  11    **A**     Because it was my job.

09:22:15  12    **Q**     Did you take pride in it?

09:22:17  13    **A**     I did.

09:22:23  14    **Q**     At the time -- throughout your time working at

09:22:28  15    Redemption, in the 8 years, how many employees worked with

09:22:32  16    you on a day-to-day basis?

09:22:33  17    **A**     On a day-to-day or just in total employees?

09:22:36  18    **Q**     Let's start with day-to-day basis.

09:22:38  19    **A**     Day-to-day, there was always three cashiers, first

09:22:42  20    shift, second shift, third shift.  And depending on day of

09:22:46  21    the week, usually weekends, there was a doorman at

09:22:50  22    Redemption.  Never at Shamrock.

09:22:51  23    **Q**     You say a doorman?

09:22:52  24    **A**     Yeah.

09:22:52  25    **Q**     What's the role of the doorman?  If the door's locked,

**R. Hull  (Direct by Howell)**                           444

09:22:55  1    why do you need a doorman?

09:22:56  2    **A**     Because the traffic coming in and out sometimes,

09:22:59  3    especially if we were doing like a promotion, the traffic in

09:23:02  4    and out was hard to keep up with with the multiple rooms and

09:23:05  5    cashing people out.

09:23:12  6    **Q**     The doorman ever armed?

09:23:14  7    **A**     Yes.  Yes.

09:23:15  8    **Q**     How do you know that?

09:23:17  9    **A**     I would see the gun on them.

09:23:20  10   **Q**     How many people carried guns that were working as

09:23:23  11   doormen there?

09:23:24  12   **A**     I don't know exact number.  I know at least three.

09:23:27  13          So usually the midnight guys.

09:23:43  14   **Q**     And you mentioned that you had a role over at

09:23:46  15   Shamrock.  Did you ever do audits over there?

09:23:47  16   **A**     I would be there for audits from time to time.

09:23:49  17   **Q**     And explain that situation to the jury, please.

09:23:51  18   **A**     So, normally, it was like I said, Jay, I don't know

09:23:55  19   his last name, and Mr. Moneypenny would do the audits at

09:24:00  20   Shamrock.  If the numbers were bad for multiple weeks, if

09:24:04  21   Kake was unavailable, he would have me go over and just be

09:24:07  22   there for the audit.

09:24:09  23   **Q**     And if you would be there for the audit, what was your

09:24:12  24   role?  Were you taking any notes?  Were you writing things

09:24:14  25   down?  What did you do?

**R. Hull  (Direct by Howell)**                    445

09:24:15  1    **A**    I would count the cash, kind of like I did at

09:24:19  2    Redemption, get it all ready.  And then they would come back

09:24:21  3    with their numbers on the computer and show me what the

09:24:24  4    numbers were for the week, and we would match it up.

09:24:27  5    **Q**    And just so we're clear, when you say "they," are you

09:24:31  6    referring to Jay and Mr. Moneypenny?

09:24:34  7    **A**    Correct.

09:24:35  8    **Q**    Talk a little bit about the computer that you said

09:24:37  9    that was shown to you.  Who was handling that and what was

09:24:38  10   it used for?

09:24:39  11   **A**    Jay or Mr. Moneypenny would always have an laptop when

09:24:43  12   this did an audit at Shamrock.

09:24:44  13   **Q**    And what would they do with it that you were able to

09:24:46  14   observe?

09:24:46  15   **A**    Instead of writing the numbers down like Jason would

09:24:47  16   do at Redemption, they would type the numbers into an Excel

09:24:50  17   sheet on the laptop.

09:24:52  18   **Q**    Where are they getting those numbers from that you're

09:24:55  19   observing?

09:24:55  20   **A**    The machines.  Audit machine.

09:24:58  21   **Q**    So each machine?

09:24:59  22   **A**    Yes.

09:25:00  23   **Q**    And you mentioned that that was shown to you.  What

09:25:03  24   was your understanding why that was shown to you?

09:25:04  25   **A**    They would show me -- at the end they'd show me like

09:25:08  1   if the numbers were on and off and then they'd show me what

09:25:11  2   Kake's cut was so I could take it to Kake if I was there.

09:25:14  3   **Q**    All right.  And explain to the jury, how would you

09:25:17  4   see -- were you shown a spreadsheet?

09:25:18  5   **A**    Yes.

09:25:18  6   **Q**    On the laptop?

09:25:19  7   **A**    Yes.

09:25:21  8   **Q**    Is that where you would be shown what Kake's cut was?

09:25:25  9   **A**    Yes.

09:25:28  10  **Q**    And based upon what they showed you on that laptop,

09:25:31  11  did you already have a number calculated as to what his cut

09:25:34  12  was, or no?

09:25:35  13  **A**    Yeah.  I mean, you can tell based off of what the last

09:25:39  14  pull was from the machine and what the starting bank for the

09:25:42  15  week was.  So the starting bank for the week, at the end

09:25:46  16  was -- at Shamrock was 15,200.  So if my last count was

09:25:50  17  30,200, you know that the store made $15,000, Kake made

09:25:56  18  7500.

09:25:56  19  **Q**    So he was getting 50 percent, to your knowledge?

09:25:58  20  **A**    Yes.

09:25:59  21  **Q**    All right.  And this is weekly?

09:26:07  22  **A**    Yes.

09:26:07  23  **Q**    Based upon you being shown the spreadsheet on the

09:26:11  24  laptop, were you able to see where the other cut was going?

09:26:14  25  **A**    I did not know.

09:26:17    1    **Q**    Okay.  So you're shown this on the laptop.  You have

09:26:22    2    your numbers.  What happens next?  If the numbers match up,

09:26:27    3    what happens?

09:26:27    4    **A**    He closes his laptop, gives me Kake's money, I take

09:26:31    5    Kake's money to Redemption, and we go our separate ways.

09:26:33    6    **Q**    Who would give you Kake's money?

09:26:35    7    **A**    Moneypenny.

09:26:37    8    **Q**    What would --

09:26:38    9    **A**    Or Jay.  Sorry.  Or Jay.

09:26:40   10    **Q**    What would you do with it?

09:26:42   11         And this being cash, I'm assuming?

09:26:44   12    **A**    Yes.

09:26:44   13    **Q**    What would you do with that cash?

09:26:46   14    **A**    I would normally put it in a black trash bag, and I

09:26:49   15    would save it for the Redemption audit.  Or if Kake was

09:26:52   16    already -- so sometimes he would send me over to Shamrock

09:26:56   17    while he had already started the Redemption audit, and I

09:27:00   18    would just give him the money when I got there.

09:27:03   19    **Q**    Were there times, when he was not available, did you

09:27:06   20    ever take money to him anywhere else?

09:27:09   21    **A**    I may have taken money to him, but not a hundred

09:27:13   22    percent sure if I ever did or not.

09:27:14   23    **Q**    Did you ever take money to anyone else?

09:27:16   24    **A**    I took money to Larry Dayton before.

09:27:23   25    **Q**    I think I asked you about this briefly before, and I

**R. Hull  (Direct by Howell)**                                    448

09:27:25  1    know you mentioned Larry Dayton kind of got out of the

09:27:28  2    picture a little bit, at least day-to-day; right?

09:27:29  3    **A**    Correct.

09:27:29  4    **Q**    Mr. Helmick comes in.  Did you ever, after that time,

09:27:32  5    did you ever deliver money to Larry Dayton?

09:27:34  6    **A**    Yes.

09:27:34  7    **Q**    Why would you do that if he's out?

09:27:36  8    **A**    They asked me to give him money.

09:27:38  9    **Q**    Who's "they"?

09:27:39  10   **A**    Jason.

09:27:53  11               MR. HOWELL:  Can we pull up Government's

09:27:55  12   Exhibit 411, please?

09:28:04  13   BY MR. HOWELL:

09:28:05  14   **Q**    Can you see that?

09:28:05  15   **A**    Yes.

09:28:07  16   **Q**    All right.  And if you're looking at an exhibit,

09:28:10  17   sometimes if you're looking at that your face is away from

09:28:13  18   the mic.  So if you need to pull it over to you a little

09:28:15  19   bit, that should work.

09:28:17  20        Do you recognize this?

09:28:18  21   **A**    I do.

09:28:19  22   **Q**    And what is this?

09:28:20  23   **A**    It's a call list at Shamrock.

09:28:24  24   **Q**    All right.  And how do you recognize Government's

09:28:27  25   Exhibit 411?

| | | | |
|---|---|---|---|
| 09:28:30 | 1 | **A** | It was hanging at the Shamrock. |
| 09:28:33 | 2 | **Q** | Are you familiar with the names on there? |
| 09:28:44 | 3 | **A** | Yes. |
| 09:28:48 | 4 | **Q** | All right.  Do you see Derek on there? |
| 09:28:50 | 5 | **A** | I do. |
| 09:28:53 | 6 | | Oh, well, maybe no, I don't. |
| 09:28:56 | 7 | | Oh, yeah, I do.  There he is.  Third one down. |
| 09:29:04 | 8 | **Q** | That a little bigger for you? |
| 09:29:06 | 9 | **A** | Yeah, that's good. |
| 09:29:07 | 10 | **Q** | Okay.  Do you see "Derek" on there? |
| 09:29:08 | 11 | **A** | I do. |
| 09:29:08 | 12 | **Q** | And who does that refer to, if you know? |
| 09:29:11 | 13 | **A** | Derek Phillips. |
| 09:29:12 | 14 | **Q** | All right.  And let's just go down the list and let us |
| 09:29:15 | 15 | | know if you know those folks. |
| 09:29:16 | 16 | **A** | Kenny Phillips, Nancy I know. |
| 09:29:19 | 17 | | Do you want me to say who they are or just -- |
| 09:29:22 | 18 | **Q** | Yes, please. |
| 09:29:22 | 19 | **A** | Nancy was a cashier.  It was also Rebecca Kachner's |
| 09:29:27 | 20 | | aunt. |
| 09:29:28 | 21 | **Q** | And where did she work? |
| 09:29:30 | 22 | **A** | I believe she worked at both. |
| 09:29:32 | 23 | **Q** | And when you say "both," just so we're clear -- |
| 09:29:35 | 24 | **A** | Redemption and Shamrock. |
| 09:29:36 | 25 | **Q** | Thank you. |

09:29:37    1        And who is Kenny again?

09:29:37    2   **A**    Kenny is Derek's brother.

09:29:40    3   **Q**    Where did he work?

09:29:40    4   **A**    Just the Shamrock.

09:29:43    5   **Q**    Okay.  Then you were past Nancy.  Let's go down the

09:29:47    6   list, please.

09:29:48    7   **A**    Sue Fano was a cashier.  She worked at Shamrock, and I

09:29:52    8   believe she did Sunday mornings at Redemption.

09:29:54    9   **Q**    You say Sue Fano.  Does that name stand out to you at

09:29:58   10   all?

09:29:58   11   **A**    Fano was a -- at the time was a candy place, like

09:30:04   12   three units down in the plaza that Redemption was in.

09:30:10   13   **Q**    All right.  Next name?

09:30:13   14   **A**    Josh, but I'm unsure which Josh that is because we

09:30:16   15   went through a couple Joshes, so I don't know which Josh

09:30:20   16   that is.

09:30:20   17   **Q**    Okay.

09:30:20   18   **A**    Bonnie was a cashier only at Shamrock.

09:30:27   19        Tim Jr. was a cashier at both.

09:30:34   20        Tim H I do not recognize.  I believe he was a midnight

09:30:38   21   guy, but I didn't interact with midnight people very often.

09:30:41   22   **Q**    Okay.

09:30:42   23   **A**    Because I tried to do everything during the day.

09:30:44   24        The R is me.

09:30:47   25        Thomas would be Tom Helmick.

09:30:50   1        Steve is the owner of the building.

09:30:52   2        Mike Sr. and Mike Jr. are the Moneypennys.  They fixed

09:30:56   3    the machines and then he did the audits on Sunday.

09:30:59   4        ATM guy.

09:31:02   5        I don't know what the second one is.

09:31:05   6        The third one was the people that would fix the lock

09:31:07   7    on the door if it broke.

09:31:09   8        And the last one was the plow company.

09:31:13   9              MR. HOWELL:  Okay.  Can zoom out?

09:31:15  10              MR. KERSEY:  What?

09:31:16  11              THE WITNESS:  The plow company.

09:31:17  12              MR. HOWELL:  Plow company.

09:31:27  13              THE WITNESS:  Those are all the food places we

09:31:29  14    would order from.

09:31:30  15              MR. HOWELL:  Just for purpose of the record,

09:31:31  16    we zoomed in on the right side of the Government's

09:31:35  17    Exhibit 411.

          18    BY MR. HOWELL:

09:31:35  19    **Q**    And go ahead and tell us what that is.

09:31:37  20    **A**    All the food places we ordered from.

09:31:39  21    **Q**    And just explain to the jury what you mean by that.

09:31:41  22    **A**    So, normally we would order lunch and dinner every

09:31:45  23    night.  Depending on crowd, sometimes we would order more.

09:31:49  24    If there was still a heavy presence later at night, they

09:31:52  25    would allow them to order pizza or something from Lindsey's

**R. Hull  (Direct by Howell)**                                           452

09:31:58  1   before they closed or Pizza Oven before they closed for the

09:32:02  2   midnight crowd.

09:32:03  3   **Q**     Based upon your experience there, were you familiar

09:32:05  4   with how much money, for example, Redemption was spending

09:32:10  5   for food on a day-to-day basis?

09:32:12  6   **A**     On a day-to-day basis, Redemption would probably spend

09:32:15  7   $200.

09:32:16  8   **Q**     All right.  What about Shamrock, to your knowledge?

09:32:18  9   **A**     75 to a hundred, maybe.

09:32:20  10                  MR. HOWELL:  Can we pull up Government's

09:32:22  11  Exhibit 406, please.

09:32:28  12  BY MR. HOWELL:

09:32:28  13  **Q**     Do you recognize this?

09:32:29  14  **A**     Yeah.  That's a -- the cash -- well, a drawer of

09:32:34  15  Shamrock.  That's at Shamrock.

09:32:37  16  **Q**     Okay.  It's a drawer of cash, you said?

09:32:40  17  **A**     Yeah.

09:32:41  18      Sometimes they left small -- like if they had, like,

09:32:45  19  an extra stack of fives or twenties, something that they

09:32:49  20  knew they were going to go through quick, they would leave

09:32:51  21  it up top.  And then the rest of the money they would put

09:32:53  22  away, like I said, under -- normally, most people put it

09:32:57  23  underneath a trash bag in a trash can, most people.

09:33:00  24  **Q**     Do you see a trash can in Government Exhibit 406?

09:33:03  25  **A**     I do.

**R. Hull  (Direct by Howell)**                                        453

09:33:03  1  **Q**     And if you take your finger, Mr. Hull, you can touch

09:33:07  2  the screen, and you can circle it if you see it.

09:33:09  3  **A**     (Witness complies).

09:33:14  4  **Q**     All right.  And you mentioned this trash can.  And

09:33:15  5  once again, just explain to us what that would generally be

09:33:19  6  used for.

09:33:19  7  **A**     It would be used to hold the extra cash underneath

09:33:26  8  that bag.

09:33:27  9  **Q**     And so it has a trash bag in it.  It looks like there

09:33:30  10  might be other items in it but --

09:33:31  11  **A**     It's probably washcloths is normally what they put on

09:33:35  12  top of it just to have something in it so it wasn't just an

09:33:38  13  empty bag.

09:33:38  14  **Q**     And the cash would be put down underneath that --

09:33:41  15  **A**     Correct.

09:33:42  16  **Q**     -- to conceal it?

09:33:45  17          MR. HOWELL:  All right.  You can take that

09:33:47  18  down.

09:33:53  19  BY MR. HOWELL:

09:33:53  20  **Q**     Based upon your experience at Redemption, did you get

09:33:56  21  a general understanding of the types of numbers, the types

09:33:59  22  of money that were coming in as far as profits go per week?

09:34:02  23  **A**     Yeah, once I started the audit.

09:34:03  24  **Q**     Can you say that again, I'm sorry?

09:34:05  25  **A**     Once I started doing the audits with them, yes.

**R. Hull  (Direct by Howell)**                    454

09:34:08  1    **Q**    Were the profits consistent throughout the year?

09:34:11  2    **A**    No.

09:34:13  3    **Q**    Explain that to the jury, please.

09:34:14  4    **A**    It would always depend on time of year, if there was a

09:34:18  5    big hit during the week.  Expenses, sometimes expenses were

09:34:24  6    more.  But, like, tax season was always a big season.  First

09:34:27  7    of the month was always a big time.  But I've seen them lose

09:34:31  8    money, I've seen them make money.

09:34:33  9    **Q**    All right.  In terms of months or seasons, was there a

09:34:41  10   season where you made more money and less money?

09:34:43  11   **A**    Tax season.  So, January to early March.

09:34:49  12   **Q**    All right.  How were the summers?

09:34:52  13   **A**    Average.  I mean, other than that, it's pretty

09:34:55  14   average.

09:34:55  15   **Q**    Okay.  If I asked you, what's the most profit you can

09:35:06  16   recall in a week at Redemption during your time there?

09:35:11  17   **A**    Are you asking me based on Jason Kachner's cut?

09:35:14  18   Because that's normally what I was affiliated with.  Or do

09:35:18  19   you want me to double that and give you a full total?

09:35:20  20   **Q**    Well, let's do them both, okay?  Why don't we start

09:35:23  21   with Mr. Kachner and then do the next one.

09:35:24  22   **A**    I think I've seen him make 25 to 30,000 in a week off

09:35:28  23   of just Redemption.  And then the most I think I've ever

09:35:31  24   seen Shamrock make in a week was maybe 16,000.

09:35:35  25   **Q**    And that's just his cut?

09:35:36  1    **A**    Just his cut.  So then you would double that to get

09:35:44  2    the total number.

09:35:45  3    **Q**    I want to write these down again.  Can you tell me

09:35:48  4    again?

09:35:48  5    **A**    Jason, 25 to 30 at Redemption would be probably the

09:35:51  6    biggest I ever seen.  And Shamrock, about 16,000, I believe,

09:35:56  7    was the biggest number I ever seen, that I'm aware of.

09:36:01  8    **Q**    And then I think your testimony was double that as far

09:36:04  9    as what the total profit was?

09:36:05  10   **A**    Correct.

09:36:07  11   **Q**    For a week?

09:36:07  12   **A**    Yes.

09:36:23  13   **Q**    Mr. Hull, do you have any criminal background?

09:36:24  14   **A**    I do not.

09:36:29  15          MR. KERSEY:  What was that?  I didn't hear

09:36:31  16   that, I'm sorry.

09:36:32  17          THE WITNESS:  I do not.

09:36:33  18          MR. HOWELL:  I asked him if he had any

09:36:35  19   criminal background.

09:36:37  20   BY MR. HOWELL:

09:36:37  21   **Q**    I want to talk a little bit about your dealings with

09:36:39  22   law enforcement in this case.  Okay?

09:36:42  23   **A**    Okay.

09:36:43  24   **Q**    Do you remember the day of July 11th of 2018?

09:36:46  25   **A**    I do.

09:36:46   1   **Q**     How do you remember that day?

09:36:47   2   **A**     I was called early in the morning by Sue Fano at

09:36:52   3   Shamrock to let me know that there was a police presence at

09:36:58   4   Redemption and that they thought it was -- either the

09:37:03   5   customers that told her or the police themselves said they

09:37:06   6   were state police from Michigan.

09:37:08   7   **Q**     That's what you -- that's what your understanding was?

09:37:10   8   **A**     Yes.

09:37:10   9   **Q**     Okay.  So what did you do with that information?

09:37:12   10  **A**     I drove in to the store to talk to them because I

09:37:17   11  assumed that because Larry had moved to Michigan and he had

09:37:20   12  a tendency to use drugs, that maybe they were there looking

09:37:25   13  for Larry.

09:37:26   14  **Q**     And you mentioned that he had a tendency to use drugs,

09:37:31   15  Larry Dayton, how did you know that?

09:37:32   16  **A**     Sometimes he would come and talk to us about his

09:37:38   17  troubles.

09:37:38   18  **Q**     All right.  And is there a specific drug that you

09:37:40   19  became familiar with that he was using?

09:37:42   20  **A**     I do not know, no.

09:37:44   21  **Q**     So you assumed that this had something to do with

09:37:48   22  Mr. Dayton, and you said that you responded to the store.

09:37:49   23          What store did you respond to?

09:37:50   24  **A**     I went to Redemption.

09:37:54   25  **Q**     Walk us through, what do you see when you get there

09:37:57  1    and what happens?

09:37:57  2    **A**    So I see the -- first thing I noticed was the parking

09:38:00  3    lot was empty, and the parking lot was never empty.  The

09:38:04  4    door was cracked.  The door was never left open.

09:38:07  5        And I grabbed the door to open it, and a police

09:38:11  6    officer -- well, it wasn't a police officer, it was -- I

09:38:15  7    don't know exactly what agency it was because there was

09:38:17  8    multiple agencies there.  He shut the door and said, we're

09:38:21  9    closed.  And I told him, I'm the -- I'm the manager here.

09:38:23  10   And he said, oh, well, thanks for showing up, and he let me

09:38:27  11   in.

09:38:27  12   **Q**    Okay.  When you say there were multiple agencies

09:38:30  13   there, did you see Secret Service there?

09:38:32  14   **A**    Secret Service, FBI, and I believe IRS were all there.

09:38:36  15   **Q**    Okay.  Were you able to tell that, they're wearing

09:38:40  16   those, like, little jackets?

09:38:42  17   **A**    Yeah, they wore -- looked like bulletproof vests, but

09:38:45  18   it could have just been like a big thick jacket that they

09:38:49  19   were wearing.

09:38:49  20   **Q**    What's going through your head?

09:38:51  21   **A**    This isn't good.

09:38:53  22   **Q**    So what did you do?

09:38:55  23   **A**    They asked me to come into the room where there was

09:38:58  24   nobody at, and they just sat down and asked me if I had --

09:39:01  25   they said, we're really not wanting to break these machines

**R. Hull  (Direct by Howell)**                                    458

09:39:04   1   open.  Do you have the keys?  And I said, yes, I have the

09:39:08   2   keys.  So I gave them the keys.

09:39:09   3        And then they were like -- they said, can you show us

09:39:12   4   how to open them and take the money out and everything?  And

09:39:14   5   I showed them how to do all that.

09:39:20   6   **Q**    So within a couple of seconds of interacting with

09:39:22   7   them, you've admitted that you're the manager and now you're

09:39:25   8   giving them the keys to open everything; right?

09:39:27   9   **A**    Correct.

09:39:28   10  **Q**    Did they ask any questions?

09:39:30   11  **A**    They asked me how we kept track of everything.  I

09:39:34   12  showed them the paperwork that we had.

09:39:36   13       They had a lot of it already ripped down and sat

09:39:39   14  there.  I just kind of showed them through most of it and

09:39:42   15  explained what the -- what we did.

09:39:46   16       And then I told them that -- I showed them the license

09:39:48   17  from the Stark County Sheriff's and said that this says that

09:39:52   18  we're legal to operate, and they didn't care about that.

09:39:56   19  **Q**    Okay.  Did they ask you any further questions that you

09:40:00   20  recall?  I mean, I'm not asking you to tell the jury what

09:40:03   21  they said to you, but just in general, did they question --

09:40:07   22  **A**    They questioned me who the owner -- oh, I'm sorry.

09:40:08   23  **Q**    That was my fault.  I couldn't spit it out.

09:40:11   24       Did they question you any further?

09:40:13   25  **A**    They questioned who the owners were, or if I knew who

**R. Hull (Direct by Howell)**    459

09:40:19    1    owned the facility.

09:40:19    2    **Q**    And did you give them answers?

09:40:20    3    **A**    I told them Jason Kachner.

09:40:22    4    **Q**    All right.

09:40:23    5    **A**    And Tom Helmick is what -- yeah.

09:40:25    6    **Q**    And Tom Helmick?

09:40:26    7    **A**    Yeah.

09:40:35    8    **Q**    What happens after that that day?

09:40:36    9    **A**    They sent me on my way.  And I didn't hear anything

09:40:39    10   again probably for 2 months.

09:40:40    11   **Q**    All right.  Before we get into that -- we'll talk

09:40:42    12   about that in just a second.

09:40:44    13        But that specific day or the couple days after, did

09:40:46    14   you have any contact with Mr. Helmick?

09:40:50    15   **A**    I don't believe I talked to Mr. Helmick.  I did talk

09:40:53    16   to Jason Kachner.

09:40:55    17   **Q**    All right.  At some point did you go back to

09:40:57    18   Redemption?

09:40:57    19   **A**    I did.  Sorry, I did.

09:40:59    20        I went back, and Kake said that we could take the

09:41:03    21   supplies.  So, there were boxes of water, pop, trash bags,

09:41:10    22   anything, he said, take whatever you want.  And I loaded up

09:41:14    23   my truck and took a bunch of household supplies and pop and

09:41:18    24   all that.  And then I left my keys with Tom.

09:41:22    25   **Q**    So, do you recall -- I know it was a long time ago.

09:41:26   1    Do you recall how long after July 11th this was,

09:41:29   2    approximately?

09:41:29   3    **A**     I don't.

09:41:30   4    **Q**     Or was it the same day?

09:41:31   5    **A**     It could -- I don't -- I don't recall.  I don't.

09:41:33   6    **Q**     That's fine.

09:41:34   7          So you say that Kake -- that's Jason Kachner; right?

09:41:37   8    **A**     Yes.

09:41:37   9    **Q**     That's who reached out to you.

09:41:40   10         When you go to Redemption, do you recall, was anyone

09:41:42   11   else there?

09:41:43   12   **A**     When I first went there when the police presence was

09:41:46   13   there or when I went back?

09:41:48   14   **Q**     The supplies that you're telling us about.

09:41:51   15   **A**     There were two or three other people there.  I don't

09:41:53   16   remember who they were.  But I remember sitting out on the

09:41:56   17   picnic table talking about what had happened.

09:41:58   18   **Q**     I think you mentioned that you gave the keys to

09:42:01   19   Mr. Helmick.  Do you recall where and when you did that?

09:42:04   20   **A**     That day, whenever we met and did the supplies,

09:42:08   21   because we had to wait because the keys were inside still.

09:42:13   22   They had shut the door.  We weren't able to get in.  So we

09:42:16   23   actually had to call that Lamb Glass place that's on the

09:42:20   24   Shamrock place for them to come open the doors for us.

09:42:22   25   **Q**     Did you hand the keys to Thomas Helmick in person?

09:42:25  1    **A**      Yeah.  So when I went in, the keys were on the -- like

09:42:28  2    where the cashier stood.  There was like a little -- almost

09:42:31  3    like a half table like this.  And they were sitting there.

09:42:34  4    And I grabbed them and I said, well, I don't need these

09:42:37  5    anymore, and I handed them off to him.

09:42:38  6    **Q**      So he was there?

09:42:40  7    **A**      Tom was there when we did the supplies, when I grabbed

09:42:44  8    the supplies, yes.

09:42:45  9    **Q**      Okay.  All right.  And I think you started to talk

09:42:50  10   about this.  You spoke to law enforcement the day of.

09:42:53  11        At some point were you contacted by law enforcement?

09:42:56  12   **A**      Yes.

09:42:58  13   **Q**      So if I say October of 2018, does that sound right?

09:43:01  14   **A**      That sounds about right, yes.

09:43:02  15   **Q**      How were you contacted?

09:43:04  16   **A**      They went to my house, but I was at work.

09:43:07  17   **Q**      And did they pass on a message or leave something for

09:43:10  18   you?

09:43:10  19   **A**      Yeah.  So my wife was home for lunch.  She went home

09:43:12  20   for lunch every day to let the dogs out, and as she was

09:43:18  21   leaving for work she was contacted by two agents.

09:43:20  22        And she said -- she texted me, and I said just give

09:43:23  23   them my number.  And they ended up calling me and setting up

09:43:26  24   a meeting.

09:43:27  25   **Q**      And does October 2018 sound about right when that

09:43:31  1   happened?

09:43:31  2   **A**    That sounds about right, yes.

09:43:32  3   **Q**    And did you go to a meeting?

09:43:33  4   **A**    I did.

09:43:34  5   **Q**    Where -- do you recall where that meeting was?

09:43:35  6   **A**    It was downtown Canton.

09:43:38  7   **Q**    And who did you meet with, if you recall?

09:43:41  8   **A**    Mr. Paul and there was another guy.  I don't remember

09:43:44  9   who the other guy was.

09:43:45  10  **Q**    When you say Mr. Paul, is that Jeff Paul?

09:43:47  11  **A**    Yes.

09:43:48  12  **Q**    IRS agent?

09:43:48  13  **A**    Yes.

09:43:51  14  **Q**    Did you sit down and go over an interview with them

09:43:54  15  about your role in this?

09:43:55  16  **A**    Yes.

09:43:56  17  **Q**    Did you answer their questions truthfully?

09:43:59  18  **A**    Yes.

09:44:00  19  **Q**    Did you meet with them anytime after that?

09:44:03  20  **A**    I believe I had one more meeting with them, but I

09:44:06  21  can't recall how long it was after that.

09:44:07  22  **Q**    Did you meet me at some point?

09:44:09  23  **A**    I did.

09:44:10  24  **Q**    Do you recall what the circumstances of that were?

09:44:12  25  **A**    Before grand jury.

09:44:14  1   **Q**    Okay.  So did you testify in grand jury in this case?

09:44:17  2   **A**    I did.

09:44:20  3   **Q**    Did you and I have any discussions in regards to

09:44:23  4   whether you were going to be charged in this case?

09:44:25  5   **A**    Yes.

09:44:26  6   **Q**    What were those discussions?

09:44:28  7   **A**    You said that I was the subject of the investigation

09:44:31  8   which could or could not lead to me being charged with

09:44:35  9   something.

09:44:36  10   **Q**    All right.  And did I tell you that before you

09:44:38  11   testified in grand jury?

09:44:39  12   **A**    Yes.

09:44:40  13   **Q**    And let the jury know, what's your understanding of

09:44:42  14   what I told you, what could happen at the end of grand jury?

09:44:46  15   **A**    That I could be charged.

09:44:49  16   **Q**    Did I tell you of your rights?

09:44:51  17   **A**    Oh, yes.  Yeah.

09:44:53  18   **Q**    And did you agree to testify anyway?

09:44:55  19   **A**    Yes.

09:45:03  20   **Q**    I'm going to go through a couple of quick photos with

09:45:07  21   you.  Okay?

09:45:07  22   **A**    Okay.

09:45:08  23             MR. HOWELL:  Can we pull up Government

09:45:10  24   Exhibit 438, please?

09:45:14  25   BY MR. HOWELL:

09:45:15  1  **Q**     Do you recognize this?

09:45:15  2  **A**     Yes.  That's Redemption.

09:45:18  3  **Q**     Is that that front door with the buzzer you were

09:45:21  4  telling us about?

09:45:21  5  **A**     Yes.

09:45:22  6  **Q**     And the windows here, if I tell you this photo is

09:45:26  7  July 11th, 2018, does that sound right?

09:45:28  8  **A**     Yes.

09:45:29  9  **Q**     Is that what it looked like at that time?

09:45:31  10  **A**     Yes.

09:45:31  11  **Q**     Can you see in the windows?

09:45:32  12  **A**     No.

09:45:33  13  **Q**     All right.

09:45:36  14            MR. HOWELL:  Government Exhibit 437.

09:45:43  15  BY MR. HOWELL:

09:45:44  16  **Q**     Do you recognize this?

09:45:44  17  **A**     Yes.  That's the front room of Redemption.

09:45:51  18            MR. HOWELL:  Government Exhibit 474.

09:45:56  19  BY MR. HOWELL:

09:45:56  20  **Q**     Do you recognize that?

09:45:57  21  **A**     Yes.  That's the same room, just taken the opposite

09:46:01  22  way.

09:46:08  23            MR. HOWELL:  Government Exhibit 402, please.

09:46:12  24  BY MR. HOWELL:

09:46:13  25  **Q**     Do you recognize that?

09:46:14   1   **A**    Yes.  That's the Skilled Shamrock.

09:46:21   2   **Q**    Did you ever paint that building?

09:46:22   3   **A**    I did.  I did.

09:46:24   4   **Q**    Do you recall approximately when you did that and why?

09:46:27   5   **A**    It was cold, I remember that, so it had to be late

09:46:31   6   winter, early spring.  I don't know why we painted it; I was

09:46:35   7   just told to paint it by Mr. Kachner.

09:46:37   8   **Q**    What color did you paint it?

09:46:39   9   **A**    Yellow.

09:46:40   10  **Q**    All right.  Did you paint any other building yellow?

09:46:43   11  **A**    Cafe 62.

09:46:44   12  **Q**    Who told you to do that?

09:46:45   13  **A**    Mr. Kachner.

09:46:46   14  **Q**    All right.  Why would you go to Cafe 62?

09:46:50   15  **A**    Because Kake said, I'll pay you a couple hundred bucks

09:46:55   16  to paint a building, so I went down there and painted a

09:46:58   17  building.

09:46:59   18  **Q**    What was your understanding of his role at that

09:47:02   19  building, if any?

09:47:02   20  **A**    Part owner.

09:47:04   21  **Q**    Do you know who he owned that with?

09:47:06   22  **A**    I believe it was Steve Saris.

09:47:08   23  **Q**    Okay.

09:47:12   24              MR. HOWELL:  Government Exhibit 400, please.

09:47:14   25  BY MR. HOWELL:

| 09:47:17 | 1 | **Q**     What do we see here? |

**A**     That's inside the Skilled Shamrock.

MR. HOWELL:  Government Exhibit 404, please.

BY MR. HOWELL:

**Q**     What do we see here?

**A**     Those are machines on the front wall of the Skilled Shamrock.

**Q**     All right.  Specifically, what do we see on the screen here?

**A**     Pot-O-Gold.

**Q**     And is that what you were referring to when you were talking about the Pot-O-Golds earlier?

**A**     Yes.

**Q**     And is that -- it says "touch screen" right there; right?

**A**     Correct.

**Q**     Okay.

MR. HOWELL:  Your Honor, I've discussed with defense counsel in regards to Government Exhibit 477.  It's a demonstrative we have in the courtroom.  With talking with defense counsel, it was agreed that we would inform the jury this particular machine was not taken from Skilled Shamrock or Redemption.  And we were going to ask the Court's permission for Mr. -- I'm going to ask for the Court's permission for Mr. Hull to step down and demonstrate on

**R. Hull  (Direct by Howell)**                                    467

09:48:19  1   this, plug it in and operate it.  But we want to be clear

09:48:22  2   that any of the numbers that come up or anything they may

09:48:24  3   see if we get to the audit screen has nothing to do with

09:48:27  4   Redemption or Skilled Shamrock.

09:48:29  5                   THE COURT:  Okay.  That sounds fair.

09:48:31  6                   MR. HOWELL:  Thank you, Your Honor.

09:48:32  7        May Mr. Hull step down to refer --

09:48:35  8                   THE COURT:  Sure.

09:48:36  9                   MR. HOWELL:  -- to Government Exhibit 477?

09:48:38  10                  THE COURT:  Now, if you're going to speak,

09:48:41  11  speak up so we can hear you.  Okay?

09:48:44  12                  THE WITNESS:  Okay.

09:48:44  13                  MR. HOWELL:  I was going to grab a microphone.

09:48:53  14       Your Honor, may I step up here and get one as well?

09:48:56  15                  THE COURT:  Sure.

09:48:57  16                  COURTROOM DEPUTY:  You can just talk into it.

09:49:12  17  BY MR. HOWELL:

09:49:13  18  **Q**    All right, Mr. Hull.  First of all, are you -- I think

09:49:17  19  we talked a little bit earlier in your testimony, this

09:49:19  20  particular machine, Government Exhibit 477, when did you see

09:49:23  21  this?

09:49:24  22  **A**    Yesterday.

09:49:25  23  **Q**    All right.  And were you able to operate it?

09:49:27  24  **A**    Yes.

09:49:28  25  **Q**    Did you come in this morning, it was not working too

**R. Hull  (Direct by Howell)**                    468

09:49:31   1   well and you got it working?

09:49:32   2   **A**    Yes.

09:49:32   3   **Q**    And how were you able to do that?

09:49:35   4   **A**    Previous knowledge of messing with the machines.

09:49:37   5   **Q**    Okay.  When you operated this yesterday when we turned

09:49:41   6   it on in the office downstairs, did it come on?

09:49:46   7   **A**    Yes.

09:49:47   8   **Q**    All right.  What came on the screen?

09:49:49   9   **A**    Pot-O-Gold.

09:49:50   10  **Q**    And similar to the exhibit we just looked at and what

09:49:52   11  you told us about, same type of software?

09:49:55   12  **A**    Yes.

09:49:55   13  **Q**    And were you able to operate it?

09:49:56   14  **A**    Yes.

09:49:57   15  **Q**    And actually play games yesterday; right?

09:50:00   16  **A**    Yes.

09:50:01   17  **Q**    Okay.  All right.  You can go ahead and turn it on.

09:50:06   18  **A**    (Witness complies).

09:50:23   19  **Q**    What do we see here?

09:50:26   20  **A**    That would be the 777s game.  If you exit here, it

09:50:30   21  will give you every game available to play.

09:50:37   22  **Q**    And if possible, when you turn it on, is that when

09:50:41   23  that Pot-O-Gold screen comes on, generally?

09:50:44   24  **A**    Generally, yeah.  It will load itself, too, every 5,

09:50:49   25  10 minutes.  It will reset and show you the Pot-O-Gold

**R. Hull  (Direct by Howell)**                    469

09:50:52  1    screen and then go to a different game.

09:50:53  2    **Q**    All right.  Now, before we start getting into the

09:50:55  3    touch screen here, you mentioned that the customers

09:50:58  4    typically with these machines would be able to put in cash.

09:51:01  5    **A**    Yes.

09:51:01  6    **Q**    Can you show the jury where that would go?

09:51:04  7    **A**    The cash would go in here (indicating) into a bill

09:51:08  8    accepter.

09:51:09  9    **Q**    And for purposes of the record, you just pulled down

09:51:11  10   that front panel and you're pointing to what?

09:51:13  11   **A**    A bill accepter.

09:51:14  12   **Q**    Okay.  And go ahead and put that back up.

09:51:16  13          And just so we're clear, yesterday, did you repair

09:51:20  14   that so it worked?

09:51:20  15   **A**    Yes.

09:51:21  16   **Q**    How did do that?

09:51:22  17   **A**    With a rubber band.

09:51:23  18   **Q**    How did you know to use a rubber band?

09:51:26  19   **A**    Time -- time at Redemption and Shamrock.

09:51:29  20   **Q**    Okay.  So, also, on this particular thing, generally

09:51:35  21   speaking, were there usually -- you mentioned keys for the

09:51:38  22   machines.  What would you need keys for the machine for?

09:51:40  23   **A**    So this would be locked, so I would have a key that

09:51:44  24   would unlock that.  Or we'd have a padlock on it.  We

09:51:49  25   normally went with padlocks because people had a tendency

09:51:53  1 | to -- we've seen -- people would be able to duplicate these

09:51:55  2 | keys, so we just went with a padlock that we would only have

09:51:58  3 | the key for.

09:51:59  4 | **Q**    Why would someone want to open that?

09:52:00  5 | **A**    Because that's where all the money's at.

09:52:02  6 | **Q**    All right.  Is there anything else back there that a

09:52:05  7 | customer may be interested in?

09:52:06  8 | **A**    So if you open this up, if you click this switch, it

09:52:11  9 | should send you to the audit screen and everything.  It

09:52:15  10 | could be loose here.

09:52:19  11 |     There you go.  It was just a little loose.

09:52:21  12 |     So this is where you can change the percentages in the

09:52:26  13 | game config and do the terminal audit.  Those are the two

09:52:31  14 | main things I ever messed with.

09:52:32  15 | **Q**    All right.  So the win percentage, can you go ahead

09:52:35  16 | and click on that?

09:52:36  17 | **A**    (Witness complies).

09:52:44  18 | **Q**    All right.  And you clicked on that, and what did that

09:52:47  19 | little touch screen say that you clicked on?

09:52:48  20 | **A**    Game config.

09:52:49  21 | **Q**    Okay.  And what are we looking at now?

09:52:51  22 | **A**    These are all available games.  The green ones are the

09:52:55  23 | games that are active to play.  The red ones are the games

09:52:58  24 | that are not active to play.

09:52:59  25 | **Q**    Okay.  And in regards to win percentage, what, if

**R. Hull  (Direct by Howell)**                              471

1    anything, do you see there?

2    **A**      It will tell you the percentage.  If you click on,

3    let's say, Superball Keno, it gives you the percentage here.

4    Payout, 94.35 percent.

5    **Q**      All right.  Are you able to -- I'm not asking you to

6    do it on this one right now, but can you change that?

7    **A**      Yeah.  So with that button engaged, you can click

8    "view next pay table" and it will go up a percent, or you

9    can "view previous pay table," it will go down a percent.

10   Now, it might not be, like, 1 percent.  It jumps based off

11   of the software, but. . .

12   **Q**      So, in order for you to be able to do that, how long

13   did it take you to learn how to do that?

14   **A**      5 minutes of someone showing me.

15   **Q**      And you just use a key to open that if it's locked?

16   **A**      Um-hmm.

17   **Q**      Where did the keys usually remain while other people

18   other than yourself were working, for example, at

19   Redemption?

20   **A**      For the -- to get in the machines?  The keys were

21   always -- Kake had a set, Jason had a set, and I had a set.

22   **Q**      What if you weren't there?

23   **A**      Then I would give the keys to Thomas.  He would

24   usually cover for me if I wasn't available.

25   **Q**      Okay.  All right.  Now, can you go back out of there?

| | | |
|---|---|---|
| 09:54:15 | 1 | And I want to show the jury some of the games that you |
| 09:54:21 | 2 | talked about. |
| 09:54:21 | 3 | **A**　You want all the way out or just out of this page? |
| 09:54:24 | 4 | **Q**　I mean, can you change the win percentages for all of |
| 09:54:28 | 5 | those games the same way? |
| 09:54:29 | 6 | **A**　Yes. |
| 09:54:30 | 7 | **Q**　All right.  Then let's just go ahead and go back and |
| 09:54:33 | 8 | let's actually go ahead and play a little bit here. |
| 09:54:41 | 9 | All right.  And the games that you talked about |
| 09:54:44 | 10 | earlier in regards to what the most popular games were based |
| 09:54:47 | 11 | on your experience, do you see those games there? |
| 09:54:50 | 12 | **A**　Yes.  Superball Keno and 777s. |
| 09:54:53 | 13 | **Q**　Let's start with the 777s. |
| 09:55:01 | 14 | And what do we see here after you clicked on that? |
| 09:55:04 | 15 | **A**　So this is the main page.  The minimum bet is $0.05. |
| 09:55:09 | 16 | It plays the only line across the middle.  Every $0.05 up to |
| 09:55:14 | 17 | eight lines will give you every line covered for a minimum |
| 09:55:18 | 18 | bet of $0.40 to cover every line. |
| 09:55:20 | 19 | **Q**　Okay.  If you were a customer and you wanted to play |
| 09:55:23 | 20 | that, do you have to do anything before you can play? |
| 09:55:25 | 21 | **A**　I mean, technically you could just spin it right now. |
| 09:55:28 | 22 | You would only be playing one line.  Most people played at |
| 09:55:31 | 23 | least $0.40, so they would move their bet up. |
| 09:55:34 | 24 | **Q**　And so what does it say on the credits there? |
| 09:55:36 | 25 | **A**　Says $2.25. |

**R. Hull  (Direct by Howell)** 473

09:55:38   1   **Q**     And did you see how it got up to that yesterday?

09:55:41   2   **A**     Yes.  You put $1 in, spun it once, and won 1.25.

09:55:47   3   **Q**     So I was pretty lucky yesterday.

09:55:48   4         All right.  So there's credits on there, so are you

09:55:51   5   able to play?

09:55:51   6   **A**     Yes.

09:55:52   7   **Q**     And before you do it, can you just let the jury know,

09:55:55   8   what does it take for you to play this, to get it to spin?

09:55:57   9   **A**     You can either hit the "play" button or you can hit

09:56:01  10   the "spin" button on the screen.

09:56:02  11   **Q**     All right.  And can you go ahead and -- let's go ahead

09:56:05  12   and hit the button on the screen there.

09:56:07  13   **A**     (Witness complies).

09:56:12  14   **Q**     And just describe for purposes of the record -- and to

09:56:16  15   get on the court reporter -- when you hit that "play"

09:56:19  16   button, what happened?

09:56:20  17   **A**     It spun the reels and I was not a winner.

09:56:24  18   **Q**     And when you say you weren't a winner, what do we see

09:56:27  19   on the -- what would -- what means you're not a winner on

09:56:29  20   that screen?

09:56:30  21   **A**     If there's -- if you're a winner, it gives you a red

09:56:34  22   line across the winning line.  So, like if you won across

09:56:39  23   the middle line, there would be a red line all the way

09:56:42  24   across it, and then your credits would ring up.

09:56:44  25   **Q**     And so just so we're clear, all you did was hit that

**R. Hull  (Direct by Howell)**                               474

09:56:48  1   button once and you didn't touch the machine, and it did

09:56:51  2   what it was going to do?

09:56:53  3   **A**    Right.

09:56:53  4   **Q**    How many credits do we have left there?

09:56:55  5   **A**    $2.20.

09:56:57  6   **Q**    Can you hit it one more time?

09:56:59  7   **A**    (Witness complies).

09:57:03  8   **Q**    What happened there?

09:57:04  9   **A**    I lost again.

09:57:05  10  **Q**    All right.  One more time.

09:57:07  11  **A**    I lost again.

09:57:08  12  **Q**    One more time on the game.

09:57:09  13  **A**    Oh.  Okay.

09:57:12  14       (Witness complies).

09:57:16  15  **Q**    Man, you need me to come up there?

09:57:19  16  **A**    That's why I never played.

09:57:20  17  **Q**    All right.  I'm sorry.

09:57:22  18       Could we switch over to the popular Keno game that you

09:57:25  19  referred to?

09:57:27  20  **A**    Superball Keno.

09:57:30  21       So, most people play between 4 and 10 numbers.  The

09:57:35  22  people that came in more often played lower numbers.  The

09:57:38  23  people that were there just to try to hit once always played

09:57:41  24  10 trying to get the big winner.  But you just pick numbers.

09:57:46  25  So, that's 9 numbers.  If you hit 9 out of 9, it would be

09:57:51  1    250.  But if you hit 9 out of 9 with a bounce, I believe it

09:57:55  2    is four times.  So that would be a thousand dollars.

09:57:56  3    **Q**     All right.  And what do you need to do -- I saw you

09:57:59  4    just touch the screen and you selected a couple numbers

09:58:02  5    there.  And then what do you do to play?

09:58:04  6    **A**     So I picked my numbers.  Right now my bet is $0.25.

09:58:07  7    And then you just hit "play game."

09:58:15  8         There you go.  So I won $0.50.

09:58:18  9    **Q**     There you go.  Fourth time's a charm.  All right.

09:58:26  10                   (Counsel conferring).

09:58:31  11                   MR. HOWELL:  Thank you, Your Honor.  I don't

09:58:32  12   have any further questions for Mr. Hull.

09:58:34  13                   THE COURT:  Okay.  Folks, it's about --

09:58:36  14        Go ahead, sit down.

09:58:38  15        It's about 10 o'clock.  I do have another matter to

09:58:41  16   attend to at 10:00 here in court so we might be a little bit

09:58:45  17   longer than -- well, I say 15 minutes, but you know what

09:58:48  18   that means.  And, so, refresh yourself.  And then after I

09:58:52  19   finish this little business in court, of course, Heather

09:58:55  20   needs a break, right?  So that's why it takes a little

09:58:58  21   longer.

09:58:59  22        So keep in mind the admonition.  We'll see you in

09:59:02  23   about 20 minutes or so.

09:59:04  24                   COURTROOM DEPUTY:  All rise.

09:59:06  25   (Jury excused from courtroom and recess taken at 9:59 a.m.)

**R. Hull (Direct by Howell)**                    476

| | | |
|---|---|---|
| 10:36:28 | 1 | COURTROOM DEPUTY:  All rise for the jury. |
| 10:36:53 | 2 | (Jury returned to courtroom at 10:36 a.m.) |
| 10:36:53 | 3 | COURTROOM DEPUTY:  Court is in session. |
| 10:36:55 | 4 | Please be seated. |
| 10:36:56 | 5 | THE COURT:  Well, folks, again, sorry for the |
| 10:36:58 | 6 | little delay.  And if you get frustrated, get angry with me, |
| 10:37:03 | 7 | not the lawyers, because they're all here raring to go.  And |
| 10:37:07 | 8 | we had another hearing that had to take place who we have -- |
| 10:37:09 | 9 | I can tell you about it.  Sometimes it's interesting. |
| 10:37:11 | 10 | You know, there are laws in the United States.  Some |
| 10:37:14 | 11 | people are prohibited from possessing a firearm, and there |
| 10:37:21 | 12 | are different reasons for it.  One of the reasons is if you |
| 10:37:24 | 13 | are -- previously been convicted of a felony offense, you |
| 10:37:27 | 14 | can't possess a firearm. |
| 10:37:28 | 15 | Well, people have ways of getting around that.  They |
| 10:37:31 | 16 | try to anyway.  We had a fellow from California who got his |
| 10:37:35 | 17 | girlfriend, poor girl, to go and buy a bunch of firearms for |
| 10:37:41 | 18 | him at different stores in and around Los Angeles, and then |
| 10:37:46 | 19 | he would sell them.  And then these guns were detected in |
| 10:37:50 | 20 | Minnesota and Massachusetts and a couple other -- like 25 |
| 10:37:55 | 21 | guns and -- because he was selling them to people who |
| 10:37:58 | 22 | otherwise couldn't get guns, you know, by going to a gun |
| 10:38:00 | 23 | store where you have to sign up stuff. |
| 10:38:02 | 24 | And eventually the police or the Secret Service or DEA |
| 10:38:06 | 25 | did a great job and tracked him down and then picked him up. |

**R. Hull (Cross by Goldberg)** 477

10:38:12 1 And then he was convicted here, and he had to get sentenced

10:38:16 2 here, but -- so you never know.

10:38:18 3     But sometimes it takes a little bit extra time.  So,

10:38:20 4 again, if you're frustrated, take it out on me, not on the

10:38:24 5 case.  Okay?

10:38:25 6     And with that, Mr. Goldberg, you're up.

10:38:28 7         MR. GOLDBERG:  Thank you, Your Honor.

10:38:29 8                 - - - - -

9         CROSS-EXAMINATION OF RONNIE HULL

10 BY MR. GOLDBERG:

10:38:31 11 **Q**   Good morning, Mr. Hull.

10:38:32 12 **A**   Good morning.

10:38:34 13 **Q**   So we -- you work at the post office now?

10:38:39 14 **A**   Yes, sir.

10:38:39 15 **Q**   Were you ever a letter carrier?

10:38:41 16 **A**   I was.

10:38:42 17 **Q**   Okay.  Are there any rules for letter carriers if you

10:38:46 18 see something, say something, if you see drugs, animal being

10:38:51 19 mistreated or something like that while you're on your

10:38:53 20 route?

10:38:53 21 **A**   Yeah.

10:38:53 22 **Q**   Okay.  And that's only reasonable.  You're out in the

10:38:58 23 neighborhood, if you see something, you should report it;

10:39:00 24 right?

10:39:01 25 **A**   Yes.

**R. Hull  (Cross by Goldberg)**                    478

10:39:01  1    **Q**    Okay.  Now, the last couple questions you answered for

10:39:08  2    Mr. Howell involved the Pot-O-Gold machine over there by the

10:39:11  3    jury box; right?

10:39:13  4    **A**    Correct.

10:39:14  5    **Q**    Okay.  And you indicated that it could be set for win

10:39:17  6    percentage.  I'm not sure that's the exact term, but --

10:39:22  7    **A**    Yes, you can change the percentage.

10:39:24  8    **Q**    Okay.  So, did you ever perform that function at

10:39:29  9    either one of these stores?

10:39:30  10   **A**    Yes.

10:39:31  11   **Q**    Whose job was it to make sure that those payouts were

10:39:36  12   the proper -- set at the proper level?

10:39:40  13   **A**    It was really no one's job.  It was more of a -- like,

10:39:45  14   if the machine rebooted or there was new software put in, a

10:39:48  15   customer would complain about --

10:39:51  16   **Q**    Okay.

10:39:51  17   **A**    -- a percentage.

10:39:52  18   **Q**    And they would know as soon as there was a problem?

10:39:55  19   **A**    Correct.

10:39:55  20   **Q**    And would you say Mr. Kachner was in charge of the

10:39:58  21   machines and making sure that they are running properly?

10:40:01  22   **A**    At Redemption.

10:40:02  23   **Q**    At Redemption?

10:40:03  24   **A**    Yes.

10:40:04  25   **Q**    Okay.  And would he be the one who usually set the

**R. Hull (Cross by Goldberg)**                    479

10:40:10  1    payouts?

10:40:10  2    **A**    Yes.

10:40:11  3    **Q**    Okay.  Now, as far as you know, were the payouts all

10:40:15  4    set to a -- fairly?

10:40:20  5    **A**    Yes.

10:40:21  6    **Q**    Okay.

10:40:21  7    **A**    Yes.

10:40:22  8    **Q**    Yeah.  So, any customer who ever played at either one

10:40:26  9    of these two stores never got cheated by those machines

10:40:32  10   intentionally?

10:40:32  11   **A**    Correct.

10:40:33  12   **Q**    Okay.  And nobody ever lost money that was not part of

10:40:42  13   the -- whatever it was, 7 percent or whatever the non-payout

10:40:46  14   was?

10:40:48  15   **A**    Correct.

10:40:48  16   **Q**    Okay.  Fair machine; correct?

10:40:53  17   **A**    As fair as a machine can go, yes.

10:40:55  18   **Q**    Right.  If you're gambling, you're going to lose

10:40:58  19   sometimes and you're going to win sometimes?

10:41:00  20   **A**    Correct.

10:41:01  21   **Q**    Okay.  So, I just wanted to make sure that this part

10:41:05  22   of it's clear.  Mr. Kachner and nobody else told -- that you

10:41:09  23   know of, ever told anyone to make the machines pay out less

10:41:13  24   than the customers expected?

10:41:16  25   **A**    Correct.

**R. Hull (Cross by Goldberg)**                    480

10:41:17  1    **Q**    Now, you testified to weekly amounts, the maximums

10:41:23  2    from either store; right?

10:41:25  3    **A**    Yes.

10:41:25  4    **Q**    Now, those stores would occasionally lose money?

10:41:30  5    **A**    Correct.

10:41:30  6    **Q**    Correct?

10:41:30  7    **A**    Yes, sir.

10:41:31  8    **Q**    Okay.  And what's the most money you saw them lose in

10:41:35  9    a particular week?

10:41:36  10   **A**    I believe I seen -- maybe the most I've ever seen

10:41:40  11   Redemption lose was like 5,000 and maybe Shamrock a thousand

10:41:43  12   or two.

10:41:43  13   **Q**    And how often would that happen?

10:41:45  14   **A**    Not very often.

10:41:46  15   **Q**    Okay.  So, but you don't -- you have not retained any

10:41:51  16   records of those weekly payouts or losses?

10:41:56  17   **A**    No, sir.

10:41:58  18   **Q**    Why not?

10:42:01  19   **A**    Wasn't my responsibility to retain.

10:42:03  20   **Q**    Whose responsibility was that?

10:42:06  21   **A**    At Redemption it would have been Kachner, and at

10:42:09  22   Shamrock it would have been Moneypenny.

10:42:11  23   **Q**    Okay.  And Kachner also was basically the owner and

10:42:18  24   manager of Redemption?

10:42:19  25   **A**    Correct.

10:42:19  1   **Q**     And he was one of the owners and one -- and a manager

10:42:23  2   of Shamrock?

10:42:24  3   **A**     Correct.

10:42:25  4   **Q**     And he made decisions about hiring and firing

10:42:28  5   individuals?

10:42:28  6   **A**     Yes, sir.

10:42:31  7   **Q**     Hours of operation?

10:42:32  8   **A**     Yes.

10:42:33  9   **Q**     Who was allowed in?

10:42:35  10  **A**     Yes.

10:42:39  11  **Q**     Am I correct in understanding that until this raid

10:42:47  12  occurred — we'll call it a raid, search warrant execution —

10:42:50  13  in July of 2018, you thought that what was going on in these

10:42:55  14  two places was completely legal?

10:42:57  15  **A**     Yes, sir.  Yes, sir.

10:42:59  16  **Q**     Okay.  And that was because of the licensure?

10:43:03  17  **A**     The license and then reaffirmation from Mr. Kachner

10:43:09  18  saying that we were legal.  I had no other reason to expect

10:43:12  19  it not to be.

10:43:13  20  **Q**     Okay.  He told you this is all legal and totally up to

10:43:16  21  snuff?

10:43:17  22  **A**     Yeah.  He always explained there's 70 of these in

10:43:21  23  Canton and we're not hiding anything.  If it wasn't legal,

10:43:28  24  why would it be open?

10:43:29  25  **Q**     How many in Canton?

**R. Hull (Cross by Goldberg)**                                          482

10:43:31   1    **A**      I'm estimating, there was probably 70 of them in

10:43:34   2    Canton.

10:43:34   3    **Q**      Okay.  And there was nothing on the outside of these

10:43:38   4    stores to hide what was going on inside; right?

10:43:40   5    **A**      Other than the tinted windows.

10:43:42   6    **Q**      Okay.  Okay.  Well, you lived in Las Vegas.  Are there

10:43:46   7    windows in casinos that aren't tinted?

10:43:49   8    **A**      No.

10:43:49   9    **Q**      Okay.  And there were signs on -- maybe not on these

10:43:55   10   two stores, but you're familiar with the other skill game

10:43:58   11   rooms in the area.  There were signs with flashing money

10:44:02   12   signs; correct?

10:44:03   13   **A**      Yeah.  Some said "win cash here."

10:44:05   14   **Q**      Okay.  "Win cash here."

10:44:06   15          Money signs; right?

10:44:07   16   **A**      Yes.

10:44:08   17   **Q**      Okay.  And while you were at both these stores, it

10:44:13   18   wasn't unusual for government investigators, either law

10:44:19   19   enforcement or health department, to come into the store;

10:44:21   20   right?

10:44:22   21   **A**      I was present for a few times the sheriffs came

10:44:25   22   regarding, like, someone stealing a purse.  And then every

10:44:29   23   year the fire marshal and the zoning came in.

10:44:32   24   **Q**      Okay.  And did Mr. Kachner tell you, better hide the

10:44:37   25   money, don't make any payouts during that time?

**R. Hull (Cross by Goldberg)**                    483

10:44:39    1    **A**    No.

10:44:41    2    **Q**    Okay.  What about health department?  Did they ever

10:44:45    3    come in?

10:44:47    4    **A**    A lot.

10:44:48    5    **Q**    How often would you say?

10:44:52    6    **A**    Once or twice a month, depending on when we were

10:44:56    7    getting close to paying off the fines, probably.

10:44:58    8    **Q**    Okay.  So, my understanding is that there were a

10:45:02    9    substantial amount of fines assessed against, was it

10:45:09   10    Shamrock or Redemption, for smoking?

10:45:11   11    **A**    Both.  Normally Redemption got hit the hardest.

10:45:16   12    **Q**    Okay.  So health department would come in, see people

10:45:19   13    smoking.  You're not allowed to smoke inside, you'd get a

10:45:22   14    ticket?

10:45:22   15    **A**    Correct.

10:45:23   16    **Q**    And to your understanding, was -- by -- how much was

10:45:26   17    the most that Redemption owed in smoking fines?

10:45:32   18    **A**    I'm unaware.

10:45:33   19    **Q**    Well, didn't you tell the government that it was

10:45:36   20    somewhere around a hundred thousand dollars?

10:45:38   21    **A**    For -- I've heard from Tom say that it was in the

10:45:42   22    hundreds of thousands, but I don't know for sure.

10:45:44   23    **Q**    Okay.  And that -- the only reason that's relevant is

10:45:48   24    because that means the health department's there often?

10:45:50   25    **A**    Correct.

**R. Hull  (Cross by Goldberg)**                              484

10:45:50  1  **Q**    And nothing was changed with the way the business was

10:45:53  2  operated because the health department was there?

10:45:55  3  **A**    Correct.

10:45:56  4  **Q**    And presumably, they had the same rules that you have

10:45:59  5  as a postal carrier, if you see something, you say

10:46:03  6  something; right?

10:46:04  7  **A**    I can't answer that.

10:46:04  8  **Q**    You don't know, but. . .

10:46:06  9  **A**    Yeah.

10:46:06  10  **Q**    But no one told anybody do anything differently?

10:46:09  11  **A**    No.

10:46:10  12  **Q**    Okay.  I'm want to ask you about Mr. Kachner.

10:46:17  13       You know, you indicated that if the -- if the sheets

10:46:21  14  were off, if the reconciliations were off, he would get

10:46:25  15  upset?

10:46:25  16  **A**    Yes.

10:46:26  17  **Q**    Agitated?

10:46:26  18  **A**    Yes.

10:46:27  19  **Q**    Yelling?

10:46:29  20  **A**    Depends on how far they were off.

10:46:31  21  **Q**    Okay.  Fair enough.

10:46:32  22       Was he regularly like that?

10:46:36  23  **A**    Depended on -- he was always worse if his wife was

10:46:39  24  there.

10:46:40  25  **Q**    He was always --

**R. Hull (Cross by Goldberg)**                                           485

10:46:41    1    **A**    Worse if his wife was there.

10:46:42    2    **Q**    You mean more aggressive and confrontational?

10:46:45    3    **A**    Yes.

10:46:46    4    **Q**    Okay.  Now, you said that he was, at least with

10:46:52    5    Redemption, in charge of the paperwork?

10:46:53    6    **A**    Correct.

10:46:53    7    **Q**    All right.

10:46:54    8              MR. GOLDBERG:  May I approach the witness,

10:46:57    9    Your Honor?

10:46:57   10              THE COURT:  Sure.

10:46:59   11              MR. GOLDBERG:  I'm going to show you what's

10:47:00   12    been marked as Government's Exhibit 447.

           13    BY MR. GOLDBERG:

10:47:04   14    **Q**    Do you recognize that?

10:47:04   15    **A**    Yes.

10:47:07   16    **Q**    Okay.  Just flip through it real quick and. . .

10:47:17   17    **A**    Do you want me to answer anything or just recognize

10:47:19   18    it?

10:47:19   19    **Q**    I just want you to be familiar with what I've handed

10:47:21   20    you.

10:47:22   21    **A**    Okay.

10:47:23   22    **Q**    Okay.  I mean, if you're done.

10:47:25   23    **A**    I believe the rest of it's just the Gaggle System

10:47:28   24    printouts.

10:47:29   25    **Q**    Okay.  This is from the Gaggle System?

**R. Hull  (Cross by Goldberg)**                           486

10:47:31   1   **A**      The last pieces you gave me were all Gaggle System

10:47:34   2   printouts, it looks like.

10:47:35   3   **Q**      And what was the front few pages?

10:47:37   4   **A**      The front page was the daily sheet.  So they would

10:47:41   5   have had the expenses, cash-outs, what expenses were for

10:47:45   6   each shift.

10:47:45   7   **Q**      Okay.  And were these for Redemption or Shamrock?

10:47:49   8   **A**      The Redemption and Shamrock had the exact same sheet.

10:47:52   9   **Q**      Okay.  So, these are the records that would be used

10:47:57  10   for the weekly audits; correct?

10:48:00  11   **A**      Correct.

10:48:01  12   **Q**      And it's your testimony that Mr. Kachner would take

10:48:08  13   possession of these documents when you were done with the

10:48:10  14   audits?

10:48:10  15   **A**      Yes, sir.

10:48:11  16   **Q**      Would that explain the reason why we only have one set

10:48:15  17   from July of 2018?

10:48:17  18   **A**      Yes.

10:48:17  19   **Q**      Okay.  So, Mr. Kachner would take these documents and

10:48:23  20   he would destroy them; correct?

10:48:24  21   **A**      I don't know what he did with them.  I would assume he

10:48:26  22   would destroy them, yes.

10:48:28  23   **Q**      Okay.  Well, at one point did you tell the government

10:48:30  24   that he would burn them?

10:48:31  25   **A**      He told me before he did, but I don't know if he

**R. Hull (Cross by Goldberg)**                    487

10:48:33  1    burned every set.  But yes, he did tell me he burned them

10:48:37  2    before.

10:48:37  3    **Q**    Did anybody else that you know of at either one of

10:48:40  4    these places destroy any records?

10:48:42  5    **A**    Not that I'm aware of.

10:48:43  6    **Q**    Okay.  And obviously you didn't destroy any records?

10:48:45  7    **A**    If he asked me to get rid of them, I just threw them

10:48:48  8    in the dumpster in the back.  So, like if he forgot,

10:48:50  9    sometimes he forgot to take it with him, he'd say, hey,

10:48:54  10   please get rid of that paperwork.  And I would just take it

10:48:57  11   to the dumpster and throw it out back in a trash bag.

10:48:57  12   **Q**    Okay.  But the documents were either destroyed by

10:49:00  13   Kachner or destroyed at his direction?

10:49:03  14   **A**    Correct.

10:49:03  15   **Q**    Okay.  So you said that Larry Dayton had a drug

10:49:06  16   problem.  I think you said that was why he was phased out

10:49:10  17   of --

10:49:11  18   **A**    Yes.

10:49:11  19   **Q**    -- the business?

10:49:12  20          Okay.  And did he appear to be under the influence at

10:49:17  21   the business that you could tell?

10:49:19  22   **A**    Sometimes, yes.  There was one time when he pretty

10:49:22  23   much had a mental breakdown in the store and dumped a full

10:49:26  24   bag of cash on a customer.

10:49:27  25   **Q**    Okay.  What about Mr. Kachner?  Did you know about his

10:49:33   1   drug problem?

10:49:34   2   **A**    I know he smoked weed.

10:49:35   3   **Q**    Every day?

10:49:36   4   **A**    Every day.

10:49:37   5   **Q**    So, he would be under the influence -- it was just

10:49:42   6   common knowledge he was under the influence of marijuana

10:49:44   7   every day?

10:49:45   8   **A**    Oh, yeah.  He woke up and smoked as soon as he woke

10:49:49   9   up, for sure.

10:49:49  10   **Q**    Call that wake and bake?

10:49:51  11   **A**    Call it whatever you want, but yes, he was always on.

10:49:54  12   **Q**    Okay.  And was he ever, like, not under the influence

10:49:59  13   of marijuana at this store, that you know of?

10:50:02  14   **A**    I don't know.  I don't know.

10:50:03  15        I would assume he was always -- had a little bit of a

10:50:07  16   high to him.

10:50:07  17   **Q**    And would his personality change?  Would he be more

10:50:10  18   aggressive when he was using or less, if you know?

10:50:14  19   **A**    No.  I mean, honestly, he was pretty laid back except

10:50:17  20   for when the numbers were kind of off.

10:50:20  21   **Q**    Okay.  You saw him at some point after the raid;

10:50:25  22   correct?

10:50:25  23   **A**    Yes.  Yes.

10:50:27  24   **Q**    Right?

10:50:28  25        And do you remember what he told you?

**R. Hull (Cross by Goldberg)** 489

| | | | |
|---|---|---|---|
| 10:50:31 | 1 | **A** | He asked me if I had talked to anybody. |
| 10:50:33 | 2 | **Q** | And what else -- what else did he say to you? |
| 10:50:35 | 3 | **A** | Don't say anything. |
| 10:50:37 | 4 | **Q** | What else did he say to you? |
| 10:50:38 | 5 | **A** | That's all I remember. |
| 10:50:39 | 6 | **Q** | How about, did he say, I'm not going down alone? |
| 10:50:42 | 7 | **A** | He did say that, yes. |
| 10:50:43 | 8 | **Q** | Okay.  He said that. |
| 10:50:45 | 9 | | What did you take that to mean? |
| 10:50:46 | 10 | **A** | I took it as he was going to bring down whoever was |
| 10:50:51 | 11 | | else involved in the stores. |
| 10:50:53 | 12 | **Q** | He was going to bring down? |
| 10:50:55 | 13 | **A** | Whoever else was involved with him in the stores. |
| 10:50:57 | 14 | **Q** | Okay.  Well, he was going to bring down whoever he |
| 10:51:03 | 15 | | could; right? |
| 10:51:03 | 16 | **A** | I -- I don't know. |
| 10:51:04 | 17 | **Q** | I mean, that was just what he said? |
| 10:51:06 | 18 | **A** | I mean -- |
| 10:51:06 | 19 | **Q** | I'm not going down alone? |
| 10:51:08 | 20 | **A** | His quote was, I'm not going down alone. |
| 10:51:11 | 21 | **Q** | Thank you. |
| 10:51:12 | 22 | | MR. GOLDBERG:  Nothing further, Your Honor. |
| 10:51:13 | 23 | | THE COURT:  Thank you. |
| 10:51:13 | 24 | | Mr. Fedor, any questions? |
| 10:51:16 | 25 | | MR. FEDOR:  Your Honor, it will be my |

10:51:17  1   colleague, associate, Benjamin Heidinger.

10:51:19  2                THE COURT:  Sure.

10:51:20  3            Ben, go ahead.

          4                        - - - - -

          5                CROSS-EXAMINATION OF RONNIE HULL

10:51:25  6   BY MR. HEIDINGER:

10:51:25  7   **Q**    Good morning, Mr. Hull.

10:51:26  8   **A**    Good morning.

10:51:28  9   **Q**    Based upon your testimony, is it fair to say that you

10:51:32  10  always -- or all the instructions you received were from

10:51:35  11  Jason Kachner?

10:51:36  12  **A**    And Larry Dayton before -- prior to 2013.

10:51:39  13  **Q**    But after '13, it was always Jason Kachner?

10:51:42  14  **A**    Yeah.  Rarely would Tom say something to me.

10:51:45  15  **Q**    Okay.  And then have you ever met Mr. DiPietro?

10:51:51  16  **A**    I have not.  I have not.

10:51:53  17  **Q**    Have you ever spoken to him on the phone?

10:51:55  18  **A**    I have not.

10:51:56  19  **Q**    Text messages with him?

10:51:57  20  **A**    No.

10:52:05  21                MR. HEIDINGER:  I believe that's all the

10:52:06  22  questions I have, Your Honor.

10:52:07  23                THE COURT:  Thank you.

10:52:08  24            Mr. Kersey, anything, sir?

10:52:11  25                MR. KERSEY:  No.  I have no further questions,

10:52:13   1    Judge.  Thank you very much.

10:52:13   2                THE COURT:  Thank you.

10:52:14   3         Adam?

10:52:16   4         Aaron.  What did I say, Adam?

10:52:18   5         Aaron.

10:52:19   6                MR. HOWELL:  I knew who you were talking to.

10:52:21   7                THE COURT:  I know.  Me too.

           8                            - - - - -

           9              REDIRECT EXAMINATION OF RONNIE HULL

10:52:25  10    BY MR. HOWELL:

10:52:25  11    **Q**    Mr. Hull, you were just asked a question in regards to

10:52:27  12    whether you had ever spoken to Mr. DiPietro on the phone.

10:52:30  13         Do you recall that?

10:52:31  14    **A**    Correct.

10:52:31  15    **Q**    Were you ever present when you heard Mr. Kachner

10:52:34  16    speaking to Ron DiPietro on the phone?

10:52:36  17    **A**    Yes.

10:52:37  18    **Q**    And tell us about that.

10:52:41  19    **A**    We were standing in Shamrock.  I don't remember the

10:52:44  20    situation, but he said, give me a moment, I'm talking to

10:52:50  21    Mr. DiPietro.  And he always called him Ron.  And he always

10:52:55  22    called him -- "my tax guy" is what he called him.  And that

10:52:59  23    was it.  And I walked out of the room when he said he was

10:53:01  24    talking to him at that point.

10:53:02  25    **Q**    Okay.  Did you notice anything about Mr. Kachner's

**R. Hull (Redirect by Howell)**                    492

10:53:06  1    demeanor when he would speak to -- did you have any other

10:53:08  2    experiences when he would speak to Mr. DiPietro?

10:53:11  3    **A**    His demeanor was someone that was talking to a

10:53:16  4    superior.

10:53:18  5    **Q**    Okay.

10:53:19  6                    MR. HOWELL:  Thank you.  I don't have any

10:53:20  7    further questions.

10:53:21  8                    THE COURT:  Mr. Goldberg, anything on that?

10:53:23  9                    MR. GOLDBERG:  No, Your Honor.

10:53:24  10                   THE COURT:  Anything further on that, Ben?

10:53:26  11                   MR. HEIDINGER:  No, Your Honor.

10:53:27  12                   THE COURT:  All right.  Thank you, Mr. Hull.

10:53:28  13   You're excused.  Watch your step going down.

10:53:31  14                   (Witness excused.)

10:53:31  15                   THE COURT:  You may call your next witness

10:53:33  16   then.

10:53:34  17                   MR. BEAN:  The government calls David Ross.

10:53:37  18                   (Brief pause in proceedings).

10:54:10  19                   THE COURT:  Sir, would you raise your right

10:54:11  20   hand for me.

10:54:12  21       Do you swear the testimony you are about to give here

10:54:14  22   will be the truth as you answer to God?

10:54:15  23                   THE WITNESS:  I do.

10:54:16  24                   THE COURT:  Please have a seat.

10:54:17  25                   THE WITNESS:  Thank you.

| | | |
|---|---|---|
| 10:54:28 | 1 | THE COURT:  Sir, could you tell us your full |
| 10:54:29 | 2 | name and spell your last name. |
| 10:54:31 | 3 | THE WITNESS:  David Wayne Ross, R-o-s-s, as in |
| 10:54:36 | 4 | Sam. |
| 10:54:36 | 5 | THE COURT:  Thank you. |
| | 6 | - - - - - |
| | 7 | DIRECT EXAMINATION OF DAVID ROSS |
| 10:54:38 | 8 | BY MR. BEAN: |
| 10:54:38 | 9 | **Q**    Good morning, Mr. Ross. |
| 10:54:39 | 10 | **A**    Good morning. |
| 10:54:40 | 11 | **Q**    How are you currently employed? |
| 10:54:42 | 12 | **A**    I'm employed as a revenue officer with the Internal |
| 10:54:46 | 13 | Revenue Service in Independence, Ohio. |
| 10:54:47 | 14 | **Q**    And we have -- we've had some issues with that |
| 10:54:50 | 15 | microphone.  Do you mind just, you know, trying to make sure |
| 10:54:53 | 16 | you lean in and speak into it so we can all hear?  We |
| 10:54:57 | 17 | appreciate it. |
| 10:54:57 | 18 | THE COURT:  You know, Mr. Ross, you can even |
| 10:54:59 | 19 | move it around to the right along the side there if you |
| 10:55:01 | 20 | want. |
| 10:55:03 | 21 | MR. HOWELL:  Push it up there towards you. |
| 10:55:05 | 22 | THE COURT:  Yeah, Aaron can figure that out. |
| 10:55:07 | 23 | Other way, Aaron. |
| 10:55:07 | 24 | MR. HOWELL:  This way? |
| 10:55:08 | 25 | THE COURT:  Yeah.  So then he can face the |

**D. Ross  (Direct by Bean)**                    494

10:55:10  1    questioner.

10:55:11  2        How does that sound?

10:55:12  3            MR. HOWELL:  Perfect.  Thank you, Judge.

10:55:14  4            THE WITNESS:  Can you hear me now?

10:55:15  5            MR. BEAN:  That's better.  Thank you.

10:55:16  6    BY MR. BEAN:

10:55:17  7    **Q**    So, sir, I'm going to ask you the same question.  Just

10:55:19  8    start at square one.

10:55:20  9        How are you currently employed?

10:55:22  10   **A**    As a revenue officer with the Internal Revenue Service

10:55:25  11   in Independence, Ohio.

10:55:26  12   **Q**    How long have you been with the IRS?

10:55:29  13   **A**    41 years plus.

10:55:31  14   **Q**    How long have you been a revenue officer?

10:55:33  15   **A**    41 years plus.

10:55:36  16   **Q**    What -- did you have employment before you joined the

10:55:39  17   IRS?

10:55:40  18   **A**    Briefly.

10:55:41  19   **Q**    What were you doing then?

10:55:42  20   **A**    It was with a mortgage bank.

10:55:46  21   **Q**    Can you describe for us, what does a revenue officer

10:55:50  22   with the IRS do?

10:55:52  23   **A**    We mainly work collection cases.  We're assigned cases

10:55:56  24   where a taxpayer, either a business or an individual, they

10:56:02  25   owe taxes, and they may have delinquent returns that have

**D. Ross  (Direct by Bean)**                                495

10:56:06  1    not been filed, or there may be a combination.

10:56:10  2    **Q**    Does the IRS offer training to revenue officers?

10:56:13  3    **A**    Yes.

10:56:14  4    **Q**    Have they ever asked you to teach any of those

10:56:17  5    trainings?

10:56:17  6    **A**    Yes.

10:56:18  7    **Q**    Does the IRS give out awards for quality work?

10:56:22  8    **A**    Yes.

10:56:23  9    **Q**    Have you received any awards?

10:56:25  10   **A**    Almost every year, superior achievement award.

10:56:29  11   **Q**    Are you familiar with individuals named Christos

10:56:34  12   Karasarides, Jr., and Ronald DiPietro?

10:56:37  13   **A**    Yes, I am.

10:56:37  14   **Q**    How are you familiar with them?

10:56:40  15   **A**    I was assigned back in, I believe, February of 2013 a

10:56:44  16   collection case that involved substantial income tax

10:56:50  17   liability, Form 1040.  It was in excess of I believe

10:56:56  18   1.2 million at the time.

10:57:00  19        Mr. DiPietro was Mr. Karasarides' power of attorney.

10:57:06  20   He's an accountant in Canton, and he was the appointed

10:57:09  21   representative to handle Mr. Karasarides' tax collection

10:57:15  22   issues before the IRS.

10:57:17  23   **Q**    What does it mean to be a taxpayer's appointed

10:57:24  24   representative?

10:57:24  25   **A**    Well, we can't just discuss someone's personal tax

**D. Ross  (Direct by Bean)**                                    496

10:57:30   1   records with anyone.  The taxpayer has to designate one or

10:57:36   2   more individuals to handle, you know, a collection case

10:57:42   3   before the Internal Revenue Service and has to, you know,

10:57:45   4   execute a signature that they want a certain person or maybe

10:57:50   5   more than one to handle their tax representation before the

10:57:55   6   Internal Revenue Service.

10:57:57   7   **Q**      And when a taxpayer has done that, they've appointed

10:58:00   8   someone to be their representative, do you have contact --

10:58:05   9   direct contact with the taxpayer after that?

10:58:09  10   **A**      Normally not.

10:58:10  11   **Q**      So who do you -- who do you have contact with?

10:58:12  12   **A**      With their appointed representative.  We are required

10:58:15  13   to go through that representative.

10:58:17  14   **Q**      Now, I believe you testified just moments ago that the

10:58:20  15   collection case started in approximately February of 2013.

10:58:24  16        How long did the collection case regarding

10:58:28  17   Mr. Karasarides carry on for, approximately?

10:58:32  18   **A**      I think my part of it ended around maybe the third or

10:58:39  19   fourth quarter of 2016 or the first quarter of 2017, around

10:58:44  20   in that area.

10:58:46  21   **Q**      Now, I believe you testified moments ago that at the

10:58:48  22   time you picked up the collection case, the tax debt was

10:58:52  23   approximately 1.2 million; is that right?

10:58:54  24   **A**      Yes, sir.

10:58:55  25   **Q**      During the period of while you attempted to collect,

**D. Ross  (Direct by Bean)**                                   497

10:58:59  1    did the tax debt grow?

10:59:01  2    **A**    Yes, it did.

10:59:01  3    **Q**    Why did it grow?

10:59:04  4    **A**    Well, like I said, I got the case in February of 2013,

10:59:09  5    and then subsequent to that, the 2013 and 2014 tax returns

10:59:17  6    were filed with balances due that were not paid.  So, there

10:59:24  7    were additional tax liability for those two years, '13 and

10:59:28  8    '14, that, you know, grew -- you know, that grew the amount

10:59:35  9    due from when I started.

10:59:36  10   **Q**    And are there other ways that a tax debt can grow over

10:59:41  11   time?

10:59:41  12   **A**    Yes.

10:59:41  13   **Q**    How?

10:59:43  14   **A**    Well, I mean, for example, we have revenue agents that

10:59:47  15   conduct audits.  You know, if they find that a person

10:59:55  16   underreported their number, you know, they can make an

10:59:58  17   adjustment to increase the tax liability for a certain year

11:00:01  18   or years.  They're called revenue agents.  We get called

11:00:05  19   revenue agents in the paper, but we're revenue officers in

11:00:08  20   collection.

11:00:09  21   **Q**    Does the IRS charge interest on unpaid tax?

11:00:12  22   **A**    Yes, we do.

11:00:16  23   **Q**    During the period of your collections, which it sounds

11:00:20  24   like was 3 to 4 years --

11:00:24  25   **A**    Yes.

**D. Ross (Direct by Bean)**                    498

11:00:24  1  **Q**      -- were you able to collect on the tax that was owed

11:00:27  2  by Mr. Karasarides?

11:00:29  3  **A**      Only nominal amounts.

11:00:34  4  **Q**      During the collection -- well, can you talk to us,

11:00:37  5  when you do a -- when you start a collections action, what

11:00:40  6  are your first steps?

11:00:41  7  **A**      My first step would be to review all internal

11:00:46  8  resources that we have regarding a certain taxpayer.  We

11:00:49  9  look at filing history.  We look at past returns and what

11:00:58  10  are -- what income is listed on past returns.  We see if

11:01:03  11  there's some kind of a written archive history that somebody

11:01:07  12  else worked on the case before it was assigned to me.  We

11:01:12  13  look and see if there are any federal tax liens filed in the

11:01:17  14  past.  We look at what's called our AMS history, which means

11:01:25  15  if the taxpayer called in with something other than a

11:01:28  16  general question, that they may record the person's name and

11:01:32  17  social security number and what the conversation amounted

11:01:36  18  to.

11:01:37  19      We may pull a credit report on the taxpayer to develop

11:01:41  20  more information.  We look at external sources, maybe county

11:01:47  21  records, including real estate, you know.  Do research on

11:01:54  22  the property where the taxpayer resides, ownership,

11:01:59  23  mortgages, things like that.

11:02:01  24  **Q**      And when you're trying to collect and you're doing

11:02:05  25  research, what are you looking -- are you looking for

**D. Ross  (Direct by Bean)**                         499

11:02:07   1   anything specifically?

11:02:11   2   **A**      Well, absent, you know, somebody comes in with a check

11:02:15   3   for full payment, we're looking for financial information to

11:02:20   4   get a complete financial picture on a certain person that's

11:02:24   5   unable or states they're unable to pay the tax liability.

11:02:27   6   **Q**      Why do you do that?

11:02:29   7   **A**      Well, that helps us decide, you know, the proper

11:02:33   8   course of action based on the facts and based on a person's

11:02:37   9   financial ability.

11:02:39  10   **Q**      In the course of, you know, a general collections

11:02:45  11   case, do you have the power to try to seize a taxpayer's

11:02:48  12   assets to satisfy a tax debt?

11:02:50  13   **A**      Yes, we do.

11:02:52  14   **Q**      And have you done that during your career?

11:02:53  15   **A**      Often.

11:02:55  16   **Q**      And during a collection case, do you file liens

11:03:00  17   against a taxpayer?

11:03:01  18   **A**      Yes, notices of federal tax lien.

11:03:04  19   **Q**      And what is that?  Can you just explain for the jury?

11:03:06  20   **A**      Well, initially when a taxpayer receives a bill from

11:03:10  21   the IRS saying you owe X amount of dollars, you know, after

11:03:14  22   that point when it's assigned frequently to someone in the

11:03:17  23   field collection, like myself, we frequently file a notice

11:03:24  24   of federal tax lien with the county recorder where the

11:03:28  25   taxpayer resides in order to, number one, you know, to take

**D. Ross  (Direct by Bean)**                                    500

11:03:35  1   priority and let the world know that the IRS has an interest

11:03:40  2   in all the taxpayer's assets, whether their personal

11:03:45  3   property or real property.

11:03:51  4   **Q**   And, sir, do you also file levies?

11:03:54  5   **A**   Yes.

11:03:54  6   **Q**   What is a levy?  Can you just explain, please?

11:03:57  7   **A**   A levy would be where we issue a notice to a third

11:04:02  8   party, for example, someone that owes the taxpayer money or

11:04:05  9   holding an asset belonging to a taxpayer, and a common one

11:04:10  10  would be a bank.

11:04:11  11      We serve a levy with the bank telling the bank

11:04:16  12  taxpayer A owes the IRS X amount of dollars, and we want all

11:04:21  13  the funds that are in that person's account, send it to the

11:04:25  14  IRS and we'll apply it to their tax debt.

11:04:28  15  **Q**   Now, during the course of the collection case on

11:04:36  16  Mr. Karasarides' tax debt, did you have communications with

11:04:38  17  Mr. DiPietro?

11:04:38  18  **A**   Yes.

11:04:39  19  **Q**   All right.  And in any of those communications, did

11:04:41  20  Mr. DiPietro say whether Mr. Karasarides was able to pay

11:04:44  21  this tax debt?

11:04:46  22  **A**   Mr. DiPietro said that he could not pay the tax debt.

11:04:50  23  **Q**   Did he say why?

11:04:52  24  **A**   Well, one reason that was given to me by Mr. DiPietro.

11:04:55  25      Was that Mr. Karasarides was involved in some gambling

11:05:03  1   businesses, and then there was a change in the state law

11:05:08  2   which forced the termination of those businesses and,

11:05:11  3   therefore, he wasn't receiving income from those businesses.

11:05:18  4   **Q**     Did -- and after that, did Mr. DiPietro say anything

11:05:22  5   about whether Mr. Karasarides continued to own any gambling

11:05:26  6   businesses, after the change in the state law?

11:05:30  7   **A**     There was one entity listed on the collection

11:05:34  8   information statement.  It was called CM Kare.

11:05:39  9   **Q**     And did Mr. DiPietro explain what that was?

11:05:43  10  **A**     It was my understanding it was a partnership with

11:05:47  11  another individual named Maggiore, last name is Maggiore, I

11:05:58  12  believe, but Mr. Karasarides had an interest in some

11:06:02  13  equipment that was owned by that company.  And that the --

11:06:08  14  my understanding, not long after that that, that that

11:06:12  15  business terminated operations also.

11:06:13  16  **Q**     Did Mr. DiPietro ever tell you about a business called

11:06:17  17  Skilled Shamrock?

11:06:18  18  **A**     No, he did not.

11:06:19  19  **Q**     Did Mr. DiPietro ever tell you that Mr. Karasarides

11:06:22  20  was involved in a business called Redemption?

11:06:25  21  **A**     No, he did not.

11:06:27  22  **Q**     At some point did you close your collections case?

11:06:31  23  **A**     Yes.

11:06:32  24  **Q**     Why?

11:06:40  25  **A**     Well, there was, in my view, tax evasion, tax fraud.

11:06:45   1    And normally in a collection case where it's referred for

11:06:55   2    investigation to the criminal division, we normally shut

11:06:57   3    down our part of the investigation.  In other words, I don't

11:07:00   4    continue do a civil investigation while the criminal

11:07:02   5    investigation is being conducted.

11:07:05   6    **Q**      And are there specific standards that define what firm

11:07:10   7    indicators of fraud are when you're making a determination

11:07:13   8    to make a referral?

11:07:14   9    **A**      Well, depends on the case.  I mean, each case is

11:07:17  10    different.

11:07:17  11           I have a fraud technical advisor who is -- reviews our

11:07:22  12    work, and if I advise him that this -- a certain case could

11:07:30  13    be fraud or evasion, he will review it and consider the

11:07:36  14    factors that, you know, I provide to him and give us advice

11:07:40  15    on whether does it rise to the standard of evasion or fraud,

11:07:46  16    or -- and therefore should be referred to criminal -- our

11:07:50  17    criminal division, or no, it doesn't, or maybe consider, you

11:07:54  18    know, securing A, B, and C and then come back and we'll

11:07:58  19    revisit it.

11:07:59  20    **Q**      Was Mr. Karasarides' case referred criminally?

11:08:02  21    **A**      Yes.

11:08:02  22    **Q**      By you?

11:08:03  23    **A**      Yes.

11:08:04  24    **Q**      Why did you refer it?

11:08:08  25    **A**      It's one of the most flagrant and egregious cases I've

| | | |
|---|---|---|
| 11:08:13 | 1 | ever seen. |
| 11:08:13 | 2 | MR. GOLDBERG:  Objection. |
| 11:08:14 | 3 | THE COURT:  Overruled. |
| 11:08:17 | 4 | THE WITNESS:  There were several major issues |
| 11:08:19 | 5 | that caused me to refer the case.  You know, at a time where |
| 11:08:29 | 6 | it's being represented to me that Mr. Karasarides cannot pay |
| 11:08:32 | 7 | his tax debt, is not making any voluntary payments on his |
| 11:08:36 | 8 | tax debt, I came -- in my investigation, I discovered that |
| 11:08:41 | 9 | Mr. Karasarides, during the course that the taxes were |
| 11:08:44 | 10 | accruing, had made a hundred thousand dollars in cash |
| 11:08:50 | 11 | payments to two attorneys, a total of a hundred thousand, |
| 11:08:55 | 12 | for legal fees for an unrelated criminal case. |
| 11:09:02 | 13 | And I've never seen that in 41 years of collecting |
| 11:09:05 | 14 | taxes that somebody could afford to pay a hundred thousand |
| 11:09:09 | 15 | dollars cash to third parties when they are stating that |
| 11:09:11 | 16 | they cannot pay the IRS. |
| 11:09:13 | 17 | Another factor was -- a significant factor was the |
| 11:09:17 | 18 | personal residence where Mr. Karasarides resides.  The |
| 11:09:23 | 19 | property -- the personal residence was being purchased by |
| 11:09:28 | 20 | Mr. Karasarides via land contract.  Very nice house that's |
| 11:09:35 | 21 | worth probably 650,000 right now.  He's purchasing it via |
| 11:09:41 | 22 | land contract. |
| 11:09:42 | 23 | And rather than Mr. Karasarides making the payments |
| 11:09:47 | 24 | directly on that land contract, the payments that I saw and |
| 11:09:52 | 25 | in my investigation, they were being funneled through |

**D. Ross (Direct by Bean)** 504

| | | |
|---|---|---|
| 11:09:56 | 1 | Mr. Karasarides' son, Christopher, who at the time I was |
| 11:09:59 | 2 | told was, you know, a student at Ohio State in Columbus. |
| 11:10:05 | 3 | That seemed odd to me. It just didn't meet the smell test, |
| 11:10:09 | 4 | because the payments were going to the owner of the |
| 11:10:16 | 5 | property, and they lived right next door to Mr. Karasarides. |
| 11:10:21 | 6 | So, you know, it smelled to high heaven that these |
| 11:10:25 | 7 | funds are being funneled to the son, the adult son, |
| 11:10:31 | 8 | Christopher, in Columbus, and then to, you know, the owner |
| 11:10:36 | 9 | of the property, which is right next door to where |
| 11:10:40 | 10 | Mr. Karasarides lived. So -- and they were significant |
| 11:10:45 | 11 | payments. |
| 11:10:46 | 12 | There were --the most recent information that I |
| 11:10:51 | 13 | reviewed was I think in, like, around September of 2016. |
| 11:11:01 | 14 | And for like a 7-month period, starting December 1st of |
| 11:11:06 | 15 | 2015, there were seven payments made on this land contract |
| 11:11:11 | 16 | to purchase the house, and they were each in the amount of |
| 11:11:15 | 17 | $6,708. So you had seven payments of those -- that amount |
| 11:11:22 | 18 | each. |
| 11:11:23 | 19 | And this was at a time where I'm being told that |
| 11:11:29 | 20 | Mr. Karasarides can't pay his tax debt, he's barely getting |
| 11:11:33 | 21 | by, can only basic -- pay his basic living expenses, and so |
| 11:11:37 | 22 | that was being done at that time. |
| 11:11:41 | 23 | Related to that, there was an offer in compromise |
| 11:11:44 | 24 | filed by the subsequent power of attorney for |
| 11:11:50 | 25 | Mr. Karasarides. It's an attorney, it was a tax attorney in |

**D. Ross  (Direct by Bean)**                                    505

11:11:56  1  Canton named Matthew Yackshaw.  And at some point he became

11:12:04  2  the attorney for Mr. Karasarides.  And he filed an offer in

11:12:06  3  compromise on behalf of Mr. Karasarides.

11:12:07  4      And he offered, on behalf of the taxpayer, around 70

11:12:12  5  or $72,000, you know, on a tax debt of -- when I ran the

11:12:18  6  numbers in 2022, they were over 2.9 million.  So you're

11:12:24  7  trying to get out of 2.9 million or whatever amount was due

11:12:28  8  at the time for $70,000, saying that's all that the IRS

11:12:32  9  could collect, that's all the taxpayer can afford.  And, so,

11:12:37  10  I mean, that was another reason.

11:12:39  11      Finally, you know, we do a lot of third-party contacts

11:12:49  12  in gathering information.  And I was aware that

11:12:51  13  Mr. Karasarides had been divorced from his first wife,

11:12:59  14  Carolyn Noble.  So I went down to the Stark County Domestic

11:13:07  15  Relations Court in Canton to review the records, and it was

11:13:10  16  very voluminous.

11:13:12  17      What stood out was there was a filing by

11:13:16  18  Mr. Karasarides' ex-wife Carolyn Noble's attorney, and the

11:13:22  19  attorney submitted a document saying, we want a do-over on

11:13:28  20  the settlement agreement, that my client --

11:13:32  21                  MR. GOLDBERG:  Objection.

11:13:32  22                  THE COURT:  Overruled.

11:13:32  23      Go ahead.

11:13:34  24                  THE WITNESS:  -- wanted a do-over, that the

11:13:38  25  agreement signed by his client, Carolyn Noble, was based on

| 11:13:43 | 1 | false information.  And accompanying that filing was a |
| 11:13:49 | 2 | spreadsheet. |
| 11:13:51 | 3 | And what the attorney for Miss Noble was indicating |
| 11:13:59 | 4 | was that -- |
| 11:14:00 | 5 | MR. GOLDBERG:  Objection, Your Honor.  Can we |
| 11:14:02 | 6 | approach? |
| 11:14:03 | 7 | THE COURT:  No. |
| 11:14:03 | 8 | Overruled. |
| 11:14:04 | 9 | Go ahead. |
| 11:14:04 | 10 | THE WITNESS:  The filing said, my client |
| 11:14:12 | 11 | signed an agreement on false information based on |
| 11:14:15 | 12 | Mr. Karasarides' representation that he was only making this |
| 11:14:18 | 13 | amount of money when, in fact, we have information — and it |
| 11:14:21 | 14 | was a spreadsheet filed with the Domestic Relations Court — |
| 11:14:25 | 15 | that purportedly Ms. Noble had secured from Mr. Karasarides' |
| 11:14:32 | 16 | laptop.  And the laptop showed this -- spreadsheet showed a |
| 11:14:38 | 17 | number of gambling businesses and the income for a certain |
| 11:14:44 | 18 | period.  So her attorney was saying Mr. Karasarides is |
| 11:14:56 | 19 | making way more in income than what he reported through the |
| 11:15:00 | 20 | divorce proceeding. |
| 11:15:01 | 21 | So, it was like for a 5- or 6-week period, the income |
| 11:15:09 | 22 | obtained from the spreadsheet from Mr. Karasarides' laptop |
| 11:15:11 | 23 | showed that he and his business partner had made over a |
| 11:15:15 | 24 | million dollars just over a 5- or 6-week period. |
| 11:15:23 | 25 | So the attorney for Miss Noble said, we want this case |

**D. Ross  (Direct by Bean)**                    507

11:15:28  1   reopened so that she gets a fair settlement based on

11:15:31  2   Mr. Karasarides' true income, not what he had previously

11:15:36  3   portrayed to the Court.

11:15:39  4   BY MR. BEAN:

11:15:40  5   **Q**     Now, I think earlier -- was your testimony, though,

11:15:43  6   that when you begin a collections case, one of the things

11:15:46  7   you do is try to identify sources of income?

11:15:51  8         Was that your testimony?

11:15:52  9   **A**     Yes.

11:15:52  10  **Q**     All right.  Are there certain things taxpayers can do

11:15:55  11  to make it -- your job doing that more difficult?

11:16:00  12  **A**     Certainly.

11:16:00  13  **Q**     What kind of things?

11:16:02  14  **A**     Well, if you had a privately held company and you're

11:16:06  15  getting income and that company does not submit income

11:16:11  16  documents to the Internal Revenue Service as is normally

11:16:17  17  done and required, we wouldn't know about that income.

11:16:23  18  **Q**     What about cash?

11:16:27  19  **A**     Cash, at times, we see cash deposits --

11:16:37  20  **Q**     Does that make it harder?

11:16:38  21  **A**     -- into banks, into bank accounts, we can see that.

11:16:41  22  But if somebody's hiding cash, it's obviously much more

11:16:43  23  difficult to locate.

11:16:44  24  **Q**     And what about if a taxpayer puts assets in the name

11:16:47  25  of another individual?

**D. Ross (Direct by Bean)** 508

11:16:52  1   **A**    Well, that makes it definitely more difficult,

11:16:55  2   although we do our best to find out when people are doing

11:16:59  3   that.

11:17:00  4   **Q**    When -- on a collections case, when you're trying to

11:17:03  5   identify sources of income, is it your practice to look at

11:17:06  6   any tax returns that are filed during your collections case?

11:17:09  7   **A**    Yes.

11:17:12  8   **Q**    And how about tax returns that were filed before you

11:17:15  9   begin the collections case?

11:17:16  10  **A**    At times.

11:17:23  11            MR. BEAN:  Carissa, can we please pull up

11:17:27  12  Exhibit 200, which the parties have stipulated to?

11:17:36  13  BY MR. BEAN:

11:17:37  14  **Q**    Sir, what is this?

11:17:40  15  **A**    It's called an ICS history.  ICS standards for

11:17:45  16  Integrated Collection Systems.  We use a million acronyms,

11:17:49  17  so sorry about that.

11:17:50  18  **Q**    And is this -- what's an ICS history used for?

11:17:54  19  **A**    Pardon?

11:17:55  20  **Q**    How is an ICS history used?

11:17:57  21  **A**    Well, it's basically a summary -- summary of events on

11:18:03  22  a particular case.  And basically we keep a written record.

11:18:08  23  Like, if we meet with taxpayer or we meet with a third party

11:18:15  24  or if we're doing research, we make a record of what -- of

11:18:19  25  what we did on the case, basically.

| | | |
|---|---|---|
| 11:18:28 | 1 | **Q**     And who's the taxpayer for this particular ICS |
| 11:18:30 | 2 | history? |
| 11:18:30 | 3 | **A**     It's Christos Karasarides, Jr. |
| 11:18:32 | 4 | **Q**     And as the revenue officer assigned to this case, were |
| 11:18:35 | 5 | you the one responsible for making entries -- |
| 11:18:37 | 6 | **A**     Yes. |
| 11:18:38 | 7 | **Q**     -- on this document? |
| 11:18:39 | 8 | **A**     Yes, including the typos. |
| 11:18:41 | 9 | **Q**     We'll forgive you for those. |
| 11:18:43 | 10 | So you've talked about generally what you do when you |
| 11:18:50 | 11 | receive a collections case in terms of trying to identify |
| 11:18:52 | 12 | assets, source of income, et cetera. |
| 11:18:54 | 13 | **A**     Right. |
| 11:18:55 | 14 | **Q**     Did you do that in this specific case? |
| 11:18:57 | 15 | **A**     Yes. |
| 11:18:59 | 16 | **Q**     And so at some point did you come to speak with |
| 11:19:01 | 17 | Mr. DiPietro? |
| 11:19:02 | 18 | **A**     Yes, I did. |
| 11:19:04 | 19 | MR. BEAN:  Can we please turn to Page 4? |
| 11:19:08 | 20 | BY MR. BEAN: |
| 11:19:09 | 21 | **Q**     When -- approximately when did you first speak with |
| 11:19:12 | 22 | Mr. DiPietro? |
| 11:19:16 | 23 | And sir, if at any point you'd ask us to change the |
| 11:19:18 | 24 | pages of the exhibit, just ask. |
| 11:19:23 | 25 | **A**     Would you go back one to Page 3, please? |

**D. Ross  (Direct by Bean)**                                    510

1      Okay.  It looks like that that was the initial contact

2  with Mr. DiPietro on April 12th of 2013.

3  **Q**     And what -- can you -- what was that contact?  What

4  was the conversation that you had?

5  **A**     Well, the initial contact, we -- you know, we want to

6  exchange -- we want to exchange contact information and we

7  want to -- what we're required to do is to explain and to

8  verify that the taxpayer, his client, is aware of taxpayer

9  rights.  So we do that.  That's required.  We ask for

10  payment, you know, if there's money due.  It's not just a

11  general call.  We want to see if the tax can be paid.

12  **Q**     Did you request payment here?

13  **A**     Yes.

14  **Q**     Did you get it?

15  **A**     No.

16  **Q**     Did Mr. DiPietro say, during this meeting, whether

17  Mr. Karasarides was able to pay?

18  **A**     He said he had made a $50,000 check recently, and I

19  believe that was on the 2012-year, I believe.

20      But, you know, I explained to him he needs to stay

21  current and keep -- and not run up any more tax liability,

22  so -- but he did say he was unable to pay the liability in

23  full.

24  **Q**     Did you request that a Form 433-A be filed on behalf

25  of Mr. Karasarides?

11:21:08  1   **A**    Yes.

11:21:10  2   **Q**    Can you just describe to the jury, what is that form?

11:21:12  3   What's reported on it?

11:21:13  4   **A**    It's a collection information statement for

11:21:16  5   individuals.  It's basically information about a taxpayer's

11:21:22  6   assets, liabilities, income, and expenses.  Just getting a

11:21:28  7   total financial picture of the taxpayer who states that they

11:21:32  8   cannot pay in full.

11:21:32  9   **Q**    And why request one here?

11:21:36  10  **A**    Because if, you know, the appointed representative is

11:21:41  11  saying that the taxpayer is unable to pay, then we need to

11:21:45  12  gather information.  Basically like a loan application in

11:21:48  13  reverse.  You know, the money is already due, and now we're

11:21:53  14  going back and trying to gather the financial information.

11:21:58  15  **Q**    Did Mr. DiPietro talk about any goals he had for

11:22:03  16  Mr. Karasarides in terms of how to address his tax debt?

11:22:06  17  **A**    Well, I don't believe it's in the history, but I do

11:22:09  18  recall that, you know, the first vibes I was getting was,

11:22:13  19  you know, we've got a couple of these houses down in the

11:22:16  20  inner city, these rental properties in the inner city of

11:22:19  21  Canton, you know, why don't you guys just take this and just

11:22:22  22  go away and leave us alone.  That was the vibe I was

11:22:25  23  getting.

11:22:25  24      Beyond that, he did mention that at some point

11:22:31  25  possibly entering into an installment agreement.  And then

11:22:35  1   he also mentioned possible filing of an offer in compromise.

11:22:38  2   **Q**     Was there ever any entry of an installment agreement?

11:22:42  3   **A**     There was never a proposal for an installment

11:22:47  4   agreement submitted.

11:22:47  5   **Q**     During the conversation, did you ask Mr. DiPietro

11:22:50  6   about Mr. Karasarides' assets and sources of income?

11:22:54  7   **A**     Yes.

11:22:55  8   **Q**     And did he provide you with an answer?

11:22:58  9   **A**     Well, he provided a collection information statement.

11:23:04  10  It was on a Form 433-F rather than the 433-A.  We both -- we

11:23:10  11  use both of those in IRS collection.

11:23:14  12  **Q**     During your communications with Mr. DiPietro, did you

11:23:18  13  communicate the need for truthful and accurate information

11:23:23  14  during this process?

11:23:25  15  **A**     I don't recall specifically saying that.  I mean,

11:23:28  16  Mr. DiPietro as a CPA is required to keep -- is required to

11:23:37  17  maintain certain standards of representation in tax

11:23:42  18  preparation that's outlined in Circular 230.

11:23:47  19            MR. BEAN:  Carissa, can we please turn to

11:23:49  20  Page 7?

11:24:02  21       Can you go back one page, please?

11:24:06  22       I had the right page.  I apologize.

11:24:18  23  BY MR. BEAN:

11:24:19  24  **Q**     Did you speak again with Mr. DiPietro on June 24th,

11:24:24  25  2013?

**D. Ross  (Direct by Bean)**                                          513

11:24:24    1   **A**      Yes, sir.

11:24:26    2   **Q**      And can you relay to the jury that communication?

11:24:30    3   **A**      Well, it said that Mr. DiPietro called my office.  He

11:24:34    4   said he has the information I had previously requested.  I

11:24:38    5   advised him to send it, I will review and then call him for

11:24:44    6   appointment or clarification and follow-up.

11:24:51    7           He raised the issue about pending possible forfeiture

11:24:58    8   based on another criminal case.  He says there's a

11:25:01    9   significant amount of money involved, approximately a half a

11:25:03   10   million being held -- it's being held by the Secret Service,

11:25:07   11   and that Mr. DiPietro sought -- and Mr. Karasarides want

11:25:13   12   this -- these assets to go to the IRS to be applied to his

11:25:18   13   tax liability.

11:25:19   14   **Q**      Did he say anything about how Mr. Karasarides was

11:25:23   15   earning money at that time?

11:25:25   16   **A**      Yes.

11:25:26   17   **Q**      What did he say?

11:25:26   18   **A**      He said he gambles professionally and that he was --

11:25:32   19   he earns commissions from an entity called V2, but now that

11:25:39   20   is on hold due to criminal cases.

11:25:43   21   **Q**      And did he explain to you what V2 was or. . .

11:25:48   22   **A**      Well, it's my understanding V2 was a company that

11:25:53   23   provided software to these gambling establishments that are

11:26:01   24   located, you know, throughout Ohio and I guess elsewhere.

11:26:08   25   **Q**      Now, after Mr. DiPietro told you about, you know,

11:26:13 1   assets that had been seized that he and Mr. Karasarides

11:26:15 2   would like to be applied to his tax debt, did you look into

11:26:20 3   that money?

11:26:20 4   **A**   Yes, I did.

11:26:22 5   **Q**   Can you just relay to the jury what you did?

11:26:24 6   **A**   Well, I contacted the Secret Service and said, you

11:26:27 7   guys are purportedly holding assets belonging to

11:26:35 8   Mr. Karasarides, and that, you know, we would like to seize

11:26:37 9   those and apply the proceeds to his tax liability.

11:26:42 10   **Q**   And were you successful in accomplishing that?

11:26:44 11   **A**   No. It was a source of frustration. You know, you

11:26:47 12   get two federal agencies dealing with each other, and I was

11:26:50 13   unable to get those assets.

11:26:53 14   **Q**   Did they give a reason why?

11:26:59 15         MR. GOLDBERG: Objection.

11:26:59 16         THE COURT: You can say yes or no.

11:27:01 17         THE WITNESS: I don't -- I don't specifically

11:27:03 18   recall what the issue, but I was unable to get those assets

11:27:05 19   from the Secret Service even though I attempted to.

11:27:10 20         MR. BEAN: Carissa, can we please turn to

11:27:12 21   Page 8? And can you blow up the one in the middle?

11:27:26 22   BY MR. BEAN:

11:27:27 23   **Q**   Now, sir, you already mentioned that a Form 433-F was

11:27:30 24   filed on behalf of Mr. Karasarides; correct?

11:27:32 25   **A**   Yes.

**D. Ross  (Direct by Bean)**                    515

11:27:33  1   **Q**    When was that -- does this entry reference that?

11:27:39  2   **A**    Well, the 433-A had previously been submitted to me.

11:27:43  3   I didn't receive it on July 9th, I received it previously,

11:27:50  4   and I was in the process of reviewing that information that

11:27:53  5   was submitted by Mr. DiPietro.

11:27:57  6              MR. BEAN:  Can we please pull up Exhibit 174?

11:28:07  7   BY MR. BEAN:

11:28:07  8   **Q**    Sir, do you recognize this?

11:28:08  9   **A**    Yes.

11:28:09  10  **Q**    What is it?

11:28:10  11  **A**    It's a collection information statement submitted on

11:28:15  12  behalf of Christos Karasarides, Jr.  It was submitted by

11:28:22  13  Mr. DiPietro.

11:28:23  14  **Q**    How do you know it was submitted by Mr. DiPietro?

11:28:27  15  **A**    Because I note in my history that he mailed it to me.

11:28:30  16  **Q**    And did you have conversations with Mr. DiPietro about

11:28:33  17  this form?

11:28:34  18  **A**    Yes.

11:28:36  19              MR. BEAN:  Carissa, can you flip down a page,

11:28:38  20  please?

11:28:39  21       Thank you.  We're on Page 2.

11:28:41  22  BY MR. BEAN:

11:28:42  23  **Q**    Do you see a signature down at the bottom of this

11:28:44  24  document?

11:28:44  25  **A**    Yes.

**D. Ross (Direct by Bean)**                                                516

11:28:45  1   **Q**    And is there a date down on that line of the document?

11:28:49  2   **A**    June 15th, 2013.

11:28:52  3   **Q**    Thank you.

11:28:53  4              MR. BEAN:  Can we go back to the first page.

11:28:55  5   BY MR. BEAN:

11:28:55  6   **Q**    And in the upper left corner, is there the name of a

11:29:00  7   taxpayer listed?

11:29:01  8   **A**    Yes, sir.

11:29:02  9   **Q**    What name?

11:29:02  10  **A**    Christos Karasarides, Jr.

11:29:07  11  **Q**    Is this a Form 433-A?

11:29:09  12  **A**    No, it is not.

11:29:10  13  **Q**    In your ICS history, is this the form you note that

11:29:14  14  was filed?

11:29:15  15  **A**    I am so used to dealing with Form 433-A, that's mainly

11:29:20  16  the one we deal with, probably just did it by habit rather

11:29:24  17  than a 433-F.

11:29:26  18  **Q**    So then is it possible then your ICS history is just a

11:29:31  19  typo?

11:29:31  20  **A**    Yes.

11:29:32  21  **Q**    All right.  I'd like to take a look at this document

11:29:34  22  with you.  Can you walk us through what information is

11:29:41  23  reported on this document?  And please tell us to change the

11:29:44  24  page as needed as you do that.

11:29:45  25  **A**    Okay.  Well, the top of the page is identifying

11:29:49 1 information, name, address, social security number, which

11:29:55 2 county they live in. And then it starts with the assets

11:30:02 3 that are owned by certain taxpayer.

11:30:05 4     In this section, Section A lists, like, you know, bank

11:30:10 5 accounts and lines of credit.

11:30:12 6     Section B includes real estate.

11:30:14 7     C is other assets, includes vehicles and, you know,

11:30:18 8 any other major asset.

11:30:25 9 **Q**    And, sir, before we move on to the next page, what

11:30:27 10 real estate asset is listed here?

11:30:28 11 **A**    Real estate at -- located at 2231 Dunkeith Drive in

11:30:35 12 Canton, Ohio.

11:30:35 13 **Q**    Were you familiar with that specific property?

11:30:38 14 **A**    Yes.

11:30:40 15 **Q**    And where is -- what's that property?

11:30:42 16 **A**    It's the personal residence of Mr. Chris -- Christos

11:30:49 17 Karasarides.

11:30:49 18 **Q**    And in the other asset section, is there anything

11:30:52 19 listed there?

11:30:53 20 **A**    There are two vehicles list. One's a Mercedes. The

11:30:56 21 other is a -- looks like a Hyundai.

11:31:00 22     MR. BEAN:  Carissa, can we please turn to

11:31:02 23 Page 2.

11:31:04 24 BY MR. BEAN:

11:31:04 25 **Q**    What about -- what's reported on this page?

**D. Ross  (Direct by Bean)**                                     518

11:31:07  1   **A**      Section D lists -- supposed to list credit cards.

11:31:12  2           E, business information.  Let's see, and -- business

11:31:19  3   accounts, business information.  Business accounts.

11:31:22  4           And then Section F, employment information.

11:31:27  5           You go down to household income and expenses.

11:31:40  6                    MR. BEAN:  Carissa, can we go to the next

11:31:42  7   page, please?

11:31:43  8           Maybe we can blow up the text on this one.

11:31:46  9   BY MR. BEAN:

11:31:46  10  **Q**      What's reported here?

11:31:52  11  **A**      At the top of the page, we have a list of business

11:31:56  12  interests for Mr. Karasarides.  All but one appear to be

11:32:09  13  closed.  Related to the litigation that Mr. DiPietro had

11:32:12  14  indicated before.

11:32:12  15          Blow that are the three rental properties in Canton,

11:32:16  16  Ohio, that I referred to previously.

11:32:17  17  **Q**      Now, you previously referred to an entity called CM

11:32:22  18  Kare.  Is that referenced here?

11:32:23  19  **A**      Yes, sir.

11:32:24  20  **Q**      And what's his interest in CM Kare as reported here?

11:32:28  21  **A**      50 percent ownership.  Equipment rental income is

11:32:31  22  listed.

11:32:31  23  **Q**      Is that consistent with what your understanding of

11:32:34  24  that business that he had with Mr. Maggiore, I believe was

11:32:37  25  your testimony?

**D. Ross  (Direct by Bean)**                                    519

11:32:38    1    **A**    Yes.

11:32:38    2    **Q**    All right.  Thank you.

11:32:40    3                MR. BEAN:  Carissa, can you zoom out and go

11:32:42    4    back to Page 2, please.

11:32:45    5         And can we zoom in on the non-wage household income

11:32:48    6    section?

11:32:54    7    BY MR. BEAN:

11:32:55    8    **Q**    Did he -- on this form, is there income reported here?

11:32:58    9    **A**    Yes.

11:32:58   10    **Q**    How much?

11:33:01   11    **A**    $20,000 per month before tax.

11:33:09   12    **Q**    Is the -- is the source of that income reported here?

11:33:13   13    **A**    I don't see that it is.

11:33:14   14    **Q**    Or how about anywhere else on this document?

11:33:19   15    **A**    I don't recall.

11:33:21   16    **Q**    Were you ever told what the source of this income was?

11:33:26   17    **A**    Well, Mr. DiPietro indicated that Mr. Karasarides is a

11:33:30   18    professional gambler and most of his income is from

11:33:34   19    professional gambling, especially now that those other

11:33:38   20    businesses were closed by the State of Ohio.

11:33:41   21                MR. BEAN:  Carissa, can you zoom out?

11:33:42   22         Can you go to the next page?

11:33:45   23         And can you go to the next page?

11:33:47   24         Can you blow that up, please?

11:33:53   25         And if we can turn it horizontally.

| | | |
|---|---|---|
| 11:34:35 | 1 | (Brief pause in proceedings). |
| 11:34:55 | 2 | BY MR. BEAN: |
| 11:34:55 | 3 | **Q**    Sir, what additional disclosures were there? |
| 11:35:00 | 4 | **A**    The top one was related to a property on Meese Road. |
| 11:35:08 | 5 | I believe that's east of Canton, maybe in the suburb of |
| 11:35:12 | 6 | Louisville.  But the representation is that this property |
| 11:35:19 | 7 | was paid for by land contract, paid to ex-wife, and that the |
| 11:35:25 | 8 | payor paid off an $89,000 loan, and the ex-wife quit-claimed |
| 11:35:31 | 9 | the property to Christos Karasarides, Jr., and that the |
| 11:35:35 | 10 | final transfer is being held up by our federal liens. |
| 11:35:43 | 11 | **Q**    And what was represented to you on this form regarding |
| 11:35:46 | 12 | VS2? |
| 11:35:47 | 13 | **A**    Well, the commissions were being held by the court |
| 11:35:51 | 14 | subject to forfeiture. |
| 11:35:54 | 15 | **Q**    And is there a reference to the assets you'd |
| 11:35:58 | 16 | previously discussed with Mr. DiPietro that had been seized? |
| 11:36:00 | 17 | **A**    There's a reference to the Secret Service holding |
| 11:36:05 | 18 | assets related to a forfeiture. |
| 11:36:09 | 19 | MR. BEAN:  Can we zoom out? |
| 11:36:25 | 20 | Are there any more pages in that exhibit? |
| 11:36:30 | 21 | BY MR. BEAN: |
| 11:36:31 | 22 | **Q**    So, is there anywhere in this document where it |
| 11:36:34 | 23 | references his ownership actively, at that time, of gambling |
| 11:36:38 | 24 | businesses? |
| 11:36:39 | 25 | **A**    No. |

11:36:40   1   **Q**     How about a business called Skilled Shamrock?

11:36:42   2   **A**     No, sir.

11:36:43   3   **Q**     How about a business called Redemption?

11:36:45   4   **A**     No, sir.

11:36:47   5   **Q**     On this form, is there anywhere where it says that

11:36:50   6   Mr. Karasarides was receiving, or had received, income from

11:36:55   7   gambling businesses?

11:36:56   8   **A**     No.

11:36:57   9   **Q**     How about income from a business called Skilled

11:36:59  10   Shamrock?

11:36:59  11   **A**     No.

11:37:00  12   **Q**     How about income from a business called Redemption?

11:37:02  13   **A**     No.

11:37:03  14   **Q**     And in the course of your collections in your case and

11:37:08  15   your communications with Mr. DiPietro, did he ever provide

11:37:10  16   any information that I just asked you about orally?

11:37:13  17   **A**     No.

11:37:15  18   **Q**     Now that you had this form and this information, what

11:37:19  19   did you do?

11:37:22  20   **A**     Well, my analysis was that there's equity in the

11:37:30  21   taxpayer's land contract that he's buying, his personal

11:37:34  22   residence where he resides at 2231 Dunkeith.

11:37:43  23   **Q**     Did you tell that to Mr. DiPietro?

11:37:49  24   **A**     Yes.

11:37:49  25   **Q**     If Mr. Karasarides had ownership of businesses and

**D. Ross  (Direct by Bean)** 522

11:37:53    1    income from businesses that were not reported on this form,

11:37:56    2    would you have wanted to know that?

11:37:57    3    **A**    Certainly.

11:37:57    4    **Q**    Why?

11:37:58    5    **A**    It would -- it would present a total financial picture

11:38:04    6    of the taxpayer's ability to pay the liabilities off.

11:38:08    7    **Q**    And before we move on, sir, that Form 433-F we just

11:38:13    8    looked at, that exhibit, was that a true and accurate

11:38:16    9    representation of the Form 433-F that you received from

11:38:21    10    Mr. DiPietro regarding Mr. Karasarides?

11:38:22    11    **A**    Yes, sir.

11:38:22    12    MR. BEAN:  Carissa, can we please pull up

11:38:25    13    Exhibit 371?

11:38:29    14    BY MR. BEAN:

11:38:29    15    **Q**    What is this?

11:38:31    16    **A**    Well, you asked about -- previously about notices of

11:38:34    17    federal tax lien.  This is a notice of federal tax lien that

11:38:38    18    we filed with the Stark County Recorder, which is the

11:38:41    19    location we would be required to file it since

11:38:44    20    Mr. Karasarides resides in that county.

11:38:47    21    It lists the tax periods and the assessed balances due

11:38:52    22    for each tax period and then the total due for those periods

11:39:00    23    that are assessed.

11:39:01    24    **Q**    And were you responsible for the filing of this

11:39:04    25    notice?

11:39:04  1    **A**    Yes.

11:39:06  2    **Q**    Is your name on this document?

11:39:08  3    **A**    It's on it, but we -- we basically hit a button and it

11:39:12  4    gets sent to the county recorder systemically, so that's a

11:39:16  5    facsimile signature for me.  I don't normally hand-carry

11:39:22  6    notices of federal tax lien to the county.

11:39:25  7    **Q**    And what's the date on this?

11:39:30  8    **A**    The date requested is April 17th of 2013.  The filing

11:39:35  9    date looks like it was filed, recorded by the county

11:39:39  10   April 26th of 2013.

11:39:43  11                MR. BEAN:  Carissa, can you please blow up the

11:39:46  12   middle section next to the yellow line?

11:39:56  13        Thank you.

11:39:57  14   BY MR. BEAN:

11:39:58  15   **Q**    What's -- what's listed on this part of the document?

11:40:03  16   **A**    The type of tax, the year.  Identifying number we

11:40:11  17   always redact.  We don't want people's social security

11:40:14  18   numbers being out in the public.  The date the tax was

11:40:16  19   assessed and the unpaid balance of assessment.

11:40:22  20   **Q**    And is there a total of all the unpaid balances on

11:40:25  21   this?

11:40:26  22   **A**    Yes, sir.

11:40:27  23   **Q**    And how much was it at that time?

11:40:29  24   **A**    At that time, it was $1,223,237.94, but that would not

11:40:37  25   include some accrued interest and penalty that's not listed

**D. Ross  (Direct by Bean)**                                        524

11:40:41  1   on this.

11:40:42  2   **Q**    Now, I think you testified to this already, but would

11:40:45  3   filing this notice, would the lien attach to his residence?

11:40:51  4   **A**    The notice of --

11:40:53  5   **Q**    Let me rephrase.

11:40:54  6        Did it attach to his residence?

11:40:55  7   **A**    Well, the notice of federal tax lien attaches to all

11:40:59  8   assets the taxpayer has, whether it's personal property or

11:41:02  9   real property.  Now, since the title of the residence was

11:41:07  10  not in Mr. Karasarides' name, the lien attached to his

11:41:10  11  interest in that land contract.

11:41:16  12                 MR. BEAN:  Carissa, can we please pull up

11:41:21  13  Exhibit 209?

11:41:22  14  BY MR. BEAN:

11:41:23  15  **Q**    Sir, what is this?

11:41:25  16  **A**    This is a Form 12277.  It's called an application for

11:41:30  17  withdrawal of filed lien.  The taxpayer is asking for the

11:41:36  18  lien to be withdrawn from the county recorder.

11:41:38  19  **Q**    And who is the taxpayer on this document?

11:41:42  20  **A**    Christos Karasarides, Jr.

11:41:44  21  **Q**    Who is the taxpayer's representative?

11:41:46  22  **A**    Ron DiPietro.

11:41:48  23  **Q**    And this document, does it appear to be signed by the

11:41:51  24  taxpayer?

11:41:53  25  **A**    Yes, it does.

11:41:55  1              MR. BEAN:  And Carissa, could we blow up that

11:41:57  2     bottom part where it says "affirmation"?

11:42:04  3     BY MR. BEAN:

11:42:04  4     **Q**     Are you able to tell the date there in this section?

11:42:07  5     **A**     It appears to be June 15th of 2013.

11:42:12  6     **Q**     Thank you.

11:42:16  7              MR. BEAN:  You can zoom out.

         8     BY MR. BEAN:

11:42:17  9     **Q**     Was the -- was this application for withdrawal of lien

11:42:21  10    granted?

11:42:22  11    **A**     No.

11:42:23  12    **Q**     Why not?

11:42:25  13    **A**     In the first place, Mr. DiPietro submitted the

11:42:28  14    incorrect form for the action he was asking the IRS to take.

11:42:33  15    It should have been a different form.  He's asking just for

11:42:38  16    the specific property on Meese Road to be released from the

11:42:44  17    lien, or withdrawn, and really the actual form should be a

11:42:48  18    lien discharge where we would discharge a specific property

11:42:51  19    from the lien, but the lien against the taxpayer would

11:42:54  20    remain against anything else.

11:42:57  21    **Q**     Well, other than the issues with the form, were there

11:42:59  22    any substantive reasons?

11:43:01  23    **A**     There is no information to back up what I was being

11:43:05  24    told.

11:43:07  25              You know, purportedly this person who resided at that

**D. Ross  (Direct by Bean)**                                  526

| | |
|---|---|
| 11:43:14 | 1 |
| 11:43:17 | 2 |
| 11:43:22 | 3 |
| 11:43:25 | 4 |
| 11:43:30 | 5 |
| 11:43:38 | 6 |
| 11:43:41 | 7 |
| 11:43:44 | 8 |
| 11:43:47 | 9 |
| 11:43:56 | 10 |
| 11:44:03 | 11 |
| 11:44:03 | 12 |
| 11:44:06 | 13 |
| 11:44:08 | 14 |
| 11:44:09 | 15 |
| 11:44:12 | 16 |
| 11:44:16 | 17 |
| 11:44:20 | 18 |
| 11:44:24 | 19 |
| 11:44:28 | 20 |
| 11:44:32 | 21 |
| 11:44:37 | 22 |
| 11:44:40 | 23 |
| 11:44:43 | 24 |
| 11:44:46 | 25 |

1  property on Meese Road, it was a Jason Kachner, I believe,

2  purportedly he had paid for the property in cash.  There was

3  no receipts, there's no record of it, there's no escrow

4  file, there's no deed submitted related to this property.

5  So, you know, it didn't have any substance warranting us to

6  address this property either from a lien discharge or

7  withdrawal.

8          MR. BEAN:  Carissa, can we please go back to

9  Exhibit 200 and go to Page 9?

10          And can we blow up that top section?

11  BY MR. BEAN:

12  **Q**    Did you have contact with Mr. DiPietro on

13  September 13th, 2013?

14  **A**    Yes, sir.

15  **Q**    What -- can you relate that conversation, please?

16  **A**    Mr. DiPietro had called me.  He asked about some type

17  of settlement on this case.  And I explained to him I don't

18  have settlement authority, I don't have that, you know,

19  ability to settle cases for less than the total amount owed.

20  And I told him about the formal process that we have which

21  is called an offer in compromise.

22          And Mr. DiPietro indicated that if Mr. Karasarides

23  loses his State of Ohio litigation, he won't be able to pay

24  anything, but if he's successful, he could pay in full in a

25  year.

11:44:47  1     And I told him that the -- any offer in compromise

11:44:51  2     submitted, he would have to file -- or submit 20 percent as

11:44:55  3     a down payment on the amount offered.

11:45:05  4         I went on to tell him that, really, the lien discharge

11:45:08  5     application is what he should submit to me rather than the

11:45:11  6     lien withdrawal form.

11:45:12  7   **Q**     Did Mr. DiPietro ask you for any information?

11:45:15  8   **A**     Yes, he did.

11:45:16  9   **Q**     What did he ask you for?

11:45:20  10  **A**     He asked me for another acronym.  He asked me for the

11:45:26  11  IRP information, which is the information that third parties

11:45:31  12  send to the IRS at the end of each year to advise the IRS of

11:45:35  13  what income a certain taxpayer had for that year.

11:45:39  14      You know, most people are familiar with the W-2s, your

11:45:44  15  W-2 form if you work for a company, if you have some bank

11:45:51  16  interest or brokerage investment interest, something like

11:45:54  17  that.  But in this case he was asking for the -- that

11:46:00  18  information for the year 2012, which would assist him in

11:46:04  19  preparing that 2012 tax return.

11:46:09  20  **Q**     And did you provide that information?

11:46:11  21  **A**     Yes, I did.

11:46:17  22  **Q**     And I apologize if you mentioned this already, sir,

11:46:21  23  but did Mr. DiPietro talk about what would happen -- what

11:46:23  24  his situation would be if his current litigation did not

11:46:28  25  resolve in his favor?

**D. Ross  (Direct by Bean)**

528

11:46:29  1   **A**     Yes.  He said the taxpayer would not be able to pay

11:46:31  2   these liabilities.

11:46:33  3   **Q**     At some point did you learn how that litigation was

11:46:36  4   resolved?

11:46:38  5   **A**     Yes.

11:46:39  6   **Q**     How was it resolved, as communicated to you?

11:46:44  7   **A**     Not in Mr. Karasarides' favor.  He was unsuccessful.

11:46:48  8   **Q**     So was it communicated to you again this same message,

11:46:51  9   that --

11:46:52  10  **A**     Yeah, my client cannot pay these taxes.

11:47:01  11  **Q**     Did you -- we mentioned this IRP data.  What tax year

11:47:05  12  was he requesting the data for?

11:47:07  13  **A**     The 2012 tax year.

11:47:09  14            MR. BEAN:  Can we please pull up Exhibit 104?

11:47:16  15        And can we please go to Page 2 of the --

11:47:19  16  Mr. Karasarides' 2012 account transcript.

11:47:23  17        And Page 3, excuse me.

11:47:27  18  BY MR. BEAN:

11:47:27  19  **Q**     Sir, are you familiar with these types of documents?

11:47:31  20  **A**     Yes, sir.  They're transcript of accounts.

11:47:33  21  **Q**     All right.  Does this document show when

11:47:37  22  Mr. Karasarides' 2012 tax return was filed?

11:47:46  23            MR. BEAN:  Can you blow up the top, please?

11:47:49  24            THE WITNESS:  You know, it was assessed --

11:47:50  25  looks like it was assessed on November 18th of 2013.  I

**D. Ross  (Direct by Bean)**                                    529

11:47:57  1    don't know that that's the same -- exact same date that the

11:48:00  2    return was filed.

11:48:01  3    BY MR. BEAN:

11:48:01  4    **Q**    Sir, does the document say whether a tax return was

11:48:04  5    filed?

11:48:04  6    **A**    Yes.

11:48:05  7    **Q**    Okay.  And on what date?

11:48:07  8    **A**    It says November 18th, 2013.

11:48:10  9    **Q**    Okay.  Thank you.

11:48:12  10               MR. BEAN:  Can we please pull up Exhibit 105?

          11   BY.  MR. BEAN:

11:48:18  12   **Q**    And on November 18th, 2013, was your collections case

11:48:22  13   ongoing?

11:48:26  14   **A**    Yes, sir.

11:48:27  15   **Q**    Okay.  Is this Mr. Karasarides' 2012 tax return?

11:48:30  16   **A**    Yes, sir.

11:48:31  17               MR. BEAN:  Can we please go to the Schedule

11:48:41  18   Cs?

11:48:56  19        Thank you.

11:48:57  20   BY MR. BEAN:

11:48:57  21   **Q**    Did you have any discussions with Mr. DiPietro

11:48:59  22   regarding Mr. Karasarides' businesses that were reported on

11:49:03  23   this tax return?

11:49:05  24   **A**    Well, he had indicated that, you know, these

11:49:09  25   businesses had been closed based on the action of, you know,

**D. Ross  (Direct by Bean)**                                                530

| | | |
|---|---|---|
| 11:49:13 | 1 | state and local authorities. |
| 11:49:14 | 2 | **Q**    But did he indicate whether they were open in 2012? |
| 11:49:21 | 3 | **A**    I don't recall. |
| 11:49:23 | 4 |         MR. BEAN:  Could we go down a couple pages? |
| 11:49:27 | 5 |    One more. |
| 11:49:28 | 6 |    Thank you. |
| 11:49:29 | 7 | BY MR. BEAN: |
| 11:49:29 | 8 | **Q**    And I believe you testified that Mr. DiPietro talked |
| 11:49:31 | 9 | about Mr. Karasarides' I think what he described as |
| 11:49:35 | 10 | professional gambling. |
| 11:49:36 | 11 | **A**    Yes, sir. |
| 11:49:38 | 12 | **Q**    Is this your understanding what -- reporting that |
| 11:49:42 | 13 | professional gambling? |
| 11:49:46 | 14 |         MR. FEDOR:  Objection. |
| 11:49:47 | 15 |         THE COURT:  Overruled. |
| 11:49:48 | 16 |         THE WITNESS:  Yes. |
| 11:49:49 | 17 | BY MR. BEAN: |
| 11:49:49 | 18 | **Q**    Sir, have you reviewed this tax return prior to your |
| 11:49:51 | 19 | testimony today? |
| 11:49:53 | 20 | **A**    Yes, I have. |
| 11:49:54 | 21 | **Q**    All right.  Is there anywhere on this tax return where |
| 11:50:00 | 22 | Mr. Karasarides reported having an interest in a business |
| 11:50:02 | 23 | called Skilled Shamrock? |
| 11:50:02 | 24 | **A**    No, sir. |
| 11:50:03 | 25 | **Q**    How about a business called Redemption? |

11:50:05  1    **A**     No, sir.

11:50:05  2    **Q**     How about that he earned income from a business called

11:50:11  3    Skilled Shamrock?

11:50:11  4    **A**     No, sir.

11:50:12  5    **Q**     Or earned income from a business called Redemption?

11:50:14  6    **A**     No, sir.

11:50:16  7    **Q**     Sir, during the course of your collections, did you

11:50:19  8    learn on your own more information about Mr. Karasarides'

11:50:26  9    gambling?

11:50:29  10   **A**     Can you be specific?

11:50:30  11   **Q**     Well, did you -- I think earlier you testified that

11:50:32  12   during a collections case it's common for you to get

11:50:35  13   documents from third parties.  Is that right?

11:50:37  14   **A**     Right.

11:50:38  15   **Q**     In the course of your collections case, did you

11:50:41  16   summons documents from casinos, you know, the type you'd

11:50:45  17   find in Vegas or the Jack next door?

11:50:48  18   **A**     You know, I may have.  I can't specifically recall.

11:50:58  19   I'm going back 8 or 9 years.  You know that?

11:51:03  20   **Q**     I do.

11:51:04  21   If Mr. Karasarides had income that was not reported on

11:51:07  22   his tax return, the 2012 tax return that he filed, is that

11:51:10  23   something that you would have wanted to know?

11:51:13  24   **A**     Yes, sir.

11:51:13  25   **Q**     Why?

**D. Ross  (Direct by Bean)**                    532

11:51:13    1    **A**    To assist us in collecting liability that he owed that

11:51:16    2    he said he couldn't pay.

11:51:18    3                    MR. BEAN:  Could we please go back to

11:51:21    4    Exhibit 200 and go to Page 15?

11:51:29    5        And can we please blow up this section?

11:51:35    6    BY MR. BEAN:

11:51:35    7    **Q**    At some time in 2014, did Mr. DiPietro tell you that

11:51:39    8    Mr. Karasarides' prior source of income from VS2 had ended

11:51:44    9    and would not restart?

11:51:52   10    **A**    I don't see that it's on this history entry.

11:51:54   11    **Q**    Oh, no.  I'm just asking you --

11:51:56   12    **A**    Oh.

11:51:57   13    **Q**    -- do you recall that conversation?

11:51:59   14    **A**    Yeah, I believe he did say that.

11:52:01   15    **Q**    And do you recall Mr. DiPietro telling you that at a

11:52:05   16    certain point Mr. Karasarides was in prison?

11:52:06   17    **A**    Yes.

11:52:07   18    **Q**    And did Mr. DiPietro make any representations to you

11:52:10   19    whether how being in prison was going to impact

11:52:13   20    Mr. Karasarides' ability to make income and pay his tax

11:52:17   21    debt?

11:52:17   22    **A**    Well, he would be out the ability to earn income if

11:52:21   23    he's in prison.

11:52:24   24                    MR. BEAN:  Can we please go to Exhibit 372?

11:52:31   25    BY MR. BEAN:

**D. Ross  (Direct by Bean)**                                    533

11:52:31   1   **Q**    What is this?

11:52:32   2   **A**    It's another notice of tax lien.  This is for the year

11:52:35   3   2012.

11:52:36   4   **Q**    And were you responsible for the filing of this tax

11:52:39   5   lien?

11:52:40   6   **A**    Yes.  I requested that lien be filed December 30th of

11:52:45   7   2013.  It was recorded January 8th of 2014.

11:52:51   8   **Q**    And who -- who is the taxpayer on this document?

11:52:54   9   **A**    Christos Karasarides, Jr.

11:52:57  10   **Q**    And what's the unpaid balance for that tax period?

11:53:00  11   **A**    For that year it was $355,404.69.

11:53:06  12   **Q**    And for what tax period does that relate to?

11:53:11  13   **A**    The December -- or the 2012 tax year.

11:53:14  14   **Q**    But he did file a 2012 tax return; right?

11:53:17  15   **A**    Yes.

11:53:20  16   **Q**    So why is -- why are you filing this lien?

11:53:23  17   **A**    He filed the tax return for 2012 but didn't make the

11:53:27  18   payment, so we're -- we're filing the lien to take our place

11:53:34  19   in competing with other creditors.

11:53:39  20               MR. BEAN:  Carissa, can you please pull up

11:53:41  21   Exhibit 175?

11:53:48  22        And can you blow up the -- this text.

11:53:54  23   BY MR. BEAN:

11:53:54  24   **Q**    Sir, what is this document?

11:53:58  25   **A**    This document is a letter number 1058, Letter 1058.

11:54:08   1    Tells the taxpayer this is your final notice.  You know, if

11:54:12   2    the liability is not paid by such and such date, we can take

11:54:18   3    action against your assets.  Giving you the final notice

11:54:23   4    that we're going to take action but you do have appeal

11:54:26   5    rights for this form.

11:54:28   6               MR. BEAN:  And Carissa, can you zoom out and

11:54:32   7    then zoom in on the top section, please?

11:54:35   8        Up here, sorry.

11:54:41   9    BY MR. BEAN:

11:54:42   10   **Q**   Who is this letter addressed to?

11:54:44   11   **A**   Christos Karasarides, Jr.

11:54:47   12   **Q**   And who is the contact person?

11:54:49   13   **A**   That would be me.

11:54:49   14   **Q**   And what's the date on this letter?

11:54:52   15   **A**   June 20th of 2014.

11:54:54   16   **Q**   Were you responsible for this letter being sent out?

11:54:58   17   **A**   Yes, sir.  I generated the letter.

11:54:59   18   **Q**   All right.

11:55:02   19              MR. BEAN:  Can you please zoom out Carissa?

11:55:05   20        And sir I'm going to --

11:55:08   21        If we can blow up the part where it says "Why are we

11:55:11   22   sending you this letter?" and ask Mr. Ross if you could

11:55:13   23   kindly read that section.

11:55:15   24              THE WITNESS:  Okay.  "Your federal tax is

11:55:17   25   still unpaid.  We asked you to pay the tax, but we still

11:55:21  1    haven't received your payment.  This letter is your notice

11:55:23  2    of our intent to levy under Internal Revenue Code § 6331 and

11:55:28  3    your right to request an appeals hearing under § 6330(a).

11:55:34  4    BY MR. BEAN:

11:55:35  5    **Q**    Now, in the course of your job as a revenue officer

11:55:37  6    and doing collections, is it uncommon for you to send out

11:55:40  7    this kind of letter?

11:55:42  8    **A**    It's very, very common.

11:55:44  9    **Q**    So is there anything unusual about you sending this

11:55:47  10   letter to Mr. Karasarides?

11:55:51  11   **A**    No.

11:55:53  12              MR. BEAN:  Carissa, can we zoom out?

11:55:57  13        And can you please zoom in on the second paragraph?

11:56:05  14   BY MR. BEAN:

11:56:05  15   **Q**    Does this letter say how much Mr. Karasarides owed at

11:56:09  16   that time?

11:56:09  17   **A**    Yes, sir.

11:56:09  18   **Q**    How much did he owe?

11:56:12  19   **A**    $1,866,152.70.  That -- that figure was good through

11:56:22  20   June 30th of 2014.

11:56:24  21   **Q**    So is it accurate this number has gone up since you

11:56:26  22   started your collections?

11:56:27  23   **A**    Yes, it has.

11:56:29  24   **Q**    And does this inform Mr. Karasarides that that number

11:56:33  25   could continue to go up if he doesn't pay?

11:56:35  1    **A**    Yes, with penalties and interest.

11:56:36  2    **Q**    All right.

11:56:39  3              MR. BEAN:  Carissa, can you zoom out and go to

11:56:42  4    Page 2, please?

11:56:44  5         And then can you zoom in on the bolded "What are we

11:56:48  6    going to do" in that section?

11:56:52  7    BY MR. BEAN:

11:56:53  8    **Q**    Sir, can you please read the "What we are going to do"

11:56:55  9    section?

11:56:55  10   **A**    "We may file notice of federal tax lien at any time to

11:56:59  11   protect the government's interest.  A lien is a public

11:57:02  12   notice to your creditors that the government has a right to

11:57:04  13   your current assets, including any assets you acquire after

11:57:09  14   we file the lien.  If you don't pay the amount owed or make

11:57:12  15   alternative arrangements to pay or request an appeals

11:57:15  16   hearing within 30 days from this letter, we may take

11:57:19  17   collection action against your property or rights to

11:57:20  18   property, such as real estate, automobiles, business assets,

11:57:23  19   bank accounts, and other income."

11:57:25  20   **Q**    So is it fair to say at this time you were starting to

11:57:29  21   conclude the information gathering portion of your

11:57:32  22   collections and moving on to trying to actually collect?

11:57:35  23   **A**    Well, the collection action as far as investigation

11:57:40  24   continues normally throughout the case.  We don't just stop

11:57:45  25   investigating after we send the final notice.

**D. Ross  (Direct by Bean)**                                 537

11:57:48   1                    MR. BEAN:  Carissa, you can zoom out.

11:57:50   2          Thank you.

11:57:53   3          And if you can zoom in on the bottom part.

11:57:56   4   BY MR. BEAN:

11:57:56   5   **Q**    Does this show -- what -- can you tell the jury what

11:57:59   6   this shows?

11:58:01   7   **A**    Shows the amounts due by tax period.

11:58:05   8   **Q**    So what periods does it show tax due for?

11:58:08   9   **A**    On those periods listed on the letter it was 2008,

11:58:15   10  2009, 2010, 2011, and 2012.

11:58:20   11                   MR. BEAN:  Can we please go back to

11:58:22   12  Exhibit 200?

11:58:25   13         And can we please go. . . last time we were. . . can

11:58:37   14  we just go to Page 15?

11:58:46   15         And can you go to the next page, please?

11:58:51   16         Can you zoom in on that very top part?  The. . .

11:59:03   17  BY MR. BEAN:

11:59:03   18  **Q**    Sir, is there a -- is this the latter half of an entry

11:59:07   19  carried over from the previous page?

11:59:08   20  **A**    Yes, sir.

11:59:08   21  **Q**    All right.  And does it make reference to an OIC?

11:59:18   22  **A**    Yeah.  I believe there was conversation with

11:59:25   23  Mr. DiPietro.

11:59:25   24  **Q**    So did Mr. DiPietro bring up something called an OIC?

11:59:29   25  **A**    Yes.

**D. Ross  (Direct by Bean)**                    538

11:59:30   1   **Q**     What does an OIC stand for?

11:59:33   2   **A**     Offer in compromise.

11:59:35   3   **Q**     And what is an offer in compromise?

11:59:40   4   **A**     Offer in compromise would be where a taxpayer proposes

11:59:44   5   to pay less than the total amount due.  In other words, we

11:59:49   6   are settling the total tax bill for a lesser amount.

11:59:55   7              MR. BEAN:  Carissa, can we please go to

11:59:57   8   Exhibit 106?

12:00:02   9        And go to the next page, and the next page, please.

12:00:05  10        Sir, does --

12:00:05  11        And can you zoom in on the top section, the top few

12:00:08  12   entries?

          13   BY MR. BEAN:

12:00:11  14   **Q**     Sir, does this 2000 tax year account transcript for

12:00:16  15   Mr. Karasarides show that he filed a tax return for that tax

12:00:19  16   year?

12:00:21  17   **A**     Yes.

12:00:22  18   **Q**     And when -- does it provide a date for when he did

12:00:25  19   that?

12:00:26  20   **A**     Shows September 29th, 2014.

12:00:30  21   **Q**     And was your collections case ongoing at that time?

12:00:33  22   **A**     Yes, sir.

12:00:35  23              MR. BEAN:  Carissa, you can zoom out.

12:00:39  24   BY MR. BEAN:

12:00:40  25   **Q**     Now, are you familiar with these type of account

**D. Ross  (Direct by Bean)**                    539

12:00:42  1   transcripts just from working at the IRS?

12:00:45  2   **A**    Yes.

12:00:45  3   **Q**    And would this account transcript show if

12:00:48  4   Mr. Karasarides had made any payments on his tax debt for

12:00:53  5   tax year 2014?

12:00:55  6   **A**    Yeah, a transcript would reflect payments.

12:00:57  7   **Q**    Okay.  Does this transcript reflect that any payments

12:01:00  8   were made?

12:01:00  9   **A**    I do not see any.

12:01:02  10  **Q**    All right.

12:01:02  11               MR. BEAN:  Carissa, are there any other pages

12:01:05  12  on this?

12:01:08  13       There are no other pages.

12:01:11  14       Can we please pull up Exhibit 107 and go to Page 2?

12:01:17  15  BY MR. BEAN:

12:01:17  16  **Q**    Is this Mr. Karasarides' 2013 tax return?

12:01:20  17  **A**    Yes, sir.

12:01:22  18  **Q**    Have you reviewed this return prior to your testimony

12:01:26  19  today?

12:01:26  20  **A**    Yes, sir.

12:01:27  21  **Q**    I mean, in fact, is -- might you have reviewed this

12:01:31  22  return during your collections activity?

12:01:32  23  **A**    Yes, sir.

12:01:34  24  **Q**    Do you remember specifically if you did?

12:01:36  25  **A**    No, I do not.

**D. Ross (Direct by Bean)**                                    540

12:01:37  1  **Q**    But would it be normal course of action?

12:01:41  2  **A**    Normal course of business, right.

12:01:43  3  **Q**    Does this tax return show that Mr. Karasarides has any

12:01:46  4  income or ownership of a business called Skilled Shamrock?

12:01:49  5  **A**    No, sir.

12:01:50  6  **Q**    Does this tax return show that Mr. Karasarides has any

12:01:55  7  income or ownership of a business called Redemption?

12:01:56  8  **A**    No, sir.

12:01:57  9  **Q**    Does this tax return report that Mr. Karasarides had

12:02:00  10  income from businesses named Skilled Shamrock or Redemption?

12:02:05  11  **A**    No, sir.

12:02:05  12  **Q**    If Mr. Karasarides had income in 2013 that was not

12:02:09  13  reported on this tax return, would you have wanted to know

12:02:11  14  that?

12:02:12  15  **A**    Definitely.

12:02:20  16          MR. BEAN:  Can we please go to Exhibit 375?

12:02:26  17      Can you try --

12:02:27  18          THE COURT:  Mr. Bean, is this a good time to

12:02:28  19  stop you?

12:02:29  20          MR. BEAN:  That would be fine, Your Honor.

12:02:30  21          THE COURT:  Okay.

12:02:31  22      Folks, it's a little bit after noon.  We'll take our

12:02:34  23  noon recess at this time.

12:02:36  24      1:20 or thereabouts I think we'll call for you.

12:02:40  25      Am I giving you enough time at lunch?

**D. Ross  (Direct by Bean)**                    541

| | |
|---|---|
| 12:02:42 | 1 |

Okay.  Enjoy your lunch.

And we'll see you where, Morgan?  Where do we meet?

Oh, all right.  Just wanted to see if you were paying attention.

COURTROOM DEPUTY:  All rise.

(Jury excused from courtroom at 12:03 p.m.)

MR. GOLDBERG:  We objected during Mr. Ross' testimony when he started to relate to the jury what he read in a pleading in divorce court, and to the extent that -- to the extent that for -- that the matters asserted in that pleading are taken for the truth, then we object on a hearsay basis.

I understand that if he -- the information he received was used as part of his investigation and he acted on it, then there may be a reason for that to come into evidence, but I'd ask that the jury get an instruction limiting their use and consideration of that evidence.

THE COURT:  What would that instruction be?

MR. GOLDBERG:  Well, that you're -- that they're not to take the testimony from the witness as to what was in a court document that he read for the truth of what he said but, rather, how it guided his investigation.

THE COURT:  Well, Mr. Bean, what do you have to say about that?

MR. BEAN:  I don't have an objection to the

**D. Ross  (Direct by Bean)**                    542

12:04:44  1    substance of the jury instruction, just that we ensure that

12:04:48  2    it's very clear exactly what it refers to.  Because we've

12:04:52  3    shown a number of documents and he's testified about a --

12:04:55  4                THE COURT:  I think he was talking about the

12:04:57  5    affidavit and the spreadsheet.  Is that what you're talking

12:04:59  6    about?

12:05:00  7                MR. GOLDBERG:  No.  He testified as to a

12:05:01  8    document that I don't believe is coming into evidence that

12:05:06  9    was in the divorce court file that the -- Mr. Karasarides'

12:05:10  10   ex-wife's lawyer filed stating there were undisclosed assets

12:05:14  11   and there was some kind of fraud.

12:05:16  12               THE COURT:  I think wasn't that her affidavit

12:05:18  13   and a spreadsheet?

12:05:18  14               MR. GOLDBERG:  There was some kind of

12:05:19  15   spreadsheet that she found on a computer, correct, yes.

12:05:21  16               THE COURT:  Right.

12:05:23  17               MR. GOLDBERG:  Correct.

12:05:25  18      I mean, I feel like that has to be -- if it's taken

12:05:28  19   for the matter that's asserted, that is that he had all

12:05:32  20   these assets, then that's hearsay, it shouldn't come in.

12:05:35  21      If it guided Mr. Ross on his investigation, then it

12:05:38  22   can be taken for that.

12:05:39  23               THE COURT:  Okay.  Well, without -- I will let

12:05:42  24   him finish his direct examination.  You can cross-examine.

12:05:46  25   If you still think a modifying instruction is appropriate,

| | | |
|---|---|---|
| 12:05:49 | 1 | I'll take -- probably give it.  Okay? |
| 12:05:53 | 2 | MR. GOLDBERG:  Yep. |
| 12:07:35 | 3 | (Recess was taken at 12:07 p.m.) |
| 01:30:48 | 4 | COURTROOM DEPUTY:  All rise for the jury. |
| 01:31:14 | 5 | (Jury returned to courtroom at 1:30 p.m.) |
| 01:31:14 | 6 | COURTROOM DEPUTY:  Court is in session. |
| 01:31:15 | 7 | Please be seated. |
| 01:31:16 | 8 | THE COURT:  Good afternoon, ladies and |
| 01:31:17 | 9 | gentlemen. |
| 01:31:17 | 10 | THE JURY:  Good afternoon. |
| 01:31:18 | 11 | THE COURT:  Well, I've got good news and bad |
| 01:31:20 | 12 | news for you. |
| 01:31:21 | 13 | Good news is, I hear today is Morgan's birthday. |
| 01:31:26 | 14 | A JUROR:  That's right. |
| 01:31:29 | 15 | THE COURT:  The bad news is, I hope she |
| 01:31:32 | 16 | doesn't go out and celebrate too much tonight and we're |
| 01:31:35 | 17 | waiting for her tomorrow morning. |
| 01:31:37 | 18 | A JUROR:  You won't be.  I promise. |
| 01:31:38 | 19 | THE COURT:  Okay.  Well, then, maybe the snow. |
| 01:31:41 | 20 | We don't know. |
| 01:31:41 | 21 | A JUROR:  That's true. |
| 01:31:42 | 22 | THE COURT:  We're keeping our fingers crossed |
| 01:31:46 | 23 | about that. |
| 01:31:52 | 24 | (Off-record discussion.) |
| 01:31:57 | 25 | THE COURT:  All right.  You may continue. |

BY MR. BEAN:

**Q**    At some point during your collections case on Mr. Karasarides, was there a civil examination of Mr. Karasarides' wife?

**A**    I wouldn't characterize it as an examination.  In IRS lingo, examination is where somebody's auditing a return.

I did summons the wife of Mr. Karasarides for testimony.  I did do that.

**Q**    So were you ever involved in a civil examination of Ms. Bragg?

**A**    Again, in relation --

**Q**    Do you do civil examinations?

**A**    No audits, not audits of returns.

**Q**    So the answer is no?

**A**    Correct, no.

**Q**    In the course of interacting with Ms. Bragg, did you interact with anybody else?

**A**    You mean in reference to meeting at the Canton office?

**Q**    Whatever interactions you had with Ms. Bragg.

**A**    Yes, I did stop by the residence on Dunkeith and served her with a summons to appear in the Canton office several weeks later for oral testimony.

**Q**    And during that visit to the residence, did you run into anybody else?

**A**    Yes.

01:33:26  1   **Q**    Who?

01:33:28  2   **A**    Christos Karasarides, Jr.

01:33:30  3   **Q**    And did he speak to you?

01:33:32  4   **A**    Yes.

01:33:32  5   **Q**    What did he say?

01:33:34  6   **A**    Well, I identified myself, and he said, oh, I know who

01:33:39  7   you are.  You're the guy that's trying to take all my stuff.

01:33:42  8   And I told him I wasn't there to interview him or meet

01:33:46  9   regarding the case, I was just there to speak with his wife,

01:33:52  10  Melissa Bragg, to serve papers on her.

01:33:56  11  **Q**    And did you have any further discussions with

01:33:58  12  Mr. Karasarides?

01:33:59  13  **A**    Yes.

01:34:02  14       You know, we don't do an end-run and try and interview

01:34:06  15  a taxpayer who has an appointed representative, so I made it

01:34:12  16  clear that I wasn't there to discuss the case with him.  But

01:34:14  17  he did mention that he intended or he wanted to settle the

01:34:19  18  tax liability case with the IRS for 5 or $10,000 but his

01:34:24  19  representative wouldn't do it or we wouldn't do it.

01:34:27  20            MR. BEAN:  Carissa, could you please pull up

01:34:30  21  Exhibit 200, again, and go to Page 20?

01:34:37  22       And could you blow up the bottom, 4-14-2015 entry?

01:34:45  23  The bottom one, please.

01:34:51  24  BY MR. BEAN:

01:34:51  25  **Q**    Mr. Ross, at some point did you begin having

**D. Ross  (Direct by Bean)**  546

01:34:54  1   discussions internally about seizing the land contract on

01:35:01  2   Mr. Karasarides' residence?

01:35:02  3   **A**     Yes, I did.

01:35:03  4   **Q**     And were there some complications at least in your

01:35:06  5   mind regarding doing that that you wanted to work out?

01:35:08  6   **A**     Yeah.  First of all, you have the -- we have to

01:35:11  7   determine a value of any asset that we're intending to

01:35:15  8   seize.

01:35:16  9        The other issue is, in this case, you know, trying to

01:35:23  10  weigh the different -- weigh the balance, seizing the land

01:35:29  11  contract or waiting until the property is completely paid

01:35:33  12  for and it goes into Mr. Karasarides' name.  It could be a

01:35:41  13  difference in value.

01:35:42  14       If somebody were to purchase an interest in a land

01:35:46  15  contract, they'd probably be buying a lawsuit.  They'd

01:35:49  16  probably need to get the sheriff to evict the person out of

01:35:51  17  the residence of that property.

01:35:55  18  **Q**     And did you have internal discussions at the IRS to

01:35:58  19  get advice on how to proceed?

01:36:00  20  **A**     Yes.

01:36:02  21  **Q**     Now, moments ago you mentioned a conversation or --

01:36:09  22  you had with Mr. Karasarides at his house while serving a

01:36:11  23  summons on his wife.  During that conversation, did

01:36:14  24  Mr. Karasarides mention his neighbor at all?

01:36:16  25  **A**     Yes.

**D. Ross  (Direct by Bean)**                                        547

01:36:16   1    **Q**     What did he say about his neighbor?

01:36:18   2    **A**     What I recall is he said, you know, I know you've been

01:36:22   3    next door, and I took that to mean the owner of the real

01:36:29   4    property where Mr. Karasarides resided.  In other words, the

01:36:34   5    seller of the land contract.

01:36:38   6                    MR. BEAN:  Carissa, can we please pull up

01:36:41   7    Exhibit 206?

01:36:43   8         And can you flip through the pages briefly just so

01:36:46   9    Mr. Ross look at it.

01:36:49   10        And go back to Page 1, please.

01:36:51   11   BY MR. BEAN:

01:36:51   12   **Q**     Sir, what is this?

01:36:53   13   **A**     What you have is a fax copy from Richard Jusseaume,

01:37:02   14   who is the husband of Theresa.  And the Theresa Jusseaume

01:37:07   15   Trust is the party selling the residence via land contract

01:37:11   16   where Mr. Karasarides resided.

01:37:16   17   **Q**     And did you summon some information from the

01:37:20   18   Jusseaumes?

01:37:20   19   **A**     Yes.

01:37:21   20   **Q**     And did Mr. Richard Jusseaume respond to that summons?

01:37:24   21   **A**     Yes, via this fax.

01:37:25   22   **Q**     So is this his response, this exhibit?

01:37:27   23   **A**     Yes.

01:37:28   24   **Q**     All right.

01:37:29   25                    MR. BEAN:  Can we please go to Page 2.

**D. Ross  (Direct by Bean)**                    548

01:37:31  1         MR. GOLDBERG:  Objection.

01:37:31  2         THE COURT:  Overruled.

3    BY MR. BEAN:

01:37:34  4    **Q**    What is reported here?

01:37:37  5    **A**    The information on this fax indicated the balance due

01:37:43  6    on the land contract as of certain dates and the dates and

01:37:49  7    the amounts of recent payments from December 1st, 2015,

01:37:55  8    until the current date, September 21st, 2016.

01:38:01  9    **Q**    Now, in the -- in the course of your collections, did

01:38:06  10   you communicate to Mr. DiPietro your intent to seize or

01:38:11  11   foreclose on his residence, Mr. Karasarides' residence?

01:38:14  12   **A**    Yeah, at some point that was my focus, to put pressure

01:38:19  13   regarding this asset because I thought that was the biggest

01:38:22  14   leverage the IRS had.

01:38:25  15         MR. BEAN:  Carissa, can we please go to

01:38:28  16   Exhibit 200, Page 37?

01:38:33  17         And can we please blow up the bottom one, bottom

01:38:38  18   entry?

01:38:39  19   BY MR. BEAN:

01:38:41  20   **Q**    Did you have contact with Mr. DiPietro on July 1st,

01:38:45  21   2015?

01:38:45  22   **A**    Yes, sir.

01:38:46  23   **Q**    And can you just describe that contact, please?

01:38:49  24   **A**    I gave him the total balances on the tax liabilities

01:38:52  25   by each tax period.  He says he wants to address -- his

01:38:58  1   client wants to address the notice of federal tax lien on

01:39:01  2   the three inner city Canton properties.  He says an investor

01:39:04  3   wants to put 10,000 down and make payments basically to the

01:39:08  4   IRS to -- for them to be able to purchase those properties.

01:39:15  5   **Q**    And did you have any discussions with Mr. DiPietro

01:39:17  6   regarding the land contract at 2231 Dunkeith?

01:39:22  7   **A**    Yeah.  I told him, you know, that we may be seeking

01:39:26  8   approval to seize the land contract regarding the residence

01:39:30  9   and then the house on Meese Road and any other assets

01:39:33  10  located.

01:39:34  11              MR. BEAN:  Carissa, can we please pull up

01:39:36  12  Exhibit 108?

01:39:40  13      And go to Page. . .

01:39:42  14  BY MR. BEAN:

01:39:43  15  **Q**    Sir, is this Mr. Karasarides' tax year 2014 account

01:39:48  16  transcript?

01:39:48  17  **A**    Yes, sir.

01:39:49  18  **Q**    All right.

01:39:50  19              MR. BEAN:  Can we please go to the next page?

01:39:52  20  And can you blow up the top few entries, please?

01:39:54  21  BY MR. BEAN:

01:39:55  22  **Q**    Does this tax return show when Mr. Karasarides filed a

01:39:57  23  tax return for tax year 2014?

01:40:01  24  **A**    Yes, it does.

01:40:01  25  **Q**    And on what date did he do that?

**D. Ross (Direct by Bean)** 550

01:40:03 1 **A** September 21st, 2015.

01:40:07 2 **Q** And did he report owing tax?

01:40:09 3 **A** Yes.

01:40:10 4 **Q** How much tax did he report owing?

01:40:12 5 **A** The tax only was 135,583, and then there were

01:40:17 6 additions for late payment and interest.

01:40:22 7 **Q** Did he make a payment with his tax return when he

01:40:25 8 filed it?

01:40:25 9 **A** No, sir.

01:40:27 10 MR. BEAN: Carissa, can you please zoom out?

01:40:31 11 BY MR. BEAN:

01:40:32 12 **Q** Did he make any payments on his tax year 2014 --

01:40:36 13 **A** No, sir.

01:40:36 14 **Q** -- tax?

01:40:39 15 MR. BEAN: Can we please pull up Exhibit 109?

01:40:43 16 And go to Page 2, please.

01:40:46 17 BY MR. BEAN:

01:40:47 18 **Q** Now, have you reviewed Mr. Karasarides' 2014 tax

01:40:50 19 return prior to testifying today?

01:40:51 20 **A** Yes.

01:40:52 21 **Q** All right. And does this tax return report that

01:40:57 22 Mr. Karasarides has any ownership of or interest in a

01:41:00 23 business called Skilled Shamrock?

01:41:02 24 **A** No, sir.

01:41:02 25 **Q** How about -- same thing for a business called

**D. Ross  (Direct by Bean)**                    551

01:41:06    1    Redemption?

01:41:06    2    **A**    No, sir.

01:41:06    3    **Q**    How about -- does it report that he had any income

01:41:09    4    from either of those -- businesses with either of those

01:41:12    5    names?

01:41:12    6    **A**    No, sir.

01:41:12    7    **Q**    All right.

01:41:13    8            MR. BEAN:  Carissa, can we go down a few

01:41:15    9    pages, please?

01:41:20   10        Keep going.

01:41:24   11        I'll tell you to stop.

01:41:30   12        Right there.  Thank you.

01:41:32   13    BY MR. BEAN:

01:41:33   14    **Q**    Does Mr. Karasarides report significant profit from

01:41:38   15    professional gambling on this tax return?

01:41:41   16    **A**    Yes, sir.

01:41:41   17    **Q**    How much?

01:41:43   18    **A**    564,559.

01:41:46   19    **Q**    And did he take out some expenses from that?

01:41:49   20    **A**    Yes.

01:41:50   21    **Q**    And so after the expenses, how much -- how much did he

01:41:53   22    report in profits?

01:41:53   23    **A**    459,559.

01:41:58   24    **Q**    Why couldn't he pay over any of that money to the IRS?

01:42:01   25    Did Mr. DiPietro tell you?

**D. Ross  (Direct by Bean)**                                                552

01:42:02  1    **A**      No, he did not.

01:42:03  2    **Q**      Did anybody tell you?

01:42:05  3    **A**      No.

01:42:10  4    **Q**      Did you -- did you ever try to seize any of the money

01:42:14  5    reported here?

01:42:17  6    **A**      I wouldn't know how to do it.  I wouldn't know

01:42:19  7    where -- we have to know where the money is first.

01:42:23  8          I did go to the United States Secret Service.  There

01:42:27  9    was an agent there, Larry Henderhan, who was familiar with

01:42:33  10   Mr. Karasarides and -- because I thought about -- I

01:42:36  11   considered going to get a court order, a writ of entry to go

01:42:41  12   into Mr. Karasarides' house to search for cash and other

01:42:44  13   assets.  And I talked to the Secret Service agent, and he

01:42:48  14   said, Dave --

01:42:50  15                  MR. GOLDBERG:  Objection.

01:42:51  16                  THE COURT:  Overruled.

01:42:52  17       Go ahead.

01:42:53  18                  THE WITNESS:  Mr. Henderhan said, Dave, we've

01:42:56  19   made two raids on the house on Dunkeith where

01:43:00  20   Mr. Karasarides lives.  There's not going to be any -- a big

01:43:04  21   pile of money there.  He's not going to -- he's not going to

01:43:06  22   be leaving that kind of -- that money there, so. . .

01:43:11  23                  MR. BEAN:  Carissa, can we please pull up

01:43:14  24   Exhibit 352A, which the parties have stipulated is a call

01:43:21  25   involving Mr. Karasarides?

**D. Ross  (Direct by Bean)**                                    553

01:43:26  1      And can you please play that.

01:43:31  2              (Audio played.)

01:44:59  3              MR. BEAN:  So I'll note the parties have

01:45:00  4   stipulated that that call took place on September 5th, 2018.

01:45:03  5   BY MR. BEAN:

01:45:04  6   **Q**    Mr. Ross, does the IRS take cash?

01:45:06  7   **A**    Certainly.

01:45:07  8   **Q**    Are there procedures for accepting payments in cash?

01:45:10  9   **A**    Yes, there are.

01:45:12  10     Each person in the job series that I am in, revenue

01:45:15  11  officer, is issued what's called an 809 receipt book.  And

01:45:22  12  it's got 50 receipts per book.  And when you get to the end

01:45:26  13  of 50, then you tell them -- you put -- give them the cover

01:45:30  14  of the old book and then they give you a new one.

01:45:33  15     We don't issue cash receipts that often, but the

01:45:35  16  procedure is in place to issue cash receipts to the taxpayer

01:45:39  17  or any third party that wants to make a payment.

01:45:44  18     The most recent one I did was a state trooper out

01:45:49  19  toward Youngstown stopped a man, and he had, like, 5 or

01:45:55  20  $6,000 worth of cash on him.  And there was no state issue.

01:45:58  21  Somehow they found out that the guy had federal tax

01:46:01  22  problems, so they called the feds.  And then somebody got

01:46:04  23  ahold of me.  I took my buddy who was sitting in the next

01:46:09  24  cube over, I said, let's go get some cash.

01:46:11  25     So I went to the State Highway Patrol.  They provided

**D. Ross  (Direct by Bean)** 554

01:46:14  1  the cash.  I gave them a receipt of the amount that they

01:46:17  2  provided so they have a record of it.

01:46:21  3       And then I take it to the bank, get it converted into

01:46:24  4  a cashier's check and then turn it in for processing like I

01:46:28  5  would a regular check.

01:46:31  6  **Q**   Is any individual able to take cash to a bank and get

01:46:34  7  a cashier's check?

01:46:36  8  **A**   As far as I know.

01:46:37  9  **Q**   Have you ever done it?

01:46:38  10  **A**   Yes.

01:46:39  11  **Q**   Do you take cashier's checks?

01:46:41  12  **A**   Yes.

01:46:42  13  **Q**   Does the IRS, I mean.

01:46:44  14  **A**   Of course.

01:46:45  15       And the receipt book has -- for people under 40, it's

01:46:49  16  got a miraculous thing called carbon paper, and it makes

01:46:53  17  copies of the image that you write on for the second and

01:46:56  18  third copies.  Because, you know, if the taxpayer makes a

01:46:58  19  cash payment, we're definitely going to give them a receipt

01:47:02  20  so he has a record of it.

01:47:04  21  **Q**   At some point in November 2015, did you learn that

01:47:09  22  Mr. Karasarides had hired a new power of attorney?

01:47:11  23  **A**   Yes, I did.

01:47:13  24  **Q**   At that point, did you stop all communications with

01:47:17  25  Mr. DiPietro?

**D. Ross  (Direct by Bean)**                                              555

01:47:18  1   **A**     At that point, Mr. DiPietro would be classified as

01:47:23  2   the -- a third party, as anyone else would, that we could

01:47:27  3   contact for information, but that he's no longer

01:47:30  4   representing Mr. Karasarides.

01:47:34  5   **Q**     Who was Mr. Karasarides' new power of attorney?

01:47:37  6   **A**     It would have been a man, a tax attorney in Canton

01:47:39  7   named Matthew Yackshaw.

01:47:42  8   **Q**     Did Mr. Karasarides submit an offer in compromise?

01:47:45  9   **A**     Yes.

01:47:46  10                  MR. BEAN:  Can we please pull up Exhibit 177?

01:47:55  11  BY MR. BEAN:

01:47:56  12  **Q**     Sir, what is this?

01:47:57  13  **A**     It is a Form 656, which is the exact -- it's the form

01:48:03  14  that someone would use if they're proposing to settle their

01:48:06  15  tax liability for less than the full amount, offer in

01:48:10  16  compromise.

01:48:10  17  **Q**     And is there a taxpayer's name listed on this

01:48:13  18  document?

01:48:13  19  **A**     Yes, sir.

01:48:13  20  **Q**     Who?

01:48:14  21  **A**     Christos Karasarides, Jr.

01:48:18  22  **Q**     And is this document stamped as being received by the

01:48:20  23  IRS?

01:48:20  24  **A**     Yes.

01:48:21  25  **Q**     On what date?

**D. Ross  (Direct by Bean)**                                      556

01:48:22   1    **A**      July 14th, 2016.

01:48:25   2                   MR. BEAN:  And Carissa, could you please go to

01:48:27   3    the next page?

01:48:28   4         And the next one.

01:48:29   5         And the next one.

01:48:30   6         The next one.

01:48:31   7         And the next one.

           8    BY MR. BEAN:

01:48:33   9    **Q**      Does this document appear to be signed by the

01:48:35  10    taxpayer?

01:48:36  11    **A**      Yes.

01:48:37  12    **Q**      Does this document appear to be signed by the

01:48:41  13    taxpayer's paid preparer?

01:48:44  14    **A**      Yes.

01:48:44  15    **Q**      And who is that paid preparer?

01:48:46  16    **A**      Matthew Yackshaw.

01:48:47  17                   MR. BEAN:  All right.  Can we please go back

01:48:49  18    to the top?

          19    BY MR. BEAN:

01:48:50  20    **Q**      And I'm just going to ask you, could you kind of walk

01:48:52  21    us through this document, please, what we're looking at and

01:48:55  22    what's communicated on this document?

01:48:57  23    **A**      Well, the taxpayer is communicating the years -- the

01:49:04  24    tax years that they want to be settled, you know, that if we

01:49:11  25    accept a certain amount, that those will drop out never to

**D. Ross (Direct by Bean)** 557

01:49:14  1  be worked on again.  But we need financial information and

01:49:20  2  we need that form completed, along with a collection

01:49:23  3  information statement to at least start the process to --

01:49:27  4  for review.

01:49:29  5  **Q**    Did Mr. Karasarides list the name of his spouse on

01:49:32  6  this document?

01:49:35  7  **A**    No.

01:49:36  8  **Q**    What is -- what does it say there?

01:49:42  9  **A**    It says "not applicable" because the wife is not

01:49:45  10  liable; in other words, she was not liable for

01:49:48  11  Mr. Karasarides' taxes.

01:49:49  12  **Q**    Who determines who is liable for what taxes?

01:49:55  13  **A**    Depends on the --

01:49:56  14  **Q**    The taxpayer?

01:49:57  15  **A**    Yeah, the filing status that's submitted on the tax

01:50:00  16  return.  You check the block whether you're single, married,

01:50:02  17  married filing separate, head of household.

01:50:06  18          MR. BEAN:  Carissa, can we please go to

01:50:10  19  Page 2?

01:50:10  20          Is there -- do you see down at the bottom --

01:50:13  21          Can we blow up the bottom, please, section?

01:50:17  22  BY MR. BEAN:

01:50:18  23  **Q**    Do you see this section, sir?

01:50:21  24  **A**    Yes, sir.

01:50:22  25  **Q**    What's -- what -- what does a taxpayer put in this

**D. Ross  (Direct by Bean)**     558

01:50:26   1   section?

01:50:27   2   **A**     This section's called Explanation of Circumstances,

01:50:30   3   and -- well, just above that it says "Doubt as to

01:50:34   4   collectability," you know, I have insufficient assets and

01:50:38   5   income to pay the full amount.  And then below, it says

01:50:42   6   "explanation of circumstances," in other words, what's the

01:50:46   7   background on these tax liabilities.

01:50:48   8        It says, "During the years in which the tax

01:50:52   9   liabilities were accrued, Christos Karasarides, Jr., the

01:50:54   10  taxpayer, owned and operated a business which was extremely

01:50:59   11  profitable which generated the tax liabilities in issue.

01:51:02   12  The taxpayer failed to pay his taxes and accumulated an

01:51:06   13  overwhelming tax bill in excess of $2.5 million.

01:51:11   14       "Furthermore, the taxpayer was criminally prosecuted

01:51:15   15  and jailed and spent a substantial period of time

01:51:18   16  incarcerated.  Since he paid his debt to society through his

01:51:22   17  incarceration, and after he had been discharged from prison,

01:51:26   18  he was able to secure. . ."

01:51:28   19       And then it goes on to the next page.

01:51:30   20            MR. BEAN:  Carissa, can we go to the last

01:51:31   21  page, please?

01:51:37   22       The last page, please.

01:51:42   23       Nope.  One more, please.

01:51:46   24       And can you -- well, it's kind of the full page.

01:51:48   25  BY MR. BEAN:

**D. Ross  (Direct by Bean)** 559

01:51:49  1   **Q**     Is this a continuation of that statement?

01:51:51  2   **A**     It says, "Continuation of explanation of

01:51:54  3   circumstances."

01:51:54  4   **Q**     And can you just finish that paragraph, please.

01:51:57  5   **A**     Sure.

01:51:58  6         ." . .he has a modest wage-earning job with Enterprise

01:52:05  7   Internet Solutions, Incorporated.  Unfortunately, the job

01:52:07  8   only pays him enough money for him to meet his normal living

01:52:12  9   expenses.  It does not provide him with any additional money

01:52:15  10  to pay the substantial federal tax liabilities which accrued

01:52:18  11  against him while he was in business for himself.

01:52:21  12        "It is highly unlikely that the taxpayer will ever be

01:52:24  13  able to make more money or accumulate any more assets other

01:52:27  14  than what he has accumulated to date."

01:52:30  15  **Q**     And Mr. Ross, I apologize, you've done a lot of

01:52:33  16  reading.  I'm going to ask you to do a little bit more.

01:52:35  17        Can you read the first sentence of the next paragraph?

01:52:37  18  **A**     Yes.

01:52:38  19        It says, "In contrast to his pre-incarceration

01:52:41  20  situation, the taxpayer has now been currently compliant in

01:52:45  21  both his tax filings and payments for more than one year."

01:52:49  22  **Q**     And then can you please read the first sentence of the

01:52:52  23  next paragraph.

01:52:53  24  **A**     Yes.

01:52:54  25        "In order to fund the offer in compromise, the

**D. Ross  (Direct by Bean)**                                    560

01:52:57   1    taxpayer will use all of his available cash and try to

01:53:00   2    either sell or borrow against the equity in his real

01:53:04   3    estate."

01:53:04   4    **Q**    Thank you.

01:53:04   5          Were these statements, were those consistent with the

01:53:08   6    representations that were made to you by Mr. Karasarides

01:53:12   7    during the collections by his various representatives?

01:53:15   8    **A**    No.

01:53:16   9    **Q**    How is it inconsistent?

01:53:18   10   **A**    Well, even with the offer in compromise that

01:53:21   11   accompanied this -- I mean, this document, they're stating

01:53:28   12   that the taxpayer had no equity in either pieces of the real

01:53:34   13   estate, the one on Dunkeith where Mr. Karasarides resides or

01:53:38   14   the property on Meese Road.

01:53:42   15             MR. BEAN:  Carissa, can we please zoom out and

01:53:46   16   go back to I think it's Page 3.

01:53:50   17        All right.  Thank you.

01:53:51   18   BY MR. BEAN:

01:53:53   19   **Q**    How much does Mr. Karasarides propose to pay?

01:53:57   20   **A**    Total amount of offer is 72,254.

01:54:01   21   **Q**    All right.  And at this time, approximately how much

01:54:03   22   did he owe?

01:54:05   23   **A**    I think the offer said about 2.5 million.

01:54:09   24   **Q**    All right.  We can -- would you agree with me that's

01:54:13   25   about -- an offer of about 3 percent?

**D. Ross (Direct by Bean)** 561

01:54:16 1 **A** Don't make me do computations without a calculator.

01:54:20 2 **Q** All right.

01:54:20 3 **A** I trust your numbers.

01:54:22 4 MR. BEAN: Carissa, can we please go to the

01:54:24 5 next page.

01:54:25 6 And can you blow up the top section?

01:54:30 7 BY MR. BEAN:

01:54:30 8 **Q** How did Mr. Karasarides say he was going to fund this

01:54:33 9 offer?

01:54:33 10 **A** Oh, he's saying from -- the source of funds would be

01:54:40 11 sale of one or more properties or borrowing against the

01:54:43 12 equity of the inner city Canton properties.

01:54:47 13 MR. BEAN: All right. Carissa, can we zoom

01:54:51 14 out and go to the second to the last page?

01:54:58 15 And this -- I'll note this is Page 6.

01:55:00 16 Can you just blow up the section where there's a

01:55:02 17 signature -- the signature section?

01:55:10 18 BY MR. BEAN:

01:55:10 19 **Q** Sir, can you please read this bold section right here

01:55:14 20 (indicating)?

01:55:14 21 **A** Yes. It's top of Page 6. It says, "Section 8. Under

01:55:18 22 penalties of perjury, I declare that I have examined this

01:55:21 23 offer, including accompanying schedules and statements, and

01:55:24 24 to the best of my knowledge and belief it is true, correct,

01:55:28 25 and complete."

**D. Ross  (Direct by Bean)**                                    562

01:55:31  1          MR. BEAN:  Carissa, can we please pull up

01:55:35  2   Exhibit 176?

01:55:37  3   BY MR. BEAN:

01:55:38  4   **Q**     Mr. Ross, what is this?

01:55:41  5   **A**     This is a Form 433-A (OIC).  It's a collection

01:55:48  6   information statement for wage earners or self-employed

01:55:51  7   people when they're submitting an offer in compromise.  This

01:55:54  8   goes with the Form 656.  It's an attachment.

01:55:58  9   **Q**     And who is the taxpayer listed on this form?

01:56:03  10  **A**     It's Christos Karasarides, Jr.

01:56:05  11  **Q**     And is this form stamped as having been received by

01:56:08  12  the IRS?

01:56:08  13  **A**     Yes.

01:56:10  14  **Q**     On?

01:56:11  15  **A**     July 14th, 2016.

01:56:13  16  **Q**     Thank you.

01:56:14  17          Sir, can you please walk us through this document and

01:56:18  18  what we're seeing here, as you have done with some others?

01:56:22  19  **A**     Well, it -- it's basically looking at a financial --

01:56:28  20  total financial picture of someone who's trying to settle

01:56:36  21  their tax debt for less than the full amount.

01:56:39  22          And then again, in Section 1 it starts with taxpayer's

01:56:44  23  name, address, phone number, information about relatives.

01:56:50  24          Section 2 is employment information, if you work for

01:56:55  25  wages.

**D. Ross (Direct by Bean)** 563

**Q** So, who does he report as his employer?

**A** The -- the employer is Enterprise Internet Solutions, Incorporated.

**Q** And does he report any employment information regarding his wife?

**A** Yes.

**Q** What information?

**A** He indicates that his wife is self-employed at MJB Connection in Canton, Ohio.

**Q** And what's -- what's her -- does it list -- is she the owner of MJB Connection per this document?

**A** It says she is self-employed at MJB and she's a sole proprietor.

MR. BEAN: Can we -- we can zoom out.

And can we please go to the next page.

BY MR. BEAN:

**Q** What's reported on this -- this page of the document?

**A** Personal asset information.

At the top you have cash and investments. We're looking for -- if you have brokerage accounts, bank accounts, savings, certificates of deposits, things like that.

**Q** And how much cash on hand does he report?

MR. BEAN: And can we just blow up this section, please (indicating)?

01:58:08  1          THE WITNESS:  He's listing $70,000 as cash on

01:58:11  2   hand.

01:58:11  3   BY MR. BEAN:

01:58:11  4   **Q**    And on this -- on this whole page of the document,

01:58:14  5   does he report any other asset information other than these

01:58:20  6   two bank accounts and that $70,000 cash on hand?

01:58:24  7   **A**    I don't believe so, but I can't see the entire

01:58:26  8   statement.

01:58:27  9          MR. BEAN:  Can we zoom out, please?

01:58:31  10          THE WITNESS:  On that page there are no other

01:58:33  11   assets listed.

01:58:34  12          MR. BEAN:  All right.  Can we please go to the

01:58:49  13   next page?

01:58:51  14   BY MR. BEAN:

01:58:52  15   **Q**    And sir, what's reported on this page, which I'll note

01:58:54  16   for the record is Page 3 of Exhibit 176?

01:58:59  17   **A**    On Page 3, the top section is talking about what

01:59:06  18   assets you have specifically on real estate.

01:59:10  19   **Q**    What assets does he report on real estate?

01:59:15  20   **A**    He's listing the -- the Canton rental property,

01:59:23  21   Canton, Ohio, rental properties.

01:59:24  22   **Q**    And what about any vehicles, does he list any of

01:59:27  23   those?

01:59:27  24   **A**    Yes.

01:59:29  25   **Q**    What does he report?

01:59:31    1    **A**    He list the Mercedes-Benz S Class 2012.

01:59:35    2    **Q**    And does he report any other assets on this page?

01:59:39    3    **A**    No, sir.

01:59:40    4             MR. BEAN:  Can we please go to the next page?

02:00:50    5         Are we able to switch to the overhead?

02:00:53    6             MR. HOWELL:  Steve's not here.

02:00:54    7             THE COURT:  What did you want?

02:00:56    8             MR. BEAN:  To switch the display to the ELMO.

02:01:00    9             THE COURT:  Well, let's see if we can do that.

02:01:03   10             MR. BEAN:  Thank you, Your Honor.

02:01:06   11             THE COURT:  How's that?

02:01:07   12             MR. BEAN:  Thank you.

02:01:14   13         I'll note for the record we're looking at Page 4 now

02:01:16   14    of Exhibit 176.

02:01:21   15    BY MR. BEAN:

02:01:22   16    **Q**    Sir, are there assets reported on this page of the

02:01:25   17    document?

02:01:26   18    **A**    Yes.  And continuing on the section for personal

02:01:29   19    asset, Mr. Karasarides is listing a Rolex watch valued at

02:01:35   20    $7,500 and some silver and silver coin valued at $4,935.

02:01:46   21    **Q**    In the next section does he again list MJB Connection

02:01:50   22    in relation to his wife?

02:01:51   23    **A**    Yes.

02:01:52   24    **Q**    Does he list that his wife has any other assets or

02:01:56   25    associations with any other businesses?

**D. Ross (Direct by Bean)** 566

02:02:04  1   **A**    I don't see so.

02:02:06  2   **Q**    And in the last section on this page, Section 5,

02:02:10  3   what's the name of this section?

02:02:12  4   **A**    Section 5 is Business Asset Information For

02:02:17  5   Self-Employed Individuals.

02:02:17  6   **Q**    And does he list any assets there?

02:02:22  7   **A**    Yes, a business bank account.

02:02:25  8   **Q**    And does he provide any details of --

02:02:27  9   **A**    No, he says he doesn't know the account number nor the

02:02:31  10  current balance.

02:02:32  11  **Q**    During your collections case, were you aware of

02:02:35  12  Mr. Karasarides having interest in bank accounts at Chase

02:02:39  13  Bank or PNC Bank?

02:02:43  14  **A**    I don't recall which bank that I knew about.  I mean,

02:02:46  15  I sent levies to several entities.  I don't know if it was

02:02:52  16  one of these or not.

02:02:53  17  **Q**    When you say you sent levies to several entities, did

02:02:57  18  those levies include banks?

02:02:58  19  **A**    Yes.

02:03:01  20       It would be in the ICS history.

02:03:05  21            MR. BEAN:  I note we're looking at Page 5 of

02:03:06  22  this -- of Exhibit 176.

02:03:09  23  BY MR. BEAN:

02:03:09  24  **Q**    And, sir, what -- what asset's listed here?

02:03:13  25  **A**    Business equipment.

**D. Ross  (Direct by Bean)**                              567

02:03:14  1   **Q**    All right.  Are there any other assets listed there?

02:03:17  2   **A**    No.

02:03:18  3   **Q**    All right.  And does he list any other assets on this

02:03:22  4   page of the document?

02:03:24  5   **A**    No.

02:03:33  6   **Q**    On this document does he report what his monthly

02:03:42  7   household income is?

02:03:43  8   **A**    Yes.

02:03:43  9   **Q**    How much?

02:03:44  10  **A**    Well, it's got net rental income of 1,116 and then

02:03:48  11  wages of 4,333.33, for a total of 5,655.33.

02:03:55  12  **Q**    And I know you asked me not to do any math, but what

02:03:59  13  does that come out to across the year, if you don't mind?

02:04:04  14  **A**    12 times 5,000 --

02:04:07  15  **Q**    A little over 60,000?

02:04:11  16  **A**    Right.  Right.

02:04:12  17  **Q**    And does he also list expenses?

02:04:15  18  **A**    Yes.

02:04:16  19  **Q**    And does he list current monthly taxes on this?

02:04:24  20  **A**    Yes.

02:04:25  21  **Q**    So per this document, does he report to you that he's

02:04:29  22  paying some taxes?

02:04:30  23  **A**    Yes.

02:04:30  24  **Q**    Okay.  Does he report any other assets on -- well, I

02:04:44  25  realize we're too zoomed in.

**D. Ross  (Direct by Bean)**

02:04:46  1    Any other assets on this page of the document?

02:04:49  2  **A**    No, sir.

02:04:49  3  **Q**    All right.  Does he reference the criminal cases that

02:04:57  4  Mr. DiPietro told you about?

02:04:58  5  **A**    Yes, in Section 9.

02:05:00  6  **Q**    All right.

02:05:02  7             MR. BEAN:  Now I'll note we're on the eighth

02:05:05  8  page of this exhibit.

02:05:06  9  BY MR. BEAN:

02:05:06  10  **Q**    Does this appear that the taxpayer signed this

02:05:08  11  document?

02:05:08  12  **A**    Yes.

02:05:09  13  **Q**    On what date?

02:05:11  14  **A**    June 19th, 2016.

02:05:13  15  **Q**    All right.

02:05:16  16             MR. BEAN:  And I'll note this is Page 9 of the

02:05:19  17  document and the last page.

02:05:20  18  BY MR. BEAN:

02:05:20  19  **Q**    What's reported here?

02:05:23  20  **A**    This is a supplemental page for personal asset

02:05:28  21  information in real estate.

02:05:31  22  **Q**    And does he report additional real estate on this

02:05:34  23  page?

02:05:34  24  **A**    Yes.

02:05:34  25  **Q**    All right.  And are any of these the -- his residence?

02:05:38  1    **A**    Yes.

02:05:39  2    **Q**    And what does he list as his interest in that

02:05:44  3    residence?

02:05:54  4    **A**    He lists that there's equity to consider for this

02:06:03  5    property.

02:06:03  6    **Q**    And did that match the work you had done?

02:06:05  7    **A**    No, it did not.

02:06:05  8    **Q**    Do you recall approximately how much equity you had

02:06:09  9    determined or believed he had in the property around this

02:06:11  10   time in July --

02:06:12  11   **A**    Around this time, the value of the property was around

02:06:16  12   $450,000.  And the last information that I had received from

02:06:23  13   Theresa Jusseaume, the seller on the land contract, was that

02:06:27  14   he owed 130,000 remaining.  But just about two months after

02:06:40  15   this was filed was when I received the fax from Richard

02:06:44  16   Jusseaume showing that, you know, the total balance due was

02:06:46  17   around, I don't know, 68, 69,000, well over under a hundred

02:06:50  18   thousand.  But I was going on the basis that it was still

02:06:53  19   around 130,000 was owed, so. . .

02:06:56  20   **Q**    Now, in anywhere in this document does Mr. Karasarides

02:06:59  21   report that he has an ownership interest in or income from

02:07:04  22   skilled games businesses?

02:07:05  23   **A**    No, sir.

02:07:06  24   **Q**    How about gambling businesses?

02:07:07  25   **A**    No, sir.

02:07:08  1    **Q**    How about a business called Skilled Shamrock?

02:07:10  2    **A**    No, sir.

02:07:11  3    **Q**    How about a business called Redemption?

02:07:13  4    **A**    No, sir.

02:07:13  5    **Q**    Okay.  In the course -- as the revenue officer

02:07:18  6    assigned to Mr. Karasarides' collection case, did you

02:07:22  7    receive Mr. Karasarides' offer in compromise and his

02:07:24  8    accompanying 433-A?

02:07:26  9    **A**    It did not come to me directly.

02:07:30  10   **Q**    But did it eventually make its way to you?

02:07:32  11   **A**    It was submitted to our New York office -- our New

02:07:39  12   York office that processes offers.  They saw that the case

02:07:41  13   was in field collection status, meaning a revenue officer

02:07:44  14   was assigned to it, so they contacted me.  And the normal

02:07:53  15   procedure is for when an offer in compromise is received

02:07:57  16   in -- at our campus, that the campus wants the revenue

02:08:02  17   officer, namely the boots on the ground, input as to whether

02:08:06  18   this offer is feasible, whether it's reasonable, or whether

02:08:11  19   it's way off base.

02:08:16  20   **Q**    When -- when a taxpayer submits an offer in

02:08:21  21   compromise, are they required to make a down payment?

02:08:23  22   **A**    Yes.

02:08:24  23   **Q**    What's the amount of the down payment?

02:08:26  24   **A**    20 percent.

02:08:27  25   **Q**    Of what?

02:08:28  1  **A**     Of the amount being offered.

02:08:31  2           MR. BEAN:  Your Honor, could we please switch

02:08:33  3  back to the computer?

02:08:36  4           THE COURT:  Well, is it the front or rear, do

02:08:39  5  we know?

02:08:40  6           MR. BEAN:  I don't -- I think probably the

02:08:42  7  other one.

02:08:45  8      I think this one.

02:08:46  9      Carissa --

02:08:47  10     Thank you, Your Honor.

02:08:47  11     Could we please pull up Exhibit 223?  Which the

02:08:52  12 parties have stipulated is an authentic business record.

02:08:58  13     Sir, what is --

02:08:59  14     And can we blow up the check?

          15 BY MR. BEAN:

02:09:04  16 **Q**     Sir, what does this appear to be?

02:09:07  17 **A**     It's a check, Number 200, drawn on Chase Bank on the

02:09:13  18 account of Christopher Karasarides.

02:09:19  19 **Q**     And can I direct your attention to the memo line,

02:09:21  20 please, and ask you to read what's in the memo line?

02:09:23  21 **A**     Yeah, the memo line is, "IRS OIC offer in compromise

02:09:29  22 application fee for Christos Karasarides, Jr."

02:09:33  23 **Q**     And is there a fee associated with filing an offer in

02:09:36  24 compromise?

02:09:36  25 **A**     Yes.

**D. Ross  (Direct by Bean)**                                    572

02:09:37   1          MR. BEAN:  All right.  Carissa, can we please

02:09:38   2   go to the next Page 2 of the exhibit?

02:09:42   3          And can we blow up that one, please?

02:09:44   4   BY MR. BEAN:

02:09:45   5   **Q**     Sir, I'm just going to ask you to do the same thing

02:09:48   6   for this one.

02:09:50   7   **A**     Yeah.  It's check Number 201 drawn on the account of

02:09:55   8   Christopher A. Karasarides, payable to the United States

02:10:00   9   Treasury.  The 20 percent down payment on the Internal

02:10:03  10   Revenue offer in compromise.  The amount is 14,451.

02:10:10  11   **Q**     Thank you.

02:10:10  12          Was Mr. Karasarides' offer in compromise accepted?

02:10:13  13   **A**     No, sir.

02:10:14  14   **Q**     Was it returned?

02:10:15  15   **A**     Yes.

02:10:15  16          MR. BEAN:  Can we please pull up Exhibit 207?

02:10:20  17          And can we blow up the text portion?  The whole text

02:10:26  18   portion, from the. . .

02:10:30  19          Thank you.

02:10:36  20   BY MR. BEAN:

02:10:36  21   **Q**     Sir, what is this?

02:10:38  22   **A**     This is a letter from our Holtsville, New York, office

02:10:44  23   that received the offer in compromise from Mr. Karasarides

02:10:49  24   originally.  And they're giving him a letter, a status

02:10:52  25   update, a response to the offer that was filed.

**D. Ross  (Direct by Bean)**                                    573

02:10:54  1    **Q**    And who -- who was this letter sent to?

02:10:58  2    **A**    It was sent to Christos Karasarides, Jr.

02:11:01  3    **Q**    And what's the date on this letter?

02:11:03  4    **A**    August 5th, 2016.

02:11:05  5    **Q**    And can you please read the first two paragraphs?

02:11:10  6    **A**    It says, "Dear Mr. Karasarides:

02:11:12  7          "We have closed our file on your offer and are

02:11:16  8    returning your Form 656 offer in compromise for the

02:11:19  9    following reasons:

02:11:20  10         "We have determined that your offer was submitted

02:11:23  11   solely to hinder or delay our collection actions which are

02:11:26  12   expected to collect significantly more than the amount you

02:11:29  13   have offered."

02:11:31  14   **Q**    Now, Mr. Ross, are you responsible for this letter

02:11:34  15   being sent to Mr. Karasarides?

02:11:35  16   **A**    Yes, I am.

02:11:37  17   **Q**    And is this a true and accurate representation of the

02:11:41  18   letter that was sent to Mr. Karasarides?

02:11:42  19   **A**    Yes.

02:11:43  20   **Q**    Why did you determine that the offer was submitted

02:11:47  21   solely to hinder or delay collection?

02:11:50  22   **A**    In my review of the application, I felt that the

02:11:58  23   taxpayer's ability to pay these taxes is way more than the

02:12:03  24   amount being offered.  It's not even -- not even close to

02:12:07  25   the 72,000 or whatever it was being offered.

**D. Ross  (Direct by Bean)**                                    574

| | |
|---|---|
| 02:12:12 | 1 |

**Q**    So, is it fair to say that you did not believe that this was in any way realistic?

**A**    That's correct.

**Q**    To the extent --

**A**    It was not realistic.

**Q**    To the extent that it did not justify any additional consideration?

**A**    Correct.

There was no consideration or listing of the equity in the two major real properties, namely the residence being purchased on land contract and the property on Meese Road.

**Q**    Now, as a revenue officer assigned to the collections case, do you have the authority to make such a determination?

**A**    Not unilaterally.

**Q**    Who else is involved?

**A**    I have to secure the approval of my group manager.

**Q**    And did you do that here?

**A**    Yes I did.

**Q**    Now, did Mr. Yackshaw object to your determination?

**A**    Vigorously.

**Q**    What did he do?

**A**    He -- he asked to speak to my manager and myself.  I was also on the call, I believe, because I was most familiar with the case.  I got to my manager, and I said, this offer

**D. Ross  (Direct by Bean)**                           575

02:13:15  1    in compromise is filed in New York.  And I believe, based on

02:13:19  2    the information, the taxpayer has way more ability to pay

02:13:23  3    these taxes than is being listed.

02:13:26  4         Now, I could have -- I could have told New York,

02:13:30  5    without my manager's approval, oh, go ahead, process the

02:13:34  6    offer and review it and see if it works, and that would get

02:13:38  7    the case off of my desk.  But I did not think it was

02:13:40  8    appropriate in this case because I knew that Mr. Karasarides

02:13:43  9    could pay way more than the amount being offered.

02:13:48  10   **Q**    After the offer in compromise was returned, what was

02:13:52  11   your plan of action for proceeding?

02:13:54  12   **A**    I was putting pressure on Mr. Karasarides in

02:13:58  13   relationship to the land contract, the house that was being

02:14:04  14   purchased.

02:14:06  15   **Q**    Did you summons any bank accounts associated with his

02:14:09  16   son, Christopher?

02:14:11  17   **A**    I believe so.  I'm not sure.

02:14:13  18   **Q**    Why -- why -- if you did do that, why would you do

02:14:17  19   that?

02:14:17  20              MR. KERSEY:  Objection.

02:14:19  21              THE COURT:  Overruled.

02:14:22  22              THE WITNESS:  I believe the information I had

02:14:26  23   secured from the Jusseaumes regarding the payments on the

02:14:34  24   land contract, I believe that's how I determined how

02:14:38  25   payments were being made.

D. Ross (Direct by Bean)                                    576

02:14:40  1          In addition, you mentioned a summons of Ms. Bragg,

02:14:46  2   Mr. Karasarides' wife.  That was done in -- the summons was

02:14:50  3   issued in April of 2014 and. . . no.  Maybe -- it was either

02:15:03  4   2014 or 2015.

02:15:05  5          Anyhow, during the interview with Ms. Bragg, she

02:15:09  6   indicated that funds were being sent to --

02:15:14  7                    MR. GOLDBERG:  Objection.

02:15:15  8                    THE COURT:  Overruled.

02:15:16  9                    THE WITNESS:  -- Christopher Karasarides Jr.

02:15:20 10   to make the payments on the house.

02:15:24 11                    MR. BEAN:  Carissa, can we please pull up

02:15:26 12   Exhibit 110?

02:15:30 13          And can we go to the next page?

02:15:32 14   BY MR. BEAN:

02:15:33 15   Q     Is this Mr. Karasarides' 2015 account transcript?

02:15:36 16   A     Yes.

02:15:37 17                    MR. BEAN:  And can we please go Page 3?

02:15:43 18          And can we blow that part up?

02:15:48 19   BY MR. BEAN:

02:15:48 20   Q     Did Mr. Karasarides file a 2015 tax year tax return?

02:15:53 21   A     Yes.

02:15:54 22   Q     And when did that happen?

02:15:57 23   A     February 29th, 2016.

02:16:01 24                    MR. BEAN:  And can we please go to

02:16:04 25   Exhibit 111?

**D. Ross  (Direct by Bean)** 577

02:16:11  1    And the next page, please.

02:16:14  2  BY MR. BEAN:

02:16:15  3  **Q**    Is this Mr. Karasarides' 2015 tax return?

02:16:17  4  **A**    Yes.

02:16:18  5            MR. BEAN:  And can we go to the next page?  I

02:16:21  6  think it's two pages, probably.

02:16:23  7       One more, please, Page 5.

02:16:26  8       Is there -- can you blow up the portion of the

02:16:28  9  exhibit?

10  BY MR. BEAN:

02:16:30  11  **Q**    Is there a paid preparer listed there?

02:16:33  12  **A**    Yes.

02:16:34  13  **Q**    Who is that?

02:16:36  14  **A**    Ron DiPietro of Ron & Associates of Canton, Ohio.

02:16:39  15  **Q**    Have you reviewed this tax return prior to your

02:16:41  16  testimony?

02:16:42  17  **A**    Yes.

02:16:42  18  **Q**    And was this tax return filed while your collections

02:16:46  19  case was ongoing?

02:16:47  20  **A**    Yes.

02:16:49  21  **Q**    Anywhere in this tax return, did Mr. Karasarides

02:16:52  22  report an interest in or income from a business called

02:16:55  23  Skilled Shamrock?

02:16:55  24  **A**    No, sir.

02:16:56  25  **Q**    Same question but for a business called Redemption?

**D. Ross  (Direct by Bean)**                    578

| | |
|---|---|
| 02:16:58 | 1 |

**A**     No, sir.

02:17:00     2         MR. BEAN:  Can we please pull up Exhibit 112?

02:17:05     3     And go to the next page.

02:17:07     4   BY MR. BEAN:

02:17:07     5   **Q**     Is this an account transcript for Mr. Karasarides for

02:17:09     6   tax year 2016?

02:17:11     7   **A**     Yes, sir.

02:17:12     8         MR. BEAN:  And can we please go to Page 3?

02:17:15     9     And can we please blow that up?

02:17:18    10   BY MR. BEAN:

02:17:18    11   **Q**     Does this show that Mr. Karasarides filed a 2016 tax

02:17:23    12   return?

02:17:23    13   **A**     Yes.

02:17:23    14   **Q**     And when was that filed?

02:17:24    15   **A**     April 17th of 2017.

02:17:27    16   **Q**     Is that after the offer in compromise was submitted?

02:17:31    17   **A**     Yes.

02:17:33    18         MR. BEAN:  Can we please go to Exhibit 113?

02:17:41    19   BY MR. BEAN:

02:17:43    20   **Q**     Is this Mr. Karasarides' 2016 tax return?

02:17:45    21   **A**     Yes, sir.

02:17:45    22   **Q**     What's his filing status on this return?

02:17:48    23   **A**     It's listed as single, block number 1.

02:17:51    24   **Q**     Now, the parties have stipulated that Mr. Karasarides

02:17:54    25   and Melissa Bragg were married in May of 2014.

**D. Ross  (Direct by Bean)**                                    579

02:17:59   1      Can a taxpayer file single if they are, in fact,

02:18:03   2    married?

02:18:03   3    **A**    No.  They're not supposed to.

02:18:05   4    **Q**    Are there other filing statuses they can use if they

02:18:09   5    want to file separately but they are married?

02:18:12   6    **A**    Yeah, that would be block number 3, married filing

02:18:15   7    separately, which is a higher tax rate than single.

02:18:19   8            MR. BEAN:  And can we please go to Page -- I

02:18:21   9    believe it's Page 4.  It's one more page, it's Page 5.  And

02:18:30   10   can we blow that up.

02:18:30   11   BY MR. BEAN:

02:18:31   12   **Q**    Who is the paid preparer listed on this return?

02:18:34   13   **A**    Ron DiPietro of Ron & Associates, Canton, Ohio.

02:18:38   14   **Q**    Now, have you had the opportunity to review this

02:18:40   15   return prior to your testimony?

02:18:41   16   **A**    Yes.

02:18:42   17   **Q**    And is there anywhere on this return where

02:18:45   18   Mr. Karasarides reports income from or an interest in a

02:18:47   19   business called Skilled Shamrock?

02:18:48   20   **A**    No, sir.

02:18:49   21   **Q**    And the same question for a business called

02:18:52   22   Redemption?

02:18:52   23   **A**    No, sir.

02:18:54   24   **Q**    During your collections case, if you had learned that

02:18:57   25   Mr. Karasarides had income from or an ownership interest in

02:19:00  1    a business, what would you have done?

02:19:02  2    **A**    Well, you consider that in his ability to pay and

02:19:05  3    consider possible seizure of assets.

02:19:09  4    **Q**    Now, earlier, sir, I asked you questions about why you

02:19:13  5    referred the case for criminal further.  And in your answer

02:19:18  6    you referenced some -- some court documents you discovered

02:19:23  7    that were filed by Mr. Karasarides.

02:19:26  8         Do you recall that?

02:19:26  9    **A**    Yes, sir.

02:19:28  10   **Q**    And you recount how your review of those court

02:19:31  11   documents referenced that Mr. Karasarides had significant

02:19:33  12   income, I think you might have even mentioned a million

02:19:37  13   dollars, over a few weeks.

02:19:38  14        Do you recall that?

02:19:38  15   **A**    Yes, sir.

02:19:39  16   **Q**    Now --

02:19:40  17                    MR. GOLDBERG:  Objection.

02:19:40  18                    THE COURT:  Overruled.

02:19:42  19   BY MR. BEAN:

02:19:43  20   **Q**    Do you know that those documents -- the statements in

02:19:45  21   those documents to be true?  Do you have firsthand knowledge

02:19:47  22   of that?

02:19:48  23   **A**    I don't have firsthand knowledge; I'm just going on

02:19:51  24   what was in the file.

02:19:52  25   **Q**    And did that impact the decisions you made regarding

02:19:55   1    how to proceed?

02:19:57   2    **A**    Yeah, it shows he has much -- extensive income, way

02:20:01   3    more than is being reported.

02:20:02   4    **Q**    Well, that's how it impacted your decision looking at

02:20:05   5    those documents?

02:20:06   6    **A**    Yes.

02:20:06   7    **Q**    All right.

02:20:07   8                 MR. BEAN:  Nothing further, Your Honor.

02:20:09   9                 THE COURT:  Okay.  Mr. Fedor, do you want to

02:20:12  10    go first or Mr. Goldberg?

02:20:14  11                 MR. FEDOR:  I think I'd like to go first,

02:20:16  12    Judge.

02:20:16  13                 THE COURT:  Okay.

02:20:17  14                 MR. FEDOR:  Thank you.

02:20:40  15        Good afternoon, again, ladies and gentlemen.

          16                        - - - - -

          17                  CROSS-EXAMINATION OF DAVID ROSS

02:20:43  18    BY MR. FEDOR:

02:20:43  19    **Q**    Good afternoon, Mr. Ross.  Nice to see you.

02:20:46  20    **A**    Good afternoon.

02:20:46  21        I'm sorry about this microphone.  I don't know.

02:20:48  22                 THE COURT:  You're doing better than almost

02:20:50  23    everybody.

02:20:52  24                 MR. FEDOR:  You are.  You are.

02:20:56  25    BY MR. FEDOR:

**D. Ross (Cross by Fedor)**                                              582

02:20:57  1  **Q**     So you're a revenue officer, correct, Mr. Ross?

02:20:59  2  **A**     Yes, sir.

02:21:00  3  **Q**     And you're not just a regular revenue officer, you're

02:21:03  4  like a super revenue officer, are you not?

02:21:05  5  **A**     Well, I'm not going to. . .

02:21:08  6  **Q**     40 years with the IRS?

02:21:10  7  **A**     Well, I'm in the abusive tax avoidance transaction

02:21:15  8  group.

02:21:16  9  **Q**     Right.  So you --

02:21:17  10  **A**     So it's a unique group.  We handle the most complex

02:21:21  11  cases normally.

02:21:23  12  **Q**     That's what I thought.  You're not just an average

02:21:25  13  collection agent.

02:21:28  14        And this case was assigned to you in February 2013;

02:21:31  15  correct?

02:21:31  16  **A**     Yes, sir.

02:21:35  17  **Q**     And I think your ICS history reflects that, correct?

02:21:39  18  **A**     Yes, sir.

02:21:40  19  **Q**     If you could tell the jurors, just for a moment -- to

02:21:44  20  me reviewing an ICS history is like the Bible of what

02:21:47  21  happened in a case.

02:21:48  22        Can you reflect for the jurors exactly what that

02:21:50  23  means?  What's your ICS history?

02:21:52  24  **A**     It's a record of actions and meetings and basically a

02:21:58  25  written record of what happened in that case.

02:22:00  1   **Q**     Is it a fair statement that every time you would touch

02:22:04  2   Mr. Karasarides' case, it's reflected in that record?

02:22:09  3   **A**     Not every time, I wouldn't think.

02:22:11  4   **Q**     Okay.  What wouldn't be reflected there?

02:22:13  5   **A**     Well, I mean, I can get on the computer and check to

02:22:15  6   see current balance due or something like that.

02:22:20  7   **Q**     But certainly all contacts with either the taxpayer or

02:22:23  8   his representative, that would be reflected there?

02:22:26  9   **A**     Contacts should be represented in that history.

02:22:30  10  **Q**     And I'm sure over the course of the last 41 years

02:22:32  11  you've been really consistent and good with doing that?

02:22:35  12  **A**     Try to.

02:22:37  13  **Q**     Let's back up a second.

02:22:39  14        What's a power of attorney?

02:22:41  15  **A**     Well, as I indicated before, it's where a taxpayer

02:22:48  16  appoints a representative to represent them before the

02:22:51  17  Internal Revenue Service.

02:22:53  18  **Q**     Correct.

02:22:53  19        And who can be a power of attorney?  What are the

02:22:56  20  qualifications?

02:22:59  21  **A**     On the back of the Page 2848, it can be an attorney,

02:23:05  22  accountant, enrolled agent, an employee of a business, even

02:23:09  23  possibly a relative.

02:23:12  24  **Q**     And what's the function of that representative?

02:23:18  25  **A**     That's who the IRS contacts in regard to this -- to a

**D. Ross  (Cross by Fedor)** 584

1  case.

2  **Q**  Correct.

3  And you're required, actually, by the Internal Revenue

4  manual to contact that representative first; correct?

5  **A**  Yes.

6  **Q**  And you cannot go around that representative, or go

7  past that representative, unless there's problems with the

8  representative, he or she self; correct?

9  **A**  Right.

10  **Q**  And then you have to give certain notifications that

11  you may do that as well?

12  **A**  Yes.

13  **Q**  Do you usually work with accountants or attorneys as

14  representatives?

15  **A**  Both.

16  **Q**  Okay.  Equal?

17  **A**  I don't keep stats.

18  **Q**  Okay.  No experience with one or the either, or better

19  experience with one or the other or. . .

20  **A**  It varies.  It varies.

21  Probably a lot more powers -- probably a lot more

22  attorneys at this stage.

23  **Q**  So the more complicated the case, typically you'd be

24  working with an attorney.  Is that a fair statement?

25  **A**  Yes, sir.

**D. Ross (Cross by Fedor)**                                    585

02:24:18   1              MR. FEDOR:  Carissa, can you help me again

02:24:19   2   today?

02:24:20   3              MS. WELCH:  Um-hmm.

02:24:20   4              MR. FEDOR:  Thank you.

02:24:21   5        Government Exhibit 174.

02:24:25   6   BY MR. FEDOR:

02:24:25   7   **Q**    And Mr. Ross, we've already spent some time on this

02:24:28   8   document, Government Exhibit 174.  This is the 433-F

02:24:33   9   statement that you reviewed.

02:24:38  10        First name is Christos Karasarides, Jr., on it;

02:24:42  11   correct?

02:24:42  12   **A**    Yes, sir.

02:24:42  13   **Q**    And what was the date you received this,

02:24:44  14   approximately?

02:24:48  15              MR. FEDOR:  Go to Page 2, I'm sorry, Carissa.

02:24:51  16              THE WITNESS:  Have to look at the ICS history.

02:24:53  17   BY MR. FEDOR:

02:24:54  18   **Q**    We'll get there.

02:24:55  19        What's the date on it, on Page 2?

02:24:56  20   **A**    The signature date is June 15th, 2013.

02:25:00  21   **Q**    And you believe that is Mr. Karasarides' signature?

02:25:03  22   **A**    I believe so.

02:25:05  23   **Q**    And what leads you to believe that?

02:25:07  24   **A**    It's a taxpayer signature section.

02:25:12  25   **Q**    Okay.

**D. Ross (Cross by Fedor)**                                586

02:25:13    1                 MR. FEDOR:  If we could go back to Page 1.

02:25:17    2   BY MR. FEDOR:

02:25:17    3   **Q**     Just walking through the document for a moment, if --

02:25:24    4   if you see, enter the number of people in the household who

02:25:27    5   can be claimed.

02:25:28    6       And then, if you or yourself are self-employed, and it

02:25:32    7   says "see attached"; correct?

02:25:34    8   **A**     Can you refer to the number or the section you're

02:25:39    9   looking at?

02:25:40   10   **Q**     It's the top section --

02:25:41   11                 MR. FEDOR:  Thank you, Carissa.

          12   BY MR. FEDOR:

02:25:42   13   **Q**     It says, "see attached"?

02:25:43   14   **A**     Yes.

02:25:43   15   **Q**     In the handwritten?

02:25:46   16   **A**     Yes.

02:25:46   17   **Q**     Do you know who filled this form out?

02:25:47   18   **A**     No, I don't.

02:25:50   19   **Q**     Going to Section A, Accounts, Lines of Credit, I

02:25:55   20   believe that says "cash on hand"; correct?

02:25:59   21   **A**     Yes.

02:25:59   22   **Q**     And how much is listed there?

02:26:01   23   **A**     $20,000.

02:26:03   24   **Q**     Correct.

02:26:05   25       And going to Section B under Real Estate, that's the

02:26:09   1    land contract issue; correct?

02:26:10   2    **A**    Yes, sir.

02:26:12   3    **Q**    And isn't it a fair statement that the land contract

02:26:17   4    has been completely disclosed here?

02:26:21   5         Is there something missing from the disclosure on the

02:26:22   6    land contract on this statement?

02:26:24   7    **A**    Land contract is disclosed.

02:26:26   8    **Q**    Correct.

02:26:26   9         And, in fact, it even discloses a hundred thousand

02:26:30   10   dollars of equity in this asset, correct?

02:26:34   11   **A**    There's no equity listed in this section.

02:26:38   12   **Q**    No, it's blank.  But we could take and surmise, I

02:26:41   13   think, 41 years of experience, Mr. Ross, a $370,000 asset

02:26:45   14   with a balance owed of 270 leaves a hundred left; right?

02:26:50   15   **A**    Well, there can be a different calculation on a land

02:26:53   16   contract compared to if it were a regular mortgage, so. . .

02:26:57   17   **Q**    So let's talk about that for a second before we get to

02:26:59   18   the ICS history.

02:27:01   19        My understanding from your -- from your preparation,

02:27:08   20   from your review of the documents, you had a lot of

02:27:11   21   questions related to the land contract that you didn't

02:27:15   22   understand yourself.

02:27:15   23        Is that accurate?

02:27:19   24   **A**    Correct.

02:27:19   25   **Q**    And who did reach you to for those questions?

**D. Ross (Cross by Fedor)** 588

02:27:21  1  **A**    I reached out to several employees within the IRS, in

02:27:22  2  addition to researching land contract issue in our internal

02:27:26  3  manual.

02:27:26  4  **Q**    Correct.

02:27:27  5    And I think you reached out to counsel, Anita Gill,

02:27:31  6  correct?

02:27:32  7  **A**    Yes, sir.

02:27:32  8  **Q**    And how long did it take you to develop that land

02:27:34  9  contract issue, to figure out if there actually was equity

02:27:39  10  or there wasn't equity or you could seize it or not seize

02:27:43  11  it?  What was the period of time it took for you to develop

02:27:45  12  that?

02:27:45  13  **A**    I don't recall.

02:27:45  14  **Q**    Okay.  And we'll review that in the ICS history.

02:27:48  15  **A**    Okay.

02:27:49  16  **Q**    Okay.  Had you in your 41 years, or maybe 31 years at

02:27:53  17  that time of experience, had you seen a land contract issue

02:27:55  18  like this prior?

02:28:00  19  **A**    I can't recall.  It's possible.

02:28:02  20  **Q**    Okay.  Had you ever seized equity in a land contract

02:28:06  21  prior to this case?

02:28:07  22  **A**    No, sir.

02:28:07  23  **Q**    So you had many questions, is that a fair statement,

02:28:11  24  on what to do with --

02:28:13  25  **A**    I had some questions.  I don't characterize how many.

02:28:16    1    I had some questions.

02:28:16    2        I was trying to research information with the IRS --

02:28:21    3    other IRS employees that could give me assistance and

02:28:25    4    guidance.

02:28:25    5    **Q**    Including whether you could do anything with the asset

02:28:28    6    or not; correct?

02:28:29    7    **A**    Yes.

02:28:32    8    **Q**    So is there anything listed in terms of the real

02:28:36    9    estate and the land contract issue, is there anything

02:28:38   10    missing on this statement that was submitted in 2013 that

02:28:41   11    you would have liked to have known about at that time in

02:28:43   12    terms of the land contract?

02:28:52   13    **A**    Can you clarify what you're looking for?

02:28:54   14    **Q**    Yeah.  It appears to me that all the questions are

02:28:56   15    asked in that box as it relates to Dunkeith and the land

02:29:01   16    contract.

02:29:07   17    **A**    Okay.

02:29:08   18    **Q**    Pardon me?

02:29:09   19    **A**    Yes.

02:29:12   20    **Q**    Let's move on to Section C.

02:29:15   21        There's a Mercedes-Benz listed; correct?

02:29:18   22    **A**    Correct.

02:29:18   23    **Q**    And there's actually equity in a vehicle that's

02:29:21   24    listed; correct?

02:29:22   25    **A**    Correct.

**D. Ross  (Cross by Fedor)**                                    590

02:29:22  1  **Q**     And how much is that equity?

02:29:23  2  **A**     It's listed at $5,000.

02:29:26  3  **Q**     Now, you see a lot of 433 statements and these

02:29:30  4  collection information statements; correct?

02:29:31  5  **A**     Correct.

02:29:31  6  **Q**     How often do you see equity in a vehicle that's

02:29:35  7  actually disclosed?  Do you see that regularly?

02:29:39  8  **A**     Again, I don't keep statistics, you know.

02:29:42  9  **Q**     Do you have an estimate?

02:29:44  10  **A**     No.

02:29:47  11  **Q**     Okay.

02:29:48  12            MR. FEDOR:  Carissa, if we could turn to

02:29:50  13  Page 2, please, of the document.

02:29:52  14       Section G.

02:29:55  15       And if you could blow that up like you did nicely for

02:29:57  16  Sam.

02:30:03  17  BY MR. FEDOR:

02:30:03  18  **Q**     And I think you've already testified on direct that

02:30:07  19  there's net self-employment income listed of $20,000, and it

02:30:11  20  looks like it's written in "before taxes"; correct?

02:30:13  21  **A**     Correct.

02:30:14  22  **Q**     And then over and above that, net rental income of a

02:30:17  23  thousand dollars a month, once again, before taxes; correct?

02:30:19  24  **A**     Correct.

02:30:20  25  **Q**     Did you do an analysis of where this $20,000 came from

**D. Ross  (Cross by Fedor)**                                591

02:30:24  1    when this document was submitted to you?

02:30:28  2    **A**    Not an analysis.  I was advised by Mr. DiPietro that

02:30:32  3    the income was from gambling.

02:30:37  4    **Q**    From gambling.

02:30:38  5    **A**    Gambling.

02:30:38  6    **Q**    Okay.  Is that in your ICS history?

02:30:41  7    **A**    I don't know what page.

02:30:43  8    **Q**    Okay.  We'll get there.

02:30:44  9    **A**    Okay.

02:30:44  10   **Q**    We'll get there.  Thank you.

02:30:46  11          So, short of speaking with Mr. DiPietro, did you do

02:30:50  12   any independent verification or investigation of what that

02:30:53  13   20,000 a month was?

02:30:55  14   **A**    I don't recall.

02:30:57  15   **Q**    Okay.  Turning to the necessary living expenses.

02:31:10  16              MR. FEDOR:  Thank you, Carissa.

         17   BY MR. FEDOR:

02:31:11  18   **Q**    There is a other expense listed for $10,000 a month in

02:31:15  19   legal costs; correct?

02:31:19  20          Bottom right.

02:31:21  21   **A**    Yes.

02:31:21  22   **Q**    Okay.  Do you know what that was for?

02:31:26  23   **A**    Legal representation for attorney fees.

02:31:29  24   **Q**    Correct.

02:31:29  25          Did you do any verification or investigation if that

**D. Ross (Cross by Fedor)**                                    592

02:31:32 | 1 | was a legitimate number, a verified number, or he actually

02:31:37 | 2 | incurred it?

02:31:38 | 3 | **A**    No, I did not.

02:31:39 | 4 | **Q**    Okay.  But at the time you are aware that he was going

02:31:42 | 5 | through some legal troubles of his own; correct?

02:31:44 | 6 | **A**    Yeah, there were multiple court cases and legal

02:31:47 | 7 | issues.

02:31:47 | 8 | **Q**    So it wouldn't surprise you if he was incurring

02:31:50 | 9 | $10,000 a month in legal fees; correct?

02:31:52 | 10 | **A**    It's possible.  I mean, he paid a hundred thousand

02:31:54 | 11 | dollars to a couple of attorneys.

02:31:56 | 12 | **Q**    Well, that wasn't my question.

02:31:58 | 13 | **A**    That I mentioned before.

02:32:01 | 14 | **Q**    Thank you.

02:32:02 | 15 | MR. FEDOR:  If we could turn to Page 3,

02:32:04 | 16 | Carissa.

02:32:10 | 17 | BY MR. FEDOR:

02:32:11 | 18 | **Q**    This is the addition disclosure which was referenced

02:32:13 | 19 | on Page 1 as attached; correct?

02:32:15 | 20 | **A**    Correct.

02:32:15 | 21 | **Q**    And I'm not going to go through each listing.

02:32:19 | 22 | Obviously, we have the rentals that we discussed in Canton

02:32:22 | 23 | on the bottom of that.

02:32:23 | 24 | Above that we have a number of different what's listed

02:32:26 | 25 | as investments; correct?

**D. Ross  (Cross by Fedor)**                              593

02:32:27  1   **A**     Correct.

02:32:27  2   **Q**     Did you do any investigation as to what each and every

02:32:30  3   one of these are?

02:32:33  4   **A**     I don't recall.

02:32:34  5   **Q**     Okay.  Would it be in your ICS history if you did?

02:32:41  6   **A**     Should be.

02:32:42  7   **Q**     Okay.  Do you know if these entities are

02:32:49  8   gambling-related entities?

02:32:50  9   **A**     Well, it was represented to me by Mr. DiPietro that

02:32:53  10  these gambling establishments that Mr. Karasarides had

02:33:00  11  relied on for income were closed by the State of Ohio.

02:33:04  12  **Q**     Well, but doesn't this document say something

02:33:07  13  different, that they're 50 percent closed?  Isn't that what

02:33:11  14  it says?

02:33:12  15  **A**     No.  I took this to mean that the business is closed,

02:33:16  16  but he has a 50 percent interest in the business, which is

02:33:18  17  now closed.

02:33:20  18  **Q**     Okay.

02:33:21  19  **A**     I mean, they don't close half a business, you know,

02:33:24  20  one side and the other.

02:33:25  21  **Q**     Thank you, Mr. Ross.

02:33:28  22            MR. FEDOR:  Let's turn to the next page,

02:33:30  23  please, Carissa.

02:33:31  24  BY MR. FEDOR:

02:33:32  25  **Q**     This is an additional disclosure; correct?

**D. Ross  (Cross by Fedor)**                594

02:33:34  1  **A**     Correct.

02:33:35  2  **Q**     Was this also attached to the 433-F you received?  Do

02:33:40  3  you recall?

02:33:40  4  **A**     I believe that was attached to the 433 that was

02:33:43  5  received.

02:33:48  6  **Q**     Okay.  On the bottom it indicates that Secret Service

02:33:50  7  is holding $30,000 in silver, 30 in cash, and it's

02:33:55  8  handwritten in, "Also holding brokerage accounts"; correct?

02:33:57  9  **A**     Correct.

02:33:58  10  **Q**     Do you know where the brokerage account was?

02:33:59  11  **A**     I can't recall.

02:34:00  12  **Q**     Did you investigate it?

02:34:01  13  **A**     Can't recall.

02:34:03  14  **Q**     Wasn't it a fact that Mr. DiPietro called you and told

02:34:06  15  you that all of this was available to go to pay this

02:34:09  16  liability?

02:34:09  17  **A**     I attempted to secure the assets from the Secret

02:34:15  18  Service.  I made several contacts with Secret Service, and I

02:34:18  19  was unsuccessful.

02:34:19  20  **Q**     Well, we'll get to that.

02:34:20  21       But my question is, did Mr. DiPietro call you -- you

02:34:24  22  didn't call him and ask for it, he called you and told you

02:34:27  23  about it, right?

02:34:28  24  **A**     About the Secret Service asset being held?

02:34:30  25  **Q**     Yeah.

**D. Ross  (Cross by Fedor)**                              595

02:34:31  1   **A**     I believe he did.

02:34:32  2   **Q**     Thank you.

02:34:42  3              MR. FEDOR:  Carissa, could we bring up

02:34:44  4   Exhibit 200.

02:34:49  5   BY MR. FEDOR:

02:34:49  6   **Q**     Okay.  I'm going to go much further in-depth than

02:34:53  7   Mr. Bean because let's get a full understanding of the

02:34:56  8   history, what happened on this case, and all of your

02:34:58  9   interaction between Mr. DiPietro and then, after

02:34:59  10  Mr. DiPietro was terminated, Mr. Yackshaw was involved, so

02:35:03  11  we're going to go through that.

02:35:04  12             So, the first entry, Page 1, is the date it was

02:35:07  13  assigned to you; correct?

02:35:09  14  **A**     Correct.

02:35:10  15  **Q**     And that was February 23rd of 2013; correct?

02:35:13  16  **A**     Correct.

02:35:14  17  **Q**     And who assigned the case to you?

02:35:20  18  **A**     Could have been my group manager.  Could have been

02:35:23  19  systemic assignment.  I don't know.

02:35:25  20  **Q**     Okay.  Was that Mr. Yurick at the time, Greg Yurick?

02:35:30  21  **A**     I believe so.

02:35:31  22  **Q**     Okay.  Turning to Page 3 --

02:35:33  23             MR. FEDOR:  Thank you, Carissa, for all your

02:35:34  24  help.

02:35:34  25  BY MR. FEDOR:

**D. Ross  (Cross by Fedor)**                    596

02:35:34  1   **Q**    Towards the bottom of that, on April 12th of 2013, it

02:35:41  2   says a resolution plan was discussed; correct?

02:35:46  3   **A**    Correct.

02:35:47  4   **Q**    Can you repeat that?

02:35:48  5   **A**    Correct.

02:35:49  6   **Q**    Your mic's going out again.  Sorry.

02:35:52  7   **A**    Sorry.

02:35:52  8   **Q**    That was correct?

02:35:53  9   **A**    Correct.

02:35:55  10  **Q**    And then the following page, Page 4 as we turn to it,

02:36:00  11  is essentially your summary of your initial findings.

02:36:03  12       Is that accurate?

02:36:10  13  **A**    It's a summary of my initial contact with

02:36:12  14  Mr. DiPietro.

02:36:12  15  **Q**    Exactly.  That's my question.

02:36:13  16  **A**    Okay.  All right.

02:36:14  17  **Q**    So when a case is assigned to you and there's a

02:36:17  18  representative involved, what's the first thing you do?

02:36:23  19  **A**    Well, we'd contact the representative.

02:36:25  20  **Q**    Correct.

02:36:26  21       And what do you ask that rep for?

02:36:29  22  **A**    Financial information for the taxpayer.

02:36:32  23  **Q**    Correct.

02:36:32  24       So, just reading through here, on April 12th, which is

02:36:37  25  the date of initial contact, you gave Mr. DiPietro as a

**D. Ross (Cross by Fedor)** 597

02:36:41 1 power of attorney holder at the time a deadline of June 1st

02:36:44 2 of 2013, correct, to provide a number of documents?

02:36:47 3 **A** Yes.

02:36:48 4 **Q** And it actually states, "Requested a 433," and it

02:36:53 5 says, "The POA, Mr. DiPietro, is working on it"; correct?

02:36:58 6 **A** Correct.

02:36:58 7 **Q** You identified certain levy sources?

02:37:00 8 **A** Correct.

02:37:01 9 **Q** Correct.

02:37:01 10 And one being Elite Entertainment. And then you

02:37:05 11 identify some of the business associates for

02:37:07 12 Mr. Karasarides; correct?

02:37:08 13 **A** Correct.

02:37:10 14 **Q** And if the case was assigned to you in February and

02:37:14 15 you make an initial contact in April, why are you already

02:37:18 16 determining levy sources?

02:37:20 17 **A** That's part of our initial analysis, part of our

02:37:24 18 review of the case.

02:37:24 19 **Q** Okay. Which -- and correct me if I'm wrong -- if a

02:37:30 20 taxpayer is not complying with your request, you can fall

02:37:31 21 back on that and actually issue levies; right?

02:37:34 22 **A** We have pre-levy notification requirements. So at

02:37:39 23 this point in time, I don't believe that the required levy

02:37:48 24 notices had been issued, the Letter 1058 on those oldest

02:37:52 25 periods. I know subsequent in 2014 we did issue a 1058,

**D. Ross  (Cross by Fedor)**                                           598

02:37:57   1   final notice.

02:37:57   2   **Q**     And can you explain to the jurors what that actually

02:37:59   3   means in layman's terms?

02:38:01   4   **A**     Please be specific.

02:38:03   5   **Q**     A Letter 1058 and the rights that a taxpayer has and

02:38:07   6   what you have to inform a taxpayer before you can take

02:38:10   7   action.

02:38:10   8   **A**     Yeah.  Before we can levy or issue levy or seizure, we

02:38:18   9   have to issue a notice -- a final notice, a Letter 1058,

02:38:21   10  which Mr. Bean had me read sections of.  In other words, if

02:38:26   11  we don't hear from you by a certain day within 30 days, we

02:38:29   12  may take action.

02:38:31   13  **Q**     So you're looking for the taxpayer's cooperation.

02:38:33   14          Is that accurate?

02:38:34   15  **A**     That would be ideal.

02:38:44   16  **Q**     And, in fact, the next entry on Page 5 at the top, the

02:38:48   17  POA, Mr. DiPietro, he acknowledged his recent legal troubles

02:38:54   18  but says the taxpayer's goal is to get an installment

02:38:57   19  agreement on these liabilities; correct?

02:38:58   20  **A**     Correct.

02:38:58   21  **Q**     He's trying to resolve it.  Isn't that what that

02:39:02   22  statement means?

02:39:02   23  **A**     That was the representation made by Mr. DiPietro.

02:39:05   24  **Q**     Correct.

02:39:06   25          And I'm sure each and every case that's assigned to

**D. Ross  (Cross by Fedor)** 599

02:39:09  1  you, when you have a representative, we want to get it

02:39:11  2  resolved; right?

02:39:12  3  **A**    That's the goal.

02:39:13  4  **Q**    And get you paid?

02:39:14  5  **A**    That's the goal.

02:39:15  6  **Q**    Get you out of our lives?

02:39:17  7  **A**    Yes.

02:39:21  8  **Q**    It also indicated, the last closing part of that, the

02:39:24  9  next line, you asked for the 433 statement.  You ask for

02:39:29  10  bank statements.  The -- Mr. DiPietro advised that

02:39:34  11  Mr. Karasarides is a professional gambler, and you provide

02:39:39  12  dates.  Okay?

02:39:42  13         MR. FEDOR:  If we could skip then to Page 6.

02:39:45  14  BY MR. FEDOR:

02:39:46  15  **Q**    Your action date of April 16th of 2013?

02:39:52  16  **A**    Correct.

02:39:53  17  **Q**    Okay.  And you state that in order to determine

02:39:56  18  appropriate resolution of the case, we need to calculate and

02:39:59  19  verify his ability to pay; right?

02:40:01  20  **A**    Yes.

02:40:05  21  **Q**    You want the taxpayer to remain current, correct?

02:40:08  22  **A**    Correct.

02:40:09  23  **Q**    And what does that mean, for the jurors?

02:40:10  24  **A**    Remain current means to file future tax returns on

02:40:17  25  time and pay the taxes due; in other words, get the bleeding

**D. Ross (Cross by Fedor)**                    600

| | | |
|---|---|---|
| 02:40:20 | 1 | stopped. |
| 02:40:21 | 2 | **Q**    Exactly.  Exactly. |
| 02:40:23 | 3 |     And then below that it states you -- 433 completed on |
| 02:40:29 | 4 | 6-1 of 2013; right? |
| 02:40:31 | 5 | **A**    That's what we requested, yes. |
| 02:40:33 | 6 | **Q**    Correct. |
| 02:40:34 | 7 |     And then you asked for an interview as well; correct? |
| 02:40:36 | 8 | **A**    Correct. |
| 02:40:40 | 9 |         MR. FEDOR:  Let's turn to Page 7 for a moment. |
| 02:40:45 | 10 | BY MR. FEDOR: |
| 02:40:46 | 11 | **Q**    May 22nd of 2013, conference call with Mr. DiPietro as |
| 02:40:52 | 12 | a representative, said he's working on the documents; |
| 02:40:55 | 13 | correct? |
| 02:40:57 | 14 |     He was going to be out of the country, and he wanted a |
| 02:40:59 | 15 | couple weeks' extra time to get everything together -- |
| 02:41:02 | 16 | **A**    Right. |
| 02:41:02 | 17 | **Q**    -- to cooperate with you; correct? |
| 02:41:04 | 18 | **A**    Correct. |
| 02:41:05 | 19 | **Q**    And then a month later there's another contact; |
| 02:41:09 | 20 | correct?  June 24th of -- |
| 02:41:12 | 21 | **A**    June 24th. |
| 02:41:14 | 22 | **Q**    -- at the bottom of the page? |
| 02:41:16 | 23 | **A**    Yes. |
| 02:41:16 | 24 | **Q**    Correct. |
| 02:41:17 | 25 |     And then Mr. DiPietro called you; correct? |

02:41:22  1   **A**     Yes.  It says, "phone call from power of attorney,"

02:41:26  2   yes.

02:41:28  3   **Q**     And it says he has information you requested.  He's

02:41:32  4   trying to cooperate with you.  He said, "let me get it over

02:41:42  5   to you," correct?

02:41:42  6   **A**     Yeah, he says he has the information, and I told him

02:41:45  7   to mail it to me.

02:41:46  8   **Q**     Correct.

02:41:47  9         And then if you could read -- read for the jurors the

02:41:49  10  next paragraph.  "TP has pending."

02:41:54  11  **A**     "Taxpayer has pending possible forfeitures based on

02:41:57  12  criminal cases currently open.  There's significant amounts

02:42:00  13  of money involved.  A note, a half million approximately.

02:42:08  14  Power of attorney and taxpayer want this money to go to the

02:42:10  15  IRS.  Advised them to provide info on this.  Possibly we

02:42:13  16  could do a jeopardy levy to the government authorities."

02:42:17  17  **Q**     And so Mr. DiPietro called you and said, hey, we have

02:42:21  18  a half million dollars here, give or take, we want to give

02:42:24  19  it to you; correct?

02:42:24  20  **A**     Correct.

02:42:25  21  **Q**     That the government is holding it, and we want to pay

02:42:27  22  down these liabilities; correct?

02:42:29  23  **A**     Correct.

02:42:30  24  **Q**     What -- how more could he have cooperated in

02:42:33  25  disclosing that information, providing that to you, at that

**D. Ross  (Cross by Fedor)**                                    602

02:42:37   1   time?  He's given you the source of the proceeds, right?

02:42:40   2   Half million dollars.  Lot a money.

02:42:42   3   **A**     Again, I was frustrated that I couldn't get it from

02:42:44   4   the Secret Service.

02:42:45   5   **Q**     Well, let's talk about that for a second.  I'm glad

02:42:47   6   you brought that up.

02:42:48   7        How long were your discussions with the Secret Service

02:42:50   8   about getting this money to go towards Mr. Karasarides'

02:42:53   9   account?  How long did those discussions go on?

02:42:56  10   **A**     I don't know.

02:42:57  11   **Q**     Your ICS history reflects it was about a year that you

02:43:01  12   tried, with the cooperation of Mr. DiPietro and

02:43:05  13   Mr. Karasarides, to get that money applied to his tax

02:43:08  14   problems, and the IRS couldn't get it done; correct?

02:43:11  15   **A**     We were unsuccessful in getting those assets from the

02:43:15  16   Secret Service.

02:43:15  17   **Q**     Right.  So let's start -- let's take a couple steps

02:43:18  18   back.

02:43:18  19        Why was the Secret Service involved with that to begin

02:43:21  20   with?  What's their function in this scheme?

02:43:26  21   **A**     They were involved in another -- in a criminal case on

02:43:31  22   Mr. Karasarides is my understanding.

02:43:31  23   **Q**     Right.  And were they holding funds?  That brokerage

02:43:35  24   account, for instance, were they holding that?

02:43:39  25   **A**     According to Mr. DiPietro they were.

**D. Ross  (Cross by Fedor)**                                    603

02:43:41  1   **Q**     Okay.  And I believe you testified previously it was

02:43:46  2   Mr. Hender- --

02:43:47  3   **A**     Henderhan.

02:43:48  4   **Q**     Henderhan.

02:43:49  5         Was he with the Secret Service?

02:43:50  6   **A**     Yes, sir.

02:43:51  7   **Q**     How many times did you speak with Mr. Henderhan about

02:43:54  8   having those proceeds, as you used the term, seized,

02:43:57  9   applied, levied, call it whatever you want?

02:43:59  10  **A**     I don't recall how many times I spoke with him.

02:44:01  11  **Q**     Okay.  And we'll get into that.

02:44:04  12        But you were unsuccessful at the end of the day;

02:44:06  13  correct?

02:44:06  14  **A**     Yes.

02:44:07  15  **Q**     Did you ever receive a reason as to why they didn't do

02:44:10  16  it?

02:44:11  17  **A**     I can't recall.

02:44:12  18  **Q**     And I don't recall ever seeing one either.

02:44:15  19        But eventually it went away and you never got paid;

02:44:18  20  correct?

02:44:19  21  **A**     Right.

02:44:19  22  **Q**     That wasn't Mr. DiPietro's fault; he gave you the

02:44:22  23  information to go get it.  Right?

02:44:24  24  **A**     He did provide that information about the Secret

02:44:27  25  Service.

**D. Ross (Cross by Fedor)**                    604

02:44:27  1    **Q**     Correct.

02:44:27  2         And you didn't call him; he called you to tell you

02:44:30  3    about it.  That's what your notes say.

02:44:34  4    **A**     Yes, he did call me.

02:44:36  5    **Q**     Correct.  Thank you.

02:44:52  6              MR. FEDOR:  Just the top of Page 8 as well,

02:44:55  7    Carissa.

02:44:56  8    BY MR. FEDOR:

02:44:56  9    **Q**     Just as a tangential issue as well, that first line

02:45:02  10   states, on Page 8, of your history in your records, he --

02:45:06  11   Mr. DiPietro says, "Mr. Karasarides has another issue.  The

02:45:10  12   taxpayer is quit-claiming real property."  He was trying to

02:45:13  13   get it resolved.

02:45:14  14        Was Mr. DiPietro seeking out your help on the land

02:45:16  15   contract issue so he could convey clear title or clean that

02:45:20  16   issue up?

02:45:24  17   **A**     This entry, I believe, was related to the property on

02:45:27  18   Meese Road, not the Dunkeith property.

02:45:29  19   **Q**     Right.  Which was the withdrawal of the lien issue

02:45:32  20   that you referenced in your direct; correct?

02:45:34  21   **A**     Right.

02:45:34  22   **Q**     Correct.

02:45:35  23        But he was seeking out your help; correct?  How do I

02:45:38  24   get this done?  How do I clear up a lien so that we can

02:45:41  25   convey a piece of property?

02:45:42   1    **A**    On the Meese Road property?

02:45:43   2    **Q**    Right.

02:45:44   3    **A**    Yes.

02:45:44   4    **Q**    But he's seeking out your help to do this; correct?

02:45:47   5    **A**    Yes.

02:45:49   6    **Q**    Thank you.

02:45:50   7    **A**    But he's hurting his client while he's doing that.

02:45:57   8    **Q**    It's all about trying to get the service paid.

02:46:04   9             MR. FEDOR:  If we could go to the -- the next

02:46:05   10   entry dated July 9th of 2013.  The issue is a forfeiture to

02:46:13   11   the Secret Service.

02:46:13   12   BY MR. FEDOR:

02:46:14   13   **Q**    And what happened there, sir, on that date?

02:46:17   14   **A**    My notes say I had previously called the forfeiture

02:46:21   15   division of Secret Service and left voicemail.  Had contact

02:46:26   16   with a Darlene Parker.  She said in some cases, assets are

02:46:31   17   released back to the IRS.  She did not recognize the

02:46:34   18   taxpayer name.  You know, they'd need a forfeiture number,

02:46:38   19   et cetera.

02:46:43   20   **Q**    You discuss with counsel as well, correct, Anita Gill?

02:46:46   21   **A**    Right.

02:46:46   22   **Q**    Because you weren't sure what to do with the land

02:46:49   23   contract because you were trying to get guidance on it;

02:46:52   24   correct?

02:46:52   25   **A**    Well, in this case, since we had not issued the

**D. Ross  (Cross by Fedor)**                                606

02:46:55  1    pre-notification before levies, it would have to be special

02:46:59  2    approval, called a jeopardy levy, meaning --

02:47:02  3    **Q**    Correct.

02:47:03  4         Well, why don't you explain that to the jurors.  What

02:47:05  5    is a jeopardy levy?

02:47:07  6    **A**    Well, you know, the normal notification is we issue

02:47:15  7    the Letter 1058, which gives the taxpayer 30 days to

02:47:18  8    respond, either pay the liability or file an appeal or make

02:47:21  9    arrangements to pay acceptable to the Service.

02:47:26  10        Jeopardy levy is basically short-cutting that process.

02:47:31  11   In other words, we take the levy action, and then the

02:47:34  12   taxpayer may appeal after the action is taken.

02:47:36  13   **Q**    Correct.

02:47:36  14        But in this case, it's a cooperative levy essentially;

02:47:39  15   they're saying go get it.  Right?

02:47:41  16   **A**    Yes.

02:47:42  17   **Q**    Right.

02:47:43  18        So it -- I would always compare this -- it would be

02:47:46  19   akin to a retirement plan.  If someone didn't want to pull

02:47:49  20   money out of their 401(k) plan or 403(b) plan or any

02:47:55  21   qualified money, they could potentially avoid the 10 percent

02:47:58  22   penalty pulling it out because you can go levy it and pay

02:48:01  23   it?

02:48:01  24   **A**    Yes.

02:48:01  25   **Q**    Similar situation.

02:48:02  1        So it's very similar to that where, hey, we want to

02:48:05  2   pay you but we don't know how, can you go get it for us.

02:48:14  3        And the next entry is dated July 9th of 2013?

02:48:21  4   **A**    Yes.

02:48:22  5   **Q**    "Per the 433 and the attachments, the amount taken by

02:48:24  6   the Secret Service is X, Y, and Z.  And there's an unknown

02:48:28  7   amount in the brokerage accounts.  These are items we'd be

02:48:30  8   seeking from the Secret Service."

02:48:32  9        Correct?

02:48:32  10  **A**    Correct.

02:48:32  11  **Q**    And I notice on the last entry you called Darlene

02:48:35  12  Parker who you testified about, with a Washington, D.C.,

02:48:39  13  number; correct?

02:48:39  14  **A**    Correct.

02:48:40  15  **Q**    Was the Secret Service on this case based in the

02:48:44  16  Northern District of Ohio?

02:48:47  17  **A**    Yes.

02:48:49  18  **Q**    Was it --

02:48:49  19  **A**    As far as I know.

02:48:50  20  **Q**    Was it in Cleveland or Akron?

02:48:52  21  **A**    Well, Larry Henderhan was in the Independence office

02:48:56  22  of the Secret Service.

02:48:57  23  **Q**    Did you have any meetings directly with him?

02:48:59  24  **A**    Yes, I did.

02:49:00  25  **Q**    Face to face?

**D. Ross  (Cross by Fedor)**                                608

02:49:01  1    **A**    Yes.

02:49:01  2    **Q**    Okay.  In the Independence office?

02:49:03  3    **A**    In his office in Independence, right.

02:49:05  4    **Q**    Okay.  And did you -- I'll ask again.

02:49:08  5         Did you ever receive an explanation as to why those

02:49:10  6    funds weren't turned over?

02:49:11  7    **A**    I don't recall.

02:49:14  8    **Q**    Okay.

02:49:15  9    **A**    I was being referred to the forfeiture division, you

02:49:19  10   know.  My understanding is Mr. Henderhan was like a case

02:49:23  11   agent for Secret Service, similar to, you know, IRS special

02:49:28  12   agents.

02:49:29  13   **Q**    And how --

02:49:30  14   **A**    And he wouldn't have -- you know, he wouldn't be

02:49:32  15   involved or in charge of releasing those assets or not.

02:49:36  16   **Q**    So he had to go back and reach out to somebody else?

02:49:38  17   **A**    Or he gave me information, and I was trying to track

02:49:41  18   down who I had to contact to try and get those assets.

02:49:45  19   **Q**    I understand why you'd be really frustrated at this

02:49:47  20   point.

02:49:47  21   **A**    I was.

02:49:48  22   **Q**    I mean, do you recall how many times you reached out

02:49:51  23   to Henderhan?

02:49:53  24   **A**    I don't recall.

02:49:57  25        But again, the contact information I was given was

**D. Ross  (Cross by Fedor)**                                    609

02:50:01  1   this person in Washington, D.C., so. . .

02:50:04  2   **Q**     Correct.  And so --

02:50:06  3   **A**     He had no direct authority, I think.  You know, he

02:50:09  4   can't go in his cabinet and say, okay, here's the stuff.  I

02:50:12  5   mean, you had to go through all these procedures, you know.

02:50:15  6   **Q**     One would think, though, that Henderhan, with the

02:50:17  7   federal government, with the Secret Service, could have

02:50:19  8   called the appropriate person and said, hey, Service is

02:50:22  9   asking for this, the IRS wants this, we can get it done,

02:50:25  10  everybody is in agreement.  Right?

02:50:28  11  **A**     I would like to have seized those assets.

02:50:31  12  **Q**     Well, and I believe, based upon prior testimony,

02:50:35  13  Mr. Karasarides and Mr. DiPietro would have liked to have

02:50:39  14  seen you seize those assets?

02:50:40  15  **A**     Yes.

02:50:41  16  **Q**     Right?  Not a problem.

02:50:42  17          So this all started in June of 2013.  So we have

02:50:50  18  another -- bottom of Page 8, August 23rd of 2013, follow-up

02:50:54  19  with the Secret Service.

02:50:56  20          They're open to releasing the money; right?

02:50:59  21  **A**     Yes.

02:51:01  22  **Q**     Can you repeat that in the microphone?

02:51:03  23  **A**     Yes.  Yes.

02:51:05  24  **Q**     Thank you.

02:51:09  25              MR. FEDOR:  And if we can turn to Page 9,

**D. Ross  (Cross by Fedor)**                              610

02:51:12 1    Carissa, at the top.

2    BY MR. FEDOR:

02:51:13 3    **Q**    The action date of September 13th of 2013; correct?

02:51:16 4    **A**    Correct.

02:51:21 5    **Q**    Mr. DiPietro tried to settle with you; correct?

02:51:24 6    **A**    He inquired about some type of settlement on this

02:51:28 7    case.

02:51:28 8    **Q**    Do you remember what he inquired about?

02:51:31 9    **A**    I know he -- he had used the term "fresh start" on

02:51:36 10    more than one occasion, and he also used the term. . . well,

02:51:42 11    "settlement," and I -- you know, I explained to him the

02:51:45 12    offer in compromise procedure.

02:51:47 13    **Q**    Well, let's talk about "fresh start" first.

02:51:49 14         That's a term of art; correct?

02:51:52 15    **A**    Well, it's a special program by the Internal Revenue

02:51:56 16    Service.

02:51:56 17    **Q**    And if you could tell the jurors, I think, while it

02:51:59 18    was in existence, Fresh Start, what it actually meant to a

02:52:02 19    taxpayer?

02:52:03 20    **A**    Well, at that time, it was giving certain taxpayers

02:52:07 21    that qualified a little more relaxed requirements for an

02:52:13 22    installment agreement or an offer in compromise.

02:52:16 23         You know, the issue in this case was Fresh Start at

02:52:20 24    the time was only limited or available to taxpayers owing --

02:52:25 25    with a total tax liability of $50,000 or less.

D. Ross (Cross by Fedor)                                    611

02:52:28  1   **Q**     Um-hmm.

02:52:29  2   **A**     So that definitely would not have qualified in the

02:52:31  3   Karasarides case.

02:52:32  4   **Q**     Well, but -- go ahead.

02:52:33  5   **A**     But you can still file an offer in compromise,

02:52:38  6   that's --

02:52:38  7   **Q**     Right.

02:52:38  8         But had that $500,000 been applied, give or take, that

02:52:42  9   might have made a big different; right?

02:52:44  10  **A**     It would still be over the limit for qualifying for a

02:52:48  11  fresh start.

02:52:48  12  **Q**     Okay.  So in that second paragraph, says you advised,

02:52:57  13  "I'm attempting Secret Service to allow us to seize assets";

02:53:00  14  correct?

02:53:02  15  **A**     Which paragraph are you looking at?

02:53:04  16  **Q**     The next one after, the 9-13-entry, second paragraph,

02:53:08  17  regarding assets.

02:53:08  18  **A**     "Power of attorney said the taxpayer has some rental

02:53:11  19  properties in bad areas of Canton --"

02:53:13  20  **Q**     Correct.

02:53:13  21  **A**     "-- that could be seized and sold."

02:53:15  22  **Q**     Correct.

02:53:16  23  **A**     "Probably $20,000 in equity, total equity, he says."

02:53:20  24  **Q**     And then you indicate that his request for a lien

02:53:22  25  withdrawal was not going to be approved as well; right?

**D. Ross  (Cross by Fedor)**                    612

| | | |
|---|---|---|
| 02:53:25 | 1 | **A**    Right. |
| 02:53:25 | 2 | **Q**    And that was related to the Meese Road property |
| 02:53:28 | 3 | because in your opinion it was the wrong form; correct? |
| 02:53:31 | 4 | **A**    Correct. |
| 02:53:32 | 5 | **Q**    And he should have filed for what's called a |
| 02:53:34 | 6 | discharge, not a lien withdrawal? |
| 02:53:35 | 7 | **A**    Yeah, I recommended him file a discharge -- |
| 02:53:38 | 8 | application for discharge. |
| 02:53:42 | 9 | **Q**    But you told him that.  You said, here's the form you |
| 02:53:45 | 10 | file, and perhaps Mr. DiPietro didn't understand which form |
| 02:53:48 | 11 | to file. |
| 02:53:48 | 12 | That happens; right? |
| 02:53:49 | 13 | **A**    Sure. |
| 02:53:52 | 14 | **Q**    We all get the forms wrong sometimes; right? |
| 02:53:55 | 15 | **A**    Right.  Right. |
| 02:54:03 | 16 | MR. FEDOR:  Turning to Page 10, action date of |
| 02:54:06 | 17 | October 25th of 2013. |
| | 18 | BY MR. FEDOR: |
| 02:54:08 | 19 | **Q**    "Based on the newspaper article recently, State of |
| 02:54:11 | 20 | Ohio shut down internet gambling"; correct? |
| 02:54:13 | 21 | **A**    Correct. |
| 02:54:14 | 22 | **Q**    And you enter -- this is your unilateral entry; |
| 02:54:18 | 23 | correct?  Nobody provided this to you? |
| 02:54:19 | 24 | **A**    Correct. |
| 02:54:20 | 25 | **Q**    Okay.  It says, which is where the taxpayer made large |

**D. Ross (Cross by Fedor)**　　613

| | | |
|---|---|---|
| 02:54:25 | 1 | amounts of income.  All that was shut down.  Correct? |
| 02:54:32 | 2 | **A**　　Yeah.  "State of Ohio shut down the internet gambling |
| 02:54:36 | 3 | establishments, which is where taxpayer made large amounts |
| 02:54:39 | 4 | of income." |
| 02:54:39 | 5 | **Q**　　Right. |
| 02:54:40 | 6 | 　　And nobody provided you that information.  You got |
| 02:54:43 | 7 | that yourself and you entered that into your activity |
| 02:54:45 | 8 | record; correct? |
| 02:54:45 | 9 | **A**　　I must have researched Google on that. |
| 02:54:48 | 10 | **Q**　　I don't know. |
| 02:54:49 | 11 | **A**　　Found it in a newspaper article. |
| 02:54:51 | 12 | **Q**　　And then you have as a -- the next line under, of |
| 02:54:55 | 13 | course, next action date, "contact Secret Service again"; |
| 02:54:58 | 14 | right? |
| 02:54:58 | 15 | **A**　　Yes. |
| 02:54:58 | 16 | **Q**　　So when you were contacting the Secret Service, did |
| 02:55:02 | 17 | you call them up?  Did you e-mail them?  Did you walk over |
| 02:55:05 | 18 | to the other office where Henderhan was?  What did you do? |
| 02:55:07 | 19 | **A**　　Telephone calls. |
| 02:55:08 | 20 | **Q**　　Okay.  Did you get someone live usually on the other |
| 02:55:11 | 21 | end or was it like calling the IRS? |
| 02:55:14 | 22 | **A**　　I don't -- I don't recall.  I did speak with that |
| 02:55:17 | 23 | Darlene Parker though, my history entry indicates. |
| 02:55:22 | 24 | **Q**　　Did you e-mail with the Secret Service at all? |
| 02:55:26 | 25 | **A**　　I don't recall e-mailing them.  I don't -- I don't -- |

**D. Ross  (Cross by Fedor)**                    614

02:55:30  1    I don't remember.

02:55:33  2         Again, it was very frustrating.

02:55:36  3    **Q**    We have another entry, going down to the bottom of

02:55:39  4    page 10, December 27th of 2013, obviously another follow-up

02:55:44  5    call with the Secret Service.

02:55:45  6         "Left a message.  Need to follow up on whether the IRS

02:55:48  7    can seize the assets in their possession that were taken

02:55:50  8    from the taxpayer."  And you have a phone number there.

02:55:53  9         Correct?

02:55:54  10   **A**    Which page are you looking?

02:55:55  11   **Q**    The top of Page 11.  I'm sorry.

02:55:58  12   **A**    I've got 10 on -- okay.

02:56:00  13   **Q**    Just that first -- first line of Page 11.

02:56:03  14   **A**    Yes.

02:56:04  15   **Q**    And this is your Bible.  This is like the history of

02:56:06  16   what happened on this case; right?

02:56:08  17   **A**    It's the history, the written record.

02:56:14  18   **Q**    So another follow-up call to Secret Service.  You got

02:56:17  19   nowhere.

02:56:18  20        Scroll down two more.  February 21st of 2014.  "Field

02:56:22  21   call to U.S. Secret Service."

02:56:23  22        That means you went and visited them; right?

02:56:26  23   **A**    Yes.

02:56:26  24   **Q**    And where was that located?

02:56:29  25   **A**    In Independence.

02:56:30  1  **Q**    So that was a field call to your office?

02:56:33  2  **A**    It was downstairs.  It was downstairs.

02:56:35  3  **Q**    That's what I thought.

02:56:43  4        And what happened at that meeting?

02:56:45  5  **A**    Which entry are you looking at, What date?

02:56:45  6  **Q**    The 2-21-14.

02:56:46  7  **A**    "Field call to Secret Service.  Located work group

02:56:50  8  employee, supervisor.  Brian Sallee is the CID employee but

02:56:59  9  worked with Agent Henderhan.  He said Henderhan not in but

02:57:03  10  would speak with him about working together to get these

02:57:06  11  assets seized."

02:57:07  12  **Q**    Did you then discover that the assets were in the

02:57:10  13  hands of the ATF somehow?  Or is that a typo?

02:57:17  14  **A**    Where are you looking?

02:57:18  15  **Q**    The following.  "E-mailed a CID agent, Brian Sallee,

02:57:22  16  regarding possible seizure of assets in the custody of the

02:57:27  17  ATF."

02:57:30  18  **A**    Oh, yeah, I see that.

02:57:31  19  **Q**    Is that accurate?

02:57:35  20  **A**    I probably meant Secret Service.

02:57:37  21  **Q**    Right.  I would think so as well.

02:57:39  22  **A**    I would think so.

02:57:39  23  **Q**    Because that's the only time I've seen ATF.

02:57:42  24        And then the following day, February 28th, you got a

02:57:46  25  response; right?  "They'll discuss.  Maybe next week."

**D. Ross  (Cross by Fedor)**                                616

02:57:49  1   Right?

02:57:49  2   **A**    Yes.

02:57:51  3   **Q**    And then, almost 2 months later, February --

02:57:56  4   April 25th of 2014, we're now 10 months into this,

02:58:01  5   Mr. DiPietro, Mr. Karasarides trying to get you paid.

02:58:04  6   10 months into this you e-mailed Brian Sallee again.  This

02:58:08  7   is a month and a half after the last time.

02:58:10  8        April 25th of '14; correct?  "Is it still possible to

02:58:15  9   seize these?"

02:58:15  10  **A**    What page and what -- what's the date?

02:58:18  11  **Q**    Bottom of Page 11, your action entry dated 4-25 of

02:58:22  12  '14?

02:58:22  13  **A**    Oh, yes.

02:58:24  14  **Q**    10 months after the fact, correct?  Still trying to

02:58:27  15  get this money sent over.  All in the hands of the federal

02:58:30  16  government.

02:58:30  17  **A**    I didn't compute how many months but --

02:58:33  18  **Q**    Well, let's go back a second.

02:58:35  19        So if we look at -- the first entry on that was 6-24

02:58:39  20  of '13, which is on the bottom of Page 7.

02:58:42  21  **A**    Okay.

02:58:42  22  **Q**    Okay.  If you go from June 24th of '13, paging through

02:58:53  23  to April 25th of '14, that's about 10 months in my

02:58:57  24  estimation.

02:58:58  25  **A**    Okay.  All right.

**D. Ross  (Cross by Fedor)**                               617

| | | |
|---|---|---|
| 02:58:58 | 1 | **Q**     That you were trying to get this done and were as |
| 02:59:01 | 2 | frustrated as anybody.  Correct? |
| 02:59:03 | 3 | **A**     Correct. |
| 02:59:07 | 4 | **Q**     Now let's turn to the top of Page 12. |
| 02:59:10 | 5 |        Entry dated May 23rd of '14.  Just about a year, a |
| 02:59:16 | 6 | little under a year of your attempts to try to get this |
| 02:59:18 | 7 | money paid over. |
| 02:59:20 | 8 |        What did you find out that day? |
| 02:59:23 | 9 | **A**     On that date that "the taxpayer entered a plea |
| 02:59:27 | 10 | bargain.  There are no assets to seize from the Secret |
| 02:59:29 | 11 | Service at this point.  Need to contact with the power of |
| 02:59:32 | 12 | attorney and determine what happened to the assets, do an |
| 02:59:36 | 13 | updated courthouse search for real property, equity |
| 02:59:39 | 14 | determination, issue final notice, determine what taxpayer |
| 02:59:44 | 15 | income he has," so forth. |
| 02:59:48 | 16 | **Q**     So, during that entire let's call it 11-month time |
| 02:59:54 | 17 | frame, give or take, no one at the Secret Service ever got |
| 02:59:57 | 18 | back to you and told you what happened with the assets? |
| 02:59:59 | 19 | **A**     Not that I can recall. |
| 03:00:00 | 20 | **Q**     It's not in your history either, is it? |
| 03:00:01 | 21 | **A**     I don't see it. |
| 03:00:02 | 22 | **Q**     It just went *poof*? |
| 03:00:05 | 23 | **A**     I don't recall what the final disposition was. |
| 03:00:08 | 24 | **Q**     So, Mr. DiPietro's efforts, Mr. Karasarides' efforts |
| 03:00:11 | 25 | to get you a half million bucks just went up in the air. |

**D. Ross  (Cross by Fedor)**                                    618

03:00:17  1   I'd be frustrated too.

03:00:33  2              MR. FEDOR:  If we could turn to Page 15

03:00:35  3   Carissa.

03:00:35  4              THE COURT:  Mr. Fedor, I'll interrupt you.  Is

03:00:37  5   this a good time --

03:00:37  6              MR. FEDOR:  It's a good time to interrupt.

03:00:41  7              THE COURT:  -- to take a break?  Good.

          8              MR. FEDOR:  Thank you, Judge.

          9         Okay.  Let's take our afternoon recess.  I do have

03:00:41  10  two, quote/unquote, short hearings that -- so it will be

03:00:44  11  about 20 minutes.

03:00:45  12        So keep in mind the admonition.  We'll see you soon.

03:00:51  13             COURTROOM DEPUTY:  All rise.

03:44:37  14  (Jury excused from courtroom and recess taken at 3:00 p.m.)

03:44:37  15             COURTROOM DEPUTY:  All rise for the jury.

03:45:07  16             (Jury returned to courtroom at 3:44 p.m.)

03:45:07  17             COURTROOM DEPUTY:  Court is in session.

03:45:11  18  Please be seated.

03:45:47  19                  (Off-record discussion.)

03:45:47  20             THE COURT:  Mr. Fedor.

03:45:49  21             MR. FEDOR:  Good segue, Your Honor, going back

03:45:52  22  to taxes.  Thank you very much, again.

03:45:58  23        Carissa, could we go back to Exhibit 200, please.

03:46:02  24        Mr. Ross, that's your ICS history.  We're going to

03:46:06  25  turn back to that.

**D. Ross (Cross by Fedor)**                                    619

03:46:08   1          We are on Page 15.  Thank you.  Good memory.

03:46:17   2    BY MR. FEDOR:

03:46:18   3    **Q**     Just picking up where we were last, Mr. Ross, you

03:46:21   4    expressed some frustration with Secret Service, the fact

03:46:24   5    that the $500,000 that was offered to be paid over couldn't

03:46:27   6    get done, the money went missing essentially, and it was

03:46:30   7    never credited back it the IRS and your frustrations;

03:46:34   8    correct?

03:46:34   9    **A**     Correct.

03:46:34   10   **Q**     Turning to the bottom of Page 15, we're now into -- so

03:46:38   11   we went from February 2013 when you were first assigned, we

03:46:41   12   went through the progress of collections, your interactions

03:46:45   13   with the taxpayer, with Mr. DiPietro, and now we're up to

03:46:49   14   February of -- July of '14.

03:46:52   15          So we're a year and a half into your collections,

03:46:55   16   approximately, right?

03:46:56   17   **A**     What date are you looking at?

03:46:57   18   **Q**     I'm looking at July 2nd, 2014, the bottom of Page 15.

03:47:02   19   **A**     Okay.  I see.

03:47:03   20   **Q**     Okay.  And then that second paragraph states -- and

03:47:08   21   this is a phone call, I believe, from Mr. DiPietro to you.

03:47:12   22   Correct?

03:47:12   23   **A**     Yes.

03:47:13   24   **Q**     Advising that the taxpayer is in prison; right?

03:47:16   25   **A**     Yes.

**D. Ross  (Cross by Fedor)** 620

| | | |
|---|---|---|
| 03:47:18 | 1 | **Q**    That the only assets remaining are two rental |
| 03:47:22 | 2 | properties, nominal value, in Canton; correct? |
| 03:47:24 | 3 | **A**    Yes. |
| 03:47:25 | 4 | **Q**    And I believe those are the rental properties that |
| 03:47:27 | 5 | were referenced in Government's Exhibit 174, which are the |
| 03:47:30 | 6 | properties on the 433 statement; right? |
| 03:47:34 | 7 | **A**    I'm not sure.  You know, you're holding it up, I |
| 03:47:38 | 8 | can't. . . |
| 03:47:38 | 9 | **Q**    Well, do you remember the 2013 collection information |
| 03:47:41 | 10 | statement? |
| 03:47:41 | 11 | **A**    Yes.  Yes. |
| 03:47:42 | 12 | **Q**    And I believe -- |
| 03:47:43 | 13 | **A**    There were rental properties in Canton.  Okay.  All |
| 03:47:46 | 14 | right. |
| 03:47:46 | 15 | **Q**    That's my only point.  That's my only question. |
| 03:47:49 | 16 | And evidently, you found out July 2, 2014, that |
| 03:47:55 | 17 | Mr. Karasarides also got married right before going to |
| 03:47:57 | 18 | prison; correct? |
| 03:47:58 | 19 | **A**    Correct. |
| 03:48:02 | 20 | **Q**    And then Mr. DiPietro advises you, hey, I'm in the |
| 03:48:06 | 21 | middle of preparing the 2013 tax return, and it's going to |
| 03:48:13 | 22 | make the liability over $2 million; right? |
| 03:48:16 | 23 | **A**    Yes, sir. |
| 03:48:16 | 24 | **Q**    And he proffered that to you, he gave that information |
| 03:48:18 | 25 | to you freely, right? |

**D. Ross  (Cross by Fedor)** 621

| | | |
|---|---|---|
| 03:48:19 | 1 | **A**    Yes, he did. |
| 03:48:20 | 2 | **Q**    And you recorded that in your ICS history? |
| 03:48:23 | 3 | **A**    Yes. |
| 03:48:24 | 4 | MR. FEDOR:  Can we turn to the top of Page 16. |
| 03:48:26 | 5 | BY MR. FEDOR: |
| 03:48:26 | 6 | **Q**    There's a further reference, I don't know how many |
| 03:48:28 | 7 | times this is now, that the taxpayer's income seized because |
| 03:48:33 | 8 | the State of Ohio shut down the gambling -- internet cafes; |
| 03:48:37 | 9 | right? |
| 03:48:37 | 10 | **A**    Yes. |
| 03:48:37 | 11 | **Q**    And obviously, then, if Mr. Karasarides is in prison, |
| 03:48:40 | 12 | he has no source of income at the time either; right? |
| 03:48:43 | 13 | **A**    I don't know that. |
| 03:48:44 | 14 | **Q**    Okay.  Well, can you work in prison? |
| 03:48:49 | 15 | **A**    You can own businesses from prison. |
| 03:48:51 | 16 | **Q**    Okay. |
| 03:48:52 | 17 | **A**    Just because you're in prison doesn't mean you have -- |
| 03:48:54 | 18 | you don't have income. |
| 03:48:56 | 19 | **Q**    Okay. |
| 03:48:56 | 20 | **A**    I had taxpayers that were in prison that were still |
| 03:48:58 | 21 | getting income from their business. |
| 03:49:00 | 22 | **Q**    Okay.  Do you know when Mr. Karasarides went away to |
| 03:49:03 | 23 | prison? |
| 03:49:03 | 24 | **A**    When did he go away? |
| 03:49:05 | 25 | **Q**    Yes. |

| | | | |
|---|---|---|---|
| 03:49:06 | 1 | **A** | I believe it was either June or July of 2014. |
| 03:49:11 | 2 | **Q** | Okay.  And do you know when he was released? |
| 03:49:15 | 3 | **A** | No, I do not. |
| 03:49:16 | 4 | **Q** | Okay.  You have no idea how long he was incarcerated? |
| 03:49:22 | 5 | **A** | Well, he was out of prison at least by April of 2015 |
| 03:49:29 | 6 | | because that's when, you know, he was seen at his |
| 03:49:33 | 7 | | residence -- at the Dunkeith address. |
| 03:49:36 | 8 | **Q** | Okay. |
| 03:49:37 | 9 | **A** | So it had been some time before then. |
| 03:49:49 | 10 | **Q** | And prior to Mr. Karasarides going to prison, do you |
| 03:49:53 | 11 | | know if he divested from his different investments? |
| 03:49:58 | 12 | **A** | I don't know. |
| 03:49:59 | 13 | **Q** | Did you ever investigate that? |
| 03:50:03 | 14 | **A** | The businesses were closed at that point I was being |
| 03:50:07 | 15 | | told.  There was no income from those businesses. |
| 03:50:10 | 16 | **Q** | But I believe -- |
| 03:50:11 | 17 | **A** | Because of the state action. |
| 03:50:13 | 18 | **Q** | I'm sorry? |
| 03:50:14 | 19 | **A** | Because of the state action. |
| 03:50:15 | 20 | **Q** | Right. |
| 03:50:16 | 21 | | And I believe at one point you testified that you met |
| 03:50:18 | 22 | | with Melissa Minnich; correct? |
| 03:50:21 | 23 | **A** | I did. |
| 03:50:22 | 24 | **Q** | And what was that in reference to? |
| 03:50:23 | 25 | **A** | What page are you looking at? |

**D. Ross  (Cross by Fedor)**                                    623

03:50:25  1    **Q**    I'm just discussing it with you and asking you

03:50:27  2    questions.

03:50:28  3    **A**    I don't recall.  If you have an exhibit, I'll look at

03:50:32  4    it and review, refresh my memory.

03:50:34  5    **Q**    At one point did you sit down with an IRS examining

03:50:38  6    agent, Melissa Minnich?

03:50:40  7    **A**    Do you have an exhibit or reference?

03:50:42  8    **Q**    No.  I'm just asking you a question.  To the best of

03:50:45  9    your knowledge.

03:50:46  10   **A**    I recall seeing her at some point on this case.

03:50:50  11   **Q**    Okay.  And do you recall what that meeting was about?

03:50:54  12   **A**    Well, she accompanied me and my group manager and

03:51:02  13   Mr. DiPietro when we interviewed Ms. Bragg at the Canton,

03:51:05  14   Ohio, office in May of 2015, I believe.

03:51:10  15   **Q**    Okay.  And do you remember what you discussed at that

03:51:12  16   meeting?

03:51:13  17   **A**    Well, the meeting, I interviewed Ms. Bragg regarding

03:51:18  18   Mr. Karasarides' tax issues.

03:51:20  19   **Q**    Correct.

03:51:20  20        And do you recall what you asked her?

03:51:24  21   **A**    I recall some of the information.  It's what, almost

03:51:30  22   9 years ago?

03:51:31  23   **Q**    I know.

03:51:32  24        To the extent you recall, would you tell the jurors

03:51:35  25   what you recall from that?

**D. Ross (Cross by Fedor)**                    624

03:51:36   1   **A**      Well, the highlights, well, number one, she did say

03:51:41   2   that she -- in front of Mr. DiPietro that she married

03:51:48   3   Christos Karasarides before he went to prison.

03:51:53   4        Another issue was the house on Meese Road.  She had

03:52:01   5   indicated to me that the property on Meese Road was being

03:52:07   6   rented to Jason, which I assumed was Jason Kachner.  Okay?

03:52:13   7   And that information differed from what I was being --

03:52:17   8   previously being told by Mr. DiPietro.  You know, that was

03:52:22   9   in connection to the withdrawal of the lien.

03:52:25   10        Another significant issue was the -- she was saying

03:52:27   11   that she was funneling money to Christopher, the son, to

03:52:34   12   make the payments on the land contract.

03:52:37   13   **Q**      Okay.  Do you remember anything else from that

03:52:39   14   meeting?

03:52:40   15   **A**      Well, that she was involved in a business in Canton.

03:52:46   16   Can't recall the name.

03:52:48   17        Do you have the name -- do you have the -- an exhibit

03:52:52   18   I can look at?

03:52:53   19   **Q**      Do you -- do you have any knowledge if she took over

03:52:57   20   Mr. Karasarides' business while he was incarcerated?

03:53:04   21   **A**      I'd have to review that memo.

03:53:06   22   **Q**      Okay.  Did you look at her tax returns to see if it

03:53:09   23   reflected previously, prior to divestment, Mr. Karasarides'

03:53:13   24   income that then went to his wife?

03:53:18   25   **A**      I don't recall.

**D. Ross  (Cross by Fedor)**                                          625

03:53:18  1    **Q**    Do you recall investigating that at all?

03:53:20  2    **A**    I don't recall.

03:53:21  3    **Q**    Okay.  Thank you.

03:53:21  4              MR. FEDOR:  Can we turn back to Government's

03:53:23  5    Exhibit 200, Page 19.

03:53:25  6         Thank you, Carissa.

03:53:28  7    BY MR. FEDOR:

03:53:29  8    **Q**    Mr. Ross, I'm looking at your action date of

03:53:32  9    February 13th of 2015.

03:53:35  10   **A**    Yes.

03:53:35  11   **Q**    And it references, in Paragraph 2, that you issued a

03:53:39  12   summons to Mr. DiPietro; correct?

03:53:46  13   **A**    It said that summons records were received from power

03:53:49  14   of attorney DiPietro.

03:53:51  15   **Q**    I'm actually mistaken.

03:53:52  16        He was returning records to you; correct?

03:53:54  17   **A**    He had submitted records to me in response to a

03:53:57  18   summons.

03:53:57  19   **Q**    Would you tell the jurors what a summons is?

03:53:59  20   **A**    Summons is a legal document that requires the

03:54:05  21   production of records and/or testimony regarding a tax case.

03:54:11  22   **Q**    And to your recollection, did Mr. DiPietro turn over

03:54:14  23   his entire file that you were seeking, actually, the

03:54:17  24   original records?

03:54:18  25   **A**    I don't know what he -- I don't know what he had, so I

**D. Ross  (Cross by Fedor)** 626

03:54:22  1  can't comment on that.

03:54:22  2  **Q**    Okay.  The second paragraph of that action date, you

03:54:27  3  started copying and reviewing records.  Approve POA notes

03:54:32  4  vis-a-vis original records, and he asked that you return

03:54:35  5  them what you're done copying them; right?

03:54:37  6  **A**    Right.

03:54:38  7  **Q**    So you actually took his file, copied them and then

03:54:42  8  gave them back to him?

03:54:42  9  **A**    Yes.

03:54:59  10  **Q**    And that was February 13th of 2015; correct?

03:55:02  11  **A**    Yes.

03:55:03  12             MR. FEDOR:  If we could turn, Carissa, to

03:55:06  13  Page 28 of this same exhibit.

03:55:16  14  BY MR. FEDOR:

03:55:17  15  **Q**    So this is the -- the last entry on that Page, May 4th

03:55:20  16  of 2015, still copying the records you received from

03:55:24  17  Mr. DiPietro; correct?

03:55:25  18  **A**    Yes.

03:55:26  19  **Q**    Okay.

03:55:28  20             MR. FEDOR:  And if we move to Page 29, May 5th

03:55:31  21  of 2015.

03:55:32  22  BY MR. FEDOR:

03:55:32  23  **Q**    Your entry, you called Mr. DiPietro back, said you

03:55:38  24  were working on some things to raise money.

03:55:40  25         That's what Mr. DiPietro told you; right?

**D. Ross  (Cross by Fedor)**                                    627

03:55:42  1    **A**    That's what I was advised, yes.

03:55:43  2    **Q**    Correct.

03:55:44  3          And do you know what he was working on to raise some

03:55:46  4    money to pay the IRS?

03:55:49  5    **A**    Well, he had previously indicated that he wanted to

03:55:56  6    borrower on those Canton properties in order to fund the

03:56:01  7    offer in compromise.

03:56:01  8    **Q**    Well, we're not talking about the offer in compromise.

03:56:04  9    **A**    Okay.

03:56:04  10   **Q**    He's raising money to pay or the IRS; correct?

03:56:06  11   **A**    Okay.  Right.  It doesn't -- it doesn't say.  So I'm

03:56:09  12   not sure.

03:56:10  13   **Q**    No.  And I'm asking your recollection, and I know

03:56:13  14   we're going back now 8 years plus.

03:56:15  15          Do you have any recollection of what he told you how

03:56:18  16   Mr. Karasarides was going to raise money to pay the IRS?

03:56:22  17   **A**    Not from this entry.

03:56:24  18   **Q**    Okay.  No, I'm asking, over and above the entry, do

03:56:27  19   you have any independent recollection?

03:56:29  20   **A**    No.

03:56:29  21   **Q**    Okay.  So other than the $500,000, Mr. DiPietro is

03:56:40  22   reaching out to you and saying, hey, we're raising money for

03:56:42  23   you as well, keep working with us; right?

03:56:45  24   **A**    Right.  We're on the Secret Service issue,

03:56:50  25   Mr. Karasarides is not going to get the assets back either

**D. Ross  (Cross by Fedor)** 628

03:56:52　1　way, so. . .

03:56:53　2　**Q**　No, because he wanted to give it to you?

03:56:55　3　**A**　I'd prefer to have it on my account for sure.

03:56:57　4　**Q**　Right.  As did he, as did Mr. DiPietro; right?

03:57:00　5　**A**　Yes.

03:57:00　6　**Q**　All trying to get the IRS paid so that you don't

03:57:03　7　bother them anymore; right?

03:57:05　8　**A**　Yeah, we're like a skunk at a picnic.  We understand.

03:57:09　9　Nobody likes us.

03:57:13　10　　　　　　THE COURT:  That was a good one, wasn't it?

03:57:20　11　　　　　　MR. FEDOR:  If we could turn to Page 30,

03:57:22　12　please, for a moment.

03:57:23　13　BY MR. FEDOR:

03:57:24　14　**Q**　Your history indicated May 6th of 2015, your notes,

03:57:28　15　again, Mr. Ross.  Last sentence:  "DiPietro requested

03:57:33　16　transcripts of the liabilities.  Advised I'd print them out

03:57:36　17　and schedule a meeting to discuss a resolution of the case."

03:57:39　18　**A**　Yes.

03:57:40　19　**Q**　What did you mean by that?

03:57:41　20　**A**　How it's going to be resolved, how -- what's the

03:57:45　21　finality of it, how is it going to be closed, resolved for

03:57:48　22　the taxpayer and the Internal Revenue Service.

03:57:51　23　**Q**　And that's precisely my question.

03:57:53　24　　　　　Did you have an understanding how it would be

03:57:55　25　resolved?  Was it -- were they going to bring you a check

**D. Ross  (Cross by Fedor)**                                629

03:57:58  1   and full pay it?  Were they going to file an offer in

03:58:02  2   compromise?  Were they going to do an installment agreement?

03:58:06  3        Did you have an understanding how it was going to be

03:58:07  4   resolved?

03:58:08  5   **A**    Mr. DiPietro was indicating -- he brought up the idea

03:58:11  6   of an off in compromise.  And again, he used that term,

03:58:11  7   "fresh start," which they didn't qualify.  But you can still

03:58:13  8   file an offer in compromise even if you don't qualify for

03:58:16  9   the other program.

03:58:17  10  **Q**    Right.

03:58:17  11       Well, and your understanding at the time and go --

03:58:21  12  we'll get into the offer in compromise issues in a moment.

03:58:23  13       But was Mr. Karasarides eligible for an offer in

03:58:26  14  compromise?  Was he compliant?

03:58:29  15  **A**    At that time I'm not -- I don't know.  It was the

03:58:32  16  representation of Mr. Yackshaw, later on, that he was

03:58:37  17  current, but at this point. . . I don't know.

03:58:42  18  **Q**    Well, let me make it easier for you.

03:58:44  19  **A**    I really don't know.

03:58:45  20  **Q**    Was he making estimated tax payments on his

03:58:48  21  self-employment income?

03:58:48  22  **A**    No.

03:58:48  23  **Q**    Wouldn't that nullify an offer in compromise?

03:58:51  24  **A**    It could, yes, for sure.

03:58:52  25  **Q**    That's not compliance; right?

**D. Ross (Cross by Fedor)**          630

03:58:54    1      Compliance is filing your tax returns and paying your

03:58:57    2  quarterly payments; correct?

03:58:59    3  **A**    Right.

03:59:01    4      But at this point, for the 2015 year, there was no tax

03:59:05    5  due.

03:59:07    6  **Q**    But how about the prior years?

03:59:09    7  **A**    Yeah.  Yeah, '14 was on the -- ended up being on the

03:59:13    8  offer in compromise.

03:59:13    9  **Q**    Correct.

03:59:14    10      So that's an issue?

03:59:15    11  **A**    Okay.

03:59:15    12  **Q**    Whether he was compliant or not?

03:59:16    13  **A**    Right.

03:59:17    14  **Q**    Correct?

03:59:18    15      And when Mr. DiPietro told you, well, we're thinking

03:59:22    16  about filing an offer in compromise, did you have any

03:59:25    17  understanding that he had a background in filing offer in

03:59:31    18  compromise or even knew what he was doing?

03:59:32    19  **A**    Well, it was my impression he was using Fresh Start

03:59:35    20  and offer in compromise synonymously, you know, but -- which

03:59:39    21  happens, you know.

03:59:42    22      As I indicated, taxpayer did not qualify for Fresh

03:59:46    23  Start, but anyone may file an offer in compromise.  You

03:59:50    24  know, whether it gets even processed, reviewed, accepted,

03:59:56    25  that's another story.

**D. Ross (Cross by Fedor)**                                   631

03:59:57   1    **Q**    Correct.  Correct.

03:59:58   2         So just so the record is clear here, Fresh Start,

04:00:01   3    offer in compromise, he was using the terms synonymously as

04:00:04   4    you just stated.  Doesn't mean he necessarily knew what he

04:00:07   5    was doing, did he?

04:00:09   6    **A**    Well, I don't know how much background he had in

04:00:11   7    collection -- working on collection cases, I don't know.

04:00:17   8    **Q**    What's your background in offers in compromise, since

04:00:20   9    we're on the subject?

04:00:23  10    **A**    The basics.  You know, I was on a detail, that was a

04:00:29  11    long time ago, 20 -- 20 some years maybe.  I was on a detail

04:00:34  12    for a number of months actually reviewing offer in

04:00:39  13    compromises, making decisions on them, so forth.

04:00:41  14    **Q**    So that was back in the time period when they worked

04:00:44  15    the offers in the field; correct?

04:00:45  16    **A**    Yes.

04:00:45  17    **Q**    So, and the Independence office would actually receive

04:00:49  18    the offer in compromise, work the offers in compromise,

04:00:52  19    negotiate them, go through them, and either reject or and

04:00:55  20    accept them; correct?

04:00:57  21    **A**    Yes.

04:00:57  22    **Q**    And that was 20-some-odd years ago; correct?

04:00:59  23    **A**    I believe.

04:01:00  24    **Q**    And I'm not holding you to the date.

04:01:02  25    **A**    When you get old, the time goes fast.  It's hard to

**D. Ross  (Cross by Fedor)**                    632

04:01:04  1  figure it out.

04:01:05  2  **Q**    And so given that history, when was the last time you

04:01:08  3  saw an offer in compromise not related to this matter?

04:01:12  4  **A**    I don't recall.

04:01:14  5  **Q**    Can you give me an estimate?

04:01:16  6  **A**    I don't know.

04:01:17  7  **Q**    Do you know the rules that are even required for an

04:01:20  8  offer in compromise?

04:01:21  9  **A**    Well, I know that you have to put 20 percent down,

04:01:24  10  submit that in connection with the offer, and the

04:01:27  11  application fee, you know, the proper form and the financial

04:01:30  12  information.

04:01:30  13  **Q**    Do you know what the terms of an offer in compromise

04:01:32  14  are, what's required on both the IRS side and the taxpayer

04:01:36  15  side?

04:01:36  16  **A**    I don't get into that area.

04:01:38  17  **Q**    Okay.  You know it's a contract with the IRS for

04:01:41  18  5 years; right?

04:01:42  19  **A**    It is a contract, right.

04:01:43  20  **Q**    Right.

04:01:43  21         And they have to stay compliant and comply with the

04:01:45  22  terms for 5 years after acceptance; right?

04:01:48  23  **A**    I believe so.

04:01:48  24  **Q**    And just so the jurors are aware, does an offer in

04:01:51  25  compromise have anything to do with what you owe?  Is it

**D. Ross  (Cross by Fedor)**                                                633

04:01:55  1   related at all to the amount you have to offer to the amount

04:01:58  2   you owe?

04:02:01  3   **A**      No.

04:02:02  4   **Q**      Correct.

04:02:02  5   **A**      Not necessarily.

04:02:04  6   **Q**      Well, not even not necessarily.  It's irrelevant to

04:02:07  7   how much you owe; correct?

04:02:08  8   **A**      Right.

04:02:08  9   **Q**      What's an offer in compromise based upon?

04:02:12  10  **A**      Taxpayer's ability to pay, how much the IRS can

04:02:17  11  reasonably expect to collect over the life of the liability.

04:02:20  12  **Q**      Correct.  Correct.

04:02:21  13          So when we heard, on your direct, 3 percent of the

04:02:25  14  offer amount, 2 percent, 5 percent, that's irrelevant;

04:02:28  15  correct?

04:02:34  16  **A**      It's relevant to the taxpayer's ability to pay.

04:02:38  17  **Q**      How so?

04:02:39  18  **A**      Because the taxpayer should be submitting a reasonable

04:02:43  19  offer of his ability to pay the taxes.  In this case, it was

04:02:49  20  like at least 4 or $500,000 less than what we believe the

04:02:56  21  taxpayer could pay.

04:02:59  22  **Q**      But that's not related to a 3 percent of the

04:03:01  23  liability; is it?

04:03:01  24  **A**      No.

04:03:02  25  **Q**      It's ability to pay?

**D. Ross  (Cross by Fedor)**                                    634

04:03:03   1   **A**      No.  I see what you're saying.  Yeah, right.

04:03:06   2   **Q**      You have your assets, you have your net equity in

04:03:08   3   assets, you have your ability to pay over the life of the

04:03:11   4   statute, whatever it's remaining, and then you put those two

04:03:14   5   together, that's what you're required to offer the IRS;

04:03:18   6   correct?

04:03:18   7   **A**      Yes.

04:03:18   8   **Q**      And that's it.  You could owe $10 million, a hundred

04:03:21   9   million dollars, or a hundred thousand dollars.

04:03:22   10         That's the analysis; correct?

04:03:23   11  **A**      Correct.

04:03:24   12  **Q**      And when Mr. Yackshaw, not Mr. DiPietro, submitted the

04:03:30   13  offer; right?

04:03:32   14  **A**      Mr. Yackshaw submitted it, yes.

04:03:34   15  **Q**      Correct.

04:03:34   16         After he was terminated; correct?

04:03:36   17  **A**      Yes.

04:03:37   18  **Q**      His POA was no longer -- this is solely Mr. Yackshaw's

04:03:42   19  work; correct?

04:03:42   20  **A**      Yes.

04:03:43   21  **Q**      He filed it in Holtsville, New York; correct?

04:03:45   22  **A**      Yes.

04:03:45   23  **Q**      And that is where offers in compromise are required to

04:03:49   24  be filed; correct?

04:03:50   25  **A**      No.  Normally, in the field, we receive the offers

**D. Ross  (Cross by Fedor)**                                    635

04:03:56  1    directly from taxpayers and then we forward them to

04:03:59  2    Holtsville.  Now, the taxpayers may send them directly to

04:04:03  3    Holtsville, and that's what happened in this case.

04:04:05  4    **Q**    Right.  There's no policy that requires them to submit

04:04:07  5    the offer directly to you.  They could copy you; correct?

04:04:10  6    **A**    I'm not aware of it.

04:04:11  7    **Q**    Correct.

04:04:12  8         So filing the offer in compromise that Mr. Karasarides

04:04:15  9    authorized Mr. Yackshaw to file with Holtsville, New York,

04:04:21  10   there's nothing wrong with that?

04:04:23  11   **A**    Well, that's what they chose to do.  I don't know

04:04:25  12   if -- I don't know the intention.  In other words, I don't

04:04:28  13   know if --

04:04:30  14   **Q**    Well, you'd agree --

04:04:31  15   **A**    -- Mr. Yackshaw was trying to --

04:04:32  16   **Q**    Sorry.

04:04:34  17   **A**    -- bypass me and bypass my knowledge of the offer.

04:04:41  18   **Q**    Do you believe that's what was happening?

04:04:43  19   **A**    I don't know.

04:04:45  20   **Q**    Well, it -- you know --

04:04:47  21   **A**    In general, my cases, people file the offers through

04:04:51  22   me.  Not always.

04:04:55  23   **Q**    Okay.  We'll get to that in your ICS history.

04:05:00  24        Let's move forward to Page 33 of the ICS history,

04:05:04  25   please.

**D. Ross (Cross by Fedor)** 636

04:05:05  1    Your action date of May 14th, 2015.  You're now

04:05:10  2  2 years, 3 months into your assignment for the collection,

04:05:15  3  and you're following up with the Secret Service still;

04:05:18  4  correct?

04:05:18  5  **A**    Right.

04:05:19  6  **Q**    So we are now, what, year and a half, give or take, of

04:05:24  7  your efforts to try to get that 500,000 bucks applied?

04:05:29  8  **A**    Yes.

04:05:29  9  **Q**    Okay.  What does it say here?

04:05:35  10  **A**    Which -- which part do you want me to read?

04:05:38  11  **Q**    Let's -- I'll just -- the Secret Service is unable to

04:05:43  12  open the other documents properly.  The tax -- "SA says that

04:05:48  13  the taxpayer should have money to pay while it may be less

04:05:52  14  likely at the home since there have been two raids at the

04:05:54  15  home already."

04:05:55  16    That's your discussion you talked about with Mr. Bean

04:05:57  17  on direct; correct?

04:05:59  18  **A**    Exactly.

04:06:00  19  **Q**    Don't bother going there, you're not going to get it?

04:06:02  20  **A**    Right.

04:06:02  21  **Q**    We already got it.  We're the Secret Service, and we

04:06:05  22  took it?

04:06:05  23  **A**    Well, his attitude was, Mr. Karasarides would be

04:06:10  24  unlikely to store cash at his house after two raids.

04:06:12  25  **Q**    Well, and getting $500,000, don't forget that.  It's

04:06:17  1    not small money.

04:06:18  2    **A**    I can't verify that $500,000.  I can't verify how much

04:06:21  3    the Secret Service was holding.

04:06:25  4    **Q**    Well, but certainly Mr. DiPietro represented to you

04:06:27  5    that he thought it was $500,000?

04:06:29  6    **A**    Yes.

04:06:29  7    **Q**    And they were offering to pay that, whatever it was.

04:06:34  8    **A**    It wasn't going to be returned either way.  I mean --

04:06:36  9    **Q**    Right --

04:06:37  10   **A**    -- it could be applied to the IRS, that's fine.

04:06:39  11   **Q**    Because both these gentlemen sitting here wanted it to

04:06:41  12   go to you.

04:06:42  13   **A**    Yes.

04:06:53  14           MR. FEDOR:  If we turn to Page 37, please.

04:06:57  15   BY MR. FEDOR:

04:06:57  16   **Q**    It says -- the last action date dated July 1st of

04:07:03  17   2015, on Page 37, you called Mr. DiPietro back, you gave him

04:07:09  18   a balances due by the period.  And it said, "The taxpayer

04:07:13  19   wants to address the tax lien on the three inner city

04:07:17  20   properties"; right?

04:07:18  21   **A**    Yes, sir.

04:07:19  22   **Q**    You then went to talk to an advisor about it, see what

04:07:22  23   could be done; correct?

04:07:26  24   **A**    I said I would talk to discharge advisor, see if that

04:07:30  25   can be done.

**D. Ross  (Cross by Fedor)**                                      638

04:07:31  1   **Q**     Correct.

04:07:31  2        And who was that that you talked to; do you know?

04:07:33  3   **A**     I don't recall.  I didn't list the name.

04:07:35  4   **Q**     Okay.  Do you know who the discharge advisor is that

04:07:38  5   you'd normally call?

04:07:39  6   **A**     Back in 2015, no.  Sorry.

04:07:42  7   **Q**     I don't know how many of them there are, so perhaps it

04:07:44  8   was one or --

04:07:46  9   **A**     I don't recall.

04:07:47  10  **Q**     Okay.  Did you have a discussion with the discharge

04:07:49  11  advisor?

04:07:52  12  **A**     I don't recall.

04:07:53  13  **Q**     So, again, this is Mr. Karasarides, this is

04:07:57  14  Mr. DiPietro on his behalf saying, hey, we want to pay you,

04:08:01  15  we're trying to pay you, will you talk with the guy who's

04:08:04  16  involved with the lien and see if we can get this released

04:08:06  17  or withdrawn or temporarily discharged so we can give you

04:08:10  18  money; correct?

04:08:11  19  **A**     Right, but I've never seen in my 41 years a case where

04:08:15  20  we did a discharge where there were installment payments

04:08:20  21  made.  It's not like they wanted to make payments to the IRS

04:08:23  22  on these inner city properties, basically like mortgage and

04:08:27  23  then pay it off over time.  And I had never heard of that

04:08:31  24  done.

04:08:32  25        I mean, we're not Rocket Mortgage, okay?  We want to

**D. Ross  (Cross by Fedor)**                                     639

04:08:34  1    collect the fair market value of the property at the same

04:08:38  2    time.

04:08:38  3    **Q**    Of course.

04:08:39  4    **A**    And not string it along.

04:08:40  5    **Q**    Of course.

04:08:42  6         But did you ever develop this issue?  Did you get

04:08:44  7    further details about how they were trying to pay you?

04:08:47  8    Maybe it was a lump sum.  Maybe it was a lump sum in

04:08:51  9    60 days.  Did you ever develop that issue?

04:08:53  10   **A**    I don't know.  I don't recall.

04:08:55  11   **Q**    So it's another -- but they were trying to offer money

04:08:57  12   again; correct?

04:08:58  13   **A**    Well, I think at this time we were already getting

04:09:01  14   levies from the Stark County metropolitan housing because

04:09:05  15   Mr. Karasarides had tenants in these properties.  So we were

04:09:09  16   getting -- we were getting monthly payments on these

04:09:12  17   properties.

04:09:12  18   **Q**    And I agree with you, you were, but this is over and

04:09:16  19   above that.  They're trying to get you money out of the

04:09:18  20   equity in the asset.

04:09:19  21   **A**    Right.

04:09:20  22   **Q**    Not the regular payments that would come to you under

04:09:23  23   rental income; right?

04:09:24  24   **A**    Well, I believe we needed a bona fide buyer to come up

04:09:27  25   with the money at one time rather than making payments over

**D. Ross  (Cross by Fedor)**                                    640

04:09:31  1 | time.

04:09:31  2 | **Q**    Exactly.

04:09:32  3 |        And my question is, did you ever follow up with that?

04:09:34  4 | **A**    I don't recall that.

04:09:36  5 | **Q**    Okay.  And going back to your 41 years, I believe you

04:09:40  6 | previously testified here just a little bit ago you had

04:09:43  7 | never seen a land contract like this either?

04:09:45  8 | **A**    Not of this size in one of my cases, I don't believe.

04:09:49  9 | **Q**    And you didn't know what to do with that, so you

04:09:51  10 | reached out to somebody else to get the right legal advice

04:09:54  11 | what to do with the land contract or not; right?

04:09:56  12 | **A**    No, my research in the legal reference guide for the

04:10:00  13 | IRS indicated that we do have an interest in land contracts.

04:10:02  14 | It wasn't like I was clueless.  You know, I was just trying

04:10:07  15 | to get clarification on procedure, you know, pitfalls,

04:10:11  16 | issues, things likes that.

04:10:12  17 | **Q**    Right.  And that wasn't what I meant by asking that

04:10:15  18 | either.

04:10:15  19 |        It was because there's always valuation issues too;

04:10:19  20 | right?

04:10:19  21 | **A**    Right.

04:10:19  22 | **Q**    Is it worthwhile pursuing it?

04:10:20  23 | **A**    Right.

04:10:21  24 | **Q**    Is there enough equity there?

04:10:23  25 | **A**    Right.

**D. Ross (Cross by Fedor)** 641

04:10:23 1 **Q** Who gets what interest and how is it broken out;

2 right?

3 **A** Right.

04:10:25 4 **Q** Are there other liens involved. There's all those

04:10:27 5 issues.

04:10:30 6 And once again, on July 1st, 2015, you advised

04:10:34 7 Mr. DiPietro, "We plan to seize assets. That's going to be

04:10:37 8 my recommendation."

04:10:38 9 **A** Right.

04:10:38 10 **Q** So you were clear on that, correct, Mr. Ross?

04:10:44 11 **A** Yes.

04:10:45 12 **Q** That's the first line in Paragraph 2.

04:10:59 13 MR. FEDOR: And if we could turn to Page 41,

04:11:01 14 then, thereafter. The entry dated November 17th of 2015,

04:11:10 15 the top -- the performance of Page 41, the top of Page 42,

04:11:15 16 please, Carissa. Thank you.

17 BY MR. FEDOR:

04:11:17 18 **Q** Mr. DiPietro calls, correct, and says he's no longer

04:11:20 19 representing Mr. Karasarides; right?

04:11:21 20 **A** That's correct.

04:11:23 21 **Q** And was that the last time you spoke with

04:11:26 22 Mr. DiPietro?

04:11:31 23 **A** I don't know. I can't recall. I may have served an

04:11:35 24 additional summons after this point. I'm not sure.

04:11:37 25 **Q** That was certainly the last time he represented

**D. Ross  (Cross by Fedor)**                    642

04:11:40    1    Mr. Karasarides before the IRS; correct?

04:11:45    2    **A**    The best of my knowledge.

04:11:46    3    **Q**    Right.

04:11:46    4        You don't recall Mr. DiPietro re-entering the case,

04:11:50    5    filing another power of attorney?

04:11:51    6    **A**    No, I do not.

04:12:06    7            MR. FEDOR:  If we could turn to Page 49,

04:12:08    8    please.

04:12:17    9    BY MR. FEDOR:

04:12:17   10    **Q**    So Mr. DiPietro's out of this matter November of 2015;

04:12:22   11    you're still working the case.

04:12:24   12        You still have a collection matter; correct?

04:12:26   13    **A**    Correct.

04:12:26   14    **Q**    And you're still trying to pursue assets.  You're

04:12:30   15    still trying to develop the land contract, and you're trying

04:12:32   16    to get the Service paid; correct?

04:12:33   17    **A**    Correct.

04:12:34   18    **Q**    You're doing your job?

04:12:35   19    **A**    Yes.

04:12:38   20    **Q**    Page 49, midway through, your action date on

04:12:41   21    August 1st of 2016, that's the date I'm thinking that you

04:12:45   22    find out that the offer in compromise was filed.  Correct?

04:12:49   23    **A**    Correct.

04:12:52   24    **Q**    And then you ask Holtsville, New York, where it was

04:12:56   25    filed, hey, can I -- can you send me a copy of it; correct?

**D. Ross (Cross by Fedor)**                                    643

04:12:59  1   **A**    Yes.  I asked for a copy.

04:13:02  2   **Q**    And I believe you testified on direct that it's

04:13:06  3   typical that if you have a revenue officer in the field,

04:13:09  4   they want to review if an offer in compromise has been

04:13:12  5   filed, just say is it good, is it bad, should it be

04:13:15  6   considered or not; correct?

04:13:16  7   **A**    They do want input.  There's a form even for that.  We

04:13:19  8   have a form for everything.

04:13:20  9   **Q**    And I believe that's Form 657.  Right?

04:13:22  10  **A**    Exactly.

04:13:34  11  **Q**    I'm not going to get too far into the weeds with

04:13:37  12  Mr. Yackshaw, but I think it was clear that he was

04:13:41  13  vehemently opposed to you pulling the offer back; correct?

04:13:44  14  **A**    Probably an understatement.

04:13:47  15  **Q**    Well, explain what your thought was on that.

04:13:50  16  **A**    Well, he was very upset that the offer wasn't put into

04:13:54  17  our terms, the pipeline, to be reviewed formally to see if

04:13:59  18  the offer was a decent offer that the IRS should accept or

04:14:07  19  not.

04:14:07  20  **Q**    And, in fact, he asked for a conference call with your

04:14:10  21  manager; correct?

04:14:11  22  **A**    Yes.

04:14:12  23  **Q**    And at one point -- I believe it was Mr. Yurick was

04:14:15  24  your manager; right?

04:14:16  25  **A**    Right.

**D. Ross  (Cross by Fedor)**                    644

04:14:17  1  **Q**     And you, Mr. Yurick, and Mr. Yackshaw had a conference

04:14:20  2  call?

04:14:20  3  **A**     Yes.

04:14:20  4  **Q**     And what did you discuss on that call?

04:14:22  5  **A**     Well, the reasons that we gave to Holtsville why the

04:14:29  6  offer should be returned.

04:14:31  7  **Q**     Okay.  And what was Mr. Yackshaw's response?

04:14:35  8  **A**     Well, he was -- he disagreed with our determination.

04:14:40  9  **Q**     That's an understatement; correct?

04:14:41  10  **A**     Exactly, yes.

04:14:42  11  **Q**     And wasn't there a point in time where Mr. Yackshaw

04:14:45  12  actually filed a written complaint and complained about you?

04:14:48  13  **A**     He filed something with the taxpayer advocate service

04:14:53  14  that I found out later.

04:14:54  15  **Q**     Okay.

04:14:54  16  **A**     Objecting to our procedures -- or, you know, our

04:14:57  17  decision.

04:14:57  18  **Q**     And for -- so the jurors understand, who is the

04:14:59  19  taxpayer advocate?

04:15:02  20  **A**     They're trying to do -- to act as a -- resolve,

04:15:10  21  troubleshooting complaints, taxpayer hasn't gotten a refund

04:15:14  22  in 6 months, you know, problems like that, that -- you know,

04:15:18  23  they're trying to short-cut the system and see what they can

04:15:23  24  do to help the taxpayer where there's disputes that can't be

04:15:26  25  resolved.

**D. Ross  (Cross by Fedor)**                                      645

04:15:26   1    **Q**    All right.  They try to resolve problems, right, and

04:15:30   2    resolve disputes?

04:15:30   3    **A**    Yes.

04:15:31   4    **Q**    And he reached out to I believe a national taxpayer

04:15:33   5    advocate; correct?

04:15:35   6    **A**    I'm not sure.

04:15:35   7    **Q**    Okay.  We'll visit that in a moment.

04:15:38   8    And complained about your lack of consideration of the

04:15:40   9    offer and your lack of attention to -- you know, to your

04:15:44   10   review and your analysis?

04:15:45   11   **A**    Right.

04:15:48   12   And we provided analysis to Mr. Yackshaw that I faxed

04:15:51   13   him, and then I determined the equity in the assets.

04:15:55   14   **Q**    Yeah.  That was the outcome of the conference call you

04:15:57   15   had with Mr. Yurick and him; right?

04:16:00   16   **A**    Right.

04:16:05   17   **Q**    So what can you tell me about Mr. Yackshaw?  He was on

04:16:11   18   the case --

04:16:11   19   **A**    I don't recall ever -- I don't know if I've ever had a

04:16:14   20   case before this with him.

04:16:16   21   **Q**    Do you know if it was --

04:16:17   22   **A**    I know he's a tax attorney in Canton.  That's all I --

04:16:21   23   basically.

04:16:21   24   **Q**    Okay.  And you had never interfaced with him prior?

04:16:23   25   **A**    I don't recall.

**D. Ross  (Cross by Fedor)**                    646

04:16:25  1   **Q**    Okay.  None of this had anything to do with

04:16:30  2   Mr. DiPietro after November of 2015; correct?

04:16:33  3   **A**    Correct.

04:16:33  4   **Q**    It was strictly Mr. Yackshaw?

04:16:35  5   **A**    Yes.  Correct.

04:16:36  6   **Q**    Okay.  Do you know what law firm he worked at?

04:16:40  7   **A**    Day Ketterer.

04:16:41  8   **Q**    Right.

04:16:42  9         Do you know anything about that law firm?

04:16:43  10  **A**    Not much.

04:16:44  11  **Q**    Do you know if it's still in existence today?

04:16:47  12  **A**    It's my understanding it's no longer in existence,

04:16:54  13  defunct.

04:16:55  14  **Q**    Have you ever met Mr. Tom Hartnett?

04:17:08  15  **A**    In what relation?  Do you reference this on the ICS

04:17:14  16  history?

04:17:15  17  **Q**    No, it's not referenced in the ICS history, just a

04:17:18  18  question.

04:17:18  19  **A**    What's the last name?

04:17:20  20  **Q**    Hartnett, H-a-r-t-n-e-t-t.

04:17:23  21  **A**    I don't recall.

04:17:23  22  **Q**    Okay.

04:17:24  23             DEFENSE ATTORNEY:  Carissa, could we go to

04:17:27  24  Exhibit 177?

04:17:36  25  BY MR. FEDOR:

**D. Ross (Cross by Fedor)**  647

| | | |
|---|---|---|
| 04:17:36 | 1 | **Q**     I'm not going to get into this in too much detail |
| 04:17:40 | 2 | because Mr. Bean already did, but this is the offer in |
| 04:17:42 | 3 | compromise that was filed on Mr. Yackshaw; correct? |
| 04:17:44 | 4 | **A**     Yes, sir. |
| 04:17:44 | 5 | **Q**     And it was dated received July 14th of I think that's |
| 04:17:48 | 6 | '16; correct? |
| 04:17:49 | 7 | **A**     Yes, sir. |
| 04:17:50 | 8 | **Q**     And attached to that is Exhibit 176, which is your 433 |
| 04:17:55 | 9 | statement; correct? |
| 04:17:58 | 10 | Do you want us to pull it up? |
| 04:18:00 | 11 | MR. FEDOR:  Can we pull up 176 real quick, |
| 04:18:03 | 12 | Carissa? |
| 04:18:04 | 13 | THE WITNESS:  Yeah, I see Exhibit 176. |
| 04:18:06 | 14 | BY MR. FEDOR: |
| 04:18:06 | 15 | **Q**     Correct. |
| 04:18:07 | 16 | And when you file an offer in compromise, if you're |
| 04:18:10 | 17 | married, do you know what you're required to report on the |
| 04:18:12 | 18 | 433 form? |
| 04:18:17 | 19 | **A**     Let me see. |
| 04:18:20 | 20 | You should include income from the non-liable spouse, |
| 04:18:24 | 21 | I believe, on the collection information statement. |
| 04:18:27 | 22 | **Q**     What about a non-liable spouse's assets, do those need |
| 04:18:30 | 23 | to be included? |
| 04:18:32 | 24 | **A**     Not to my knowledge. |
| 04:18:34 | 25 | **Q**     Right. |

04:18:34  1          They're not; correct?

04:18:37  2      **A**    Not to my knowledge.

04:18:38  3      **Q**    So let's go back to what an offer in compromise is.

04:18:41  4          It's two things, right?  Cash flow; correct?

04:18:44  5      **A**    Pardon?

04:18:45  6      **Q**    Cash flow in the household, the household income?

04:18:48  7      **A**    Right.

04:18:48  8      **Q**    So that would include the non-liable spouse, whatever

04:18:52  9  year she contributes to the household; correct?

04:18:55  10     **A**    Yes.

04:18:55  11     **Q**    And then the assets of the taxpayer that's trying to

04:18:58  12  get his offer in compromise completed and resolve his tax

04:19:01  13  problem; right?

04:19:01  14     **A**    Yes.

04:19:02  15     **Q**    And those two things combined is what makes an offer

04:19:05  16  in compromise; correct?

04:19:06  17     **A**    If a person's married, yes.

04:19:08  18     **Q**    Correct.  Nothing else.

04:19:10  19          So if a non-liable spouse has separate business

04:19:13  20  interests, it's not part of this; right?

04:19:16  21     **A**    It depends.

04:19:18  22     **Q**    It depends on what?

04:19:20  23     **A**    How the spouse acquired the business.  Is there any

04:19:23  24  business -- relationship to those assets from the liable

04:19:27  25  spouse.  Did she receive those as a gift from the spouse

**D. Ross  (Cross by Fedor)**   649

04:19:31  1   that owes taxes.  I mean, just the fact that she owns

04:19:35  2   something on paper would not necessarily mean that we

04:19:40  3   wouldn't look at it.

04:19:41  4   **Q**   That was --

04:19:42  5   **A**   How did she acquire those assets, you know, the

04:19:45  6   background in other words.

04:19:45  7   **Q**   Right.

04:19:45  8        But generally speaking -- and that wasn't my question.

04:19:48  9   **A**   Okay.

04:19:48  10  **Q**   Generally speaking, a non-liable spouse has no

04:19:51  11  obligation to report -- the taxpayer seeking the offer has

04:19:54  12  no obligation to report a non-liable spouse's assets;

04:19:58  13  correct?

04:19:58  14  **A**   Not to my knowledge.

04:19:59  15  **Q**   Correct.  Thank you.

04:20:18  16          MR. FEDOR:  Carissa, could we go to

04:20:20  17  Exhibit 100?

04:20:24  18       Thank you very much.

04:20:25  19  BY MR. FEDOR:

04:20:27  20  **Q**   I don't recall if Mr. Bean reviewed this with you,

04:20:30  21  Mr. Ross.  What is this again?

04:20:33  22  **A**   It's an account transcript for the tax year 2009,

04:20:39  23  Form 1040, for Christos Karasarides, Jr.

04:20:43  24  **Q**   And what's the date of this printout?

04:20:47  25  **A**   December 11th, 2023.

**D. Ross  (Cross by Fedor)**                                    650

| | | |
|---|---|---|
| 04:20:50 | 1 | **Q**    So, what, 2, 3 weeks ago; correct? |
| 04:20:55 | 2 | **A**    Right. |
| 04:20:56 | 3 | **Q**    And what's the current account balance on this for the |
| 04:20:59 | 4 | 2009 year? |
| 04:21:00 | 5 | **A**    Shows 0. |
| 04:21:04 | 6 |              MR. FEDOR:  And if we could turn to Page 2. |
| 04:21:08 | 7 |          And Page 3. |
| 04:21:10 | 8 |          Thanks, Carissa. |
| 04:21:11 | 9 |          And Page 4. |
| 04:21:12 | 10 |          And 5. |
| 04:21:14 | 11 | BY MR. FEDOR: |
| 04:21:15 | 12 | **Q**    And I believe scrolling through here, these are all |
| 04:21:20 | 13 | the levy payments received on behalf of Mr. Karasarides; |
| 04:21:23 | 14 | correct? |
| 04:21:23 | 15 | **A**    Yes. |
| 04:21:24 | 16 | **Q**    The $500, I don't know how often they came in.  It |
| 04:21:29 | 17 | looks like monthly, give or take? |
| 04:21:30 | 18 | **A**    Right. |
| 04:21:31 | 19 | **Q**    And that was your levy proceeds from his Canton |
| 04:21:34 | 20 | rentals; right? |
| 04:21:35 | 21 | **A**    Right. |
| 04:21:35 | 22 | **Q**    And so you're getting paid on a monthly basis -- I |
| 04:21:39 | 23 | shouldn't say you. |
| 04:21:40 | 24 |          The Service is getting paid on a monthly basis based |
| 04:21:43 | 25 | upon the money you're getting from his rental properties; |

**D. Ross  (Cross by Fedor)**                              651

04:21:45  1  correct?

04:21:45  2  **A**    Correct.

04:21:46  3  **Q**    And that was never contested by Mr. Karasarides, was

04:21:49  4  it?

04:21:49  5  **A**    No, sir.

04:21:49  6  **Q**    It wasn't contested by Mr. DiPietro, was it?

04:21:52  7  **A**    No, sir.

04:21:52  8  **Q**    They allowed that to happen?

04:21:54  9  **A**    Well, they couldn't really stop it, but they didn't

04:21:58  10  make a formal objection.

04:21:59  11  **Q**    Thank you.

04:22:00  12      And I believe — and correct me if I'm wrong — it's the

04:22:06  13  Service's policy, any monies that you receive are required

04:22:09  14  to be applied to the oldest period that's open and there's a

04:22:13  15  balance due, correct, generally speaking?

04:22:14  16  **A**    Generally speaking.

04:22:16  17          MR. FEDOR:  Can we turn to the next page,

04:22:18  18  Carissa?

04:22:18  19  BY MR. FEDOR:

04:22:19  20  **Q**    And you'll see the second last entry on this exhibit,

04:22:22  21  says, write-off balance due December 12th, 2022, 270,000 and

04:22:29  22  change; correct?

04:22:30  23  **A**    Yes, sir.

04:22:30  24  **Q**    And what does that mean to you?

04:22:32  25  **A**    What it means to me is that particular tax period went

**D. Ross  (Cross by Fedor)**                                     652

04:22:37  1   to 0 balance when -- on the civil side when the collection

04:22:43  2   statute expired.

04:22:46  3   **Q**     And did you participate in the collection statute

04:22:52  4   analysis?

04:22:58  5   **A**     I believe I did review that.

04:22:59  6   **Q**     Okay.  And you were aware when the statutes were

04:23:02  7   expiring; correct?

04:23:04  8   **A**     Yes.

04:23:05  9   **Q**     You kept track of that; correct?

04:23:07  10  **A**     Well, I didn't keep track of it on my records after,

04:23:13  11  you know, late 2016, early 2017.  I would respond if a

04:23:19  12  special agent contacted me and says, you know, we want to

04:23:23  13  update a balances due or had a question on a particular

04:23:26  14  period or something.  You know, I would respond to that.

04:23:30  15  But I didn't have a file where I was keeping track of

04:23:33  16  these -- the civil assessments.

04:23:35  17  **Q**     Okay.

04:23:37  18            MR. FEDOR:  Carissa, could we turn to

04:23:39  19  Exhibit 102?

04:23:44  20       Thank you.

04:23:48  21  BY MR. FEDOR:

04:23:48  22  **Q**     And this is the same account transcript for tax year

04:23:51  23  2011; right?

04:23:52  24  **A**     Yes.

04:23:53  25  **Q**     And it's dated December 11th of 2023; correct?

**D. Ross  (Cross by Fedor)**                                    653

04:23:57  1   **A**     Yes, sir.

04:23:58  2   **Q**     And this is evidently, as of this date, a statute

04:24:02  3   which has not expired; correct?  There's a balance due?

04:24:06  4   **A**     It shows a balance due.  I don't -- I don't see the

04:24:09  5   complete transcript, so. . .

04:24:11  6              MR. FEDOR:  Okay.  Can you turn to Page 2?

04:24:13  7          Thanks, Carissa.

04:24:14  8          Page 3.

04:24:17  9          Page 2, back.

         10   BY MR. FEDOR:

04:24:20  11   **Q**     So that's the whole history.  It has not been written

04:24:23  12   off yet; correct?

04:24:24  13   **A**     It's still showing a balance at that point.

04:24:26  14   **Q**     Correct.

04:24:27  15              MR. FEDOR:  And can we turn to Exhibit 103?

04:24:35  16   BY MR. FEDOR:

04:24:36  17   **Q**     And this is a 2011 tax return; correct?

04:24:39  18   **A**     Correct.

04:24:40  19   **Q**     And I believe you had testified on direct that you

04:24:44  20   reviewed a number of tax returns related to Mr. Karasarides;

04:24:46  21   correct?

04:24:47  22   **A**     Correct.

04:24:47  23   **Q**     And did you review those in preparation for today's

04:24:51  24   testimony, or did you review those as you were collecting --

04:24:55  25   assigned the collection case for Mr. Karasarides?

**D. Ross  (Cross by Fedor)**                    654

04:24:58  1    **A**    It's the normal course that I would review tax

04:25:02  2    returns.  I don't recall specifically sitting down on a

04:25:04  3    certain date and looking at these.  I did review these in

04:25:08  4    preparation for testimony.

04:25:09  5    **Q**    Okay.  And how many times did you meet with the

04:25:11  6    government to prepare for your testimony?

04:25:14  7    **A**    I believe twice.

04:25:30  8            MR. FEDOR:  Nothing further, Your Honor.

04:25:31  9            THE COURT:  Thank you.

04:25:32  10           Well, it's like 25 after 4:00.  We probably shouldn't

04:25:36  11   start Mr. Goldberg until tomorrow.  I think that Morgan

04:25:41  12   wants to get home.  Her husband's got a surprise for her or

04:25:44  13   something, we think, so we're hoping that.

04:25:47  14           Okay, folks, you've heard quite a bit of testimony.

04:25:50  15   You haven't heard it all.  Keep in mind the admonition.

04:25:53  16           Now, I don't know what to tell you about the weather.

04:25:55  17   I get people telling me, oh, it's going to be terrible,

04:25:59  18   other people say don't worry about it.  Don't know -- you

04:26:02  19   know, be safe.  Don't try to rush in.

04:26:04  20           We are scheduled -- we don't -- this building, as far

04:26:07  21   as I've ever been here, it's been a long time too, we've

04:26:10  22   never been closed, so. . . and a couple people have a long

04:26:17  23   way to go.  But everybody will do their best to be here.

04:26:20  24   You could always call and double-check, but I think we're

04:26:23  25   set to go forward regardless.

04:26:26  1      But keep in mind the admonition, and we'll see you

04:26:28  2  about 8:15 or thereabouts.

04:26:32  3      You can get here then, Morgan, right after your big

04:26:34  4  night?

04:26:38  5          COURTROOM DEPUTY:  All rise.

04:27:27  6          (Jury excused from courtroom at 4:27 p.m.)

04:27:27  7          COURTROOM DEPUTY:  Court is adjourned.

04:50:48  8          (Proceedings adjourned at 4:27 p.m.)

9              *  *  *  *  *

10

11          **C E R T I F I C A T E**

12

13      I certify that the foregoing is a correct transcript

14  of the record of proceedings in the above-entitled matter

15  prepared from my stenotype notes.

16

17      */s/ Heather K. Newman*          *01-18-2024*
          HEATHER K. NEWMAN, RMR, CRR          DATE

18

19

20

21

22

23

24

25